## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**JANE DOE, M.D., and JOHN DOE,**

  **Plaintiffs,**

  **v.**

**THE UNIVERSITY OF COLORADO,**

**DONALD ELLIMAN, Chancellor of the University of Colorado Anschutz School of Medicine, in his official capacity, and**

**SHANTA ZIMMER, M.D., Senior Associate Dean of Medical Education, University of Colorado Anschutz School of Medicine, in her official capacity,**

  **Defendants.**

**JURY TRIAL DEMANDED**

## VERIFIED COMPLAINT
## FOR TEMPORARY AND PERMANENT INJUNCTION AND DAMAGES

1.　The University of Colorado has enacted a Policy dividing its staff and students into two categories based on their religious beliefs: the "sheep," whose religions teach the approved orthodoxy, receive exemptions to the University's COVID vaccine mandate, while the "goats," who hold non-approved religious beliefs, are denied exemptions and then fired or expelled. Only those who belong to religions "whose *teachings* are opposed to *all* immunizations" may ascend to the University's Valhalla. All others, including Plaintiffs here—a Catholic and a Buddhist—must be cast out.

2.　The University's foray into theology has gone even further, with its administrators probing and debating the religious beliefs of its staff and students and imposing value judgments on believers in an Inquisition process that further violates the First Amendment.

3.      The University is unapologetically, aggressively enforcing this Policy to the detriment of the Plaintiffs, a physician on staff, and a medical student who had recently begun his first year of studies, at the University's Anschutz School of Medicine.

4.      Plaintiffs have sincere religious objections to the COVID vaccines currently available to them – John Doe because of the tenets of his Buddhist faith and Dr. Jane Doe because of the tenets of her Roman Catholic faith.

5.      Dr. Jane Doe will be imminently fired from the Anschutz's teaching faculty and lose her staff privileges at the Anschutz's teaching hospital in Colorado Springs as early as October 1, 2021, because of her religiously grounded inability to accept the Pfizer, Moderna, or Johnson & Johnson COVID vaccines.  She will be unable to practice her profession as a pediatric care specialist within 100 miles of the medical school campus in Aurora, or of its associated Children's Hospital in Colorado Springs—and effectively in the entire state of Colorado—for a period of two years as a result if she is fired.

6.      John Doe has been forced to take a leave of absence from his studies at Anschutz also because of his religiously grounded inability to accept the Pfizer, Moderna, or Johnson & Johnson COVID vaccines, and is currently barred from all Anschutz property.  He will be unable to begin his medical studies anew anywhere in the United States, without finding a new medical school that would accept him under these circumstances and then applying for and securing admission to that new school.

7.      The University's foray into explicit religious discrimination violates the deepest traditions of government neutrality towards religion, as originally enshrined in the Establishment and Free Exercise Clauses of the First Amendment and as applied to state actors like Colorado in

the Fourteenth Amendment. Since the University has refused to voluntarily back down from this Policy, immediate judicial intervention is now necessary.

**Parties**

8.      Plaintiff Jane Doe, M.D., is a physician licensed to practice medicine by the state of Colorado. She is currently employed as a pediatric physician by the University of Colorado Anschutz School of Medicine and is assigned to Children's Hospital of Colorado Springs, one of the teaching hospitals of Anschutz. She is a devout Catholic who was raised in the faith, founded a student pro-life group known as Physicians for Life while in medical school, and in 2018 obtained a master's degree in Catholic bioethics from the University of Mary in North Dakota, in association with the National Catholic Bioethics Center.

9.      Plaintiff John Doe was until earlier this fall a first-year student at the Anschutz School of Medicine. He is, however, being forced out of that program by Defendants' unlawful Policy and actions, as alleged in this Verified Complaint. Mr. Doe is a devout Buddhist who made a vow to the Buddha 10 years ago (after visiting a significant monastery in China) that he would live a moral life. After that he began practicing meditation, reading scriptures and Buddhist teachings, avoiding products developed through the killing or harming of animals (including human beings), and overall seeking to formulate his life consistent with the "five precepts" of Buddhism.

10.      The University of Colorado is a constitutionally created body of the State of Colorado and consists of schools situated throughout the State, including the Anschutz School of Medicine.

11.      Defendant Donald Elliman is the Chancellor of the University of Colorado Anschutz School of Medicine and is sued in his official capacity. He is the agent authorized by

3

the University to enact and enforce policies governing the educational and employment practices of the Anschutz School of Medicine.

12.     Defendant Shanta Zimmer is the Senior Associate Dean of Medical Education, University of Colorado Anschutz School of Medicine and is sued in his official capacity.  She is the agent authorized by the University and Defendant Elliman to enforce policies governing the student life and study at the Anschutz School of Medicine.

13.     In adopting and enforcing the University of Colorado Anschutz School of Medicine's COVID-19 Vaccination Policy challenged by this suit, Defendants have acted under color, regulation, custom, or usage, of an arm of the state of Colorado.

## Jurisdiction and Venue

14.     Three of the four discrete claims in this action arise under the First and Fourteenth Amendments to the United States Constitution and are brought pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     The Court has jurisdiction over the Plaintiffs' claim under the Colorado Constitution under the supplemental jurisdiction provision of the Judicial Code, 28 U.S.C. §1367(a).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

17.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

18.    This Court is authorized to grant Plaintiffs' prayer for temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

19.    This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## FACTS

### A.  Relevant terms and requirements of Defendants' vaccination policy

20.    A copy of the currently effective "University of Colorado Anschutz Medical Campus['s] COVID-19 Vaccination Requirement and Compliance" Policy (the "Policy") is attached as Exhibit 1.

21.    As Exhibit 1 shows (p. 1) it was "Prepared By" the Office of University Counsel and "Approved By" Defendant Elliman.  It was made effective as of September 1, 2021, and remains effective as of the filing of this Verified Complaint.

22.    Defendants Elliman and Zimmer have acted as the duly empowered agents of the Defendant University in enacting and enforcing that Policy.

23.    The Policy requires all students, employees, and other individuals "who currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program" or otherwise interact with members of the Anschutz community "regardless of location" to "become fully vaccinated against COVID-19 with a vaccine that has been approved by the World Health Organization . . . subject to limited exceptions and exemptions." (Ex. 1, Policy at (A).)

24.    The Policy then provides for two kinds of exemptions: medical and religious. (*Id.* at (C)(2).) "Medical" exemptions are allowed "if vaccination is medically contraindicated due to

other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health," as attested to by a qualifying medical professional. (*Id.*)

25. As to "religious" exemptions, the Policy states as follows: "A religious exemption may be submitted based on a person's religious belief whose teachings [*sic*] are opposed to all immunizations." (*Id.*)

26. As both Plaintiffs' experience shows, the confused malapropism "religious belief whose *teachings*" oppose "*all* immunizations*"* imposes two necessary conditions to Defendants' consideration of any religious accommodation, namely:

   a. That the person requesting a religious accommodation have a sincere religious belief that opposes acceptance of "all immunizations" and vaccines; and

   b. That the person requesting a religious accommodation be a member of an organized religion whose tenets include a hierarchically promulgated, authoritative position on the moral liceity of "all immunizations" and vaccines.

27. Both conditions are clearly forbidden by the Establishment, Free Exercise, and Equal Protection clauses of the United States constitution and the Religious Freedom provisions of the Colorado constitution. Quite literally, they require that a qualifying belief be grounded in an organized religion whose tenets include an authoritative position against the moral liceity of "all immunizations" and vaccines, thus privileging hierarchically prescribed religious belief over autonomously prescribed (yet sincerely held) religious belief.

28. Plaintiffs were denied religious accommodation because of these unlawful conditions.

29. Those who hold the approved religious beliefs, and thus receive a religious exemption, along with those who qualify for a medical exemption, may continue to work and

study at the University, if they "adhere to additional safety protocols, including, but not limited

to wearing masks, social distancing, staying home when sick, quarantining in accordance with

current [CDC] guidance, submitting daily attestations, and undergoing frequent asymptomatic

testing." (*Id.*)

> **B. Plaintiffs' communication to Defendants of their sincere religious beliefs, and Defendants' summary, form rejection under the Policy.**

30.     Plaintiffs communicated their sincere, autonomously derived religious beliefs to

Defendants regarding their opposition to accepting any of the three vaccines.

31.     Plaintiffs shortly thereafter received summary rejections via form-communiques

clearly designed to reject accommodations without individualized consideration.

**Dr. Jane Doe**

32.     On August 20, 2021, Dr. Jane Doe received from the "Vaccine Verify" team to

whom the Defendants delegated the responsibility to deal with accommodation requests from

physicians the following "Dear Employee" form email:

> From: Vaccine Verify <vaccineverify@cuanschutz.edu>
> Sent: Friday, August 20, 2021 5:38 PM
> Subject: Your Vaccine Religious Exemption Request
>
> Dear Employee,
>
> You have submitted a request for an exemption from the vaccination requirements set forth in the campus policy based on a religious exemption. In order to evaluate that request we need you to respond completely to the questions below within 2 business days of recipient of this email. After this information has been reviewed you will be advised as to whether you request for an exemption has been approved or rejected.
>
> Thank you for your prompt attention.
>
> The CU Anschutz Vaccine Verification Team
>
> 1.     **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are**

7

**requesting an exemption?  Please include a detailed response for each vaccine for which you are requesting an exemption.**

**2.   Have you had an influenza or other vaccine in the past? How does this differ?**

[Bolded emphasis in original]

33.     On August 22, 2021, Dr. Jane Doe responded by email to the "Vaccine Verify"

team as follows:

> From: Jane Doe, <XXXXXXX@childrenscolorado.org>
> Sent: Sunday, August 22, 2021 11:14 PM
> To: Vaccine Verify <vaccineverify@cuanschutz.edu>
> Subject: Re: Your Vaccine Religious Exemption Request
>
> Response to questions regarding SARS CoV-2 vaccination:
>
> 1.As a faithful Catholic, I uphold the dignity and sanctity of every human life and firmly oppose abortion and the evil involved in the use of cell lines derived from abortions. All 3 available emergent-use authorized vaccines in the U.S. - Moderna, Pfizer-BioNTech, and Johnson & Johnson - used the abortion-derived cell lines (HEK293) in one or more phases of developing the SARS CoV-2 vaccine.
>
> 2.I have had other vaccines; including influenza - which does not utilize unethically derived cell lines.
>
>  [Jane Doe], MD, MS Bioethics

34.     The position that Dr. Jane Doe expressed there has the public support of the

Roman Catholic bishops of Colorado, among other Catholic authorities, as Defendants know.

The Colorado bishops have published and broadly disseminated to the public at large a letter

expressing their teachings regarding the liceity of the vaccines that says, among other things:

> • Vaccination is not morally obligatory and so must be voluntary.
>
> • There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion; however, it is permissible to use such vaccines only under case-specific conditions—if there are no other alternatives available and the intent is to preserve life.

8

• A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings.

• A person is morally required to obey his or her conscience…

Taken as a whole, these points mean a Catholic may judge it right or wrong to receive certain vaccines for a variety of reasons, and there is no Church law or rule that obligates a Catholic to receive a vaccine.

Exhibit 2 attached. Available at https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-COVID-19-vaccine-mandates/

35.     On August 26, Dr. Jane Doe received by email a form letter that purported to be a formal, final decision from the "Vaccine Verify" team as a documentary attachment.  A copy is attached as Exhibit 3.  In critical part, it stated:

Your exemption request has been denied because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations.

36.     The response made no attempt to hide that the *sole reason* for the denial was that she lacked the qualifying religious beliefs.

37.     On September 15, 2021, Dr. Doe, by and through counsel, sent the University a letter advising it of the constitutional infirmities of the Policy and sought reconsideration of her religious accommodation request. (Exhibit 4 attached) University counsel responded via letter on September 20, 2021 and doubled down on its Policy. (Exhibit 5 attached) That letter entirely ignored the Policy's failure to abide by religious neutrality and instead cited generic caselaw about government authority to require vaccines and to determine whether one's objections to a vaccine are religious or "personal." It also argued for the first time that, despite her care for patients over the past 19 months, and despite the availability of COVID vaccines since at least January 2021, it would now be an "undue hardship" to accommodate Dr. Jane Doe given that her pediatric patients are not eligible for vaccination—an argument that was plainly pretextual. (*Id.*)

38.     In the meantime, notwithstanding the University's alleged compelling interest in requiring that all associated individuals receive vaccinations by September 1, Dr. Jane Doe has been allowed to continue serving her patients at Children's Hospital while exercising the normal protective measures to prevent the spread of COVID—the same ones outlined in the Policy for exemptees. (See Ex. 1, Policy at (C)(2).)

### John Doe

39.     On May 19, 2021, John Doe was assured by campus authorities that "a religious exemption [to vaccination] will just require the individual's signature attesting to it being consistent with their religious beliefs." Exhibit 6 attached. Those forms were provided to Mr. Doe on July 20, and with those and other assurances supplied, he travelled from his home in British Columbia to set up a new life in Colorado and begin study in the University's medical school.

40.     On August 8 and 9, 2021, Mr. Doe had an exchange with Anschutz's ombudsman inquiring about the need for him to seek an exemption from Anschutz's vaccine requirements. (A copy of this exchange is attached as Exhibit 7).  That exchange includes advice from the office of University counsel about the contours of the Policy it was then still developing, including University counsel's belief that no religion only prohibits COVID vaccines. (Exh. 7 at p. 3: "Pursuant to our policy the religious exemption applies to people whose religion precludes all vaccinations. I am unaware of a religion that only prohibits COVID 19 vaccinations.")  But even under this erroneous legal and theological advice, Mr. Doe was given no indication that his religious exemption (to all vaccines) would be denied.

41.     On August 10, 2021, Mr. Doe met personally with Defendant Zimmer about exemption from the COVID vaccines.  A copy of Doe's and Zimmer's follow-up email exchange

is attached as Exhibit 8.  The upshot of that meeting, as that exchange makes clear, is that Mr. Doe would be exempt from the vaccines if he kept to Anschutz protocols for the unvaccinated. See Exh. 8, Doe email: "I am grateful that the Deans are providing me alternatives / accommodations while I am self-quarantined, and I will learn it well to serve patients in the future."  Those protocols, and a formal acknowledgment that he was "vaccine exempted" were then forwarded to John Doe by email on August 13.  A copy of that email is attached as Exhibit 9.

42.     However, soon afterward, an assistant Dean working with Defendant Zimmer, Dr. Brian Dwinnell, advised Mr. Doe that a new vaccination Policy was in place, that his prior exemption was revoked, and that he would need to seek another religious exemption.   A copy of the August 18, email conveying this revocation is attached as Exhibit 10.

43.     On August 23, 2021, Plaintiff John Doe submitted another request for religious accommodation (a copy is attached as Exhibit 11) under the Policy. He also provided a detailed explanation of his Buddhist background and development. He explained how his religious beliefs oppose all vaccinations based on three tenets of Buddhism as he understood them: (1) the power of the mind to heal the body which is disrupted by vaccination; (2) the medicinal purpose of suffering, in which use of medications should be limited and taken only for afflictions one is presently suffering; and (3) the involvement of killing or harming animals in vaccine development, which directly violates "Buddha's teaching on Not-killing and Not-harming." (Exhibit 12 attached, August 22, 2021, letter at pp. 3-5.)

44.     That letter explained that he had received a religious exemption during undergraduate school from lab work that involved the killing of drosophila and mice. (*Id.*, at p. 2.) He also explained that his last vaccination was in 2016 at the University of Michigan (as

required to volunteer at its hospital), which he accepted only after much internal struggle and, upon learning of legal protections for sincere religious beliefs, thereafter "vowed to the Buddha" to "never go against my faith again." (*Id.* at p. 2.) He further stated that consistent with all of these, he now spends much time in meditation, has become a vegan, seeks to avoid using products that involve animal ingredients or animal testing in their development. (*Id.* at 5.)

45.     None of this was good enough for the University. On August 24th, the Student Response Team (headed by Defendant Zimmer) requested "documentation that demonstrates your religion is opposed to all immunizations." (Exhibit 13 attached) The email openly stated that "Citations from specific documents are not sufficient. The University will only accept requests for religious exemption that cite to **the official doctrine of an organized religion, in this case, <u>Buddhism</u>, as announced by the leaders of that religion." (***Id.***)** The email then stated:

> Please note, that in the course of reviewing your request, the University learned that the Dharma Realm Buddhist University set up by Dharma Master Xuan Hua who you list in your letter is in fact requiring vaccinations for all of its students, faculty and staff.  https://www.buddhistdoor.net/news/dharma-realm-buddhist-university-in-california-resumes-in-person-classes-with-largest-student-cohort

(Defendant Zimmer was included in the circulation of this email)

46.     The University had thus openly entered the theological business of judging the truth or falsity of its students' religious beliefs.

47.     On August 26, 2021, John Doe sent Defendant Zimmer a supplemental letter explaining that the available COVID vaccines more gravely offend his religious beliefs because of their developmental use of "human fetal cell cultures" that "were developed by taking a life which violates the fundamental tenets of my long-held Buddhist religion." (Exhibit 14 attached,

Letter at p. 1.) He further explained that "My Buddhism philosophy in one of the five precepts, not killing, has made the strongest impact on my academics and daily life" [at p. 2] and:

> The currently available COVID-19 vaccines in the U.S. market are either developed from, or tested on, fetal cell lines from aborted babies . . . None of the vaccines is completely free from any use of abortion-derived cells . . . As a sincere Buddhist, I believe that production of vaccines using fetal cells from aborted babies is directly against my belief in the Buddha's doctrine of not-killing and not-harming.

Exhibit 14 at p. 1.

48.     John Doe's second letter also included a number of legal citations highlighting, in part, that it was impermissible to require him to provide "input from an outside source, such as a formal religious leader." (*Id.* at 3.)

49.     On August 30, after John Doe had submitted his supplemental request, Defendant Zimmer sent him what purported to be the final decision of the Student Response Team.  A copy of that final decision is attached as Exhibit 15.  It, too, reiterated that "The University's mandatory vaccination policy offers exemption to individual's [*sic*] whose religious beliefs are opposed to **all** vaccinations."  Zimmer inaccurately summarized John Doe's objections as based on "(1) your belief that COVID-19 vaccines involve cell lines from human fetal cell cultures, (2) your belief that the vaccine may be harmful to your body, and (3) your belief that a mandatory vaccine requirement violates your right to free choice." (*Id.*)  She provided no citations to John Doe's letters in describing these alleged objections, particularly to the latter two which are plainly misrepresentative of John Doe's beliefs.

50.     Zimmer then concluded as follows:

> The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine, disbelieve the scientifically accepted view that it is harmless to most people, and express concern that a mandatory requirement infringes on your freedom. The basis for your objections are all of a personal nature and **not part of a comprehensive system of religious beliefs.**

51.     The cover email to that final decision also advised that "you will be referred to the promotions committee on September 1, 2021" for formal denial of participation in study at Anschutz.

52.     John Doe was given only three options following the final denial of his exemption request: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw."

53.     Faced with no other options, Mr. Doe chose to take this coerced leave of absence. He was forced to sell his local belongings, terminate his apartment lease, and incur unnecessary and unexpected expenses and loss of income associated with his preparing for and coming to campus and premature move back home. Mr. Doe hopes to resume his studies at the University as soon as possible, in a manner consistent with his protected religious beliefs.

   **C. Defendants have neither a legitimate nor compelling interest in exercising express and overt religious discrimination.**

54.     In its September 20th letter responding to Dr. Jane Doe's claim that Defendants had violated her First Amendment rights (Exh. 5), university counsel defended its decision in significant part based on a Title VII analysis arguing that Dr. Jane Doe's clinical work makes her a "direct threat" and poses "undue hardship" under Title VII—a reason that had never been given to Dr. Jane Doe and one that came solely in response to a threat of a lawsuit.

**55.**     University counsel's invocation of those strawmen "direct threat" and "undue hardship" defenses are plainly false pretexts attempting to cover for the Defendants' explicit religious discrimination. The formal and actual denial of Dr. Jane Doe's request simply stated that she was excluded *solely because* her religious beliefs did not oppose *all* vaccinations.

**56.**     Not only was University counsel's argument pretextual, but there is plainly no compelling interest justifying the University's blatant exercise in overt religious discrimination.

57.     Defendants' own actions demonstrate their lack of compelling interest since they have *granted* exemptions to students who work in clinical settings from taking the vaccine on grounds of disability/medical status, while simultaneously *denying* those very same students that exemption when requested for religious reasons.

58.     Attached as Exhibit 16 is a denial of religious exemption request from COVID vaccination that Defendant Zimmer sent to Student A, a fourth-year University medical student, saying (as she likewise wrote to John Doe) your "rationale provided does not constitute a religious belief, but a personal objection." (Ex. 16, at p. 2.) Zimmer explained that her conclusion was based on an analysis that, notwithstanding Student A's asserted Catholic faith— affirmed and supported by a signed statement from his Catholic parish priest—that her view of Catholic Church teaching is opposite to his.[1] (Ex. 16.) Zimmer went on to thus conclude that the student's views were necessarily "personal," not religious. (*Id.*)

59.     Undersigned counsel then sent a demand letter to Defendants, similar to that sent on behalf of Dr. Jane Doe. (Exhibit 17 attached.) Thereafter, instead of addressing the student's request for religious exemption, the University summarily granted the student a medical exemption from the COVID vaccine, which had previously been withheld. (Exhibit 18 attached.)

60.     Unlike first-year students (like John Doe), fourth-year students work extensively in hospital and other clinical settings with high-risk populations.  The medical accommodation provided to the fourth-year student addressed in Exhibit 17 thus posed greater theoretical risk than the religious accommodation John Doe requested.  Both the denial of John Doe's religious

---

[1] In her theological analysis, Zimmer did not address authoritative Catholic teaching that COVID-19 vaccination must be voluntary. *See, e.g.,* Congregation for the Doctrine of the Faith, "Note on the morality of using some anti-COVID-19 vaccines, Dec. 21, 2020, at No. 5 ("vaccination is not, as a rule, a moral obligation and . . . therefore, it must be voluntary").

exemption and refusal to squarely address the fourth-year student's religious exemption requests turned solely on the religious character of the requests, not on any risk factors. Religious exemption requests that don't meet the University's religious test are thus denied in the very same or similarly situated circumstances where medical accommodations are granted. Notably, the precautionary measures that unvaccinated staff like Dr. Jane Doe have been using for months—extensive COVID-tracing survey before every shift, sanitizing in and out of rooms, thorough use of PPE—have been and remain highly effective. For instance, throughout the COVID era, to her knowledge, Dr. Doe has neither contracted COVID herself nor infected any patients or colleagues in the workplace.

61.     Dr. Doe has also remained COVID-free while continuing to work at Children's Hospital since September 1st, the deadline the University gave her to get vaccinated on the theory that otherwise she would essentially be a mortal threat to the Anschutz community.

62.     Additionally, Dr. Doe has been informed by Children's Hospital that it will have its own independent religious accommodation policy for its own employees, based on directions from the State Board of Medicine which instructions are expected to be issued by October 21, 2021. Children's Hospital has informed its employees that if they have a religious objection to COVID vaccination, they must submit their accommodation requests by October 1, 2021. Children's Hospital will then begin evaluating those requests "no earlier than **Oct. 21, 2021**." (Exhibit 19 attached, Email from Children's Hospital) (emphasis in original)

63.     This means that health care professionals with whom Dr. Doe works alongside may be eligible for religious or medical accommodation directly from Children's Hospital as their direct employer, further demonstrating that Anschutz does not have a compelling interest in outright terminating Dr. Jane Doe (who is an employee of Anschutz and not of Children's

Hospital directly), while the very hospital where she exclusively works is not currently terminating employees who are similarly situated, and will offer a religious accommodation process based on directions from the State Board of Medicine in late October.

64.   Additionally, studies show that the pediatric patients Dr. Jane Doe treats are at relatively low risk of contracting and suffering serious illness of COVID-19.[2] At the same time, it is not clear that all or most patients treated by vaccine-exempt students or professionals are themselves vaccinated. Yet it is clear that the substantial majority of serious "breakthrough" cases in vaccinated people is among the elderly.[3] Thus, even though her patients are not vaccinated, Dr. Jane Doe is plainly similarly situated to any other clinician treating non-pediatric COVID-vulnerable patients at the University. As a highly competent and caring medical professional, Dr. Doe would not continue to treat patients if she believed herself to be a danger.

65.   The Student Response Team's initial denial of John Doe's request similarly relies on plain inaccuracy.  It incorrectly represents that John Doe is a disciple of Dharma Master Xuan Hua and is obliged to follow the procedures of the Dharma Realm University.

66.   Defendant Zimmer's final decision regarding John Doe's accommodation (Ex. 15) also, without proper analysis or resort to any authority, characterizes John Doe's objections

---

[2] Karolinska Institutet, "Low risk of infection in babies born to mothers with COVID-19," EurekAlert!, April 29, 2021, https://www.eurekalert.org/news-releases/598334 KAROLINSKA INSTITUTET; CDC, SDF  Breastfeeding and Caring for Newborns if You Have COVID-19, August 18, 2021 (authorizing COVID-19 infected mothers to provide direct care for their newborns as long as they exercise proper precautions like wearing PPE), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/pregnancy-breastfeeding.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpregnancy-breastfeeding.html#caring-for-newborns

[3] Deidre McPhillips, CNN, "Risk of severe breakthrough COVID-19 higher for seniors and people with underlying conditions," September 8, 2021, https://www.cnn.com/2021/09/08/health/severe-breakthrough-cases-cdc-studies/index.html

based on "involve[ment of] stem cell lines from human fetal cell cultures [and their] be[ing]
harmful to your body [and] violat[ing] your right to free choice" as "not constitut[ing] a religious
belief, but a personal objection."

67.     Finally, both Plaintiffs are aware that hospitals and medical schools across the
country, *and within the University of Colorado's own health care system*, have offered religious
accommodations to similarly situated individuals who work directly with and around COVID-
vulnerable patients (many of whom are unvaccinated or who are still susceptible despite being
vaccinated), without undermining any interest in providing safe and effective care to patients in
need. Plaintiffs are attaching Group Exhibit 20 with the declarations of 31 exemplary health care
witnesses around the country who have received religious accommodations and are continuing to
provide critical health care services. Of this group, witness 21 is employed by the University of
Colorado.

68.     Their experience, which is consistent with national media reports, confirms that
there can be no compelling interest in categorically forbidding similar accommodations for
Plaintiffs here simply on the basis of the nature of their religious beliefs and the University's
view of the veracity of those beliefs.

 **E. How Plaintiffs have been harmed**

69.     Attached as Exhibit 21 is a non-competition agreement Dr. Jane Doe executed in
February 2019.  It says, among other things:

> … if Member's [Dr. Jane Doe's] employment with the University terminates for any
> reason … and the Member enters into competition with the University as defined below,
> Member shall pay to CU Medicine and the University liquidated damages in the amount
> of $310,950 … [T]he terms "competition with the business of the University" means for
> a period of 2 years after termination, establish, operate or provide professional medical
> services … within a 100 mile radius of the intersection of Colfax and Ursula, Aurora,
> Colorado or any other facility where the Member regularly provides medical services.

70.     Thus if Dr. Jane Doe is fired, she will be unable to practice her specialty in Colorado for two years, as all the critical pediatric care centers are centered in or around Denver and Colorado Springs.

71.     Employment termination will further harm Dr. Jane Doe's professional standing and reputation, be a permanent part of her licensure record, and could be a source of potential discipline.

72.     As to Mr. Doe, attached as Exhibit 22 is the Association of American Medical Colleges Guidelines for the Consideration of Application for Transfer or Advanced Standing. They make clear that only students who have begun M.D. studies, and who can document an "entire academic history" at an existing M.D.-granting program can request transfer. Mr. Doe is thus not eligible for transfer, but must undertake the application process anew if he is to attend another M.D. program in the U.S.

73.     John Doe was given only three options following the final denial of his exemption request: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw."

74.     John Doe chose to take a leave of absence, but desires to return as soon as possible to Anschutz medical school. Otherwise, he faces the near-impossible prospect of starting medical school over somewhere else, or entirely forgoing his dream of becoming a medical doctor.

### F.  Plaintiffs' Reasons for Proceeding with Pseudonyms

75.     The same "front line" health care workers and students hailed as heroes by the media for treating COVID patients before vaccines were available, including Plaintiffs, are now vilified by the same media as pariahs who must be excluded from society until they are vaccinated against their deeply held religious beliefs.

76.     The Policy is a product of this atmosphere of fear in which the unvaccinated are threatened with being reduced to a caste of untouchables, if they will not consent to being injected with vaccines that violate their religious beliefs.

77.     As things now stand, according to public health authorities the vaccinated can infect the unvaccinated, the unvaccinated can infect the vaccinated, both the vaccinated and the unvaccinated can infect each other, and everyone must wear masks indoors in "high transmission" areas—that is, virtually the entire country[4]—as if no one at all had been vaccinated.[5]  And with both the fully vaccinated and the unvaccinated still contracting COVID, "booster shots" of the vaccines, to which Plaintiffs have the same religious objections, are doubtless on the way, accompanied by further government mandates.

78.     In the midst of this regulatory muddle, combined with unreasoning official coercion and widespread, media-generated panic, Plaintiffs seek leave of court to proceed anonymously as they run the risk of ostracization, threats of harm, immediate firing, and other retaliatory consequences, if their names become known.  This is shown by the following examples of a pervasive climate of fear and loathing of the unvaccinated:

79.     On ABC News, commentator Margaret Hoover declared that government, by withholding all benefits from the unvaccinated, should "just make it almost impossible for people to—to live their lives without being protected and protecting the rest of us."[6] On CNN, commentator Don Lemon stated to Chris Cuomo that "[If you] don't get the vaccine, you can't

---

[4] *See* CDC Map at https://www.usatoday.com/in-depth/graphics/2021/07/29/cdc-mask-guidelines-map-high-covid-transmission-county/5400268001/

[5]  *See* "When You've Been Fully Vaccinated," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html

[6]  "This Week," July 25, 2021, https://abcnews.go.com/Politics/week-transcript-25-21-speaker-nancy-pelosi-sen/story?id=79045738

go to the supermarket. Don't have the vaccine, can't go to the ball game. Don't have a vaccine, can't go to work. You don't have a vaccine, can't come here. No shirt, no shoes, no service."[7]

80.     On his national late night show Jimmy Kimmel stated that the unvaccinated who contract COVID should be allowed to die rather than being admitted to the hospital: "Rest in peace, wheezy."[8] The audience roared its approval. In *The Week*, Ryan Cooper declared that "Anti-vaxxers" (i.e., people who decline the COVID vaccines) "should be exiled from society until they get their shots, and their efforts to intimidate people against controlling the pandemic should be met with massive resistance."[9]

81.     There is a top-down cultural, societal, and legal assault currently underway against those who forgo the vaccines. Nowhere is this more apparent than in the speech by President Biden on September 9, 2021, wherein the nation's Chief Executive brings down opprobrium on the heads of Americans who decline vaccination: "We've been patient, *but our patience is wearing thin*, and the refusal *has cost all of us….*" (emphasis added) Absent anonymity, Plaintiffs would be identified as members of the public who, according to the sitting leader of the free world, are "cost[ing] all of us."[10]

---

[7] https://www.realclearpolitics.com/video/2021/08/01/don_lemon_no_shirt_no_shoes_no_vaccine_no_service.html

[8] https://www.westernjournal.com/late-night-host-ghoulishly-mocks-sick-unvaccinated-rest-peace-wheezy/.

[9] https://theweek.com/coronavirus/1002909/theres-1-obvious-solution-to-the-delta-variant-mandatory-vaccination

[10] Remarks by President Biden on Fighting the COVID-19 Pandemic, WhiteHouse.gov, Sep. 9, 2021, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

82.     Those who are unable to receive the vaccines for sincere religious reasons are thus subject to a vicious mob whipped into a frenzy, facing vicious threats, such as this one, in response to an article related to opposition by health care workers to New York's vaccine mandate:



83.     Under these circumstances, Plaintiffs clearly meet the criteria for permission to proceed anonymously.

**COUNT I**
**VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRSTAMENDMENT TO THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

84.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-83 above as if fully set forth herein.

85.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' rights to free exercise of religion.

86.     Plaintiffs have sincerely held religious beliefs set forth above that compel them to refuse any of the available COVID vaccines.

87.     Defendants' Policy, on its face and as applied, impermissibly targets Plaintiffs' sincerely held religious beliefs by disallowing recognition those beliefs as genuine religious belief.

88.     The Policy, on its face and as applied, impermissibly targets Plaintiffs' sincerely held religious beliefs by disqualifying them from obtaining a religious exemption based solely on the nature of their religious beliefs.

89.     The Policy engages in blatant denominational discrimination in violation of religious neutrality by requiring that qualifying religious beliefs be in accord with official denominational teaching as understood by the Defendants.

90.     The Policy, on its face and as applied, authorizes intrusive religious inquiries in violation of religious neutrality by inviting University officials to question the legitimacy and veracity of students' and employees' religious beliefs.

91.     The Policy, on its face and as applied, is not generally applicable because it allows exemptions for medical reasons and some religious reasons, but not Plaintiffs' religious reasons, despite that exemptees' activities could or do pose similar risks of spreading COVID as Plaintiffs' activities, and Plaintiffs are entirely willing to perform (as Dr. Jane Doe already has) the alternative precautions of masking, daily attesting, etc., required by the Policy at Section (C)(2). (Ex. A.)

92.     The Policy, on its face and as applied, is not generally applicable because it is subject to individualized exemptions insofar as Dr. Jane Doe has been allowed to continue working as a full-service employee of Anschutz for nearly a month after its September 1 vaccination deadline, which is itself roughly nine months since the vaccines first became available, without any consequences to her employment status or any negative impact on patients or employees.

93.     The Policy on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs without a compelling interest or narrow tailoring.

94.     The Policy, on its face and as applied, lacks a compelling interest because it leaves appreciable damage to its supposedly compelling interest unprohibited, since it offers exemptions for medical or some religious reasons, but not for Plaintiffs' religious reasons. Exempted activities, while exercising the required precautions, are just as likely to spread COVID as Plaintiffs' activities to the extent Plaintiffs exercise the same precautions.

95.     Accordingly, the University cannot show it has a compelling interest in denying accommodations for *these particular Plaintiffs*, which is the requisite test under controlling Supreme Court precedent.

96.     The Policy, on its face and as applied, also lacks a compelling interest as applied to Dr. Jane Doe because Children's Hospital where she works exclusively is not applying the same Policy to its own direct employees, and Dr. Doe has continued to work there throughout COVID, and for nearly a month after Anschutz's September 1 vaccination deadline, while exercising highly effective alternative precautions and not having even one incident of contracting or spreading COVID from or to co-workers or patients.

97.     The Policy, on its face and as applied, is not the least restrictive means of furthering any hypothetical compelling interest because the University has shown that qualifying exemptees can continue to study and work at Anschutz while adopting alternative precautions outlined in the Policy.

98.     Further, Defendants cannot show, as they must, that they gave sufficient weight to practices in other hospitals around the country *and in their own university health care system* allowing religious accommodations for employees around COVID-vulnerable, oft-unvaccinated patients without apparently undermining their interest in providing effective health care without spreading COVID.

99.     The Policy, on its face and as applied, will thus compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has irreparably harmed Plaintiffs.

100.     Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional rights and sincerely held religious beliefs.

## COUNT II
## VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

101.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-100 above as if fully set forth herein.

102.     The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from enacting any requirement respecting an establishment of religion.

103.     By adopting and enforcing a Policy that conditions allowance of a religious accommodation on the requirement that one's religious beliefs oppose *all* vaccinations,

25

Defendants have established favorable treatment for some religious beliefs to the direct detriment of other, disqualifying religious beliefs.

104.    Further, on its face and as applied, the Policy requires qualifying religious beliefs to be supported by and associated with "teachings" of "organized" denominations with a "comprehensive system of religious beliefs," in direct violation of the "clearest command" of the Establish Clause prohibiting denominational discrimination by government.

105.    The Policy's overt religious discrimination, on its face and as applied, cannot survive strict scrutiny for the reasons described above.

106.    The Policy, on its face and as applied, also establishes and authorizes a process of intrusive religious inquisition to test the veracity of students' and employees' asserted religious beliefs, in direct violation of the Establishment Clause's longstanding prohibition on the "excessive entanglement" between government and religion. Such excessive entanglement is a per se violation of the Constitution without any opportunity for the government to overcome strict scrutiny.

107.    Defendants' policy's establishment of state prescribed religious content and organization targets the holders of all religious beliefs that prohibit acceptance of the COVID vaccines, but whose beliefs fall outside the state-prescribed norms.

108.    Plaintiffs hold sincerely held religious beliefs that prohibit acceptance of the COVID vaccines, but their beliefs fall outside the state-prescribed norms of Defendants' Policy. Defendants' Policy will thus compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has harmed Plaintiffs.

109.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**COUNT III**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH**
**AMENDMENT TO THE UNITED STATES CONSTITUTION.**
**(42 U.S.C. § 1983)**

110.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-109 above as if fully set forth herein.

111.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits any state from denying the protection of laws to any person within its jurisdiction.

112.     The Policy, on its face and as applied, classifies Plaintiffs based on their fundamental right to religious exercise thus must survive strict scrutiny, which it cannot for the reasons described above.

113.     Plaintiffs hold religious beliefs that prohibit acceptance of the COVID vaccines, but their beliefs fall *outside* the state prescribed norms of Defendants' Policy.  The Policy, on its face and as applied, thus denies the Plaintiffs the protections afforded to similarly situated people whose religious beliefs also prohibit acceptance of the COVID vaccines but fall *within* the state prescribed norms of the Policy.

114.     The Policy, both facially and as applied, fails to provide Plaintiffs with equal treatment to similarly situated employees and students who have received medical exemptions under the Policy.

115.     Plaintiffs have thus been deprived of constitutionally guaranteed equal protection.

116.     The Defendants' Policy will compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has harmed Plaintiffs.

117.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**COUNT IV**

**VIOLATION OF THE RELIGIOUS FREEDOM CLAUSES OF THE CONSTITUTION OF THE STATE OF COLORADO.**

118.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-117 above as if fully set forth herein.

119.    Article II, section 4 of the Constitution of the State of Colorado provides "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion... Nor shall any preference be given by law to any religious denomination or mode of worship."

120.    By adopting and enforcing a Policy that ostensibly allows accommodation of religious beliefs that prevent acceptance of the currently available COVID vaccines, but conditioning allowance of accommodation on the requirement the religious belief be articulated by a hierarchical religious authority whose tenets oppose all vaccinations, Defendants have established religious content and religious organization that is acceptable to the state, and religious content and religious organization that is unacceptable.

121.    That Policy thus gives preference to certain religions based on the religions' organization and the content of its tenets.  The Policy thus discriminates against the religious beliefs of those whose beliefs are outside the state prescribed norms, impairs their free exercise of their beliefs, and gives preference to the beliefs of religious denominations or mode of worship that are within state prescribed norms.

122.    In enacting and enforcing their policy, Defendants have thus violated Article II, section 4.

123.    The Defendants' Policy will compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has harmed Plaintiffs.

## PRAYER FOR RELIEF

*Wherefore,* Plaintiffs respectfully pray for the following relief:

(A) That a temporary restraining order and preliminary injunction, followed by a permanent injunction, be entered (1) restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Anschutz School of Medicine COVID Vaccination Requirement and Compliance Policy to the extent it prohibits religious exemptions unless an individual holds religious beliefs that oppose all vaccinations or are in accord with official denominational "teachings;" (2) ordering that Plaintiffs be granted their requested religious exemptions; and (3) ordering that all prior denials of requested religious exemptions under the Policy (whatever the requesters may have called them) be revoked and the requests re-examined under conditions compliant with the Constitutions of the United States and Colorado;

 (B) That a declaratory judgment issue, declaring that the Policy's religious exemption provision, both on its face and as applied by Defendants, is unconstitutional and unlawful in that it violates the Free Exercise and Establishment Clauses of the First Amendment of the Constitution of the United States; the Equal Protection Clause of the Fourteenth Amendment of the Constitution of

the United States; and the Religious Freedom protections of the Colorado Bill of Rights, Article II, section 4 of the Colorado Constitution;

(C) That Plaintiffs be given an award of nominal damages, actual and compensatory damages, and punitive damages;

(D) That Plaintiffs be given an award of reasonable costs and expenses of this action, including reasonable attorney's fees, in accordance with 42 U.S.C. § 1988; and

(E) Such other and further relief as the Court deems equitable and just under the circumstances.

/s/ Peter Breen
Peter Breen
Martin Whittaker*
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

Michael G. McHale*
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs*

*\* pro hac vice motion to be filed*

### *Verification*

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Dr. Jane Doe who is one of the co-plaintiffs in the case captioned *Dr. Jane Doe and John Doe vs The University of Colorado;* that I have knowledge of all of the Facts pleaded in the Complaint in that case that pertain to me, and that those facts are true.

I specifically have knowledge of the matters alleged in ¶¶1-5, 7-8, 20-38, 61-64, 67-71, and 75-83, and those matters are true.  I know the exhibits referred to there are true and correct copies of originals.

*Dr. Jane Doe*                9/28/21

Dr. Jane Doe                   Dated

*Verification*

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe who is one of the co-plaintiffs in the case captioned *Dr. Jane Doe and John Doe vs The University of Colorado;* that I have knowledge of all of the Facts pleaded in the Complaint in that case that pertain to me, and that those facts are true.

I specifically have knowledge of the matters alleged in ¶¶1-4, 6-7, 9, 20-31, 39-53, 65-68, 72-83, and those matters are true. I know the exhibits referred to there are true and correct copies of originals.

John Doe                          09.28.21

_____      _____
John Doe                     Dated