## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

JANE DOE, M.D., and JOHN DOE,

  Plaintiffs,

  v.

THE UNIVERSITY OF COLORADO,

DONALD ELLIMAN, Chancellor of the
University of Colorado Anschutz School of
Medicine, in his official capacity, and

SHANTA ZIMMER, M.D., Senior Associate
Dean of Medical Education, University of
Colorado Anschutz School of Medicine, in her
official capacity,

  Defendants.

Case No. 1:21-cv-2637

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A
# TEMPORARY RESTRAINING ORDER AND PRELIMINARY
# INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE POLICY FLAGRANTLY VIOLATES THE CONSTITUTIONAL GUARANTEES OF RELIGIOUS NEUTRALITY AND GENERAL APPLICABILITY. ............................... 2

    A.    The Policy is a Quintessential Violation of Religious Neutrality and Excessive Entanglement Under the Establishment and Free Exercise Clauses. ............................. 4

        1.    The Policy expressly discriminates in favor of some religions over others in violation of facial neutrality and denominational equality. ................................................. 4

        2.    The Policy Violates Excessive Entanglement ........................................................ 9

    B.    The Policy is Also Non-Generally Applicable in Violation of the Free Exercise and Equal Protection Clauses. ............................................................................................. 16

    C.    The Policy Easily Fails Both Prongs of Strict Scrutiny. ............................................... 19

    D.    The University's Post-Hoc Excuse of "Undue Hardship" is Manifestly Pretextual and Preempted by the First Amendment .............................................................................. 22

II.    PLAINTIFFS SATISFY THE REMAINING FACTORS FOR OBTAINING A TEMPORARY AND PRELIMINARY INJUNCTION. ................................................. 24

    A.    Imminent Irreparable Harm ......................................................................................... 24

    B.    Balance of Harms ......................................................................................................... 25

    C.    Public Interest .............................................................................................................. 25

CONCLUSION .................................................................................................................. 26

**CASES**

*Agudath Israel v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) ...................................................... 20

*Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)................................................................. 25

*Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004)............................................ 23

*Brooklyn Diocese v. Cuomo*, 141 S. Ct. 63, 68 (2020)................................................................ 25

*Caviezel v. Great Neck Public Schools*, 701 F. Supp. 2d 414, 429-30 (E.D.N.Y. 2010) ............. 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)......... passim

*City of Cleburne, Tex.v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) .................................. 17

*Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) ...................... passim

*Delmarte E.J.M. Vreeland, II v. Desiree Vigil, et al.*, 2021 WL 4237267 ..................................... 2

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) .................................................................................. 24

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 894 (1990)......................... 2, 6

*Espinoza v. Montana Dep't of Rev.*, 140 S. Ct. 2246, 2255 (2020)................................................ 5

*Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 16 (1947) (emphasis in original) ............................ 6

*Farina v. Bd. of Educ. of the City of New York*, 116 F. Supp. 2d 503, 507-508
(S.D.N.Y. 2000) .......................................................................................................................... 14

*Fraternal Order of Police Lodge No. 12 v. City of Newark Lodge*, 170 F.3d 359, 366 (3d Cir.
1999) ......................................................................................................................................... 18

*Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989) .................................................. 8

*Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021) ............................... 5

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)............................. 26

*Int'l Soc. for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 438 (2d Cir. 1981)....... 12, 13

*Larson v. Valente*, 456 U.S. 228, 244-45 (1982) .......................................................................... 4

*Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 ........................................................ 21

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018).... 5, 12, 26

*McCullen v. Coakley*, 573 U.S. 464, 494 (2014) ........................................................ 21

*Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality) ........................................ 10

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).................................. 10, 13

*Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) .............................................. 24, 26

*RoDa Drilling Co. v. Siegal*, 552 F.3d 120, 1208 (10th Cir. 2009)................................ 2

*Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021)................................ 16, 18, 20

*Thomas v. Rev. Bd. of Indiana Security Div.*, 450 U.S. 707, 718 (1981) .................. 13, 19

*Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012, 2021 (2017)................ 5

*United States v. Friday*, 525 F.3d 938, 958 (10th Cir. 2008) .................................... 20

*University of Great Falls v. NLRB*, 278 F.3d 1335, 1343 (D.C. Cir. 2002) .................. 13

*Walz v. Tax Comm'n*, 397 U.S. 664, 694 (1970) ...................................................... 12

## INTRODUCTION

Rare is the occasion today when a state actor engages in overt discrimination expressly in favor of one religion over another. But the University of Colorado Anschutz School of Medicine (the "University") has adopted a "religious exemption" policy to its COVID vaccine mandate does just that. The University's "COVID-19 Vaccination Requirement and Compliance" Policy (the "Policy") provides as follows: "A religious accommodation may be submitted based on a person's religious belief whose **teachings** are opposed to **all immunizations**." (V. Cmplt., Ex. 1.) Rubbing one's eyes for a moment and looking again does not make it say otherwise. The Policy expressly disqualifies certain religious beliefs simply based on the *religious nature* of those beliefs and alleged lack of *denominational* support, as scrutinized and interpreted through the University's officially a-religious lenses.

The University wielded this discriminatory Policy aggressively and unapologetically against the two plaintiffs in this case, a Catholic physician (Dr. Jane Doe) and a Buddhist student (John Doe) who both hold sincere religious objections to the available COVID vaccines. The University denied both of their requests for religious exemptions *solely* because their respective denominations did not—in the University's eyes—hold the qualifying religious beliefs against *all* vaccinations. Apparently the University thinks it can exercise theology (or a sorry attempt at it) to determine whether opposition to COVID vaccines is sincerely *religious*. Instead, it has openly and embarrassingly violated the "clearest command" of our Religion Clauses against denominational discrimination and contravened our nation's founding tenet against "excessive entanglement" between government and religion.

As Justice O'Connor once stated, "few States would be so naïve as to enact a law directly prohibiting or burdening a religious practice as such." *Emp. Div., Dep't of Hum. Res. of Oregon*

*v. Smith*, 494 U.S. 872, 894 (1990) (O'Connor, J., concurring). Here the only credit to the University is its willingness to exercise such naivety in the full light of day. That makes this case surprisingly easy.

Because Dr. Jane Doe might be fired as early as this Friday, October 1st, and John Doe has effectively been expelled from campus for one year and must immediately begin reapplying for other medical schools or forgo his dream of being a physician (V. Cmplt. ¶¶6, 52-53, 72-74), a Temporary Restraining Order and Preliminary Injunction should now issue. (Plaintiffs hereby incorporate by reference the facts of the simultaneously filed Verified Complaint for the remaining background in this case.)

## ARGUMENT

"To succeed on a motion for a preliminary injunction or temporary restraining order," Plaintiffs must show: (1) they're likely to succeed on the merits; (2) irreparable harm; (3) the balance of equities tips in their favor; and (4) the public interest favors an injunction. *Delmarte E.J.M. Vreeland, II v. Desiree Vigil, et al.*, 2021 WL 4237267, at *2 (D. Colo. Sept. 16, 2021) (unpublished) (citing *RoDa Drilling Co. v. Siegal*, 552 F.3d 120, 1208 (10th Cir. 2009)). For the reasons below, Plaintiffs easily satisfy all four factors.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE POLICY FLAGRANTLY VIOLATES THE CONSTITUTIONAL GUARANTEES OF RELIGIOUS NEUTRALITY AND GENERAL APPLICABILITY.

The University's Policy unashamedly flouts our nation's bedrock requirement of government neutrality toward religion, as enshrined in both the Establishment and Free Exercise Clauses of the First Amendment, by: (a) explicitly picking and choosing *some* religious beliefs over others as eligible for exemption from the University's vaccine mandate, and (b) requiring that those beliefs be in accord with *denominational "teachings"* in order to qualify for

exemption. In a pluralistic, dis-Established society like ours, those criteria are completely off limits to government actors like the University. The Policy also fails the Free Exercise and Equal Protection Clause's demands of general applicability by expressly allowing exemptions for *both medical and some religious reasons*, but not for Plaintiffs' religious reasons. This despite the University's express interest in stopping the spread of COVID-19 to vulnerable patients and co-workers—an interest that supposedly can brook no departures (at least not by Plaintiffs). Finally, the University's post-hoc excuse that accommodating Dr. Jane Doe would be an undue hardship on Anschutz, as stated in response to Dr. Jane Doe's demand letter requesting respect for her First Amendment rights, is manifestly pretextual and also unavailing in light of her *constitutional* right to equal treatment with other exemptees.

So the Policy must undergo strict scrutiny. But there is no compelling interest in allowing exemptions for *some* religious beliefs over others (or for medical over religious accommodations) based solely on the content of those beliefs; nor is it the *least restrictive means* to simply terminate and effectively expel Plaintiffs from the University given the accommodations expressly allowed for other University employees and students (either for medical or *some* religious reasons). Additionally, termination cannot be the least restrictive means for Dr. Jane Doe given her past 19 months of service throughout COVID—including nearly one month of service after the University's vaccination deadline on September 1st—while exercising evidenced-based, alternative precautions that have been entirely effective in preventing the spread of COVID-19.

In sum, our Constitution provides no tolerance for the Policy's express preference of some religions over others in determining who qualifies for a religious exemption from the University's vaccine mandate.

**A.    The Policy is a Quintessential Violation of Religious Neutrality and Excessive Entanglement Under the Establishment and Free Exercise Clauses.**

"From the beginning, this nation's conception of religious liberty included, at a minimum, the equal treatment of all religious faiths without discrimination or preference." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008). This principle is enshrined in both the Establishment and Free Exercise Clauses of the First Amendment. *See Larson v. Valente*, 456 U.S. 228, 244-45 (1982) The Religion Clauses also prohibit the government "from trolling through a person's or institution's religious beliefs." *Colorado Christian Univ.*, 534 F.3d at 1261 (i.e., excessive entanglement). Here, the Policy violates the prohibitions of facial religious neutrality, denominational discrimination, and excessive entanglement. It expressly favors *particular religious beliefs* with denominational "*teachings*" against *all vaccinations*, and it authorizes unabashed prying into the merits of individuals' religious beliefs—which is exactly what University officials did here when Plaintiffs applied for religious exemptions. Such express religious discrimination and inquisition simply cannot stand under either the Establishment or Free Exercise Clauses.

**1.    The Policy expressly discriminates in favor of some religions over others in violation of facial neutrality and denominational equality.**

The Policy could not be more clear: only Anschutz students and employees with "religious belief[s] whose *teachings* are opposed to *all immunizations*" may seek a religious exemption from the University's Vaccine Mandate. (V. Cmplt., Ex. 1, Policy at C.(2).) The Policy openly separates religious beliefs into favored and disfavored categories based on their religious *nature*, in blatant violation of facial neutrality. And the Policy requires those favored beliefs to be associated with official religious "teachings," in a rare violation of denominational

equality. Appallingly, the University applied this flagrantly unconstitutional standard against both Plaintiffs without hesitation. (V. Cmplt. ¶¶35, 45, 49-50.) It is simply unavoidable to conclude that such blunt religious discrimination flunks the test of religious neutrality.

### a. Lack of Facial Neutrality

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their *religious nature*." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021) (emphasis added). "[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). As the Tenth Circuit recognizes, this includes "not only laws with 'the object' of suppressing a religious practice, but also 'official action that targets religious conduct for distinctive treatment.'" *Colorado Christian Univ.*, 534 F.3d at 1260 (cleaned up); *see also Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012, 2021 (2017) (forbidding government from disqualifying religious believers "solely because of their religious character"); *Espinoza v. Montana Dep't of Rev.*, 140 S. Ct. 2246, 2255 (2020) (government may not discriminate "solely because of religious status"); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs or practices"). Here, the Policy's picking and choosing between religious beliefs for favored and disfavored treatment is a paradigmatic exercise in facial religious discrimination.

The Policy expressly states that only religious beliefs opposed to *all* vaccinations may apply for exemption from the Vaccine Mandate. *Any other religious beliefs need not apply, simply because of the content of those beliefs*. Dr. Jane Doe said her Catholic faith required her to oppose COVID vaccines to the extent they were developed, approved, or tested on cell lines

derived from aborted children (V. Cmplt., ¶33.). Because her objection did not necessarily extend to *all* vaccinations, it fell into the Policy's disfavored category *solely* because of the *religious nature* of her beliefs. That is, the Policy *restricts* Dr. Jane Doe's ability to practice medicine as an Anschutz employee *because of her particular religious objection* to COVID vaccination. But the Policy expressly *allows* others the opportunity to continue practicing medicine at Anschutz *despite their particular religious objection* to COVID vaccination. The only difference between the two categories is quite literally the *nature* of the religious beliefs against COVID vaccination—a flagrant violation of religious neutrality. Those who do not religiously oppose *all* vaccinations are literally "exclude[ed] . . . *because of their faith*." *Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 16 (1947) (emphasis in original); *see also Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990) ("government may not . . . impose special disabilities on the basis of religious views.").

The Policy's explicit lack of neutrality falls squarely under the prohibition of *Colorado Christian University*. There, the Tenth Circuit invalidated a provision of a higher-education public scholarship program insofar as it excluded institutions that were "pervasively sectarian." *Colorado Christian Univ.*, 534 F.3d at 1250. The Tenth Circuit held this aspect of the program violated religious neutrality since such terms "refer[red] to a religious practice without a secular meaning discernible from the language or context." *Id*. at 1260 (quoting *Lukumi*, 508 U.S. at 534). As the Tenth Circuit observed, when government adopts policies "that facially regulate religious issues, it must treat individual religions and religious institutions without discrimination or preference." *Id*. at 1257. Simply, the Colorado scholarship program discriminated against "*pervasively* sectarian" institutions and thus expressly favored *plain* "sectarian" institutions.

A mirror image of that problem exists here. The University's Policy on its face gives *favored* treatment to a kind of *pervasive* religious opposition to all vaccines, and thus discriminates against a kind of *plain* religious opposition to COVID vaccination on more particular grounds (including Plaintiffs' religious opposition based on the vaccines' connection to aborted fetal cell lines). (V. Cmplt. ¶¶33, 47.)

In sum, the University may not expressly pick and choose between degrees of religious opposition to COVID vaccines in determining eligibility for a religious exemption. But the Policy here does exactly that, and the University made no apologies in wielding it against Plaintiffs here. The Policy's lack of neutrality triggers strict scrutiny, which it cannot survive for reasons discussed below.

### b. *Denominational Discrimination*

The Policy also unashamedly ignores the "clearest command of the Establishment Clause" (and a corollary requirement of the Free Exercise Clause) forbidding *denominational* discrimination. *See Larson*, 456 U.S. at 244. The government is not "permitted to make a value judgment . . . favoring some *religions* over others." *Colorado Christian Univ.*, 534 F.3d at 1260 (emphasis added). Put another way, government may not make "explicit and deliberate distinctions between different religious organizations." *Id.* at 1259; *see also id.* at 1258 ("no State can pass laws . . . that prefer one religion over another") (cleaned up). But the Policy here does just that.

In explicit and deliberate terms, the Policy offers religious exemptions only to those with "religious beliefs whose *teachings* are opposed to all vaccination." (V. Cmplt., Ex. 1 (emphasis added).) So the Policy expressly conditions religious exemption not on an *individual*'s religious beliefs against all vaccination, but on being a member of a *denomination* with *teachings* that

require opposition to all vaccination. Never mind the Supreme Court's blackletter admonishment "reject[ing] the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989); *see also Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). Nor pay mind to a core founding principle that government "must treat individual religions and religious institutions 'without discrimination or preference.'" *Colorado Christian Univ.*, 534 F.3d at 1257 (quoting New York Constitution of 1777, art. XXXVIII, *reprinted in* 4 *The Founders' Constitution*, at 75). Here, the Policy "necessarily and explicitly discriminates among religious institutions," *id.* at 1258, by authorizing religious exemptions only for those whose *religious institutions teach* the golden-ticket beliefs.

The University's application of the Policy to Student John Doe confirms as much. On August 22, 2021, John Doe submitted a letter request for a religious exemption on the basis that his Buddhist faith prohibits him from receiving *any vaccination*. (V. Cmplt., ¶¶44 and Ex. 11, Letter at pp. 3-5.) On Aug. 24, 2021, John Doe received a response email from Brian Dwinnell requesting that John Doe "provide documentation that demonstrates that your *religion* is opposed to all immunizations." (V. Cmplt., ¶45 and Ex. 13.) The email further stated that "[t]he University will only accept requests for religious exemption that cite to the *official doctrine of an organized religion*, **in this case, Buddhism**, as announced by the leaders of that religion." (Id.(emphasis added).) The email didn't stop there, next asserting that "the University learned that the Dharma Realm Buddhist University set up by the Dharma Master Xuan Hua who you list in your letter is in fact requiring vaccinations for all of its students, faculty and staff." (Id.) The

University thus had no reservations in acknowledging to John Doe that notwithstanding his own religious opposition to all vaccinations, religious exemptions under the Policy are truly limited to individuals whose *denominations "officially"* oppose all vaccinations.

Once again, the Policy falls directly under the prohibitions of *Colorado Christian University*. The Tenth Circuit there observed that the criteria Colorado used to determine whether an institution is *not* "pervasively sectarian" (e.g., its faculty and students are not all the same religion, there is no required attendance at religious services, etc.) resulted in the allowance of scholarships to a Catholic and Methodist University, but not to Colorado Christian or a Buddhist university. *Colorado Christian Univ.*, 534 F.3d at 1258. The Tenth Circuit held that the program's "pervasively sectarian" requirement constituted denominational discrimination because it discriminated "*expressly based on the degree of religiosity* of the institution," which was "*even more problematic*" than a rule that makes "explicit and deliberate distinctions between different religious organizations." *Id.* at 1259 (emphasis added).

The same problem exists here, since the Policy insists that individuals seeking religious exemptions belong to denominations that officially teach the requisite beliefs. "The sole function and purpose of the challenged provision[] is to exclude *some* but not all religious institutions on the basis of the stated criteri[on]." *Id.* at 1258 (emphasis). The Policy is thus a rare, yet straight-faced exercise in blatant denominational discrimination. It must undergo strict scrutiny, which, again, it cannot survive for reasons discussed below.

### 2. The Policy violates Excessive Entanglement.

The Policy also sets up a process of *religious inquisition* that independently violates the First Amendment's Religion Clauses, specifically its prohibitions against "intrusive religious inquiry" or "excessive entanglement" between government and religion. *Colorado Christian Univ.*, 534 F.3d at 1261. Even assuming arguendo that discriminating based on denomination

were permissible, "a second line of Supreme Court precedents precludes [the University from] doing so on the basis of intrusive judgments regarding contested questions of religious belief or practice." *Id.* "Under the First Amendment, the government is not permitted to have an ecclesiology, or to second-guess the ecclesiology espoused by our citizens." *Colorado Christian Univ.*, 534 F.3d at 1265. As the Supreme Court has stated, "[i]t is not only the conclusions reached by the [government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).

Here, the Policy authorizes University officials to conduct intrusive inquiries into individual religious beliefs. Specifically, University officials are tasked with investigating whether applicants for religious exemptions from COVID vaccination are (a) religiously opposed to all vaccinations per se and (b) members of a denomination that *actually* espouses such beliefs. University officials then determine either whether an individual's beliefs are either (1) "of a *personal* nature," which does not qualify for exemption, or (2) "part of a *comprehensive system of religious beliefs*," which can qualify for exemption. There is nothing in between. (V. Cmplt. ¶50.) In other words, the Policy flagrantly and unconstitutionally authorizes "trolling through a person's or institution's religious beliefs" to determine the alleged veracity of those beliefs. *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality).

Illegal religious trolling is precisely what University did here, particularly with respect to John Doe's religious beliefs. The University denied his first request for a religious exemption (which he sought on the basis that his Buddhist faith required forgoing all vaccinations (see V. Cmplt., ¶44), because *the University officials* had a *different view* of Buddhism's teachings on vaccination. Deans Brian Dwinnell and Shanta Zimmer specifically informed John Doe that "the

University had learned" a Buddhist university established by Dharma Master Xuan Hua (whom John Doe had cited in his exemption request letter) was "in fact requiring vaccinations for all of its students, faculty and staff," thus implying that Buddhism as such—*in the University's eyes*—does not require forgoing all vaccination. (V. Cmplt. ¶45.) After John Doe submitted a supplemental letter opposing COVID vaccines on the added basis that they were produced with or tested on aborted fetal cell lines, in direct violation of his understanding of Buddhism's "no-killing" first principle explained in the first letter (V. Cmplt., 14), Dean Zimmer informed him that, in the end, all of his objections simply "do[] not constitute a religious belief, but a *personal objection* to receiving the vaccination." (V. Cmplt., ¶50.)

To be sure, the University's denial of *Dr. Jane Doe's request* in reliance on her "Catholic faith" was likely based on a similar inquisition. Plaintiffs have become aware that when a fourth-year medical student at Anschutz who applied for a religious objection based on similar Catholic beliefs, the University denied the request on the basis that it believed the Catholic Church itself did not oppose COVID vaccination. (V. Cmplt. ¶58, Ex. 16.) The University, in a letter signed by Defendant Zimmer, lectured the student about allegedly supportive statements on COVID vaccination by Catholic authorities like "the Vatican's doctrinal office," the United States Conference of Catholic Bishops, and the Colorado Catholic Bishops. (Id., Ex. 16.) Based on the University's own evaluation of supposed Catholic doctrine, it concluded that the student's position against COVID vaccination because of its connection to abortion must be a "personal belief" and "personal objection" that was "not part of a comprehensive system of religious beliefs"; thus, it did not qualify for the Policy's "religious exemption." (Id.) But Dr. Jane Doe communicated essentially the same Catholic beliefs to the University in support of her exemption request and, days earlier, was denied simply because her beliefs did "not comply with

the campus policy." (V. Cmplt. ¶35.) As it turns out, the University's interaction with the aforesaid medical student revealed it had essentially determined, based on its own evaluation of Catholic teaching, that Catholics need not apply.[1]

Such overt Religious Inquisition into an individual's religious beliefs is exactly the kind of "second-guessing [of] the ecclesiology espoused" by the University's students or employees that is forbidden by the First Amendment. *Colorado Christian Univ.*, 534 F.3d at 1265. "It hardly requires restating that government has no role in deciding or even suggesting whether the religious ground for [an individual's] conscience-based objections in legitimate or illegitimate." *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731. As one prominent Court has put it: "The free exercise of religion promotes the inviolability of *individual conscience* . . . recognizing that *private choice*, not official coercion, should form the basis for religious conduct and belief." *Int'l Soc. for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 438 (2d Cir. 1981) (citing *Walz v. Tax Comm'n*, 397 U.S. 664, 694 (1970) (Harlan, J., concurring)). The broad goal of "pluralism of thought" promoted by the First Amendment "can best be satisfied if any belief that is *arguably religious* is considered 'religious' for the sake of free exercise analysis." *Id.* at 439 (emphasis added). Critically here, the Supreme Court has adopted "a more *subjective* definition of religion, which examines an individual's *inward attitudes* towards a particular belief system, . . . [and] the availability of a free exercise defense *cannot depend on the objective truth or verity of a [person's] religious beliefs*." *Id*. (emphasis added) (citing *United States v. Ballard*, 322 U.S. 78, 86 (1944), *and Thomas v. Rev. Bd.*, 101 S. Ct. 1425, 1429 (1981)).

---

[1] Indeed, in an email on August 6, 2021, from University counsel Steve Zweck-Bronner to Lisa Neale, who was in communications with John Doe about exemption from COVID-19 vaccination and was seeking advice about exemption requests, Mr. Zweck-Bronner confirmed in the plainest terms that the University's religious exemption only "applies to people whose **religion** precludes **all vaccinations**. **I am unaware of a religion that only prohibits COVID 19 vaccinations**." V. Cmplt. ¶40.

The Policy utterly and completely fails that test, and the intrusive Religious Inquisition into applicants' beliefs only followed logically. Such "inquiry into [students' and employees'] religious views" is "not only unnecessary but also offensive." *Mitchell*, 530 U.S. at 828; *see also Catholic Bishop*, 440 U.S. at 1313 (holding that NLRB oversight of teachers in Catholic schools would be excessive entanglement "whenever a school claimed that its challenged actions were mandated by its religious creeds," as that would necessarily require "inquiry into the relationship of the school's actions to the school's religious mission") (cleaned up); *University of Great Falls v. NLRB*, 278 F.3d 1335, 1343 (D.C. Cir. 2002) (government could not require University president to "respond to [NLRB] doubts that [the university] was legitimately 'Catholic'").

Here, the University's explicit inquiry into whether John Doe's asserted religious beliefs were legitimately Buddhist "is the *exact* kind of questioning into religious matters which *Catholic Bishop* specifically sought to avoid." *Univ. of Great Falls*, 278 F.3d at 1353, *as cited by Colorado Christian Univ.*, 534 F.3d at 1264. Simply, the University's Modern Inquisition at the expense of students' and employees' very livelihoods and careers simply cannot be tolerated under the First Amendment.

To be clear, the University's intrusive religious inquiries go far beyond the "threshold inquiry into the 'religious' aspect particular beliefs and practices" allowed under the First Amendment. *Int'l Soc. for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 439 (2d Cir. 1981). For example, requiring an applicant for a vaccine religious exemption to "obtain a letter from the Roman Catholic diocese or her parish [is] misplaced" under the Constitution since "*[p]ersonal* religious beliefs, as long as they are in fact religious, are sufficient." *Farina v. Bd. of Educ. of the City of New York*, 116 F. Supp. 2d 503, 507-508 (S.D.N.Y. 2000) (stating governments must "take care to avoid making impermissible assessments of the credibility of the

*beliefs themselves*," as those beliefs "need not be consistent with the dogma of any organized religion, whether or not the plaintiffs belong to any recognized religion") (emphasis added). That's different from a scenario where the claimant could cite *no religious authority whatsoever* for her alleged religious opposition to vaccination for her child; her primary objection was based on health concerns; and she had acted inconsistently with those beliefs (including having her prior three children vaccinated) without having undergone a *religiously motivated* change of heart. *See Caviezel v. Great Neck Public Schools*, 701 F. Supp. 2d 414, 429-30 (E.D.N.Y. 2010) (holding that pantheist mother with those characteristics merely had selective "personal" but not "religious" objection to vaccination for her fourth child).

Here, Dr. Jane Doe's objection to available COVID vaccines is expressly based her *Catholic beliefs* forbidding her to receive vaccines with any developmental connection to abortion. Her position is supported by ample authority within her Catholic faith tradition.[2] *See, e.g.*, Colorado Catholic Bishops, *A letter from the bishops of Colorado on COVID-19 vaccine mandates*, Aug. 6, 2021 (stating "the Catholic Church teaches that one may refuse . . . a vaccination, if his or her conscience leads them to that decision"; "[t]here is a moral duty to refuse . . . certain vaccines, that are created using human cell lines" unless "there are no other alternatives and the intent is to preserve life"; "[a] person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected"; and in sum, "these points mean a Catholic may judge it right or wrong to receive certain vaccines for a variety of reasons, and there is no Church law or rule that obligates a Catholic to receive a

---

[2] This authority supports the *religious nature* of Dr. Jane Doe's beliefs but is *not* cited as a means for government (including this Court) to determine official Catholic teaching.

vaccine");[3] *see also* South Dakota Catholic Bishops, *Statement Regarding COVID-19 Vaccination Requirements*, August 10, 2021 (similar);[4] Statement of Bishop Joseph Strickland of Diocese of Tyler, Texas, December 8, 2020 (stating Catholics should avoid receiving COVID-19 vaccines with *any* connection to abortion); Statement of Bishop Athanasius Schneider, December 11, 2021 (stating it is morally *impermissible* to receive any available COVID-19 vaccine with even "a very remote" connection to abortion).[5] And moreover, Dr. Jane Doe is unquestionably a devout Catholic who is especially well-formed in this sensitive area of theological bioethics. (*See* Cmplt. ¶8.) Her opposition to the available COVID vaccines is unquestionably religious.

John Doe's religious objection, in turn, is based expressly on his understanding of *Buddhism's* tenets on the priority of the healing power of the mind over the body, the importance of medicinal *suffering* in this life and the next, and the Buddha's teaching on "Not-killing and Not-harming" any living thing, which precludes one from taking any vaccination insofar as their ingredients either contain or are tested on chemicals derived from harming animals (V. Cmplt. ¶44) and, for COVID-19 vaccines in particular, from cell lines derived from aborted human children (V. Cmplt. ¶47). As to his individual sincerity, John Doe has become a devout Buddhist over the past 10 years, after visiting a well-known Buddhist monastery in northeastern China and vowing to the Buddha to abstain from all forms of immorality. (V. Cmplt. ¶9.) He later received a religious accommodation during undergraduate school from lab work that relied on the killing of drosophila and mice; he became a vegan; he began avoiding use of any products that involve animal ingredients or testing; and (after struggling over and then receiving an influenza and Tdap

---

[3] https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-covid-19-vaccine-mandates/.
[4] https://www.sfcatholic.org/bishop-degrood/wp-content/uploads/sites/28/2021/08/SDCC-Stmt_Aug10-2021-.pdf.
[5] Bishop Athanasius Schneider: Covid vaccines: 'The ends cannot justify the means' – Corona Guidance: Religious Norms for Navigating the COVID-19 Pandemic (colby.edu)

vaccine at the University of Michigan in 2016), he took a "vow[] to the Buddha that I will never go against my faith again and will adopt my religious beliefs as the basis for my medical care and healthcare related decisions." (V. Cmplt. ¶44.)

In short, both Plaintiffs have shown themselves to be devout members of their respective faiths with manifestly *religious* objections to available COVID-19 vaccines. Instead of acknowledging as much, the University engaged in a bald-faced religious Inquisition into the credibility of religious *beliefs themselves*, rather than the sincerity of the individual Plaintiffs. The University's intrusive religious inquiry strayed far afield from the true meaning of Separation of Church and State. It is thus unquestionably forbidden by the Religion Clauses.[6]

### B. The Policy is Also Non-Generally Applicable in Violation of the Free Exercise and Equal Protection Clauses.

The Policy also fails the general applicability requirement of the First and Fourteenth Amendments because it authorizes exemptions for *medical* and *some religious* reasons, but not for Plaintiffs' religions reasons. These exemptions render the Policy underinclusive as to its purpose of ensuring widespread use the "best" means (vaccination) of stopping COVID from spreading to the Anschutz community and vulnerable patients.

A regulation is not generally applicable when it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021) (emphasis in original). "Whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," including activities that "*could* . . . present[] similar risks" of "spread[ing]

---

[6] The Tenth Circuit has explained that while violations of religious discrimination trigger strict scrutiny, violations of "excessive entanglement are unconstitutional *without further inquiry*." *Colorado Christian Univ.*, 534 F.3d at 1266 (emphasis added). Accordingly, the Policy and its application to those who request religious exemptions must be invalidated on that basis alone without any opportunity to survive strict scrutiny.

COVID-19." *Id.* (emphasis added) (internal quotations omitted). Relatedly, the Equal Protection Clause requires "that all persons similarly situated should be treated alike." *City of Cleburne, Tex.v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Policy also flunks both of these constitutional requirements.

The Policy states that its "purpose" is "to protect the health and safety of the University of Colorado Anschutz Medical Campus." (V. Cmplt., Ex. 1) That stratospheric level of generality is narrowed in reviewing the University's final letter of denial to John Doe. That letter reiterated the Policy's goal of "protecting the health and safety of the campus community including the patients that medical students treat in University, UC Health, and Children's Hospital clinics." (V. Cmplt., Ex. 15.) But the letter then specified that mandatory vaccination is the "*best way* to accomplish this goal." (Id. (emphasis added).) It explained that the CDC recently found that unvaccinated individuals "were nearly five times more likely to be infected with COVID-19 than vaccinated people," and that the unvaccinated are "about 29 times more likely to be hospitalized with COVID-19 than the unvaccinated. (*Id.*) Thus, the concrete (and obvious) purpose of the Policy is to *achieve widespread vaccination* to reduce the risk of catching and spreading COVID-19 within the Anschutz community (including patients). But that interest is directly undermined by allowing exemptions from vaccination (i.e., the "best way" to achieve campus "health") for those with qualifying religious or medical exemptions.

It's obvious that under the University's premises about vaccination, medical personnel who are exempt from the vaccine mandate for "medical" reasons or some religious reasons "*could* . . . present[] similar risks" of "spread[ing] COVID-19" as those with *disqualifying* religious objections to the vaccine. *Tandon*, 141 S. Ct. at 1296 (emphasis added); *see Fraternal Order of Police Lodge No. 12 v. City of Newark Lodge*, 170 F.3d 359, 366 (3d Cir. 1999) (health

exception to police department's "no-beard" rule rendered it non-generally applicable as applied to officers whose *religion* required beards). There is no reason of science or logic that any mitigating accommodations allowed of the former group should be categorically denied of the latter. Therefore, the Policy plainly treats "comparable secular activity" (i.e., the practice of health care while unvaccinated for medical reasons) and even some comparable religious activity (the practice of health care while unvaccinated for religious reasons) "more favorably than religious exercise" (i.e., the practice of health care while unvaccinated for disfavored religious reasons). In other words, the policy "fail[s] to prohibit nonreligious conduct that endangers [its] interests in a similar . . . degree than [Plaintiffs' religious exercise] does." *Lukumi*, 508 U.S. at 543. That kind of unequal treatment triggers strict scrutiny under the Free Exercise Clause, which, again, the Policy cannot satisfy.[7]

The Policy also violates the Equal Protection Clause for the separate reason that Plaintiffs are similarly situated to other Anschutz physicians and students who have received exemptions under the Policy, and there is no rational basis for treating the two classes differently. (*See* V. Cmplt. ¶¶58-60.) Nothing about "the characteristics" of Plaintiffs in particular "rationally justify denying to [them] what would [and has already been] permitted to [individuals] occupying the same site" for the same purposes. *Cleburne*, 473 U.S. at 450 (holding that zoning ordinance excluding group home for the intellectually disabled was not rationally related to a legitimate interest since such homes would not pose a special threat to the City's interest). Here Dr. Jane Doe would not pose any special threat to the Policy's interest not already allowed of other

---

[7] The Policy is not generally applicable for the separate reason that the University has effectively granted Dr. Jane Doe an *individualized exemption* to continue working at Children's Hospital well past the University's September 1st vaccination date (V. Cmplt. ¶96) , which alone triggers strict scrutiny. *See Fulton*, 141 S. Ct. at 1877 (where a law has created a "system of individualized exemptions," "it may not refuse to extend that system to cases of religious hardship without compelling reason").

similarly situated physicians or medical students at Children's Hospital where she works, as long as she abides by similar alternative precautions as they do. The same is true of John Doe with respect to similarly situated students and employees on Anschutz's Denver campus. Thus the Policy, at least as applied to Plaintiffs, cannot survive even rational-basis review under the Equal Protection Clause.

### C.     The Policy Easily Fails Both Prongs of Strict Scrutiny.

To survive strict scrutiny, the Policy's vaccine mandate must "advance[] interests of the highest order and [b]e narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881. "[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 2234. The asserted compelling interest cannot be stated at an unduly "high level of generality," but rather must be a compelling interest "in denying an exception" to "*particular* religious claimants." *Fulton*, 141 S. Ct. at 1882 (emphasis added). Further, narrow tailoring requires "showing that [the challenged rule] is the *least restrictive means*" of achieving a compelling interest. *Thomas v. Rev. Bd. of Indiana Security Div.*, 450 U.S. 707, 718 (1981) (emphasis added). The Policy cannot remotely satisfy either prong.

First, there can be no compelling interest in burdening the free exercise rights of these Plaintiffs when the Policy already authorizes exemptions for *medical and some religious reasons*. The University can offer "no compelling reason why it has a particular interest in denying an exception [to these "particular religious claimants"] while making them available to others." *Fulton*, 141 S. Ct. at 1882 (holding that City's authorization of secular exemptions from a non-discrimination rule "undermines the City's contention that its non-discrimination policies can brook no departures"). As the Supreme Court put it earlier this year with respect to the government's "interest in reducing the spread of COVID," "[w]here the government permits

other activities to proceed with precautions, it must *show* that the religious exercise at issue is *more dangerous* than those activities *even when the same precautions are applied*." *Tandon*, 141 S. Ct. at 1297 (emphasis added); *see also Agudath Israel v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (government "declarations did not purport to assess the transmission risk of religious worship based on any data"). That's exactly what the government cannot do here, given that health-care work while unvaccinated is indeed permitted for *medical and some religious reasons*, but not for Plaintiffs' religious reasons. *See United States v. Friday*, 525 F.3d 938, 958 (10th Cir. 2008) ("Underinclusiveness suggests that the government's 'supposedly vital interest' is not really compelling.") (emphasis added).

Additionally, the University cannot show that requiring Plaintiffs to vaccinate is the *least restrictive* means of furthering its interest. "[N]arrow tailoring requires the government *to show* that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandon*, 141 S. Ct. at 1296-97 (emphasis added). To accomplish this, the government "must do more than *assert* that risk factors are always present in the [burdened religious activity], or always absent from other secular activities the government may allow." *Id*. at 1296 (emphasis added) (internal quotes omitted). Applied here, there is an abundance of widely accepted evidence that COVID-19 vaccines do not *prevent* the transmission of COVID-19 and its variants. As CDC Director Dr. Rochelle Walensky recently admitted in a public interview: "What COVID vaccines can't do anymore is prevent transmission."[8] And the University can provide no explanation for why any alternative precautions allowed of authorized *medical and other religious exemptees*—or indeed, the *same* precautions allowed of Dr. Jane Doe with demonstrated success over the last 19 months—cannot be allowed of Plaintiffs now

---

[8] CNN Transcripts, Interview with Dr. Rochelle Walensky, Aug. 5, 2021, http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html.

given their religious objections to COVID vaccination. Importantly, Dr. Jane Doe has continued to take these precautions for every shift at Children's Hospital since her now expired vaccination deadline of September 1st, and she has not, to her knowledge, had one incident of contracting or spreading COVID before or after that date. (V. Cmplt. ¶60.) Additionally, the fact Children's Hospital is not applying the Policy's myopic religious exemption to its *own* employees, or to Dr. Jane Doe as she presently continues to work there while undertaking alternative precautions, only further shows the University's blatant religious discrimination is not narrowly tailored.

Further, this Court should ensure the University gave "sufficient weight to rules in other jurisdictions" before concluding that its particularized interest is truly narrowly tailored. *See Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring) (the fact governments in other states allow for water-disposal alternatives of the kind sought by Amish plaintiffs in Minnesota undermined the county's refusal to provide accommodation); *see also id.* ("It is the government's burden to show this alternative won't work; not the Amish's to show it will."); *McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (government must "show[] that it considered different methods that other jurisdictions have found effective"). Here, Plaintiffs are aware of hospitals around the country and *those affiliated with UC Health itself* that are allowing religious accommodations for health care workers who hold religious objections to COVID-vaccines, and they are doing so without apparently undermining their interest in protecting patients and health care workers from COVID. (V. Cmplt., Ex. 20) (*see, e.g.*, Employee Witness # 21, at ¶¶2, 4-6, UC health ultrasound technician explaining they have received a religious accommodation and are continuing to work on site with inpatients, outpatients, and ER patients while continuing to follow masking guidelines, wearing PPE, and undergoing COVID testing twice a week, and they are personally aware of five other similarly situated employees in their

hospital who have also been granted religious accommodations).) The University cannot demonstrate that these kinds of religious accommodations allowed of providers in health care settings across the country, and even *within its own health care system*, are unavailable to Plaintiffs here.

In sum, the Policy's express religious discrimination cannot satisfy the demands of strict scrutiny. Accordingly, Plaintiffs are likely to succeed on the merits of their claims under the Establishment, Free Exercise, and Equal Protection Clauses.

### D. The University's Post-Hoc Excuse of "Undue Hardship" is Manifestly Pretextual and Preempted by the First Amendment.

In response to a demand letter Dr. Jane Doe sent to University counsel on September 15, 2021, summarizing the above legal violations, the University responded on September 20th with a letter that (a) ignored Dr. Jane Doe's claim of lack of religious neutrality; (b) cited caselaw about governments' authority to require vaccination; and (c) argued that regardless, it would be an "undue hardship" on the University to accommodate Dr. Jane Doe's religious beliefs under Title VII employment law. The "undue hardship" excuse is manifestly pretextual given the University's actions in this case. Additionally, Dr. Jane Doe's constitutional right to equal treatment with other exempted, similarly situated Anschutz employees or students in clinical settings preempts the University's made-for-litigation undue hardship excuse.

In an analogous context, the Tenth Circuit recognized courts' authority "to override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004). In *Axson-Flynn*, the Tenth Circuit found there was sufficient evidence that the University of Utah's insistence that a Mormon plaintiff (who was an actor-in-training) adhere to a script that violated her religious beliefs was actually motivated by "anti-Mormon sentiment," since the

plaintiff testified that other non-Mormon students had received religious exemptions, and a professor told her that "other good Mormon" girls didn't object to the script. *Id*. at 1293. Thus "Defendants' behavior" raised a genuine issue of material fact as to whether the University's motivation "was a pretext for religious discrimination." *Id*.

Even more can be said of the University here. On August 26th, the University's "Exemption Verification Team" denied Dr. Jane Doe's religious exemption request **<u>solely because</u>** it did "not comply with the campus policy, *which only recognizes religious exemptions based on a religious beliefs whose teachings are opposed to all immunizations*." (V. Cmplt. ¶35.) Here, unlike in *Axson-Flynn*, the University *admitted* it denied Dr. Jane Doe's request purely on the basis of her religion. It did not assert its "undue hardship" excuse until September 20, 2021, and then only in a letter from legal counsel nearly three weeks after the University's vaccination deadline. Further, the University's Policy expressly allows exemptions for medical and some religious reasons for Anschutz students and employees, at least some if not all of whom work in clinical settings with patients who are elderly, immunosuppressed, or otherwise infected—and *not necessarily vaccinated*—and thus similarly (if not more) vulnerable to COVID as compared to Dr. Jane Doe's child patients. Thus, the University's own actions show that its assertion that retaining her would be an "undue hardship" is blatantly pretextual.

Even if the University's assertion is not pretextual, Dr. Jane Doe's rights to equal treatment under the First and Fourteenth Amendments preempts Title VII. For the reasons discussed above, the Policy is non-generally applicable under the Free Exercise Clause and violates the Equal Protection Clause because it allows exemptions for medical and some religious reasons to individuals in clinical settings around patients vulnerable to COVID. Thus, Dr. Jane Doe is entitled to equal treatment with individual employees *or students* (who are not

subject to Title VII) who have received such exemptions and work in clinical settings. (V. Cmplt. ¶59.) Thus, Dr. Jane Doe's constitutional rights supersede the University's assertion of "undue hardship" under statutory employment law, which, regardless, is nothing but a made-for-litigation, pretextual excuse given the defendants' behavior in this case.

## II.   PLAINTIFFS SATISFY THE REMAINING FACTORS FOR OBTAINING A TEMPORARY AND PRELIMINARY INJUNCTION.

### A.   Imminent Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, prohibiting Plaintiffs from practicing or studying medicine and health care in accord with their sincerely held religious beliefs, on the same terms and conditions as those for whom COVID-19 vaccines are medically contraindicated, or as those *who hold the University's favored religious beliefs*, "assuredly inflicts irreparable harm." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (holding as much with respect to Kentucky's order closing houses of worship to stop the spread of COVID-19 while authorizing the continued operation of many secular businesses); *see also Brooklyn Diocese v. Cuomo*, 141 S. Ct. 63, 68 (2020) (similar). Additionally, the Tenth Circuit has recognized that "government condemnation of religion" inflicts irreparable injury. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). That is what the University has done here in disqualifying Plaintiffs' religious beliefs from exemption simply based on their religious nature.

Moreover, absent an injunction, Dr. Jane Doe will face *imminent termination of employment* and with it, loss of admitting privileges at area hospitals, likely damage to her professional standing, possible disciplinary consequences, and effectively, the inability to practice pediatric medicine in Colorado for a period of two years given her two-year, 100-mile

radius non-compete clause with the University of Colorado. (V. Cmptl., at 69.) For John Doe, he will be unable to transfer to other medical schools since he has not completed two years at Anschutz and he will have to start over at another school and lose a year of practicing medicine following graduation, residency, and fellowships—or otherwise forgo his dreams of becoming a doctor and choose another career. (V. Cmplt. ¶¶72-74.) All of these harms are imminent and irreparable.

### B.   Balance of Harms

Here, the balance of harms of issuing versus not issuing an injunction weigh heavily in favor of Plaintiffs, because the Policy already allows Anschutz students and employees exemptions for reasons of health or *some* religious beliefs, presumably with reasonable accommodations, and there is no actual evidence that those exemptions or the available accommodations for Plaintiffs undermine the University's asserted purposes. The University cannot show that granting the same accommodations to Plaintiffs that health care workers (including Plaintiff Dr. Jane Doe) have been exercising for the past 19 months would impose any more harm. Plaintiffs merely seek an injunction that "appropriately permits religious [conduct] with the same risk-minimizing precautions as similar activities" allowed of health care workers and employees with medical and other religious exemptions. *Roberts*, 958 F.3d at 316.

### C.   Public Interest

"Treatment of similarly situated [health care providers] in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees." *Id*. And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). Further, with respect to Dr. Jane Doe, the University cannot show that her use of alternative precautions (including for nearly one month after the alleged September 1st vaccination deadline) "has resulted in the spread of

the disease." *Brooklyn Diocese*, 141 S. Ct. at 68. Thus, for the reasons explained above, a TRO and preliminary injunction against the Policy is directly in service of the public interest.

<u>**CONCLUSION**</u>

As the Supreme Court recently stated, "[t]he Constitution commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from . . . distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 547).

For the foregoing reasons, this Court should grant Plaintiffs' motion for a Temporary Restraining Order and Preliminary Injunction against the Policy's explicit religious discrimination.

Respectfully submitted,

/s/ Peter Breen
Peter Breen
Martin Whittaker*
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/Michael G. McHale
Michael G. McHale*
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**

19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs*

*\* pro hac vice motion to be filed*