**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-2637-RM

Jane DOE, M.D., and John DOE,

      Plaintiffs,

v.

The UNIVERSITY OF COLORADO; Donald ELLIMAN, Chancellor of the University of Colorado Anschutz, in his official capacity; and Shanta ZIMMER, M.D., Senior Associate Dean of Medical Education, University of Colorado Anschutz, School of Medicine, in her official capacity,

      Defendants.

---

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

---

Defendants oppose Plaintiffs' Motion for Preliminary Injunction as follows:

**INTRODUCTION**

"Can a man excuse his practices to the contrary [of the law] because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878). Yet, that is precisely what Plaintiffs—a pediatric intensive care doctor and a medical student—claim they are entitled to do in the middle of the greatest public health crisis in living memory. With barely a mention of the magnitude of the COVID crisis and the risk their refusal to be vaccinated presents to the most vulnerable—in Plaintiff Jane Doe's case, young patients in the pediatric intensive care unit who cannot be vaccinated and are in the midst of medical crises—Plaintiffs argue that they should be permitted

not to get vaccinated because of their religious beliefs. This is despite the fact that they admit they have received other vaccinations in the past and that they practice (or aspire to practice) medicine that has been developed, in large part, relying on the very same processes and cell lines they find objectionable now.

For over a century, the Supreme Court and federal and state courts nationwide have held that vaccination mandates are constitutional. As the Supreme Court stated in 1905, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905).

In light of this well-established authority, Plaintiffs do not—and cannot—argue that the University does not have the power to mandate vaccination. Instead, they argue that the University's prior policy was unconstitutional based on their own strained interpretation of its language. Plaintiffs' challenge fails for several reasons.

First, Plaintiffs' facial challenge to the prior policy is moot. Prior to the filing of this lawsuit, the University repealed and replaced the policy to clarify its intent and application. Accordingly, the Court has no jurisdiction to consider Plaintiffs' facial challenge to the now repealed policy.

Second, contrary to Plaintiffs' argument, the denial of Plaintiffs' requests for religious exemption was not based on the specifics of Plaintiffs' professed religious beliefs. Rather, given Plaintiffs' inconsistent past positions and actions, the University rightfully questioned whether Plaintiffs' religious objections to *the COVID vaccines* were "truly held." *See United States v. Seeger*, 380 U.S. 163, 185 (1965) ("[W]hile the 'truth' of a belief is not open to question, there

2

remains the significant question whether it is 'truly held.'"). As the evidence demonstrates, much of modern medicine, including many vaccines, has been developed and/or tested substantially the same way as the COVID vaccines. Plaintiffs' failure to raise prior objections to vaccinations and medications demonstrates that their professed religious objection to *these vaccines* is not a "sincerely held belief," but rather a personal, or perhaps a political, choice.

Third, the vaccination policy, as revised, is a neutral policy of general applicability, subject to a rational basis review. And, under *Jacobson* and *Prince*, the policy easily passes that test. That the University, in compliance with its obligations under federal law, considers accommodations under the ADA and Title VII, does not transform the policy into one that targets or singles out religion and does not subject it to heightened scrutiny.

Further, neither Plaintiff can show irreparable harm if an injunction is not granted. Plaintiff John Doe requested and received a leave of absence prior to filing suit and has not demonstrated how the denial of an injunction will irreparably damage his ability to return to the University next year or attend any other school. As to Plaintiff Jane Doe, the damage asserted is potential termination of employment—for which there are monetary remedies. Finally, given the extraordinary public health crisis, the public interest and the balancing of the equities strongly weigh in favor of denying the injunction.

## BACKGROUND

### I.     COVID-19

COVID-19 is an infectious disease caused by SARS-CoV-2, the novel coronavirus that primarily spreads through respiratory droplets and very small particles that contain the virus.[1]

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, *last visited* Oct. 12, 2021. A court may take judicial notice of a fact not subject to reasonable dispute because it can be readily determined from sources whose accuracy cannot reasonably be questioned. *See* F.R.E. 201(b); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of

People of all ages can contract and transmit COVID-19, and those who contract the disease may suffer severe illness or death, or incur long-term, ongoing health problems.[2] Anyone who contracts COVID-19, including children and young people, can transmit the disease to others.[3]

The University's pediatric critical care doctors, including Dr. Jane Doe, have been treating children admitted to the pediatric intensive care unit (PICU) due to COVID-19 infections.[4] Some of those children have developed complex and life-threatening Multisystem Inflammatory Syndrome in Children (MIS-C) following such an infection.[5] Further, due to widespread infections, the SARS-CoV-2 virus has mutated into the so-called Delta variant, which is currently the most prevalent variant circulating in Colorado and in the United States as a whole and is significantly more transmissible than the prior version of the virus.[6]

To date, there have been approximately 44 million cases of COVID-19 in the United States[7] and almost 700,000 people have died from COVID-19 nationwide.[8] Colorado has had over 694,349 confirmed cases and approximately 8,065 confirmed deaths.[9] The pandemic has had a particularly devastating impact on communities of color.[10]

## II.     COVID-19 Vaccines

There are three COVID-19 vaccinations currently available in Colorado at no cost: the Pfizer BioNTech mRNA vaccine, the Moderna mRNA vaccine, and the Johnson/Janssen ("J&J")

---

factual information found on the world wide web."); *Denius v. Dunlap*, 330 F.3d 919, 926–27 (7th Cir. 2003) (taking judicial notice of information from official government website).
[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html, *last visited* Oct. 12, 2021.
[3] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, *last visited* Oct. 12, 2021.
[4] Ex. A, Decl. of Dr. Cripe, ¶ 3; Ex. B, Decl. of Dr. Dominguez, ¶ 6.
[5] Ex. B, ¶ 5; https://covid.cdc.gov/covid-data-tracker/#mis-national-surveillance, *last visited* Oct. 12, 2021.
[6] Ex. B, ¶ 8.
[7] Ex. C, CDC Chart of Cumulative Cases.
[8] Ex. D, CDC Chart of Cumulative Deaths.
[9] https://covid19.colorado.gov/data, *last visited* Oct. 12, 2021.
[10] Ex. E, Decl. of Dr. Zimmer, ¶¶ 5, 9-10.

viral vector vaccine ("COVID Vaccines").[11] The COVID Vaccines were approved by the U.S.
Food and Drug Administration ("FDA") under an Emergency Use Authorization ("EUA"), an
approval method used during public health emergencies.[12] On August 23, 2021, the FDA gave
full approval to the Pfizer BioNTech mRNA vaccine.[13]

The Pfizer BioNTech and Moderna vaccines, like many widely-used medications and
certain vaccines, were tested on a fetal cell line commonly referred to as HEK-293.[14] While it is
believed that HEK-293 was derived from an aborted fetus in the Netherlands in early 1970s,
there is no scientific consensus as to whether the fetus was aborted or was miscarried.[15] Because
these cell lines can be continually cultured for weeks to months without deterioration, they have
been widely used for the past 20 years for testing a wide variety of medications, including
Tylenol, Benadryl, Tums, Lipitor, Albuterol, Azithromycin, and certain vaccines, including
Rubella, Chickenpox, and Hepatitis A, among others.[16] HEK-293 was not used in the actual
production of the Pfizer and Moderna vaccines.[17] The J&J vaccine was developed using a
different cell line, commonly referred to as PER.C6, first isolated in mid-eighties, also from
human fetal cells.[18]

Each of the COVID Vaccines has been shown to be safe and effective, with over 401
million doses having been administered in the United States to date.[19] Those who are vaccinated

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html, *last visited* Oct. 12, 2021.
[12] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html, *last visited* Oct. 12, 2021.
[13] *Id.*
[14] Ex. F, Decl. of Dr. Levin, ¶ 8; *see also* https://www.chop.edu/centers-programs/vaccine-education-center/vaccine-ingredients/fetal-tissues, *last visited* Oct. 12, 2021.
[15] Ex. G, Decl. of Dr. Jackson, ¶ 10.
[16] Ex. F, ¶¶ 7, 10.
[17] Ex. F, ¶ 8. Because of this, even though the Vatican's doctrinal office, the Congregation for the Doctrine of the Faith (CDF) has determined that all COVID-19 vaccines are "morally acceptable" to receive, the U.S. Conference of Catholic Bishops has particularly supported the Pfizer and Moderna vaccines because no fetal cell lines have been used in their production. *See* Ex. H.
[18] Ex. F, ¶ 9.
[19] Ex. I, CDC Chart.

are less likely to be infected and to transmit the virus to others (including the so-called Delta variant of the virus) and the chances of hospitalization or death from contracting the virus substantially decrease.[20] Vaccination is the only safe means of controlling the spread and further mutations of the SARS-CoV-2 virus to achieve herd immunity and to end the pandemic that has been ravaging the United States and the world for almost 20 months now.[21] And it is the most effective means of protecting the most vulnerable—children and the immunocompromised— whom Plaintiffs serve as medical professionals.[22]

### III.     Campus Policy 3012

Achieving the highest vaccination rates among healthcare workers is of vital importance. The Colorado Board of Health has issued a rule requiring that all staff, including students and trainees, in health care facilities be vaccinated against COVID-19. 6 CCR 1011-1, Chapter 2, Part 12.

To that end, the University adopted Policy 3012 (the "Policy) to require vaccination of all of individuals who work or learn on the Anschutz Medical Campus or off campus in connection with CU Anschutz programs.[23] On September 24, the Policy was repealed and reenacted to clarify its language and, given the rise of COVID-19 infections and hospitalizations in Colorado, to further narrow the allowable requests for exemptions.[24] Under the reenacted Policy, consistent with its obligations under the ADA and Section 504 of the Rehabilitation Act, as well as Title VII, the University continues to evaluate exemption requests as accommodations for medical conditions or sincerely held religious beliefs. There are no other exceptions or exemptions under

---

[20] https://covid19.colorado.gov/vaccine-breakthrough, *last visited* Oct. 12, 2021.
[21] Ex. B, ¶ 11; Ex. E, ¶¶ 16-17; Ex. J, Decl. of Dr. Wynia, ¶ 14.
[22] Ex. A, ¶ 7; Ex. B, ¶ 12; Ex. E, ¶ 15; Ex. G, ¶ 16.
[23] Plaintiff's Ex. 1.
[24] Ex. K.

the Policy, including no exemptions based on religious beliefs for students and applicants.

### IV.    Dr. Jane Doe

Plaintiff Jane Doe is a pediatric critical care doctor at the Children's Hospital in Colorado Springs. In addition to a Doctor of Medicine degree, she holds a Master's degree in Bioethics. She is one of seven physicians who staff the pediatric intensive care unit (PICU).[25] In that capacity, she works very closely with patients, ranging from 3-4 days to 21 years old, who suffer from complex and life-threatening medical conditions, including patients with COVID-19.[26] Many of the patients are not vaccinated due to their age.[27]

Dr. Doe submitted a request for an exemption from the Policy based on her religious beliefs. The University requested further information to evaluate her request. Dr. Doe responded:

1.  As a faithful Catholic, I uphold the dignity and sanctity of every human life and firmly oppose abortion and the evil involved in the use of cell lines derived from abortions. All 3 available emergent-use authorized vaccines in the U.S. - Moderna, Pfizer-BioNTech, and Johnson & Johnson - used the abortion-derived cell lines (HEK293) in one or more phases of developing the SARS CoV-2 vaccine.

2.  I have had other vaccines; including influenza - which does not utilize unethically derived cell lines.[28]

Dr. Doe did not describe how her religious beliefs supported receiving other vaccines, including those developed or tested the same way as the COVID-19 Vaccines, but not the COVID-19 Vaccines, and did not articulate an individualized Catholic belief different from the views of the Vatican doctrinal office or the U.S. Conference of Catholic Bishops, which have come out strongly in favor of vaccination against COVID-19.[29] Further, as a bioethicist, Dr. Doe

---

[25] Ex. A, ¶ 2.
[26] *Id.*, ¶ 3.
[27] Ex. A, ¶ 6.
[28] Ex. L.
[29] Ex. H.

was surely aware of the long line of drugs and several common vaccines that she routinely

prescribes to her patients that have been tested on the same HEK-293 cell line as the Pfizer and

Moderna vaccines.[30] Based on her inconsistent positions taken as a physician and as someone

who took other vaccines, the University determined that her objection to the COVID-19 vaccine

was not a sincerely held religious belief and denied the exemption request. Dr. Doe was provided

an additional time to change her position and receive the vaccine. When she continued to refuse,

she was placed on administrative leave, pending the outcome of her legal challenge.

### V.        Mr. John Doe

Mr. Doe is a first-year medical student. He applied for a religious exemption under the

prior Policy which has now been repealed. There are no religious exemptions permitted for

students and applicants under the reenacted Policy.[31] Mr. Doe stated that his religious beliefs

based on Buddhism did not permit him to take vaccinations because "vaccination is antithetical

to the Buddha's scriptures and Buddhism teaching."[32] He stated that at the age of 21, he attended

a monastery in China where he learned Buddhism scriptures and ceremonies and "vowed to the

Buddha that he would abstain from killing, stealing, sexual misconduct, lying, and

intoxication."[33] He came to believe that "[m]edical vaccination was not endorsed in the

Buddhism's teaching[,] that one can maintain his or her good health through the purity of

thoughts and actions, not sustained through vaccinations[,] . . . vaccines are not created by the

nature, it creates disturbance to the balance and interactions among the mind, body, and nature. .

. [and] [v]accines circumvents [sic] potential diseases and subsequently the sufferings that one

---

[30] Ex. A, ¶ 11; Ex. F, ¶ 10.
[31] Ex. K, p. 4.
[32] Plaintiffs' Ex. 12, p. 2.
[33] *Id.*, p. 3.

may need to experience. . . ."[34]

Nevertheless, he admitted that after he turned 21 (after his vow to the Buddha), he voluntarily took vaccines so that he could volunteer at a hospital.[35] Since that action appeared to be inconsistent with his stated beliefs, the University requested additional information. In response, Mr. Doe, for the first time, raised an objection based on the use of fetal cell lines.[36] Given Mr. Doe's inconsistent positions and shifting objections, the University determined that his objection was not based on sincerely held religious belief and denied the exemption request. Mr. Doe was provided with the option of withdrawing or taking a leave of absence. He opted for the latter. He received full tuition and fees refund. His academic standing has not been affected, and he is free to transfer to another medical school at any time.

## ARGUMENT

### I.   Plaintiffs have not established a clear and unequivocal right to a preliminary injunction.

A preliminary injunction is "a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

To obtain a preliminary injunction, the moving party must establish four factors: (1) it has a substantial likelihood of success on the merits of the case, (2) it will suffer irreparable harm if the injunction is not granted, (3) its threatened injury outweighs the harm caused to the opposing

---

[34] *Id.*
[35] *Id.*, p. 2.
[36] Plaintiffs' Ex. 14.

party as a result of the injunction, and (4) the injunction is not adverse to the public interest.

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).

**A. There is no substantial likelihood of success on the merits of Plaintiffs' claims.**

> *a. All claims against the University and the claims for damages against the individual Defendants are barred by the Eleventh Amendment.*

Plaintiffs have asserted three claims under 42 U.S.C. § 1983 alleging violations of the Free

Exercise Clause and the Establishment Clause of the First Amendment and a violation of the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The

fourth claim for relief is brought under the Colorado Constitution.

All claims against the University are barred by the Eleventh Amendment. Sovereign

immunity protects states and arms of the states from suit in federal court. *Levy v. Kansas Dep't*

*of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015). The University, as an arm of the

state of Colorado, is entitled to Eleventh Amendment immunity from suit in federal court. *See*

*Rozek v. Topolnicki*, 865 F.2d 1154, 1158 (10th Cir. 1989); *see also Sturdevant v. Paulsen*, 218

F.3d 1160, 1170–71 (10th Cir. 2000) ("We have consistently held that state colleges and

universities are arms of the state.") (collecting cases); *Robinson v. Bd. of Regents of Univ. of*

*Colorado*, 390 F. Supp. 2d 1011, 1016 (D. Colo. 2005) ("It is well-settled that the University of

Colorado is considered a state entity capable of claiming Eleventh Amendment immunity.").

For the same reasons, because official capacity suits against state employees are suits

against the state, Plaintiffs' claims against the individual Defendants are also barred by the

Eleventh Amendment with one exception discussed below. *See Kentucky v. Graham*, 473 U.S.

159, 169 (1985) (holding official capacity suit is suit for damages against state barred by

Eleventh Amendment).[37]

The exceptions to this jurisdictional bar are: (1) valid Congressional abrogation of the Eleventh Amendment immunity; and (2) waiver. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002). The U.S. Supreme Court has held that Congress did not abrogate states' Eleventh Amendment immunity when it enacted Section 1983. *Quern v. Jordan*, 440 U.S. 332, 345 (1979); *Murray v. Colorado*, 149 F. App'x 772, 774 (10th Cir. 2005) (unpublished) (holding the University of Colorado is immune from Section 1983 claims under the Eleventh Amendment). And Colorado has not waived its Eleventh Amendment immunity against being sued under 42 U.S.C. § 1983 in federal court. *See Am. Tradition Inst. v. Colorado*, 876 F. Supp. 2d 1222, 1236 (D. Colo. 2012).

Accordingly, the Court does not have jurisdiction over Plaintiffs' claims, with one exception: under *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Levy*, 789 F.3d at 1169.[38]

> b. *Plaintiffs' facial challenges based on the language of the prior Policy are moot.*

Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2; *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019). "Courts employ three jurisdictional doctrines to 'keep federal courts

---

[37] The Section 1983 claims against the University and the individual Defendants sued in their official capacity for damages are barred because Defendants are not "persons" who can be sued under Section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63–68 (1989) (holding that in light of Section 1983's language and legislative history, "a State is not a person within the meaning of § 1983").

[38] The *Ex parte Young* exception does not apply to state law claims seeking prospective injunctive relief. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding that the Eleventh Amendment prohibited a federal district court from ordering state officials to conform their conduct to state law, even though only prospective injunctive relief was sought).

within their constitutional bounds': standing, mootness, and ripeness." *Prison Legal News*, 944

F.3d at 879 (citation omitted). "Mootness is 'standing set in a time frame: The requisite personal

interest that must exist at the commencement of the litigation (standing) must continue

throughout its existence (mootness).'" *Id.* (citation omitted).

Plaintiffs assert facial and as-applied challenges to the prior version of Campus Policy

3012, focusing on the following language:

> A medical exemption may be submitted if vaccination is medically contraindicated
> due to other medical conditions or due to a physical condition that would cause
> vaccination to endanger an individual's life or health. . . . A religious exemption may
> be submitted based on a person's religious belief whose teachings are opposed to all
> immunizations.[39]

Plaintiffs' facial challenges to the Policy are moot because on September 24, 2021—

before this case was filed—the Policy was repealed and reenacted. The Policy now reads:

> All Individuals, who are, or may access any University facility or participate in any
> University program, or whose employment or academic activities may require in-
> person interaction with other CU Anschutz employees, students, patients, study
> subjects or members of the public, including external conferences, regardless of
> location, must be fully vaccinated against COVID -19 unless they have received an
> approved medical or religious accommodation as further described below.
>
> ***
>
> Individuals may receive a medical or religious accommodation if they are unable to
> receive the vaccine for medical reasons or sincerely held religious beliefs as further
> described below.
>
> ***
>
> A medical accommodation may be granted if vaccination is absolutely
> contraindicated due to other medical conditions.[40] . . . A medical accommodation
> will not be granted, if the accommodation poses an undue hardship or the
> accommodation poses a direct threat to the health or safety of the Individual or others.

---

[39] Plaintiffs' Ex. 1.
[40] Currently the only absolute contraindications to COVID-19 vaccination are i) severe immediate allergic reaction
to a previous dose or to a component of the COVID-19 vaccine, ii) immediate reaction of any severity to a previous
dose or known (diagnosed) allergy to a component of the COVID-19 vaccine.

> A religious accommodation may be granted based on an employee's religious beliefs. . . . A religious accommodation will not be granted if the accommodation would unduly burden the health and safety of other Individuals, patients, or the campus community. Religious accommodations are not currently available to students or applicants.[41]

Neither the Policy, nor its implementation, base religious exemption decisions on the requestor's religious views or denomination. To be clear, the University disagrees that the prior Policy language or the University's actions in any way differentiated between various religious views or denominations. Plaintiffs' strained interpretation and focus on the words "teachings" and "all immunization" imputes intent for which there is simply no evidence. Regardless, the repeal and reenactment of the Policy has mooted Plaintiffs' facial challenges. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'") (citation omitted).

Nor does the voluntary cessation exception to the mootness doctrine apply. *See Prison Legal News*, 944 F.3d at 881 ("The voluntary cessation exception does not apply, and a case is moot," if the defendant makes it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.") (citations omitted). "[A] defendant must undertake 'changes that are permanent in nature' and "foreclose a reasonable chance of recurrence of the challenged conduct.'" *Id.* (citing *Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004)). "Such changes could include 'withdrawal or alteration of administrative policies' through a formal process[.]" *Id.* (citations omitted).

The Policy was repealed and reenacted prior to the lawsuit being filed and no longer

---

[41] Ex. K, pp. 1, 4.

contains the language on which Plaintiffs base their facial challenges. Under *Prison Legal News*, *supra*, the withdrawal of the administrative policy moots these facial challenges and the voluntary cessation exception does not apply.

>  c.  *The reenacted Policy is a neutral policy of general applicability which passes the rational review test.*

"Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006). Thus, the first question is whether the reenacted Policy is neutral. "A law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Id.* at 649-50.

The Policy's goal is not the infringement or restriction of religious practices. As set forth in the Policy itself: "The purpose of this policy is to protect the health and safety of the University of Colorado Anschutz Medical Campus ("CU Anschutz") community . . . ." Further, as set forth in the Declaration of Chancellor Elliman, the Policy is part of the larger goal of the University of Colorado Anschutz Medical Campus, as one of the largest public health providers in Colorado, to stop the spread and mutation of the SARS-CoV-2 virus and to end the COVID-19 pandemic through herd immunity.[42]

The next question is whether the Policy is of general applicability. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions[,]'" or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted

---

[42] Ex. M, ¶¶ 9-11.

interests in a similar way." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021).

Here, the Policy mandates vaccination for the entire campus community. Contrary to Plaintiffs' arguments, the University's compliance with federal law—the ADA, Section 504 of the Rehabilitation Act, and Title VII—does not change this general requirement. The University's consideration of appropriate accommodations for medical reasons under the ADA and Section 504 of the Rehabilitation Act is not a system of individualized *ad hoc* exemptions. *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006) ("objective exceptions does not establish a subjective system of individualized considerations").

As the medical accommodations are necessary for the protection of the community member's health or life, they are not exemptions for "secular conduct that undermine[] the government's asserted interests." *Id.* Indeed, quite the contrary, as they are in line with the Policy's purpose of protecting the health and safety of the community. Accordingly, because the "single exception for medical exemptions" furthers the same policy as the vaccination requirement, it does not subject the Policy to heightened scrutiny. *See W.D. v. Rockland County*, No. 19-civ-2066, 2021 WL 707065, at *26-30 (S.D.N.Y. Feb. 22, 2021); *see also Grace United Methodist Church*, 451 F.3d at 651 ("Consistent with the majority of our sister circuits, however, we have already refused to interpret [*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878 (1990)] as standing for the proposition that a secular exemption automatically creates a claim for a religious exemption.").

Nor does the University's compliance with Title VII in considering accommodations for employees with sincerely held religious beliefs transform the Policy into a rule that impermissibly burdens Plaintiffs' rights under the Free Exercise Clause. As discussed above, the

15

Policy does not distinguish between various religious beliefs or denominations. No exemptions have been granted based on some religious beliefs or denominations as opposed to others, and Plaintiffs present no evidence to the contrary.[43]

Under both the prior version and the current Policy, the University employs a two-step process in evaluating all requests for exemptions. First, the University inquires whether the requestor has demonstrated a sincerely held religious belief or a medical condition for which the vaccine is contraindicated. Then, the University evaluates whether it is able to accommodate the request based on the requestor's job and interactions with patients and campus community without undue hardship.

In *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878 (1990), the plaintiffs argued, similar to the position Plaintiffs have taken here, that "requiring an individual to observe a generally applicable law that requires . . . the performance of an act that [their] religious belief forbids" was "prohibiting the free exercise of religion." The Supreme Court soundly rejected that argument, reasoning:

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. . . . "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted)."

*Id.* at 878–79 (quoting *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594–595 (1940)). The Court held that a neutral law of general applicability that only incidentally burdens an individual's religious exercise is subject to rational basis review:

---

[43] *Id.*, ¶ 13.

> [I]f "compelling interest" [applying strict scrutiny] really means what it says . . . , many laws will not meet the test. Any society adopting such a system would be courting anarchy, but that danger increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress none of them. Precisely because "we are a cosmopolitan nation made up of people of almost every conceivable religious preference," and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming *presumptively invalid,* as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order. The rule respondents favor would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind—ranging from compulsory military service,[44] to the payment of taxes,[45] to health and safety regulation such as manslaughter and child neglect laws,[46] **compulsory vaccination laws,**[47] drug laws,[48] and traffic laws,[49] to social welfare legislation such as minimum wage laws,[50] child labor laws,[51] animal cruelty laws,[52] environmental protection laws,[53] and laws providing for equality of opportunity for the races[54]. The First Amendment's protection of religious liberty does not require this.

*Smith*, 494 U.S. at 888–89 (citations removed to footnotes for ease of reference) (emphasis in bold added).

As summarized by the Supreme Court, numerous laws—including mandatory vaccination laws—of general applicability that incidentally burden the exercise of religion have been held constitutional, and the Policy here is no different. Indeed, over a century ago, in a pandemic not unlike the one the world is experiencing now, the Supreme Court upheld the mandatory smallpox vaccination requirement for all citizens, holding: "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty

---

[44] *Gillette v. United States,* 401 U.S. 437 (1971).
[45] *United States v. Lee,* 455 U.S. 252, 258-61 (1982).
[46] *Funkhouser v. State,* 763 P.2d 695 (Okla. Crim. App. 1988).
[47] *Cude v. State,* 377 S.W.2d 816 (Ark. 1964).
[48] *Olsen v. Drug Enforcement Administration,* 878 F.2d 1458 (D.C. Cir. 1989).
[49] *Cox v. New Hampshire,* 312 U.S. 569 (1941).
[50] *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290 (1985).
[51] *Prince v. Massachusetts,* 321 U.S. 158 (1944).
[52] *Church of the Lukumi Babalu Aye Inc. v. City of Hialeah,* 723 F. Supp. 1467 (S.D. Fla. 1989). *jdgm't reversed Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993).
[53] *United States v. Little,* 638 F. Supp. 337 (Mont. 1986).
[54] *Bob Jones University v. United States,* 461 U.S. 574, 603–604 (1983).

may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced

by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S.

11, 29 (1905). The Court reiterated this principle in *Prince v. Massachusetts*, 321 U.S. 158, 165-

66 (1944):

> [A state's police power] is not nullified merely because the parent grounds his claim
> to control the child's course of conduct on religion or conscience. Thus [a parent]
> cannot claim freedom from compulsory vaccination for the child more than for
> himself on religious grounds. The right to practice religion freely does not include
> liberty to expose the community or the child to communicable disease or the latter
> to ill health or death.

*See also Zucht v. King*, 260 U.S. 174, 176 (1922) (holding that there was no constitutional

question "substantial in character" challenging, on equal protection grounds, a municipality's

mandatory vaccination ordinance, since "[l]ong before this suit was instituted, *Jacobson* had

settled that it is within the police power of a state to provide for compulsory vaccination"). *See*

*also Nikolao v. Lyon*, 875 F.d 310, 316 (6th Cir. 2017); *Phillips v. City of New York*, 775 F.3d

538, 543 (2d Cir. 2015) ("New York law goes beyond what the Constitution requires by allowing

an exemption for parents with genuine and sincere religious beliefs."); *Workman v. Mingo*

*County Bd. of Educ.*, 419 F. App'x 348, 353-54 (4th Cir. 2011) ("[F]ollowing the reasoning of

*Jacobson* and *Prince*, we conclude that the West Virginia statute requiring vaccinations as a

condition of admission to school does not unconstitutionally infringe [plaintiff's] right to free

exercise.") (collecting cases); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1084 (S.D. Cal.

2016) (upholding California law that removed religious exemption to vaccination mandate,

stating that "it is clear that the Constitution does not require the provision of a religious

exemption to vaccination requirements . . . ."); *Caviezel v. Great Neck Pub. Sch.*, 739 F. Supp.

2d 273, 285 (E.D.N.Y. 2010) *aff'd*, 500 F. App'x 16 (2d Cir. 2012) ("[T]he free exercise clause

of the First Amendment does not provide a right for religious objectors to be exempt from [the state] compulsory inoculation law.").

As a neutral rule of general applicability, the Policy easily passes the rational review test: it is rationally related to a legitimate state interest of protecting the health and safety of the campus community and Colorado citizens as a whole. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) ("If no heightened scrutiny applies, the statute need only be rationally related to a legitimate government purpose.").

In fact, the Policy withstands even the highest standard of review—strict scrutiny. *Fulton*, 141 S. Ct. at 1881 ("A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests."). The Policy serves a compelling goal: as one of the largest institutions of public health in Colorado, one of the goals of the Anschutz Medical Campus is to help achieve herd immunity in Colorado to end the COVID-19 pandemic.[55] *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest[.]"); *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1064 (D.N.M. 2020), *aff'd sub nom. Legacy Church, Inc. v. Collins*, 853 F. App'x 316 (10th Cir. 2021) ("The public's interest in limiting the COVID-19 outbreak in the State, a compelling interest outweighs the right to gather.").

The vaccination mandate (with proper accommodations consistent with the ADA and Title VII) is the least restrictive alternative toward achieving that goal: it is the safest and most effective means, as opposed to allowing natural immunity to build through community infections which could lead to more deaths.[56]

---

[55] Ex. M, ¶¶ 9-11.
[56] Ex. B, ¶ 11; Ex. I, ¶ 12.

     *d.  Plaintiff John Doe's as-applied challenge under the First Amendment has also been rendered moot by the repeal and reenactment of the Policy.*

Plaintiff John Doe's as-applied challenge, as a first-year medical student, is moot because the reenacted Policy does not permit exemption requests based on religious beliefs. As discussed above, the state's authority to mandate vaccinations irrespective of an individual's religious belief under the First Amendment is well established. And allowing only narrow medical exemptions—required by the ADA and Section 504 of the Rehabilitation Act—do not alter the neutral and general nature of the Policy, nor subject it to heightened scrutiny.

     *e.  Plaintiff Jane Doe's speculations do not support her as-applied challenge.*

Dr. Jane Doe's as-applied challenge claims that the University discriminated against her by granting exemptions to others based on their religious beliefs, but denied her request based on the nature of her belief. Not so.

First, Dr. Doe presents no evidence that any CU employee on the Anschutz campus has been granted an exemption from the vaccine mandate based on religious beliefs. Indeed, none have been granted.[57]

Second, contrary to Dr. Doe's arguments, the University did not impermissibly intrude into the truth of her religious beliefs or reject them. Rather, the University questioned, as it is entitled to do, whether Dr. Doe's claim that she cannot ethically get any of the available COVID-19 vaccines is "truly held." *See Seeger*, 380 U.S. at 185 ("while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held'"). As the Supreme Court held: "This is the threshold question of sincerity which must be resolved in every case." *Id.*

---

[57] Ex. M, ¶ 13.

And whether religious beliefs are sincerely held is a question of fact. *Id.*; *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991).

"Without some sort of required showing of sincerity on the part of the individual or organization seeking judicial protection of its beliefs, the first amendment would become 'a limitless excuse for avoiding all unwanted legal obligations.'" *Africa v. Com. of Pa.*, 662 F.2d 1025, 1030 (3d Cir. 1981) (citation omitted). *See also E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) ("The element of sincerity is fundamental, since 'if the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement.'") (quoting *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)).

"[T]he burden is upon the plaintiff to establish that his belief or practice is truly rooted in a religious belief." *Otero v. State Election Bd. of Oklahoma*, 975 F.2d 738, 740 (10th Cir. 1992). "The mere assertion of generic religious objections is not sufficient to invoke first amendment protections." *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989).

"Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) (citations in a footnote omitted). Here, in support of her request for religious exemption, Dr. Doe, a pediatric critical care doctor, generically claimed:

> As a faithful Catholic, I uphold the dignity and sanctity of every human life and firmly oppose abortion and the evil involved in the use of cell lines derived from abortions. All 3 available emergent-use authorized vaccines in the U.S. - Moderna,

Pfizer-BioNTech, and Johnson & Johnson - used the abortion-derived cell lines (HEK293) in one or more phases of developing the SARS CoV-2 vaccine.[58]

However, Dr. Doe admitted that she had received other vaccines.[59] As a doctor and a bioethicist, she must be well aware that the use of the cell lines from fetal tissue going back to the 1970s is neither new, nor unique to the COVID-19 vaccines.[60] Indeed, it would be practically impossible to practice medicine as Dr. Doe does, if she had maintained the objection she raised to the COVID-19 vaccines, as a large number of commonly used over-the-counter and prescribed drugs, and some vaccines have been developed or tested using the very same fetal cell lines.[61] The University rightfully questioned the sincerity of Dr. Doe's belief as it appears to have been limited to *the COVID-19 Vaccines*, not to other vaccines developed in the same way or to drugs developed in the same way and which she invariably uses or prescribes for her young patients.[62] Indeed, Dr. Doe has an ethical obligations to put her patients' interests above her own, and so she rightly prescribes and administers medications that underwent the same development using HEK-293 as the COVID vaccine.[63] In the same way, Dr. Doe has an ethical obligation to be vaccinated herself—to protect her patients from herself."[64]

Therefore, the University did not discriminate against Dr. Doe in finding that her objection to the COVID-19 Vaccines is not based in sincerely held religious belief. Even if the University accepted her stated beliefs, the inquiry does not stop there. Under Title VII, the University then would evaluate whether it could accommodate Dr. Doe's religious beliefs without undue hardship. *See Tabura v. Kellogg USA*, 880 F.3d 544, 554 (10th Cir. 2018) (under Title VII, an

---

[58] Ex. L.
[59] *Id.*
[60] Ex. F, ¶¶ 5-7, 10; Ex. G, ¶ 9; Ex. J, ¶ 6.
[61] Ex. J, ¶ 9; Ex. E, ¶ 18.
[62] Ex. A, ¶¶ 11, 12; Ex. F, ¶ 10.
[63] Ex. E, ¶ 18; Ex. G, ¶¶ 11-13; Ex. J, ¶¶ 10-13.
[64] *Id.*

employer must reasonably accommodate a religious need, unless the accommodation will cause undue hardship, i.e. if it will impose more than a de minimis cost on the employer).

Because Dr. Doe is one of seven physicians staffing a busy PICU at the Children's Hospital in Colorado, it would cause undue hardship on the University to accommodate her by removing her clinical duties, as other doctors would have to add to their already extremely heavy schedules to pick up her shifts.[65] In the long run, this would cause physician burnout and compromise patient care.[66] Further, even assuming Dr. Doe could continue to perform her duties with PPE only—a practice that would put her extremely vulnerable patients at risk—should she come down with an infection, it would require other staff and physicians working with her to quarantine and be removed from service, placing undue burdens on their colleagues.[67]

Further, as a pediatric critical care doctor, Dr. Doe interacts with a large number of persons on a daily basis who may not consistently and correctly wear PPE at all times.[68] The fact that Dr. Doe previously practiced safely with PPE has only minimal relevance: the Delta variant, which is on the rise, is significantly more transmissible.[69] In addition, unlike most of the past year, the lockdowns in the state have been lifted, schools and the economy have reopened, and mask mandates and mask compliance in the community have substantially decreased—all of which has increased Dr. Doe's and others' risk of getting infected and spreading the infection.[70]

    f.  *Plaintiffs' claims under the Equal Protection Clause fail because Plaintiffs are not similarly situated to those granted medical exemptions.*

Plaintiffs argue that the Policy violates the Equal Protection Clause because Plaintiffs are

---

[65] Ex. A, ¶¶ 4, 9-10.
[66] *Id.*
[67] *Id.*
[68] *Id.* ¶ 5; Ex. Ex. G, ¶ 8. *See* Ex. E, ¶¶ 11-13.
[69] *See* https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.
[70] Ex. B, ¶ 8.

similarly situated to other Anschutz physicians and students who have received exemptions, and there is no rational basis for treating the two classes differently. Plaintiffs are wrong.

First, as discussed above, Plaintiffs do not present any evidence that any employee or student has received an exemption from the vaccine requirement based on his or her religious beliefs. But even if they did, each request for exemption is evaluated to determine if accommodations may be provided without undue hardship in light of each individual's work duties and interactions with patients and colleagues. *See Tabura*, 880 F.3d at 554. Plaintiffs present no evidence that any employee or student who allegedly received an exemption based on religious beliefs held the same job, duties, and position on campus as they did.

As to the medical exemptions, Plaintiffs' arguments miss the mark entirely. There are no allegations, and Plaintiffs have presented no evidence, that receiving the COVID-19 vaccine presents a risk to their health or safety. Accordingly, they are not similarly-situated as those— very few—employees who have received accommodations to protect their life or health.[71] *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decision makers from treating differently persons who are *in all relevant respects* alike.") (emphasis added). Because Plaintiffs have not adequately alleged, and have not presented evidence of, similarly situated persons treated differently, Plaintiffs' challenge under the Equal Protection Clause does not have a substantial likelihood of success on the merits.

**B.  Plaintiffs have not shown irreparable harm.**

Irreparable harm may be suffered when the injury cannot be adequately remedied with money or when complete relief cannot be granted following a final determination on the

---

[71] Ex. N, Decl. of Dr. Montague, ¶ 5.

merits. *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (internal citation and quotations omitted). *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) ("To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'"). The threatened injury "must be both certain and great," and "not be merely serious or substantial." *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250.

While the alleged violation of a constitutional right must weigh heavily in the irreparable harm analysis, the Court "must nonetheless engage in [the] traditional equitable inquiry as to the presence of irreparable harm in such a context[.] *Fish*, 840 F.3d at 752. Here, as discussed above, Plaintiffs have failed to show substantial likelihood of success on their constitutional claims. Further, in Plaintiff John Doe's case, he has not established any imminent harm: he was granted a leave of absence prior to filing suit and remains in good academic standing to resume his studies at the University (in accordance with campus policies in effect at that time) or transfer to another school.

In Plaintiff Jane Doe's case, even assuming she can establish a violation of her rights under Title VII (which she has not raised or exhausted administratively), the imminent harm she complains of is termination of employment, the remedy for which is compensable by money damages (front and back pay). *See e.g.*, *Sampson* v. *Murray*, 415 U.S. 61, 90–92 (1974); *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982) ("Absent some indication of action on the part of the employer which could jeopardize its ability to reinstate affected employees or to pay them wages for the period of unemployment, we hold that loss of employment, even if occasioned by employer action which is subject to arbitration, is not irreparable harm and will not support a claim by the

union for injunctive relief.").

Further, Dr. Doe's argument that the non-compete covenant in her employment contract would prevent her from finding other work is contrary to the terms of her contract, which states that if the University exercises at-will termination rights, the non-compete covenant does not apply. Since Dr. Doe is an at-will employee, the argument that her termination would trigger the non-compete covenant fails based on the terms of her contract.[72]

### C. Balance of the equities and the public interest strongly favor denial of the preliminary injunction.

It is hard to imagine a case where the public interest is more directly impacted by the granting of the injunction Plaintiffs are seeking than the one before the Court here. SARS-CoV-2 has had a catastrophic impact on all aspects of life for the past 20 months. Over 700,000 lives have been lost, millions have been hospitalized, millions of people have lost their livelihoods, with tragic consequences on their ability to keep their homes, feed their families, and pay their bills. There is only one way to stop tis devastation: by reducing the number of new infections through mass vaccinations, such that the virus cannot continue mutating in new hosts and will eventually infect so few people that the pandemic ends.[73] To that end, the exemptions from mass vaccination mandates must be extremely narrowly construed—as the University has—to essentially limit exemptions to medical cases where the vaccine itself would threaten the life or health of an individual and to religious exemptions where they can be accommodated without presenting a "direct threat" and undue hardship to the CU patients and community.

Plaintiffs' refusal to receive the vaccination is not a self-contained choice that only risks their own health. Although, especially in Dr. Doe's case, even risking her own health would

---

[72] Plaintiffs' Ex. 21.
[73] Ex. E, ¶ 17.

place a hardship on the University, as it would unduly burden other doctors to cover her shifts and provide critical care that Dr. Doe's choice would prevent her from providing. Granting an exemption to Plaintiffs—and to the many others who, like Plaintiffs, have requested a similar exemption—would defeat the Policy's purpose of safeguarding the community and working to end the pandemic. The University cannot compromise the safety of its community and the community at large by allowing exemptions to swallow the rule. *See Legacy Church, Inc.*, 472 F. Supp. 3d at 1064 ("The public's interest in limiting the COVID-19 outbreak in the State, a compelling interest outweighs the right to gather."); *see also Kimberly Harsman, et al., v. Cincinnati Children's Hosp. Med. Ctr., et al.*, No. 1:21-CV-597, 2021 WL 4504245, at *5 (S.D. Ohio Sept. 30, 2021) ("[T]here is no question that balancing the equities requires the Court to deny Plaintiffs' motion. Denying injunctive relief serves the public's interest in combating COVID-19, at an infinitesimally small risk to Plaintiffs' health or liberty.").

## CONCLUSION

Plaintiffs have not satisfied any of the required prongs to be entitled to the extraordinary relief of a preliminary injunction. Accordingly, Defendants respectfully request that the Court deny the motion and grant such other relief to Defendants as the Court deems just.

Respectfully submitted on October 12, 2021:

<div style="margin-left:40%">

*s/ Hermine Kallman*
Hermine Kallman
Senior Assistant University Counsel
Special Assistant Attorney General
University of Colorado, Office of University Counsel
1800 Grant Street, Suite 700, Denver, CO 80203
303-860-5691
Hermine.Kallman@cu.edu
*Attorney for Defendants*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2021, I electronically filed the foregoing with the Court's electronic filing system (CM/ECF) which will automatically cause notification to be sent to the following counsel of record:

Peter Breen
Thomas More Law Center
P.O. Box 393
24 Frank Lloyd Wright Drive
Suite J 3200
Ann Arbor, MI 48106
312-782-1680
pbreen@thomasmoresociety.org

Martin Whittaker
The Thomas More Society
309 W. Washington, Suite 1250
Chicago, IL 60606
312-782-1680
mwhittaker@thomasmoresociety.org

Joseph Brown
Theresa Sidebotham
Telios Law PLLC
P.O. Box 3488
19925 Monument Hill Road
Monument, CO 80132
855-748-4201
jbb@telioslaw.com
tls@telioslaw.com

*Attorneys for Plaintiffs*

*s/ Linda Ruth Carter*
Linda Ruth Carter, Paralegal