IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| JANE DOE, M.D., and JOHN DOE, <br><br>  Plaintiffs, <br><br>  v. <br><br> THE UNIVERSITY OF COLORADO, <br><br> DONALD ELLIMAN, Chancellor of the University of Colorado Anschutz School of Medicine, in his official capacity, and <br><br> SHANTA ZIMMER, M.D., Senior Associate Dean of Medical Education, University of Colorado Anschutz School of Medicine, in her official capacity, <br><br>  Defendants. | Case No. 1:21-cv-2637 <br><br> The Hon. Raymond P. Moore <br> U.S. District Judge |

# PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 3

   I.    LIKELIHOOD OF SUCCESS ON THE MERITS ........................................................... 3

        1.    Plaintiffs' challenge is not moot because their harm is the result of the September 1st Policy ................................................................................................................... 4

        2.    Contrary to Defendants' desperate contentions, the September 1st Policy expressly discriminated based on religion and not on religious sincerity ................................. 5

      B.    Defendants' Attempts to Undermine Plaintiffs' Sincerity are Unavailing. .................... 7

      C.    The September 24th Policy *Also* Violates the First Amendment .................................. 9

      D.    The September 1st Policy Fails Strict Scrutiny. ........................................................... 10

      E.    Plaintiffs' Equal Protection Claim is Also Likely to Succeed. ..................................... 11

   II.   The Remaining Factors All Still Favor Plaintiffs. ............................................................. 12

      A.    Irreparable Harm: ......................................................................................................... 12

      B.    Balance of Equities and Public Interest ....................................................................... 12

CONCLUSION ......................................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*A. v. Hochul*, 2021 WL 4734404, at *8 (N.D.N.Y. Oct. 12, 2021) ............................................. 10

*Brown v. Buhman*, 822 F.3d 1151, 1166-1172 (10th Cir. 2016) ..................................................... 5

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540 (1993) ........................... 10

*Dahl v. Bd. of Trustees of W. Michigan Univ.*, 2021 WL 4618519, at *6 (6th Cir. Oct. 7, 2021) 12

*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 n.11, 1049 (11th Cir. 2011) ........................ 8

*Elrod v. Burns*, 427 U.S. 347, 374 (1976) .................................................................................... 12

*Fish v. Koach*, 840 F.3d 710, 752 (10th Cir. 2016) ...................................................................... 12

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ...................................................... 10

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) .............................. 13

*Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1732 (2018) .... 4, 5

*Nordlinger v. Han*, 505 U.S. 1, 10 (1992) .................................................................................... 11

*Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2021) ................................................................... 12

*Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021) ............................................................ 9

# **INTRODUCTION**

Defendants' Response is riddled with misrepresentations and legal errors. Most glaringly, they attempt to turn this case into a fight over religious sincerity, even though the policy at issue discriminated explicitly based on religious beliefs and affiliation, with sincerity going unquestioned. Further, Defendants' Declarations mislead on basic science, claim that people of faith and conscience cannot ethically practice medicine, and even defend the morality of using Nazi experimentation data—all in the service of bulldozing the sincere religious beliefs of Plaintiffs.

Without notice to Plaintiffs (or their counsel), the University of Colorado *retreated* from its discriminatory September 1st Campus Administrative Policy ("September 1st Policy").[1] Caught on the wrong side of both the facts and law, Defendants attack Plaintiffs' character, caricaturing their religious beliefs and claiming they have a "duty" to violate their conscience as to COVID-19 vaccinations and the practice of medicine.

Defendants and their Declarants, licensed medical doctors and alleged "bioethicists," urge that a host of common medicines, like Aspirin, Tylenol, and Tums, are connected with testing on aborted human fetal cell lines, just like the currently available COVID-19 vaccinations. On this basis, their Declarants attack Plaintiffs' religious position on the use of aborted human fetal cell lines in vaccines as either untenable or insincere.

But Defendants omit the fact that Aspirin and Tylenol have been in use since the 1800's and Tums (calcium carbonate and sugar) since 1928.[2] These medicines were not developed in connection with abortion, at all. Whatever strange tests researchers may have performed in hundred-plus years since the development of Asprin, Tylenol, and Tums don't impact the

---

[1] Even so, Defendants cling to their defense of that policy, twisting its plain meaning and application.
[2] https://cogforlife.org/2021/09/21/14-medicines-fr-matthew-schneider-claimed-use-aborted-fetal-cell-lines-but-do-not/

morality of taking these products for one's headache or stomachache. (Dr. Jane Doe Decl. ¶¶28-29.)³ Defendants' lie-by-omission serves as the foundation for their "bioethicists" to launch their salvos against Plaintiffs' religious beliefs. These same "bioethicists" claim that Catholics must take the vaccine as a matter of faith (*see, e.g.*, ECF No. 15-10, ¶ 7), conveniently leaving out that the Catholic Bishops of Colorado have publicly opposed COVID vaccine mandates without religious exemptions, even going so far as to publish a form letter for Catholic pastors to sign in support of their congregants' religious exemption requests.⁴

Defendants' Response papers thus continue the illegal and unconstitutional Inquisition that Plaintiffs complained of and have suffered over the whole of this foul episode.

Defendants also have the temerity to argue the old policy that it discretely left in the dust (notably soon after Plaintiff Dr. Jane Doe's September 15th demand letter outlining its constitutional defects) was not in any way illegal and merely tested for religious insincerity (based on the false facts noted above), while at the same time arguing any challenges to that policy are now moot.⁵ They even *double down* on the fantasy that the University has figured out the teaching of the "Vatican" (a term for an Italian city-state and not the Church proper) on whether one must get a COVID-19 vaccine. (Def.'s Br. 7; ECF No. 15-10, ¶7.) And they preposterously argue that a convicted Catholic simply cannot practice medicine in today's world if they're not willing to "compromise" their religious beliefs (ECF No. 15-5, ¶18), and that they should even unquestionably accept the fruits of "Nazi experiments" (ECF No. 15-7, ¶11). To put it mildly, Defendants' opposition brief confirms (and even celebrates) the complete lack of

---

³ https://cogforlife.org/2021/09/21/14-medicines-fr-matthew-schneider-claimed-use-aborted-fetal-cell-lines-but-do-not/
⁴ https://cocatholicconference.org/template-for-religious-exemption-from-covid-19-vaccines/.
⁵ Plaintiffs will amend their Complaint to reflect the new policy ("September 24th Policy"), the existence of which Defendants did not tell Plaintiffs (or their counsel). The September 24th Policy was enacted after the September 1st deadline for religious exemption requests of staff and students to be filed and addressed, and no reconsideration of prior denials has been made under the September 24th Policy.

religious neutrality underlying their obviously defective Policy, whether viewed from September 1st or 24th.

More to it, the *only* policy imposed on Plaintiffs' religious objections to the available COVID-19 vaccines was *the September 1st policy*, so it's because of *that policy* that Dr. Jane Doe remains on indefinite administrative leave with impending termination and Student John Doe has been effectively expelled and cannot return unless he violates his sincerely held religious beliefs. Plaintiffs thus remain in need of an injunction on *that* policy and a corresponding reconsideration and granting of their requests for religious accommodation in accord with the Constitution. Therefore, despite the University's midnight retreat from its brazenly unconstitutional denominational discrimination in the September 1st Policy, Plaintiffs' original challenge is not moot and a preliminary injunction should now issue.

## ARGUMENT

I. **LIKELIHOOD OF SUCCESS ON THE MERITS**

    A. **Plaintiffs' Challenge is Not Moot, and the September 1st Policy Unquestionably Discriminated Based on Religion and Not Religious Sincerity.**

Defendants argue Plaintiffs' challenge is now moot because of the midnight retreat from the old policy and the enshrinement of a new policy on September 24th attempting to cover their discriminatory tracks. At the same time they insist the old policy did nothing wrong and merely tested whether a religious objector's beliefs were "truly held." In reality, both Plaintiffs were victim only to the September 1st Policy and thus their constitutional challenges remain live. Additionally, Defendants utterly misrepresent both the terms and application of that policy, which unquestionably tested not for religious sincerity but for whether one belonged to a *religion* that formally opposed *all vaccinations*.

### 1. Plaintiffs' challenge is not moot because their harm is the result of the September 1st Policy.

Plaintiffs retain a personal interest in enjoining the September 1st Policy because it's *that Policy* which has resulted in their expulsion from the University, and no other policy has applied to them at this point. Dr. Jane Doe's religious exemption application was denied by the anonymous "Vaccine Verify" "team" on August 26, 2021, in a letter stating simply that her beliefs did not accord with "campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations." (V. Cmplt. ¶35.) That policy was formalized on September 1st and thus constitutes the "September 1st Policy" at issue here. (Id. Ex. 1.) And Student John Doe was denied on August 30th via letter from Defendant Zimmer, who reiterated that "[t]he University's mandatory vaccination policy offers exemptions to individual's [sic] whose religious beliefs are opposed to all vaccinations," and concluded that his objections were merely "of a personal nature and not part of a comprehensive system of religious beliefs." (Id. ¶49-50.) As a result, Dr. Jane Doe was threatened with termination and has been placed on indefinite administrative leave, and John Doe has taken a coerced leave of absence and cannot return unless he violates his religious beliefs. (Id. ¶¶52-53.)

Plaintiffs challenges are accordingly not moot, because each "was entitled to a neutral decisionmaker who would give full and fair consideration to his [or her] religious objection as he [or she] sought to assert it." *Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1732 (2018). For that reason, "the rulings of the" University and those "that enforced the [University's] order must be invalidated." *Id*. Such brazen violations of religious neutrality cannot be immunized by locking Plaintiffs into the disfavored religious category, throwing away the key, and starting over again. The University "was obliged under the Free Exercise Clause to

proceed in a manner neutral toward and tolerant of [Plaintiffs'] religious beliefs," *id*. at 1731, and thus an injunction must issue against that constitutionally defective process.

This case thus does not involve the doctrine of voluntary cessation, because Defendants have not cured the unconstitutional process actually applied to Plaintiffs. But even if it did, Defendants have *doubled down* on the rightfulness of the September 1st Policy and have refused to disclaim the reasonable probability that it will be promulgated again. (Defs.' Br. 13.) Indeed, the University asserts that the September 1st Policy employs the *same* "two-step" evaluation as the September 24th policy, and that reason for switching to the latter version was simply "to further narrow the allowable requests for exemptions." (Id. 6, 16.) Thus, not only has the University failed to make "absolutely clear" that "the alleged wrongful behavior could not reasonably be expected to recur," *Brown v. Buhman*, 822 F.3d 1151, 1166-1172 (10th Cir. 2016), it believes the September 1st Policy *remains in effect* in modified form. Plaintiffs' own attempt to twist the meaning of that policy thus confirms the live nature of Plaintiffs' challenge and their need for an injunction.

### 2. Contrary to Defendants' desperate contentions, the September 1st Policy expressly discriminated based on religion and not on religious sincerity.

Appallingly, Defendants deny that the September 1st policy and its application "in any way differentiated between various religious views or denominations." (Defs.' Br. 13.) They say it involved merely "a two-step process" evaluating one's religious sincerity and whether an accommodation would impose an undue hardship on the University. (Defs.' Br. 16.) And they say Plaintiffs' position to the contrary is based on a "strained interpretation" of the policy's text. (Id.) Once again, Defendants' arguments are wholly out of touch with reality. The only thing "strained" here is Defendants' attempt to defend the old policy.

The text of the September 1st Policy could not be clearer. Only persons with "religious belief[s] whose teachings are opposed to all immunizations" could submit requests for religious exemptions. (V. Cmplt. Ex. 1.) Even if there were a question about the role of the word "teachings" (which there is not), it is simply undeniable that an Anschutz student or employee was required to religiously oppose "*all immunizations*" in order to qualify for exemption, *regardless of whether* they had a harmonized reason for opposing only *some* vaccines, or whether an accommodation would pose an undue hardship on the University (an issue nowhere mentioned in the Policy[6]). (Id.) It's thus clear that the second of the two questions posed by "Vaccine Verify" to those seeking religious exemption asking whether they've "had an influenza or other vaccine in the past" was not to determine whether their religious opposition to the COVID-19 vaccines was sincere, but whether applicants held the *proper religious belief* under "campus policy" "opposed to all immunizations." (See, e.g., V. Cmplt. ¶35, Ex. 1.)

Indeed, the University applied exactly that understanding to Dr. Jane Doe, who stated that she religiously opposed the available COVID-19 vaccinations but did not religiously oppose *all* vaccinations because all vaccinations (and in particular the flu vaccine) "do[] not utilize unethically derived cell lines." (V. Cmplt. ¶33.) Her distinction between COVID-19 vaccines and at least *some* other permissible vaccines (nowhere did she imply support of *all* other vaccines) thus had a reasoned basis, and yet she was still denied for not opposing "all immunizations" per "campus policy." (Id. ¶35; see also Dr. Jane Doe Decl. ¶15.) Moreover, Defendants fail to acknowledge that Dr. Jane Doe was not informed she would be an "undue hardship" to the University until University counsel responded to her demand letter on September 20th, nearly a month after she received her official denial solely on religious grounds and in a blatant pretextual

---

[6] Nor does it appear that any medical exemption requestors were actually subjected to an undue hardship, or any burden, analysis at all. *See, e.g.,* Declaration of Student A, ¶¶8-9 (dkt. 3-1); Declaration of Elliman, ¶13 (dkt. 15-13).

attempt to cover for the prior policy's express discrimination—which the University was soon to abandon on September 24th. (Pls.' Op. Br. 22.-24.)

Further, the University's application of the policy to John Doe and Student A confirms its foray into flagrant *denominational* discrimination. Even though John Doe's request for religious exemption asserted his Buddhist opposition to *all vaccines*, an August 24th email from the "Student Response Team" (as signed off by Defendant Zimmer) openly stated "[t]he University will only accept requests for religious exemption that cite *to the official doctrine of an organized religion*, in this case, Buddhism, *as announced by the leaders of that religion*." (V. Cmplt. ¶43, 45 (emphasis added).) And the University employed a similar inquisition against Student A. (V. Cmplt. ¶58 and Ex. 16 (emphasis added).) Defendants do not acknowledge any of these facts.

In light of the foregoing, Defendants' assertion that "the University's actions" did not "*in any way* differentiate[] between various religious views or denominations" is risible. (Defs.' Br. 13 (emphasis added).) Simply, the September 1st Policy unquestionably evaluated not whether one's beliefs were "truly held" but whether those beliefs were *true*, based on the University's sad attempt at discerning the official teachings of an individual's religion. This is not the first time Colorado state government officials have launched such an inquiry. *See Masterpiece*, 138 S. Ct. at 1731 ("It hardly requires restating that the government has no role in deciding or even suggesting whether the religious grounds for [an individual's] conscience-based objections is legitimate or illegitimate.") In sum, the Plaintiffs' challenge to the September 1st Policy is still live, and that policy blatantly discriminated against them based solely on their religious beliefs and affiliations.

    **B.**    **Defendants' Attempts to Undermine Plaintiffs' Sincerity are Unavailing.**

Defendants attack Plaintiffs' religious sincerity on several grounds, all of which fail. Primarily, Defendants arrogantly assert that "as a bioethicist, Dr. Doe was surely aware" that common medications like Tylenol and Tums which "she routinely prescribes to her patients [] have been *tested on* the same HEK-293 cell line as the Pfizer and Moderna vaccines." (Defs.' Br. 7-8 (emphasis added).) But the "surely"-she-must-know standard is hardly evidence of lack of sincerity. Moreover, Dr. Doe's attached declaration fills in the details Defendants omitted: "most of these medications mentioned are not *developed via*, but used *in conjunction with*, the aborted fetal cell lines (for another experiment) – an important distinction," and that "[m]any of these medications were developed prior to the abortion that resulted in HEK-293 cells" and "thus they are not a *result of* the use of these cells." (Jane Doe Decl. ¶29 (emphasis in original).)[7] She also states that, since obtaining her Master's in bioethics in 2018, she *does* oppose the MMR and Hepatitis B vaccines per their *intrinsic* reliance on abortion-derived cell lines, despite having received them without her consent *as a child*. (Id. ¶15). These are facts the University might have learned had it engaged in any semblance of an "interactive process" as required under Title VII. See *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 n.11, 1049 (11th Cir. 2011).

Indeed, in a rare moment of clarity and candor far removed from lawyers' spin, an August 29th email from Dr. Jane Doe's medical director and immediate supervisor Patrick Cripe to several of her teammates at Children's Hospital speaks volumes. (Jane Doe Decl. ¶13, and Ex. A thereto.) Cripe noted that while he strongly disagrees with Dr. Jane Doe's religious opposition to the COVID-19 vaccines, "this is a strongly held religious belief for her – not just a newly found opinion or concern;" that she "dutifully wears PPE . . . , cleans workstations and phones, and follows all other infection control measures;" that the process used against her involving a

---

[7] https://cogforlife.org/2021/05/12/lets-get-a-few-things-cleared-up-testing-cell-lines-and-fetal-tissue/; https://cogforlife.org/2021/09/21/14-medicines-fr-matthew-schneider-claimed-use-aborted-fetal-cell-lines-but-do-not/%20).

"form letter from what appears to be a committee with no defined members, no contact information, and no information for possible recourse" "is abhorrent;" and that it is completely "out of bounds for a University" to determine "what constitutes an 'acceptable' religious belief." (Jane Doe Decl. Ex. A.) Simply, Mr. Cripe's email puts the lie to Defendants' case.

The University also attacks John Doe's sincerity on the ground that he admitted to receiving a prior vaccine in order to volunteer at a hospital, and because he did not raise his aborted-fetal-cell-lines objection until his second request letter. (Defs.' Br. 9.) But the University fails to acknowledge that he received the prior vaccine *under duress* and subsequently promised himself to "never go against my faith *again*," and that his discovery that available COVID-19 vaccines were developed in reliance on aborted fetal cell lines "more gravely offended" his already stated religious beliefs against "not killing." (Am. Cmplt. ¶¶44, 47.) Defendants' assertions simply fail to actually grapple with John Doe's actual beliefs and, of course, merely attempt to whitewash the overt religious discrimination actually wielded against him.

Finally, it appears the University has not put any of its students or staff on its *other* campuses through this religious inquisition, solely on the Anschutz campus.[8] Plaintiffs deserve equal treatment under the Constitution, of which they have been deprived.

C. **The September 24th Policy *Also* Violates the First Amendment.**

Plaintiffs will be imminently amending their complaint and formally seeking a preliminary injunction against the September 24th Policy, as well, and hereby incorporate by reference the arguments in that impending motion. However, Plaintiffs note the following points:

---

[8] See, e.g., ucdenver.edu/coronavirus/testing ("CU Denver's process allows exemptions to anyone who requests one for any reason; religious, medical, or personal. We trust our students and employees to act in the best interest of our community."); https://covid19.uccs.edu/vaccination ("How can I request an exemption? UCCS students can request an exemption in the attestation process, which will be sent to each student individually. There is no official approval process at this time outside of claiming you are exempting out of receiving the vaccine.").

Even if not demanded by Title VII, the ADA, or Section 504 of the Rehabilitation Act, the First Amendment prohibits the University from denying students any opportunity for religious accommodations if it offers it to employees (as Title VII requires). *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021) (a regulation that substantially burdens religious exercise is not generally applicable when it "treat[s] *any* comparable secular activity more favorably than religious exercise").

Additionally, here "the specific series of events leading to the . . . official policy in question" reveals its de facto lack of religious neutrality. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540 (1993). This is further confirmed by Defendants' proud admission that they have not granted *any* religious exemptions, (ECF No. 15-13, ¶13), while hospitals across the country and the *CU Health System itself* have granted religious exemptions on the same or similar bases as Plaintiffs seek here. (Am. Cmplt. Ex. 20.)

For similar reasons, the University's admission that it has granted *medical* exemptions but not religious accommodations also violates the First Amendment's promise of religious equality. (Defs.' Br. 26). *See A. v. Hochul*, 2021 WL 4734404, at *8 (N.D.N.Y. Oct. 12, 2021) ("[A]lthough defendants claim that they expect the number of people in need of a medical exemption to be low . . . absent further factual development the Court cannot conclude that [denying all religious exemptions] satisfies the requirement of general applicability.").

### D.    The September 1st Policy Fails Strict Scrutiny.

Defendants do not even attempt to argue the September 1st Policy satisfies strict scrutiny (nor would any attempt succeed) (Defs.' Br. 19) and thus have waived that argument. Additionally, their assertion that broadly seeking to "achieve herd immunity in Colorado to end the COVID-19 pandemic" is unavailing because the question "is not whether the [University] has a compelling interest in enforcing its . . . policies generally, but whether it has such an

interest in denying an exception to [the plaintiffs]." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). And here, they can have no such interest, and their policies cannot be narrowly tailored, where they have failed to "explain[] why they chose to depart from" the practice of numerous other hospitals offering religious accommodations from their COVID-19 vaccine mandates. *A. v. Hochul*, 2021 WL 4734404 at *9. Thus, neither of the University's policies can satisfy strict scrutiny, and Plaintiffs are likely to succeed on the merits of their First Amendment Claim.[9]

### E. Plaintiffs' Equal Protection Claim is Also Likely to Succeed.

Defendants argue that Plaintiffs' Equal Protection argument fails because they are not similarly situated to other Anschutz individuals who have received exemptions from the mandate. They say this is because nobody else has received a religious exemption, and no Plaintiff has shown the vaccine "presents a risk to their health or safety." (Defs.' Br. 24.) But, as Defendants acknowledge, the question is whether Plaintiffs and other medical exemptees "are *in all relevant respects alike*." (Id. (quoting *Nordlinger v. Han*, 505 U.S. 1, 10 (1992).) And here, the relevant aspect is the effect of an exemption *on the campus's goal of achieving herd immunity and ending COVID-19*. (Id. 6, 26 ("Vaccination is the only safe means of controlling the spread and further mutations of the SARS-CoV-2 virus to achieve heard immunity"; "There is only one way to stop this devastation: by reducing the number of new infections through mass vaccinations, such that the virus cannot continue mutating in new hosts")). Thus, Plaintiffs are similarly situated to medical exemptees—including those allowed to continue caring for

---

[9] Critically, whether government has the *power* to impose vaccine mandates is not at issue in this case, contrary to what Defendants would have this Court believe. Rather, the issue is whether government may apply a vaccine mandate to certain religious adherents in violation of the *Free Exercise Clause*, especially when it has flagrantly imposed disparate treatment on those religious believers. *See Zucht v. King*, 260 U.S. 174, 177 (1922) (finding "a substantial constitutional question" as to whether the application of a San Antonio school vaccine mandate violated plaintiff's rights under the Equal Protection Clause).

vulnerable patients in clinical settings (see Student A Decl., ECF No. 3-1)—with respect to *that interest*, and Defendants offer no rational distinction for why Plaintiffs should be treated any differently. Thus, Plaintiffs are likely to succeed on the merits of all their claims.

## II. The Remaining Factors All Still Favor Plaintiffs.

**A. Irreparable Harm:** Because Plaintiffs are likely to succeed on the merits of their First Amendment claims, they have "unquestionably" suffered "irreparable harm." *Fish v. Koach*, 840 F.3d 710, 752 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 374 (1976)).

Defendants' additional protestations also fail. They argue that John Doe (an economically vulnerable medical student) remains free to resume his studies at the University on the condition that he violate his sincerely held religious beliefs or to "transfer to another school," which entirely ignores his documented inability to simply transfer to another program. (V. Cmplt. ¶72.) They also argue Dr. Jane Doe can simply be compensated for any loss of employment, mentioning nothing about her impending loss of professional standing, reputation, admitting privileges access, and other non-compensable harms as a result of being terminated from prior employment. (Id. ¶71.)

**B. Balance of Equities and Public Interest:** Defendants argue that Plaintiffs' refusal to vaccinate poses an unduly high risk to themselves and others in the effort to stop COVID-19. Whatever the theoretical possibility that an unvaccinated Plaintiff following safety protocols could spread COVID to another member of the Anschutz community, this risk is no greater than that for a member of the same community authorized to be unvaccinated for *medical* reasons. *See Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2021). Further, the idea that a Plaintiff might spread COVID "is somewhat speculative, and it fails to consider the broader picture" in part because the University's policy "does not limit [Anschutz members'] exposure to unvaccinated" people at large, as there is no requirement that patients be vaccinated or that Anschutz members

refrain from mingling with the unvaccinated when they're off campus. *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 2021 WL 4618519, at *6 (6th Cir. Oct. 7, 2021). They have also presented no data showing that alternative precautions taken by medical professionals over the past 19 months are not effective in stopping COVID—while Plaintiffs' expert and Plaintiff Jane Doe attest that these precautions work. (French Decl. ¶¶12-16; *see also* Jane Doe Decl. ¶¶13, 32.)

Critically, Dr. Jane Doe's medical director acknowledged that her termination would only contribute to physician fatigue and burnout on her small team, "potentially pos[ing] a risk to critically ill children in the region and/or those currently under our care." (Jane Doe Decl. ¶¶42, 43 and Ex. A thereto.) And of course, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013).

Here, given that exemptions have been actually allowed for medical reasons at Anschutz, and that they've been allowed for medical and religious reasons across health care facilities in Colorado and the rest of the country—without any reported harm to patients or the health care system—the University "has not shown that public health would be imperiled by employing less restrictive measures" with respect to Plaintiffs here. *Tandon*, 141 S. Ct. at 1297 (internal quotes omitted). Thus the equitable factors weigh heavily in favor of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, a preliminary injunction should issue.

Respectfully submitted,

/s/ Peter Breen
Peter Breen
Martin Whittaker
THOMAS MORE SOCIETY
309 W. Washington Street, Ste. 1250

Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/ Michael McHale
Michael G. McHale
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown
Colorado Attorney ID# 54986
Theresa Lynn Sidebotham
Telios Law PLLC
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs*