IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

JANE DOE, M.D., and JOHN DOE,

  Plaintiffs,

  v.

THE UNIVERSITY OF COLORADO,

DONALD ELLIMAN, Chancellor of the
University of Colorado Anschutz School of
Medicine, in his official capacity, and

SHANTA ZIMMER, M.D., Senior Associate
Dean of Medical Education, University of
Colorado Anschutz School of Medicine, in her
official capacity,

  Defendants.

Case No. 1:21-cv-2637

**DECLARATION OF DR. JANE DOE 1, M.D., M.S. BIOETHICS**

I, Dr. Jane Doe 1, state the following in response to the University and its filed declarations:

1.     I am a board certified pediatric critical care physician.

2.     I currently hold the position of Instructor in the Department of Pediatrics, Section of Critical Care, at the University of Colorado School of Medicine.

3.     I received my Doctorate of Medicine from the University of Texas Southwestern Medical School, Dallas, TX, in 2001.

4.     I completed a pediatric residency, chief residency, and pediatric critical care fellowship at Children's Medical Center, Dallas, TX (2001-2008).

1

5.      I received a Certificate in Health Care Ethics from the National Catholic Bioethics

Center in 2017 and completed a Master of Science degree in Bioethics in 2018 at the

University of Mary, Bismarck, North Dakota.

6.      I am a member of the Catholic Medical Association and the American College of

Pediatricians.

7.      I am an associate scholar at the Charlotte Lozier Institute.

8.      To be a physician that specializes in pediatric critical care is not a light decision

made in a day or two but over a lifetime of experiences that molds and fashions one into a

privileged, and often challenging, opportunity to be an instrument in the lives of critically

ill children. Not just anyone, but only a few, receive this calling.

9.      Seeing Defendants and their Declarants present me as a risk and even a "direct

threat" to my patients is truly an overreach, is not reflective of my patient care, and

hinders collegiality.

10.     In this statement, I do not refute the credentials that the experts, on behalf of the

University, possess. I do challenge many of the statements put forward, though.

11.     Since the University allowed itself to repeal and replace the policy on 9/24/21 "to

clarify its intent and application," *after receiving* the initial letter from my attorneys

(9/15/21) written on my behalf, I consider it my liberty, as well, to clarify any

misconceptions the University may have about my initial response.

12.     I shall first address the opinion that the University holds that my objection to the

current available SARS CoV-2 vaccines "is not a 'sincerely held belief,' but rather a

personal, or perhaps a political, choice." This assumption and accusation has absolutely

no foundation.

2

13.     This argument, crafted by the University's lawyers as part of this lawsuit, directly

contradicts the candid views expressed, without the assistance of counsel, by my own

medical director, Dr. Cripe, in his email communication (dated 8/29/21) to the

administration at Children's Hospital (as forwarded to me by Dr. Cripe on a later date), in

which he states:

I have known [Dr. Jane Doe 1] for several years.  Though I may disagree with it, this is a
strongly held religious belief for her - not just a newly found opinion or concern.  [Dr.
Jane Doe 1] dutifully wears PPE (including appropriate masks or PAPR), cleans
workstations and phones, and follows all other infection control measures.  Her
convictions on the sanctity of life result in her treating ALL individuals equally in her
practice of medicine, which is an ideal that we should all attempt to attain. (Ex. A to this
Declaration.)

14.     The initial policy that I was held to (the "September 1st Policy") asked about my

objection to the SARS CoV-2 vaccine and whether or not I had received other

vaccinations. I responded that my objection was due to the use of abortion-derived cell

lines in one or more phases of development and that I have received other vaccines,

including influenza—which does *not* utilize unethical cell lines.

15.     Other vaccines that I have received in the past that could have potentially been

manufactured using abortion-derived cell lines are the MMR and Hepatitis B, both of

which I received at a younger age, well prior to any knowledge or awareness of their

development. Not until I was studying for my degree in bioethics (completed in 2018) did

I become fully conscious of the impact of the ongoing use of these unethically derived

cell lineages in vaccine production.

16.     Because the Catholic Church teaches that the available vaccines are morally

permitted to be received (given the passive remote material cooperation with the evil of

abortion) if there exists a *proportional reason*, it does not mean that they are morally

*required.* A conscientious objection must be allowed, as "no American should be forced to choose between being vaccinated against this potentially deadly virus and violating his or her conscience" as noted in the April 17, 2020, letter from the Unites States Conference of Catholic Bishops (USCCB) and others to Dr. Hahn, the commissioner of the FDA.[1] (See also Ex. B. to this Declaration ("Catholic Medical Association Opposes Vaccine Mandates without Conscience and Religious Exemptions").

17.      The "duty to put our patient's interests above our own" does not supersede obeying one's conscience.  According to the declaration by Dr. Shanta Zimmer (ECF No. 15-5, Ex. E) on behalf of the University, "There are many examples where we sacrifice or compromise our religious beliefs and practices in order to fulfill our professional obligations." (Id. ¶18.) I am familiar with not attending Mass on Sundays or Holy Days of Obligation on numerous occasions throughout my career due to hospital call . . . for even the Lord healed on the Sabbath. A religious belief or practice is not compromised but can be elevated in light of the situation. However, this is not equitable with abandoning one's well-formed conscience.

18.      In his statement for the University, Dr. Matthew K. Wynia states that he is "familiar with religious concepts in bioethics, including Catholic bioethics." (ECF No. 15-10, Ex. J, ¶5.) Familiar is not the same as a true understanding or application thereof. He is half-correct in saying that the Congregation for the Doctrine of Faith (CDF) says it is "morally acceptable" for Catholics to receive the available SARS-CoV-2 vaccines, but

---

[1]USCCB (US Conference of Catholic Bishops). 2020. Letter to The Honorable Stephen M. Hahn, M.D., Commissioner, U.S. Food and Drug Administration, 17 April. https://www.usccb.org/resources/Letter-to-FDA-urging-ethical-COVID-vaccines.pdf

he's missing the critical point here. In Catholic teaching, an individual's moral conscience, properly formed, must be respected and freely allowed without coercion.

19.      According to the Catechism of the Catholic Church:

Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment . . . For man has in his heart a law inscribed by God . . . His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths (CCC no. 1776).[2]

20.      The formation of one's conscience, in addition to the guidance of the Holy Spirit, also must include one's knowledge, education, experience, and deciphering of what is true (in this situation, must include one's understanding of the vaccine and its safety and efficacy). "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself" (CCC no. 1790).[3]

21.      "At the same time, practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary."[4]

22.      As an initial matter, my well-formed religious conscience dictates that I should not take vaccines using unethically derived cell lines, especially in light of the grave evil of abortion. However, in deciding whether or not to take the available COVID vaccines, which use unethically derived cell lines, I considered whether I have a *proportional reason* to take the injection.[5] Per the CDC, given my age and fortunate health, I have a

---

[2]Catechism of the Catholic Church (CCC), 1994, n. 1776
[3]CCC, 1790
[4]Congregation for the Doctrine of the Faith. 2020. *Note on the Morality of Using Some Anti-Covid-19 Vaccines.*
https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html
[5] A letter from the Colorado bishops on COVID-19 vaccine mandates, Aug. 6, 2021,
https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-covid-19-vaccine-mandates/ (stating that "it is permissible to use" "medical products, including certain vaccines, that are created using human

99.6% chance survivability should I contract SARS CoV-2 and develop COVID. Given

that vaccination has not proven to interrupt transmission, I do not see any additional

benefit in protecting my patients from myself above and beyond the adherence to strict

PPE use (for which I have been performing and has been effective).[6],[7]

23.      For Dr. Wynia to draw out of context a claim from the pope that it would be like

"suicide" (a mortal sin) to not get the vaccine is humorous, at best. (ECF 15-10, Ex. J.,

¶7.) On a serious note, what is more concerning is the statement "that a physician who

has an unsurmountable problem with using or prescribing all vaccines and drugs

potentially developed or tested using fetal cell lines cannot effectively practice modern

medicine." (Id. ¶9.) Essentially, he is claiming that because of my stance in objecting to

be injected with the currently available SARS CoV-2 vaccines, all of which have utilized

abortion-tainted fetal cell lines in either production and/or testing, that I cannot practice

medicine, which I have been doing for the past two decades.

24.      Does the reality of abortion, and the evil effects of the act, present within the

profession of medicine imply that I should abandon my profession and not participate in

the care of others since I do not approve of such an abhorrent practice? No. Should I

avoid paying taxes even though there are taxpayer dollars that fund abortions? No. Do I

have a responsibility to speak up against these practices and avoid legitimation if I do not

have a *proportional reason* to cooperate with them? Absolutely.

25.      According to the Pontifical Academy for Life Statement:

---

cell lines derived from abortion" "only under case-specific conditions—if there are no other alternatives available and the intent is to preserve life"; "A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings").

[6]Centers for Disease Control and Prevention (CDC). Accessed Oct. 18, 2021. https://covid.cdc.gov/covid-data-tracker/#demographics

[7]CDC graphic (attachment). (Exhibit C to this Declaration.)

Therefore, doctors . . . have a duty to take recourse to alternative vaccines (if they exist), putting pressure on the political authorities and health systems so that other vaccines without moral problems become available. They should take recourse, if necessary, to the use of conscientious objection with regard to the use of vaccines produced by means of cell lines of aborted human foetal origin.[8]

26.      The controversy of whether or not HEK 293 cells were derived from a

miscarriage or an induced abortion has been raised by Defendants. According to a

document published by Alvin Wong, MD, entitled The Ethics of HEK 293:

A publicly available document records the proceedings of a meeting in May 2001 of the U.S. Food and Drug Administration (FDA) Vaccines and Related Bio- logical Products Advisory Committee. In this document, which deals with both the HEK 293 and the PER.C6 fetal cell lines, Dr. Alex van der Eb, who was involved in the development of HEK 293, is quoted:

"So the kidney material, the fetal kidney material was as follows: the kidney of the fetus was, with an unknown family history, obtained in 1972 probably. The precise date is not known anymore. The fetus, as far as I can remember was completely normal. Nothing was wrong. The reasons for the abortion were unknown to me. I probably knew it at that time, but it got lost, all this information."
Could there have been any chance that the "abortion" referred to in the FDA document might mean a naturally or spontaneously aborted (i.e., miscarried) fetus? The context certainly sounds as if it referred to a routine-induced abortion, with no qualifications mentioned.

In examining the issue further, it appears that in all probability the cells were obtained from the embryo of a willfully induced abortion. Not only is it easier administratively to receive cells from induced abortions of normal pregnancies than from spontaneous miscarriages, it may also be scientifically more advantageous to use tissue from induced abortions, which are "healthier," since the majority of fetuses are usually genetically normal and aborted for social reasons. In the FDA proceedings, Dr. van der Eb admits that the fetus was "completely normal." He later gives testimony to the development of PER.C6 (human embryonic retinal cells), in which the evidence that it was obtained from a willfully induced abortion is undeniable. Again, it was a "healthy fetus." PER.C6 is used for similar purposes as HEK 293 in the field of gene therapy.[9]

---

[8]Pontifical Academy for Life Statement: Moral Reflections on Vaccines Prepared from Cells derived from Aborted Human Foetuses. 2019. *The Linacre Quarterly* 86, no. 2-3: 182-187. doi: 10.1177/0024363919855896.
[9]Wong, Alvin. 2006. "The Ethics of HEK 293." *National Catholic Bioethics Quarterly* 6, no. 3: 473-495. doi: 10.5840/ncbq20066331.

27.     The very fact that one cannot say definitively that the HEK 293 cells were *not* derived from an elective abortion does not provide moral certainty. Thus, if one cannot rule this out definitively then one must proceed as if it *did* occur.

28.     The use of aborted fetal cell lines in the development of the current SARS CoV-2 vaccines is well-documented. Their existence is reliant on these cell lines.

29.     Dr. Jose Trasancos, President of the Board and CEO of Children of God for Life, reports that most of these medications mentioned are not *developed via,* but used *in conjunction with,* the aborted fetal cell lines (for another experiment) - an important distinction. Many of these medications were developed *prior* to the abortion that resulted in HEK-293 cells thus they are not a *result of* the use of the cells.[10],[11]

30.     The University claims that I have an "ethical obligation," unless "medically contraindicated," to be vaccinated to protect my patients from myself. I have been protecting my patients from the spread of the SARS CoV-2 virus by adhering to the prescribed protocols in place for donning and doffing PPE since the beginning of the pandemic in the U.S. (See Ex. A, Email from Dr. Cripe.)

31.     To imply that I am now more of a risk to my patients because I have not received the SARS CoV-2 vaccine is to imply that the PPE I have been faithfully utilizing is no longer as effective as has been demonstrated for well over the past year and a half (or is less effective for me than those granted a medical exemption).

---

[10]Trasancos, Jose. 2021. "Let's Get a Few Things Cleared Up: Testing, Cell Lines and Fetal Tissue." *Children of God For Life,* May 12. https://cogforlife.org/2021/05/12/lets-get-a-few-things-cleared-up-testing-cell-lines-and-fetal-tissue/.
[11]Trasancos, Jose. 2021. "14 Medicines Fr. Matthew Schneider Claimed Use Aborted Fetal Cell Lines - But Do Not." *Children of God For Life,* Sept. 21. https://cogforlife.org/2021/09/21/14-medicines-fr-matthew-schneider-claimed-use-aborted-fetal-cell-lines-but-do-not/.

32.     The University claims that my previous practice with PPE now "has only minimal relevance: the Delta variant, which is on the rise, is significantly more transmissible." The Delta variant, according to our knowledge, was first noted in the United States in May 2021. My practice of wearing PPE appropriately during this surge has been effective just as it has and will continue to be for other respiratory viruses (RSV, rhino/enterovirus, parainfluenza, influenza, adenovirus), for which we do not have vaccines, that can potentially affect infants and children more seriously than SARS CoV-2.

33.     The trials for the production of the three currently available SARS CoV-2 vaccines evaluated the prevention of symptomatic disease in vaccine recipients as a primary endpoint, not reduction in severe COVID-19 or interruption in transmission. [12]

34.     The vaccinated are contracting and spreading the SARS CoV-2 virus, as well. The University is aware of this as they report the number of vaccinated individuals who are hospitalized in a "weekly situation update"—and it is *not* an insignificant percentage.

35.     In addition, the mandates remove one of the fundamental premises of medicine— informed consent. Informed consent cannot be freely given as many of the long-term risks of the vaccines are unknown, and new vaccine-related conditions and adverse events are occurring at alarming rates (including myocarditis, pericarditis, vaccine-induced thrombotic thrombocytopenia (VITT), Parsonage-Turner syndrome, and even death).[13] A key element of informed consent is freedom of coercion - the very thing vaccine mandates violate. (See *supra*, n. 5 (Statement of Colorado Bishops noting

---

[12]Doshi, Peter. 2020. "Will Covid-19 Vaccines Save Lives? Current Trials Aren't Designed to Tell Us." *BMJ* 371: m4037. doi: 10.1136/bmj.m4037.
[13]Search Results - From the 10/8/2021 release of VAERS data. (2021, October 8). Retrieved from https://www.medalerts.org/vaersdb/findfield.php?TABLE=ON&GROUP1=AGE&EVENTS=ON&VAX =COVID19&DIED=Yes.

legitimacy of considering side effects in weighing whether to receive a vaccine developed in reliance on aborted fetal cell lines).)

36.     With respect to the burden on the PICU if I were to contract SARS CoV-2, Dr. Cripe states that it would increase physician fatigue and burnout due to the need for other physicians in our group to cover shifts assigned to me. (ECF No. 15-1, Ex. A, ¶9.) I do not foresee a 10-14 day period of isolation/quarantine to contribute to this type of scenario. Further, his email (prepared without the assistance of a lawyer) to administrators stated that without me in the PICU, the staffing model "will not accommodate this new change," which "potentially poses a risk to critically ill children in the region and/or those currently under our care," and that "My entire team of faculty will suffer from the way that this is being handled, so I would not be astonished by further attrition of staff—and because the PICU interfaces with nearly every part of the hospital, this could have meaningful impacts across the entire institution." (Ex. A.)

37.     Soon after the opening of the Children's Hospital in Colorado Springs in the spring of 2019, our physician team in the PICU had only five physicians covering the PICU 24/7. We managed the unit that way for approximately one year, until we were able to secure two more physician providers, to allow our team to have an adequate task force for emergent situations (including times when the unit is difficult for one physician to safely manage), sick leave, maternity/paternity leave, etc. without needing to contract short-term visiting physicians which usually requires more time to locate and credential than a 10-14 day isolation period for COVID requires.[14]

---

[14]How to Isolate. (2021, March 21). Retrieved from https://covid19.colorado.gov/how-to-isolate.

38.    In conclusion, I hold the care of and respect for the dignity of my patients as supreme in my profession. In order to maintain this view, I follow my conscience, not taking for granted the understanding and respect I have for all humanity through its formation.

Executed under penalty of perjury this <u>19th</u> day of October, 2021

_Dr. Jane Doe 1_
_____
Dr. Jane Doe 1
