## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

JANE DOES 1 through 11,DOE, M.D., and
JOHN DOES 1 through 7DOE,

  Plaintiffs,

– v.

BOARD OF REGENTS of theTHE
UNIVERSITY OF COLORADO, TODD
SALIMAN, President of the University of
Colorado, in his official capacity,

DONALD ELLIMAN, Chancellor of the
University of Colorado Anschutz
CampusSchool of Medicine, in his official &
personal capacity, and

SHANTA ZIMMER, M.D., Senior Associate
Dean of Medical Education, University of
Colorado Anschutz School of Medicine, in her
official & personal capacity, ERIC
MEDIAVILLA, Associate Dean for Student
Affairs, University of Colorado School of
Dental Medicine, in his official & personal
capacity, ANN-MICHAEL HOLLAND,
Master of Science Program Director,
Department of Anesthesiology, in her official
& personal capacity, JOHN & JANE DOES
1-9, members of the Vaccine Verify team, in
their official & personal capacities,capacity,

  Defendants.

No. 21 CV 2637

The Hon. Raymond P. Moore
U.S. District Judge

JURY TRIAL BY JURY
DEMANDED

## VERIFIED AMENDED & SUPPLEMENTAL COMPLAINT
## FOR TEMPORARY AND PERMANENT INJUNCTION AND DAMAGES

1.      DefendantsThe University of Colorado has enacted a pPolicy dividing theits staff

and students of the University of Colorado's Anschutz Campus into two categories based on

their religious beliefs: the "sheep," whose religions teaugeht the approved orthodoxy, were to

receive exemptions to the University's COVID vaccine mandate, while the "goats," who heeold

non-approved religious beliefs, ~~we~~are denied exemptions and then fired or expelled. ~~Only those who belong to religions "whose *teachings* are opposed to *all* immunizations" may ascend to the University's Valhalla. All others, including Plaintiffs here—a Catholic and a Buddhist—must be cast out.~~

2.       Defendants'~~The University's~~ foray into theology went deep,~~has gone even further, with its administrators~~ probing and debating the religious beliefs of ~~its~~ staff and students and imposing value judgments on believers in an Inquisition process that further violates the First Amendment.

3.       Defendants rejected every single request for religious exemption by Plaintiffs and others by~~The University is~~ unapologetically, aggressively enforcing their policy, which allowed exemptions only for those who are members of organized religions whose teachings entirely forbid vaccinations. At the same time, Defendants granted medical exemptions ~~this Policy~~to the vaccine mandate to Anschutz staff and students. And Defendants liberally allowed religious and medical exemptions to staff and students of every other University campus, with all or most of those religious exemptions granted summarily, without any review or testing of sincerity at all.

4.       Plaintiffs are staff and students of the Anschutz Campus, dedicated to the health and well-being of the people of Colorado. Plaintiffs respectively embrace a variety of faith traditions, and each of them has a sincere religious objection to the currently available COVID vaccines.

5.       After rejecting all submitted religious exemption requests, Defendants received several demand letters in September 2021, on behalf of staff and students, highlighting the illegal and unconstitutional nature of their policy, which had purported to require vaccination by September 1. In response, Defendants neither reconsidered their decisions under the policy nor

conceded any defects in it. Well after all religious exemption requests were required to be submitted—and after they had all been denied—Defendants then amended their policy on September 24 in preparation for litigation, without notice to Plaintiffs and without in any way applying the amended policy to rescind or reconsider the blanket denials issued against Plaintiffs and others.

6.      For Plaintiffs who are staff, that September 24 Policy purports to remove the limitation on certain religious beliefs qualifying for exemption imposed by the September 1 Policy. But whatever the alleged improvements in the text of the amended Policy, Defendants' illegal actions have not changed. In this litigation, Defendants both defended their past religious discrimination and launched vigorous and illegal challenges to the religious beliefs of at least Plaintiffs Jane Doe 1, M.D., a practicing Catholic who holds an advanced degree in Catholic bioethics, and John Doe 1, a faithful Buddhist who has repeatedly and concretely expressed his faith with his past actions. Defendants have even taken the position that Plaintiffs (or at least the physicians among them) have a duty, as a matter of professional ethics, to violate their religious beliefs and obey Defendants' vaccine mandate—unless they also have a medical contraindication to the COVID vaccine, in which case they are wholly exempt. (*See, e.g.*, Dkt. 15-10, ¶ 10).

7.      For Plaintiffs who are students, they are worse off under the September 24 Policy, on its face. That Policy allows Anschutz staff to apply for religious exemptions but strips that right entirely from Anschutz students. At the same time, students and staff at *every other* University campus may freely apply for and be granted religious exemptions. No challenges are made by the University to the sincerity of belief of those other students and staff, no consideration taken of the alleged hardship of "accommodating" them, and no concern that students and staff at other campuses are in situations where they may be more likely to spread

COVID-19 than Plaintiffs and others who sit under the auspices of Defendants at the Anschutz campus.

8.      That severe treatment for religious students and staff at Anschutz under both the September 1 and September 24 Policies, moreover, cannot be a product of any feature of the work they perform or of any feature of their studies at Anschutz. It must, rather, be a product of anti-religious animus at Anschutz.  Three of the plaintiffs here, John Doe 3, John Doe 5, and John Doe 7, for example, work for the university's Office of Information Technology, a Central Services Administrative unit serving the computing and IT needs of *both* Anschutz's Aurora campus and the University of Colorado Denver's downtown Denver campus. While colleagues of theirs at the Denver campus, sharing their very same building workspaces, have routinely been granted exemptions from vaccination because they fall under the Denver campus hierarchy, these individuals are facing loss of their jobs. While they routinely interact with colleagues at both campuses, and have workspaces at both, they are not in physical contact with Anschutz health care staff and students any more than their off-campus family and friends, or on-campus patients (none of whom Anschutz requires to be vaccinated) are in contact with those staff and students.

9.      That same animus infects the decision to terminate Jane Doe 11, who works at an institution unaffiliated with Anschutz, a facility neither owned nor controlled by Defendants, nor even near any facility owned or controlled by Anschutz (she works at the Colorado Mental Health Institute in Pueblo). She is a conscientious Christian. But Jane Doe 11 happens to be an employee of Anschutz, contracted out to that remote facility of an unaffiliated institution, which has granted her an exemption from its own vaccine mandate.  But Defendants are insisting that, remote as Jane Doe 11 is, she must abide by *their* Policies, not the policies in place where she actually works, or be terminated.

10.     That same animus features undeniably in the treatment of student Jane Doe 8, too. She is a dual degree student who was seeking both bachelor's of arts and master's of public health degrees, in a program offered by the University, with the bachelor's taken at the University's Denver campus and the master's at the University's Anschutz campus. Her religious objection to the vaccination is fully accommodated by the Denver program, but not by Defendants. She has been forced to withdraw from the master's component of her studies.

11.     That unforgiving, severe treatment of the religiously devout, moreover, is not something that other local health care institutions consider necessary. Plaintiff Jane Doe 3, a devout Catholic, is~~detriment of the Plaintiffs,~~ a physician with faculty appointments at both Defendants' University of Colorado – Anschutz Medical Campus and the nearby Rocky Mountain Regional Veterans Administration Medical Center in Aurora, too. The administrators and physicians at Rocky Mountain Regional VA Medical Center are, just like Defendants, fully aware that she both opposes the vaccines for religious reasons, and has robust natural immunity from a recovered bout of COVID, and so the VA is not insisting on her receiving a COVID vaccination to continue her work there. Defendants, however, are insisting on vaccination, under both the September 1 and September 24 Policies, have barred her from all Anschutz facilities and placed her on administrative leave without pay. If she were to lose her faculty appointment at the University of Colorado-Anschutz, as Defendants have told Jane Doe 3 will happen by mid-November, she will also lose her faculty appointment at the VA Medical Center, too, under the terms of her dual appointment.

12.     After Jane Doe 1, a Catholic pediatric physician, and John Doe 1, a Buddhist medical student, filed this lawsuit and sought temporary injunctive relief, numerous other Anschutz staff and students have learned of the suit and sought to join them. All of these other

Plaintiffs face significant financial impact from their expulsion or termination. Many Plaintiffs, facing financial ruin, cannot afford private counsel—they are able to proceed here solely because of the representation *pro bono publico* provided by undersigned counsel. All face grave and immediate threats to their educational and professional careers. If expelled or forced to take an indefinite leave (with no guarantee of return), Defendants strip the student Plaintiffs of their ability to pursue a degree in the healthcare field. Saddled with debt, these Plaintiffs will lose at least a~~on staff, and a medical student who had recently begun his first~~ year of schooling, fall behind their class, and suffer a black mark on their academic record. If fired or forced into indefinite unpaid leave, the staff Plaintiffs risk imminent and grave harm to their ability to financially support themselves and their families, along with risking their licensure and suffering a loss of professional reputation at having been terminated or forced to leave involuntarily. And each Plaintiff is suffering a grave and continuing violation of their constitutional rights due to Defendants' threats of or actual termination or expulsion.

~~3.~~     Jane Does 1 through 11 are nine employees of the University (including three physicians), under the auspices of Defendant Elliman, chancellor of the Anschutz campus; a fourth year student in the ~~studies, at the University's~~ Anschutz School of Dental Medicine; and a student in a dual degree program for bachelor's and master's degrees in public health, all of whom ~~.~~

~~4.~~13.     ~~Plaintiffs~~ have sincere religious objections to the COVID vaccines currently available to them, but who have been informed that they will lose their jobs or their place in their schools, if they are not vaccinated~~— John Doe because of the tenets of his Buddhist faith and Dr. Jane Doe because of the tenets of her Roman Catholic faith~~.

14.    ~~Dr.~~ John Does 1 through 7 are four employees and three students at Anschutz (two M.D. candidates in the medical school and a master's anesthesiology student) who also have sincere religious objections to the COVID vaccines currently available to them, but who have been informed that they will lose their jobs or educations, if they are not vaccinated.  John Doe 2 is also a member of the U.S. Air Force, which is paying his fees and expenses while he pursues his M.D., and which has promised him a promotion from Second Lieutenant to Captain as soon as he earns his M.D. and can serve as a military physician.  Both his medical and military careers are at risk if he is forced to withdraw or be expelled.

~~5.    Jane Doe will be imminently fired from the Anschutz's teaching faculty and lose her staff privileges at the Anschutz's teaching hospital in Colorado Springs as early as October 1, 2021, because of her religiously grounded inability to accept the Pfizer, Moderna, or Johnson & Johnson COVID vaccines.  She will be unable to practice her profession as a pediatric care specialist within 100 miles of the medical school campus in Aurora, or of its associated Children's Hospital in Colorado Springs—and effectively in the entire state of Colorado—for a period of two years as a result if she is fired.~~

~~6.    John Doe has been forced to take a leave of absence from his studies at Anschutz also because of his religiously grounded inability to accept the Pfizer, Moderna, or Johnson & Johnson COVID vaccines, and is currently barred from all Anschutz property.  He will be unable to begin his medical studies anew anywhere in the United States, without finding a new medical school that would accept him under these circumstances and then applying for and securing admission to that new school.~~

~~7.~~15.    The University's foray into explicit religious discrimination violates the deepest traditions of government neutrality towards religion, as originally enshrined in the Establishment

and Free Exercise Clauses of the First Amendment and as applied to state actors like Colorado in the Fourteenth Amendment. And its failure to treat those with religious objections to COVID-19 vaccination the same as those with medical contraindications to the vaccine also violates the First Amendment. Since the University has refused to voluntarily back down from these Policiesthis Policy, immediate judicial intervention is now necessary.

## PARTIES

### Parties

9.16.    Plaintiff Dr. Jane Doe 1, M.D., is a physician licensed to practice medicine by the state of Colorado. She is currently employed as a pediatric physician by the University of Colorado Anschutz School of Medicine and is exclusively assigned to Children's Hospital of Colorado Springs, over sixty miles away fromone of the teaching hospitals of Anschutz Campus in Aurora. She is a devout Catholic who was raised in the faith, founded a student pro-life group known as Physicians for Life while in medical school, and in 2018 obtained a master's degree in Catholic bioethics from the University of Mary in North Dakota, in association with the National Catholic Bioethics Center. Dr. Doe 1 is the mother of young children, and she relies upon the income provided by her job to support them. In late August 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from tissue from an aborted fetus—was denied. And in late September, Defendants confirmed that denial in response to a demand letter from her counsel. Despite Defendants' alleged interest in requiring all staff and students to be vaccinated by September 1, Dr. Jane Doe 1 was allowed to continue to work freely at Children's Hospital Colorado Springs for the month of September, following standard COVID protocols.

17.     Dr. Jane Doe 2 is a physician licensed to practice in the State of Colorado. Until October 2, 2021, she was employed as a pediatric anesthesiologist and Associate Professor of Clinical Practice at Children's Hospital Colorado at the Anschutz Medical Campus in Aurora. She is a devout Christian and known by colleagues to be devout and conscientious in her religious practices. In late September 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from tissue from an aborted fetus—was denied with finality. She was notified of her termination on September 21, 2021, but was allowed to characterize that involuntary separation as a "resignation," lest a "termination" affect her continuing licensure.

18.     Dr. Jane Doe 3 is a physician licensed to practice in the State of Colorado. Until October 2021, she was employed as a physician and associate professor of medicine at the Anschutz School of Medicine. She has faculty appointments at both the University of Colorado-Anschutz Medical Campus in Aurora (with clinical privileges at University of Colorado Hospital tied to her faculty appointment) and the Rocky Mountain Regional VA Medical Center in Aurora. In mid-September 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines from an aborted fetus—was denied.  In making that request, Dr. Doe informed Defendants that her religious objection to the involvement of those cell lines in medical and pharmaceutical research extended not only to her personal health care decisions, but to her professional, ethical decision making, as well.  She informed Defendants that her recent research work involves development of new therapy whose production would have utilized cell lines that are derived from cells from live aborted fetuses, as is standard in the field, but "when I

discovered that the cell line was derived from an aborted fetus, I have made the decision not to use it." Dr. Doe's work has earned her a national and international professional reputation, as well. Earlier this year she was courted by another American medical research university to relocate there and continue her current teaching and research work but chose to stay at Anschutz where she has the trust and esteem of longtime colleagues. Defendants are fully aware that Dr. Jane Doe 3 also contracted COVID-19 in August 2021, and has fully recovered, and is thus naturally immune to COVID-19, an immunity as good or better than vaccination provides.

19. Jane Doe 4 is employed as an instructor in multisystemic therapy by the Kempe Center at the Anschutz Medical Campus in Aurora. In late August 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine, at all—was denied with finality. She is currently being allowed to perform her work fully remote from Defendants' facilities and fully remote from Kempe clients' facilities. As long as that arrangement continues, she is not subject to any vaccination policy. Her supervisors told her that they will try to keep that arrangement in place as long as possible, but whenever she might be required to return to Anschutz or Kempe client facilities, she will be terminated if not vaccinated.

20. Jane Doe 5 is employed as program coordinator in an ambulatory surgical center in Englewood, Colorado, affiliated with the Anschutz School of Medicine and subject to its policies. She requested that she not be required to receive the COVID vaccines because of her sincere religious objections to the vaccines (she is a conscientious Orthodox Christian), but, just as all other plaintiffs, her request was denied. She is currently being allowed to perform her work fully remote from Defendants' facilities, and as long as that arrangement continues, she is not subject to any vaccination policy. She is informed that arrangement, however, cannot continue beyond the

end of December, when she will be terminated. Despite working the same hours and having the same job duties she had before working remotely, she has been docked 10% of her pay, solely because she has asserted a religious objection to the COVID vaccination requirement.

21.     Jane Doe 6 is employed as a program manager in the Office of the Dean of the Anschutz School of Medicine. In late August 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine made or tested with material derived from cell lines derived from tissue from an aborted fetus— was denied with finality. She is currently being allowed to perform her work fully remote from Defendants' facilities. She is informed that arrangement, however, cannot continue beyond the middle of November. When she is required to return to Anschutz facilities, she will be terminated.

22.     Jane Doe 7 is a fourth-year student at the Anschutz School of Dental Medicine. She submitted a request in late August 2021, to be exempted from Defendants' vaccine mandate —she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines from an aborted fetus—but that request was denied. Jane Doe 7 also contracted COVID-19 in early September 2021, has fully recovered, and is thus naturally immune to COVID-19, an immunity as good or better than vaccination provides. She was advised by her physician not to accept a COVID vaccine for 90 days. Defendants have placed Jane Doe 7 on forced "medical leave" during that 90-day period and restricted her from campus, because she also asserted a religious objection to vaccination, instead of allowing her to remain on campus and in classes like others who have received medical exemptions to vaccination. Defendants have indicated they will force her to withdraw or be expelled from the program—

notwithstanding her religious objections to the vaccines—at the end of that 90-day period, in late December 2021.

23.     Jane Doe 8 is a dual degree student who was seeking both bachelor's of arts and master's of public health degrees, in a program offered by the University, with the bachelor's taken at the University's Denver campus and the master's at the University's Anschutz campus. She is also part-time student employee of the University on the Denver campus. She is regularly in contact with a variety of others in both her student and staff roles on the University's Denver campus. In early September 2021, her request to be exempted from Defendants' vaccine mandate was denied with finality, and she has been forced to withdraw from the Anschutz master's program. She was, however, freely granted a religious exemption to attend classes and work on the Denver campus, and she continues to pursue her bachelor's there.

24.     Jane Doe 9 is a project coordinator, data and analytics, working in the Anschutz Division of Hospital Medicine.  She holds a master's in public health. In late August 2021, her request to be exempted from Defendants' vaccine mandate–she had communicated a sincere religious objection to all vaccines "in all their forms and mechanisms for altering my body, [because they] go against my faith"—was denied with finality.

25.     Jane Doe 10 is a clinical trials manager at the University of Colorado Cancer Clinical Trials Office at the Anschutz Medical Campus in Aurora. In late August 2021, her request to be exempted from Defendants' vaccine mandate – she had communicated a sincere religious objection to all vaccines–was denied in circumstances that show it was never even read, much less considered.  She is currently being allowed to perform her work fully remote from any of Defendants' facilities, and as long as that arrangement continues, she is not subject to any

vaccination policy.  Her position, however, is considered a clinical position, requiring in-person interaction with patients, and so that fully remote arrangement cannot continue indefinitely.

26.     Jane Doe 11 is a Psychiatric Mental Health Nurse Practitioner at the Colorado Mental Health Institute at Pueblo, a facility operated by the Colorado Department of Human Services.  Her position, however, is contracted through the University of Colorado School of Medicine.

10.27.  Plaintiff John Doe 1 was until earlier this fall a first-year student at the Anschutz School of Medicine. He is, however, being forced out of that program by Defendants' unlawful Policy and actions, as alleged in this Complaint. He will be unable to begin his medical studies anew anywhere in the United States, without finding a new medical school that would accept him under these circumstances and then applying for and securing admission to that new school, a process that will take at least a year or more. Verified Complaint. Mr. Doe is a devout Buddhist who made a vow to the Buddha 10 years ago (after visiting a significant monastery in China) that he would live a moral life. After that he began practicing meditation, reading scriptures and Buddhist teachings, avoiding products developed through the killing or harming of animals (including human beings), and overall seeking to formulate his life consistent with the "five precepts" of Buddhism.

28.     John Doe 2 is a third-year medical student at the Anschutz School of Medicine. He submitted a request in late August 2021, to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from an aborted fetus—but that request was denied on August 31. He was notified by the Anschutz promotions committee on September 15 that he must either take a forced leave of absence, withdraw, or be terminated from his M.D. program. John Doe 2

also contracted COVID-19 in May of 2021, has fully recovered, and is thus naturally immune to COVID-19, an immunity as good or better than vaccination provides.

29.     John Doe 3 is a senior data integration engineer working for the Office of Information Technology, a Central Services Administrative unit of Anschutz operating under the Anschutz Medical Campus' vaccine policy. In late August 2021, he requested to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from live aborted fetuses—was denied with finality. He is currently being allowed to perform his work fully remote from any of Defendants' facilities. As long as that arrangement continues, he is not subject to any vaccination policy, but he cannot properly perform his work in that arrangement because he would soon become ineffective and unable to perform his job.

30.     John Doe 4 is a police communications supervisor in the Anschutz police force. In late August 2021, his request to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from live aborted fetuses—was denied with finality. He has been allowed to work as an Anschutz police communications supervisor because he has been deemed essential. Despite no change to his duties or work hours, he has been docked 10% of his pay, solely because he has asserted a religious objection to the COVID vaccination requirement. He has been informed that he will be terminated within the next twelve weeks because of his religiously motivated rejection of the vaccination.

31.     John Doe 5 is a senior network engineer working for the Office of Information Technology, a Central Services Administrative unit of Anschutz operating under the Anschutz Medical Campus' vaccine policy. In late August 2021, he requested to be exempted from

Defendants' vaccine mandate—he communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from aborted fetuses—but that request was denied with finality. He is currently being allowed to perform his work fully remote from Defendants' facilities. As long as that arrangement continues, he is not subject to any vaccination policy, but he feels he cannot adequately perform his job functions in that arrangement. Because he is steadfast in his religious refusal to the vaccine, he will be terminated as soon as he must return to Anschutz facilities.

32.    John Doe 6 is a first-year student at the Anschutz School of Medicine's master's program in anesthesiology. He submitted a request in late August 2021, to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from an aborted fetus—but that request was denied on August 31. He was notified by the Anschutz promotions committee that he must either take a forced leave of absence, withdraw, or be terminated from his program.

33.    John Doe 7 is an identity management developer in the Office of Information Technology working for the Office of Information Technology, a Central Services Administrative unit operating under the Anschutz Medical Campus' vaccine policy. In late August 2021, he requested to be exempted from Defendants' vaccine mandate–he had communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from aborted fetuses–was denied with finality.  He is currently being allowed to perform his work fully remote from any of Defendants' facilities. As long as that arrangement continues, he is not subject to any vaccination policy.

11. 34.  Defendant Board of Regents of the The University of Colorado areis a constitutionally created body of the State of Colorado and govern, control, and operate the

University of Colorado, which has several campuses~~consists of schools situated~~ throughout the State, including the Anschutz campus in Aurora. The Board has authorized the other Defendants to enact and enforce the COVID-19 vaccine mandates at issue here.~~School of Medicine.~~

35.    Defendant Todd Saliman is the President of the University of Colorado and is sued in his official capacity.[1] He was appointed to that position by the Board of Regents and in that role is the chief executive of the University. His office issued, maintains, and oversees the COVID-19 vaccination mandate for all students and staff of the University.[2]

~~12.~~36.  Defendant Donald Elliman is the Chancellor of the University of Colorado Anschutz School of Medicine and is sued in his official and personal capacities.~~capacity.~~ He is the agent authorized by the University to enact and enforce policies governing the educational and employment practices of the Anschutz campus~~School of Medicine~~.

~~13.~~37.   Defendant Shanta Zimmer, Eric Mediavilla, ~~is the Senior Associate Dean of Medical Education, University of Colorado Anschutz School of Medicine~~ and Ann-Michael Holland are agent~~is sued in his official capacity.  She is the agent~~ authorized by the University and Defendant Elliman to enforce policies governing ~~the~~ student life and study at the School of Medicine, the ~~Anschutz~~ School of Dental Medicine, and the Anesthesiology program at the School of Medicine, respectively. They are sued in their official and personal capacities.

38.    Defendants Jane and John Does are members of the "Vaccine Verify" team are sued in their official and personal capacities. They are an unknown group of agents authorized by

_____

[1] Plaintiffs do not know the extent or nature of Defendant Saliman's involvement in the violation of their constitutional rights, and thus do not sue him in his personal capacity at this time. Discovery should yield the information necessary to determine whether a suit against him in his personal capacity is proper.

[2] *CU Requires Vaccine for Fall Semester 2021*, Statements from the President (April 28, 2021), https://president.cu.edu/statements/cu-requires-vaccine-fall-semester-2021.

the University to enforce the Anschutz campus COVID-19 vaccine policy and rule on requests for exemptions under the Policies operative during the events described herein.

14.39.  In adopting and enforcing the University of Colorado Anschutz campusSchool of Medicine's COVID-19 Vaccination Policiesy challenged by this suit, Defendants have acted under color, regulation, custom, or usage, of an arm of the state of Colorado.

## JURISDICTION AND VENUE

### Jurisdiction and Venue

16.40.  Three of the fivefour discrete claims in this action arise under the First and Fourteenth Amendments to the United States Constitution and are brought pursuant to 42 U.S.C. § 1983, and another under Title II of the Americans with Disabilities Act, 42 U.S.C. §12133.. This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1343.

17.41.  The Court has jurisdiction over the Plaintiffs' claim under the Colorado Constitution under the supplemental jurisdiction provision of the Judicial Code, 28 U.S.C. §1367(a).

18.42.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19.43.  This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

20.44.  This Court is authorized to grant Plaintiffs' prayer for temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

21.45.  This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

**FACTS**

**A.  Defendants implemented a University-wide COVID vaccine mandate which was to allow for medical~~Relevant terms~~ and non-medical exemptions.**

~~A.~~46.   On April 28, 2021, Defendants announced a university-wide policy that all staff and students must be vaccinated against COVID-19 before the start~~requirements~~ of fall semester 2021.[3] That announcement linked to an FAQ page,[4] confirming that exemptions would be available to the COVID~~Defendants'~~ vaccination mandate, just as with existing vaccine mandates:~~policy~~

> **Q: Will there be exemptions from the requirement?**
> A: As with current CU vaccination policy, there will be a process for requesting exemptions on medical and non-medical grounds.
>
> **Q: How do I apply for an exemption?**
> A: Each campus has its own process for exemptions. Check with campus COVID web pages.

47.     On or before July 21, 2021, the Anschutz campus FAQ page[5] confirmed that staff and students would be allowed exemptions from the vaccination requirement:

---

[3] https://president.cu.edu/statements/cu-requires-vaccine-fall-semester-2021.
[4] https://www.cu.edu/vaccine-requirement.
[5] https://web.archive.org/web/20210721172814/https://www.cuanschutz.edu/coronavirus/frequently-asked-questions#ac-what-is-the-process-for-opting-out-of-the-covid-19-vaccine-for-medical-or-religious-reasons-5.

**What is the process for opting out of the COVID-19 vaccine for medical or religious reasons?**

Students and employees may request medical or religious exemptions to the vaccination requirement. You can find details and downloadable exemption forms here.

Students should submit medical and/or religious exemption forms to their programs before beginning the fall 2021 semester. Employees will be able to submit medical exemption forms, and/or attest to religious exemptions, using the vaccine verification system currently under development.

48.     The FAQ linked to the COVID vaccination exemptions page.[6] On or before August 3, 2021, that page provided a process for religious exemptions that required no form for employees, merely that they "select this option," while students were to fill out a simple religious exemption form:

**Religious Exemptions**

Religious exemptions require students and employees to attest to their exemption based on religious beliefs.

Students may download the religious exemption form using the link below, and should submit their religious exemption form to their program before beginning the fall 2021 semester.

Employees may claim a religious exemption within the vaccination verification system. There is no form necessary for employee religious exemptions; you may simply select this option as you complete the vaccine verification process.

On the University's other campuses, religious exemptions have flowed freely, with little or no investigation as to the sincerity or even the nature
49.     A copy of exemptees' beliefs:

---

[6] https://web.archive.org/web/20210803204610/https://www.cuanschutz.edu/coronavirus/vaccine-information/exemptions.

- **Boulder**: submit signed form to obtain generic "Non-medical exemption . . . for religious or personal beliefs that are opposed to immunizations." https://www.colorado.edu/health/student-covid-19-vaccine-requirement

- **Colorado Springs**: "You may ask for an exemption for a medical reason or a non-medical reason (religious or personal belief) within the attestation. There is no official approval process at this time outside of claiming you are exempting out of receiving the vaccine." https://covid19.uccs.edu/vaccination

- **Denver**: "CU Denver's process allows exemptions to anyone who requests one for any reason; religious, medical, or personal. We trust our students and employees to act in the best interest of our community." https://www.ucdenver.edu/coronavirus/faq-topics

23.50.  While it first appeared that exemptions would be freely granted for students and staff on the Anschutz campus, Defendants reversed course and adopted their September 1the currently effective "University of Colorado Anschutz Medical Campus['s] COVID-19 Vaccination Requirement and Compliance" Policy, which (the "Policy") is attached as Exhibit 1.

24.    The September 1As Exhibit 1 shows (p. 1) it was "Prepared By" the Office of University Counsel and "Approved By" Defendant Elliman.  It was made effective as of September 1, 2021, and remains effective as of the filing of this Verified Complaint.

25.    Defendants Elliman and Zimmer have acted as the duly empowered agents of the Defendant University in enacting and enforcing that Policy.

26.51.  The Policy requires all students, employees, and other individuals "who currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program" or otherwise interact with members of the Anschutz community "regardless of location" to "become fully vaccinated against COVID-19 with a vaccine that has been approved

by the World Health Organization . . . subject to limited exceptions and exemptions." (Ex. 1, Policy at (A)). The Policy states it was "Prepared By" the Office of University Counsel and "Approved By" Defendant Elliman. It was made effective as of September 1, 2021. At least Defendants Elliman, Zimmer, and Does of the "Vaccine Verify" team have acted as the duly empowered agents of the Defendant Board of Regents in enacting and/or enforcing that Policy.).)

27.1.   The Policy then provides for two kinds of exemptions: medical and religious. (*Id.* at (C)(2The September 1 Policy stated that it allowed for religious exemptions as follows:).) "Medical" exemptions are allowed "if vaccination is medically contraindicated due to other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health," as attested to by a qualifying medical professional. (*Id.*)

28.52.   As to "religious" exemptions, the Policy states as follows:  "A religious exemption may be submitted based on a person's religious belief whose teachings [*sic*] are opposed to all immunizations."  (*Id.*)

29.53.   As both Plaintiffs' experience shows, the confused malapropism "religious belief whose *teachings*" oppose "*all* immunizations*"* imposeds two necessary conditions to Defendants' consideration of any religious accommodation, namely:

    a.   That the person requesting a religious accommodation have a sincere religious belief that opposes acceptance of "all immunizations" and vaccines; and

    b.   That the person requesting a religious accommodation be a member of an organized religion whose tenets include a hierarchically promulgated, authoritative position on the moral liceity of "all immunizations" and vaccines.

30.54.  Both conditions are clearly forbidden by the Establishment, Free Exercise, and Equal Protection clauses of the United States constitution and the Religious Freedom provisions

of the Colorado constitution. Quite literally, they require that a qualifying belief be grounded in an organized religion whose tenets include an authoritative position against the moral liceity of "all immunizations" and vaccines, thus privileging hierarchically prescribed religious belief over autonomously prescribed (yet sincerely held) religious belief. These conditions flagrantly violate well-established constitutional law.

55.     Defendants denied each and every religious exemption request presented to them, including those of Plaintiffs, under and in view of the September 1 Policy's unlawful religious tests and conditions. These denials persist to the present day and have never been rescinded or reconsidered.

56.     Moreover, Defendants imposed more stringent requirements on religious belief, including inquiries into sincerity, solely against the beliefs of Anschutz students and staff members, while not imposing any substantive requirements at all on other University students and staff members. This stark difference in respect for sincere religious beliefs of one group as against the other is both discriminatory and irrational.

31.     The September 1 Policy provides for medical exemptions. Plaintiffs were denied religious accommodation because of these unlawful conditions.

57.     Those who hold the approved religious beliefs, and thus receive a religious exemption, along with those who qualify for a medical exemption, may (*Id.* at (C)(2)). "Medical" exemptions are allowed "if vaccination is medically contraindicated due to other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health," as attested to by a qualifying medical professional. (*Id.*)

32.58.  The Policy allows those who qualify for a medical exemption[7] to continue to work and study at the University, if they "adhere to additional safety protocols, including, but not limited to wearing masks, social distancing, staying home when sick, quarantining in accordance with current [CDC] guidance, submitting daily attestations, and undergoing frequent asymptomatic testing." (*Id.*) Defendants have admitted they granted medical exemptions to individuals on the Anschutz campus. Those "medically contraindicated" staff and students are free to work and study on the campus, including in areas with medical patients and other members of the public, while the "morally contraindicated" are fired and expelled.(*Id.*)

**B.   Plaintiffs' communication to Defendants of their sincere religious beliefs, and Defendants' summary, form rejection under the Policy.**

33.59.  Plaintiffs communicated their sincere, autonomously derived religious beliefs to Defendants regarding their opposition to accepting any of the three vaccines.

34.60.  Plaintiffs shortly thereafter received summary rejections via form-communiques clearly designed to reject accommodations without individualized consideration.

**C.   After all religious exemptions were rejected, Defendants prepared for litigation by promulgating a new September 24 Policy, but they have not applied that policy to Plaintiffs or otherwise reconsidered the denials made under the September 1 Policy.**

61.     After all staff and student religious exemption requests were submitted and denied—and after receiving demand letters from attorneys in relation to the September 1 policy—Defendants amended that policy, solely in preparation for litigation, on September 24, 2021. See Exhibit 28 hereto.

62.     Defendants have not applied the September 24 Policy to reconsider or rescind denials issued to Plaintiffs, all of which were issued under the September 1 Policy. Despite

---

[7] Along with those (hypothetical) individuals who hew to Defendants' "approved" religious beliefs.

repeated challenges, Defendants have neither admitted any infirmities in their September 1 Policy nor retreated from their conduct in denying all religious exemptions under that Policy. Whatever the *words* of the policy adopted September 24, the *actions* of Defendants stem from and continue to adhere to and effect the September 1 Policy. The September 1 Policy remains a primary cause of the persisting harm that Plaintiffs suffer.

63.     Under the September 24 Policy, Defendants purported to remove the prohibition on certain religious beliefs being ineligible for exemption, at least as to staff members. However, in their communications with Plaintiffs' counsel and their filings in this lawsuit, Defendants have taken a hostile position against the religious beliefs of Plaintiffs ~~Dr.~~ Jane Doe 1 (Catholic) and John Doe 1 (Buddhist), despite ample evidence of the sincerity of their beliefs. As just one example, Defendants have rejected the sincerity of Catholic staff and students objecting to the available COVID vaccines, in the teeth of well-publicized formal statements of support by the Catholic Bishops of Colorado in favor of religious objectors and in opposition to vaccine mandates[8]—those Bishops have even widely promulgated a form letter[9] for pastors to sign in support of their parishioners' exemption requests. Defendants have no justification for their overt hostility to sincere religious beliefs like Plaintiffs'.

64.     As to students of the Anschutz campus, the September 24 Policy entirely strips them of the ability to obtain a religious exemption. On its face, the September 24 Policy is unconstitutional, for it allows staff members to seek religious exemptions but strips those

---

[8] Catholic News Service, *Colorado bishops oppose vaccine mandates, welcome Denver's religious exemption*, NATIONAL CATHOLIC REPORTER (August 10, 2021), https://www.ncronline.org/news/coronavirus/colorado-bishops-oppose-vaccine-mandates-welcome-denvers-religious-exemption.

[9] ; *Template for Religious Exemption from COVID-19 Vaccines*, https://cocatholicconference.org/template-for-religious-exemption-from-covid-19-vaccines/ (last visited October 26, 2021)

exemptions from students. Defendants present no reason at all for this sweeping disparity in treatment, which is the opposite of a narrowly tailored means to achieve a compelling interest. Defendants' new policy is more anti-religious than its prior one, at least as to students.

65.     Under both the September 1 and 24 Policies, students and staff are allowed medical exemptions. Such medical exemptees are allowed to work and study with minimal restrictions, whether with and around patients, other staff and students, or members of the public. But those with sincere religious objections are to be fired and expelled, and at least entirely forbidden from in-person contact with anyone affiliated with the Anschutz campus.

66.     Defendants have not challenged or even tested the religious sincerity of those who work and study on its other campuses. Those staff and students are not subject to an "undue hardship" analysis. Instead, religious objectors on those other campuses freely attend class, live in dormitories, and work alongside other staff, students, and members of the public.

67.     Plaintiffs seek to be treated no better or worse than the many others granted exemptions by the University: to have their beliefs recognized as sincere by Defendants and to be allowed to work and study on campus, just like Anschutz medical exemptees and other-campus medical and religious exemptees. Plaintiffs present no greater danger of spreading COVID-19 than any of these many other individuals.

**Jane Doe**

**Dr. Jane Doe 1**

35.68.  On August 20, 2021, Dr. Jane Doe 1 received from the Defendant "Vaccine Verify" team members to whom the Defendants delegated the responsibility to deal with accommodation requests from physicians the following "Dear Employee" form email:

From: Vaccine Verify <vaccineverify@cuanschutz.edu>
Sent: Friday, August 20, 2021 5:38 PM
Subject: Your Vaccine Religious Exemption Request

Dear Employee,

You have submitted a request for an exemption from the vaccination requirements set forth in the campus policy based on a religious exemption. In order to evaluate that request we need you to respond completely to the questions below within 2 business days of recipient of this email. After this information has been reviewed you will be advised as to whether you request for an exemption has been approved or rejected.

Thank you for your prompt attention.

The CU Anschutz Vaccine Verification Team

1. **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**

2. **Have you had an influenza or other vaccine in the past? How does this differ?**

[Bolded emphasis in original]

~~36.~~69.  On August 22, 2021, Dr. Jane Doe 1 responded by email to the "Vaccine Verify"

team as follows:

From: Jane Doe, <XXXXXXX@childrenscolorado.org>
Sent: Sunday, August 22, 2021 11:14 PM
To: Vaccine Verify <vaccineverify@cuanschutz.edu>
Subject: Re: Your Vaccine Religious Exemption Request

Response to questions regarding SARS CoV-2 vaccination:

1.As a faithful Catholic, I uphold the dignity and sanctity of every human life and firmly oppose abortion and the evil involved in the use of cell lines derived from abortions. All 3 available emergent-use authorized vaccines in the U.S. - Moderna, Pfizer-BioNTech, and Johnson & Johnson - used the abortion-derived cell lines (HEK293) in one or more phases of developing the SARS CoV-2 vaccine.

2.I have had other vaccines; including influenza - which does not utilize unethically derived cell lines.

27

[Jane Doe], MD, MS Bioethics

~~37.~~70.  The position that Dr. Jane Doe 1 expressed ~~there~~ has the public support of the Roman Catholic bishops of Colorado, among other Catholic authorities, as Defendants know. In addition to the form letter promulgated by the ~~The Colorado~~ bishops for local pastors to sign, the bishops also~~have~~ published and broadly disseminated ~~to the public at large~~ a letter expressing their teachings regarding the liceity of the vaccines that says, among other things:

> • Vaccination is not morally obligatory and so must be voluntary.
>
> • There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion; however, it is permissible to use such vaccines only under case-specific conditions—if there are no other alternatives available and the intent is to preserve life.
>
> • A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings.
>
> • A person is morally required to obey his or her conscience…
>
> Taken as a whole, these points mean a Catholic may judge it right or wrong to receive certain vaccines for a variety of reasons, and there is no Church law or rule that obligates a Catholic to receive a vaccine.

Exhibit 2 attached. Available at https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-COVID-19-vaccine-mandates/

~~38.~~71.  On August 26, Dr. Jane Doe 1 received by email a form letter that purported to be a formal, final decision from the "Vaccine Verify" team as a documentary attachment. A copy is attached as Exhibit 3. In critical part, it stated:

> Your exemption request has been denied because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations.

~~39.~~72.  The response made no attempt to hide that the *sole reason* for the denial was that she lacked the qualifying religious beliefs.

40.73.  On September 15, 2021, Dr. Jane Doe 1, by and through counsel, sent the University a letter advising it of the constitutional defects ininfirmities of the Policy and sought reconsideration of her religious accommodation request. (Exhibit 4 attached) University counsel responded via letter on September 20, 2021, and doubled down on its Policy. (Exhibit 5 attached) That letter entirely ignored the Policy's failure to abide by religious neutrality and instead cited generic caselaw about government authority to require vaccines and to determine whether one's objections to a vaccine are religious or "personal." It also argued for the first time that, despite her care for patients over the past 19 months, and despite the availability of COVID vaccines since at least January 2021, it would now be an "undue hardship" to accommodate Dr. Jane Doe 1 given that her pediatric patients are not eligible for vaccination—an argument that was plainly pretextual. (*Id.*)

41.74.  In the meantime, notwithstanding the University's alleged compelling interest in requiring that all associated individuals receive vaccinations by September 1, Dr. Jane Doe 1 washas been allowed[10] for nearly a month to continue serving her patients at Children's Hospital while exercising the normal protective measures to prevent the spread of COVID—the same ones outlined in the Policy for exemptees. (See Ex. 1, Policy at (C)(2)).).)

**Dr. Jane Doe 2**

75.  In early September 2021, Dr. Jane Doe 2 submitted a request to the Vaccine Verify team to be exempted from taking any COVID vaccines because of her sincere religious beliefs precluding acceptance of the vaccines. (Previously, in August 2021, she had submitted a

---

[10] In response to the filing of this lawsuit, Defendants placed Dr. Jane Doe 1 on administrative leave, pending the outcome of her prior Motion for Preliminary Injunction. With the denial of that motion, on mootness grounds, she faces imminent termination.

request for medical exemption, too, because of multiple chronic conditions including migraines, chronic liver disease and chronic lung disease that substantially impair major life activities.)

76.     In early September 2021, Dr. Jane Doe 2 received the "Dear Employee" form email from the Vaccine Verify team identical to the August 20, form email received by Dr. Jane Doe 1 which is quoted in paragraph 68 above.

77.     On September 13, Dr. Jane Doe 2 emailed a response to this form email that included both responses to the discrete "Please explain your sincerely held religious belief..." and "Have you had an influenza or other vaccine..." questions, as well a personal statement of faith. Among other things that response said:

> I believe that God created each of us in His own image, and that my body is the temple of the Holy Spirit who dwells in me. I also believe in the sanctity of all human life from the time of conception. My beliefs are based on my relationship with God and my knowledge of His character that grows through prayer and study of the Bible. I believe it is fundamentally wrong to inject this unclean substance into my body and it would violate my faith. Please see my attached statement of faith for further details...

> I also find some … [Biblical] verses speak to the sanctity of life from before birth, so I am deeply troubled that all available vaccines used fetal tissue or fetal-derived cell lines at some stage of their testing or development.

78.     On September 16, 2021, the day after the University received a demand letter from counsel for Dr. Jane Doe 1 explaining the unconstitutionality of the September 1 Policy, Dr. Jane Doe 2 received an email from the Vaccine Verify team that said:

> **From:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Sent:** Thursday, September 16, 2021 2:59 PM
> **Subject:** RE: Medical Exemption – More Information Needed
>
> **SUBJECT: Religious Exemption Request Rejected – Action Required**
>
> Hello,
>
> The CU Anschutz Exemption Verification Team has reviewed your request to be exempted from the vaccination requirements under the University of Colorado Anschutz

Medical Campus policy regarding COVID-19 vaccination because of your stated religious beliefs.

Your exemption request has been denied because the exemption would pose significant health and safety risk to CU Anschutz community and, most importantly, to our patients. Removing or modifying your duties to preclude contact with others would pose an undue burden on the University, as it would require your colleagues to perform your duties in addition to their own.

Therefore, you will need to provide proof of vaccination by 5 pm on September 17, 2021. Please submit your vaccine verification form HERE. For more information, see the campus policy at https://www.ucdenver.edu/docs/librariesprovider284/default-document-library/3000-general-admission/3012---covid-19-vaccination-requirement-and-compliance.pdf?sfvrsn=4e9df3ba_2

Failure to submit proof of COVID-19 vaccine verification by 5 pm on September 17, 2021 will result in additional actions being taken due to your failure to comply with the campus vaccination policy, including but not limited to termination.

* * *

Thank you, **Vaccine Exemption Verification Team**

79.     On September 21, Dr. Jane Doe 2 and her supervisor, Dr. Thomas Majcher, met by teleconference with representatives of the Human Resources department to discuss her work schedule for the week. That same day, Dr. Majcher informed Dr. Jane Doe 2 that she was being fired. He said she would either be officially fired as of September 25 or, alternatively, could avoid potential difficulties with continuing licensure if she submitted a letter of "resignation" before then characterizing her involuntary separation as a "resignation" rather than a "termination." She did so shortly thereafter.

**Dr. Jane Doe 3**

80.     In early September 2021, Dr. Jane Doe 3 submitted a request to the Vaccine Verify team to be exempted from taking any COVID vaccines because of her sincere religious beliefs precluding acceptance of the vaccines. On September 13, 2021, she received an email from the Vaccine Verify time acknowledging that her "Vaccine Verification Process Completed" due to her certification that she was exempted. A copy of this email is attached as Exhibit 23.

(Also in September 2021, she submitted a request for medical exemption, too, because of a heart condition that, if impacted by the COVID vaccines, would substantially impair major life activities. That request was denied, too, as an ADA accommodation.)

81.    However, on September 14, 2021, Dr. Jane Doe 3 received the "Dear Employee" form email from the Vaccine Verify team identical to the August 20, form email received by Dr. Jane Doe 1 which is quoted in paragraph 68 above asking her to "explain …your sincerely held religious belief."

82.    On September 16, 16, 2021 Dr. Jane Doe 3 emailed a response to this form as follows:

**From:** [Jane Doe 3, M.D.]
**Date:** Thursday, September 16, 2021 at 6:14 PM
**To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
**Subject:** Re: Your Vaccine Religious Exemption Request

1.  **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**

I am a devout Catholic and am opposed to abortion. The Johnson and Johnson vaccine includes pieces of a cell that was derived from an aborted human fetus. The Moderna and Pfizer vaccine used this cell line in the testing of the efficacy of their vaccine, although their vaccines do not contain the actual cell line. I am firmly opposed to the use of embryonic cell lines in any research or therapeutics. To show how strong this belief is, I am currently developing a therapy … that normally would use this same cell line in its production, but when I discovered that the cell line was derived from an aborted fetus, I have made the decision not to use it, even though this may make FDA approval of my therapy more difficult …

 I am claiming this exemption for all three vaccines (J and J, Pfizer, Moderna) because of their use of the cell line from the aborted fetus in their development, testing, or production. I also have a valid medical exemption for the Moderna and Pfizer vaccines, and my PCP is providing me with the revised form for resubmission. Please note that I have already had COVID 19 and therefore have natural immunity to the virus and should not pose a threat to my patients or colleagues at this institution. This makes the impetus not to receive a

vaccine developed using a cell line from an aborted fetus even stronger, because not only do I consider it morally wrong, but in my case it is completely unnecessary.

**2.   Have you had an influenza or other vaccine in the past? How does this differ?**
Yes, I have an influenza vaccine every year and I have received many other vaccines as well. I only realized this year that this fetal cell line is used in the development of vaccines, and I will be looking closely at whether it is used in any future vaccines that I receive …

83.     Shortly thereafter, Dr. Jane Doe 3 received the "Hello" email from the Vaccine Verify team identical to that sent to Dr. Jane Doe 2 on September 16. Just as it did for Dr. Jane Doe 2, the Vaccine Verify team claimed to have "reviewed your request to be exempted from the vaccination requirements under the University of Colorado Anschutz Medical Campus policy regarding COVID-19 vaccination because of your stated religious beliefs. Your exemption request has been denied because the exemption would pose significant health and safety risk to CU Anschutz community and, most importantly, to our patients. Removing or modifying your duties to preclude contact with others would pose an undue burden on the University, as it would require your colleagues to perform your duties in addition to their own."

84.     Notwithstanding that apparent termination, Dr. Jane Doe 3 continued to communicate with the Vaccine Verify team to have it reverse its irrational position. On October 8, 2021, she wrote:

**From:** [Jane Doe 3, M.D.]
**Date:** Friday, October 8, 2021 at 10:02 AM
**To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
**Subject:** Appeal of denial of religious exemption request
Dear Vaccine Exemption Verification Team

I am writing to request that you reconsider your denial of my religious exemption.

The reason for my religious exemption is my opposition to vaccines prepared using cell lines from aborted fetuses. My objection is particularly strong to the J and J vaccine, which contains parts of the cell lines that bleb off with the adenoviral particles in the preparation of the vaccine. However, it is also present for the RNA vaccines, which used the cell line in development of the vaccine and not in its production, because my sincerely held religious belief is that aborted human fetuses and embryos should not be

used for research or therapeutics. In your rejection of my religious exemption, you did not state that the denial was because my request was not valid; instead, you said that "…the exemption would pose significant health and safety risk to CU Anschutz community and, most importantly, to our patients. Removing or modifying your duties to preclude contact with others would pose an undue burden on the University, as it would require your colleagues to perform your duties in addition to their own." …[T]his is not true since I have had COVID and thus have natural immunity, which has been shown to be effective and durable. Therefore I am at no more risk to my patients and colleagues here than those individuals who have been vaccinated, and there is no need to remove or modify my duties to preclude contact with others.

85.     Defendants have not, however, reversed their position and Dr. Jane Doe 3 has been barred from all Anschutz facilities, and so cannot perform her clinical, teaching, or research responsibilities at those facilities.

86.     The Rocky Mountain Regional VA Medical Center has also informed Dr. Jane Doe 3 that, if she loses her appointment as a faculty member at the Anschutz School of Medicine, she will likewise lose her appointment at the VA Medical Center.

87.     Dr. Jane Doe 3 is also prosecuting a valuable patent in connection with her work at Anschutz. Successful prosecution of that patent will be severely impaired if she is no longer able to work at Anschutz. She will also be deprived of an imminent and likely promotion to full Professor at Anschutz.

88.     In early 2021, Dr. Jane Doe 3 was offered an academic post at another major American academic medical center where she would be able to continue all of the research projects she has been conducting at Anschutz and the VA Medical Center and likewise continue her clinical and teaching duties on terms at least as financially favorable as those she enjoyed at Anschutz. She continued to negotiate the terms of that offer through the summer of 2021, but relying on Defendants' good faith, and relying also on the truth of the terms of all Defendants' personnel policies and communiques (including the COVID vaccination requirements) from June, July and August of 2021, Dr. Jane Doe 3 declined the offer.

**Jane Doe 4**

89.      On August 21, 2021, Jane Doe 4 emailed Vaccine Verify a request to be exempted from the requirement to receive a COVID vaccine because of her "very long-standing and sincere religious convictions that have also prevented me from ever getting the flu vaccine as well."

90.      On August 26, 2021, Vaccine Verify emailed Jane Doe 4 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe's form letter, it said that Jane Doe 4's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

91.      Incredulous at that denial, on September 1, 2021, Jane Doe 4 again requested exemption from Vaccine Verify by the following email to Vaccine Verify:

> **From:** [Jane Doe 4]
> **Sent:** Wednesday, September 1, 2021 3:26 PM
> **To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Subject:** Religious Exemption and supporting documents
>  **1. Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**
>  I am requesting an exemption for the COVID-19 vaccine due to my long-standing and strongly-held faith in God and my religious convictions.
> In 2000, my family was shocked when we received the news that my father had an inoperable Glioblastoma Multiforme. During the nine months my father battled this horrendous tumor, my family prayed daily and relied on our faith in God to get us through the most challenging days. I was raised to hold the belief that God's will for our lives had reason and purpose. It was during this truly difficult time in my life that I came to accept that it is often hard to understand God's plan for each of us, but as the Bible teaches us, we must accept and trust in it. In accepting God's will, I was able to submit to His larger plan for my father and family, which helped us cope with our sorrow and grief. I have come to

embrace that God works in mysterious ways, acknowledging that His plans for me and my family are superior to my own.

I strongly believe that accepting any vaccines would be contrary to my long-held (and documented) beliefs and how I have led my life until now and an afront to God's will. I am firm in my beliefs and position on this matter and St. Paul's letter to the Romans (Romans 12:1-2) appropriately addresses the embodiment of my belief system;

"Therefore, I urge you, brothers and sisters, in the view of God's mercy, to offer your bodies as a living sacrifice, holy and pleasing God- this is your true and proper worship. Do not conform to the pattern of this world but be transformed by the renewing of your mind. Then you will be able to test and approve what God's will is- His good, pleasing and perfect will."

I continue to live my life with these religious convictions which have been accepted and approved by the Colorado Department of Education as well as the New York State Department of Education. My sons are now 16 and 14 years old, neither of whom have had vaccines…

**2.Have you had an influenza or other vaccine in the past? How does this differ?**
I have never had an influenza vaccine, nor any other vaccines in my adult life. The vaccines I received as a baby/young child were different because I was obviously not of age to consent nor understand/make my own decisions regarding medical treatment and religion.

92.     Jane Doe 4 did not receive a written response to that September 1, email, but was informed in early October by the Anschutz vice-chancellor in charge of human resources that the August 26 denial of her request still stands.

93.     Jane Doe 4's supervisors at the Kempe Center regard her as an exemplary employee and, in order not to lose her have allowed her to work for the last several weeks remote from any Anschutz facility, and remote from the facilities of any Kempe client she serves. That remote arrangement makes Defendants' vaccination policies inapplicable to Jane Doe 4, and so allows her to remain employed.

94.     Jane Doe 4's supervisors have told her that they will keep the fully remote arrangement she is currently working under in place as long as possible. But they have told her she must either be compliant with Defendants' vaccination policy whenever she is required to return to Anschutz or Kempe client facilities or be terminated.

**Jane Doe 5**

95.     On August 4 and again on August 22, 2021, Jane Doe 5 emailed Vaccine Verify requests to be exempted from the requirement to receive a COVID vaccine because, as she wrote in her August 22 request:

> I am an Orthodox Christian who believes in the Bible, and I follow God and the principles laid out in His words. As a believer in Jesus Christ, I believe in divine and supernatural healing. To be forced upon by a cure (vaccine) that has not been proven or thoroughly tested is to diminish my faith in God. … I will now state a few reasons based on scripture:
>
> Exodus 15:26 – 26 and said, If thou wilt diligently hearken to the voice of the LORD thy God, and wilt do that which is right in his sight, and will give ear to his commandments., and keep all his statutes, I will put none of these diseases upon thee, which I have brought upon the Egyptians: for I *am* the LORD that healeth thee.
>
> * * *
> I make this request for the glory of God and to be consistent with my faith.

96.     On August 26, 2021, Vaccine Verify emailed Jane Doe 5 the same form letter that Dr. Jane Doe also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Jane Doe 1's form letter, it said that Jane Doe 5's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

97.     Jane Doe 5 has persisted in her principled religious refusal to accept the vaccinations. Her supervisors, however, regard her as an exemplary employee and, in order not to lose her have allowed her to work for the last several weeks remote from the ambulatory surgical facility, thus making the vaccination policy inapplicable to her.

98.     Jane Doe 5's supervisors have told her, however, that the fully remote

arrangement she is currently working under cannot continue past the end of December 2021. On

October 7, the operations director of her Anschutz department wrote her as follows:

> Due to your failure to comply with the University's vaccination policy and our inability to
> accommodate your exemption request, effective immediately, you will be allowed to
> work remotely until you have provided proof of vaccination. Your University badge has
> been deactivated therefore you will not be permitted on campus for any work-related
> reason. During this period of remote work your salary will be reduced by 10% as of the
> date of this letter and you will be ineligible for a merit increase or promotion.
>
> You will be given until November 1, 2021 to submit verification of vaccination (at least
> one dose of a two-dose series) via the campus vaccine verification system. Failure to
> submit verification of the vaccination by November 1, 2021 will result in a continuance
> of the 10% salary reduction and a termination date of December 31, 2021.

**Jane Doe 6**

99.     On August 24, 2021, Jane Doe 6 emailed a request to be exempted from the

requirement to receive a COVID vaccine on the Vaccine Verify team's standard form. In answer

to the question "Please explain why your sincerely held religious belief, practice, or observance

prevents you from getting the vaccination" she wrote:

> I am a member of Harvest Fellowship and I am exercising my right to receive a religious
> exemption for vaccination. The vaccines I oppose include the current COVID-19 mRNA
> vaccines and the Jansen vaccine which are produced with aborted fetal cell lines.
> The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that
> was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the
> mRNAs on fetal cell lines from an aborted fetus cell from 1973. This is evil and
> sickening.
> As a faithful Christian, I cannot according to the Church tenets on conscience, use any
> product that takes its origin in abortion. "For you created my inmost being You knit me
> together in my mother's womb." Psalm 139:13. The inmost being is sacrosanct.
> I consider these vaccines as an impurity. Using fetal cells from an aborted fetus for the
> benefit of the greater good or my personal benefit can be reconciled. I will not knowingly
> participate in the process to use such a product that violates the right to life and dishonors
> the lives of the unborn.
> The scriptures are very specific about how those who practice Christianity should
> navigate life. Ephesians 6:10-18 directs us to "put on the armor of God," so that we can
> be equipped with truth, righteousness, peace and faith.

Therefore, as a faithful Christian, opposed to abortion, I cannot according to the tenets of the Bible's teaching on conscience, use any product that takes its origin in abortion.

100.    On August 26, 2021, Vaccine Verify emailed Jane Doe 6 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe 1's form letter, it said that Jane Doe 6's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

101.    Jane Doe 6's supervisors regard her as an exemplary employee and, in order not to lose her have allowed her to work for the last several weeks remote from any Anschutz facility. That remote arrangement makes Defendants' vaccination policies inapplicable to Jane Doe 6, and so allows her to remain employed.

102.    Jane Doe 6's supervisors have told her, however, that the fully remote arrangement she is currently working under cannot continue past the middle of November 2021 and may have to cease sooner. They have told her she must either be compliant with Defendants' vaccination policy at that time or be terminated.

**Jane Doe 7**

103.    On August 29, 2021, Jane Doe 7 submitted a request to be exempted from taking any COVID vaccines because of her sincere religious beliefs precluding acceptance of the vaccines. That request said:

> **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a COVID-19 vaccination? Please include a detailed response.**
> In that I am a member of the Christian faith, I am exercising my right to receive a religious exemption for vaccination. First and foremost, the vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are tested, developed, and/or produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973.

Therefore, as a faithful Christian, I cannot according to the church tenants on conscience, which are outlined below, use any product that takes its origin in abortion. "For You created my inmost being You knit me together in my mother's womb." Psalm 139:13. The inmost being is sacrosanct.

Defiling of the body, many Christians, including me, believe as 2 Corinthians 7 teaches, that we should "cleanse ourselves from every impurity of flesh and spirit." The way I practice my religion includes aligning myself with scriptures on issues that oppose the wisdom of the world. What the world considers a type of remedy, a privilege, and something to covet in 2021 but is something I consider an impurity, I do not believe that using fetal cells from an aborted fetus for the benefit of the greater good or my personal benefit can be reconciled. I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn.

The scriptures are very specific about how those who practice Christianity should navigate life. Ephesians 6:10-18 directs us to "put on the armor of God," so that we can be equipped with truth, righteousness, peace, and faith. . . .

Therefore, as a faithful Christian, opposed to abortion, I cannot according to the Church tenets on conscience, which I outlined, use any product that takes its origin in abortion…

104.     On September 7, however, the Associate Dean for Student Affairs of the dental school, Eric Mediavilla, emailed Jane Doe 7 a denial of her request as follows:

The University's mandatory vaccination policy offers exemptions based on a person's religious belief whose teachings are opposed to all immunizations, **i.e., your religion teaches you and all other adherents that immunizations are forbidden under all circumstances.** When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you object based on your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion.

The basis for your objection to vaccination against COVID-19 is of a personal nature and not part of a comprehensive system of religious beliefs. Having considered your exemption request and the campus COVID-19 vaccination policy, your request is not approved. [Exhibit 24] (Emphasis added.)

105.     Shortly afterward, on September 9, Jane Doe 7 was diagnosed as having contracted COVID 19 and has since recovered. Her treating physician advised her not to receive any COVID vaccination because of this condition for at least 90 days.

106.    Jane Doe 7 promptly advised the Dental School Dean's Office of her physician's advice, and on September 22, the Dean's Office informed her that she had been placed on an involuntary 90-day medical leave of absence. Unlike others with medical exemptions to vaccination, she is not allowed to attend class or come onto campus. The Dean's Office has further advised that, after the 90-day medical leave of absence, she will be required to receive a COVID vaccination or be placed on forced personal leave of absence, pending ultimate dismissal from the program.

### Jane Doe 8

107.    On August 22, 2021, Jane Doe 8 submitted a request for exemption to the Vaccine Verify team on its form template asking to "explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine." Jane Doe 8 wrote:

> My religious and sincerely held moral and ethical beliefs are that my body is to remain pure because it is the temple of the Holy Spirit and the living embodiment of Jesus Christ. I must take optimal care of my temple at all times for I am made in the image of God and cannot desecrate it. All things going into my body, my temple, must be natural and God-made. Through the use of prayer, meditation, the blessing of food and drink before consumption, and exercise I keep my temple pure and healthy. I must keep my temple pure in the manner than God created: by eating, drinking, and breathing. God created me perfectly with natural immunizations, as I am in his image. I am requesting religious exemptions from the Covid-19 vaccination that will taint the purity of my temple as stated above.

108.    On August 26, 2021, Vaccine Verify emailed Jane Doe 8 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe 1's form letter, it said that Jane Doe 8's request was being denied "because it does not

comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

109.    Ms. Doe 8 emailed Vaccine Verify that same day, August 26, an appeal of that decision. Vaccine Verify responded the next day, August 27, as follows:

**From:** Vaccine Verify <vaccineverify@cuanschutz.edu>
**Sent:** Friday, August 27, 2021 11:37:12 AM
**To:** [Jane Doe 8]
**Subject:** RE: Your Vaccine Religious Exemption Request

Hello,

Your response has been received and it is understood that you disagree with the university's decision, however the policy requirement to be vaccinated by September 1, 2021 must be met.

Please submit your vaccine verification form HERE.

Failure to submit proof of COVID-19 vaccine verification by September 1, 2021 will result in additional actions being taken due to your failure to comply with the campus vaccination policy, including but not limited to termination.

110.    On September 8, Jane Doe 8 was told by her academic advisor that she could no longer be enrolled in the master's level courses on the Anschutz campus, and that she would no longer be part of the master of public health program.

111.    The University of Colorado Denver has, however, granted Jane Doe 8 an exemption from its vaccination policy and she continues to pursue her bachelor's degree in public health.

**Jane Doe 9**

112.    In mid-August 2021, Jane Doe 9 emailed to Vaccine Verify a form request to be exempted from the requirement to receive a COVID vaccine because of her religious opposition to the vaccines.

113.    On August 24, in response to Vaccine Verify's emailed form, two question follow-up to such requests ("Please explain why your sincerely held religious belief, practice, or

observance prevents you …" and "Have you ever had and influenza vaccine?"),  Jane Doe 9

emailed the following response:

> **From:** [Jane Doe 9]
> **Sent:** Tuesday, August 24, 2021 4:02 PM
> **To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Subject:** Re: Your Vaccine Religious Exemption Request
>
> Greetings,
> 1.  I am requesting exemption from both the flu vaccine and the COVID vaccine. Both are against my sincerely held religious belief/practice/observance because I believe my relationship with God is the ultimate source of healing. Vaccinations, in all their forms and mechanisms for altering my body, go against my faith and causes harm to my conscience because it would harm my relationship with God. My body is a Temple and I, guided by my deeply held religious convictions, determine what I will or will not put in my body.
> 2.  As an adult, I have only ever received one flu shot when I started graduate school in 2018. However, this situation differs because my sincerely held religious beliefs/practices/observances began in 2019 when my relationship with God started, which is why I have not received a flu vaccine or any others since then.
>     Thank you for your time and consideration.

114.     On August 26, 2021, Vaccine Verify emailed Jane Doe 9 the same form letter that

Dr. Jane Doe 1 also received on August 26. (Exhibit 3).  Like Dr. Jane Doe 1's form denial, that

form letter to Jane Doe 9 was addressed simply "Hello," without any identification of its

intended recipient.  Like Dr. Jane Doe 1's form letter, and notwithstanding Jane Doe 9's explicit

statement that she objected to vaccinations "in all their forms," it said that Jane Doe 9's request

was being denied "because it does not comply the campus policy, which only recognizes

religious exemptions based on a religious belief whose teachings are opposed to all

immunizations." On September 16th, one day after taking the initiative to email "Vaccine

Verify" seeking an "update" on her religious exemption status, she received an email from the

same Vaccine Verify confirming her denial (again, one day after Dr. Jane Doe 1's demand letter

noted above), this time stating Jane Doe 9 would "pose a significant health and safety threat to

the University" and "pose an undue burden" to her coworkers. She has since been terminated.

**Jane Doe 10**

115.    Jane Doe 10 first informed Defendants' human resources personnel that she is religiously opposed to vaccinations in 2020, in connection with a requirement for employees to get vaccinated against the flu.  After that initial request, defendants had allowed her to be exempt from their requirements for *any* vaccination until late in August 2021.

116.    In mid-August 2021, Jane Doe 10 emailed a request to be exempted from the requirement to receive a COVID vaccine.  On August 20, 2021, Vaccine Verify emailed her its form, two-question request for details about her religious beliefs. On August 24, she emailed the following response:

**1.    Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**

I am filing an exemption from the COVID-19 vaccine. I already have an influenza vaccine exemption on file. I have been a Christian for my entire life but after becoming a mother I began practicing my faith more deeply. From spending time reading the Bible, in prayer, and in discussion with my pastor, it is my sincerely held religious belief that the use of vaccines violates my Christian faith and the ability for God to use my body to its full potential on this earth; therefore I should not receive vaccinations moving forward. My body is a temple of God and I must keep it holy and glorify God and the health that He has given to me. Proverbs 3:5 reminds us to "trust in the Lord with all your heart, and do not lean on your own understanding" similar to Psalms 146:3. Colossians 2:8 tells us to "see to it that no one take you captive through hollow and deceptive philosophy, which depends on human tradition...rather than on Christ".

**2. Have you had an influenza or other vaccine in the past? How does this differ? I have received the influenza vaccine in the past.**

After having my daughter in 2019 I reconnected with my faith and you can see that I was granted an exemption from the influenza vaccine in 2020. ...

117.    Notwithstanding Jane Doe 10's longstanding notice to Defendants that she opposed *all* vaccinations, on August 27, Vaccine Verify emailed Jane Doe 10 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3).  Like other Plaintiffs' form

letters, that form letter was addressed simply "Hello," without any identification of its intended recipient.

118.    The Vaccine Verify team further alleged that Jane Doe 10's request "does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations," notwithstanding that Defendants had previously acknowledged her religious sincerity in granting her a religious exemption to the flu over a year before, based on her stated opposition to *all* vaccinations.

119.    Similar to the situation faced by John Doe 1, Jane Doe 10's rejection stems, at least in part, from her perceived lack of membership in an organized religion whose tenets include a hierarchically promulgated, authoritative position rejecting all vaccines.

120.    That very day, August 27, 2021, Jane Doe 10 promptly pointed all of this out to the Vaccine Verify team, emailing it the following:

> I am confused by the response since the only vaccine I currently am being requested to get is the covid vaccine. My religious exemption request was already in place for the influenza vaccine. There are no other vaccines that I need an exemption from; however, I can confirm that my religious belief applies to all vaccinations. I refused the TDap booster at my midwife appointment just last week. My daughter, almost 2 years old, has not received any vaccines on account of my religious belief.

121.    The Vaccine Verify team responded to Jane Doe 10 again on September 2, 2021, but again revealed that it had given her request no more meaningful consideration.  That day they emailed her their form response that "[t]he basis for your objection to vaccination against COVID-19 is of a personal nature and not part of a comprehensive system of religious beliefs."

122.    Jane Doe 10 is also pregnant and anticipates delivery in early to mid-November. She has depended on the salary and benefits from her job to pay for pre-natal care, and will need them, too, to care for peri- and post-natal care when she goes on maternity leave next month.

123.     Jane Doe 10's supervisors want her to continue in her work and have told her that she may continue in her position for now, but must perform her duties from home, fully remote from Anschutz facilities. That fully remote arrangement she is currently working under cannot continue, however. Because her position is considered a clinical position—requiring in-person contact with patients in clinical trials—after the end of her pregnancy leave, she must either become compliant with Defendants' vaccination policy or be terminated from that position.

**Jane Doe 11**

124.     Prior to requesting her religious exemption from Defendants, Jane Doe 11 requested, and promptly received, an exemption from the Colorado Department of Human Services, the owner and operator of the medical facility in Pueblo where she works.  She afterward also submitted a request to Defendants for an exemption from their vaccine mandate, including notification to Defendants of her exemption from the Department of Human Services.

125.     On September 2, 2021, in response to Vaccine Verify's two-question form follow up to initial religious requests [quoted in paragraph 68 above], Jane Doe 11 emailed the following responses:

> Good afternoon.  I have previously received a religious exemption VIA C[olorado] D[epartment of] H[uman] S[ervices] since we are required to complete this process for both institutions to keep our privileges here at C[olorado] M[ental] H[ealth] I[nstitute at] P[ueblo].  In response to your questions I can provide you the following information:
>
> 1:The Ten Commandments tell us "Thou shall not kill."  Many of the vaccines that are administered in the United States, to include the Johnson and Johnson COVID19 vaccination are initially derived from live attenuated viruses, which have been cultured in aborted fetal cell lines.  Abortion results in a great loss of life and is not within my belief system as an act that should be supported and substances derived from these  fetal cell lines should definitely not be injected into my body.  Furthermore, the Bible teaches me that my body was created in the image of God, the temple of the Holy Spirit, and is a living sacrifice to the Lord.  I truly hold the belief that Moderna, Pfizer, and Johnson and Johnson, and the up and coming NovaVax COVID19 vaccinations have the potential to cause harm to my body and have witnessed harm to others who have chosen to allow themselves to be vaccinated.  In holding the sincere belief that this vaccination has the

potential to cause harm to my body, it is a duty of God, on my behalf, to refuse this vaccination.
Finally, the Bible decrees that I ought obey God rather than men and in my duty to be an obedient servant to the Lord, I must refuse to partake in this vaccination.

2: I have received vaccinations in the past.  I was fully vaccinated as a child and this was my parents' choice, not mine.  I also received the influenza vaccination after becoming an adult because I was told it was a requirement to complete my education and to work at my facility.  I have done a lot of reflection with God and my religious beliefs over the course of COVID and have realized the importance of being firm with my convictions.  I no longer plan on receiving vaccinations to include the ones that may be suggested as I age.  As a person of religious conviction, it is important to do things that I believe in even if they cause me the slight inconvenience of having to wear extra PPE, rather than doing something I don't believe in to avoid wearing goggles or a face shield.  Also, since I have become a health care provider I understand now, more than ever, the importance of freedom in medical and healthcare decisions.
Thank you for your time and consideration.

126.    On September 7, however, Vaccine Verify emailed Jane Doe 11 the same form letter denial her co-plaintiffs received in late August through mid-September. (Exhibit 3). Like all the other form denials, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like the other form letters, it said that Jane Doe 11's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

127.    Notwithstanding the adoption of the new September 24, Policy that denial has never been revisited by Defendants.

128.    Jane Doe 11's supervisors at the Colorado Mental Health Institute at Pueblo regard her as a vital employee and, having already granted her an exemption from their own vaccine mandate to allow her to keep working allowing her to continue working at the Pueblo facility until they receive an explicit command from Defendants that she is barred from that facility.

129.    On October 27, 2021, Jane Doe 11's HR liaison at Anschutz, Rachel Anderson, notified Jane Doe 11 by email, cc'ing also her direct supervisor at the Pueblo facility, that:

> I was just notified by CU HR and legal that they are requesting that you begin the process of vaccination by the end of this week by either receiving the first dose of Pfizer/Moderna or the Johnson and Johnson vaccine.  If you do not comply with this action, you will be put on unpaid administrative leave effective Monday 11/1/21 for 30 days to come into compliance, if you are not in compliance there may be other actions taken including potential termination.

**John Doe 1**

~~John Doe~~

~~42.~~130.        On May 19, 2021, John Doe 1 was assured by campus authorities that "a religious exemption [to vaccination] will just require the individual's signature attesting to it being consistent with their religious beliefs." Exhibit 6 attached. Those forms were provided to Mr. Doe 1 on July 20, and with those and other assurances supplied, he travelled from his home in British Columbia to set up a new life in Colorado and begin study in the University's medical school.

~~43.~~131.        On August 8 and 9, 2021, Mr. Doe had an exchange with Anschutz's ombudsman inquiring about the need for him to seek an exemption from Anschutz's vaccine requirements. (A copy of this exchange is attached as Exhibit 7). That exchange includes advice from the office of University counsel about the contours of the Policy it was then still developing, including University counsel's belief that no religion only prohibits COVID vaccines. (Exh. 7, at p. 3: "Pursuant to our policy the religious exemption applies to people whose religion precludes all vaccinations. I am unaware of a religion that only prohibits COVID 19 vaccinations.") But even under this erroneous legal and theological advice, Mr. Doe was given no indication that his religious exemption (to all vaccines) would be denied.

44.132.         On August 10, 2021, Mr. Doe met personally with Defendant Zimmer about exemption from the COVID vaccines. A copy of Doe's and Zimmer's follow-up email exchange is attached as Exhibit 8. The upshot of that meeting, as that exchange makes clear, is that Mr. Doe would be exempt from the vaccines if he kept to Anschutz protocols for the unvaccinated. See Exh. 8, Doe email: "I am grateful that the Deans are providing me alternatives / accommodations while I am self-quarantine, and I will learn it well to serve patients in the future." Those protocols, and a formal acknowledgment that he was "vaccine exempted" were then forwarded to John Doe 1 by email on August 13. A copy of that email is attached as Exhibit 9.

45.133.         However, soon afterward, an assistant Dean working with Defendant Zimmer, Dr. Brian Dwinnell, advised Mr. Doe 1 that a new vaccination Policy was in place, that his prior exemption was revoked, and that he would need to seek another religious exemption. A copy of the August 18, email conveying this revocation is attached as Exhibit 10.

46.134.         On August 23, 2021, Plaintiff John Doe 1 submitted another request for religious accommodation (a copy is attached as Exhibit 11) under the Policy. He also provided a detailed explanation of his Buddhist background and development. He explained how his religious beliefs oppose all vaccinations based on three tenets of Buddhism as he understood them: (1) the power of the mind to heal the body which is disrupted by vaccination; (2) the medicinal purpose of suffering, in which use of medications should be limited and taken only for afflictions one is presently suffering; and (3) the involvement of killing or harming animals in vaccine development, which directly violates "Buddha's teaching on Not-killing and Not-harming." (Exhibit 12 attached, August 22, 2021, letter, at pp. 3-5).)

47.135.      That letter explained that he had received a religious exemption during undergraduate school from lab work that involved the killing of drosophila and mice. (*Id.*, at p. 2).) He also explained that his last vaccination was in 2016 at the University of Michigan (as required to volunteer at its hospital), which he accepted only after much internal struggle and, upon learning of legal protections for sincere religious beliefs, thereafter "vowed to the Buddha" to "never go against my faith again." (*Id.* at p. 2).) He further stated that consistent with all of these, he now spends much time in meditation, has become a vegan, seeks to avoid using products that involve animal ingredients or animal testing in their development. (*Id.* at 5).)

48.136.      None of this was good enough for the University. On August 24th, the Student Response Team (headed by Defendant Zimmer) requested "documentation that demonstrates your religion is opposed to all immunizations." (Exhibit 13 attached).) The email openly stated that "Citations from specific documents are not sufficient. The University will only accept requests for religious exemption that cite to **the official doctrine of an organized religion, in this case, <u>Buddhism</u>, as announced by the leaders of that religion." (*Id.*)** The email then stated:

> Please note, that in the course of reviewing your request, the University learned that the Dharma Realm Buddhist University set up by Dharma Master Xuan Hua who you list in your letter is in fact requiring vaccinations for all of its students, faculty and staff.  https://www.buddhistdoor.net/news/dharma-realm-buddhist-university-in-california-resumes-in-person-classes-with-largest-student-cohort

(Defendant Zimmer was included in the circulation of this email)

49.137.      The University had thus openly entered the theological business of judging the truth or falsity of its students' religious beliefs.

50.138.      On August 26, 2021, John Doe 1 sent Defendant Zimmer a supplemental letter explaining that the available COVID vaccines more gravely offend his religious beliefs

because of their developmental use of "human fetal cell cultures" that "were developed by taking

a life which violates the fundamental tenets of my long-held Buddhist religion." (Exhibit 14

attached, Letter at p. 1).~~.)~~ He further explained that "My Buddhism philosophy in one of the five

precepts, not killing, has made the strongest impact on my academics and daily life" [at p. 2]

and:

> The currently available COVID-19 vaccines in the U.S. market are either developed
> from, or tested on, fetal cell lines from aborted babies . . . None of the vaccines is
> completely free from any use of abortion-derived cells . . . As a sincere Buddhist, I
> believe that production of vaccines using fetal cells from aborted babies is directly
> against my belief in the Buddha's doctrine of not-killing and not-harming.

Exhibit 14 at p. 1.

~~51.~~139.        John Doe 1's~~Doe's~~ second letter also included a number of legal citations

highlighting, in part, that it was impermissible to require him to provide "input from an outside

source, such as a formal religious leader." (*Id.* at 3).~~.)~~

~~52.~~140.        On August 30, after John Doe 1 had submitted his supplemental request,

Defendant Zimmer sent him what purported to be the final decision of the Student Response

Team. ~~A~~ copy of that final decision is attached as Exhibit 15.~~ It~~, too, reiterated that "The

University's mandatory vaccination policy offers exemption to individual's [*sic*] whose religious

beliefs are opposed to **all** vaccinations." ~~~~Zimmer inaccurately summarized John Doe's

objections as based on "(1) your belief that COVID-19 vaccines involve cell lines from human

fetal cell cultures, (2) your belief that the vaccine may be harmful to your body, and (3) your

belief that a mandatory vaccine requirement violates your right to free choice." (*Id.*) She

provided no citations to John Doe 1's~~Doe's~~ letters in describing these alleged objections,

particularly to the latter two which are plainly misrepresentative of John Doe's beliefs.

~~53.~~141.        Zimmer then concluded as follows:

The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine, disbelieve the scientifically accepted view that it is harmless to most people, and express concern that a mandatory requirement infringes on your freedom. The basis for your objections are all of a personal nature and **not part of a comprehensive system of religious beliefs.**

54.142.        The cover email to that final decision also advised that "you will be referred to the promotions committee on September 1, 2021" for formal denial of participation in study at Anschutz.

55.143.        John Doe 1 was given only three options following the final denial of his exemption request: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw."

56.144.        Faced with no other options, Mr. Doe chose to take this coerced leave of absence. He was forced to sell his local belongings, terminate his apartment lease, and incur unnecessary and unexpected expenses and loss of income associated with his preparing for and coming to campus and premature move back home. Mr. Doe hopes to resume his studies at the University as soon as possible, in a manner consistent with his protected religious beliefs.

**John Doe 2**

145.    In mid-August, 2021, John Doe 2 submitted a request to the Student Response team to be exempted from taking any COVID vaccines because of his sincere religious beliefs precluding acceptance of the vaccines. Among other things, that request said:

To Whom it May Concern,

Upon praying about how to respond to the COVID shot directive, in light of my recent COVID infection as evidenced by positive antibody test, and in consideration of my pro-life and other values informed by my faith in Jesus Christ, I write to request a medical and religious exemption from the University of Colorado's mandate. As a Christian, I believe that my body belongs to God and is the temple of His Holy Spirit (1 Cor 6:19-20), and from conception (Psalm 139:13-16) to birth to natural death, I hold that innocent life bears God's image (Genesis 1:26-27) and is sacred to God (Jeremiah 1:5). God's promise that "if anyone lacks wisdom, let him ask of God, who gives to all liberally," has spurred me to seek wisdom regarding this particular vaccine, distinguished from other

vaccines. It came to my understanding that the manufacturers of the COVID shots have used aborted fetal cell lines as part of their development or testing of vaccines. Regardless of when in time the corresponding abortion occurred, and irrespective of the medical yield garnered therefrom, my faith prohibits me from participating in or benefiting from it.

Furthermore, the nature of this shot as an mRNA vaccine separates it from any other immunization I have received. Whereas killed or live attenuated vaccines use some derivative of natural infection to prompt an immune response, the way in which this vaccine uses mRNA to unnaturally program cells to produce foreign protein trespasses God's design for disease defense.

146.     At the end of August, however, Defendants denied John Doe 2's request. On August 30, Defendant Zimmer sent John Doe 2 a form letter substantially identical to the August 30, letter sent to John Doe 1 described above [Exh.15]. In both letters she said:

The University's mandatory vaccination policy offers exemptions to individual's whose religious beliefs are opposed to all vaccinations. When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you had several objections including (1) your belief that the COVID-19 vaccines involve aborted fetal cell lines and (2) your belief that the COVID-19 vaccines use mRNA to unnaturally program cells to produce foreign protein and has the capacity to alter your genetic code.
The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine and disbelieve the scientifically accepted view that it is harmless to most people. The basis for your objections are all of a personal nature and not part of a comprehensive system of religious beliefs. Having considered your exemption request, it is denied…
Failure to submit documentation that you have received the first vaccine by September 1, 2021 will result in a referral to the Promotions Committee for further action, up to and including dismissal.

147.     John Doe 2 met with the Promotions Committee on September 12, 2021, by teleconference and also submitted a written statement reiterating his religious objections to receiving any COVID vaccine. That letter began:

I write to appeal for retention at the University of Colorado School of Medicine despite not receiving the COVID-19 vaccine. Briefly, the administration denied my recent religious exemption request, and secondarily, I possess natural immunity from prior COVID-19 infection evidenced by a positive antibody test. However, I have personal

contacts through UCHealth who have been granted religious exemptions for the same reasons I wrote about in my own letter.

148.    On September 24, 2021, however, the Promotions Committee affirmed the denial

of John Doe 2's request via a form letter substantially identical to the one by which it affirmed

the denial of John Doe 1's request as described above. It said:

*   If you choose to not be vaccinated, you have the option of taking a leave of absence for up to a year. You will be required to return to the SPC prior to your return to the School of Medicine to determine if you are complying with all applicable campus and school policies.
*   You can also choose to withdraw from the School of Medicine and either receive a master's degree or maintain the ability to reapply to the School of Medicine via the SPC within 2 years.
*   If you choose not to obtain the appropriate vaccination, take a leave of absence or withdraw, you will be dismissed from the School of Medicine and must meet all vaccination requirements prior to your return from a leave of absence.

John Doe 2 thus faces forced leave, withdrawal, or dismissal, without the intervention of this

Court.

149.    By contrast, in early September, shortly after he submitted his initial request to

the Anschutz Student Response Team, John Doe 2 submitted a substantially identical request to

the Colorado Permanente Group (the owner of one of the Colorado Springs medical clinics

where John Doe 2 was doing clinical rotations) for exemption from its vaccine mandate.

Permanente responded as follows:

> **From:** Tanya M Carbone <Tanya.X.Carbone@kp.org>
> **Sent:** Friday, September 17, 2021 11:49 AM
> **To:** [John Doe 2]
> **Subject:** Religious Exemption Provisionally Approval
> [External Email - Use Caution]
> Good morning-
> I am please to inform you that your Religious Exemption Request has been Provisionally approved! As an employee who has an approved exemption you are considered unvaccinated and must adhere to the guidelines found in the attached document. …At this time we are not requiring our unvaccinated employees to get weekly COVID testing, but that, along with any additional changes in protocol, may come in the future.
> Please let me know if you have any questions or concerns.

Have a great afternoon!
-Tanya
Tanya Carbone, MHR
Senior Human Resources Business Partner
tanya.x.carbone@kp.org
720-661-7551 (cell)
303-344-7925 (fax)
**HR One**

150.    And on the evening of October 27, 2021, John Doe 2 emailed another, substantially identical, request for exemption to Centura Health, the owner of another one of the medical facilities where John Doe 2 may do clinical rotations. *Less than an hour later*, he received this response:

**Approved: COVID-19 vaccination exemption**

**From:** Occupational Health COVID-19 Command Center

Hello,

Your COVID-19 vaccination exemption request has been **approved**.

*Safety First, People Always* is at the core of everything we do at Centura, and your health and safety are our top priority. We have put measures in place to help protect you and prevent the spread of illness in our workplaces and communities. Please read below to view the requirements of your exemption:

- **Adhere to Centura's testing guidance** for exempted individuals:
  - Currently testing will occur following our current COVID-19 protocols and algorithms.
  - Please recognize testing frequency may vary based on changing state/federal mandates.
- **Adhere to all masking and social distancing guidelines**, including but not limited to:
  - A mask must be worn at all times, in accordance with our masking guidance.

\* \* \*

Please note, your leader, direct supervisor, chief medical officer or placement coordinator has been copied on this message. …

**John Doe 3**

151.    In mid-August, 2021, John Doe 3 emailed to Vaccine Verify a request to be exempted from the requirement to receive a COVID vaccine because of his religious opposition to any vaccine whose creation or testing for use involved use of stem cell lines from live aborted fetuses (he is a conscientious practicing Catholic).

152.    On August 24, in response to Vaccine Verify's emailed form request for more information about his religious beliefs, John Doe 3 emailed the following response:

56

Tue 8/24/2021 3:11 PM
To: Vaccine Verify <vaccineverify@cuanschutz.edu>

ReligiousExemptionLetter.pdf; COVID-19-Vaccine-Candidates-and-Abortion-Derived-Cell-Lines.pdf;
Vaccine Verify Team,
I hope this message is received. The email address as documented at the end of your email "vaccineverification@cuanschutz.edu " is not a recognized email address. Please see my information below answering your questions along with the attached documentation referenced. I have re-pasted my response here: Please find attached a letter signed by my parish priest documenting the reasons a baptized Catholic may claim a religious exemption. I do not believe it is my obligation to go into any additional detail beyond the tenets within the document and these hold true for all currently available vaccines. I have also provided documentation from the Charlotte Lozier Institute documenting COVID-19 vaccine candidates and any associations to abortion derived cell lines. Through much discernment I have formed my conscience on this matter and am morally obligated to obey my conscience.
Regarding the second question below and the influenza vaccine, I have never received any. Regarding others in my past, they were received as a child under the authority of my parents and not a personal decision of my own.
I trust this meets your requests. I look forward to your response soon.

153.    The letter from John Doe 3's parish priest that he attached to that email accurately

related the Catholic moral doctrine guiding John Doe 3's decision. It said:

[John Doe 3] is a baptized Catholic seeking a religious exemption from an immunization requirement. This letter explains how the Catholic Church's teachings may lead individual Catholics, including [John Doe 3], to decline certain vaccines.

The Catholic Church teaches that a person may be required to refuse a medical intervention, including a vaccination, if his or her conscience comes to this judgment. While the Catholic Church does not prohibit the use of most vaccines, and generally encourages them to safeguard personal and public health, the following authoritative Church teachings demonstrate the principled religious basis principled religious basis on which a Catholic may determine that he or she ought to refuse certain vaccines:

• Vaccination is not morally obligatory in principle and so must be voluntary. 1
• There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion; however, it is permissible to use such vaccines only under case-specific conditions-if there are no other alternatives available and the intent is to preserve life.
• A person's assessment of whether the benefits of a medical intervention outweigh the
undesirable side-effects are to be respected unless they contradict authoritative Catholic

moral teachings.
• A person is morally required to obey his or her conscience.

154. On August 26, 2021, Vaccine Verify emailed John Doe 3 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's form denial, that form letter to John Doe 3was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe's form letter, it said that John Doe 3's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

155. John Doe 3's supervisors regard him as an exemplary employee and, in order not to lose him have reclassified him as working 100% remote from any Anschutz facility. That remote arrangement makes Defendants' vaccination policies inapplicable to John Doe 3, and so allows him to remain employed.

156. The fully remote arrangement that John Doe 3 is currently working under does not allow him to receive vital skill-development—*e.g.*, educational conferences, in person collaboration and problem solving with Anschutz colleagues and clients—that are necessary for him to perform his work. Even if he were allowed to work remotely indefinitely, he would soon become ineffective and eventually unable to perform his job.

**John Doe 4**

157. On August 21, 2021, John Doe 4 emailed to Vaccine Verify a request to be exempted from the requirement to receive a COVID vaccine because of his religious opposition to any vaccine whose creation or testing for use involved use of stem cell lines from live aborted fetuses (he is a conscientious practicing Christian). That request included this personal statement regarding his religious beliefs:

In that I am a Christian believer, I am exercising my right to receive a religious exemption for vaccination. First and foremost, I have a sincere and deeply held religious objection to these vaccines. The vaccines I oppose include the current COVID-19 mRNA vaccines and the Janssen vaccine which are produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Janssen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973.

Therefore as a faithful Christian, I cannot according to the Church tenets on conscience which are outlined below, use any product that takes its origin in abortion. "For you created my inmost being You knit me together in my mother's womb." Psalm 139:13. The inmost being is sacrosanct.

158.    * * *

Further, the Catechism of the Catholic Church which Pope John Paul II declared to be the "sure teaching norm of the Catholic Church" contains tenets of the Christian faith and our duty to adhere to these teachings regarding the right of conscience objections states:

*1776 Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment…. For man has in his heart a law inscribed by God…. His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths. 1777 Moral conscience, present at the heart of the person, enjoins him at the appropriate moment to do good and to avoid evil. It also judges particular choices, approving those that are good and denouncing those that are evil. It bears witness to the authority of truth in reference to the supreme Good to which the human person is drawn, and it welcomes the commandments. When he listens to his conscience, the prudent man can hear God speaking. 1778 Conscience is a judgment of reason whereby the human person recognizes the moral quality of a concrete act that he is going to perform, is in the process of performing, or has already completed. In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law: Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; I mean that it was not a dictate, nor conveyed the notion of responsibility, of duty, of a threat and a promise…. [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ. 1779 It is important for every person to be sufficiently present to himself in order to hear and follow the voice of his conscience. This requirement of interiority is all the more necessary as life often distracts us from any reflection, self-examination or introspection.*

Therefore, as a faithful Christian, opposed to abortion, I cannot, with a moral conscience, and with my deeply held religious objection, use any product that takes its origin in

abortion. I have the right to an objection of conscience regarding what is put into my body.

159.    The Vaccine Verify team shortly thereafter denied John Doe 4's request via the same form letter that it sent to his co-plaintiffs. (Exhibit 3).

160.    By mid-September, because John Doe 4 had not received any COVID vaccination, the chief of the Anschutz police department began a discipline process that will eventually lead to John Doe 4's termination. Attached here as Exhibit 25 is the September 29 formal notification to John Doe 4 that his failure to accept the vaccinations for his stated religious beliefs is a disciplinable offense.

161.    As that notice recites, John Doe 4's pay has already been docked 10% solely due to his assertion of a religious objection to vaccination, and the Anschutz police department's chief has informed John Doe 4 that unless he accepts the vaccination, he will be terminated at the end of a 12-week discipline process. The extended duration of that discipline process is necessary, the notice recites, because his continuing to work—notwithstanding that he is not vaccinated—is necessary to avoid an undue hardship to the department.

**John Doe 5**

162.    John Doe 5 is a conscientious, practicing Christian, firmly opposed to abortion and to any complicity with it.

163.    On August 23, 2021, John Doe 5 emailed Vaccine Verify a request not to be required to accept the COVID vaccination on Vaccine Verify's standard, two question form (quoted in ¶68 above). He explained his religious opposition to the currently available COVID vaccines because of their use of stem cell lines from aborted fetuses in manufacture or testing.

164.    On August 26, 2021, Vaccine Verify emailed John Doe 5 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's form denial, that

form letter to John Doe 3was addressed simply "Hello," without any identification of its intended

recipient. Like Dr. Jane Doe 1's form letter, it said that John Doe 3's request was being denied

"because it does not comply the campus policy, which only recognizes religious exemptions

based on a religious belief whose teachings are opposed to all immunizations."

165.    John Doe 5's supervisors regard him as an exemplary employee and, in order not

to lose him have reclassified him as working 100% remote from any Anschutz facility. That

remote arrangement makes Defendants' vaccination policies inapplicable to John Doe 5, and so

allows him to remain employed at the present time.

166.    The fully remote arrangement that John Doe 5 is currently working under,

however, does not allow him to receive vital skill-development—*e.g.*, educational conferences,

in person collaboration and problem solving with Anschutz colleagues and clients—that are

necessary for him to perform his work. He also cannot adequately serve the internal clients of the

Office of Information Technology without some in-person interaction. Even if he were allowed

to work remotely indefinitely, he would soon become ineffective and eventually unable perform

his job.

**John Doe 6**

167.    On June 15, 2021, John Doe 6 tendered to the Vaccine Verify team a signed

attestation on an Anschutz-prepared form that he had sincere religious objections to accepting

the COVID vaccinations. In response, on August 13, 2021, he received a form email identical to

that received by John Doe 1 [Exhibit 9] saying "Thank you for completing the University of

Colorado Anschutz Medical Campus verification process. You have attested that you are vaccine

exempted. Please keep this email."

168.     Notwithstanding that "complet[ion of] … Anschutz Medical Campus verification process," he was instructed on August 19 by the program coordinator of his anesthesiology program that he would need to submit yet another religious exemption request on a newly created form. So, on August 24, he tendered the following request, printed on the Vaccine Verify team's form, to the anesthesiology programs director (Ann-Michael Holland) and assistant director (David Dunipace):

**1. Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a COVID-19 vaccination? Please include a detailed response.**
I feel morally compromised by accepting any of the proposed "vaccinations" for COVID-19 developed under the emergency use authorization. Vaccination is not morally obligatory in principle and so must be voluntary. There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion. The use of cells from electively aborted fetuses for vaccine production make the available COVID-19 vaccine programs unethical, because they exploit the innocent human beings who were aborted. A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Christian moral teachings. A person is morally required to obey his or her conscience.

**2. Have you had an influenza or other vaccine in the past? How does this differ?**
The Christian Faith does not prohibit the use of most vaccines, and generally encourages them to safeguard personal and public health, the following authoritative Church teachings demonstrate the principled religious basis on which a Christian may determine that he or she ought to refuse certain vaccines. I have had the influenza vaccine and various other vaccines throughout my life. The development of injectable therapies using aborted cells goes against my most sacredly held beliefs and even being exposed to this interrogation feels like a violation of conscious.

169.     Two days later John Doe 6 met by teleconference with Defendant Zimmer, who had been given a copy of this second request, and Zimmer told John Doe 6 then that the only religious requests that could be approved were for those students who never had gotten, and never would get, any vaccinations—"like Christian Scientists," Zimmer said. On August 30th, 2021, program director Ann-Michael Holland emailed John Doe 6 a letter denying his religious

request and declaring that his expressly religious objection to COVID-19 vaccines' intrinsic connection to abortion are "personal" and not "religious" and "not part of a comprehensive system of beliefs." At the same time, the letter attempted to cover its discriminatory tracks by also asserting he would be an "undue hardship" to the Program. A copy is attached as Exhibit 26 hereto.

170.     In early September 2021, program director Holland emailed John Doe 6 a letter dismissing him from the anesthesiology program. A copy is attached as Exhibit 27 hereto. Holland there says that because "campus policy states that religious exemptions will be approved if they indicate that the individual holds religious beliefs that are opposed to all vaccinations" the Progress and Promotions Committee recommended his dismissal, and Holland accepted that recommendation.

171.     Though John Doe 6 pursued the appeals process through the Progress and Promotions Committee, Holland's decision has not been reversed.

172.     John Doe 6 is aware that at least one other student in that anesthesiology master's program remains unvaccinated, has not been dismissed (having been granted a medical exemption) and performs clinical work in hospital operating rooms.

**John Doe 7**

173.     In mid-August 2021, John Doe 7 emailed Vaccine Verify his request to be exempted from the requirement to receive a COVID vaccine because of his religious opposition to any vaccine whose creation or testing for use involved use of stem cell lines from aborted fetuses (he is a conscientious practicing Catholic).

174.     On August 23, in response to Vaccine Verify's emailed form request for more information about his religious beliefs, John Doe 7 emailed the following response:

1.  **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption?  Please include a detailed response for each vaccine for which you are requesting an exemption.**

In that I am a member of the Church, I am exercising my right to receive a religious exemption for vaccination.  First and foremost, the vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973. (Fetal Cell Lines Were Used to Make the Johnson & Johnson COVID Vaccine—Here's What That Means 3/4/2021, MSN.com)

Therefore as a faithful Christian, I cannot according to the Church tenets on conscience which are outlined below, use any product that takes its origin in abortion.  "For you created my inmost being You knit me together in my mother's womb." Psalm 139:13.  The inmost being is sacrosanct.

Defiling of the body, many Christians, including me, believe as 2 Corinthians 7 teaches, that we should "cleanse ourselves from every impurity of flesh and spirit."  The way I practice my religion includes aligning myself with scriptures on issues that oppose the wisdom of the world.  What the world considers a type of remedy, a privilege, and something to covet in 2021 but is something I consider an impurity, I do not believe that using fetal cells from an aborted fetus for the benefit of the greater good or my personal benefit can be reconciled.  I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn.

* * *

Therefore as a faithful Christian, opposed to abortion, I cannot according to the Church tenets on conscience which I outlined use any product that takes its origin in abortion.

2.  **Have you had an influenza or other vaccine in the past? How does this differ?**

I have had the Influenza and other vaccines in the past. It has been years since I have had a vaccine due to reasons and convictions outlined in my response to question 1. The last flu shot I received I was under the impression that it was not produced from stem cells originally isolating from fetal tissue.

175.    On August 26, 2021, Vaccine Verify emailed John Doe 7 the same form letter that

Dr. Jane Doe also received on August 26. (Exhibit 3, ECF #1-3).  Like Dr. Jane Doe's form

denial, that form letter to John Doe 7 was addressed simply "Hello," without any identification

of its intended recipient. Like Dr. Jane Doe's form letter, it said that John Doe 7's request was

being denied "because it does not comply the campus policy, which only recognizes religious

exemptions based on a religious belief whose teachings are opposed to all immunizations."

176.    John Doe 7's supervisors regard him as an exemplary employee and, in order not

to lose him have reclassified him as working 100% remote from any Anschutz facility. That

remote arrangement makes Defendants' vaccination policies inapplicable to John Doe 7, and so

allows him to remain employed.

177.    The fully remote arrangement that John Doe 7 is currently working under does

not allow him to receive vital skill-development—*e.g.*, educational conferences, in person

collaboration and problem solving with Anschutz colleagues and clients—that are necessary for

him to perform his work. Even if he were allowed to work remotely indefinitely, he would soon

become ineffective and eventually unable perform his job.

### C.D.    Defendants have neither a legitimate nor compelling interest in exercising express and overt religious discrimination.

57.178.        In its September 20th letter, responding to Dr. Jane Doe 1's Doe's claim

that Defendants had violated her First Amendment rights (Exh. 5), Defendants' university

counsel alternately defended theirits decision in significant part based on a Title VII analysis

arguing that Dr. Jane Doe 1's Doe's clinical work makes her a "direct threat" and poses an

"undue hardship" under Title VII—a reason that had never been given to Dr. Jane Doe and one

that came solely in response to a threat of a lawsuit.

58.179.        University counsel's invocation of those strawmen "direct threat" and

"undue hardship" defenses are plainly false pretexts attempting to cover for the Defendants'

explicit religious discrimination. The formal and actual denial of Dr. Jane Doe 1's Doe's request

simply stated that she was excluded *solely because* her religious beliefs did not oppose *all* vaccinations.

~~59.~~**180.**          Not only was University counsel's argument pretextual, but there is plainly no compelling interest justifying the University's blatant exercise in overt religious discrimination.

~~60.~~**181.**          Defendants' own actions demonstrate their lack of compelling interest since they have *granted* exemptions to those~~students~~ who work in clinical settings from taking the vaccine on grounds of disability/medical status, while simultaneously *denying* those asserting~~very same students that exemption when requested for~~ religious reasons.

~~61.~~**182.**          Attached as Exhibit 16, is a denial of religious exemption request from COVID vaccination that Defendant Zimmer sent to Student A, a fourth-year University medical student, saying (as she likewise wrote to John Doe 1) your "rationale provided does not constitute a religious belief, but a personal objection." (Ex. 16, at p. 2).~~.)~~ Zimmer explained that her conclusion was based on an analysis that, notwithstanding Student A's asserted Catholic faith—affirmed and supported by a signed statement from his Catholic parish priest—that her view of Catholic Church teaching is opposite to his.~~11~~ (Ex. 16).~~.)~~ Zimmer went on to thus conclude that the student's views were necessarily "personal," not religious. (*Id.*)

~~62.~~**183.**          Undersigned counsel then sent a demand letter to Defendants, similar to that sent on behalf of Dr. Jane Doe 1. (Exhibit 17 attached).~~.)~~ Thereafter, instead of addressing the student's request for religious exemption, the University summarily granted the student a

---

~~11 In her theological analysis, Zimmer did not address authoritative Catholic teaching that COVID-19 vaccination must be voluntary. *See, e.g.,* Congregation for the Doctrine of the Faith, "Note on the morality of using some anti-COVID-19 vaccines, Dec. 21, 2020, at No. 5 ("vaccination is not, as a rule, a moral obligation and . . . therefore, it must be voluntary").~~

medical exemption from the COVID vaccine, which had previously been withheld. (Exhibit 18 attached).~~)~~

63.184.        Unlike first-year students (like John Doe 1), fourth-year students work extensively in hospital and other clinical settings with high-risk populations. The medical accommodation provided to the fourth-year student addressed in Exhibit 17 thus posed greater, or no less than equal, theoretical risk than the religious accommodation ~~John Doe~~ requested by Plaintiffs here. Both the denial of Plaintiffs' ~~John Doe's~~ religious exemptions and refusal to squarely address the fourth-year student's religious exemption requests turned solely on the religious character of the requests, not on any risk factors. Religious exemption requests that don't meet the University's religious test are thus denied in the very same or similarly situated circumstances where medical accommodations are granted. Notably, the precautionary measures that unvaccinated staff, including medical provider Plaintiffs, ~~like Dr. Jane Doe~~ have been using for months—extensive COVID-tracing survey before every shift, sanitizing in and out of rooms, thorough use of PPE—have been and remain highly effective. ~~For instance, throughout the COVID era, to her knowledge, Dr. Doe has neither contracted COVID herself nor infected any patients or colleagues in the workplace.~~

185.    Further supporting the lack of compelling interest on the part of Defendants, some Plaintiffs were allowed to work past the September 1 deadline, despite the position of Defendants that the unvaccinated are a mortal threat to others. For example, Dr. Jane Doe 1 was allowed to work at Children's Hospital Colorado Springs for nearly all of September, and at least as of today, John Doe 4 is working in-person.

64.        Additionally, as noted *supra*, some Plaintiffs have either exclusive or joint postings at other locations, away from the Anschutz campus. Those other postings have either

provided religious exemptions to these Plaintiffs, or at the very least are still considering how to handle such requests. In the latter category, Dr. Jane Doe 1 submitted a religious exemption request to Children's Hospital which had informed her that it would~~Dr. Doe has also remained COVID-free while continuing to work at Children's Hospital since September 1st, the deadline the University gave her to get vaccinated on the theory that otherwise she would essentially be a mortal threat to the Anschutz community.~~

~~65.~~**186.**     ~~Additionally, Dr. Doe has been informed by Children's Hospital that it will~~ have its own independent religious accommodation policy for its own employees, based on directions from the State Board of Health~~Medicine~~ which instructions we~~a~~re expected to be issued by October 21, 2021. Children's Hospital ha~~d~~s informed its employees that if they have a religious objection to COVID vaccination, they must submit their accommodation requests by October 1, 2021. Children's Hospital will then begin evaluating those requests "no earlier than **Oct. 21, 2021**." (Exhibit 19 attached, e~~E~~mail from Children's Hospital) (emphasis in original)[12]

~~66.~~**187.**     Thus~~This means that~~ health care professionals with whom Dr. Jane Doe 1 works alongside may be eligible for religious or medical accommodation directly from Children's Hospital as their direct employer, further demonstrating that Anschutz does not have a compelling interest in outright terminating Dr. Jane Doe 1 (who is an employee of Anschutz and not of Children's Hospital directly), while the very hospital where she exclusively works is not currently terminating employees who are similarly situated, and will presumably offer a fair and appropriate religious accommodation process, unlike ~~based on directions from~~ the inquisition pursued by Defendants.~~State Board of Medicine in late October.~~

---

[12] The Board of Health instead declined to issue final rules on October 21, deciding it "will instead wait to harmonize with the federal rule." See, https://www.sos.state.co.us/CCR/eDocketDetails.do?trackingNum=2021-00541. Children's Hospital has not yet notified its staff how it will handle exemption requests.

67.**188.**      Additionally, studies show that the pediatric patients Dr. Jane Doe 1 treats

are at relatively low risk of contracting and suffering serious illness of COVID-19.[13] At the same

time, it is not clear that all or even most patients treated by other vaccine-exempt students andor

professionals are themselves vaccinated. Yet it is clear that the substantial majority of serious

"breakthrough" cases in vaccinated people areis among the elderly.[14] Thus, even though her

patients are not vaccinated, Dr. Jane Doe 1 is plainly similarly situated to any other clinician

treating non-pediatric COVID-vulnerable patients at the University. As a highly competent and

caring medical professional, Dr. Jane Doe 1 would not continue to treat patients if she believed

herself to be a danger.

**189.**    The initial denial of John Doe 1's religious exemption request provides just one

example of the Inquisition-style tactics of Defendants. In response to his sincere, well-supported

statement of religious belief against all vaccination, in which he included a statement of

admiration for Dharma Master Xuan Hua, Defendants sought to trap him, "gotcha"-style, by

claiming that the Dharma Realm University, which was founded by that Master, was allegedly

requiring COVID vaccinations. In their haste to attack John Doe 1, Defendants omitted the fact

that Master Xuan Hua has been dead for decades—he obviously has no part in that university's

---

[13] Karolinska Institutet, "Low risk of infection in babies born to mothers with COVID-19," EurekAlert!, April 29, 2021, https://www.eurekalert.org/news-releases/598334 KAROLINSKA INSTITUTET; CDC, SDF –Breastfeeding and Caring for Newborns if You Have COVID-19, August 18, 2021 (authorizing COVID-19 infected mothers to provide direct care for their newborns as long as they exercise proper precautions like wearing PPE), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/pregnancy-breastfeeding.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpregnancy-breastfeeding.html#caring-for-newborns

[14] Deidre McPhillips, CNN, "Risk of severe breakthrough COVID-19 higher for seniors and people with underlying conditions," September 8, 2021, https://www.cnn.com/2021/09/08/health/severe-breakthrough-cases-cdc-studies/index.html

COVID vaccination policies. John Doe 1's beliefs are clearly sincere, backed up by real-world examples, and are laid out in detail in his communications with Defendants.[15]

68.     The Student Response Team's initial denial of John Doe's request similarly relies on plain inaccuracy. It incorrectly represents that John Doe is a disciple of Dharma Master Xuan Hua and is obliged to follow the procedures of the Dharma Realm University.

69.190.     Defendant Zimmer's final decision regarding John Doe 1'sDoe's accommodation (Ex. 15) also, without proper analysis or resort to any authority, characterizes John Doe 1'sDoe's objections based on "involve[ment of] stem cell lines from human fetal cell cultures [and their] be[ing] harmful to your body [and] violat[ing] your right to free choice" as "not constitut[ing] a religious belief, but a personal objection."

70.191.     Finally, allboth Plaintiffs are aware that hospitals and medical schools across the country, *and within the University of Colorado's own health care system*, have offered religious accommodations to similarly situated individuals who work directly with and around COVID-vulnerable patients (many of whom are unvaccinated or who are still susceptible despite being vaccinated), without undermining any interest in providing safe and effective care to patients in need. Plaintiffs are attaching Group Exhibit 20, with the declarations of 31 exemplary health care witnesses around the country who have received religious accommodations and are continuing to provide critical health care services. Of this group, witness 21 is employed by the University of Colorado.

71.192.     Their experience, which is consistent with national media reports, confirms that there can be no compelling interest in categorically forbidding similar

---

[15] Defendants in this lawsuit have similarly attacked the sincerity of Dr. Jane Doe 1, whose own bishops publicly supported their congregants' assertions of religious objections to the available COVID vaccinations, and will now presumably attack the religious sincerity of the 16 new Plaintiffs bringing this Verified Amended & Supplemental Complaint.

accommodations for Plaintiffs here simply on the basis of the nature of their religious beliefs and the University's view of the veracity of those beliefs.

  **E.** ~~·~~**How Plaintiffs have been harmed**

  193.    ~~Attached as Exhibit 21 is~~Employment termination will further harm Dr. Jane Doe 1's and the other staff Plaintiffs professional standing and reputation, be a permanent part of their licensure records, and could be a source of potential discipline.

  ~~72.~~194.      And if Dr. Jane Doe 1 were to decide instead to resign and avoid licensure risk, the non-competition agreement she has with the University would render her unable to unable to practice her specialty~~Dr. Jane Doe executed~~ in Colorado for two years, as all the critical pediatric care centers are centered in or around Denver and Colorado Springs.~~February 2019.~~ It says, among other things:

> … if Member's [Dr. Jane Doe's] employment with the University terminates for any reason … and the Member enters into competition with the University as defined below, Member shall pay to CU Medicine and the University liquidated damages in the amount of $310,950 … [T]he terms "competition with the business of the University" means for a period of 2 years after termination, establish, operate or provide professional medical services … within a 100 mile radius of the intersection of Colfax and Ursula, Aurora, Colorado or any other facility where the Member regularly provides medical services.

  ~~73.    Thus if Dr. Jane Doe is fired, she will be unable to practice her specialty in Colorado for two years, as all the critical pediatric care centers are centered in or around Denver and Colorado Springs.~~

~~Employment termination will further harm Dr.~~ Exhibit 21 [Dkt #1-21].

  195.    Jane Doe 2 and Jane Doe 3 have signed identical agreements.  As alleged more fully above, Jane Doe 3 also risks imminent loss—by mid-November 2021—of her ongoing appointment at the Rocky Mountain VA Medical Center as a direct result of Defendants' Policies, too.

196.    As alleged above, the non-physician staff Plaintiffs have been exemplary employees and their workplace supervisors—who value their contributions—have taken pains to try to keep them in their positions, allowing them to work remotely for as long as the Defendants will allow. The staff Plaintiffs still on the job know, however, that they will eventually be required to return to Anschutz facilities.  All of them intend to remain faithful to their religious convictions, nevertheless, and realize that when the return day comes, they must lose their jobs.

74.    As to John Doe 1, attached as Exhibit 22,~~Jane Doe's professional standing and reputation, be a permanent part of her licensure record, and could be a source of potential discipline.~~

~~75.~~198.    ~~As to Mr. Doe, attached as Exhibit 22~~ is the Association of American Medical Colleges Guidelines for the Consideration of Application for Transfer or Advanced Standing. They make clear that only students who have begun M.D. studies, and who can document an "entire academic history" at an existing M.D.-granting program can request transfer. Mr. Doe is thus not eligible for transfer, but must undertake the application process anew if he is to attend another M.D. program in the U.S.

~~76.~~198.    John Doe 1 was given only three options following the final denial of his exemption request: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw."

~~77.~~199.    With no other realistic alternatives available to him, John Doe 1~~John Doe~~ chose to take a leave of absence, but desires to return as soon as possible to Anschutz medical school. Otherwise, he faces the near-impossible prospect of starting medical school over somewhere else, or entirely forgoing his dream of becoming a medical doctor.

200.    John Doe 2 has been given the same choices, and the consequences for him are equally or more severe. While pursuing appeals of the denial of his religious exemption, he has

continued to attend classes and work at his clinical rotations at partner sites (that is, non-Anschutz clinical sites) without objection from those sites. That arrangement may not be allowed to continue however after his next meeting with the Dean John Reilly, scheduled for Monday, November 1. His commitment to the Air Force, and the Force's commitment to him, were mutually predicated on his finishing his M.D. and practicing for several years as a military physician.  He has been an exemplary student for two and half years, and is indisputably on course to finish his studies, thus achieve promotion to Captain, and find a residency to suit his, and the Air Force's, professional needs starting in 2023.  That cannot happen if Defendants' unlawful Policies are allowed to stand and force his withdrawal from study.

201.    Jane Doe 7, a fourth-year dental student, faces the same choices, too, but her being in the final year of her professional studies makes the consequences of withdrawal now most severe.  The University of Colorado School of Dental Medicine is the only dental school in Colorado, where Jane Doe 7 intends to pursue her career, so even if she can transfer to another program to finish her professional degree, it will require at least a full-year's delay, and require another full year of relocation from her current home in Colorado, the intended home of her professional career.

202.    The para-professional students have had their professional career plans interrupted or perhaps aborted entirely.  No other similar programs are offered in the state of Colorado, and so all must give up his or her career plans or relocate to another state.

**F.  Plaintiffs' Reasons for Proceeding with Pseudonyms**

78.203.        The same "front line" health care workers and students hailed as heroes by the media for treating COVID patients before vaccines were available, including Plaintiffs,

are now vilified by the same media as pariahs who must be excluded from society until they are vaccinated against their deeply held religious beliefs.

79.204.       The Policies arePolicy is a product of this atmosphere of fear in which the unvaccinated are threatened with being reduced to a caste of untouchables, if they will not consent to being injected with vaccines that violate their religious beliefs.

80.205.       As things now stand, according to public health authorities the vaccinated can infect the unvaccinated, the unvaccinated can infect the vaccinated, both the vaccinated and the unvaccinated can infect each other, and everyone must wear masks indoors in "high transmission" areas—that is, virtually the entire country[16]—as if no one at all had been vaccinated.[17] And with both the fully vaccinated and the unvaccinated still contracting COVID, "booster shots" of the vaccines, to which Plaintiffs have the same religious objections, are doubtless on the way, accompanied by further government mandates.

81.206.       In the midst of this regulatory muddle, combined with unreasoning official coercion and widespread, media-generated panic, Plaintiffs seek leave of court to proceed anonymously as they run the risk of ostracization, threats of harm, immediate firing, and other retaliatory consequences, if their names become known. This is shown by the following examples of a pervasive climate of fear and loathing of the unvaccinated:

82.207.       On ABC News, commentator Margaret Hoover declared that government, by withholding all benefits from the unvaccinated, should "just make it almost impossible for

---

[16] *See* CDC Map at https://www.usatoday.com/in-depth/graphics/2021/07/29/cdc-mask-guidelines-map-high-covid-transmission-county/5400268001/

[17]    *See* "When   You've   Been   Fully   Vaccinated," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html

people to—to live their lives without being protected and protecting the rest of us."[18] On CNN, commentator Don Lemon stated to Chris Cuomo that "[If you] don't get the vaccine, you can't go to the supermarket. Don't have the vaccine, can't go to the ball game. Don't have a vaccine, can't go to work. You don't have a vaccine, can't come here. No shirt, no shoes, no service."[19]

83.208.          On his national late night show Jimmy Kimmel stated that the unvaccinated who contract COVID should be allowed to die rather than being admitted to the hospital: "Rest in peace, wheezy."[20] The audience roared its approval. In *The Week*, Ryan Cooper declared that "Anti-vaxxers" (i.e., people who decline the COVID vaccines) "should be exiled from society until they get their shots, and their efforts to intimidate people against controlling the pandemic should be met with massive resistance."[21]

84.209.          There is a top-down cultural, societal, and legal assault currently underway against those who forgo the vaccines. Nowhere is this more apparent than in the speech by President Biden on September 9, 2021, wherein the nation's Chief Executive brings down opprobrium on the heads of Americans who decline vaccination: "We've been patient, *but our patience is wearing thin*, and the refusal *has cost all of us....*" (emphasis added) Absent anonymity, Plaintiffs would be identified as members of

---

[18] "This Week," July 25, 2021, https://abcnews.go.com/Politics/week-transcript-25-21-speaker-nancy-pelosi-sen/story?id=79045738

[19] https://www.realclearpolitics.com/video/2021/08/01/don_lemon_no_shirt_no_shoes_no_vaccine_no_service.html

[20] https://www.westernjournal.com/late-night-host-ghoulishly-mocks-sick-unvaccinated-rest-peace-wheezy/.

[21] https://theweek.com/coronavirus/1002909/theres-1-obvious-solution-to-the-delta-variant-mandatory-vaccination

the public who, according to the sitting leader of the free world, are "cost[ing] all of us."[22]

~~85.~~210.        Those who are unable to receive the vaccines for sincere religious reasons are thus subject to a vicious mob whipped into a frenzy, facing vicious threats, such as this one, in response to an article related to opposition by health care workers to New York's vaccine mandate:



~~86.~~211.        Under these circumstances, Plaintiffs clearly meet the criteria for permission to proceed anonymously.

## COUNT I

---

[22] Remarks by President Biden on Fighting the COVID-19 Pandemic, WhiteHouse.gov, Sep. 9, 2021, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

**VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRSTAMENDMENT TO
THE UNITED STATES CONSTITUTION
(42 U.S.C. § 1983)**

87.212.      Plaintiffs hereby reallege and adopt each and every allegation in

paragraphs 1-21183 above as if fully set forth herein.

88.213.      The Free Exercise Clause of the First Amendment to the United States

Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from

abridging Plaintiffs' rights to free exercise of religion.

89.214.      Plaintiffs have sincerely held religious beliefs set forth above that compel

them to refuse any of the available COVID vaccines.

90.215.      Defendants' September 1 Policy, on its face and as applied, impermissibly

targets Plaintiffs' sincerely held religious beliefs by disallowing recognition of those beliefs as

genuine religious belief.

91.216.      Defendants' September 1The Policy, on its face and as applied,

impermissibly targets Plaintiffs' sincerely held religious beliefs by disqualifying them from

obtaining a religious exemption based solely on the nature of their religious beliefs.

92.217.      Defendants' September 1 Policy, on its face and as applied,The Policy

engages in blatant denominational discrimination in violation of religious neutrality by requiring

that qualifying religious beliefs be in accord with official denominational teaching as understood

by the Defendants.

93.218.      Defendants' September 1The Policy, on its face and as applied, and

September 24 Policy, as applied, authorizeauthorizes intrusive religious inquiries in violation of

religious neutrality by inviting University officials to question the legitimacy and veracity of

students' and employees' religious beliefs. While Defendants have not (yet) applied their

September 24 Policy to Plaintiffs, based on the positions taken by Defendants in their communications with Plaintiffs and in this lawsuit, Defendants clearly intend to wield that policy to challenge and reject Plaintiffs' sincere religious beliefs.

94.219.    Defendants' September 1The Policy, on its face and as applied, is not generally applicable because it allows exemptions for medical reasons and some religious reasons—such as being a Christian Scientist—,but not Plaintiffs' religious reasons, despite that exemptees' activities could or do pose similar risks of spreading COVID as Plaintiffs' activities, and Plaintiffs are entirely willing to perform (e.g., as Dr. Jane Doe 1 already has) the alternative precautions of masking, daily attesting, etc., required by the Policy at Section (C)(2). (Ex. A). Defendants' September 24 Policy, on its face and as applied, fares no better, as it allows exemptions for medical reasons for both students and staff and purports to allow religious exemptions only for staff but not for students—but even as to staff Plaintiffs here, they have been given no consideration or relief under the September 24 Policy, while an unknown number of exemptions have been granted to students and staff for medical reasons.A.)

95.220.    The Policiesy, on theirits face and as applied, areis not generally applicable because they areit is subject to individualized exemptions, for instance that at least insofar as Dr. Jane Doe 1 and John Doe 4 werehas been allowed to continue working in person wellas a full-service employee of Anschutz for nearly a month after Defendants' arbitraryits September 1 vaccination deadline, which wasis itself roughly nine months aftersince the vaccines first became available, without any consequences to her employment status or any negative impact on patients or employees.

96.221.    The Policies,y on theirits face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs without a compelling interest or narrow tailoring.

~~97.~~222.　　　The Polic~~ies~~y, on ~~their~~its face and as applied, lack~~s~~ a compelling interest because ~~they leave~~it leaves appreciable damage to ~~their~~its supposedly compelling interest unprohibited, since ~~they offer~~it offers exemptions for medical or for some religious reasons, but not for Plaintiffs' religious reasons. Exempted activities, while exercising the required precautions, are just as likely to spread COVID as Plaintiffs' activities, to the extent Plaintiffs exercise the same precautions.

~~98.~~223.　　　Accordingly, the University cannot show it has a compelling interest in denying accommodations for *these particular Plaintiffs*, which is the requisite test under controlling Supreme Court precedent.

~~99.~~224.　　　The Polic~~ies~~y, on ~~their~~its face and as applied, also lack~~s~~ a compelling interest as applied to Plaintiffs working at or doing clinical rounds in facilities off the Anschutz campus, such as ~~Dr.~~ Jane Doe 11 and John Doe 2, who have both received exemptions from the locations where they work and do clinicals and Dr. Jane Doe 1, whose~~because~~ Children's Hospital Colorado Springs has ~~where she works exclusively is not applying the same Policy to~~ its own religious exemption policy still in progress~~direct employees, and Dr. Doe has continued to work there throughout COVID, and for nearly a month after Anschutz's September 1 vaccination deadline, while exercising highly effective alternative precautions and not having even one incident of contracting or spreading COVID from or to co-workers or patients~~.

~~100.~~225.　　　The Polic~~ies~~y, on ~~their~~its face and as applied, ~~are~~is not the least restrictive means of furthering any hypothetical compelling interest because the University has shown that qualifying (medical) exemptees can continue to study and work at Anschutz while adopting alternative precautions outlined in the Policy.

101.226.       Further, Defendants cannot show, as they must, that they gave sufficient weight to practices in other hospitals around the country *and in their own university health care system* allowing religious accommodations for employees around COVID-vulnerable, oft-unvaccinated patients without apparently undermining their interest in providing effective health care without spreading COVID. Nor can Defendants show, as is their burden, they gave sufficient weight to practices on their own other University campuses, where the religious sincerity of all requesters was respected and an exemption granted to anyone who requested it, and exempted students and staff are freely allowed in similar or more intimate settings than those on the Anschutz campus—on those other campuses, exempted persons attend classes communally, live and congregate together, and work alongside one another. For instance, at least Plaintiffs John Doe 3, John Doe 5, and John Doe 7, who also work at the University's Denver campus, would have been entitled to an exemption there, and Jane Doe 8 was actually granted a religious exemption to attend her classes and remain in her public health program at the Denver campus but denied class attendance and participation in her program at the Anschutz campus.

102.227.       The Policiesy, on theirits face and as applied, will thus compel and have compelled loss of employment or access to credentialing study, including delays in education and professional opportunities, along withand Plaintiffs' consequent inability to pursue their chosen professions, and so has irreparably harmed Plaintiffs.

228.     While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

103.229.      Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional rights and sincerely held religious beliefs.

**COUNT II**
**VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

104.230.      Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-228100 above as if fully set forth herein.

105.231.      The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from enacting any requirement respecting an establishment of religion.

106.232.      By adopting and enforcing the September 1a Policy, which that conditions allowance of a religious accommodation on the requirement that one's religious beliefs oppose *all* vaccinations, Defendants have established favorable treatment for some religious beliefs to the direct detriment of other, disqualifying religious beliefs.

107.233.      Further, on its face and as applied, the September 1 Policy requires qualifying religious beliefs to be supported by and associated with "teachings" of "organized" denominations with a "comprehensive system of religious beliefs," in direct violation of the "clearest command" of the Establish Clause prohibiting denominational discrimination by government.

108.234.      The September 1 Policy's overt religious discrimination, on its face and as applied, cannot survive strict scrutiny for the reasons described above.

109.235.      At least the September 1The Policy, on its face and as applied, also establishes and authorizes a process of intrusive religious inquisition to test the veracity of students' and employees' asserted religious beliefs, in direct violation of the Establishment

Clause's longstanding prohibition on the "excessive entanglement" between government and religion. Such excessive entanglement is a per se violation of the Constitution without any opportunity for the government to overcome strict scrutiny. While Defendants have not (yet) applied the September 24 Policy to Plaintiffs, that policy is similarly unconstitutional, as applied, based on Defendants' conduct in this lawsuit, repeatedly and falsely attacking Plaintiffs' sincerity and continuing the inquisition tactics begun under the September 1 Policy, as described herein.

110.236.    Defendants' September 1 Policy's policy's establishment of state prescribed religious content and organization targets the holders of all religious beliefs that prohibit acceptance of the COVID vaccines, but whose beliefs fall outside the state-prescribed norms.

111.237.    Plaintiffs hold sincerely held religious beliefs that prohibit acceptance of the COVID vaccines, but their beliefs fall outside the state-prescribed norms of Defendants' September 1 Policy and application of Defendants' September 24 Policy. Policy.  Defendants' Policy will thus compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has harmed Plaintiffs.

238.    Defendants' Policies will compel and have compelled loss of employment or access to credentialing study, including delays in education and professional opportunities, along with Plaintiffs' consequent inability to pursue their chosen professions, and so has irreparably harmed Plaintiffs.

239.    While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have

and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

112.240.   Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**COUNT III**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**
**(42 U.S.C. § 1983)**

113.241.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-237109 above as if fully set forth herein.

114.242.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits any state from denying the protection of laws to any person within its jurisdiction.

115.243.   The Policiesy, on theirits face and as applied, classifyies Plaintiffs based on their fundamental right to religious exercise—the September 1 Policy allowing only acceptable religious beliefs and the September 24 Policy purporting to allow staff to exercise their religious beliefs but not students—and thus must survive strict scrutiny, which theyit cannot for the reasons described above.

116.244.   Plaintiffs hold religious beliefs that prohibit acceptance of the COVID vaccines, but their beliefs or their status fall *outside* the state prescribed norms of Defendants' Policiesy.- The Policiesy, on theirits face and as applied, thus denyies the Plaintiffs the protections afforded to similarly situated people whose religious beliefs also prohibit acceptance of the COVID vaccines but fall *within* the state prescribed norms of the Policy.

117.245.   The Policiesy, both facially and as applied, fails to provide Plaintiffs with equal treatment to similarly situated employees and students who have received medical

exemptions under the Policies. Indeed, there is no *rational* distinction for allowing all *staff* the opportunity to seek religious exemption, even if their employment duties involve direct patient contact, while prohibiting all *students* from seeking religious exemptions, even if their activities do not involve direct patient contactPolicy.

118.246.      Plaintiffs have thus been deprived of constitutionally guaranteed equal protection.

119.247.      The Defendants' Policies, on their face and as applied,Policy will compel and have compelled loss of employment or access to credentialing study, including delays in education and professional opportunities, along withand Plaintiffs' consequent inability to pursue their chosen professions, and so has irreparably harmed Plaintiffs.

248.      While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

120.249.      Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**COUNT IV**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. §12133)**

250.      Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-245 above as if fully set forth herein.

251.      42 U.S.C. §12133 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

252.    42 U.S.C. §12102 defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual […] or being regarded as having such an impairment."

253.    In enacting and applying their vaccination policies, Defendants have (erroneously) treated the absence of COVID-vaccination generated antibodies in Plaintiffs as a physical impairment that substantially limits major life activities such as normal activities in a workplace or classroom--like breathing or speaking—and any other activity that involves normal human interaction. All plaintiffs, therefore, have a "regarded as" disability under §12102. Several Plaintiffs (e.g., Jane Doe 2, Jane Doe 3, and Jane Doe 7) also have actual disabilities as alleged above.

254.    All of the student Plaintiffs have been excluded from participation in and denied the benefits of the educational programs of Defendants in that they are currently barred from participation in any of the activities—didactic work in classrooms, clinical work in Defendants' hospitals or clinics—that are preconditions to their receiving their professional degrees.

255.    Even apart from normal employment remuneration, all of the employee plaintiffs have likewise been excluded from participation in and denied the benefits of Anschutz services, programs, or benefits by their exclusion from Anschutz's physical facilities.

256.    While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

257.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their legal rights.

## COUNT V [OM1]

**VIOLATION OF THE RELIGIOUS FREEDOM CLAUSES OF THE CONSTITUTION OF THE STATE OF COLORADO.**

~~121.~~258.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-251~~117~~ above as if fully set forth herein.

~~122.~~259.    Article II, section 4 of the Constitution of the State of Colorado provides "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion... Nor shall any preference be given by law to any religious denomination or mode of worship."

~~123.~~260.    By adopting and enforcing Policies~~a Policy~~ that ostensibly allow~~s~~ accommodation of religious beliefs that prevent acceptance of the currently available COVID vaccines, but conditioning allowance of accommodation on the requirement the religious belief be articulated by a hierarchical religious authority whose tenets oppose all vaccinations, Defendants have established religious content and religious organization that is acceptable to the state, and religious content and religious organization that is unacceptable. And as to the September 24 Policy, students have been entirely denied their religious rights, while those same rights have been afforded to staff Defendants. Defendants have further attacked and rejected the sincerity of Plaintiffs' beliefs under the September 1 Policy and would presumably continue their conduct if applying the September 24 Policy.

~~124.~~261.    That September 1 Policy thus gives preference to certain religions based on the religions' organization and the content of its tenets. The Policy thus discriminates against

the religious beliefs of those whose beliefs are outside the state prescribed norms, impairs their free exercise of their beliefs, and gives preference to the beliefs of religious denominations or mode of worship that are within state prescribed norms.

~~125.~~262.    In enacting and enforcing their ~~P~~policies~~y~~, Defendants have thus violated Article II, section 4.

~~126.~~263.    The Defendants' Policies~~y~~ will compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has harmed Plaintiffs.

264.    While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

265.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**PRAYER FOR RELIEF**

*Wherefore,* Plaintiffs respectfully pray for the following relief:

(A) That a temporary restraining order and preliminary injunction, followed by a permanent injunction, be entered (1) restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the (a) September 1 Policy,~~Anschutz School of Medicine COVID Vaccination Requirement and Compliance Policy~~ to the extent it prohibits religious exemptions unless an individual holds religious beliefs that oppose all vaccinations or are in

accord with official denominational "teachings," (b) September 24 Policy, to the extent it denies students the right to seek and receive religious exemptions, (c) both Policies, to the extent Defendants improperly intrude into the sincerity of religious objectors at Anschutz by discerning Plaintiffs' sincerity through questioning the *legitimacy* of their religious beliefs or in any way more intensely than they do into the sincerity of religious objectors on other University campuses, (d) both Policies, to the extent Defendants prohibit Plaintiffs from receiving the same accommodations allowed for individuals who have actually received medical exemptions or for those on other University of Colorado campuses who present a comparable or greater risk of spreading COVID-19 than Plaintiffs;" (2) ordering that Plaintiffs be granted their requested religious exemptions; and (3) ordering that all prior denials of requested religious exemptions under the Policies (whatever the requesters may have called them) be revoked and the requests re-examined under conditions compliant with the ~~Constitutions of the~~ United States and Colorado Constitutions;

(B) That a declaratory judgment issue, declaring that the Policies's religious exemption provisions, both on their face and as applied by Defendants, are unconstitutional and unlawful in that they violate the Free Exercise and Establishment Clauses of the First Amendment of the Constitution of the United States; and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States; and ~~the Religious Freedom protections of the Colorado Bill of Rights,~~ Article II, Section 4 of the Colorado Constitution;

(C) That judgment be entered in favor of Plaintiffs and they be awarded~~given an award of~~ nominal damages, actual and compensatory damages, and punitive damages;

(D) That Plaintiffs be given an award of reasonable costs and expenses of this action, including reasonable attorney's fees, in accordance with 42 U.S.C. § 1988 and the Americans with Disabilities Act; and

(E) Such other and further relief as the Court deems equitable and just under the circumstances.

/s/ Peter Breen
Peter Breen
Martin Whittaker*
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

Michael G. McHale*
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs*

*\* pro hac vice motion to be filed*