**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **JANE DOES 1 through 11, and JOHN DOES 1 through 7,** | **No. 21 CV 2637** |
| **Plaintiffs,** | |
| **v.** | **The Hon. Raymond P. Moore U.S. District Judge** |
| **BOARD OF REGENTS of the UNIVERSITY OF COLORADO, *et al.*,** | **The Hon. Kathleen M. Tafoya U.S. Magistrate Judge** |
| **Defendants.** | |

**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION[1]**

Now come Plaintiffs, by their undersigned counsel, and move that this Court enter a preliminary injunction pursuant to Fed. R. Civ. P. 65 preventing Defendants and their agents, employees, and successors, from enforcing their COVID-19 vaccination mandate for the Anschutz Campus of the University of Colorado (the "September 1 Policy" and "September 24 Policy" described in their proposed Verified Amended & Supplemental Complaint) in any manner that violates Plaintiffs' rights under the First and Fourteenth Amendments, submitting and relying upon the facts in their proposed Verified Amended & Supplemental Complaint and exhibits thereto, and the Declarations of Scott French, M.D., Jane Doe 1, M.D., Student A, and Michael McHale, and state in further support as follows:[2]

---

[1] Pursuant to D.C.COLO.LCivR7.1(a), Plaintiffs served an earlier version of this motion on Defendants' counsel on October 29, 2021, as a motion for both a Temporary Restraining Order and Preliminary Injunction. In lieu of TRO proceedings, the University has agreed to a standstill (for at least most Plaintiffs), and thus this Motion seeks only preliminary injunctive relief. Defendant's counsel has stated they will otherwise oppose this Motion.

[2] The Court previously denied Jane Doe 1 and John Doe 1's challenge to the September 1 Policy as moot, (dkt. #21, Order at 2-3), recognizing that they intended to file a new complaint, to address the September 24 Policy—a policy of which they had no notice nor reason to know of, until Defendants alleged it in their Response to original Plaintiffs' Motion for Preliminary Injunction. Original Plaintiffs (Jane Doe 1 and John Doe 1) respectfully request that the Court

1

"To succeed on a motion for a preliminary injunction," Plaintiffs must show: (1) they're likely to succeed on the merits; (2) irreparable harm; (3) the balance of equities tips in their favor; and (4) the public interest favors an injunction. *Delmarte E.J.M. Vreeland, II v. Desiree Vigil, et al.*, 2021 WL 4237267, at *2 (D. Colo. Sept. 16, 2021) (unpublished) (citing *RoDa Drilling Co. v. Siegal*, 552 F.3d 120, 128 (10th Cir. 2009)). Plaintiffs easily satisfy each factor.

## I.      Plaintiffs Are Likely To Succeed on the Merits.

### A.      The University is Violating Plaintiffs' Free Exercise and Establishment Clause Rights Under Both the September 1 and September 24 Policies.

**First**, Defendants unquestionably denied each of Plaintiffs' religious exemption requests under the prior Campus Administrative Policy effective September 1, 2021 ("September 1 Policy"), before erasing and replacing that policy's express denominational discrimination from the ostensibly superseding Policy effective September 24 ("September 24 Policy"). However, Defendants have not reconsidered any Plaintiff's exemption request under the September 24 Policy (which, as discussed below, is riddled with its own constitutional flaws) or even invoked that September 24 Policy in any communication with any Plaintiff. Defendants have only invoked that September 24 Policy in lawyers' arguments in this case. Thus, each of the denials must be enjoined for reasons already discussed on behalf of the original Plaintiffs (dkt. #3, Br. at 2-22)—reasons evident in the University's sudden change of heart in the September 24 Policy,

---

revisit its prior Order as to them, in view of the facts alleged in their Verified Amended & Supplemental Complaint, which includes facts (including those as to the September 24 Policy) not available to original Plaintiffs at the filing of the prior Motion—and also includes myriad facts brought forward by their new co-plaintiffs. New Plaintiffs (Jane Does 2-11 and John Does 2-7) raise their challenge here for the first time, and as discussed *infra* at n.4 and elsewhere, urge that their challenge to the September 1 Policy is not moot because their religious exemption requests and corresponding statuses at Anschutz have not been rescinded or reevaluated under the September 24 Policy.

after receiving a demand letter on September 15, on behalf of Plaintiff Dr. Jane Doe 1, outlining similar violations. (Am. Cmplt. at ¶73.)

**Second**, while a handful of Plaintiffs received denial communiques claiming that they would pose an undue health burden (*e.g.,* Jane Does 2 and 3, see Am. Cmplt. at ¶¶78, 83)—most after Dr. Jane Doe 1's demand letter explaining the unconstitutionality of the prior scheme—those communiques predated the September 24 Policy, and thus did not invoke it or even mention that September 24 Policy, or state that a new Policy may become operative. *Id.* Those communiques were thus merely part of the University's pretextual effort to cover its tracks for blatant discrimination based on the *nature* of Plaintiffs' religious beliefs, as already discussed for original Plaintiff Dr. Jane Doe 1. (Dkt. #3, Br. 22-24.).

**Third**, turning to the September 24 Policy, its provisions are non-neutral and non-generally applicable *on their face*, in violation of the Free Exercise Clause because, as mentioned, they categorically deny religious accommodations for students (including multiple new Plaintiffs) while categorically allowing religious accommodations for employees and medical accommodations for both students and employees.

**Fourth**, the September 24 Policy is non-generally applicable *as applied* insofar as the University has authorized medical exemptions for other members of the Anschutz community, some of whom have direct patient contact and *could* pose the same or even greater health risks as Plaintiffs (some of whom have *no* patient contacts).

**Fifth**, all of the University's policies at issue here, both *de jure* and *de facto*, brazenly fail strict scrutiny.

> 1. **The University denied each Plaintiff's religious exemption request under the September 1 Policy in flagrant violation of the Religion Clauses; thus those denials must be enjoined.**

Like the two original Plaintiffs, the sixteen new Plaintiffs here were denied religious exemptions under the September 1 Policy, in blatant violation of the Free Exercise and Establishment Clauses of the First Amendment. As noted in original Plaintiffs' prior Motion for Preliminary Injunction, such express religious and denominational discrimination is unconstitutional. (Dkt. #3, Br. 2-22.) Moreover, Plaintiffs' challenge to the September 1 Policy (which Defendants claim to have rescinded) is not moot given that it alone remains the source the denial of their requests for religious exemption, as explained previously and discussed briefly below. (Dkt. #17, Br. 4-5; *see, e.g.,* Am. Cmplt. ¶¶5-6, 55, 61-62.) Here, that means Plaintiffs' denials under the old policy must be preliminary enjoined.

In summary, just as it did with respect to original Plaintiffs, the September 1 Policy flagrantly violates new Plaintiffs' rights under the Free Exercise and Establishment Clauses of the First Amendment, for the following reasons:

(1) The September 1 Policy violates religious neutrality by limiting eligibility for religious accommodations to those who religiously oppose "all vaccinations." *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) ("Government fails to act neutrally when it . . . restricts practices because of their *religious nature*" (emphasis added)); *Church of Lukumi v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("the minimum requirement of neutrality is that a law not discriminate on its face").

(2) The September 1 Policy discriminates on the basis of religious *affiliation or denomination* by requiring that one have a "religious belief whose *teachings* are opposed to all immunizations." (Emphasis added.) *See Colorado Christian University v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (government is not "permitted to make a value judgment favoring

some religions over others" and "no State can pass laws . . . that prefer one religion over another").

(3) The Policy violates the rule against Excessive Entanglement by authorizing University officials to conduct intrusive inquiries into the *legitimacy* (as distinct from the sincerity) of one's religious beliefs, based on the University's understanding of the religion to which a person belongs. *See Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731 ("It hardly requires restating that government has no role in deciding or even suggesting whether the religious ground for [an individual's] conscience-based objections is legitimate or illegitimate.")

(4) The Policy is non-generally applicable because it allows *some* religious and medical exemptions that undermine the University's interest in stopping the spread of COVID in healthcare facilities via COVID vaccination." *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (A regulation is non-generally applicable when it "treat[s] *any* comparable secular activity more favorable than religious exercise") (emphasis in original).

Moreover, while its violation of excessive entanglement is unconstitutional per se, *Colorado Christian Univ.*, 534 F.3d at 1266, the September 1 Policy's remaining defects fail strict scrutiny for the same reasons as the September 24 policy, described *infra*.

Most Plaintiffs were denied religious exemptions on August 26, 2021, via an essentially identical letter emailed by the mysterious and still unidentified "Vaccine Verify" team to each of them individually. The letter stated: "Your exemption request has been denied because it does not comply with the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations." (E.g., Am. Cmplt. ¶78.) The letter applied the same standard adopted days later in the September 1 Policy.

Several other Plaintiffs were also expressly denied based on their religion at later dates. Jane Doe 7 received a denial letter on September 7 from Eric Mediavilla, DDS, Associate Dean for Student Affairs and Admissions, stating that to obtain an exemption, the University requires that "your religion teaches you and all other adherents that immunizations are forbidden under all circumstances." (Am. Cmplt. ¶104.) The letter stated that, despite her express and overt *religious* opposition to the use of aborted fetal cell lines in the development of the available COVID vaccines, her position "is of a personal nature and not part of a **comprehensive system of religious beliefs**." (*Id.*) (Emphasis added.) Additionally, John Doe 6 was the victim of a similar letter from Ann-Michael Holland, Director of the Anesthesiology Assistant Program, and he was also told by Defendant Zimmer that religious exemptions were available only to such religions as "Christian Scientists." (*Id.* ¶179.)[3]

Dr. Jane Doe 3 sought a religious exemption on September 10, after being denied a medical exemption on September 8 and 9. She submitted her formal request on September 16, one day after Dr. Jane Doe 1 sent the University a demand letter summarizing the September 1 Policy's constitutional violations. (Am. Cmplt. ¶82.) She received a denial email from "Vaccine Verify" a day or two later solely on grounds that an exemption "would pose [a] significant health and safety risk to CU Anschutz community [sic] and, most importantly, to our patients," and that

---

[3] Plaintiffs have provided ample evidence of the religious nature of their beliefs to Defendants, as part of their exemption requests, and to this Court (*see* dkt. #3, Br., 10-16; Am. Cmplt., *passim*; Decl. of Jane Doe 1, M.D., dkt. #19). *See also United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) (observing that the threshold for establishing the religious nature of beliefs is low; under the First Amendment, "if there is any doubt about whether a particular set of beliefs constitutes a religion, the Court will err on the side of freedom and find that the beliefs are a religion . . . [because the country's] founders were animated in large part by a desire for religious liberty"), *aff'd*, 95 F.3d 1475, 1482-83 (10th Cir. 1996); *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 887, 887 (1990) (explaining in Free Exercise Clause case that "[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim").

an accommodation "would pose an undue burden on the University." (*Id.* ¶83.) However, Dr. Jane Doe 3's denial still occurred during the existence of the September 1 Policy, which forbade religious exemption requests solely based on the nature of one's beliefs and not on any hardship to the University. Thus, Dr. Jane Doe 3 was victim to the same discriminatory policy, and the University's "undue burden" excuse was entirely pretextual as discussed further below.[4]

> **2. The University's additional assertion that three of the new Plaintiffs here would pose an "undue hardship" was manifestly pretextual.**

The University told Plaintiffs Jane Doe 8 and John Doe 6 that, in addition to having invalid religious beliefs, they would also pose an undue hardship to the University if they refused vaccination. And the University denied Dr. Jane Doe 3's exemption request on undue hardship grounds. In reality, the University's "undue hardship" assertion was manifestly pretextual.

As original Plaintiffs explained (dkt. #3, Br. 22), the University's "undue burden" rationale is pretextual where, as here, the evidence shows that Plaintiffs' religious beliefs motivated the University's decision. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004) (evidence of pretext existed based on defendants' "behavior" where plaintiff student-actor testified that others received religious exemptions and a professor said "other good Mormon" girls didn't object to reading the required script).

---

[4] For these reasons, Plaintiffs' challenge to the September 1 Policy is not moot. Plaintiffs' harms were caused by the application of the September 1 Policy, and the University never reconsidered Plaintiffs' requests under the September 24 Policy. Further, Plaintiffs' harms remain ongoing and thus their need for an injunction against the September 1 Policy endures. Accordingly, this challenge does not involve the doctrine of "voluntary cessation," but even if it did, the University's Opposition Brief in response to Original Plaintiffs' Motion for a TRO/PI refused to disclaim the September 1 Policy's constitutional flaws or the notion that it might reimpose the policy again—especially as COVID continues to "ravag[e]" the United States (dkt. #15, Br. 6, 11-14)—thus failing to make "absolutely clear" that "the allegedly wrongful behavior could not reasonably be expected to recur." *Brown v. Buhman*, 822 F.3d 1151, 1166-1172 (10th Cir. 2016).

The circumstances here reveal even more obvious pretext. Jane Doe 9 was denied by the mysterious "Vaccine Verify" team solely on the basis of her religion on August 26. She was only informed she would also be an undue burden on September 16—one day after she took the initiative to ask for a status update on her exemption request, and, as mentioned, one day after original Plaintiff Dr. Jane Doe 1 served a demand letter explaining that the September 1 Policy violated the First Amendment. (Am. Cmplt. ¶114.) And John Doe 6 was told religious exemptions would be available only to "Christian Scientists" or to people from other rare religions that officially oppose all vaccines. (Am. Cmplt. ¶169.). Unsurprisingly, his official denial letter from Defendant Ann-Michael Holland concluded that his religious opposition based on the vaccines' abortion connection "does not constitute a religious belief, but a personal objection to the vaccine," because the belief is "not part of a comprehensive system of religious beliefs." (*Id.*) Only then did the letter additionally assert an exemption would also be an "undue burden" to the University. (*Id.*) Thus, both Jane Doe 9 and John Doe 6 were obviously denied exemptions because of the nature of their religious beliefs, in flagrant violation of the First Amendment. John Doe 6 was additionally subject to overt religious hostility and inquisition. *See Masterpiece Cakeshop, Ltd. V. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). Under these circumstances, the University's supplemental (and conveniently timed) "undue burden" excuses were clearly pretextual.

As to Dr. Jane Doe 3, although her particular denial was based on "undue burden" grounds, this only occurred *after* the University received original Plaintiff Dr. Jane Doe 1's demand letter. Dr. Jane Doe 3 received the same "explain . . . your sincerely held religious belief" email as other Plaintiffs, and she explained in her submission of September 16 that she religiously objected to the use of aborted fetal cell lines in the development of the available

COVID vaccines—the same objection that "Vaccine Verify," Defendant Zimmer, Defendant Holland, and Defendant Mediavilla had already deemed categorically ineligible as insufficiently religious when other Plaintiffs raised the same objection. (Am. Cmplt., *passim*) And of course, Dr. Jane Doe 3's denial occurred while the September 1 Policy's express religious and denominational discrimination was still in effect. Thus, Dr. Jane Doe 3's circumstances likewise show the University's "undue hardship" excuse to be pretext.

Accordingly, for this reason too, Plaintiffs all these Plaintiffs are likely to succeed on the merits of their challenge to the September 1 Policy.

### 3. The September 24 Policy facially violates the Free Exercise Clause by categorically prohibiting religious exemptions for students.

The September 24 Policy is neither a neutral nor generally applicable burden on religious exercise, and it cannot overcome the requisite strict scrutiny. As original Plaintiffs explained (dkt. #3, Br. 16), a regulation that substantially burdens religious exercise is not generally applicable when it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021) (emphasis in original); "Whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," including activities that "*could* . . . present[] similar risks" of "spread[ing] COVID-19." *Id.* (emphasis added) (internal quotations omitted). Indeed, where a rule fails to prohibit conduct "that endangers [its] interests in a similar or greater degree than [the claimants' religious activity], "[t]he underinclusion is substantial, not inconsequential," and is thus non-generally applicable. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993); *see also id.* at 542 ("The Free Exercise Clause protects religious observers against unequal treatment.") (cleaned up).

Here, the September 24 Policy unquestionably imposes unequal treatment on students seeking religious exemptions. It states expressly that, while "[r]eligious accommodations are *not currently available to students or applicants*." (Am. Cmplt. Ex. 28), "religious accommodation[s]" *are* in fact available for employees, *as are* "medical accommodation[s]" for both students and employees—as long as neither category of accommodation "poses an undue hardship or . . . direct threat to the health or safety of the Individual or others." (*Id.*) But clearly students and employees who remain unvaccinated for medical reasons, or employees who remain unvaccinated for religious reasons "could" (and almost certainly do) present "similar risks" of spreading COVID-19 as the Plaintiff students if they were to receive accommodations for religious reasons. *See Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (noting that Cuomo's order treating "less harshly" factories and schools that "have contributed to the spread of COVID-19" as compared to houses of worship was not generally applicable); *see also Does 1-3 v. Mills*, No. 21A90, 2021 WL 5027177, at *2 (U.S. Oct. 29, 2021) (Gorsuch, J., dissenting) ("Maine does not suggest a worker who is unvaccinated for medical reasons is less likely to spread or contract the virus than someone who is unvaccinated for religious reasons").[5]

Here, nothing on the face of the policy stops authorized exemptees from engaging in clinical and other person-to-person work that is any less dangerous than any activities performed by the student Plaintiffs. *See, e.g.*, dkt. #3-1, Decl. of Student A (noting that as a medical exemptee, the University allows him to continue treating vulnerable patients while exercising

---

[5] While the Supreme Court denied an emergency stay in *Does 1-3*, two Justices joined Justice Gorsuch's dissent, and Justices Barrett and Kavanaugh concurred on discretionary grounds, separate from their view of the merits. *Does 1-3*, 2021 WL 5027177, at *1 (Barrett, J., concurring), and at *2 (Gorsuch, J., dissenting). No Justice challenged Justice Gorsuch's legal analysis of the underlying dispute. The act of denying an emergency stay is "not a decision on the merits of the underlying legal issues," *Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009) (per curiam).

appropriate precautions); Am. Cmplt. ¶172 (Anschutz anesthesiology student with medical exemption performs clinical work in hospital operating rooms); Decl. of Chancellor Elliman, dkt. #15-13, ¶ 13 (conceding that medical exemptions have been granted at Anschutz). Such bald unequal treatment is flagrantly and facially underinclusive.

The Sixth Circuit applied similar logic in recently striking down a different university's denial of student religious exemptions from its COVID vaccine mandate. In *Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021), the Sixth Circuit held that Western Michigan University's COVID vaccine mandate for student athletes was not generally applicable as to the plaintiff student athletes who were denied religious exemptions, because the University authorized "[m]edical or religious exemptions and accommodations," as "considered on an individual basis." *Dahl*, 2021 WL 4618519 at *4. Because the University "retain[ed] discretion to extend exemptions in whole or in part . . . the policy is not generally applicable," and "[a]s a result, the University must prove that its decision not to grant religious exemptions to plaintiffs survives strict scrutiny." *Id.*; *see also* Decl. of Brian Montague, dkt. #15-14, ¶¶5-6 (describing how he individually evaluates requests for medical exemptions and recommends approval or denial of each).

The same is true here, where the University plainly allows medical, but not religious, exemptions for students (while also allowing both religious and medical exemptions for employees), and it determines who qualifies for these exemptions on an individualized basis, including as to whether applicants for authorized exemptions would pose an undue hardship without vaccination. *See, e.g., id.*, ¶7. "But the [University] may not refuse to extend that exemption system to cases of religious hardship without compelling reason." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021) (cleaned up). Even where authorized exemptions are

11

not "individualized," "they treat comparable secular activity"—i.e., often *identical* activity that affects the University's interest in stopping the spread of COVID to patients and their caregivers in comparable, often identical ways—"more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. As a result, the policy must undergo strict scrutiny. *See also Roman Catholic Diocese, et al. v. Emami, et al.*, No. 20-1501 (U.S. November 1, 2021) (Granting, vacating, and remanding in light of *Fulton* a lower-court order upholding New York requirement that employer health insurance plans cover abortion, with a narrow exemption for only some religious organizations but not others); *accord Fulton*, 141 S. Ct. at 1877 (noting that strict scrutiny applies where government burdens religion while allowing exemptions "that undermine[] the government's asserted interests in a similar way").

Additionally, the September 24 Policy also singles out student religious exercise for disfavored treatment in a flagrant violation of religious neutrality. A law is not neutral toward religion if its "object" "is to infringe upon or restrict practices because of their religious motivations." *Lukumi*, 508 U.S. at 533. That requires, at minimum, "that a law not discriminate on its face." *Id.* But lack of neutrality can also be discerned from "the specific series of events leading to the . . . official policy in question." *Id.* at 540.

Here, the policy is explicit that "[r]eligious accommodations are not currently available to students or applicants," while making them available to employees, and making medical accommodations open to both students and employees. (Am. Cmplt. Ex. 28.) This is the same error as Colorado's past restriction on the use of public scholarship funds at "pervasively sectarian" colleges and universities, which the Tenth Circuit found non-neutral because when government "facially regulate[s] religious issues, it must treat individual religions . . . without discrimination or preference." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th

Cir. 2008). Here, the September 24 Policy expressly regulates and singles out student religious objectors for disfavored treatment, while allowing *employee* religious exemptions, unless they pose an undue hardship. This disparate treatment of individuals' religion plainly fails facial neutrality. *See Lukumi*, 508 U.S. at 538 (finding "significant evidence" of non-neutrality where the ordinance "proscribe[s] more religious conduct than is necessary to achieve [the government's] stated ends").

The specific series of events leading to the September 24 Policy also betrays its lack of neutrality. As the original Plaintiffs explained, the September 1 Policy was a case study in religious and denominational discrimination and was the starting point for Defendants' litigation-motivated rewrite on September 24. (Dkt. #3, Br. at 2-22.) Defendants also sent individual letters or emails to students purporting *to instruct them* on the teachings of the students' own faiths. (*See, e.g.,* Zimmer letter to Student A, Ex. 16 to Am. Cmplt. at ¶180; email to Student John Doe 1, Am. Cmplt. at ¶136). They also told Plaintiff John Doe 6 that only those affiliated with groups like "Christian Scientists" need apply. (*Id.* ¶169.) Only after Dr. Jane Doe 1 sent her demand letter to the University on September 15 did Defendants begin consistently denying requests for religious exemption on "undue hardship" grounds.

Further, lack of neutrality is evident in the University's switch in time from purporting to allow some student religious exemptions (if they belonged to an approved religion) under the September 1 Policy to outright forbidding any "religious accommodations" for students in the September 24 Policy. The District Court in *Dr. A. v. Hochul* found that a similar move by New York authorizing religious exemptions in its initial vaccine mandate policy, and then eliminating it via amendment just days later, *targets* religious conduct for distinctive treatment. *Dr. A. v. Hochul*, 2021 WL 4734404, at *8 (N.D.N.Y. Oct. 12, 2021), *vacated and remanded by sub.*

13

*nom.*, No. 21-2566 (2d Cir. Oct. 29, 2021).[6] As the Court stated: "This intentional change in language is the kind of 'religious gerrymander' that triggers strict scrutiny." *Id*.; *Lukumi*, 508 U.S. at 534-535. The same is also true here.

Defendants attempt at discrimination appears inspired, in part, by a misunderstanding of the scope and import of Title VII of the 1964 Civil Rights Act, which mandates religious protections for employees but is silent on students. 42 U.S.C. § 2000e(j). The University, in setting up its system of exemptions, once again ignored its obligations under the *U.S. Constitution*, which, as original Plaintiffs previously explained (dkt. #3, *passim*), prohibits such overt religious discrimination. Thus the September 24 Policy's denial of student religious exemptions must undergo strict scrutiny, which it cannot satisfy.

> **4.   The September 24 Policy also violates the Free Exercise Clause as applied to Plaintiffs insofar as the University has actually granted medical exemptions to members of the Anschutz community.**

Under the same Free Exercise principles outlined above, the September 24 Policy violates the First Amendment as applied to both the student and employee Plaintiffs. That's because the University admits that, in practice, it is categorically *forbidding* religious exemptions to all comers (dkt. #17, Br. at 20) while it willingly *grants* some medical exemptions to members of Anschutz communities—even though the latter "could" pose "similar risks" as the former of contracting and spreading COVID to vulnerable patients and staff. *Tandon*, 141 S. Ct. at 1296; *accord Does 1-3*, 2021 WL 50217177, at *2-*3 (Gorsuch, J., dissenting).

---

[6] Although the Second Circuit recently vacated the District Court's injunction in *Dr. A.*, as of the time of this filing no opinion has issued explaining the reasons for its vacatur, and the District Court's reasoning on this issue is persuasive on this point. *See also Does 1-6 v. Mills*, 2021 WL 4860328, at *9 (1st Cir. Oct. 19, 2021) (upholding Maine healthcare vaccine mandate and distinguishing *Dr. A.* because New York "eliminate[d] the religious exemption" it had promulgated as part of its earlier healthcare vaccine mandate eight days earlier).

Defendant Zimmer has acknowledged that as a matter of practice, Anschutz is "allowing . . . narrow medical exemptions" to "keep[] the number of unvaccinated individuals on campus very low," in order to achieve "herd immunity, the ultimate goal in stopping the pandemic." (Dkt. #15-5, Zimmer Decl. ¶16.) The mere fact the University is granting medical but not religious exemptions renders the policy non-generally applicable as applied to these Plaintiffs, whom the University cannot show actually pose any more risk of spreading COVID. *See Tandon*, 141 S. Ct. at 1296 (already exempted activities are comparable if they "could" present "similar risks" of spreading COVID). Indeed, a number of Plaintiffs pose manifestly *less* risk insofar as they are not regularly in clinical settings, such as for instance, those who work in IT positions or offices, those who work in facilities away from the Anschutz campus, and students in a classroom setting. Even taken together, Plaintiffs represent a "very low" fraction of the Anschutz community, and they are dispersed throughout discrete locations on and off of the Anschutz Medical Campus. These Plaintiffs plainly represent a "very low" number of would-be exemptees both in the aggregate and within their respective divisions, some of which involve zero patient contact.

As three Justices of the U.S. Supreme Court recently put it: "Slice it how you will, medical exemptions and religious exemptions are on comparable footing when it comes to the State's asserted interests." *Does 1-3*, 2021 WL 5027177, at *3 (Gorsuch, J., dissenting); *see also Fraternal Order of Police Lodge No. 12 v. City of Newark Lodge*, 170 F.3d 359, 366 (3d Cir. 1999) (deeming police department's "no-beard" policy non-generally applicable where some officers received medical exemptions undermining department's interest in uniformity but others were refused religious exemptions because of the alleged interest in uniformity). Thus, the University's policy is clearly non-generally applicable and must undergo strict scrutiny.

### 5.   The University cannot satisfy strict scrutiny.

For reasons similar to those already explained (dkt. #3, Br. 19-22), the University's refusal to grant Plaintiffs religious accommodations on equal terms with medical exemptees easily fails strict scrutiny. These reasons are summarized as follows:

First, the University has "no compelling reason why it has a particular interest in *denying an exception*" to these religious claimants "while making them available to others." *Fulton*, 141 S. Ct. at 1882 (emphasis added). Thus the University cannot show that "failure to exempt plaintiffs serves 'interests of the highest order.'" *Dahl*, 2021 WL 4618519 at *5; *see also Does 1-3*, 2021 WL 5027177, at *3 (Gorsuch, J., dissenting) (noting that the government's compelling interest in "stemming the spread of COVID-19 . . . cannot qualify as such forever").

Second, the University cannot satisfy narrow tailoring in part because it has not shown it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). Notably, the precautions regularly used at Anschutz by all healthcare workers for 20 months, and medical exemptees since September, *are effective* in reducing the spread of COVID from providers to patients. (*See, e.g.,* Decl. of Scott French, M.D., dkt. #18, at ¶8; Decl. of Samuel R. Dominguez, M.D., Ph.D., dkt. #15-2, at ¶7 (Defendants' expert conceding "PPE has been quite effective in preventing the spread of provider-to-patient and patient-to-provider infections" but noting provider-to-provider transmission "due to more lax behavior of physicians and staff").) That's especially true here, where some Plaintiffs are not even in clinical settings or often work remotely and thus are far from vulnerable patients or those who work with them. Additionally, the government cannot "show[] that it considered different methods that other jurisdictions have found effective." *McCullen*, 573 U.S. at 494.

The University has now acknowledged it denied *all* requests for religious accommodation. (Dkt. #15, Br. at 20.) But Plaintiffs are aware that hospitals around the country—*and those within the UC Health system itself*—are allowing religious accommodations for health care workers in clinical settings without apparently undermining patient care (Am. Cmplt. Ex. 20), and several Plaintiffs have themselves received religious accommodations from nearby medical sites where they work or do clinicals (*see, e.g.,* Am. Cmplt. ¶¶124, 149-150). *See Dahl*, 2021 WL 4618519 at *5 (no narrow tailoring where "several other universities grant exemptions from their COVID-19 mandates"); *see also Brooklyn Diocese*, 141 S. Ct. at 67 (government failed narrow tailoring where COVID restriction was "much tighter than those adopted by many other jurisdictions hard-hit by the pandemic"); *Does 1-3*, 2021 WL 6027177, at *5 (Gorsuch, J., dissenting) (noting "that the overwhelming majority of States with similar mandates provide a religious exemption"). Plaintiffs are also aware that in a neighboring state to Colorado, the University of Nebraska Medical Center ("UNMC") in Omaha recently granted religious exemption requests to its COVID vaccination mandate to nearly 200 students and employees. (McHale Declaration, attached hereto.) Just like the University of Colorado's Anschutz campus, the UNMC Omaha campus features a prominent medical school and other schools (nursing, public health, etc.) and a major hospital—UNMC has the same interest in protecting vulnerable patients from COVID and its effects on its campus as do Defendants here. *Id.* Defendants cannot demonstrate why similar accommodations would prevent them from achieving their interests.

Additionally, the fact the University does not impose the same restrictions on religious exemptions on its other campuses and facilities, when Anschutz employees and students (including some Plaintiffs here, e.g., John Doe 3, 5, and 7, and Jane Doe 8) engage in activities

on those other campuses and facilities and may more easily contract or spread COVID there, further demonstrates the lack of narrow tailoring here. *See Dahl*, 2021 WL 4618519, at *5 (university's failure to impose same vaccine restriction on non-student athletes with whom student athletes interact undermined narrow tailoring).

In sum, the University's *de jure* and *de facto* total bans on religious exemptions for students and employees within its Anschutz community easily fail strict scrutiny. Plaintiffs are thus likely to succeed on the merits of their Free Exercise Challenge.[7]

## II.   PLAINTIFFS SATISFY THE REMAINING FACTORS FOR A PRELIMINARY INJUNCTION.

### A.  Imminent Irreparable Harm.

As the Tenth Circuit recognizes, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fish v. Koach*, 840 F.3d 710, 752 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 374 (1976)). Thus, because the University has brazenly trampled on Plaintiffs' First Amendment rights to religious neutrality and equality, it has "assuredly inflict[ed] irreparable harm" for the same reasons explained by the original Plaintiffs. (Dkt. #3, Br. 24.) *See Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020). Additionally, all Plaintiffs are threatened with termination and/or expulsion and thus damage to their professional and/or educational standing, along with their reputation in the medical field. These harms cannot be remedied at law and only exacerbate the harm caused by Defendants' overt religious discrimination wielded against them.

---

[7] For similar reasons, Plaintiffs are also likely to succeed on their Equal Protection Challenge, as original Plaintiffs previously explained (dkt #3, Br. 16-18), for Plaintiffs are similarly situated to other Anschutz physicians and students who have received exemptions under the Policy, and there is no rational basis for treating the two classes differently. Nothing about "the characteristics" of Plaintiffs in particular "rationally justify denying to [them] what would [and has already been] permitted to [individuals] occupying the same site" for the same purposes. *City of Cleburne, Tex.v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985).

The imminent harms to Plaintiffs will be life altering. The student Plaintiffs, if they cannot continue at Anschutz, face at least a year's delay in the completion of their professional degrees, if they can even find programs to transfer to. And if they do find transfer institutions, those institutions will likely be outside the state of Colorado. If they cannot continue at Anschutz, student Plaintiffs must relocate under the most favorable possible scenario. (Am. Cmplt. ¶¶144, 197-200.) The alternative is to forgo their plans of a professional career.

The physician staff Plaintiffs likewise face at least a two-year hiatus from the practice of medicine or permanent relocation, (*Id.* ¶¶191-193), a choice that Jane Doe 3 considered, and rejected, earlier this year when she was being courted by a rival institution. (*Id.* ¶88.) She preferred to stay where she had established her reputation and sunk her personal and professional roots. (Am. Cmplt. ¶18.) Her rejected life choice may now be forced upon her by Defendants' unlawful Policies, without this Court's intervention.

**B.  Balance of Harms and Public Interest.**

The balance of harms and public interest here weigh decidedly in Plaintiffs' favor. Whatever the possibility that an individual unvaccinated Plaintiff may spread COVID or otherwise harm another member of the Anschutz community, this risk is no greater than that for a member of the same community authorized to be unvaccinated for *medical* reasons. *See Roberts*, 958 F.3d at 316. Further, the idea that a Plaintiff might spread COVID "is somewhat speculative, and it fails to consider the broader picture" in part because the University's policy "does not limit [Anschutz members'] exposure to unvaccinated" people at large, as there is no requirement that patients be vaccinated or that Anschutz members refrain from mingling with the unvaccinated when they're off campus. *Dahl*, 2021 WL 4618519, at *6. And of course, "it is

always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013).

Here, given that exemptions have been actually allowed for medical reasons at the Anschutz campus, and the numerous exemptions allowed for medical and religious reasons at the University's other campuses and across health care facilities in Colorado and elsewhere— without any reported harm to patients or the health care system—the University "has not shown that public health would be imperiled by employing less restrictive measures" with respect to Plaintiffs here. *Tandon*, 141 S. Ct. at 1297 (internal quotes omitted). The equitable factors thus weigh heavily in favor of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

/s/ Peter Breen
Peter Breen
Martin Whittaker
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs*

/s/ Michael G. McHale
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*