## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**JANE DOES 1 through 11, and JOHN DOES 1 through 7,**

  **Plaintiffs,**

 **v.**

**BOARD OF REGENTS of the UNIVERSITY OF COLORADO, TODD SALIMAN, President of the University of Colorado, in his official capacity, DONALD ELLIMAN, Chancellor of the University of Colorado Anschutz Campus, in his official & personal capacity, SHANTA ZIMMER, Senior Associate Dean of Medical Education, University of Colorado School of Medicine, in her official & personal capacity, ERIC MEDIAVILLA, Associate Dean for Student Affairs, University of Colorado School of Dental Medicine, in his official & personal capacity, ANN-MICHAEL HOLLAND, Master of Science Program Director, Department of Anesthesiology, in her official & personal capacity, JOHN & JANE DOES 1-9, members of the Vaccine Verify team, in their official & personal capacities,**

  **Defendants.**

**No. 21 CV 2637**

**The Hon. Raymond P. Moore**
**U.S. District Judge**

**TRIAL BY JURY DEMANDED**

### VERIFIED AMENDED & SUPPLEMENTAL COMPLAINT
### FOR TEMPORARY AND PERMANENT INJUNCTION AND DAMAGES

1.     Defendants enacted a policy dividing the staff and students of the University of

Colorado's Anschutz Campus into two categories based on their religious beliefs: the "sheep,"

whose religions taught the approved orthodoxy, were to receive exemptions to the University's

COVID vaccine mandate, while the "goats," who held non-approved religious beliefs, were

denied exemptions and then fired or expelled.

2.     Defendants' foray into theology went deep, probing and debating the religious beliefs of staff and students and imposing value judgments on believers in an Inquisition process that further violates the First Amendment.

3.     Defendants rejected every single request for religious exemption by Plaintiffs and others by unapologetically, aggressively enforcing their policy, which allowed exemptions only for those who are members of organized religions whose teachings entirely forbid vaccinations. At the same time, Defendants granted medical exemptions to the vaccine mandate to Anschutz staff and students. And Defendants liberally allowed religious and medical exemptions to staff and students of every other University campus, with all or most of those religious exemptions granted summarily, without any review or testing of sincerity at all.

4.     Plaintiffs are staff and students of the Anschutz Campus, dedicated to the health and well-being of the people of Colorado. Plaintiffs respectively embrace a variety of faith traditions, and each of them has a sincere religious objection to the currently available COVID vaccines.

5.     After rejecting all submitted religious exemption requests, Defendants received several demand letters in September 2021, on behalf of staff and students, highlighting the illegal and unconstitutional nature of their policy, which had purported to require vaccination by September 1. In response, Defendants neither reconsidered their decisions under the policy nor conceded any defects in it. Well after all religious exemption requests were required to be submitted—and after they had all been denied—Defendants then amended their policy on September 24 in preparation for litigation, without notice to Plaintiffs and without in any way applying the amended policy to rescind or reconsider the blanket denials issued against Plaintiffs and others.

6.     For Plaintiffs who are staff, that September 24 Policy purports to remove the limitation on certain religious beliefs qualifying for exemption imposed by the September 1 Policy. But whatever the alleged improvements in the text of the amended Policy, Defendants' illegal actions have not changed. In this litigation, Defendants both defended their past religious discrimination and launched vigorous and illegal challenges to the religious beliefs of at least Plaintiffs Jane Doe 1, M.D., a practicing Catholic who holds an advanced degree in Catholic bioethics, and John Doe 1, a faithful Buddhist who has repeatedly and concretely expressed his faith with his past actions. Defendants have even taken the position that Plaintiffs (or at least the physicians among them) have a duty, as a matter of professional ethics, to violate their religious beliefs and obey Defendants' vaccine mandate—unless they also have a medical contraindication to the COVID vaccine, in which case they are wholly exempt. (*See, e.g.*, Dkt. 15-10, ¶ 10).

7.     For Plaintiffs who are students, they are worse off under the September 24 Policy, on its face. That Policy allows Anschutz staff to apply for religious exemptions but strips that right entirely from Anschutz students. At the same time, students and staff at *every other* University campus may freely apply for and be granted religious exemptions. No challenges are made by the University to the sincerity of belief of those other students and staff, no consideration taken of the alleged hardship of "accommodating" them, and no concern that students and staff at other campuses are in situations where they may be more likely to spread COVID-19 than Plaintiffs and others who sit under the auspices of Defendants at the Anschutz campus.

8.     That severe treatment for religious students and staff at Anschutz under both the September 1 and September 24 Policies, moreover, cannot be a product of any feature of the work they perform or of any feature of their studies at Anschutz. It must, rather, be a product of

anti-religious animus at Anschutz.  Three of the plaintiffs here, John Doe 3, John Doe 5, and John Doe 7, for example, work for the university's Office of Information Technology, a Central Services Administrative unit serving the computing and IT needs of *both* Anschutz's Aurora campus and the University of Colorado Denver's downtown Denver campus. While colleagues of theirs at the Denver campus, sharing their very same building workspaces, have routinely been granted exemptions from vaccination because they fall under the Denver campus hierarchy, these individuals are facing loss of their jobs. While they routinely interact with colleagues at both campuses, and have workspaces at both, they are not in physical contact with Anschutz health care staff and students any more than their off-campus family and friends, or on-campus patients (none of whom Anschutz requires to be vaccinated) are in contact with those staff and students.

9.     That same animus infects the decision to terminate Jane Doe 11, who works at an institution unaffiliated with Anschutz, a facility neither owned nor controlled by Defendants, nor even near any facility owned or controlled by Anschutz (she works at the Colorado Mental Health Institute in Pueblo). She is a conscientious Christian. But Jane Doe 11 happens to be an employee of Anschutz, contracted out to that remote facility of an unaffiliated institution, which has granted her an exemption from its own vaccine mandate.  But Defendants are insisting that, remote as Jane Doe 11 is, she must abide by *their* Policies, not the policies in place where she actually works, or be terminated.

10.     That same animus features undeniably in the treatment of student Jane Doe 8, too. She is a dual degree student who was seeking both bachelor's of arts and master's of public health degrees, in a program offered by the University, with the bachelor's taken at the University's Denver campus and the master's at the University's Anschutz campus.  Her

religious objection to the vaccination is fully accommodated by the Denver program, but not by Defendants. She has been forced to withdraw from the master's component of her studies.

11.     That unforgiving, severe treatment of the religiously devout, moreover, is not something that other local health care institutions consider necessary. Plaintiff Jane Doe 3, a devout Catholic, is a physician with faculty appointments at both Defendants' University of Colorado – Anschutz Medical Campus and the nearby Rocky Mountain Regional Veterans Administration Medical Center in Aurora, too. The administrators and physicians at Rocky Mountain Regional VA Medical Center are, just like Defendants, fully aware that she both opposes the vaccines for religious reasons, and has robust natural immunity from a recovered bout of COVID, and so the VA is not insisting on her receiving a COVID vaccination to continue her work there. Defendants, however, are insisting on vaccination, under both the September 1 and September 24 Policies, have barred her from all Anschutz facilities and placed her on administrative leave without pay. If she were to lose her faculty appointment at the University of Colorado-Anschutz, as Defendants have told Jane Doe 3 will happen by mid-November, she will also lose her faculty appointment at the VA Medical Center, too, under the terms of her dual appointment.

12.     After Jane Doe 1, a Catholic pediatric physician, and John Doe 1, a Buddhist medical student, filed this lawsuit and sought temporary injunctive relief, numerous other Anschutz staff and students have learned of the suit and sought to join them. All of these other Plaintiffs face significant financial impact from their expulsion or termination. Many Plaintiffs, facing financial ruin, cannot afford private counsel—they are able to proceed here solely because of the representation *pro bono publico* provided by undersigned counsel. All face grave and immediate threats to their educational and professional careers. If expelled or forced to take an

indefinite leave (with no guarantee of return), Defendants strip the student Plaintiffs of their ability to pursue a degree in the healthcare field. Saddled with debt, these Plaintiffs will lose at least a year of schooling, fall behind their class, and suffer a black mark on their academic record. If fired or forced into indefinite unpaid leave, the staff Plaintiffs risk imminent and grave harm to their ability to financially support themselves and their families, along with risking their licensure and suffering a loss of professional reputation at having been terminated or forced to leave involuntarily. And each Plaintiff is suffering a grave and continuing violation of their constitutional rights due to Defendants' threats of or actual termination or expulsion.

13.     Jane Does 1 through 11 are nine employees of the University (including three physicians), under the auspices of Defendant Elliman, chancellor of the Anschutz campus; a fourth year student in the Anschutz School of Dental Medicine; and a student in a dual degree program for bachelor's and master's degrees in public health, all of whom have sincere religious objections to the COVID vaccines currently available to them, but who have been informed that they will lose their jobs or their place in their schools, if they are not vaccinated.

14.     John Does 1 through 7 are four employees and three students at Anschutz (two M.D. candidates in the medical school and a master's anesthesiology student) who also have sincere religious objections to the COVID vaccines currently available to them, but who have been informed that they will lose their jobs or educations, if they are not vaccinated.  John Doe 2 is also a member of the U.S. Air Force, which is paying his fees and expenses while he pursues his M.D., and which has promised him a promotion from Second Lieutenant to Captain as soon as he earns his M.D. and can serve as a military physician.  Both his medical and military careers are at risk if he is forced to withdraw or be expelled.

15.     The University's foray into explicit religious discrimination violates the deepest traditions of government neutrality towards religion, as originally enshrined in the Establishment and Free Exercise Clauses of the First Amendment and as applied to state actors like Colorado in the Fourteenth Amendment. And its failure to treat those with religious objections to COVID-19 vaccination the same as those with medical contraindications to the vaccine also violates the First Amendment. Since the University has refused to voluntarily back down from these Policies, immediate judicial intervention is now necessary.

## PARTIES

16.     Plaintiff Dr. Jane Doe 1 is a physician licensed to practice medicine by the state of Colorado. She is currently employed as a pediatric physician by the University of Colorado Anschutz School of Medicine and is exclusively assigned to Children's Hospital Colorado Springs, over sixty miles away from the Anschutz Campus in Aurora. She is a devout Catholic who was raised in the faith, founded a student pro-life group known as Physicians for Life while in medical school, and in 2018 obtained a master's degree in Catholic bioethics from the University of Mary in North Dakota, in association with the National Catholic Bioethics Center. Dr. Doe 1 is the mother of young children, and she relies upon the income provided by her job to support them. In late August 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from tissue from an aborted fetus—was denied. And in late September, Defendants confirmed that denial in response to a demand letter from her counsel. Despite Defendants' alleged interest in requiring all staff and students to be vaccinated by September 1, Dr. Jane Doe 1 was allowed to continue to work freely at Children's Hospital Colorado Springs for the month of September, following standard COVID protocols.

17.     Dr. Jane Doe 2 is a physician licensed to practice in the State of Colorado. Until October 2, 2021, she was employed as a pediatric anesthesiologist and Associate Professor of Clinical Practice at Children's Hospital Colorado at the Anschutz Medical Campus in Aurora. She is a devout Christian and known by colleagues to be devout and conscientious in her religious practices. In late September 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from tissue from an aborted fetus—was denied with finality. She was notified of her termination on September 21, 2021, but was allowed to characterize that involuntary separation as a "resignation," lest a "termination" affect her continuing licensure.

18.     Dr. Jane Doe 3 is a physician licensed to practice in the State of Colorado. Until October 2021, she was employed as a physician and associate professor of medicine at the Anschutz School of Medicine. She has faculty appointments at both the University of Colorado-Anschutz Medical Campus in Aurora (with clinical privileges at University of Colorado Hospital tied to her faculty appointment) and the Rocky Mountain Regional VA Medical Center in Aurora. In mid-September 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines from an aborted fetus—was denied.  In making that request, Dr. Doe informed Defendants that her religious objection to the involvement of those cell lines in medical and pharmaceutical research extended not only to her personal health care decisions, but to her professional, ethical decision making, as well.  She informed Defendants that her recent research work involves development of new therapy whose production would have utilized cell lines that are derived from cells from live aborted fetuses, as is standard in the field, but "when I

discovered that the cell line was derived from an aborted fetus, I have made the decision not to use it." Dr. Doe's work has earned her a national and international professional reputation, as well. Earlier this year she was courted by another American medical research university to relocate there and continue her current teaching and research work but chose to stay at Anschutz where she has the trust and esteem of longtime colleagues. Defendants are fully aware that Dr. Jane Doe 3 also contracted COVID-19 in August 2021, and has fully recovered, and is thus naturally immune to COVID-19, an immunity as good or better than vaccination provides.

19.     Jane Doe 4 is employed as an instructor in multisystemic therapy by the Kempe Center at the Anschutz Medical Campus in Aurora. In late August 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine, at all—was denied with finality. She is currently being allowed to perform her work fully remote from Defendants' facilities and fully remote from Kempe clients' facilities. As long as that arrangement continues, she is not subject to any vaccination policy. Her supervisors told her that they will try to keep that arrangement in place as long as possible, but whenever she might be required to return to Anschutz or Kempe client facilities, she will be terminated if not vaccinated.

20.     Jane Doe 5 is employed as program coordinator in an ambulatory surgical center in Englewood, Colorado, affiliated with the Anschutz School of Medicine and subject to its policies. She requested that she not be required to receive the COVID vaccines because of her sincere religious objections to the vaccines (she is a conscientious Orthodox Christian), but, just as all other plaintiffs, her request was denied. She is currently being allowed to perform her work fully remote from Defendants' facilities, and as long as that arrangement continues, she is not subject to any vaccination policy. She is informed that arrangement, however, cannot continue

beyond the end of December, when she will be terminated. Despite working the same hours and having the same job duties she had before working remotely, she has been docked 10% of her pay, solely because she has asserted a religious objection to the COVID vaccination requirement.

21.     Jane Doe 6 is employed as a program manager in the Office of the Dean of the Anschutz School of Medicine. In late August 2021, her request to be exempted from Defendants' vaccine mandate—she had communicated a sincere religious objection to accepting any vaccine made or tested with material derived from cell lines derived from tissue from an aborted fetus— was denied with finality. She is currently being allowed to perform her work fully remote from Defendants' facilities. She is informed that arrangement, however, cannot continue beyond the middle of November. When she is required to return to Anschutz facilities, she will be terminated.

22.     Jane Doe 7 is a fourth-year student at the Anschutz School of Dental Medicine. She submitted a request in late August 2021, to be exempted from Defendants' vaccine mandate —she had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines from an aborted fetus—but that request was denied. Jane Doe 7 also contracted COVID-19 in early September 2021, has fully recovered, and is thus naturally immune to COVID-19, an immunity as good or better than vaccination provides. She was advised by her physician not to accept a COVID vaccine for 90 days. Defendants have placed Jane Doe 7 on forced "medical leave" during that 90-day period and restricted her from campus, because she also asserted a religious objection to vaccination, instead of allowing her to remain on campus and in classes like others who have received medical exemptions to vaccination. Defendants have indicated they will force her to withdraw or be expelled from the program—

notwithstanding her religious objections to the vaccines—at the end of that 90-day period, in late December 2021.

23.     Jane Doe 8 is a dual degree student who was seeking both bachelor's of arts and master's of public health degrees, in a program offered by the University, with the bachelor's taken at the University's Denver campus and the master's at the University's Anschutz campus. She is also part-time student employee of the University on the Denver campus. She is regularly in contact with a variety of others in both her student and staff roles on the University's Denver campus. In early September 2021, her request to be exempted from Defendants' vaccine mandate was denied with finality, and she has been forced to withdraw from the Anschutz master's program. She was, however, freely granted a religious exemption to attend classes and work on the Denver campus, and she continues to pursue her bachelor's there.

24.     Jane Doe 9 is a project coordinator, data and analytics, working in the Anschutz Division of Hospital Medicine.  She holds a master's in public health. In late August 2021, her request to be exempted from Defendants' vaccine mandate–she had communicated a sincere religious objection to all vaccines "in all their forms and mechanisms for altering my body, [because they] go against my faith"—was denied with finality.

25.     Jane Doe 10 is a clinical trials manager at the University of Colorado Cancer Clinical Trials Office at the Anschutz Medical Campus in Aurora. In late August 2021, her request to be exempted from Defendants' vaccine mandate – she had communicated a sincere religious objection to all vaccines–was denied in circumstances that show it was never even read, much less considered.  She is currently being allowed to perform her work fully remote from any of Defendants' facilities, and as long as that arrangement continues, she is not subject to any

vaccination policy.  Her position, however, is considered a clinical position, requiring in-person interaction with patients, and so that fully remote arrangement cannot continue indefinitely.

26.     Jane Doe 11 is a Psychiatric Mental Health Nurse Practitioner at the Colorado Mental Health Institute at Pueblo, a facility operated by the Colorado Department of Human Services.  Her position, however, is contracted through the University of Colorado School of Medicine.

27.     John Doe 1 was until earlier this fall a first-year student at the Anschutz School of Medicine. He is, however, being forced out of that program by Defendants' unlawful Policy and actions, as alleged in this Complaint. He will be unable to begin his medical studies anew anywhere in the United States, without finding a new medical school that would accept him under these circumstances and then applying for and securing admission to that new school, a process that will take at least a year or more. Mr. Doe is a devout Buddhist who made a vow to the Buddha 10 years ago (after visiting a significant monastery in China) that he would live a moral life. After that he began practicing meditation, reading scriptures and Buddhist teachings, avoiding products developed through the killing or harming of animals (including human beings), and overall seeking to formulate his life consistent with the "five precepts" of Buddhism.

28.     John Doe 2 is a third-year medical student at the Anschutz School of Medicine. He submitted a request in late August 2021, to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from an aborted fetus—but that request was denied on August 31. He was notified by the Anschutz promotions committee on September 15 that he must either take a forced leave of absence, withdraw, or be terminated from his M.D. program. John Doe 2

also contracted COVID-19 in May of 2021, has fully recovered, and is thus naturally immune to COVID-19, an immunity as good or better than vaccination provides.

29.     John Doe 3 is a senior data integration engineer working for the Office of Information Technology, a Central Services Administrative unit of Anschutz operating under the Anschutz Medical Campus' vaccine policy. In late August 2021, he requested to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from live aborted fetuses—was denied with finality. He is currently being allowed to perform his work fully remote from any of Defendants' facilities. As long as that arrangement continues, he is not subject to any vaccination policy, but he cannot properly perform his work in that arrangement because he would soon become ineffective and unable to perform his job.

30.     John Doe 4 is a police communications supervisor in the Anschutz police force. In late August 2021, his request to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from live aborted fetuses—was denied with finality. He has been allowed to work as an Anschutz police communications supervisor because he has been deemed essential. Despite no change to his duties or work hours, he has been docked 10% of his pay, solely because he has asserted a religious objection to the COVID vaccination requirement. He has been informed that he will be terminated within the next twelve weeks because of his religiously motivated rejection of the vaccination.

31.     John Doe 5 is a senior network engineer working for the Office of Information Technology, a Central Services Administrative unit of Anschutz operating under the Anschutz Medical Campus' vaccine policy. In late August 2021, he requested to be exempted from

Defendants' vaccine mandate—he communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from aborted fetuses—but that request was denied with finality. He is currently being allowed to perform his work fully remote from Defendants' facilities. As long as that arrangement continues, he is not subject to any vaccination policy, but he feels he cannot adequately perform his job functions in that arrangement. Because he is steadfast in his religious refusal to the vaccine, he will be terminated as soon as he must return to Anschutz facilities.

32.     John Doe 6 is a first-year student at the Anschutz School of Medicine's master's program in anesthesiology. He submitted a request in late August 2021, to be exempted from Defendants' vaccine mandate—he had communicated a sincere religious objection to accepting any vaccine derived or tested using cell lines derived from an aborted fetus—but that request was denied on August 31. He was notified by the Anschutz promotions committee that he must either take a forced leave of absence, withdraw, or be terminated from his program.

33.     John Doe 7 is an identity management developer in the Office of Information Technology working for the Office of Information Technology, a Central Services Administrative unit operating under the Anschutz Medical Campus' vaccine policy. In late August 2021, he requested to be exempted from Defendants' vaccine mandate–he had communicated a sincere religious objection to accepting any vaccine whose creation or testing for use involved use of cell lines derived from aborted fetuses–was denied with finality.  He is currently being allowed to perform his work fully remote from any of Defendants' facilities. As long as that arrangement continues, he is not subject to any vaccination policy.

34.     Defendant Board of Regents of the University of Colorado are a constitutionally created body of the State of Colorado and govern, control, and operate the University of

Colorado, which has several campuses throughout the State, including the Anschutz campus in Aurora. The Board has authorized the other Defendants to enact and enforce the COVID-19 vaccine mandates at issue here.

35.     Defendant Todd Saliman is the President of the University of Colorado and is sued in his official capacity.[1] He was appointed to that position by the Board of Regents and in that role is the chief executive of the University. His office issued, maintains, and oversees the COVID-19 vaccination mandate for all students and staff of the University.[2]

36.     Defendant Donald Elliman is the Chancellor of the University of Colorado Anschutz School of Medicine and is sued in his official and personal capacities. He is the agent authorized by the University to enact and enforce policies governing the educational and employment practices of the Anschutz campus.

37.     Defendant Shanta Zimmer, Eric Mediavilla, and Ann-Michael Holland are agents authorized by the University and Defendant Elliman to enforce policies governing student life and study at the School of Medicine, the School of Dental Medicine, and the Anesthesiology program at the School of Medicine, respectively. They are sued in their official and personal capacities.

38.     Defendants Jane and John Does are members of the "Vaccine Verify" team are sued in their official and personal capacities. They are an unknown group of agents authorized by the University to enforce the Anschutz campus COVID-19 vaccine policy and rule on requests for exemptions under the Policies operative during the events described herein.

---

[1] Plaintiffs do not know the extent or nature of Defendant Saliman's involvement in the violation of their constitutional rights, and thus do not sue him in his personal capacity at this time. Discovery should yield the information necessary to determine whether a suit against him in his personal capacity is proper.

[2] *CU Requires Vaccine for Fall Semester 2021*, Statements from the President (April 28, 2021), https://president.cu.edu/statements/cu-requires-vaccine-fall-semester-2021.

39.     In adopting and enforcing the University of Colorado Anschutz campus COVID-19 Vaccination Policies challenged by this suit, Defendants have acted under color, regulation, custom, or usage, of an arm of the state of Colorado.

## JURISDICTION AND VENUE

40.     Three of the five discrete claims in this action arise under the First and Fourteenth Amendments to the United States Constitution and are brought pursuant to 42 U.S.C. § 1983, and another under Title II of the Americans with Disabilities Act, 42 U.S.C. §12133. This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1343.

41.     The Court has jurisdiction over the Plaintiffs' claim under the Colorado Constitution under the supplemental jurisdiction provision of the Judicial Code, 28 U.S.C. §1367(a).

42.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

43.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

44.     This Court is authorized to grant Plaintiffs' prayer for temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

45.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## FACTS

### A.  Defendants implemented a University-wide COVID vaccine mandate which was to allow for medical and non-medical exemptions.

46.      On April 28, 2021, Defendants announced a university-wide policy that all staff and students must be vaccinated against COVID-19 before the start of fall semester 2021.[3] That announcement linked to an FAQ page,[4] confirming that exemptions would be available to the COVID vaccination mandate, just as with existing vaccine mandates:

> **Q: Will there be exemptions from the requirement?**
> A: As with current CU vaccination policy, there will be a process for requesting exemptions on medical and non-medical grounds.
>
> **Q: How do I apply for an exemption?**
> A: Each campus has its own process for exemptions. Check with campus COVID web pages.

47.      On or before July 21, 2021, the Anschutz campus FAQ page[5] confirmed that staff and students would be allowed exemptions from the vaccination requirement:

---

[3] https://president.cu.edu/statements/cu-requires-vaccine-fall-semester-2021.

[4] https://www.cu.edu/vaccine-requirement.

[5] https://web.archive.org/web/20210721172814/https://www.cuanschutz.edu/coronavirus/frequently-asked-questions#ac-what-is-the-process-for-opting-out-of-the-covid-19-vaccine-for-medical-or-religious-reasons-5.

> **What is the process for opting out of the COVID-19 vaccine for medical or religious reasons?**
>
> Students and employees may request medical or religious exemptions to the vaccination requirement. You can find details and downloadable exemption forms here.
>
> Students should submit medical and/or religious exemption forms to their programs before beginning the fall 2021 semester. Employees will be able to submit medical exemption forms, and/or attest to religious exemptions, using the vaccine verification system currently under development.

48.     The FAQ linked to the COVID vaccination exemptions page.[6] On or before August 3, 2021, that page provided a process for religious exemptions that required no form for employees, merely that they "select this option," while students were to fill out a simple religious exemption form:

> **Religious Exemptions**
>
> Religious exemptions require students and employees to attest to their exemption based on religious beliefs.
>
> Students may download the religious exemption form using the link below, and should submit their religious exemption form to their program before beginning the fall 2021 semester.
>
> Employees may claim a religious exemption within the vaccination verification system. There is no form necessary for employee religious exemptions; you may simply select this option as you complete the vaccine verification process.

49.     On the University's other campuses, religious exemptions have flowed freely, with little or no investigation as to the sincerity or even the nature of exemptees' beliefs:

---

[6] https://web.archive.org/web/20210803204610/https://www.cuanschutz.edu/coronavirus/vaccine-information/exemptions.

- **Boulder**: submit signed form to obtain generic "Non-medical exemption . . . for religious or personal beliefs that are opposed to immunizations." https://www.colorado.edu/health/student-covid-19-vaccine-requirement

- **Colorado Springs**: "You may ask for an exemption for a medical reason or a non-medical reason (religious or personal belief) within the attestation. There is no official approval process at this time outside of claiming you are exempting out of receiving the vaccine." https://covid19.uccs.edu/vaccination

- **Denver**: "CU Denver's process allows exemptions to anyone who requests one for any reason; religious, medical, or personal. We trust our students and employees to act in the best interest of our community." https://www.ucdenver.edu/coronavirus/faq-topics

50.     While it first appeared that exemptions would be freely granted for students and staff on the Anschutz campus, Defendants reversed course and adopted their September 1 "University of Colorado Anschutz Medical Campus COVID-19 Vaccination Requirement and Compliance" Policy, which is attached as Exhibit 1.

51.     The September 1 Policy requires all students, employees, and other individuals "who currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program" or otherwise interact with members of the Anschutz community "regardless of location" to "become fully vaccinated against COVID-19 with a vaccine that has been approved by the World Health Organization . . . subject to limited exceptions and exemptions." (Ex. 1, Policy at (A)). The Policy states it was "Prepared By" the Office of University Counsel and "Approved By" Defendant Elliman. It was made effective as of September 1, 2021. At least Defendants Elliman, Zimmer, and Does of the "Vaccine Verify" team have acted as the duly empowered agents of the Defendant Board of Regents in enacting and/or enforcing that Policy.

52.     The September 1 Policy stated that it allowed for religious exemptions as follows: "A religious exemption may be submitted based on a person's religious belief whose teachings [*sic*] are opposed to all immunizations." (*Id.*)

53.     As Plaintiffs' experience shows, the confused malapropism "religious belief whose *teachings*" oppose "*all* immunizations*"* imposed two necessary conditions to Defendants' consideration of any religious accommodation, namely:

    a.  That the person requesting a religious accommodation have a sincere religious belief that opposes acceptance of "all immunizations" and vaccines; and

    b.  That the person requesting a religious accommodation be a member of an organized religion whose tenets include a hierarchically promulgated, authoritative position on the moral liceity of "all immunizations" and vaccines.

54.     Both conditions are clearly forbidden the Establishment, Free Exercise, and Equal Protection clauses of the United States constitution and the Religious Freedom provisions of the Colorado constitution. Quite literally, they require that a qualifying belief be grounded in an organized religion whose tenets include an authoritative position against the moral liceity of "all immunizations" and vaccines, thus privileging hierarchically prescribed religious belief over autonomously prescribed (yet sincerely held) religious belief. These conditions flagrantly violate well-established constitutional law.

55.     Defendants denied each and every religious exemption request presented to them, including those of Plaintiffs, under and in view of the September 1 Policy's unlawful religious tests and conditions. These denials persist to the present day and have never been rescinded or reconsidered.

56.     Moreover, Defendants imposed more stringent requirements on religious belief, including inquiries into sincerity, solely against the beliefs of Anschutz students and staff members, while not imposing any substantive requirements at all on other University students and staff members. This stark difference in respect for sincere religious beliefs of one group as against the other is both discriminatory and irrational.

57.     The September 1 Policy provides for medical exemptions. (*Id.* at (C)(2)). "Medical" exemptions are allowed "if vaccination is medically contraindicated due to other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health," as attested to by a qualifying medical professional. (*Id.*)

58.     The Policy allows those who qualify for a medical exemption[7] to continue to work and study at the University, if they "adhere to additional safety protocols, including, but not limited to wearing masks, social distancing, staying home when sick, quarantining in accordance with current [CDC] guidance, submitting daily attestations, and undergoing frequent asymptomatic testing." (*Id.*) Defendants have admitted they granted medical exemptions to individuals on the Anschutz campus. Those "medically contraindicated" staff and students are free to work and study on the campus, including in areas with medical patients and other members of the public, while the "morally contraindicated" are fired and expelled.

**B.  Plaintiffs' communication to Defendants of their sincere religious beliefs, and Defendants' summary, form rejection under the Policy.**

59.     Plaintiffs communicated their sincere, autonomously derived religious beliefs to Defendants regarding their opposition to accepting any of the three vaccines.

60.     Plaintiffs shortly thereafter received summary rejections via form-communiques clearly designed to reject accommodations without individualized consideration.

---

[7] Along with those (hypothetical) individuals who hew to Defendants' "approved" religious beliefs.

**C. After all religious exemptions were rejected, Defendants prepared for litigation by promulgating a new September 24 Policy, but they have not applied that policy to Plaintiffs or otherwise reconsidered the denials made under the September 1 Policy.**

61.     After all staff and student religious exemption requests were submitted and denied—and after receiving demand letters from attorneys in relation to the September 1 policy—Defendants amended that policy, solely in preparation for litigation, on September 24, 2021. See Exhibit 28 hereto.

62.     Defendants have not applied the September 24 Policy to reconsider or rescind denials issued to Plaintiffs, all of which were issued under the September 1 Policy. Despite repeated challenges, Defendants have neither admitted any infirmities in their September 1 Policy nor retreated from their conduct in denying all religious exemptions under that Policy. Whatever the *words* of the policy adopted September 24, the *actions* of Defendants stem from and continue to adhere to and effect the September 1 Policy. The September 1 Policy remains a primary cause of the persisting harm that Plaintiffs suffer.

63.     Under the September 24 Policy, Defendants purported to remove the prohibition on certain religious beliefs being ineligible for exemption, at least as to staff members. However, in their communications with Plaintiffs' counsel and their filings in this lawsuit, Defendants have taken a hostile position against the religious beliefs of Plaintiffs Jane Doe 1 (Catholic) and John Doe 1 (Buddhist), despite ample evidence of the sincerity of their beliefs. As just one example, Defendants have rejected the sincerity of Catholic staff and students objecting to the available COVID vaccines, in the teeth of well-publicized formal statements of support by the Catholic Bishops of Colorado in favor of religious objectors and in opposition to vaccine mandates[8]—

---

[8] Catholic News Service, *Colorado bishops oppose vaccine mandates, welcome Denver's religious exemption*, NATIONAL CATHOLIC REPORTER (August 10, 2021),

those Bishops have even widely promulgated a form letter[9] for pastors to sign in support of their parishioners' exemption requests. Defendants have no justification for their overt hostility to sincere religious beliefs like Plaintiffs'.

64.     As to students of the Anschutz campus, the September 24 Policy entirely strips them of the ability to obtain a religious exemption. On its face, the September 24 Policy is unconstitutional, for it allows staff members to seek religious exemptions but strips those exemptions from students. Defendants present no reason at all for this sweeping disparity in treatment, which is the opposite of a narrowly tailored means to achieve a compelling interest. Defendants' new policy is more anti-religious than its prior one, at least as to students.

65.     Under both the September 1 and 24 Policies, students and staff are allowed medical exemptions. Such medical exemptees are allowed to work and study with minimal restrictions, whether with and around patients, other staff and students, or members of the public. But those with sincere religious objections are to be fired and expelled, and at least entirely forbidden from in-person contact with anyone affiliated with the Anschutz campus.

66.     Defendants have not challenged or even tested the religious sincerity of those who work and study on its other campuses. Those staff and students are not subject to an "undue hardship" analysis. Instead, religious objectors on those other campuses freely attend class, live in dormitories, and work alongside other staff, students, and members of the public.

67.     Plaintiffs seek to be treated no better or worse than the many others granted exemptions by the University: to have their beliefs recognized as sincere by Defendants and to

---

https://www.ncronline.org/news/coronavirus/colorado-bishops-oppose-vaccine-mandates-welcome-denvers-religious-exemption.

[9] ; *Template for Religious Exemption from COVID-19 Vaccines*, https://cocatholicconference.org/template-for-religious-exemption-from-covid-19-vaccines/ (last visited October 26, 2021)

be allowed to work and study on campus, just like Anschutz medical exemptees and other-campus medical and religious exemptees. Plaintiffs present no greater danger of spreading COVID-19 than any of these many other individuals.

**Dr. Jane Doe 1**

68.     On August 20, 2021, Dr. Jane Doe 1 received from the Defendant "Vaccine Verify" team members to whom the Defendants delegated the responsibility to deal with accommodation requests from physicians the following "Dear Employee" form email:

> From: Vaccine Verify <vaccineverify@cuanschutz.edu>
> Sent: Friday, August 20, 2021 5:38 PM
> Subject: Your Vaccine Religious Exemption Request
>
> Dear Employee,
>
> You have submitted a request for an exemption from the vaccination requirements set forth in the campus policy based on a religious exemption. In order to evaluate that request we need you to respond completely to the questions below within 2 business days of recipient of this email. After this information has been reviewed you will be advised as to whether you request for an exemption has been approved or rejected.
>
> Thank you for your prompt attention.
>
> The CU Anschutz Vaccine Verification Team
>
> 1. **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**
>
> 2. **Have you had an influenza or other vaccine in the past? How does this differ?**

[Bolded emphasis in original]

69.     On August 22, 2021, Dr. Jane Doe 1 responded by email to the "Vaccine Verify" team as follows:

From: Jane Doe, <XXXXXXX@childrenscolorado.org>
Sent: Sunday, August 22, 2021 11:14 PM
To: Vaccine Verify <vaccineverify@cuanschutz.edu>
Subject: Re: Your Vaccine Religious Exemption Request

Response to questions regarding SARS CoV-2 vaccination:

1.As a faithful Catholic, I uphold the dignity and sanctity of every human life and firmly oppose abortion and the evil involved in the use of cell lines derived from abortions. All 3 available emergent-use authorized vaccines in the U.S. - Moderna, Pfizer-BioNTech, and Johnson & Johnson - used the abortion-derived cell lines (HEK293) in one or more phases of developing the SARS CoV-2 vaccine.

2.I have had other vaccines; including influenza - which does not utilize unethically derived cell lines.

 [Jane Doe], MD, MS Bioethics

70.    The position that Dr. Jane Doe 1 expressed has the public support of the Roman Catholic bishops of Colorado, among other Catholic authorities, as Defendants know. In addition to the form letter promulgated by the bishops for local pastors to sign, the bishops also published and broadly disseminated a letter expressing their teachings regarding the liceity of the vaccines that says, among other things:

• Vaccination is not morally obligatory and so must be voluntary.

• There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion; however, it is permissible to use such vaccines only under case-specific conditions—if there are no other alternatives available and the intent is to preserve life.

• A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings.

• A person is morally required to obey his or her conscience…

Taken as a whole, these points mean a Catholic may judge it right or wrong to receive certain vaccines for a variety of reasons, and there is no Church law or rule that obligates a Catholic to receive a vaccine.

Exhibit 2 attached. Available at https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-COVID-19-vaccine-mandates/

71.     On August 26, Dr. Jane Doe 1 received by email a form letter that purported to be a formal, final decision from the "Vaccine Verify" team as a documentary attachment. A copy is attached as Exhibit 3. In critical part, it stated:

> Your exemption request has been denied because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations.

72.     The response made no attempt to hide that the *sole reason* for the denial was that she lacked the qualifying religious beliefs.

73.     On September 15, 2021, Dr. Jane Doe 1, by and through counsel, sent the University a letter advising it of the constitutional defects in the Policy and sought reconsideration of her religious accommodation request. (Exhibit 4 attached) University counsel responded via letter on September 20, 2021, and doubled down on its Policy. (Exhibit 5 attached) That letter entirely ignored the Policy's failure to abide by religious neutrality and instead cited generic caselaw about government authority to require vaccines and to determine whether one's objections to a vaccine are religious or "personal." It also argued for the first time that, despite her care for patients over the past 19 months, and despite the availability of COVID vaccines since at least January 2021, it would now be an "undue hardship" to accommodate Dr. Jane Doe 1 given that her pediatric patients are not eligible for vaccination—an argument that was plainly pretextual. (*Id.*)

74.     In the meantime, notwithstanding the University's alleged compelling interest in requiring that all associated individuals receive vaccinations by September 1, Dr. Jane Doe 1 was

allowed[10] for nearly a month to continue serving her patients at Children's Hospital while exercising the normal protective measures to prevent the spread of COVID—the same ones outlined in the Policy for exemptees. (See Ex. 1, Policy at (C)(2)).

**Dr. Jane Doe 2**

75.     In early September 2021, Dr. Jane Doe 2 submitted a request to the Vaccine Verify team to be exempted from taking any COVID vaccines because of her sincere religious beliefs precluding acceptance of the vaccines. (Previously, in August 2021, she had submitted a request for medical exemption, too, because of multiple chronic conditions including migraines, chronic liver disease and chronic lung disease that substantially impair major life activities.)

76.     In early September 2021, Dr. Jane Doe 2 received the "Dear Employee" form email from the Vaccine Verify team identical to the August 20, form email received by Dr. Jane Doe 1 which is quoted in paragraph 68 above.

77.     On September 13, Dr. Jane Doe 2 emailed a response to this form email that included both responses to the discrete "Please explain your sincerely held religious belief..." and "Have you had an influenza or other vaccine..." questions, as well a personal statement of faith. Among other things that response said:

> I believe that God created each of us in His own image, and that my body is the temple of the Holy Spirit who dwells in me. I also believe in the sanctity of all human life from the time of conception. My beliefs are based on my relationship with God and my knowledge of His character that grows through prayer and study of the Bible. I believe it is fundamentally wrong to inject this unclean substance into my body and it would violate my faith. Please see my attached statement of faith for further details...

---

[10] In response to the filing of this lawsuit, Defendants placed Dr. Jane Doe 1 on administrative leave, pending the outcome of her prior Motion for Preliminary Injunction. With the denial of that motion, on mootness grounds, she faces imminent termination.

I also find some … [Biblical] verses speak to the sanctity of life from before birth, so I am deeply troubled that all available vaccines used fetal tissue or fetal-derived cell lines at some stage of their testing or development.

78.     On September 16, 2021, the day after the University received a demand letter

from counsel for Dr. Jane Doe 1 explaining the unconstitutionality of the September 1 Policy,

Dr. Jane Doe 2 received an email from the Vaccine Verify team that said:

**From:** Vaccine Verify <vaccineverify@cuanschutz.edu>
**Sent:** Thursday, September 16, 2021 2:59 PM
**Subject:** RE: Medical Exemption – More Information Needed

**SUBJECT: Religious Exemption Request Rejected – Action Required**

Hello,

The CU Anschutz Exemption Verification Team has reviewed your request to be exempted from the vaccination requirements under the University of Colorado Anschutz Medical Campus policy regarding COVID-19 vaccination because of your stated religious beliefs.

Your exemption request has been denied because the exemption would pose significant health and safety risk to CU Anschutz community and, most importantly, to our patients. Removing or modifying your duties to preclude contact with others would pose an undue burden on the University, as it would require your colleagues to perform your duties in addition to their own.

Therefore, you will need to provide proof of vaccination by 5 pm on September 17, 2021. Please submit your vaccine verification form HERE. For more information, see the campus policy at https://www.ucdenver.edu/docs/librariesprovider284/default-document-library/3000-general-admission/3012---covid-19-vaccination-requirement-and-compliance.pdf?sfvrsn=4e9df3ba_2

Failure to submit proof of COVID-19 vaccine verification by 5 pm on September 17, 2021 will result in additional actions being taken due to your failure to comply with the campus vaccination policy, including but not limited to termination.

* * *

Thank you, **Vaccine Exemption Verification Team**

79.     On September 21, Dr. Jane Doe 2 and her supervisor, Dr. Thomas Majcher, met

by teleconference with representatives of the Human Resources department to discuss her work

schedule for the week. That same day, Dr. Majcher informed Dr. Jane Doe 2 that she was being

fired. He said she would either be officially fired as of September 25 or, alternatively, could avoid potential difficulties with continuing licensure if she submitted a letter of "resignation" before then characterizing her involuntary separation as a "resignation" rather than a "termination." She did so shortly thereafter.

**Dr. Jane Doe 3**

80.     In early September 2021, Dr. Jane Doe 3 submitted a request to the Vaccine Verify team to be exempted from taking any COVID vaccines because of her sincere religious beliefs precluding acceptance of the vaccines. On September 13, 2021, she received an email from the Vaccine Verify time acknowledging that her "Vaccine Verification Process Completed" due to her certification that she was exempted. A copy of this email is attached as Exhibit 23. (Also in September 2021, she submitted a request for medical exemption, too, because of a heart condition that, if impacted by the COVID vaccines, would substantially impair major life activities. That request was denied, too, as an ADA accommodation.)

81.     However, on September 14, 2021, Dr. Jane Doe 3 received the "Dear Employee" form email from the Vaccine Verify team identical to the August 20, form email received by Dr. Jane Doe 1 which is quoted in paragraph 68 above asking her to "explain …your sincerely held religious belief."

82.     On September 16, 16, 2021 Dr. Jane Doe 3 emailed a response to this form as follows:

> **From:** [Jane Doe 3, M.D.]
> **Date:** Thursday, September 16, 2021 at 6:14 PM
> **To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Subject:** Re: Your Vaccine Religious Exemption Request
>
> 1. **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an**

**exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**

I am a devout Catholic and am opposed to abortion. The Johnson and Johnson vaccine includes pieces of a cell that was derived from an aborted human fetus. The Moderna and Pfizer vaccine used this cell line in the testing of the efficacy of their vaccine, although their vaccines do not contain the actual cell line. I am firmly opposed to the use of embryonic cell lines in any research or therapeutics. To show how strong this belief is, I am currently developing a therapy … that normally would use this same cell line in its production, but when I discovered that the cell line was derived from an aborted fetus, I have made the decision not to use it, even though this may make FDA approval of my therapy more difficult …

 I am claiming this exemption for all three vaccines (J and J, Pfizer, Moderna) because of their use of the cell line from the aborted fetus in their development, testing, or production. I also have a valid medical exemption for the Moderna and Pfizer vaccines, and my PCP is providing me with the revised form for resubmission. Please note that I have already had COVID 19 and therefore have natural immunity to the virus and should not pose a threat to my patients or colleagues at this institution. This makes the impetus not to receive a vaccine developed using a cell line from an aborted fetus even stronger, because not only do I consider it morally wrong, but in my case it is completely unnecessary.

**2.  Have you had an influenza or other vaccine in the past? How does this differ?**
Yes, I have an influenza vaccine every year and I have received many other vaccines as well. I only realized this year that this fetal cell line is used in the development of vaccines, and I will be looking closely at whether it is used in any future vaccines that I receive …

83.     Shortly thereafter, Dr. Jane Doe 3 received the "Hello" email from the Vaccine Verify team identical to that sent to Dr. Jane Doe 2 on September 16. Just as it did for Dr. Jane Doe 2, the Vaccine Verify team claimed to have "reviewed your request to be exempted from the vaccination requirements under the University of Colorado Anschutz Medical Campus policy regarding COVID-19 vaccination because of your stated religious beliefs. Your exemption request has been denied because the exemption would pose significant health and safety risk to CU Anschutz community and, most importantly, to our patients. Removing or modifying your duties to preclude contact with others would pose an undue burden on the University, as it would require your colleagues to perform your duties in addition to their own."

84.     Notwithstanding that apparent termination, Dr. Jane Doe 3 continued to

communicate with the Vaccine Verify team to have it reverse its irrational position. On October

8, 2021, she wrote:

> **From:** [Jane Doe 3, M.D.]
> **Date:** Friday, October 8, 2021 at 10:02 AM
> **To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Subject:** Appeal of denial of religious exemption request
> Dear Vaccine Exemption Verification Team
>
> I am writing to request that you reconsider your denial of my religious exemption.
>
> The reason for my religious exemption is my opposition to vaccines prepared using cell
> lines from aborted fetuses. My objection is particularly strong to the J and J vaccine,
> which contains parts of the cell lines that bleb off with the adenoviral particles in the
> preparation of the vaccine. However, it is also present for the RNA vaccines, which used
> the cell line in development of the vaccine and not in its production, because my
> sincerely held religious belief is that aborted human fetuses and embryos should not be
> used for research or therapeutics. In your rejection of my religious exemption, you did
> not state that the denial was because my request was not valid; instead, you said that
> "…the exemption would pose significant health and safety risk to CU Anschutz
> community and, most importantly, to our patients. Removing or modifying your duties to
> preclude contact with others would pose an undue burden on the University, as it would
> require your colleagues to perform your duties in addition to their own." …[T]his is not
> true since I have had COVID and thus have natural immunity, which has been shown to
> be effective and durable. Therefore I am at no more risk to my patients and colleagues
> here than those individuals who have been vaccinated, and there is no need to remove or
> modify my duties to preclude contact with others.

85.     Defendants have not, however, reversed their position and Dr. Jane Doe 3 has

been barred from all Anschutz facilities, and so cannot perform her clinical, teaching, or research

responsibilities at those facilities.

86.     The Rocky Mountain Regional VA Medical Center has also informed Dr. Jane

Doe 3 that, if she loses her appointment as a faculty member at the Anschutz School of

Medicine, she will likewise lose her appointment at the VA Medical Center.

87.     Dr. Jane Doe 3 is also prosecuting a valuable patent in connection with her work at Anschutz. Successful prosecution of that patent will be severely impaired if she is no longer able to work at Anschutz. She will also be deprived of an imminent and likely promotion to full Professor at Anschutz.

88.     In early 2021, Dr. Jane Doe 3 was offered an academic post at another major American academic medical center where she would be able to continue all of the research projects she has been conducting at Anschutz and the VA Medical Center and likewise continue her clinical and teaching duties on terms at least as financially favorable as those she enjoyed at Anschutz. She continued to negotiate the terms of that offer through the summer of 2021, but relying on Defendants' good faith, and relying also on the truth of the terms of all Defendants' personnel policies and communiques (including the COVID vaccination requirements) from June, July and August of 2021, Dr. Jane Doe 3 declined the offer.

**Jane Doe 4**

89.     On August 21, 2021, Jane Doe 4 emailed Vaccine Verify a request to be exempted from the requirement to receive a COVID vaccine because of her "very long-standing and sincere religious convictions that have also prevented me from ever getting the flu vaccine as well."

90.     On August 26, 2021, Vaccine Verify emailed Jane Doe 4 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe's form letter, it said that Jane Doe 4's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

91.     Incredulous at that denial, on September 1, 2021, Jane Doe 4 again requested

exemption from Vaccine Verify by the following email to Vaccine Verify:

**From:** [Jane Doe 4]
**Sent:** Wednesday, September 1, 2021 3:26 PM
**To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
**Subject:** Religious Exemption and supporting documents
 **1. Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**
 I am requesting an exemption for the COVID-19 vaccine due to my long-standing and strongly-held faith in God and my religious convictions.
In 2000, my family was shocked when we received the news that my father had an inoperable Glioblastoma Multiforme. During the nine months my father battled this horrendous tumor, my family prayed daily and relied on our faith in God to get us through the most challenging days. I was raised to hold the belief that God's will for our lives had reason and purpose. It was during this truly difficult time in my life that I came to accept that it is often hard to understand God's plan for each of us, but as the Bible teaches us, we must accept and trust in it. In accepting God's will, I was able to submit to His larger plan for my father and family, which helped us cope with our sorrow and grief. I have come to embrace that God works in mysterious ways, acknowledging that His plans for me and my family are superior to my own.
 I strongly believe that accepting any vaccines would be contrary to my long-held (and documented) beliefs and how I have led my life until now and an afront to God's will. I am firm in my beliefs and position on this matter and St. Paul's letter to the Romans (Romans 12:1-2) appropriately addresses the embodiment of my belief system;
"Therefore, I urge you, brothers and sisters, in the view of God's mercy, to offer your bodies as a living sacrifice, holy and pleasing God- this is your true and proper worship. Do not conform to the pattern of this world but be transformed by the renewing of your mind. Then you will be able to test and approve what God's will is- His good, pleasing and perfect will."
I continue to live my life with these religious convictions which have been accepted and approved by the Colorado Department of Education as well as the New York State Department of Education. My sons are now 16 and 14 years old, neither of whom have had vaccines…

 **2.Have you had an influenza or other vaccine in the past? How does this differ?**
I have never had an influenza vaccine, nor any other vaccines in my adult life. The vaccines I received as a baby/young child were different because I was obviously not of age to consent nor understand/make my own decisions regarding medical treatment and religion.

92.     Jane Doe 4 did not receive a written response to that September 1, email, but was informed in early October by the Anschutz vice-chancellor in charge of human resources that the August 26 denial of her request still stands.

93.     Jane Doe 4's supervisors at the Kempe Center regard her as an exemplary employee and, in order not to lose her have allowed her to work for the last several weeks remote from any Anschutz facility, and remote from the facilities of any Kempe client she serves. That remote arrangement makes Defendants' vaccination policies inapplicable to Jane Doe 4, and so allows her to remain employed.

94.     Jane Doe 4's supervisors have told her that they will keep the fully remote arrangement she is currently working under in place as long as possible. But they have told her she must either be compliant with Defendants' vaccination policy whenever she is required to return to Anschutz or Kempe client facilities or be terminated.

**Jane Doe 5**

95.     On August 4 and again on August 22, 2021, Jane Doe 5 emailed Vaccine Verify requests to be exempted from the requirement to receive a COVID vaccine because, as she wrote in her August 22 request:

> I am an Orthodox Christian who believes in the Bible, and I follow God and the principles laid out in His words. As a believer in Jesus Christ, I believe in divine and supernatural healing. To be forced upon by a cure (vaccine) that has not been proven or thoroughly tested is to diminish my faith in God. … I will now state a few reasons based on scripture:
>
> Exodus 15:26 – 26 and said, If thou wilt diligently hearken to the voice of the LORD thy God, and wilt do that which is right in his sight, and will give ear to his commandments., and keep all his statutes, I will put none of these diseases upon thee, which I have brought upon the Egyptians: for I *am* the LORD that healeth thee.
>     * * *
> I make this request for the glory of God and to be consistent with my faith.

34

96.     On August 26, 2021, Vaccine Verify emailed Jane Doe 5 the same form letter that Dr. Jane Doe also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe 1's form letter, it said that Jane Doe 5's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

97.     Jane Doe 5 has persisted in her principled religious refusal to accept the vaccinations. Her supervisors, however, regard her as an exemplary employee and, in order not to lose her have allowed her to work for the last several weeks remote from the ambulatory surgical facility, thus making the vaccination policy inapplicable to her.

98.     Jane Doe 5's supervisors have told her, however, that the fully remote arrangement she is currently working under cannot continue past the end of December 2021. On October 7, the operations director of her Anschutz department wrote her as follows:

> Due to your failure to comply with the University's vaccination policy and our inability to accommodate your exemption request, effective immediately, you will be allowed to work remotely until you have provided proof of vaccination. Your University badge has been deactivated therefore you will not be permitted on campus for any work-related reason. During this period of remote work your salary will be reduced by 10% as of the date of this letter and you will be ineligible for a merit increase or promotion.
>
> You will be given until November 1, 2021 to submit verification of vaccination (at least one dose of a two-dose series) via the campus vaccine verification system. Failure to submit verification of the vaccination by November 1, 2021 will result in a continuance of the 10% salary reduction and a termination date of December 31, 2021.

**Jane Doe 6**

99.     On August 24, 2021, Jane Doe 6 emailed a request to be exempted from the requirement to receive a COVID vaccine on the Vaccine Verify team's standard form. In answer

to the question "Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination" she wrote:

> I am a member of Harvest Fellowship and I am exercising my right to receive a religious exemption for vaccination. The vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are produced with aborted fetal cell lines.
> The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973. This is evil and sickening.
> As a faithful Christian, I cannot according to the Church tenets on conscience, use any product that takes its origin in abortion. "For you created my inmost being You knit me together in my mother's womb." Psalm 139:13. The inmost being is sacrosanct.
> I consider these vaccines as an impurity. Using fetal cells from an aborted fetus for the benefit of the greater good or my personal benefit can be reconciled. I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn.
> The scriptures are very specific about how those who practice Christianity should navigate life. Ephesians 6:10-18 directs us to "put on the armor of God," so that we can be equipped with truth, righteousness, peace and faith.
> Therefore, as a faithful Christian, opposed to abortion, I cannot according to the tenets of the Bible's teaching on conscience, use any product that takes its origin in abortion.

100.     On August 26, 2021, Vaccine Verify emailed Jane Doe 6 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe 1's form letter, it said that Jane Doe 6's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

101.     Jane Doe 6's supervisors regard her as an exemplary employee and, in order not to lose her have allowed her to work for the last several weeks remote from any Anschutz facility. That remote arrangement makes Defendants' vaccination policies inapplicable to Jane Doe 6, and so allows her to remain employed.

102.     Jane Doe 6's supervisors have told her, however, that the fully remote arrangement she is currently working under cannot continue past the middle of November 2021 and may have to cease sooner. They have told her she must either be compliant with Defendants' vaccination policy at that time or be terminated.

**Jane Doe 7**

103.     On August 29, 2021, Jane Doe 7 submitted a request to be exempted from taking any COVID vaccines because of her sincere religious beliefs precluding acceptance of the vaccines. That request said:

> **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a COVID-19 vaccination? Please include a detailed response.**
> In that I am a member of the Christian faith, I am exercising my right to receive a religious exemption for vaccination. First and foremost, the vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are tested, developed, and/or produced with aborted fetal cell lines.
> The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973.
> Therefore, as a faithful Christian, I cannot according to the church tenants on conscience, which are outlined below, use any product that takes its origin in abortion. "For You created my inmost being You knit me together in my mother's womb." Psalm 139:13. The inmost being is sacrosanct.
> Defiling of the body, many Christians, including me, believe as 2 Corinthians 7 teaches, that we should "cleanse ourselves from every impurity of flesh and spirit." The way I practice my religion includes aligning myself with scriptures on issues that oppose the wisdom of the world. What the world considers a type of remedy, a privilege, and something to covet in 2021 but is something I consider an impurity, I do not believe that using fetal cells from an aborted fetus for the benefit of the greater good or my personal benefit can be reconciled. I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn.
> The scriptures are very specific about how those who practice Christianity should navigate life. Ephesians 6:10-18 directs us to "put on the armor of God," so that we can be equipped with truth, righteousness, peace, and faith. . . .
>
> Therefore, as a faithful Christian, opposed to abortion, I cannot according to the Church tenets on conscience, which I outlined, use any product that takes its origin in abortion…

104.     On September 7, however, the Associate Dean for Student Affairs of the dental

school, Eric Mediavilla, emailed Jane Doe 7 a denial of her request as follows:

> The University's mandatory vaccination policy offers exemptions based on a person's religious belief whose teachings are opposed to all immunizations, **i.e., your religion teaches you and all other adherents that immunizations are forbidden under all circumstances.** When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you object based on your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion.
>
> The basis for your objection to vaccination against COVID-19 is of a personal nature and not part of a comprehensive system of religious beliefs. Having considered your exemption request and the campus COVID-19 vaccination policy, your request is not approved. [Exhibit 24] (Emphasis added.)

105.     Shortly afterward, on September 9, Jane Doe 7 was diagnosed as having

contracted COVID 19 and has since recovered. Her treating physician advised her not to receive

any COVID vaccination because of this condition for at least 90 days.

106.     Jane Doe 7 promptly advised the Dental School Dean's Office of her physician's

advice, and on September 22, the Dean's Office informed her that she had been placed on an

involuntary 90-day medical leave of absence. Unlike others with medical exemptions to

vaccination, she is not allowed to attend class or come onto campus. The Dean's Office has

further advised that, after the 90-day medical leave of absence, she will be required to receive a

COVID vaccination or be placed on forced personal leave of absence, pending ultimate dismissal

from the program.

**Jane Doe 8**

107.     On August 22, 2021, Jane Doe 8 submitted a request for exemption to the Vaccine

Verify team on its form template asking to "explain why your sincerely held religious belief,

practice, or observance prevents you from getting the vaccination for which you are requesting

an exemption? Please include a detailed response for each vaccine." Jane Doe 8 wrote:

> My religious and sincerely held moral and ethical beliefs are that my body is to remain pure because it is the temple of the Holy Spirit and the living embodiment of Jesus Christ. I must take optimal care of my temple at all times for I am made in the image of God and cannot desecrate it. All things going into my body, my temple, must be natural and God-made. Through the use of prayer, meditation, the blessing of food and drink before consumption, and exercise I keep my temple pure and healthy. I must keep my temple pure in the manner than God created: by eating, drinking, and breathing. God created me perfectly with natural immunizations, as I am in his image. I am requesting religious exemptions from the Covid-19 vaccination that will taint the purity of my temple as stated above.

108.    On August 26, 2021, Vaccine Verify emailed Jane Doe 8 the same form letter that

Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's, that form letter

was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane

Doe 1's form letter, it said that Jane Doe 8's request was being denied "because it does not

comply the campus policy, which only recognizes religious exemptions based on a religious

belief whose teachings are opposed to all immunizations."

109.    Ms. Doe 8 emailed Vaccine Verify that same day, August 26, an appeal of that

decision. Vaccine Verify responded the next day, August 27, as follows:

> **From:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Sent:** Friday, August 27, 2021 11:37:12 AM
> **To:** [Jane Doe 8]
> **Subject:** RE: Your Vaccine Religious Exemption Request
>
> Hello,
>
> Your response has been received and it is understood that you disagree with the university's decision, however the policy requirement to be vaccinated by September 1, 2021 must be met.
>
> Please submit your vaccine verification form HERE.
>
> Failure to submit proof of COVID-19 vaccine verification by September 1, 2021 will result in additional actions being taken due to your failure to comply with the campus vaccination policy, including but not limited to termination.

110.    On September 8, Jane Doe 8 was told by her academic advisor that she could no longer be enrolled in the master's level courses on the Anschutz campus, and that she would no longer be part of the master of public health program.

111.    The University of Colorado Denver has, however, granted Jane Doe 8 an exemption from its vaccination policy and she continues to pursue her bachelor's degree in public health.

**Jane Doe 9**

112.    In mid-August 2021, Jane Doe 9 emailed to Vaccine Verify a form request to be exempted from the requirement to receive a COVID vaccine because of her religious opposition to the vaccines.

113.    On August 24, in response to Vaccine Verify's emailed form, two question follow-up to such requests ("Please explain why your sincerely held religious belief, practice, or observance prevents you …" and "Have you ever had and influenza vaccine?"),  Jane Doe 9 emailed the following response:

> **From:** [Jane Doe 9]
> **Sent:** Tuesday, August 24, 2021 4:02 PM
> **To:** Vaccine Verify <vaccineverify@cuanschutz.edu>
> **Subject:** Re: Your Vaccine Religious Exemption Request
>
> Greetings,
> 1. I am requesting exemption from both the flu vaccine and the COVID vaccine. Both are against my sincerely held religious belief/practice/observance because I believe my relationship with God is the ultimate source of healing. Vaccinations, in all their forms and mechanisms for altering my body, go against my faith and causes harm to my conscience because it would harm my relationship with God. My body is a Temple and I, guided by my deeply held religious convictions, determine what I will or will not put in my body.
> 2. As an adult, I have only ever received one flu shot when I started graduate school in 2018. However, this situation differs because my sincerely held religious beliefs/practices/observances began in 2019 when my relationship with God started, which is why I have not received a flu vaccine or any others since then.
>    Thank you for your time and consideration.

114.     On August 26, 2021, Vaccine Verify emailed Jane Doe 9 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3).  Like Dr. Jane Doe 1's form denial, that form letter to Jane Doe 9 was addressed simply "Hello," without any identification of its intended recipient.  Like Dr. Jane Doe 1's form letter, and notwithstanding Jane Doe 9's explicit statement that she objected to vaccinations "in all their forms," it said that Jane Doe 9's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations." On September 16th, one day after taking the initiative to email "Vaccine Verify" seeking an "update" on her religious exemption status, she received an email from the same Vaccine Verify confirming her denial (again, one day after Dr. Jane Doe 1's demand letter noted above), this time stating Jane Doe 9 would "pose a significant health and safety threat to the University" and "pose an undue burden" to her coworkers. She has since been terminated.

**<u>Jane Doe 10</u>**

115.     Jane Doe 10 first informed Defendants' human resources personnel that she is religiously opposed to vaccinations in 2020, in connection with a requirement for employees to get vaccinated against the flu.  After that initial request, defendants had allowed her to be exempt from their requirements for *any* vaccination until late in August 2021.

116.     In mid-August 2021, Jane Doe 10 emailed a request to be exempted from the requirement to receive a COVID vaccine.  On August 20, 2021, Vaccine Verify emailed her its form, two-question request for details about her religious beliefs. On August 24, she emailed the following response:

**1.     Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an**

**exemption? Please include a detailed response for each vaccine for which you are requesting an exemption.**

I am filing an exemption from the COVID-19 vaccine. I already have an influenza vaccine exemption on file. I have been a Christian for my entire life but after becoming a mother I began practicing my faith more deeply. From spending time reading the Bible, in prayer, and in discussion with my pastor, it is my sincerely held religious belief that the use of vaccines violates my Christian faith and the ability for God to use my body to its full potential on this earth; therefore I should not receive vaccinations moving forward. My body is a temple of God and I must keep it holy and glorify God and the health that He has given to me. Proverbs 3:5 reminds us to "trust in the Lord with all your heart, and do not lean on your own understanding" similar to Psalms 146:3. Colossians 2:8 tells us to "see to it that no one take you captive through hollow and deceptive philosophy, which depends on human tradition...rather than on Christ".

**2. Have you had an influenza or other vaccine in the past? How does this differ? I have received the influenza vaccine in the past.**

After having my daughter in 2019 I reconnected with my faith and you can see that I was granted an exemption from the influenza vaccine in 2020. ...

117.    Notwithstanding Jane Doe 10's longstanding notice to Defendants that she opposed *all* vaccinations, on August 27, Vaccine Verify emailed Jane Doe 10 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3).  Like other Plaintiffs' form letters, that form letter was addressed simply "Hello," without any identification of its intended recipient.

118.    The Vaccine Verify team further alleged that Jane Doe 10's request "does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations," notwithstanding that Defendants had previously acknowledged her religious sincerity in granting her a religious exemption to the flu over a year before, based on her stated opposition to *all* vaccinations.

119.    Similar to the situation faced by John Doe 1, Jane Doe 10's rejection stems, at least in part, from her perceived lack of membership in an organized religion whose tenets include a hierarchically promulgated, authoritative position rejecting all vaccines.

120.    That very day, August 27, 2021, Jane Doe 10 promptly pointed all of this out to the Vaccine Verify team, emailing it the following:

> I am confused by the response since the only vaccine I currently am being requested to get is the covid vaccine. My religious exemption request was already in place for the influenza vaccine. There are no other vaccines that I need an exemption from; however, I can confirm that my religious belief applies to all vaccinations. I refused the TDap booster at my midwife appointment just last week. My daughter, almost 2 years old, has not received any vaccines on account of my religious belief.

121.    The Vaccine Verify team responded to Jane Doe 10 again on September 2, 2021, but again revealed that it had given her request no more meaningful consideration.  That day they emailed her their form response that "[t]he basis for your objection to vaccination against COVID-19 is of a personal nature and not part of a comprehensive system of religious beliefs."

122.    Jane Doe 10 is also pregnant and anticipates delivery in early to mid-November. She has depended on the salary and benefits from her job to pay for pre-natal care, and will need them, too, to care for peri- and post-natal care when she goes on maternity leave next month.

123.    Jane Doe 10's supervisors want her to continue in her work and have told her that she may continue in her position for now, but must perform her duties from home, fully remote from Anschutz facilities. That fully remote arrangement she is currently working under cannot continue, however. Because her position is considered a clinical position—requiring in-person contact with patients in clinical trials—after the end of her pregnancy leave, she must either become compliant with Defendants' vaccination policy or be terminated from that position.

**Jane Doe 11**

124.    Prior to requesting her religious exemption from Defendants, Jane Doe 11 requested, and promptly received, an exemption from the Colorado Department of Human Services, the owner and operator of the medical facility in Pueblo where she works.  She

afterward also submitted a request to Defendants for an exemption from their vaccine mandate,

including notification to Defendants of her exemption from the Department of Human Services.

125.    On September 2, 2021, in response to Vaccine Verify's two-question form follow

up to initial religious requests [quoted in paragraph 68 above], Jane Doe 11 emailed the

following responses:

> Good afternoon.  I have previously received a religious exemption VIA C[olorado] D[epartment of] H[uman] S[ervices] since we are required to complete this process for both institutions to keep our privileges here at C[olorado] M[ental] H[ealth] I[nstitute at] P[ueblo].  In response to your questions I can provide you the following information:
>
> 1:The Ten Commandments tell us "Thou shall not kill."  Many of the vaccines that are administered in the United States, to include the Johnson and Johnson COVID19 vaccination are initially derived from live attenuated viruses, which have been cultured in aborted fetal cell lines.  Abortion results in a great loss of life and is not within my belief system as an act that should be supported and substances derived from these  fetal cell lines should definitely not be injected into my body.  Furthermore, the Bible teaches me that my body was created in the image of God, the temple of the Holy Spirit, and is a living sacrifice to the Lord.  I truly hold the belief that Moderna, Pfizer, and Johnson and Johnson, and the up and coming NovaVax COVID19 vaccinations have the potential to cause harm to my body and have witnessed harm to others who have chosen to allow themselves to be vaccinated.  In holding the sincere belief that this vaccination has the potential to cause harm to my body, it is a duty of God, on my behalf, to refuse this vaccination.
> Finally, the Bible decrees that I ought obey God rather than men and in my duty to be an obedient servant to the Lord, I must refuse to partake in this vaccination.
>
> 2: I have received vaccinations in the past.  I was fully vaccinated as a child and this was my parents' choice, not mine.  I also received the influenza vaccination after becoming an adult because I was told it was a requirement to complete my education and to work at my facility.  I have done a lot of reflection with God and my religious beliefs over the course of COVID and have realized the importance of being firm with my convictions.  I no longer plan on receiving vaccinations to include the ones that may be suggested as I age.  As a person of religious conviction, it is important to do things that I believe in even if they cause me the slight inconvenience of having to wear extra PPE, rather than doing something I don't believe in to avoid wearing goggles or a face shield.  Also, since I have become a health care provider I understand now, more than ever, the importance of freedom in medical and healthcare decisions.
>  Thank you for your time and consideration.

126.    On September 7, however, Vaccine Verify emailed Jane Doe 11 the same form letter denial her co-plaintiffs received in late August through mid-September. (Exhibit 3). Like all the other form denials, that form letter was addressed simply "Hello," without any identification of its intended recipient. Like the other form letters, it said that Jane Doe 11's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

127.    Notwithstanding the adoption of the new September 24, Policy that denial has never been revisited by Defendants.

128.    Jane Doe 11's supervisors at the Colorado Mental Health Institute at Pueblo regard her as a vital employee and, having already granted her an exemption from their own vaccine mandate to allow her to keep working allowing her to continue working at the Pueblo facility until they receive an explicit command from Defendants that she is barred from that facility.

129.    On October 27, 2021, Jane Doe 11's HR liaison at Anschutz, Rachel Anderson, notified Jane Doe 11 by email, cc'ing also her direct supervisor at the Pueblo facility, that:

> I was just notified by CU HR and legal that they are requesting that you begin the process of vaccination by the end of this week by either receiving the first dose of Pfizer/Moderna or the Johnson and Johnson vaccine.  If you do not comply with this action, you will be put on unpaid administrative leave effective Monday 11/1/21 for 30 days to come into compliance, if you are not in compliance there may be other actions taken including potential termination.

### John Doe 1

130.    On May 19, 2021, John Doe 1 was assured by campus authorities that "a religious exemption [to vaccination] will just require the individual's signature attesting to it being consistent with their religious beliefs." Exhibit 6 attached. Those forms were provided to Mr.

Doe 1 on July 20, and with those and other assurances supplied, he travelled from his home in British Columbia to set up a new life in Colorado and begin study in the University's medical school.

131.    On August 8 and 9, 2021, Mr. Doe had an exchange with Anschutz's ombudsman inquiring about the need for him to seek an exemption from Anschutz's vaccine requirements. (A copy of this exchange is attached as Exhibit 7). That exchange includes advice from the office of University counsel about the contours of the Policy it was then still developing, including University counsel's belief that no religion only prohibits COVID vaccines. (Exh. 7, at p. 3: "Pursuant to our policy the religious exemption applies to people whose religion precludes all vaccinations. I am unaware of a religion that only prohibits COVID 19 vaccinations.") But even under this erroneous legal and theological advice, Mr. Doe was given no indication that his religious exemption (to all vaccines) would be denied.

132.    On August 10, 2021, Mr. Doe met personally with Defendant Zimmer about exemption from the COVID vaccines. A copy of Doe's and Zimmer's follow-up email exchange is attached as Exhibit 8. The upshot of that meeting, as that exchange makes clear, is that Mr. Doe would be exempt from the vaccines if he kept to Anschutz protocols for the unvaccinated. See Exh. 8, Doe email: "I am grateful that the Deans are providing me alternatives / accommodations while I am self-quarantined, and I will learn it well to serve patients in the future." Those protocols, and a formal acknowledgment that he was "vaccine exempted" were then forwarded to John Doe 1 by email on August 13. A copy of that email is attached as Exhibit 9.

133.    However, soon afterward, an assistant Dean working with Defendant Zimmer, Dr. Brian Dwinnell, advised Mr. Doe 1 that a new vaccination Policy was in place, that his prior

exemption was revoked, and that he would need to seek another religious exemption. A copy of the August 18, email conveying this revocation is attached as Exhibit 10.

134.     On August 23, 2021, John Doe 1 submitted another request for religious accommodation (a copy is attached as Exhibit 11) under the Policy. He also provided a detailed explanation of his Buddhist background and development. He explained how his religious beliefs oppose all vaccinations based on three tenets of Buddhism as he understood them: (1) the power of the mind to heal the body which is disrupted by vaccination; (2) the medicinal purpose of suffering, in which use of medications should be limited and taken only for afflictions one is presently suffering; and (3) the involvement of killing or harming animals in vaccine development, which directly violates "Buddha's teaching on Not-killing and Not-harming." (Exhibit 12 attached, August 22, 2021, letter, at pp. 3-5).

135.     That letter explained that he had received a religious exemption during undergraduate school from lab work that involved the killing of drosophila and mice. (*Id.*, at p. 2). He also explained that his last vaccination was in 2016 at the University of Michigan (as required to volunteer at its hospital), which he accepted only after much internal struggle and, upon learning of legal protections for sincere religious beliefs, thereafter "vowed to the Buddha" to "never go against my faith again." (*Id.* at p. 2). He further stated that consistent with all of these, he now spends much time in meditation, has become a vegan, seeks to avoid using products that involve animal ingredients or animal testing in their development. (*Id.* at 5).

136.     None of this was good enough for the University. On August 24, the Student Response Team (headed by Defendant Zimmer) requested "documentation that demonstrates your religion is opposed to all immunizations." (Exhibit 13 attached). The email openly stated that "Citations from specific documents are not sufficient. The University will only accept

requests for religious exemption that cite to **the official doctrine of an organized religion, in this case, <u>Buddhism</u>, as announced by the leaders of that religion." (*Id.*)** The email then stated:

> Please note, that in the course of reviewing your request, the University learned that the Dharma Realm Buddhist University set up by Dharma Master Xuan Hua who you list in your letter is in fact requiring vaccinations for all of its students, faculty and staff. https://www.buddhistdoor.net/news/dharma-realm-buddhist-university-in-california-resumes-in-person-classes-with-largest-student-cohort

(Defendant Zimmer was included in the circulation of this email)

137.    The University had thus openly entered the theological business of judging the truth or falsity of its students' religious beliefs.

138.    On August 26, 2021, John Doe 1 sent Defendant Zimmer a supplemental letter explaining that the available COVID vaccines more gravely offend his religious beliefs because of their developmental use of "human fetal cell cultures" that "were developed by taking a life which violates the fundamental tenets of my long-held Buddhist religion." (Exhibit 14 attached, Letter at p. 1). He further explained that "My Buddhism philosophy in one of the five precepts, not killing, has made the strongest impact on my academics and daily life" [at p. 2] and:

> The currently available COVID-19 vaccines in the U.S. market are either developed from, or tested on, fetal cell lines from aborted babies . . . None of the vaccines is completely free from any use of abortion-derived cells . . . As a sincere Buddhist, I believe that production of vaccines using fetal cells from aborted babies is directly against my belief in the Buddha's doctrine of not-killing and not-harming.

Exhibit 14 at p. 1.

139.    John Doe 1's second letter also included a number of legal citations highlighting, in part, that it was impermissible to require him to provide "input from an outside source, such as a formal religious leader." (*Id.* at 3).

140.    On August 30, after John Doe 1 had submitted his supplemental request, Defendant Zimmer sent him what purported to be the final decision of the Student Response Team. A copy of that final decision is attached as Exhibit 15. It, too, reiterated that "The University's mandatory vaccination policy offers exemption to individual's [*sic*] whose religious beliefs are opposed to **all** vaccinations." Zimmer inaccurately summarized John Doe's objections as based on "(1) your belief that COVID-19 vaccines involve cell lines from human fetal cell cultures, (2) your belief that the vaccine may be harmful to your body, and (3) your belief that a mandatory vaccine requirement violates your right to free choice." (*Id.*) She provided no citations to John Doe 1's letters in describing these alleged objections, particularly to the latter two which are plainly misrepresentative of John Doe's beliefs.

141.    Zimmer then concluded as follows:

The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine, disbelieve the scientifically accepted view that it is harmless to most people, and express concern that a mandatory requirement infringes on your freedom. The basis for your objections are all of a personal nature and **not part of a comprehensive system of religious beliefs.**

142.    The cover email to that final decision also advised that "you will be referred to the promotions committee on September 1, 2021" for formal denial of participation in study at Anschutz.

143.    John Doe 1 was given only three options following the final denial of his exemption request: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw."

144.    Faced with no other options, Mr. Doe chose to take this coerced leave of absence. He was forced to sell his local belongings, terminate his apartment lease, and incur unnecessary and unexpected expenses and loss of income associated with his preparing for and coming to

campus and premature move back home. Mr. Doe hopes to resume his studies at the University

as soon as possible, in a manner consistent with his protected religious beliefs.

**John Doe 2**

145.    In mid-August, 2021, John Doe 2 submitted a request to the Student Response

team to be exempted from taking any COVID vaccines because of his sincere religious beliefs

precluding acceptance of the vaccines. Among other things, that request said:

> To Whom it May Concern,
>
> Upon praying about how to respond to the COVID shot directive, in light of my recent COVID infection as evidenced by positive antibody test, and in consideration of my pro-life and other values informed by my faith in Jesus Christ, I write to request a medical and religious exemption from the University of Colorado's mandate. As a Christian, I believe that my body belongs to God and is the temple of His Holy Spirit (1 Cor 6:19-20), and from conception (Psalm 139:13-16) to birth to natural death, I hold that innocent life bears God's image (Genesis 1:26-27) and is sacred to God (Jeremiah 1:5). God's promise that "if anyone lacks wisdom, let him ask of God, who gives to all liberally," has spurred me to seek wisdom regarding this particular vaccine, distinguished from other vaccines. It came to my understanding that the manufacturers of the COVID shots have used aborted fetal cell lines as part of their development or testing of vaccines. Regardless of when in time the corresponding abortion occurred, and irrespective of the medical yield garnered therefrom, my faith prohibits me from participating in or benefiting from it.
>
> Furthermore, the nature of this shot as an mRNA vaccine separates it from any other immunization I have received. Whereas killed or live attenuated vaccines use some derivative of natural infection to prompt an immune response, the way in which this vaccine uses mRNA to unnaturally program cells to produce foreign protein trespasses God's design for disease defense.

146.    At the end of August, however, Defendants denied John Doe 2's request. On

August 30, Defendant Zimmer sent John Doe 2 a form letter substantially identical to the August

30, letter sent to John Doe 1 described above [Exh.15]. In both letters she said:

> The University's mandatory vaccination policy offers exemptions to individual's whose religious beliefs are opposed to all vaccinations. When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you had several objections including (1) your belief that the COVID-19 vaccines involve

aborted fetal cell lines and (2) your belief that the COVID-19 vaccines use mRNA to unnaturally program cells to produce foreign protein and has the capacity to alter your genetic code.

The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine and disbelieve the scientifically accepted view that it is harmless to most people. The basis for your objections are all of a personal nature and not part of a comprehensive system of religious beliefs. Having considered your exemption request, it is denied… Failure to submit documentation that you have received the first vaccine by September 1, 2021 will result in a referral to the Promotions Committee for further action, up to and including dismissal.

147.    John Doe 2 met with the Promotions Committee on September 12, 2021, by teleconference and also submitted a written statement reiterating his religious objections to receiving any COVID vaccine. That letter began:

> I write to appeal for retention at the University of Colorado School of Medicine despite not receiving the COVID-19 vaccine. Briefly, the administration denied my recent religious exemption request, and secondarily, I possess natural immunity from prior COVID-19 infection evidenced by a positive antibody test. However, I have personal contacts through UCHealth who have been granted religious exemptions for the same reasons I wrote about in my own letter.

148.    On September 24, 2021, however, the Promotions Committee affirmed the denial of John Doe 2's request via a form letter substantially identical to the one by which it affirmed the denial of John Doe 1's request as described above. It said:

* If you choose to not be vaccinated, you have the option of taking a leave of absence for up to a year. You will be required to return to the SPC prior to your return to the School of Medicine to determine if you are complying with all applicable campus and school policies.
* You can also choose to withdraw from the School of Medicine and either receive a master's degree or maintain the ability to reapply to the School of Medicine via the SPC within 2 years.
* If you choose not to obtain the appropriate vaccination, take a leave of absence or withdraw, you will be dismissed from the School of Medicine and must meet all vaccination requirements prior to your return from a leave of absence.

John Doe 2 thus faces forced leave, withdrawal, or dismissal, without the intervention of this Court.

149.    By contrast, in early September, shortly after he submitted his initial request to

the Anschutz Student Response Team, John Doe 2 submitted a substantially identical request to

the Colorado Permanente Group (the owner of one of the Colorado Springs medical clinics

where John Doe 2 was doing clinical rotations) for exemption from its vaccine mandate.

Permanente responded as follows:

> **From:** Tanya M Carbone <Tanya.X.Carbone@kp.org>
> **Sent:** Friday, September 17, 2021 11:49 AM
> **To:** [John Doe 2]
> **Subject:** Religious Exemption Provisionally Approval
> [External Email - Use Caution]
> Good morning-
> I am please to inform you that your Religious Exemption Request has been Provisionally approved! As an employee who has an approved exemption you are considered unvaccinated and must adhere to the guidelines found in the attached document. …At this time we are not requiring our unvaccinated employees to get weekly COVID testing, but that, along with any additional changes in protocol, may come in the future.
> Please let me know if you have any questions or concerns.
> Have a great afternoon!
> -Tanya
> Tanya Carbone, MHR
> Senior Human Resources Business Partner
> tanya.x.carbone@kp.org
> 720-661-7551 (cell)
> 303-344-7925 (fax)
> **HR One**

150.    And on the evening of October 27, 2021, John Doe 2 emailed another,

substantially identical, request for exemption to Centura Health, the owner of another one of the

medical facilities where John Doe 2 may do clinical rotations.  *Less than an hour later*, he

received this response:

**Approved: COVID-19 vaccination exemption**

**From:** Occupational Health COVID-19 Command Center

Hello,

Your COVID-19 vaccination exemption request has been **approved**.

*Safety First, People Always* is at the core of everything we do at Centura, and your health and safety are our top priority. We have put measures in place to help protect you and prevent the spread of illness in our workplaces and communities. Please read below to view the requirements of your exemption:

- **Adhere to Centura's testing guidance** for exempted individuals:
  - Currently testing will occur following our current COVID-19 protocols and algorithms.
  - Please recognize testing frequency may vary based on changing state/federal mandates.
- **Adhere to all masking and social distancing guidelines**, including but not limited to:
  - A mask must be worn at all times, in accordance with our masking guidance.

\* \* \*

Please note, your leader, direct supervisor, chief medical officer or placement coordinator has been copied on this message. …

### John Doe 3

151.    In mid-August, 2021, John Doe 3 emailed to Vaccine Verify a request to be exempted from the requirement to receive a COVID vaccine because of his religious opposition to any vaccine whose creation or testing for use involved use of stem cell lines from live aborted fetuses (he is a conscientious practicing Catholic).

152.    On August 24, in response to Vaccine Verify's emailed form request for more information about his religious beliefs, John Doe 3 emailed the following response:

Tue 8/24/2021 3:11 PM
To: Vaccine Verify <vaccineverify@cuanschutz.edu>

ReligiousExemptionLetter.pdf; COVID-19-Vaccine-Candidates-and-Abortion-Derived-
Cell-Lines.pdf;
Vaccine Verify Team,
I hope this message is received. The email address as documented at the end of your
email "vaccineverification@cuanschutz.edu " is not a recognized email address. Please
see my information below answering your questions along with the attached
documentation referenced. I have re-pasted my response here: Please find attached a
letter signed by my parish priest documenting the reasons a baptized Catholic may claim
a religious exemption. I do not believe it is my obligation to go into any additional detail
beyond the tenets within the document and these hold true for all currently available
vaccines. I have also provided documentation from the Charlotte Lozier Institute
documenting COVID-19 vaccine candidates and any associations to abortion derived cell
lines. Through much discernment I have formed my conscience on this matter and am
morally obligated to obey my conscience.
Regarding the second question below and the influenza vaccine, I have never received
any. Regarding others in my past, they were received as a child under the authority of my
parents and not a personal decision of my own.
I trust this meets your requests. I look forward to your response soon.

153.    The letter from John Doe 3's parish priest that he attached to that email accurately

related the Catholic moral doctrine guiding John Doe 3's decision. It said:

> [John Doe 3] is a baptized Catholic seeking a religious exemption from an immunization
> requirement. This letter explains how the Catholic Church's teachings may lead
> individual Catholics, including [John Doe 3], to decline certain vaccines.
>
> The Catholic Church teaches that a person may be required to refuse a medical
> intervention, including a vaccination, if his or her conscience comes to this judgment.
> While the Catholic Church does not prohibit the use of most vaccines, and generally
> encourages them to safeguard personal and public health, the following authoritative
> Church teachings demonstrate the principled religious basis principled religious basis on
> which a Catholic may determine that he or she ought to refuse certain vaccines:
>
>> • Vaccination is not morally obligatory in principle and so must be voluntary. 1
>> • There is a moral duty to refuse the use of medical products, including certain
>> vaccines, that are created using human cells lines derived from abortion; however,
>> it is permissible to use such vaccines only under case-specific conditions-if there
>> are no other alternatives available and the intent is to preserve life.
>> • A person's assessment of whether the benefits of a medical intervention
>> outweigh the
>> undesirable side-effects are to be respected unless they contradict authoritative
>> Catholic

moral teachings.
• A person is morally required to obey his or her conscience.

154.    On August 26, 2021, Vaccine Verify emailed John Doe 3 the same form letter that

Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's form denial, that

form letter to John Doe 3was addressed simply "Hello," without any identification of its intended

recipient. Like Dr. Jane Doe's form letter, it said that John Doe 3's request was being denied

"because it does not comply the campus policy, which only recognizes religious exemptions

based on a religious belief whose teachings are opposed to all immunizations."

155.    John Doe 3's supervisors regard him as an exemplary employee and, in order not

to lose him have reclassified him as working 100% remote from any Anschutz facility. That

remote arrangement makes Defendants' vaccination policies inapplicable to John Doe 3, and so

allows him to remain employed.

156.    The fully remote arrangement that John Doe 3 is currently working under does

not allow him to receive vital skill-development—*e.g*., educational conferences, in person

collaboration and problem solving with Anschutz colleagues and clients—that are necessary for

him to perform his work. Even if he were allowed to work remotely indefinitely, he would soon

become ineffective and eventually unable to perform his job.

**John Doe 4**

157.    On August 21, 2021, John Doe 4 emailed to Vaccine Verify a request to be

exempted from the requirement to receive a COVID vaccine because of his religious opposition

to any vaccine whose creation or testing for use involved use of stem cell lines from live aborted

fetuses (he is a conscientious practicing Christian). That request included this personal statement

regarding his religious beliefs:

In that I am a Christian believer, I am exercising my right to receive a religious exemption for vaccination. First and foremost, I have a sincere and deeply held religious objection to these vaccines. The vaccines I oppose include the current COVID-19 mRNA vaccines and the Janssen vaccine which are produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Janssen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973.

Therefore as a faithful Christian, I cannot according to the Church tenets on conscience which are outlined below, use any product that takes its origin in abortion. "For you created my inmost being You knit me together in my mother's womb." Psalm 139:13. The inmost being is sacrosanct.

158.   * * *

Further, the Catechism of the Catholic Church which Pope John Paul II declared to be the "sure teaching norm of the Catholic Church" contains tenets of the Christian faith and our duty to adhere to these teachings regarding the right of conscience objections states:

*1776 Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment…. For man has in his heart a law inscribed by God…. His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths.*
*1777 Moral conscience, present at the heart of the person, enjoins him at the appropriate moment to do good and to avoid evil. It also judges particular choices, approving those that are good and denouncing those that are evil. It bears witness to the authority of truth in reference to the supreme Good to which the human person is drawn, and it welcomes the commandments. When he listens to his conscience, the prudent man can hear God speaking.*
*1778 Conscience is a judgment of reason whereby the human person recognizes the moral quality of a concrete act that he is going to perform, is in the process of performing, or has already completed. In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law: Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; I mean that it was not a dictate, nor conveyed the notion of responsibility, of duty, of a threat and a promise…. [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ.*
*1779 It is important for every person to be sufficiently present to himself in order to hear and follow the voice of his conscience. This requirement of interiority is all the more necessary as life often distracts us from any reflection, self-examination or introspection.*

Therefore, as a faithful Christian, opposed to abortion, I cannot, with a moral conscience, and with my deeply held religious objection, use any product that takes its origin in

abortion. I have the right to an objection of conscience regarding what is put into my body.

159.    The Vaccine Verify team shortly thereafter denied John Doe 4's request via the same form letter that it sent to his co-plaintiffs. (Exhibit 3).

160.    By mid-September, because John Doe 4 had not received any COVID vaccination, the chief of the Anschutz police department began a discipline process that will eventually lead to John Doe 4's termination. Attached here as Exhibit 25 is the September 29 formal notification to John Doe 4 that his failure to accept the vaccinations for his stated religious beliefs is a disciplinable offense.

161.    As that notice recites, John Doe 4's pay has already been docked 10% solely due to his assertion of a religious objection to vaccination, and the Anschutz police department's chief has informed John Doe 4 that unless he accepts the vaccination, he will be terminated at the end of a 12-week discipline process. The extended duration of that discipline process is necessary, the notice recites, because his continuing to work—notwithstanding that he is not vaccinated—is necessary to avoid an undue hardship to the department.

**John Doe 5**

162.    John Doe 5 is a conscientious, practicing Christian, firmly opposed to abortion and to any complicity with it.

163.    On August 23, 2021, John Doe 5 emailed Vaccine Verify a request not to be required to accept the COVID vaccination on Vaccine Verify's standard, two question form (quoted in ¶68 above). He explained his religious opposition to the currently available COVID vaccines because of their use of stem cell lines from aborted fetuses in manufacture or testing.

164.    On August 26, 2021, Vaccine Verify emailed John Doe 5 the same form letter that Dr. Jane Doe 1 also received on August 26. (Exhibit 3). Like Dr. Jane Doe 1's form denial, that

form letter to John Doe 3was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe 1's form letter, it said that John Doe 3's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

165.    John Doe 5's supervisors regard him as an exemplary employee and, in order not to lose him have reclassified him as working 100% remote from any Anschutz facility. That remote arrangement makes Defendants' vaccination policies inapplicable to John Doe 5, and so allows him to remain employed at the present time.

166.    The fully remote arrangement that John Doe 5 is currently working under, however, does not allow him to receive vital skill-development—*e.g.*, educational conferences, in person collaboration and problem solving with Anschutz colleagues and clients—that are necessary for him to perform his work. He also cannot adequately serve the internal clients of the Office of Information Technology without some in-person interaction. Even if he were allowed to work remotely indefinitely, he would soon become ineffective and eventually unable perform his job.

**John Doe 6**

167.    On June 15, 2021, John Doe 6 tendered to the Vaccine Verify team a signed attestation on an Anschutz-prepared form that he had sincere religious objections to accepting the COVID vaccinations. In response, on August 13, 2021, he received a form email identical to that received by John Doe 1 [Exhibit 9] saying "Thank you for completing the University of Colorado Anschutz Medical Campus verification process. You have attested that you are vaccine exempted. Please keep this email."

168.    Notwithstanding that "complet[ion of] … Anschutz Medical Campus verification

process," he was instructed on August 19 by the program coordinator of his anesthesiology

program that he would need to submit yet another religious exemption request on a newly

created form. So, on August 24, he tendered the following request, printed on the Vaccine Verify

team's form, to the anesthesiology programs director (Ann-Michael Holland) and assistant

director (David Dunipace):

**1. Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a COVID-19 vaccination? Please include a detailed response.**

I feel morally compromised by accepting any of the proposed "vaccinations" for COVID-19 developed under the emergency use authorization. Vaccination is not morally obligatory in principle and so must be voluntary. There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion. The use of cells from electively aborted fetuses for vaccine production make the available COVID-19 vaccine programs unethical, because they exploit the innocent human beings who were aborted. A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Christian moral teachings. A person is morally required to obey his or her conscience.

**2. Have you had an influenza or other vaccine in the past? How does this differ?**

The Christian Faith does not prohibit the use of most vaccines, and generally encourages them to safeguard personal and public health, the following authoritative Church teachings demonstrate the principled religious basis on which a Christian may determine that he or she ought to refuse certain vaccines. I have had the influenza vaccine and various other vaccines throughout my life. The development of injectable therapies using aborted cells goes against my most sacredly held beliefs and even being exposed to this interrogation feels like a violation of conscious.

169.    Two days later John Doe 6 met by teleconference with Defendant Zimmer, who

had been given a copy of this second request, and Zimmer told John Doe 6 then that the only

religious requests that could be approved were for those students who never had gotten, and

never would get, any vaccinations—"like Christian Scientists," Zimmer said. On August 30th,

2021, program director Ann-Michael Holland emailed John Doe 6 a letter denying his religious

request and declaring that his expressly religious objection to COVID-19 vaccines' intrinsic connection to abortion are "personal" and not "religious" and "not part of a comprehensive system of beliefs." At the same time, the letter attempted to cover its discriminatory tracks by also asserting he would be an "undue hardship" to the Program. A copy is attached as Exhibit 26 hereto.

170.    In early September 2021, program director Holland emailed John Doe 6 a letter dismissing him from the anesthesiology program. A copy is attached as Exhibit 27 hereto. Holland there says that because "campus policy states that religious exemptions will be approved if they indicate that the individual holds religious beliefs that are opposed to all vaccinations" the Progress and Promotions Committee recommended his dismissal, and Holland accepted that recommendation.

171.    Though John Doe 6 pursued the appeals process through the Progress and Promotions Committee, Holland's decision has not been reversed.

172.    John Doe 6 is aware that at least one other student in that anesthesiology master's program remains unvaccinated, has not been dismissed (having been granted a medical exemption) and performs clinical work in hospital operating rooms.

**John Doe 7**

173.    In mid-August 2021, John Doe 7 emailed Vaccine Verify his request to be exempted from the requirement to receive a COVID vaccine because of his religious opposition to any vaccine whose creation or testing for use involved use of stem cell lines from aborted fetuses (he is a conscientious practicing Catholic).

174.    On August 23, in response to Vaccine Verify's emailed form request for more information about his religious beliefs, John Doe 7 emailed the following response:

1. **Please explain why your sincerely held religious belief, practice, or observance prevents you from getting the vaccination for which you are requesting an exemption?  Please include a detailed response for each vaccine for which you are requesting an exemption.**

In that I am a member of the Church, I am exercising my right to receive a religious exemption for vaccination.  First and foremost, the vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on fetal cell lines from an aborted fetus cell from 1973. (Fetal Cell Lines Were Used to Make the Johnson & Johnson COVID Vaccine—Here's What That Means 3/4/2021, MSN.com)

Therefore as a faithful Christian, I cannot according to the Church tenets on conscience which are outlined below, use any product that takes its origin in abortion.  "For you created my inmost being You knit me together in my mother's womb." Psalm 139:13.  The inmost being is sacrosanct.

Defiling of the body, many Christians, including me, believe as 2 Corinthians 7 teaches, that we should "cleanse ourselves from every impurity of flesh and spirit."  The way I practice my religion includes aligning myself with scriptures on issues that oppose the wisdom of the world.  What the world considers a type of remedy, a privilege, and something to covet in 2021 but is something I consider an impurity, I do not believe that using fetal cells from an aborted fetus for the benefit of the greater good or my personal benefit can be reconciled.  I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn.

                              * * *

Therefore as a faithful Christian, opposed to abortion, I cannot according to the Church tenets on conscience which I outlined use any product that takes its origin in abortion.

2. **Have you had an influenza or other vaccine in the past? How does this differ?**

I have had the Influenza and other vaccines in the past. It has been years since I have had a vaccine due to reasons and convictions outlined in my response to question 1. The last flu shot I received I was under the impression that it was not produced from stem cells originally isolating from fetal tissue.

175.    On August 26, 2021, Vaccine Verify emailed John Doe 7 the same form letter that

Dr. Jane Doe also received on August 26. (Exhibit 3, ECF #1-3).  Like Dr. Jane Doe's form

denial, that form letter to John Doe 7 was addressed simply "Hello," without any identification of its intended recipient. Like Dr. Jane Doe's form letter, it said that John Doe 7's request was being denied "because it does not comply the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."

176.     John Doe 7's supervisors regard him as an exemplary employee and, in order not to lose him have reclassified him as working 100% remote from any Anschutz facility. That remote arrangement makes Defendants' vaccination policies inapplicable to John Doe 7, and so allows him to remain employed.

177.     The fully remote arrangement that John Doe 7 is currently working under does not allow him to receive vital skill-development—*e.g.*, educational conferences, in person collaboration and problem solving with Anschutz colleagues and clients—that are necessary for him to perform his work. Even if he were allowed to work remotely indefinitely, he would soon become ineffective and eventually unable perform his job.

### D. Defendants have neither a legitimate nor compelling interest in exercising express and overt religious discrimination.

178.     In its September 20 letter, responding to Dr. Jane Doe 1's claim that Defendants had violated her First Amendment rights (Exh. 5), Defendants' counsel alternately defended their decision based on a Title VII analysis arguing that Dr. Jane Doe 1's clinical work makes her a "direct threat" and poses an "undue hardship" under Title VII—a reason that had never been given to Dr. Jane Doe and one that came solely in response to a threat of a lawsuit.

179.     University counsel's invocation of those strawmen "direct threat" and "undue hardship" defenses are plainly false pretexts attempting to cover for the Defendants' explicit religious discrimination. The formal and actual denial of Dr. Jane Doe 1's request simply stated that she was excluded *solely because* her religious beliefs did not oppose *all* vaccinations.

180.     Not only was University counsel's argument pretextual, but there is plainly no compelling interest justifying the University's blatant exercise in overt religious discrimination.

181.     Defendants' own actions demonstrate their lack of compelling interest since they have *granted* exemptions to those who work in clinical settings from taking the vaccine on grounds of disability/medical status, while simultaneously *denying* those asserting religious reasons.

182.     Attached as Exhibit 16, is a denial of religious exemption request from COVID vaccination that Defendant Zimmer sent to Student A, a fourth-year University medical student, saying (as she likewise wrote to John Doe 1) your "rationale provided does not constitute a religious belief, but a personal objection." (Ex. 16, at p. 2). Zimmer explained that her conclusion was based on an analysis that, notwithstanding Student A's asserted Catholic faith— affirmed and supported by a signed statement from his Catholic parish priest—that her view of Catholic Church teaching is opposite to his. (Ex. 16). Zimmer went on to thus conclude that the student's views were necessarily "personal," not religious. (*Id.*)

183.     Undersigned counsel then sent a demand letter to Defendants, similar to that sent on behalf of Dr. Jane Doe 1. (Exhibit 17 attached). Thereafter, instead of addressing the student's request for religious exemption, the University summarily granted the student a medical exemption from the COVID vaccine, which had previously been withheld. (Exhibit 18 attached).

184.     Unlike first-year students (like John Doe 1), fourth-year students work extensively in hospital and other clinical settings with high-risk populations. The medical accommodation provided to the fourth-year student addressed in Exhibit 17 thus posed greater, or no less than equal, theoretical risk than the religious accommodation requested by Plaintiffs here. Both the denial of Plaintiffs' religious exemptions and refusal to squarely address the

fourth-year student's religious exemption requests turned solely on the religious character of the requests, not on any risk factors. Religious exemption requests that don't meet the University's religious test are thus denied in the very same or similarly situated circumstances where medical accommodations are granted. Notably, the precautionary measures that unvaccinated staff, including medical provider Plaintiffs, have been using for months—extensive COVID-tracing survey before every shift, sanitizing in and out of rooms, thorough use of PPE—have been and remain highly effective.

185.    Further supporting the lack of compelling interest on the part of Defendants, some Plaintiffs were allowed to work past the September 1 deadline, despite the position of Defendants that the unvaccinated are a mortal threat to others. For example, Dr. Jane Doe 1 was allowed to work at Children's Hospital Colorado Springs for nearly all of September, and at least as of today, John Doe 4 is working in-person.

186.    Additionally, as noted *supra*, some Plaintiffs have either exclusive or joint postings at other locations, away from the Anschutz campus. Those other postings have either provided religious exemptions to these Plaintiffs, or at the very least are still considering how to handle such requests. In the latter category, Dr. Jane Doe 1 submitted a religious exemption request to Children's Hospital which had informed her that it would have its own independent religious accommodation policy for its own employees, based on directions from the State Board of Health which instructions were expected to be issued by October 21, 2021. Children's Hospital had informed its employees that if they have a religious objection to COVID vaccination, they must submit their accommodation requests by October 1, 2021. Children's

Hospital will then begin evaluating those requests "no earlier than **Oct. 21, 2021**." (Exhibit 19 attached, email from Children's Hospital) (emphasis in original)[11]

187.    Thus health care professionals with whom Dr. Jane Doe 1 works alongside may be eligible for religious or medical accommodation directly from Children's Hospital as their direct employer, further demonstrating that Anschutz does not have a compelling interest in outright terminating Dr. Jane Doe 1 (who is an employee of Anschutz and not of Children's Hospital directly), while the very hospital where she exclusively works is not currently terminating employees who are similarly situated, and will presumably offer a fair and appropriate religious accommodation process, unlike the inquisition pursued by Defendants.

188.    Additionally, studies show that the pediatric patients Dr. Jane Doe 1 treats are at relatively low risk of contracting and suffering serious illness of COVID-19.[12] At the same time, it is not clear that all or even most patients treated by other vaccine-exempt students and professionals are themselves vaccinated. Yet it is clear that the substantial majority of serious "breakthrough" cases in vaccinated people are among the elderly.[13] Thus, even though her patients are not vaccinated, Dr. Jane Doe 1 is plainly similarly situated to any other clinician treating non-pediatric COVID-vulnerable patients at the University. As a highly competent and

---

[11] The Board of Health instead declined to issue final rules on October 21, deciding it "will instead wait to harmonize with the federal rule." See, https://www.sos.state.co.us/CCR/eDocketDetails.do?trackingNum =2021-00541. Children's Hospital has not yet notified its staff how it will handle exemption requests.

[12] Karolinska Institutet, "Low risk of infection in babies born to mothers with COVID-19," EurekAlert!, April 29, 2021, https://www.eurekalert.org/news-releases/598334 KAROLINSKA INSTITUTET; CDC, SDF Breastfeeding and Caring for Newborns if You Have COVID-19, August 18, 2021 (authorizing COVID-19 infected mothers to provide direct care for their newborns as long as they exercise proper precautions like wearing PPE), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/pregnancy-breastfeeding.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpregnancy-breastfeeding.html#caring-for-newborns

[13] Deidre McPhillips, CNN, "Risk of severe breakthrough COVID-19 higher for seniors and people with underlying conditions," September 8, 2021, https://www.cnn.com/2021/09/08/health/severe-breakthrough-cases-cdc-studies/index.html

caring medical professional, Dr. Jane Doe 1 would not continue to treat patients if she believed herself to be a danger.

189.    The initial denial of John Doe 1's religious exemption request provides just one example of the Inquisition-style tactics of Defendants. In response to his sincere, well-supported statement of religious belief against all vaccination, in which he included a statement of admiration for Dharma Master Xuan Hua, Defendants sought to trap him, "gotcha"-style, by claiming that the Dharma Realm University, which was founded by that Master, was allegedly requiring COVID vaccinations. In their haste to attack John Doe 1, Defendants omitted the fact that Master Xuan Hua has been dead for decades—he obviously has no part in that university's COVID vaccination policies. John Doe 1's beliefs are clearly sincere, backed up by real-world examples, and are laid out in detail in his communications with Defendants.[14]

190.    Defendant Zimmer's final decision regarding John Doe 1's accommodation (Ex. 15) also, without proper analysis or resort to any authority, characterizes John Doe 1's objections based on "involve[ment of] stem cell lines from human fetal cell cultures [and their] be[ing] harmful to your body [and] violat[ing] your right to free choice" as "not constitut[ing] a religious belief, but a personal objection."

191.    Finally, all Plaintiffs are aware that hospitals and medical schools across the country, *and within the University of Colorado's own health care system*, have offered religious accommodations to similarly situated individuals who work directly with and around COVID-vulnerable patients (many of whom are unvaccinated or who are still susceptible despite being vaccinated), without undermining any interest in providing safe and effective care to patients in

---

[14] Defendants in this lawsuit have similarly attacked the sincerity of Dr. Jane Doe 1, whose own bishops publicly supported their congregants' assertions of religious objections to the available COVID vaccinations, and will now presumably attack the religious sincerity of the 16 new Plaintiffs bringing this Verified Amended & Supplemental Complaint.

need. Plaintiffs are attaching Group Exhibit 20, with the declarations of 31 exemplary health care witnesses around the country who have received religious accommodations and are continuing to provide critical health care services. Of this group, witness 21 is employed by the University of Colorado.

192.    Their experience, which is consistent with national media reports, confirms that there can be no compelling interest in categorically forbidding similar accommodations for Plaintiffs here simply on the basis of the nature of their religious beliefs and the University's view of the veracity of those beliefs.

**E. How Plaintiffs have been harmed**

193.    Employment termination will further harm Dr. Jane Doe 1's and the other staff Plaintiffs professional standing and reputation, be a permanent part of their licensure records, and could be a source of potential discipline.

194.    And if Dr. Jane Doe 1 were to decide instead to resign and avoid licensure risk, the non-competition agreement she has with the University would render her unable to unable to practice her specialty in Colorado for two years, as all the critical pediatric care centers are centered in or around Denver and Colorado Springs. It says, among other things:

> … if Member's [Dr. Jane Doe's] employment with the University terminates for any reason … and the Member enters into competition with the University as defined below, Member shall pay to CU Medicine and the University liquidated damages in the amount of $310,950 … [T]he terms "competition with the business of the University" means for a period of 2 years after termination, establish, operate or provide professional medical services … within a 100 mile radius of the intersection of Colfax and Ursula, Aurora, Colorado or any other facility where the Member regularly provides medical services.

Exhibit 21 [Dkt #1-21].

195.    Jane Doe 2 and Jane Doe 3 have signed identical agreements.  As alleged more fully above, Jane Doe 3 also risks imminent loss—by mid-November 2021—of her ongoing

appointment at the Rocky Mountain VA Medical Center as a direct result of Defendants' Policies, too.

196.     As alleged above, the non-physician staff Plaintiffs have been exemplary employees and their workplace supervisors—who value their contributions—have taken pains to try to keep them in their positions, allowing them to work remotely for as long as the Defendants will allow. The staff Plaintiffs still on the job know, however, that they will eventually be required to return to Anschutz facilities.  All of them intend to remain faithful to their religious convictions, nevertheless, and realize that when the return day comes, they must lose their jobs.

197.     As to John Doe 1, attached as Exhibit 22, is the Association of American Medical Colleges Guidelines for the Consideration of Application for Transfer or Advanced Standing. They make clear that only students who have begun M.D. studies, and who can document an "entire academic history" at an existing M.D.-granting program can request transfer. Mr. Doe is thus not eligible for transfer, but must undertake the application process anew if he is to attend another M.D. program in the U.S.

198.     John Doe 1 was given only three options following the final denial of his exemption request: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw."

199.     With no other realistic alternatives available to him, John Doe 1 chose to take a leave of absence, but desires to return as soon as possible to Anschutz medical school. Otherwise, he faces the near-impossible prospect of starting medical school over somewhere else, or entirely forgoing his dream of becoming a medical doctor.

200.     John Doe 2 has been given the same choices, and the consequences for him are equally or more severe. While pursuing appeals of the denial of his religious exemption, he has continued to attend classes and work at his clinical rotations at partner sites (that is, non-

Anschutz clinical sites) without objection from those sites. That arrangement may not be allowed to continue however after his next meeting with the Dean John Reilly, scheduled for Monday, November 1. His commitment to the Air Force, and the Force's commitment to him, were mutually predicated on his finishing his M.D. and practicing for several years as a military physician.  He has been an exemplary student for two and half years, and is indisputably on course to finish his studies, thus achieve promotion to Captain, and find a residency to suit his, and the Air Force's, professional needs starting in 2023.  That cannot happen if Defendants' unlawful Policies are allowed to stand and force his withdrawal from study.

201.    Jane Doe 7, a fourth-year dental student, faces the same choices, too, but her being in the final year of her professional studies makes the consequences of withdrawal now most severe.  The University of Colorado School of Dental Medicine is the only dental school in Colorado, where Jane Doe 7 intends to pursue her career, so even if she can transfer to another program to finish her professional degree, it will require at least a full-year's delay, and require another full year of relocation from her current home in Colorado, the intended home of her professional career.

202.    The para-professional students have had their professional career plans interrupted or perhaps aborted entirely.  No other similar programs are offered in the state of Colorado, and so all must give up his or her career plans or relocate to another state.

**F.  Plaintiffs' Reasons for Proceeding with Pseudonyms**

203.    The same "front line" health care workers and students hailed as heroes by the media for treating COVID patients before vaccines were available, including Plaintiffs, are now vilified by the same media as pariahs who must be excluded from society until they are vaccinated against their deeply held religious beliefs.

204.    The Policies are a product of this atmosphere of fear in which the unvaccinated are threatened with being reduced to a caste of untouchables, if they will not consent to being injected with vaccines that violate their religious beliefs.

205.    As things now stand, according to public health authorities the vaccinated can infect the unvaccinated, the unvaccinated can infect the vaccinated, both the vaccinated and the unvaccinated can infect each other, and everyone must wear masks indoors in "high transmission" areas—that is, virtually the entire country[15]—as if no one at all had been vaccinated.[16] And with both the fully vaccinated and the unvaccinated still contracting COVID, "booster shots" of the vaccines, to which Plaintiffs have the same religious objections, are doubtless on the way, accompanied by further government mandates.

206.    In the midst of this regulatory muddle, combined with unreasoning official coercion and widespread, media-generated panic, Plaintiffs seek leave of court to proceed anonymously as they run the risk of ostracization, threats of harm, immediate firing, and other retaliatory consequences, if their names become known. This is shown by the following examples of a pervasive climate of fear and loathing of the unvaccinated:

207.    On ABC News, commentator Margaret Hoover declared that government, by withholding all benefits from the unvaccinated, should "just make it almost impossible for people to—to live their lives without being protected and protecting the rest of us."[17] On CNN,

---

[15] *See* CDC Map at https://www.usatoday.com/in-depth/graphics/2021/07/29/cdc-mask-guidelines-map-high-covid-transmission-county/5400268001/

[16]    *See* "When You've Been Fully Vaccinated," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html

[17]    "This Week," July 25, 2021, https://abcnews.go.com/Politics/week-transcript-25-21-speaker-nancy-pelosi-sen/story?id=79045738

commentator Don Lemon stated to Chris Cuomo that "[If you] don't get the vaccine, you can't go to the supermarket. Don't have the vaccine, can't go to the ball game. Don't have a vaccine, can't go to work. You don't have a vaccine, can't come here. No shirt, no shoes, no service."[18]

208.    On his national late night show Jimmy Kimmel stated that the unvaccinated who contract COVID should be allowed to die rather than being admitted to the hospital: "Rest in peace, wheezy."[19] The audience roared its approval. In *The Week*, Ryan Cooper declared that "Anti-vaxxers" (i.e., people who decline the COVID vaccines) "should be exiled from society until they get their shots, and their efforts to intimidate people against controlling the pandemic should be met with massive resistance."[20]

209.    There is a top-down cultural, societal, and legal assault currently underway against those who forgo the vaccines. Nowhere is this more apparent than in the speech by President Biden on September 9, 2021, wherein the nation's Chief Executive brings down opprobrium on the heads of Americans who decline vaccination: "We've been patient, *but our patience is wearing thin*, and the refusal *has cost all of us….*" (emphasis added) Absent anonymity, Plaintiffs would be identified as members of

---

[18] https://www.realclearpolitics.com/video/2021/08/01/don_lemon_no_shirt_no_shoes_no_vaccine_no_service.html

[19] https://www.westernjournal.com/late-night-host-ghoulishly-mocks-sick-unvaccinated-rest-peace-wheezy/.

[20] https://theweek.com/coronavirus/1002909/theres-1-obvious-solution-to-the-delta-variant-mandatory-vaccination

the public who, according to the sitting leader of the free world, are "cost[ing] all of us."[21]

210.    Those who are unable to receive the vaccines for sincere religious reasons are thus subject to a vicious mob whipped into a frenzy, facing vicious threats, such as this one, in response to an article related to opposition by health care workers to New York's vaccine mandate:



211.    Under these circumstances, Plaintiffs clearly meet the criteria for permission to proceed anonymously.

---

[21] Remarks by President Biden on Fighting the COVID-19 Pandemic, WhiteHouse.gov, Sep. 9, 2021, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

# COUNT I
## VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRSTAMENDMENT TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

212.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-211 above as if fully set forth herein.

213.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' rights to free exercise of religion.

214.     Plaintiffs have sincerely held religious beliefs set forth above that compel them to refuse any of the available COVID vaccines.

215.     Defendants' September 1 Policy, on its face and as applied, impermissibly targets Plaintiffs' sincerely held religious beliefs by disallowing recognition of those beliefs as genuine religious belief.

216.     Defendants' September 1 Policy, on its face and as applied, impermissibly targets Plaintiffs' sincerely held religious beliefs by disqualifying them from obtaining a religious exemption based solely on the nature of their religious beliefs.

217.     Defendants' September 1 Policy, on its face and as applied, engages in blatant denominational discrimination in violation of religious neutrality by requiring that qualifying religious beliefs be in accord with official denominational teaching as understood by the Defendants.

218.     Defendants' September 1 Policy, on its face and as applied, and September 24 Policy, as applied, authorize intrusive religious inquiries in violation of religious neutrality by inviting University officials to question the legitimacy and veracity of students' and employees' religious beliefs. While Defendants have not (yet) applied their September 24 Policy to

Plaintiffs, based on the positions taken by Defendants in their communications with Plaintiffs and in this lawsuit, Defendants clearly intend to wield that policy to challenge and reject Plaintiffs' sincere religious beliefs.

219.    Defendants' September 1 Policy, on its face and as applied, is not generally applicable because it allows exemptions for medical reasons and some religious reasons—such as being a Christian Scientist—but not Plaintiffs' religious reasons, despite that exemptees' activities could or do pose similar risks of spreading COVID as Plaintiffs' activities, and Plaintiffs are entirely willing to perform (e.g., as Dr. Jane Doe 1 already has) the alternative precautions of masking, daily attesting, etc., required by the Policy at Section (C)(2). (Ex. A). Defendants' September 24 Policy, on its face and as applied, fares no better, as it allows exemptions for medical reasons for both students and staff and purports to allow religious exemptions *only* for staff but *not* for students—but even as to staff Plaintiffs here, they have been given no consideration or relief under the September 24 Policy, while an unknown number of exemptions *have* been granted to students and staff for medical reasons.

220.    The Policies, on their face and as applied, are not generally applicable because they are subject to individualized exemptions, for instance that at least Dr. Jane Doe 1 and John Doe 4 were allowed to continue working in person well after Defendants' arbitrary September 1 vaccination deadline, which was itself roughly nine months after the vaccines first became available.

221.    The Policies, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs without a compelling interest or narrow tailoring.

222.    The Policies, on their face and as applied, lack a compelling interest because they leave appreciable damage to their supposedly compelling interest unprohibited, since they offer

exemptions for medical or for some religious reasons, but not for Plaintiffs' religious reasons. Exempted activities, while exercising the required precautions, are just as likely to spread COVID as Plaintiffs' activities, to the extent Plaintiffs exercise the same precautions.

223.    Accordingly, the University cannot show it has a compelling interest in denying accommodations for *these particular Plaintiffs*, which is the requisite test under controlling Supreme Court precedent.

224.    The Policies, on their face and as applied, also lack a compelling interest as applied to Plaintiffs working at or doing clinical rounds in facilities off the Anschutz campus, such as Jane Doe 11 and John Doe 2, who have both received exemptions from the locations where they work and do clinicals and Dr. Jane Doe 1, whose Children's Hospital Colorado Springs has its own religious exemption policy still in progress.

225.    The Policies, on their face and as applied, are not the least restrictive means of furthering any hypothetical compelling interest because the University has shown that qualifying (medical) exemptees can continue to study and work at Anschutz while adopting alternative precautions outlined in the Policy.

226.    Further, Defendants cannot show, as they must, that they gave sufficient weight to practices in other hospitals around the country *and in their own university health care system* allowing religious accommodations for employees around COVID-vulnerable, oft-unvaccinated patients without apparently undermining their interest in providing effective health care without spreading COVID. Nor can Defendants show, as is their burden, they gave sufficient weight to practices on their own other University campuses, where the religious sincerity of all requesters was respected and an exemption granted to anyone who requested it, and exempted students and staff are freely allowed in similar or more intimate settings than those on the Anschutz campus—

on those other campuses, exempted persons attend classes communally, live and congregate together, and work alongside one another. For instance, at least Plaintiffs John Doe 3, John Doe 5, and John Doe 7, who also work at the University's Denver campus, would have been entitled to an exemption there, and Jane Doe 8 was actually granted a religious exemption to attend her classes and remain in her public health program at the Denver campus but denied class attendance and participation in her program at the Anschutz campus.

227.    The Policies, on their face and as applied, will compel and have compelled loss of employment or access to credentialing study, including delays in education and professional opportunities, along with Plaintiffs' consequent inability to pursue their chosen professions, and so has irreparably harmed Plaintiffs.

228.    While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

229.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional rights and sincerely held religious beliefs.

## COUNT II
## VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

230.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-228 above as if fully set forth herein.

231.    The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from enacting any requirement respecting an establishment of religion.

232.   By adopting and enforcing the September 1 Policy, which conditions allowance of a religious accommodation on the requirement that one's religious beliefs oppose *all* vaccinations, Defendants have established favorable treatment for some religious beliefs to the direct detriment of other, disqualifying religious beliefs.

233.   Further, on its face and as applied, the September 1 Policy requires qualifying religious beliefs to be supported by and associated with "teachings" of "organized" denominations with a "comprehensive system of religious beliefs," in direct violation of the "clearest command" of the Establish Clause prohibiting denominational discrimination by government.

234.   The September 1 Policy's overt religious discrimination, on its face and as applied, cannot survive strict scrutiny for the reasons described above.

235.   At least the September 1 Policy, on its face and as applied, also establishes and authorizes a process of intrusive religious inquisition to test the veracity of students' and employees' asserted religious beliefs, in direct violation of the Establishment Clause's longstanding prohibition on the "excessive entanglement" between government and religion. Such excessive entanglement is a per se violation of the Constitution without any opportunity for the government to overcome strict scrutiny. While Defendants have not (yet) applied the September 24 Policy to Plaintiffs, that policy is similarly unconstitutional, as applied, based on Defendants' conduct in this lawsuit, repeatedly and falsely attacking Plaintiffs' sincerity and continuing the inquisition tactics begun under the September 1 Policy, as described herein.

236.   Defendants' September 1 Policy's establishment of state prescribed religious content and organization targets the holders of all religious beliefs that prohibit acceptance of the COVID vaccines, but whose beliefs fall outside the state-prescribed norms.

237.    Plaintiffs hold sincerely held religious beliefs that prohibit acceptance of the COVID vaccines, but their beliefs fall outside the state-prescribed norms of Defendants' September 1 Policy and application of Defendants' September 24 Policy.

238.    Defendants' Policies will compel and have compelled loss of employment or access to credentialing study, including delays in education and professional opportunities, along with Plaintiffs' consequent inability to pursue their chosen professions, and so has irreparably harmed Plaintiffs.

239.    While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

240.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

### COUNT III
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

241.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-237 above as if fully set forth herein.

242.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits any state from denying the protection of laws to any person within its jurisdiction.

243.    The Policies, on their face and as applied, classify Plaintiffs based on their fundamental right to religious exercise—the September 1 Policy allowing only acceptable religious beliefs and the September 24 Policy purporting to allow staff to exercise their religious

beliefs but not students—and thus must survive strict scrutiny, which they cannot for the reasons described above.

244.     Plaintiffs hold religious beliefs that prohibit acceptance of the COVID vaccines, but their beliefs or their status fall *outside* the state prescribed norms of Defendants' Policies. The Policies, on their face and as applied, thus deny the Plaintiffs the protections afforded to similarly situated people whose religious beliefs also prohibit acceptance of the COVID vaccines but fall *within* the state prescribed norms of the Policy.

245.     The Policies, both facially and as applied, fail to provide Plaintiffs with equal treatment to similarly situated employees and students who have received medical exemptions under the Policies. Indeed, there is no *rational* distinction for allowing all *staff* the opportunity to seek religious exemption, even if their employment duties involve direct patient contact, while prohibiting all *students* from seeking religious exemptions, even if their activities do not involve direct patient contact.

246.     Plaintiffs have thus been deprived of constitutionally guaranteed equal protection.

247.      Defendants' Policies, on their face and as applied, will compel and have compelled loss of employment or access to credentialing study, including delays in education and professional opportunities, along with Plaintiffs' consequent inability to pursue their chosen professions, and so has irreparably harmed Plaintiffs.

248.     While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

249.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**COUNT IV**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. §12133)**

250.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-245 above as if fully set forth herein.

251.    42 U.S.C. §12133 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

252.    42 U.S.C. §12102 defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual […] or being regarded as having such an impairment."

253.    In enacting and applying their vaccination policies, Defendants have (erroneously) treated the absence of COVID-vaccination generated antibodies in Plaintiffs as a physical impairment that substantially limits major life activities such as normal activities in a workplace or classroom--like breathing or speaking—and any other activity that involves normal human interaction. All plaintiffs, therefore, have a "regarded as" disability under §12102. Several Plaintiffs (e.g., Jane Doe 2, Jane Doe 3, and Jane Doe 7) also have actual disabilities as alleged above.

254.    All of the student Plaintiffs have been excluded from participation in and denied the benefits of the educational programs of Defendants in that they are currently barred from

participation in any of the activities—didactic work in classrooms, clinical work in Defendants' hospitals or clinics—that are preconditions to their receiving their professional degrees.

255.     Even apart from normal employment remuneration, all of the employee plaintiffs have likewise been excluded from participation in and denied the benefits of Anschutz services, programs, or benefits by their exclusion from Anschutz's physical facilities.

256.     While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

257.     Plaintiffs have no adequate remedy at law to prevent the continuing violation of their legal rights.

## COUNT V [OM1]

### VIOLATION OF THE RELIGIOUS FREEDOM CLAUSES OF THE CONSTITUTION OF THE STATE OF COLORADO

258.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-251 above as if fully set forth herein.

259.     Article II, section 4 of the Constitution of the State of Colorado provides "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion... Nor shall any preference be given by law to any religious denomination or mode of worship."

260.     By adopting and enforcing Policies that ostensibly allow accommodation of religious beliefs that prevent acceptance of the currently available COVID vaccines, but conditioning allowance of accommodation on the requirement the religious belief be articulated

by a hierarchical religious authority whose tenets oppose all vaccinations, Defendants have established religious content and religious organization that is acceptable to the state, and religious content and religious organization that is unacceptable. And as to the September 24 Policy, students have been entirely denied their religious rights, while those same rights have been afforded to staff Defendants. Defendants have further attacked and rejected the sincerity of Plaintiffs' beliefs under the September 1 Policy and would presumably continue their conduct if applying the September 24 Policy.

261.   That September 1 Policy thus gives preference to certain religions based on the religions' organization and the content of its tenets. The Policy thus discriminates against the religious beliefs of those whose beliefs are outside the state prescribed norms, impairs their free exercise of their beliefs, and gives preference to the beliefs of religious denominations or mode of worship that are within state prescribed norms.

262.   In enacting and enforcing their Policies, Defendants have thus violated Article II, section 4.

263.   The Defendants' Policies will compel loss of employment or access to credentialing study, and Plaintiffs' consequent inability to pursue their chosen profession, and so has harmed Plaintiffs.

264.   While Plaintiffs have and will continue to suffer harm that cannot be remedied by actual and nominal damages due to Defendants' past and continuing illegal actions, they have and will continue to incur actual and nominal damages as noted herein, whether in lost wages, expenses for relocation and housing, emotional distress, and other damages.

265.   Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

**PRAYER FOR RELIEF**

*Wherefore,* Plaintiffs respectfully pray for the following relief:

(A) That a temporary restraining order and preliminary injunction, followed by a permanent injunction, be entered (1) restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the (a) September 1 Policy, to the extent it prohibits religious exemptions unless an individual holds religious beliefs that oppose all vaccinations or are in accord with official denominational "teachings," (b) September 24 Policy, to the extent it denies students the right to seek and receive religious exemptions, (c) both Policies, to the extent Defendants improperly intrude into the sincerity of religious objectors at Anschutz by discerning Plaintiffs' sincerity through questioning the *legitimacy* of their religious beliefs or in any way more intensely than they do into the sincerity of religious objectors on other University campuses, (d) both Policies, to the extent Defendants prohibit Plaintiffs from receiving the same accommodations allowed for individuals who have actually received medical exemptions or for those on other University of Colorado campuses who present a comparable or greater risk of spreading COVID-19 than Plaintiffs; (2) ordering that Plaintiffs be granted their requested religious exemptions; and (3) ordering that all prior denials of requested religious exemptions under the Policies (whatever the requesters may have called them) be revoked and the requests re-examined under conditions compliant with the United States and Colorado Constitutions;

(B) That a declaratory judgment issue, declaring that the Policies' religious exemption provisions, both on their face and as applied by Defendants, are unconstitutional and unlawful in that they violate the Free Exercise and Establishment Clauses of the First Amendment of the

Constitution of the United States; and the Equal Protection Clause of the Fourteenth Amendment

of the Constitution of the United States; and Article II, Section 4 of the Colorado Constitution;

(C) That judgment be entered in favor of Plaintiffs and they be awarded nominal

damages, actual and compensatory damages, and punitive damages;

(D) That Plaintiffs be given an award of reasonable costs and expenses of this action,

including reasonable attorney's fees, in accordance with 42 U.S.C. § 1988 and the Americans

with Disabilities Act; and

(E) Such other and further relief as the Court deems equitable and just under the

circumstances.

/s/ Peter Breen
Peter Breen
Martin Whittaker
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

Michael G. McHale
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs*

**Verification – Jane Doe 1**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Dr. Jane Doe 1 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 16, 68 – 74, 184 – 187, 192 - 193, and those matters are true.

Dr. Jane Doe 1, October 27, 2021

**Verification – John Doe 1**

Under penalties of perjury as provided by the laws of the United States, I declare that I am John Doe 1 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 27, 130 – 144, 196 - 198, and those matters are true.

_____\October 27, 2021

                                Dated

**Verification – Jane Doe 2**

Under penalties of perjury as provided by the laws of the United States, I declare that I am Jane Doe 2 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶  17, 75 - 79, 194, and those matters are true.



_____\October 27, 2021

                Dated

**Verification – John Doe 2**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe 2 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 28, 145 – 149, 199, and those matters are true.



_____\October 27, 2021

**Verification – Dr. Jane Doe 3**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Dr. Jane Doe 3 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 11, 18, 80 – 88, 194, and those matters are true.



_____\October 27, 2021

**Verification – John Doe 3**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe 3 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 9 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 8, 29, 150 -155, and those matters are true.



_____\October 27, 2021

**Verification – Jane Doe 4**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 4 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 19, 89 - 94, and those matters are true.



_____\October27, 2021

**Verification – John Doe 4**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe 4 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 30, 156 - 160, and those matters are true.



_____\October 27, 2021

**Verification – Jane Doe 5**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 5 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶20, 95 - 98, and those matters are true.



_____\October 27, 2021

**Verification – John Doe 5**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe 5 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 8, 31, 161 - 165, and those matters are true.

_____\October 27, 2021

**Verification – Jane Doe 6**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 6 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 21, 99 - 102, and those matters are true.



_____\October 27, 2021

**Verification – John Doe 6**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe 6 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 32, 166 - 171, and those matters are true.



_____\October 27, 2021

**Verification – Jane Doe 7**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 7 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶22, 103 - 106, and those matters are true.



_____\October 27, 2021

**Verification – John Doe 7**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the John Doe 7 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 8, 33, 172 - 176, and those matters are true.

_____\October 27, 2021

**Verification – Jane Doe 8**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 8 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 10, 23, 107 - 111, and those matters are true.



_____\October 27, 2021

**Verification – Jane Doe 9**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 9 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 24, 112 - 114, and those matters are true.



_____\October 27, 2021

**Verification – Jane Doe 10**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 10 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 25, 115 -123, and those matters are true.



_____\October 27, 2021

**Verification – Jane Doe 11**

Under penalties of perjury as provided by the laws of the United States, I declare that I am the Jane Doe 11 who is one of the co-plaintiffs in the case captioned *Jane Does 1 through 11 vs. The University of Colorado*, No. 21 CV 2637; that I have knowledge of the facts pleaded in the Amended Complaint in that case that pertain to me, and those facts are true.

I specifically have knowledge of the matters alleged in ¶¶ 9, 26, 124 - 129, and those matters are true.



_____\October 27, 2021



University of Colorado **Anschutz Medical Campus**

**Campus Administrative Policy**

**Policy Title:**      **COVID-19 Vaccination Requirement and Compliance**

**Policy Number:**  3012          Functional Area:  General Administration

---

Effective:                          September 1, 2021
Date Last Amended/Reviewed:        September 1, 2021
Date Scheduled for Review:         September 1, 2028
Supersedes:                        COVID-19 Vaccination Requirement and Compliance June 2, 2021

Approved by:                       Donald M. Elliman, Jr.
                                   Chancellor, University of Colorado Anschutz Medical Campus

Prepared by:                       Office of University Counsel

Reviewing Office:                  Office of the Chancellor of the CU Anschutz Medical Campus
Responsible Officer:               Executive Vice Chancellor for Administration and Finance | CFO, University of Colorado Anschutz Medical Campus

Applies to:                        CU Anschutz Medical Campus

---

## A.   INTRODUCTION

The purpose of this policy is to protect the health and safety of the University of Colorado Anschutz Medical Campus ("CU Anschutz") community, including all faculty, staff, students,  badged affiliates, persons of interest (POIs), visitors, and volunteers ("Individuals") who work or learn on the Anschutz  Medical Campus or off campus in connection with CU Anschutz programs. This policy, requires all Individuals who currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program, or whose employment or academic activities may require in-person interaction with other CU Anschutz employees, students, patients, study subjects, or members of the public, regardless of location to become fully vaccinated against COVID-19 with a vaccine that has been approved by the World Health Organization ("WHO") as of June 1, 2021, subject to limited exceptions and exemptions.[1]  In addition, this policy requires Individuals to receive booster shots for those specific vaccines, as required by the WHO or Centers for

---

[1] As of June 1, 2021, the WHO has approved the following COVID-19 vaccines: Pfizer-BioNTech, Moderna, Johnson & Johnson, Oxford–AstraZeneca, Sinovac, and Sinopharm.



Disease Control.

Faculty, staff, badged affiliates, and POIs must submit proof of COVID-19 vaccination by September 1, 2021.  Students must submit proof of COVID-19 vaccination before the start of the Fall 2021 semester, which varies by program and may occur prior to September 1,  2021. Students who will initially participate in University-related activities remotely will be required to submit proof of COVID-19 vaccination before any in-person component of their curriculum whether on campus, or at a clinical site or remote location. Individuals who do not provide proof of vaccination may be subject to additional safety protocols as described more fully below.

**B.   DEFINITIONS**

    **1.**    The term "employees" includes, but is not limited to, all full and part -time staff, faculty, post-doctoral  fellows, medical residents, predoc trainees, and fellows.

    **2.**    The term "badged affiliates" includes, but is not limited to, any individual who has  a CU Anschutz badge to access campus facilities, whether leased or owned on or off campus, including badged contractors and  employees at affiliated institutions who have a CU Anschutz badge and access campus  facilities on a regular basis.

    **3.**    The term "students" includes, but is not limited to, all students, including part-time,  full-time, degree-seeking, non-degree seeking, hybrid (combination of online and in  person, either: (i) on campus and/or (ii) in clinical settings), visiting students, undergraduate, or graduate students enrolled at CU Anschutz.

**C.   POLICY STATEMENT**

All Individuals, who are, or may access any University facility or participate in any University program, or whose employment or academic activities may require in-person interaction with other CU Anschutz employees, students, patients, study subjects or members of the public, including external conferences, regardless of location, must no later than September 1, 2021, either (i) be fully vaccinated against COVID -19, or (ii) receive an approved exemption as further described below. Individuals are required to comply with this Policy, regardless of the Individual's frequency on campus or interaction with other employees, students, patients, or others. For example, even a one-time visit or interaction requires compliance.

Positions or programs that require on-campus presence or interaction with others will not be allowed to be performed remotely in order to avoid compliance with this Policy.  However, Individuals who hold positions that have been previously approved by a supervisor as being 100% remote without any current or future presence at <u>any</u> CU Anschutz facility (owned or leased) or participation in any Anschutz program, or whose employment or academic activities do not require in-person interaction with other CU Anschutz employees, students,

2

patients or study subjects of the Anschutz Medical campus, regardless of location, are not required to be comply with this policy.

1.   **Vaccine Verification**

All Individuals must submit verification of COVID-19 vaccination. Employees, badged affiliates, POIs, and volunteers must submit verification of their COVID-19 vaccination via the campus verification system. Visitors will not be required to submit verification via the campus verification system, but will be required to submit verification to the department or unit hosting their visit. It is the responsibility of the unit who is hosting the visitor to ensure the visitor's compliance with this Policy. Students must submit proof of COVID-19 vaccination to their individual Schools/College/programs in the same manner that they would submit proof of other required vaccinations.

An Individual's failure to provide valid proof of vaccination or to submit an exemption pursuant to Section 2 may be disciplined, up to and including termination.

2.   **Exemptions**

Individuals may be exempted from the requirement to receive a COVID-19 vaccine for medical or religious reasons. Supervisors and unit heads will be made aware that an Individual has received an exemption, but will not be aware of the reason for the exemption.

A medical exemption may be submitted if vaccination is medically contraindicated due to other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health. A Physician (MD, DO), Advanced Practice Nurse (APN), or Physician Assistant must sign the medical exemption form and attest to the accuracy of the information contained therein. Employees, badged affiliates, visitors, and volunteers must submit their medical exemption forms via the approved campus database, which is a campus-wide platform. Students must submit their medical exemption forms to their individual Schools/College/programs in the same manner that they would submit exemptions for other required vaccinations.

A religious exemption may be submitted based on a person's religious belief whose teachings are opposed to all immunizations. Employees, badged affiliates, POIs, and volunteers must submit their religious exemption form via the campus verification system. Students must submit religious exemption forms to their individual Schools/College/program in the same manner that they would submit exemptions for other required vaccinations.

Individuals who are granted medical or religious exemptions will be required to adhere to additional safety protocols, including, but not limited to wearing masks, social distancing, staying home when sick, quarantining in accordance with current Centers for Disease Control ("CDC") guidance, submitting daily

3

attestations, and undergoing frequent asymptomatic testing.[2]

Unvaccinated Employees, Badged Affiliates, or POIs who fail to complete the COVID -19 verification form or comply with required safety protocols for exempted individuals will be referred to their Supervisor for potential action and/or discipline, up to and including termination. Supervisors will be required to provide Campus Human Resources with information regarding such action and/or discipline with respect to unvaccinated employees.

Unvaccinated students who fail to submit verification of vaccination or comply with required safety protocols may be referred to their respective School/College/program for potential action and/or discipline, up to and including termination from the program.

Schools/College/programs will be required to provide the Associate Vice Chancellor for Student Affairs at CU Anschutz with information regarding such action and/or discipline.

Individuals who are not vaccinated and do not have an approved medical or religious exemption, will not be allowed to access University facilities or programs in person. Individuals who previously tested positive for COVID-19 will not be granted an exemption unless they obtain a note from a physician or health care provider that indicates vaccination would endangers the individual's life or health.

The COVID-19 pandemic and its impact on campus operations is rapidly evolving.

Individuals are encouraged to consult the COVID-19 website referenced in Section D(4) below on a regular basis for up-to-date information regarding CU Anschutz' COVID-19-related policies, procedures, and guidance.

3.      **Reasonable Accommodations**

CU Anschutz recognizes that some medical conditions may be protected under the Americans with Disabilities Act and amendments ("ADA"), entitling students and employees to request reasonable accommodations.

If you are a student at the CU Anschutz Medical Campus and need to make an application for reasonable accommodations or need information regarding the ADA, contact the Office of Disability Access and Inclusion at (303) 724-5640 or disabilityresources@cuanschutz.edu.

---

[2] Currently, Individuals who are required to submit to ongoing asymptomatic testing will be required to do so on a  weekly basis, but the frequency of testing is subject to change at CU Anschutz' discretion based on evolving medical and scientific recommendations.

If you are an employee and need to make an application for reasonable accommodations  or need information regarding the ADA, contact the ADA Coordinator at (303) 315-2700 or  HR.ADACoordinator@ucdenver.edu.

**D.     RELATED POLICIES, PROCEDURES, FORMS, GUIDELINES, AND OTHER RESOURCES**

1.  Related Administrative Policy Statements (APS) and Other Policies

- Campus Policy 7014: Student Immunization Requirements and Compliance

2.  Forms

- CU Anschutz Student Medical Exemption Form
- CU Anschutz Student Religious Exemption Form
- CU Anschutz Non-Student Medical Exemption Form

3.  Other Resources (i.e., training, secondary contact information)

- CU Anschutz COVID-19 Resources
- EEOC What you Should Know About COVID-19 and the ADA, the Rehabilitation Act, and other EEOC laws

Notes

1.      Dates of official enactment and amendments:

September 1, 2021: Approved by the CU Anschutz Chancellor

2.      History:

August 23, 2021:  This is a new policy.  As part of the Anschutz Medical Campus' ongoing response to the COVID-19 pandemic, the University of Colorado system decided to require that all faculty and staff be vaccinated against COVID-19 by September 1, 2021, and that all students be vaccinated against COVID-19 before the start of each respective School's Fall Semester. Chancellor Elliman further decided that this Policy will apply to volunteers, visitors, and badged affiliates who come to the Anschutz Medical Campus. Religious and Medical Exemptions from the Policy are available.

3.      Initial Policy Effective Date: September 1, 2021

4.      Cross References/Appendix:

- Campus Policy 7014: Student Immunization Requirements and Compliance

5

We, the Catholic bishops of Colorado, consistent with **our previous letters** on COVID-19 vaccines, affirm that the use of some COVID-19 vaccines is morally acceptable under certain circumstances. Throughout the pandemic we have cooperated with the various secular authorities and encouraged Catholics to help each other, and the broader society, remain healthy and safe during this challenging time. We understand that some individuals have well-founded convictions that lead them to discern they should not get vaccinated. We are pleased to see that in the case of the most recent Denver vaccine mandate there is accommodation for sincerely held religious beliefs. This is appropriate under the laws protecting freedom of religion.

We always remain vigilant when any bureaucracy seeks to impose uniform and sweeping requirements on a group of people in areas of personal conscience. Throughout history, human rights violations and a loss of respect for each person's God-given dignity often begin with government mandates that fail to respect the freedom of conscience. In the case of the COVID-19 vaccine, we are convicted that the government should not impose medical interventions on an individual or group of persons. We urge respect for each person's convictions and personal choices.

We have been asked several questions by the Faithful about relevant Catholic teaching applicable to this issue. The Catholic Church teaches that a person may refuse a medical intervention, including a vaccination, if his or her conscience leads them to that decision. Here are relevant points for this personal decision:

• Vaccination is not morally obligatory and so must be voluntary.

• There is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cells lines derived from abortion; however, it is permissible to use such vaccines only under case-specific conditions—if there are no other alternatives available and the intent is to preserve life.

**Exhibit 2**

• A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings.

• A person is morally required to obey his or her conscience.

• For more information on these weighty ethical issues, the United States Conference of Catholic Bishops (USCCB) has issued a statement that can be read **here.**

Taken as a whole, these points mean a Catholic may judge it right or wrong to receive certain vaccines for a variety of reasons, and there is no Church law or rule that obligates a Catholic to receive a vaccine — including COVID-19 vaccines.

The three Colorado Catholic dioceses remain committed to working with public health and other secular authorities to protect the wellbeing of our communities, at the same time urging that personal freedoms of conscience and expression be fully supported, and the integrity and autonomy of religious institutions be respected. The vaccination question is a deeply personal issue, and we continue to support religious exemptions from any and all vaccine mandates.

If any person comes to an informed judgment that he or she should receive or not receive a vaccine, that person should follow their conscience, and they should not be penalized for doing so. We encourage any individual seeking exemption to consult their employer or school. The Colorado Catholic Conference also has **a letter template** available to be signed by pastors of the Faithful if a Catholic wants a written record that they are seeking exemption on religious grounds.

Sincerely,

**Most Reverend Samuel J. Aquila**

*Archbishop of Denver*


**Most Reverend Stephen J. Berg**

*Bishop of Pueblo*


**Most Reverend James R. Golka**

*Bishop of Colorado Springs*


**Most Reverend Jorge Rodriguez**

*Auxiliary Bishop of Denver*



**SUBJECT:  Religious Exemption Request Rejected – Action Required**

Hello,

The CU Anschutz Exemption Verification Team has reviewed your request for religious exemption from the University of Colorado Anschutz Medical Campus policy regarding COVID-19 vaccination.

Your exemption request has been denied because it does not comply with the campus policy, which only recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations.  For more information, see the campus policy at https://www.ucdenver.edu/docs/librariesprovider284/default-document-library/3000-general-admission/3012---covid-19-vaccination-requirement-and-compliance.pdf?sfvrsn=4e9df3ba_2

Therefore, you will need to provide proof of vaccination by September 1, 2021.  Please submit your vaccine verification form HERE.

Failure to submit proof of COVID-19 vaccine verification by September 1, 2021 will result in additional actions being taken due to your failure to comply with the campus vaccination policy, including but not limited to termination.

Find out where you can get vaccinated | Colorado COVID-19 Updates

During the interim period, as an unvaccinated individual, you need to follow all CU Anschutz Medical Campus safety protocols if you must come to campus:

- Completing the health questionnaire every day you are on campus.
- Wearing a mask at all times, except when outdoors and 10+ feet  from others
- Maintaining physical distance of 6 feet or more between yourself and others at all times, both indoors and outdoors.

If at any time you experience coronavirus symptoms, are exposed to someone with COVID-19 or test positive for COVID-19, you are required to self-report here.

Thank you,

**Vaccine Exemption Verification Team**

CU Anschutz Medical Campus



**Exhibit 3**



# Thomas More
# SOCIETY

*A national public interest law firm defending life, family and religious liberty.*

September 15, 2021

University of Colorado Vaccine Verification Team
University of Colorado Anschutz Medical Campus
13001 East 17th Place
Aurora, CO 80045
vaccineverification@cuanschutz.edu
*Sent via email*

Jeremy Hueth
Vice President and University Counsel
1800 Grant Street, Ste. 800
Denver, CO 80203
Jeremy.hueth@cu.edu
*Sent via email*

Kimberly C. Spiering
Senior Associate University Counsel
University of Colorado
Office of University Counsel – Denver
Anschutz Medical Campus
Kimberly.spiering@ucdenver.edu
*Sent via email*

Dear CU Anschutz Exemption Verification Team, Mr. Hueth, and Ms. Spiering:

My name is Peter Breen, and I am Vice President and Senior Counsel for the Thomas More Society. We are a non-profit, public interest law firm that has defended the rights of individuals and organizations across the country for the past 25 years, including in Colorado. I am writing to you because one of your employees, Dr. ██████████, was recently denied a religious exemption from the Anschutz Medical Campus's ("University's") COVID-19 vaccine mandate ("Mandate") on grounds that are flagrantly illegal.

Specifically, the University's "Campus Administrative Policy" for "COVID-19 Vaccination Requirement and Compliance" authorizes religious exemptions from the Mandate only for those whose religious "*teachings* are opposed to *all immunizations*." (*See* Exhibit A attached.) (Emphasis added.) The University's policy commits the double error of (1) explicitly *favoring* some religious beliefs over others, and (2) implying that religious beliefs must be tied to organizational teachings in order to be recognized for exemptions. Both of these errors independently violate the First Amendment's requirement that governments remain *neutral* towards religious beliefs and practices, which are furthermore entitled to protection whether or not they are part of any denominational "teachings." They also violate federal Title VII's requirement that employers reasonably accommodate their employees' sincere religious beliefs and practices (of whatever kind) unless (and *only unless*) they pose an "undue hardship" to the employer.

Therefore, we request that you immediately amend the Campus Administrative Policy's religious exemption to comply with both the First Amendment and Title VII. We also request that you accordingly re-evaluate and grant Dr. ██████'s request for a religious exemption from the University's Mandate. Otherwise, we will not hesitate to file discrimination charges against the University and pursue First Amendment litigation in federal court, where we will seek corresponding attorney's fees.

Dr. ██████ is a long-time pediatrician employed by the University and works at the University-associated Children's Hospital. Dr. ██████ is a devout Catholic, and in 2018 she obtained a Master's Degree in Bioethics from a combined program with the National Catholic Bioethics Center and the University of Mary. As a result, Dr. ██████ has strongly-held, sincere religious objections to receiving any vaccines that were developed through the use of or testing on cell lines derived from aborted human



children. It is unquestionable that the available COVID-19 vaccines fall into that category,[1] so Dr. ███████'s religious beliefs categorically forbid her from receiving these vaccines.

Dr. ███████ told the University as much on August 22, 2021, when she responded to its inquiry about the basis of her prior request for a religious exemption from its COVID-19 vaccine mandate by stating the following: "As a faithful Catholic, I uphold the dignity and sanctity of every human life and firmly oppose abortion and the evil involved in the use of cell lines derived from abortions. All 3 available emergent-use authorized vaccines in the U.S. – Moderna, Pfizer-BioNTech, and Johnson & Johnson – used the abortion-derived cell lines (HEK293) in one or more phases of developing the SARS CoV-2 vaccine." (See Dr. ███████'s Statement, attached as Ex. B.) Additionally, in response to the University's inquiry about whether she has "had an influenza or other vaccine in the past," and asking "How does this differ?" Dr. ███████ stated as follows: "I have had other vaccines; including influenza – which does not utilize unethically derived cell lines." (Ex. B)

The University responded via an electronically sent letter on August 26, 2021, rejecting Dr. ███████'s request simply "because . . . campus policy . . . only recognizes religious exemptions based on a religious belief whose teachings are opposed to *all* immunizations." (See Ex. C, attached.) (Emphasis added.) The letter then referred Dr. ███████ to the aforementioned Campus Administrative Policy. The letter further instructed that Dr. ███████ would need to provide proof of vaccination by September 1, 2021 or otherwise face "additional actions . . . including but not limited to termination." (Ex. C.) To date Dr. ███████ has not submitted proof of vaccination and has continued to work at Children's Hospital without disruption to her employment status.

If there is any clear command in our Supreme Court's oft-muddled Free Exercise jurisprudence, it's that "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against *some* or all religious beliefs." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added). And "the minimum requirement of neutrality is that a law not discriminate on its face." *Id*. Laws that are not neutral toward religion must survive "the most rigorous of scrutiny," *id*. at 546 (i.e., strict scrutiny), which is possible only if they "advance interests of the highest order and are narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (cleaned up).

The Campus Administrative Policy is a paradigmatic example of facial discrimination against *some* religious beliefs. It explicitly singles out those who are religiously opposed to *all* vaccinations and grants them favored treatment, while it categorically rejects requests for religious exemptions by anyone whose religious beliefs deign to approve some (even non-abortion-connected) vaccines—including people like Dr. ███████ with unquestionably sincerely held religious beliefs against receiving the COVID-19 vaccines in view of their ties to abortion. Indeed, the only question for government actors like the University here is whether Dr. ███████'s religious beliefs are sincere. But it is almost always impermissible for a non-theocratic government like ours to explicitly discriminate against certain religious beliefs, and a "law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. This is not one of those cases.

Here, the University can offer "no compelling reason why it has a particular interest in denying an exception [to Dr. ███████] while making them available to others"—i.e., those who are opposed to *all* vaccinations or those for whom COVID-19 vaccines are "medically contraindicated" (See Ex. A, at Sec. C.2.). *Fulton*, 141 S. Ct. at 1882; *see also id.* (holding that the government's requisite "compelling

---

[1] https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/

interest" must not be "in enforcing its . . . policies generally, but" in *denying a particular claimant a religious exemption*, and that authorizing exemptions from particular policies "undermines the . . . contention that its . . . polices can brook no departures"). Indeed, the fact that Dr. ▮▮▮ has been allowed to continue serving her patients for two weeks beyond vaccination deadline day undermines the idea that the University has a compelling interest in denying her an exemption.

Further, it almost goes without saying that the University's Mandate applied to Dr. ▮▮▮ is not the *least restrictive means* where she successfully served as "front-line hero" for the past 18 months while donning PPE in continued service of her patients, and where Dr. ▮▮▮'s counsel are aware that hospitals and medical schools around the country are currently granting religious exemptions from similar mandates without apparently undermining patient care. *See McCullen v. Coakley*, 573 U.S. 464, 466 (2014) (government must "show[] that it seriously undertook to address [its] various problems with less intrusive tools readily available to it"); *see also Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring) (stating that it's "the government's burden to show" that "alternative" treatment of religious activity in other jurisdictions "won't work" in this jurisdiction).

With respect to the University's reference to religious "teachings," the U.S. Supreme Court has plainly held that "we reject the notion that to claim the protection of the Free Exercise Clause, *one must be responding to the commands of a particular religious organization.*" *Frazee v. Illinois Dep't of Emp. Sec.,* 489 U.S. 829, 834, 109 S. Ct. 1514, 1517–18, 103 L. Ed. 2d 914 (1989) (emphasis added); *see also Thomas v. Rev. Bd. Of Indiana Emp. Sec. div.*, 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").

Therefore, the University may not imply that Dr. ▮▮▮ beliefs must be supported by denominational "teachings" without violating the First Amendment.[2]

Finally, Title VII federal employment law plainly forbids employers like the University from engaging in *any* discrimination based on their employees' "religion," which is a term covering *any* sincerely held "religious observance and practice, as well as belief" of an employee, "unless" (*and only unless*) "an employer *demonstrates* that he is unable to reasonably accommodate . . . an employee's religious observance or practice without undue hardship" on the employer's business." 42 U.S.C. §§ 2000e-2(a)(1) & 2000e(j) (emphasis added). In practice, this means Title VII prohibits an employer from discriminating against an employee "in order to avoid accommodating a religious practice that it could accommodate without an undue hardship." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015); *see also id.* ("An employer may not make [an employee's] religious practice, confirmed or otherwise a factor in employment decisions."). Moreover this rule applies even as against an employer's *neutral* polices that *incidentally* burden people's religious beliefs and practices. *See id.* at 775 ("An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter," but Title VII gives religious practices "favored treatment" and "*requires* otherwise neutral policies to give way to the need for an accommodation") (emphasis added).

---

[2] Still, it's worth noting that Dr. ▮▮▮'s religious beliefs are squarely consistent with a recent unified statement by the Colorado Catholic Bishops, who declared that a Catholic may "judge it . . . wrong" to receive the available COVID-19 vaccines in part because of the "moral duty to refuse the use of medical products, including certain vaccines, that are created using human cell lines derived from abortion." The Colorado Bishops also stated that such a person's beliefs should "be respected" through "religious exemptions from any and all vaccine mandates." Colo. Bishops Statement, Aug. 6, 2021, https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-covid-19-vaccine-mandates/.

CU Anschutz Exemption Verification Team            4                    September 15, 2021

Here, the University has made no attempt to demonstrate that granting Dr. ████'s request for religious exemption would be an undue hardship (and indeed, that would be a difficult showing in light of the exemptions allowed for *other* religious beliefs and for those who cannot receive the vaccine for reasons of "health," notwithstanding the presumed continued susceptibility of exempted individuals to contracting and spreading COVID-19 and its delta variant). Rather, it has denied Dr. ████ a religious exemption simply because she is essentially *not religious enough* (or maybe *too* religious). The Campus Administrative Policy fails to provide Dr. ████'s religious observances the same required "favored treatment" it gives to other religious beliefs and practices. That policy plainly amounts to discrimination against religion, in violation of Title VII.

Therefore, we reiterate our request that the University rescind its unconstitutional and illegal religious exemption policy and bring it into compliance with the First Amendment and Title VII. We also again request an immediate re-evaluation and grant of Dr. ████'s request for religious exemption from the University's Mandate. Otherwise we will pursue any and all legal remedies available to Dr. ████ under the aforesaid law and, of course, seek attorney's fees, which would likely be substantial.

Please respond to this request by noon this Friday, September 17th. Thank you for your immediate attention.

Very truly yours,

Peter Breen
*Counsel for Dr.* ████

Enclosures

cc:  Theresa Lynn Sidebotham          Paul M. Jonna                      Michael McHale
     Telios Law PLLC                  LiMandri & Jonna LLP               Thomas More Society
     19925 Monument Hill Road         P.O. Box 9120                      10506 Burt Circle, Suite 110
     Monument, CO 80132 (physical)    Rancho Santa Fe, CA 92067          Omaha, Nebraska 68114
     P.O. Box 3488                    Tel: (858) 759-9930                402-501-8586 (direct)
     Monument, CO 80132 (mailing)
     (855) 748-4201



**UNIVERSITY COUNSEL**

September 20, 2021

<u>**VIA ELECTRONIC MAIL**</u>
Mr. Peter Breen
Thomas Moore Society
309 W. Washington St.
Suite 1250
Chicago, IL 60606
pbreen@thomasmoresociety.org

      Re: ▮▮▮▮▮▮▮▮▮▮

Dear Mr. Breen:

This letter is in response to your September 15, 2021 letter challenging the University of Colorado's denial of Dr. ▮▮▮▮▮▮▮ request for religious exemption from the campus requirement that all University of Colorado Anschutz Medical Campus faculty be immunized against COVID-19 by September 1, 2021. Dr. ▮▮▮▮ is a critical care doctor in the Pediatric Intensive Care Unit ("PICU") at the Colorado Springs location of Children's Hospital Colorado.

You argue that the University's denial of Dr. ▮▮▮▮ request is in violation of the First Amendment and state statute. You are incorrect for the following reasons:

    **I.**    **There has been no First Amendment violation**

The University has committed no violation of the First Amendment's Free Exercise Clause. As an initial matter, there is no constitutional right to be exempt from a vaccination requirement based on religious beliefs. *See*, *e.g.*, *Nikolao v. Lyon*, 875 F.d 310, 316 (6th Cir. 2017); *Caviezel v. Great Neck Pub. Sch.*, 739 F. Supp. 2d 273, 285 (E.D.N.Y. 2010) *aff'd*, 500 F. App'x 16 (2d Cir. 2012) ("[T]he free exercise clause of the First Amendment does not provide a right for religious objectors to be exempt from [the state] compulsory inoculation law."). The United States Supreme Court has explained that:

> [A state's police power] is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus [a parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

*Prince v. Massachusetts*, 321 U.S. 158, 165-66 (1944) (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 39 (1905) (upholding the mandatory smallpox vaccination

Exhibit 5



requirement for all citizens)). *See also Workman v. Mingo County Bd. of Educ.*, 419 F. App'x 348, 353-54 (4th Cir. 2011) ("[F]ollowing the reasoning of *Jacobson* and *Prince*, we conclude that the West Virginia statute requiring vaccinations as a condition of admission to school does not unconstitutionally infringe [plaintiff's] right to free exercise.") (collecting cases); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("New York law goes beyond what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs."); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1084 (S.D. Cal. 2016) (upholding California law that removed religious exemption to vaccination mandate, stating that "it is clear that the Constitution does not require the provision of a religious exemption to vaccination requirements . . . ."). Just last month, the Court of Appeals for the Seventh Circuit upheld a similar vaccine mandate imposed by Indiana University, stating that "[g]iven *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with [a university requiring] vaccination against SARS-CoV-2." *Klaassen v. Trustees of Indiana University*, 7 F.4th 592, 593 (7th Cir. 2021).

Second, where, as here, a state actor chooses to provide a religious exemption for sincerely held religious beliefs, it does not violate individuals' free exercise rights for the state actor to determine that their objection to the vaccine is based on personal or secular reasons, and not religious considerations. *See Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51–52 (2d Cir. 1988); *Farina v. Bd. of Educ.*, 116 F. Supp. 2d 503, 508 (S.D.N.Y. 2000); *NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 257–59 (E.D.N.Y. 2016); *Caviezel*, 701 F. Supp. 2d at 427–30 (E.D.N.Y 2010). "Court[s] may, as in any state of mind inquiry, draw inferences from the plaintiffs' words and actions, in determining whether they hold genuine and sincere religious beliefs against inoculations." *Farina*, 116 F. Supp. 2d at 508. Even when the facts show that a plaintiff is devoutly religious, denial of an exemption is appropriate where the plaintiff's opposition to vaccination is a selective personal belief, as opposed to a religious one. *NM*, 155 F. Supp. 3d at 258; *Caviezel*, 701 F. Supp. 2d at 429–30.

Importantly, an individual's assertion that his or her belief is religious does not automatically make it so. *Mason*, 851 F.2d at 51; *see also Sherr v. Northport-East Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 94 (E.D.N.Y. 1987). "To the contrary, 'a threshold inquiry into the "religious" aspect of particular beliefs and practices cannot be avoided,' if [courts] are to determine what is in fact based on religious belief, and what is based on secular or scientific principles." *Mason*, 851 F.2d at 51 (internal citations omitted).

## II.    Accommodating Dr. █████ Request for a Religious Exemption Poses an Undue Hardship under Title VII.

The University adopted its COVID-19 Vaccination Policy for the purpose of protecting the health and safety of the campus community, including the patients treated in University, UC Health, and Children's Hospital clinics. The University determined that a mandatory vaccination requirement for its employees and students is the best way to accomplish this goal.



**UNIVERSITY COUNSEL**

A recent study by the Centers for Disease Control and Prevention found that individuals who have not been vaccinated were nearly five times more likely to be infected with COVID-19 than vaccinated people. In addition, the study found that unvaccinated people are about 29 times more likely to be hospitalized with COVID-19 than those who are fully vaccinated.[1]

To require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religion imposes undue hardship on the employer and is thus not a reasonable accommodation under Title VII. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

An employer is not required to provide a reasonable accommodation if it would pose a "direct threat" to the safety of the employee or others which cannot be eliminated or reduced by reasonable accommodation. *See Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) (under the ADA); *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 614 (3d Cir. 2006) (ADA); *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir.1975) (safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business); *Robinson v. Children's Hosp. Bos.*, No. CV 14-10263-DJC, 2016 WL 1337255, at *8 (D. Mass. Apr. 5, 2016) (granting employer's motion for summary judgment in a case involving employee's refusal to get a flu vaccine for religious reasons, holding that "[u]ndue hardship can also exist if the proposed accommodation would 'either cause or increase safety risks or the risk of legal liability for the employer.'"); *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 757–58 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999) (where a proposed accommodation for a religious practice threatens to compromise safety in the workplace, an undue burden is easy to establish).

Dr. ▮▮▮▮ treats the sickest children in her current role in the Pediatric Intensive Care Unit, and a large number of the patients she will encounter there are not yet eligible to be vaccinated, making them particularly vulnerable to a COVID-19 infection resulting in serious illness.  Accommodating Dr. ▮▮▮▮ request for religious exemption from the vaccination mandate would present a direct threat to the health and safety of our patients and staff, and thus would impose an undue hardship on the University.

Likewise, removing Dr. ▮▮▮▮ duties that require in-person interaction with patients and staff would impose an undue hardship on the University. "An employer incurs an undue hardship if it must 'bear more than a de minimis cost in order to'" provide reasonable accommodation the employee's religious practice. *Tabura v. Kellogg USA*, 880 F.3d 544, 557 (10th Cir. 2018); *see also Hardison*, 432 U.S. at 84.

"The factors to be considered in determining whether an accommodation would cause an employer undue hardship are, among others: the nature and cost of the accommodation; the number of persons employed by the company; the financial resources of the company; and the

---

[1] *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention, August 27, 2021.



**UNIVERSITY COUNSEL**

impact of the accommodation upon the operation of the company." *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1178 (10th Cir. 1999). "The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Tabura*, 880 F.3d at 557–58. Courts have held that the employer is not required to create a new position in order to accommodate an employee, or transform a temporary light duty position into a permanent position. *See Buskirk v. Apollo Metals*, 307 F.3d 160, 169 (3d Cir. 2002) (analyzing ADA duty to accommodate).[2]

Dr. ███ particular skills in the PICU will be difficult to replace, and yet, the University cannot allow her to continue in her current role as an unvaccinated individual because she would pose a direct threat to the health and safety of her pediatric patients. As a result, Dr. ███ is effectively unavailable to perform her job duties due to her religious belief and to accommodate her religious belief clearly poses an undue hardship.

The preservation of health and safety of our patients, students, staff, and faculty is of utmost importance to the University during the public health crisis caused by COVID-19. The University's immunization requirement is vital to that goal. We sincerely urge Dr. ███ to reconsider her position and receive a COVID-19 vaccine, so she can provide patient care to pediatric patients in the intensive care unit of Children's Hospital Colorado without presenting a health and safety risk to patients, colleagues, and herself.

I have conferred with the School of Medicine, and the decision to deny Dr. ███ religious exemption request will not be reconsidered.

Sincerely,

Kimberly Spiering
Senior Associate University Counsel,
Office of University Counsel
13001 E. 17th Place Aurora, CO 80045
Telephone: 303-724-9283
Kimberly.Spiering@ucdenver.edu

---

[2] The ADA cases are applicable to religious discrimination cases under Title VII, as a "claim of religious discrimination under Title VII is similar to a claim under the ADA because, in both situations, the employer has an affirmative obligation to make a reasonable accommodation." *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 n. 5 (10th Cir. 2000).

## RE: Immunization Question

Dwinnell, Brian <BRIAN.DWINNELL@CUANSCHUTZ.EDU>

Wed 5/19/2021 5:02 PM

To: ⬛⬛⬛⬛CUANSCHUTZ.EDU>
Cc: Kireva, Regina <REGINA.KIREVA@CUANSCHUTZ.EDU>; Soohoo, Jeffrey <JEFFREY.SOOHOO@CUANSCHUTZ.EDU>

Hi 

Welcome to CUSOM!

We apologize for the delay but as you can imagine the COVID policies have been evolving.  There will be an official campus policy for all of the professional schools.  There will be exemptions for medical and/or religious reasons. There will be form for either exemption. A medical exemption will require a provider's signature.  A religious exemption will just require the individual's signature attesting to it being consistent with their religious beliefs. Personal choice will not be considered an exemption.

Regardless of the reason for exemption, any student, faculty member, or staff who is not vaccinated will need to wear a mask at all times while on campus or in clinical settings (this is the same for the influenza vaccine as well).  In addition there will likely be required periodic testing.

Let us know if you have any questions. We hope to have the forms available soon.

We look forward to meeting you in person!
Brian D

Brian G. Dwinnell, MD, FACP
Associate Dean, Student Life
Professor of Clinical Practice
University of Colorado School of Medicine

**From:** ⬛⬛⬛⬛CUANSCHUTZ.EDU>
**Sent:** Wednesday, May 5, 2021 11:30 AM
**To:** Kireva, Regina <REGINA.KIREVA@CUANSCHUTZ.EDU>
**Subject:** Immunization Question

Dear Regina,

Greetings from ⬛⬛ I am an incoming MS1 student.

I received an email from Lamar this morning regarding the immunization information prior to orientation and have a question about the requirement. I would like to request an exemption but not sure how to do so. Can you provide me some directions please?

Thank you for your help.

Best Wishes,

⬛⬛



9/21/2021                                                    Mail - █████████ - Outlook

Re: vaccine exemption questions

█████████████████ CUANSCHUTZ.EDU>

Tue 8/10/2021 3:43 PM

To: Neale, Lisa M. <LISA.NEALE@CUANSCHUTZ.EDU>

Hi Lisa,

I have just talked with the Dean of the School of Medicine. May I know if you have time soon to discuss about the next steps please?

The Dean basically stated that the hospitals require vaccination to enter or work with no exemptions. Yet, I found on the following on the government website and not sure how it will work. I really need some help on this..

Here is what I find:

[565] For Colorado requirements, see 6 CCR 1011-1, Chapter 2, Part 10, pertaining to influenza immunization of healthcare workers. 6 CCR 1011-1 Chapter 2, §10.8 provides that each licensed hospital, hospital unit, ambulatory surgical center and long-term care facility shall have a written policy regarding the annual influenza immunization of its healthcare workers that, at a minimum, ensures that each of its healthcare workers has either proof of immunization or a medical exemption signed by a physician, physician's assistant, advanced practice nurse or nurse midwife licensed in the State of Colorado stating that influenza vaccination for that individual is medically contraindicated as described in the product labeling approved by the United States Food and Drug Administration. 6 CCR 1011-1 Chapter 2, §10.8 additionally provides that such written policy must ensure that each healthcare worker who does not have proof of immunization wears a surgical or procedure mask during influenza season when in direct contact with patients and in common areas as specified by the licensee's policy. 6 CCR 1011-1 Chapter 2, §10.6 provides for exemptions to the requirements of Sections 10.7 through 10.12 if a licensed healthcare entity demonstrates that it has vaccinated a targeted percentage of its employees in a given year, using its own methodology, and continues to use the same or more stringent methodology. The minimum targets required for the exemption are 60 percent of employees vaccinated by December 31, 2012; 75 percent of employees vaccinated by December 31, 2013, and 90 percent of employees vaccinated by December 31, 2014 and December 31 of each year thereafter. 6 CCR 1011-1 Chapter 2, §10.5 defines a hospital as a facility licensed and regulated pursuant to 6 CCR 1011-1, Chapter IV, General Hospitals and defines a healthcare worker as any person working in a healthcare entity who has the potential for exposure to patients, residents, or consumers of the healthcare entity and/or to infectious materials, including body substances, contaminated medical supplies and equipment, contaminated environmental surfaces, or contaminated air. The definition of healthcare worker does not include volunteers.

[567] For Colorado, for exemptions to the immunization requirements of 6 CCR 1011-1, Chapter 2, Part 10, see 6 CCR 1011-1, Chapter 2 §10.8(A)(2). 6 CCR 1011-1, Chapter 2 §10.8(A)(2) provides that in lieu of proof of immunization, a healthcare worker may have a medical exemption signed by a physician, physician's assistant, advanced practice nurse or nurse midwife licensed in the State of Colorado stating that influenza vaccination for that individual is medically contraindicated as described in the product labeling approved by the United States Food and Drug Administration. Note also that 6 CCR 1011-1 Chapter 2, §10.6 provides for exemptions to the requirements of Sections 10.7 through 10.12 if a licensed healthcare entity demonstrates that it has vaccinated a targeted percentage of its employees in a given year, using its own methodology, and continues to use the same or more stringent methodology. The minimum targets required for the exemption are 60 percent of employees vaccinated by December 31, 2012; 75 percent of employees vaccinated by December 31, 2013, and 90 percent of employees vaccinated by December 31, 2014 and December 31 of each year thereafter. 6 CCR 1011-1 Chapter 2, §10.5 defines a hospital as a facility licensed and regulated pursuant to 6 CCR 1011-1, Chapter IV, General Hospitals and defines a healthcare worker as any person working in a healthcare entity who has the potential for exposure to patients, residents, or consumers of the healthcare entity and/or to infectious materials, including body substances, contaminated medical supplies and equipment, contaminated environmental surfaces, or contaminated air. The definition of healthcare worker does not include volunteers.

Exhibit 7



Thank you very much for your help.

Best Wishes,



---

**From:** Neale, Lisa M. <LISA.NEALE@CUANSCHUTZ.EDU>
**Sent:** Monday, August 9, 2021 6:57 AM
**To:** ████████████CUANSCHUTZ.EDU>
**Subject:** FW: vaccine exemption questions

Hi █████
Hope you had a nice weekend!  You can see my questions and Legal's answers below in blue.  Please let me know if you would like to meet again.
Thanks,
lisa

Lisa Neale, BA MSS
Pronouns:  she, her, hers
Associate Director, Ombuds Office
Ombuds | Certified Organizational Ombudsman Practitioner
University of Colorado Denver | Anschutz
Fitzsimons Building, Room 7005C
(303)724.2950

Due to the informal (i.e., **off the record**), impartial, independent, and confidential nature of the Office of the Ombuds, communication with this office does not constitute notice to the University of Colorado Denver|Anschutz.  Please remember that email is not appropriate for confidential discussions. For more information about the Ombuds Office, please visit us on the web at http://www.ucdenver.edu/ombuds.

## Confidential  Informal  Impartial  Independent  Voluntary

*Please note the Ombuds Office is temporarily working virtually. We continue to have meetings with visitors via phone and Zoom.  You can also find tips, suggestions and resources at the Ombuzz Blog at https://ombuzz.blog/ .





**From:** Zweck-Bronner, Steve <STEVE.ZWECK-BRONNER@UCDENVER.EDU>
**Sent:** Sunday, August 8, 2021 1:38 PM
**To:** Neale, Lisa M. <LISA.NEALE@CUANSCHUTZ.EDU>
**Cc:** Willits, Jenny W <JENNY.WILLITS@UCDENVER.EDU>
**Subject:** RE: vaccine exemption questions

---

**From:** Neale, Lisa M. <LISA.NEALE@CUANSCHUTZ.EDU>
**Sent:** Friday, August 6, 2021 2:36 PM
**To:** Zweck-Bronner, Steve <STEVE.ZWECK-BRONNER@UCDENVER.EDU>
**Subject:** vaccine exemption questions

Hi Steve,
We are getting inquiries in our office about exemptions.  I'm wondering if you could speak to any of these?

1. Will the university accept religious exemptions at face value or will there be some sort of validation process?  I'm thinking about Jehovah's Witnesses as an example, who, I believe, seek exemptions for all vaccinations.  Conversely, if a person is fully vaccinated against measles, mumps, etc. but want to say this vaccine violates their religious freedoms/rights, will that be acceptable? Pursuant to our policy the religious exemption applies to people whose religion precludes all vaccinations. I am unware of a religion that only prohibits COVID 19 vaccinations ( you should refer people to the campus COVID website. The EEOC allows employers to inquire a bit into the religious exemption.

2. Can programs on the Anschutz campus insist that their students are vaccinated, even if they provide an exemption? Not if they have an approved religious or medical exemption however it may impact they students progression depending on the polices of the clinical sites.

3. Can programs dismiss students if they fail to be vaccinated, even with an exemption? No, but see above

Thanks in advance – I appreciate how complex this all is!

Have a nice weekend,

Lisa

Lisa Neale, BA MSS
Pronouns:  she, her, hers
Associate Director, Ombuds Office
Ombuds | Certified Organizational Ombudsman Practitioner
University of Colorado Denver | Anschutz
Fitzsimons Building, Room 7005C
(303)724.2950

Due to the informal (i.e., **off the record**), impartial, independent, and confidential nature of the Office of the Ombuds, communication with this office does not constitute notice to the University of Colorado Denver|Anschutz.  Please remember that email is not appropriate for confidential discussions. For more information about the Ombuds Office, please visit us on the web at http://www.ucdenver.edu/ombuds.

## Confidential  Informal  Impartial  Independent  Voluntary

*Please note the Ombuds Office is temporarily working virtually. We continue to have meetings with visitors via phone and Zoom.  You can also find tips, suggestions and resources at the Ombuzz Blog at https://ombuzz.blog/ .

9/21/2021                                              Mail - ███████ Outlook





## Re: thanks for meeting

██████████████CUANSCHUTZ.EDU>

Wed 8/11/2021 7:04 PM

To: Zimmer, Shanta <SHANTA.ZIMMER@CUANSCHUTZ.EDU>

Dear Dr. Zimmer,

Thank you for getting back to me. It was also nice to talk with you yesterday, and I do appreciate your help reaching out to the hospital epidemiologists on the hospitals' policy on exemptions. I was frustrated yesterday after our conversation due to the unclear potential impact of me not vaccinated, but I am feeling relieved that hospitals do take exemptions. I cherish the opportunity that the school provides me to study medicine and am grateful that the Deans are providing me alternatives/accommodations while I am self-quarantined, and I will learn it well to serve patients in the future. I do hope the school can value and respect my religious belief and medical concerns, and I will be very happy to work with the school on any situations that may come up. I will also pay attention to the vaccine updates and keep myself informed about the pandemic progress. Hope everything will be settled next year or so, so we all don't have to worry too much about it.

Also thanks for sharing the article with me. I will read it after the Friday exam. And I am looking forward to work with you in the near future.

Have a good evening.

Best Wishes,

██ 

---

**From:** Zimmer, Shanta <SHANTA.ZIMMER@CUANSCHUTZ.EDU>
**Sent:** Wednesday, August 11, 2021 11:34 AM
**To:** ██████████████CUANSCHUTZ.EDU>
**Subject:** thanks for meeting

Dear ████
Thank you again for meeting with me yesterday. I enjoyed getting to meet you and hope to have a chance to see you and your wife in person when she visits some time.
After our meeting, I reached out to the hospital epidemiologists to hear what their approach will be to our students and residents who are not vaccinated.
The response was that for exemptions, masking will be required and twice a week COVID PCR testing.
Below is an article that I received this morning about safety of the vaccine in people who had prior reactions. As I was pondering your history of the response you had to the influenza vaccine and also the TdaP, I thought about the possibility that you also experienced another concomitant viral infection, possibly even influenza itself which can causes some of the symptoms you described, even more commonly than the influenza vaccine.  Just some food for thought about alternative hypotheses. I also wanted to emphasize that the covid vaccine is very different from a design than either the influenza or TdaP vaccines.
Best,
Shanta

---

**From:** Zimmer, Shanta <SHANTA.ZIMMER@CUANSCHUTZ.EDU>
**Sent:** Wednesday, August 11, 2021 8:14 AM
**To:** Zimmer, Shanta <SHANTA.ZIMMER@CUANSCHUTZ.EDU>
**Subject:**

https://www.cdc.gov/mmwr/volumes/70/wr/mm7032e4.htm?s_cid=mm7032e4_w

**Exhibit 8**

Shanta M. Zimmer

## Vaccine Verification Process Completed

vaccine@cuanschutz.edu <vaccine@cuanschutz.edu>

Fri 8/13/2021 10:00 AM

To: ███████████ CUANSCHUTZ.EDU>

📎 1 attachments (299 KB)
Vaccine Verification Form - 8-13-2021.tif;

[External Email - Use Caution]

Hello ███

Thank you for completing the University of Colorado Anschutz Medical Campus vaccine verification process. You have attested that you are vaccine exempted. Please keep this email for your records.

If you **are fully vaccinated**, there is no further action needed.

If you **are not fully vaccinated**, and have submitted an exemption, CU Anschutz requires that you follow all established safety protocols while on campus (complete the daily health questionnaire; wear a mask; observe physical distancing; self-report if symptomatic, test positive or exposed).  A requirement for regular COVID-19 testing may follow.

Learn about current campus protocols: CU Anschutz Return to Campus Information

Find campus FAQ's: CU Anschutz COVID-19 FAQs

Thank you for helping keep #CUAnschutzTogether.

**Exhibit 9**

9/21/2021                                                      Mail - ■■■■■ - Outlook

## COVID Exemption

**Dwinnell, Brian** <BRIAN.DWINNELL@CUANSCHUTZ.EDU>

Wed 8/18/2021 4:10 PM

Cc: Druck, Jeffrey <JEFFREY.DRUCK@CUANSCHUTZ.EDU>; Seymour, Deb <DEB.SEYMOUR@CUANSCHUTZ.EDU>; Shacklock, Haylee
<HAYLEE.SHACKLOCK@CUANSCHUTZ.EDU>; Kireva, Regina <REGINA.KIREVA@CUANSCHUTZ.EDU>

📎 1 attachments (53 KB)

CU Anschutz Religious Exemption Form 8-21.docx;

If you are receiving this, your previous submission for exemption will not meet campus approval based on the new
requirements. As stated previously, with the emergence of the Delta variant, the guidelines would likely change.  The
attached exemption form was provided today by our campus legal team and must be completed and uploaded in both
MyRecordTracker as well as this central campus verification portal: https://www.cuanschutz.edu/coronavirus/vaccine-
information/verification

Please complete this as soon as possible as an exemption must be in place by 9/1/21.  If you choose to be vaccinated, we are
willing to provide you an extension if you receive the first vaccination prior to 9/1/21.

Thank you!
Brian D

Brian G. Dwinnell, MD, FACP
Associate Dean, Student Life
Professor of Clinical Practice
University of Colorado School of Medicine
303-724-6402

**Exhibit 10**



## <u>Religious Exemption From COVID-19 Vaccination Requirement</u>

All University of Colorado Anschutz Medical Campus students are required to be immunized against COVID-19 prior to their participation in courses in the Fall of 2021, which may be as early as June 1, 2021. However, the University recognizes religious exemptions based upon a religious belief whose teachings are opposed to immunizations. Under that circumstance, the University requires that students submit this religious exemption form.

1.      Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a COVID-19 vaccination?  Please include a detailed response.

<u>Please refer to the attached letter of religious exemption request            </u>

2.      Have you had an influenza or other vaccine in the past? How does this differ?

<u>I had vaccines when I was very young and had influenza vaccine in 2016, when I am not given a choice or aware of religious exemptions and public laws. If given a choice, I would not have taken it based on my religious beliefs. For more details, please refer to the letter of religious exemption attached for more details.                                              </u>

By signing below, I acknowledge that although a religious exemption from the required COVID-19 vaccination is recognized by CU Anschutz as the student's right, the clinical, lab, practica, and internship sites that partner with CU Anschutz, may reserve and exercise their right to decline or rescind a student's clinical placement if that partner does not recognize this religious exemption or does not allow unvaccinated individuals on their premises.

Student Name:_____███████████_____

<u>Statement of Exemption</u>
I am hereby claiming a religious exemption from vaccination against COVID-19 as indicated above.
I attest that the information I have provided on this form is complete and accurate.
I understand that claiming this religious exemption may affect my progression at CU Anschutz as described above.
I also understand that because I am not being vaccinated against COVID-19 I will be required to follow CU Anschutz policies and procedures that apply to students who are not vaccinated against COVID-19 during the entire time I am enrolled ████████████████████████

**REQUIRED** Student Signature:___███████████████████_____

Date: _____08/23/2021_____

Exhibit 11

Request for a Religious Exemption

███████

Aug 22nd, 2021

School of Medicine

University of Colorado Denver

1635 Aurora Ct, Aurora, CO 80045

To whom this letter may concern,

My name is ███████ and I am a first-year medical student at the School of Medicine, University of Colorado Denver Anschutz Medical Campus. As an international student from Canada, I was welcomed by the school and was very excited to meet student peers during the orientation, while I have enjoyed studying medicine for the past three weeks since the semester had begun. As a contributing member of the student community, I plan to run for various representative positions at the Medical Student Council and various interest groups, while I also intend to take the Global Health Track to incorporate my interest in global health with the practice of medicine. I am grateful for this precious education opportunity that I have received from the School of Medicine as well as the academic and social support from the Deans at the Office of Student Life. It is my plan to study medicine well and work diligently to complete my M.D. degree at the School of Medicine, so that I can employ my medical knowledge to provide patients the best treatments.

The purpose of this letter is to respectfully request a religious exemption for vaccination at the University of Colorado Denver Anschutz Medical Campus. My request is based solely on religious grounds, pursuant to my right within the Colorado Law Revised Statues § 25-4-902, 903, Senate Bill 20-163, and House Bill 14-1288, as well as my right to religious freedom within the First Amendment of the United States Constitution. Medical immunizations have issues that are contrary to my Buddhism beliefs as I practice them on a daily basis. Enclosed in this letter, is a detailed elaboration of my practice of Buddhism as well as my understanding of the Buddhism truths that prohibit vaccination, which are supported by scriptures that concur with my religious convictions. It is my intention to share with and help the readers to understand my unique perspectives on the ideology and presence of Buddhism in my life.

Before elaborating more details on my religious ideologies, I would like to humbly request that this letter be treated with confidentiality and would greatly appreciate a high level of discretion and privacy in handling my request for the religious exemption. My relationship with the Buddha, understanding of the Buddhism philosophy and its practices are topics more of self and inner contemplation of my mind and body, which are not discussed or shared in daily conversations with others. As a result, I would expect one or at most a limited number of people will review my request and be made aware of my request for a religious exemption.

**Exhibit 12**

1 | P a g e

Having grown up in a family that believes in Buddhism, I began my own discovery of the Buddhism truths at the age of 21 when I began learning meditation, reading scriptures, adhering to the Buddha's teaching principles, and practicing them in my daily life. My faith had led me to realize that vaccination is antithetical to the Buddha's scriptures and Buddhism teaching. It was my regret that I didn't realize this conflict earlier in my life. My previous vaccinations, in contrast, was performed at my birth or in my early childhood as I was a minor, when it was not my personal choice to be vaccinated but the choice of the health care systems and the government in China that didn't provide alternatives or exemptions. The only time that I took a vaccine ever since I was 21 was the influenza and Tdap vaccine at the University of Michigan in 2016, which was required for volunteering at the hospital. Yet, as an international student who were not familiar with the laws in the U.S., I was neither aware of nor informed about the opportunity to request a religious exemption before getting the vaccine. I was forced to choose between my religion and my education. I struggled and waited until the very last day to receive the vaccine. Later in my educational training in public health and epidemiology, I began aware of the health care laws, especially the option of filing vaccination exemptions under the U.S. Constitution and local state laws. Since then, I have vowed to the Buddha that I will never go against my faith again and will adopt my religious beliefs as the basis for my medical care and healthcare related decisions.

**My personal story in Buddhism**

I grew up in a family that cherished Buddhism. Although not educated with knowledge in Buddhism, my parents frequently brought me to the local Buddhism monasteries for praying to the Buddha and Boddhisatva when I was young. After beginning studying abroad out of my home in China, I had visited many Buddhism monasteries and took praying to the Buddha as a monthly activity out of my school. At the age of 21, I had a gap year before attending college and decided to explore more in Buddhism. I went to a well-known monastery in the mountain in northeastern China and spent days there attending ceremonies and learning Buddhism scriptures. There, I took my three refuges and five precepts, and vowed to the Buddha that I would abstain from killing, stealing, sexual misconduct, lying, and intoxication. Upon entering college, I have decided to become a vegan, as the Buddha said not to eat animals because our lives are created all equal in this universe and it is not right for one to kill and eat another. Meanwhile, I began sitting meditation on a weekly basis to cultivate my mind, especially exploring the connection between the mind and the body as well as that and the universe. Through meditation, I came to the realization that the body and mind are in unity, where one's wellbeing will affect the other's. During the winter or summer breaks, I usually spent weeks traveling to a monastery in California to attend Buddhism retreats and listen to the dharma masters' teaching on Buddha's scriptures. Throughout these years, I gradually developed a strong understanding of the Buddhism philosophy and learned to incorporate it in my daily life.

My Buddhism philosophy in one of the five precepts, not killing, has made the strongest impact on my academics and daily life. As a participant of the summer undergraduate research internship program at University of Texas-Southwestern Medical School after my sophomore year, I was initially assigned to a lab that focus on DNA analysis on drosophila and mice. After being introduced to the lab during my first day, I realized that the lab's research relied heavily on killing drosophila and mice, sacrificing their bodies to obtain DNA samples for analysis. I felt uncomfortable about killing living

beings and sacrificing their life for publishable research outcomes, and shared my concerns with the program director, who helped me identify another lab that didn't involve the use of animals. On another occasion in my senior year, I was studying a biology course on neurodegenerative diseases, in which students were taught to grow drosophila and sacrifice them in weeks to compare their DNA samples. Realizing that the practice ran against my Buddhism belief, I shared my thoughts with the professor and was glad that he made an accommodation for me during the course and asked me to volunteer in the Virginia Home, a location for patients of intellectual disabilities, instead. There are many instances like these in the past ten years, and I was grateful that I could adhere and practice my faith of not killing in my daily life.

I came to realize the connection of body and mind through the sharing of a teacher in spirituality and Buddhism. More than thirty years ago, she was diagnosed with blood cancer and her doctor informed her that she would not live very long even with the medical treatment such as chemotherapy. Instead of feeling distressed or discouraged, she turned to her inner-self and practice the Buddhism philosophy by connecting with her mind. By sending love vibrations to the environment and aligning herself to the soul, natural loving intelligence, wisdom, knowing, and intuition, she healed her mind on her own and the body rehabilitated. To her doctor in the hospital, it was a miracle and the physiological change in her body cannot be explained by medical science. Yet, to her, it was not a miracle, as she shared with me that it was a normal practice of self-healing without interference from outside treatment, such as chemotherapy, that everyone is capable of performing. With her sharing, I gradually began exploring the underlining meaning behind the Buddha's scriptures; through the practice of connecting the mind and the body, I can perceive how they affect each other and maintain the alignment of my mind with the love vibration which subsequently keep my body healthy.

Meditation is another pathway for me to explore and realize my connection with the Buddha. Through sitting meditations, I occasionally could perceive the past life of mine and vision the future. It has led me to realize that the body is like a carrier of the soul while the soul has all knowing and healing potential, just like the teacher has shared with me. I began contemplating the deep meaning of the Buddha's scripture and reflecting on my daily life experiences through meditation, and it frequently occurred to me that I could understand the Buddha's teaching more profoundly afterwards. Meditation has therefore become an inseparable part of my life for many years.

**The Buddha's Scripture and Vaccination**

Throughout the past 10 years, I have explored the meaning of the Buddha's scripture and followed its guidance in my life. Medical vaccination was not endorsed in the Buddhism's teaching, and I have quoted the following lines from scriptures and teachings from dharma masters to elaborate my reasoning.

The Dharma Master Xuan Hua who set up the City of Ten Thousand Buddhas in California had said, "*our thoughts directly lead to our life experiences. Good thoughts will draw pleasant outcomes, while bad thoughts will result in serious consequences. If accumulated for a long time, the bad thoughts and their associated consequences may lead to karma, manifested by diseases and sufferings on human beings*." The Buddha also stated "*All states of being are determined by mind. It is mind that leads the way. Just as the wheel of the oxcart follows the hoof print of the animal that draws it, so suffering will*

surely follow when we speak or act impulsively from an impure state of mind." My understanding of this teaching is that one can maintain his or her good health through the purity of thoughts and actions, not sustained through vaccinations. If a person's thought and action is not proper, a vaccination will not heal that person's diseases. In another word, suffering and disease will certainly follow if one's actions and words are not generated from a pure heart and mind. As a result, the solution to resolve a disease and return to the healthy balance between mind and body is to reflect on one's own thoughts and actions and to realign them with the purity and properness, rather than through vaccinations; the body will heal itself, just like my teacher's personal story shared before. Moreover, as the vaccines are not created by the nature, it creates disturbance to the balance and interactions among the mind, body, and nature, a lesson that I have personally experienced after the last vaccination in 2016. (when I was not aware of the option of religious exemption) My mind and body were blocked off from the natural, true intelligence, health, happiness, creativity, and evolvement that I usually kept connected with the Buddha, leading me unable to experience the true self and pursue enlightenment. As a result, I chose to abstain from vaccinations in order to maintain my true self.

Diseases and sufferings may seem intimidating but the Buddha has taught me that "*correct suffering*" teaches one what to do right next time. The Buddha said, "*As medicine puts an end to sickness, so Nirvana to all sufferings.*" Medicine may be used to end a sickness temporarily, but if the suffering has not led one's realization of correcting his or her mind, it will come back again and sometimes will be even worse than its previous appearance. Vaccines circumvents potential diseases and subsequently the sufferings that one may need to experience, but this is not helpful for one to learn and achieve enlightenment through suffering. Sometimes, such sufferings may lead to death, but in Buddhism, death does not mean the end to learn and experience the world. The soul will enter the wheel of the six realms and come back to life until Nirvana is achieved. As a result, death itself is a lesson for one's soul to learn as well. If one can realize the origin of the suffering and correct the thoughts or actions, one will complete a lesson and avoid repeating the same suffering in the next life. My understanding of the Buddhism in this aspect has informed me that vaccination should not be taken as it may eliminate the "*correct sufferings*" from my life.

Sometimes people may need medications, and the Buddha's teaching has taught me well on this aspect. The Buddha said, "*Do not dwell in the past, do not dream of the future; concentrate the mind on the present moment,*" and "*All that we are is a result of what we have thought, it is founded on our thoughts, it is made up of our thoughts. If a man speaks or acts with pure thought, happiness follows him, like a shadow that never leaves him.*" Vaccination is developed as a preventative method for a potential disease in the future and will lead one's mind to concentrate on the future instead of the present moment, an opposition from the Buddha's teaching. Moreover, the Majjhima Nikaya taught me, "*reflecting wisely, one uses the medicinal requisites only from protection from arisen afflictions.*" *(Chapter 2. Sabbasava Sutta, Pg. 49, verse 16)* Medications shall be used only for present, arisen afflictions, not upcoming, potential ones. As vaccinations focus on the future, I would stay following the Buddha's teaching and focus on the present, and therefore choose not to be vaccinated.

Even when medications are required, the Buddhism philosophy has provided me a solid foundation in selecting medicine or treatment plans for myself. In Buddhism, I was taught that all living beings in this world are created equally; one should not initiate harm on another, as it will initiate hatred

and hinder one's ultimate achievement of enlightenment and nirvana. Not-killing, one of the precepts, elaborated this better in daily life, as I learn to cherish the lives of all and even the small beings, such as a drosophila or a fly, and became a vegan for over ten years so far. In the past ten years, I decided not to use products that involve with animal ingredients or animal testing, so as to adhere to the Buddha's teaching on Not-killing and Not-harming. As the ingredients of vaccines contain either animal-derived chemicals or go through animal testing before going public, or both, it creates harm and discomfort to the animals. Therefore, I identify it as not suitable for my health use, and choose not to take it based on my practice of not-killing and not-harming in Buddhism.

As a faithful Buddhism believer, I am exercising my understanding of and following the Buddha's teaching on the matter of vaccinations. It would be considered as immoral and a betrayal to myself and my faith, if I choose to do otherwise. As a result, it is my hope that my sincere decision of not to be vaccinated, based on my genuine religious beliefs and practices, will be honored and respected by the school. Moreover, I wish the exemption will be granted, as I like studying at the school of medicine and hope to complete my medical education here.

(This being a very private and personal matter, I ask that it remains confidential and only for the eyes of relevant persons within the university. Thank you for taking the time to read my letter and for your consideration in this matter.)

Sincerely,

███████

MD Class of 2025

School of Medicine

University of Colorado Denver Anschutz Medical Campus

9/21/2021                                                                 Mail - ▮▮▮▮ - Outlook

## Vaccination Exemption

Dwinnell, Brian <BRIAN.DWINNELL@CUANSCHUTZ.EDU>

Tue 8/24/2021 11:59 AM

To: ▮▮▮▮▮▮▮▮▮UANSCHUTZ.EDU>

Cc: Zimmer, Shanta <SHANTA.ZIMMER@CUANSCHUTZ.EDU>; Spiering, Kimberly <KIMBERLY.SPIERING@UCDENVER.EDU>

Dear ▮▮▮,

Thank you for submitting your request for religious exemption. The request has been reviewed and we need you to provide more information.  This applies to all outstanding vaccinations.

Please provide documentation that demonstrates that your religion is opposed to all immunizations.  Citations from specific documents are not sufficient.  The University will only accept requests for religious exemption that cite to the official doctrine of an organized religion, in this case, Buddhism, as announced by the leaders of that religion.  Please provide this documentation by the end of the day on August 26, 2021.

Please note that, in the course of reviewing your request, the University learned that the Dharma Realm Buddhist University set up by Dharma Master Xuan Hua who you list in your letter is in fact requiring vaccinations for all of its students, faculty and staff. https://www.buddhistdoor.net/news/dharma-realm-buddhist-university-in-california-resumes-in-person-classes-with-largest-student-cohort

If you are not able to submit documentation to support your request for a religious exemption by the end of the day on August 26, 2021, the University will require that you comply with vaccination as the other Buddhist followers at DRBU are required to do.  Without an approved religious exemption, you must demonstrate to us that you have initiated the vaccine process by September 1st or you will be referred to the School of Medicine's Promotions Committee for dismissal. As an alternative, you may choose to withdraw from the School of Medicine. If you think you would be willing to take the vaccine after more deliberation, you could request a leave of absence.

Sincerely,
Deans Dwinnell and Zimmer


Brian G. Dwinnell, MD, FACP
Associate Dean, Student Life
Professor of Clinical Practice
University of Colorado School of Medicine
303-724-6402



August 26, 2021

To: The School of Medicine, Drs. Brian Dwinnell and Shanta Zimmer

From: ████████

Re: Additional request for COVID-19 vaccine exemption

My name is ████████ and I am a first-year medical student at the School of Medicine, University of Colorado Denver Anschutz Medical Campus.

The purpose of my letter is to supply additional information on my sincerely held religious belief and practices and to respectfully request a religious exemption for vaccinations. As I will describe below, **the essence of my request relates to the fact that current COVID-19 vaccines were all produced using human fetal cell cultures and, accordingly, were developed by taking a life which violates the fundamental tenets of my long-held Buddhist religion.**

The School of Medicine, University of Colorado Anschutz, is requesting and directing me, a student enrolled in the Medical Doctor program, to get vaccinated with a COVID-19 vaccine. However, I cannot receive a COVID-19 vaccine because to do so violates my sincere and long held religious beliefs and practices as a Buddhist.

My letter will further elaborate my religious beliefs and practices and request the religious exemption for COVID-19 vaccinations. Additional letters will be provided requesting exemptions for other vaccinations, including Hepatitis B and Influenza. Moreover, in this letter, you will find more information on the definition of religion and religious discrimination from the legal perspective and my responses to your initial reply (August 24, 2021 email) to my initial request for exemption. My request is solely based on my sincerely held belief in Buddhism and my relationship with the Buddha, and I would also respectfully invite the school to consider my exemption request solely on the ground of my sincerely held beliefs and practices in Buddhism.

Before elaborating, I would again like to humbly request that this letter be treated with confidentiality and would greatly appreciate a high level of discretion and privacy in handling my request for the religious exemption.

I took my three refuges and five precepts at a Buddhist monastery near my home at a very young age and attended dharma assemblies in China and in the U.S. throughout the past years. These interactions cultivated my Buddhism beliefs and my connection with the Buddha. At my home, I also established a room for an Avalokitesvara Boddhisatva statue and have followed the practice of worshipping, reciting sutras, and performing meditations on a daily basis. As a sincere believer in Buddhism and a follower of the Buddha's teaching, I became a vegan for over a decade and will continue until the end of my life. I have attached a photo of proof of the three refuges and five precepts that I received when I was young and a photo of the Boddhisatva statue at my home.

The currently available COVID-19 vaccines in the U.S. market are either developed from, or tested on, fetal cell lines from aborted babies. Johnson & Johnson required the use of fetal cell cultures, specifically PER.C6, to produce and manufacture its vaccines. Pfizer and Moderna used the fetal cells to characterize the SARS-CoV-2 spike protein and applied such a cell line to test the efficacy of both vaccines. None of the vaccines is completely free from any use of abortion-derived cell lines.

(http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf)

As a sincere Buddhist, I believe that production of vaccines using fetal cells from aborted babies is directly against my belief in the Buddha's doctrine of not-killing and not-harming. The first doctrine from the Five Precepts that I adopted many years ago is to "…refrain from taking life". I believe in not killing any living being in any form,

Exhibit 14

including humans, animals, and even the small ants or flies. I believe that life should not be destroyed and reject abortion because it involves the deliberate destroying of a life.

The Buddha teaches me that all of "life is one." This phrase means that "…all forms of life are essentially related to one another and share a common essence." I believe that all lives are basically equal, and they only differ in terms of expressions of life and the external forms of beings. The Buddhism teaching also states that "…individual human life begins at conception, and the new being, bearing the karmic identity of a recently deceased individual, is therefore as entitled to the same moral respect as an adult human being." A fundamental principle in Buddhism is the Wheel of Rebirth, in which "…all forms of life will be reincarnated according to the karma they accumulated while living. Someday, in the process of reincarnation when all karma has been completely exhausted, the wheel of rebirth can be stopped," and one will achieve Nirvana. As a result, if a Buddhist wants to reach this Nirvana, he or she must carefully observe the 8-fold Path and the Ten Precepts that help prevent any accumulation of karma. This is because the karma of killing, for example, is very heavy. "If one kills a sentient being, then for 500 lifetimes one will be killed by others," as the Buddha teaches.

The Mahayana Brahajala Sutra explains the first precept in this way: "A disciple of the Buddha shall not himself kill, encourage others to kill, kill by expedient means, praise killing, rejoice at witnessing killing, or kill through incantation or deviant mantras. He must not create the causes, conditions, methods, or karma of killing, and shall not intentionally kill any living creature."

Based on these lessons that I learned from my connection with the Buddha and Buddhism's scriptures, I believe that destroying a baby's life at conception is equal to destroying an individual's life and therefore contrary to my religious beliefs. I also believe that a fetal cell is a living form, and the use of the living form in the production of vaccines is against the teaching of the Buddha, because it praises and encourages killing and violates the First precept of the Buddhist doctrine.

Thus, it is my sincerely held religious belief that, if being vaccinated with any of the currently available vaccines like Pfizer, Moderna, and J&J, I would be cooperating with and complicit in abortion -killing-, and this would result in a strong karma in my life and a violation of the Buddha's teaching—a violation for which I would be held accountable for and be harmed in my ability to achieve Nirvana. Moreover, I am opposed to taking all vaccines that have a connection to abortion or the use of human fetal cells.

For these reasons, I request a religious exemption that will exempt me from having to receive a COVID-19 vaccine. In the meantime, I would also respectfully ask that no adverse action be taken against me on account of my religious beliefs. I recognize that I could be a symptomatic carrier of COVID-19 and, consequently, I am willing, however, to comply with accommodations such as masking and weekly testing to ensure that I am healthy and functional in my daily learning activities and interactions with patients. If exposed or self-identified as COVID-19 positive, I will stay in quarantine and refrain from interacting with others until I am recovered from the illness. Meanwhile, I am also open to future alternative options for vaccinations, if they don't violate my sincerely held belief.

The followings are to clarify legal perspectives on religious belief and respond to the schools' denial letter dated Aug 24th, 2021. Key information is underlined.

1. According to the Title VII of the Civil Rights Act of 1964 and the U.S. Equal Opportunity Employment Commission's guidance on religious discrimination, the definition of religion is broad. Title VII defines "religion" to include "all aspects of religious observance and practice as well as belief," not just practices that are mandated or prohibited by a tenet of the individual's faith. Religion includes not only traditional, organized religions such as Christianity, Judaism, Islam, Hinduism, Sikhism, and Buddhism, but also religious beliefs that are new, uncommon, not part of a formal church or sect, only subscribed to by a small

number of people, or that seem illogical or unreasonable to others.[19]  Further, a person's religious beliefs "need not be confined in either source or content to traditional or parochial concepts of religion." A belief is "religious" for Title VII purposes if it is "religious" in the person's "own scheme of things," i.e., it is a "sincere and meaningful" belief that "occupies a place in the life of its possessor parallel to that filled by . . . God."  The Supreme Court has made it clear that it is not a court's role to determine the reasonableness of an individual's religious beliefs, and that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." An employee's belief, observance, or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief, observance, or practice, or if few – or no – other people adhere to it. Religious beliefs include theistic beliefs as well as non-theistic "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." Religious observances or practices include, for example, attending worship services, praying, wearing religious garb or symbols, displaying religious objects, adhering to certain dietary rules, proselytizing or other forms of religious expression, and refraining from certain activities. Determining whether a practice is religious turns not on the nature of the activity, but on the employee's motivation. (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_9593682596821610748647076)

A guidance for employers on evaluating religious accommodation requests is as follows. Though it refers to a different state, it is only released on Aug 23rd, and similar legal procedures or professional conducts shall be expected to be released in Colorado.

2.  According to the U.S. Equal Opportunity Employment Commission's (EEOC) guidance on religious discrimination, because the definition of religion is broad and protects beliefs, observances, and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief. If, however, an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice, the employer would be justified in seeking additional supporting information.   In determining whether an employee's religious belief is sincerely held, a limited initial inquiry could include objective, general questions, without delving too far into an employee's reasons for a particular belief and without requiring input from an outside source, such as a formal religious leader. Such inquiries might include asking how long the employee has followed the professed belief or what constitutes the basic tenets of the religion. The employer does not have to accept a high-level statement of religious observance that provides no details; an employer can ask about the specific belief, tenet, or observance that conflicts with the vaccination requirement. The template religious accommodation request form includes a question about the conflict presented. Employers should proceed with caution and obtain legal advice before seeking additional supporting information if they have doubts as to the sincerely held religious belief, including third-party verification (e.g., requesting verification from the employee's pastor, rabbi, church elder, etc.). Because the definition of religion is broad and protects beliefs, observances, and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief.

(https://www.k12.wa.us/sites/default/files/public/communications/2021docs/FAQ-COVID-19-Vaccine-Requirement-for-K-12-School-Employees.pdf)

The Employment Law Landscape reveals the following:

3.  Exemption from a Vaccine Mandate Based on Religious Beliefs:

An employee may request, based on a sincerely-held religious belief, <u>to remain unvaccinated, receive only a specific brand of the COVID-19 vaccine, or wait for an alternative version of the vaccine to become available</u>. Employers should process these requests in the same manner as other accommodation requests. "Religion" is defined broadly under Title VII. According to the Guidance, <u>employers should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance</u>, "unless the employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance," in which case the employer could request additional supporting information.

([https://www.employmentlawlandscape.com/2021/06/eeoc-updates-vaccine-guidance-accommodation-confidentiality-employer-incentives-and-more/](https://www.employmentlawlandscape.com/2021/06/eeoc-updates-vaccine-guidance-accommodation-confidentiality-employer-incentives-and-more/))

Also, "Sincerely Held Religious Beliefs Do Not Need to Be Express Tenets of a Religion in Order to Require Accommodation."

4. In religious discrimination cases, employers often believe that the burden is on the employee to prove that the sincerely held religious practice (for example not getting vaccinated) is an express requirement of the employee's religion, and absent proof of such requirement, no accommodation is necessary.  However, <u>the definition of sincerely held religious belief is not necessarily tied to express religious requirements</u>.

([https://www.callaborlaw.com/entry/defining-sincerely-held-religious-beliefs-that-might-excuse-mandatory-covid-19-vaccination](https://www.callaborlaw.com/entry/defining-sincerely-held-religious-beliefs-that-might-excuse-mandatory-covid-19-vaccination))

In the meantime, I have consulted with Harry Mihet, Esq., Vice President of Legal Affairs and Chief Litigation Counsel for Liberty Counsel, regarding my sincerely held, religious beliefs. He cited:

5. Supreme Court of the United States: Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 714 (1981) "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences . . . and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. <u>Courts are not arbiters of scriptural interpretation</u>"

6. Supreme Court of the United States: Frazee v. Ill. Dep't of Emp. Sec., 489 U.S. 829, 834 (1989) "Undoubtedly, membership in an organized religious denomination, especially one with a specific tenet forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs, but we <u>reject the notion that to claim the protection [for sincerely held religious beliefs], one must be responding to the commands of a particular religious organization</u>."

7. First Amendment of the United States Constitution:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The First Amendment <u>guarantees freedoms concerning religion, expression, assembly, and the right to petition</u>.  It <u>forbids Congress from both promoting one religion over others and also restricting an individual's religious practices</u>.  It guarantees freedom of expression by prohibiting Congress from restricting the press or the rights of individuals to speak freely.  It also guarantees the right of citizens to assemble peaceably and to petition their government. ([https://www.law.cornell.edu/constitution/first_amendment](https://www.law.cornell.edu/constitution/first_amendment))

I also consulted KrisAnne Hall, J.D., Chief Counsel, Liberty First Legal, Inc., on my case, and she cited:

8. Under Title VII of the Civil Rights Act of 1964, individuals have the right to be free from discrimination based on religion. Title VII prohibits two categories discrimination. It is unlawful:

a. "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

b. (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e—2(a).

The above quotations are for the school's reference on the legal rights of my sincerely-held religious belief. I also have kept and will continue being in touch with the American Civil Liberties Union of Colorado (ACLU), The National Association for the Advancement of Colored People (NAACP), and Marie Miller, J.D. The Institute for Justice, for more legal perspectives of my sincerely-held religious belief.

My religious beliefs are sincerely held for decades. Legally, I cannot be required to prove a church, a monastery or a religious leader agrees with my sincere religious beliefs, my interpretation of the Buddha's scripture, or my instruction from the Buddha. My beliefs are my own, sincerely and deeply held for many years. Below are responses to the school's claims in the email dated Aug 24, 2021, to my initial religious exemption request.

1. From my conversation with the Deans and from the claims laid in the email sent to me by the School of Medicine, it was apparent that my religious beliefs were misconstrued as a personal preference. But the citations and laws discussed above support and recognize the existence of my sincerely held religious beliefs. Moreover, from the point of religion, it is expected that no government, and no employer or school, has the right to inform me what I should believe or that what I believe is not acceptable. My sincerely held religious beliefs are not meant to be judged by others or deemed unacceptable, according to the Constitution. As a result, it is be subject to a violation of law and considered religious discrimination if my sincerely held religious beliefs are judged and not treated respectfully.

2. The School of Medicine's claim that "The University will only accept requests for religious exemption that cite to the official doctrine of an organized religion, in this case, Buddhism, as announced by the leaders of that religion." The doctrines of the Five Precepts were introduced in Buddhist teaching over 2500 years ago and they are widely recognized among Buddhists and leaders. There are certainly rooms of disagreement among groups or individuals under the various forms of Buddhism or any other religion, but disagreements do not necessarily lead to derecognition and disrespect. As underlined in the previous legal section, my sincerely held religious beliefs and practices are not meant to be judged by or necessarily agreed by a particular religious group leader. It is my own sincerely-held religious beliefs and practices of Buddhism and my relationship with the Buddha, which is protected by the law. Clearly, it must be illustrated that the school's claim or request, that all my religious beliefs and practices must be approved by a religious leader in order to be recognized as religious, has the lack of support from the U.S. law on religious freedom and religious discrimination, and therefore has the potential of violating the law in this aspect.

3. The School of Medicine's request to demonstrates that my religion is opposed to all immunizations. It has to be acknowledged that vaccinations or immunizations were a relatively recent invention thanks to the advancement of science and technology. All religions, prior to the first developed vaccines for small pox in the 1700s, have no scriptures about blood or RNA vaccinations or immunizations, because they were

conceived thousands of years ago. Since then, the scriptures or doctrines are subjected to diverse, not necessarily mutually-agreed, interpretations, by a sincerely religious believer like me or others, which serve as guiding principles on one's life.

From the legal perspective, the requirement for an official doctrine explicitly commenting on vaccines has no basis in either Colorado or federal law. In contrast, most of the case law relating to this area of the law suggests that a sincerely held religious belief can be either theistic or a moral and/or ethical belief as to what is right and wrong. Both, however, are acceptable if they are sincerely held. Colorado law, specifically, affirms this principle by explicitly providing that a valid "nonmedical exemption" can be based upon "a religious belief whose teachings are opposed to immunizations or a personal belief that is opposed to immunizations." C.R.S. 25-4-901(1.7). This language almost certainly precludes imposing a requirement of official doctrine documentation. Moreover, religions are defined by the beliefs of its constituents, not uniform statutory constructs. The writings of Buddha predate vaccinations. I recognize that other individuals who practice my religion reach different conclusions about what is/is not permissible. I can only define my religious beliefs. The tenants of my religion, based on my interpretation and practice, preclude me from receiving vaccinations. It is expected that the school's responsibility is to determine whether my beliefs are sincerely held. To require an "official doctrine" discriminates against my religion. I invite the school to acknowledge this point. As I have shared with the school about my sincerely held religious and guiding principles of Buddhism in my life, I humbly ask that the school respects my religious belief and principles that I adopted from Buddhism.

4.  The School of Medicine claims or requests that I need to comply with other Buddhis followers at DRBU. The respected Dharma Master Xuan Hua, whose teaching has made an important impact on my sincerely held religious beliefs, have passed away in 1995. He established the City of Ten Thousand Buddha (CTTB) in California in the early 1960s-1980s. CTTB is a Buddhism monastery that not only welcomes Buddhists of all groups or individuals but also other religions including but not limited to Christianity, Judaism, Daoism and others. There is no enforcement from the CTTB that one has to be a particular type of Buddhist in order to enter, live, or practice Buddhism there. CTTB is a monastery where I frequently visited in the past, but it doesn't mean that I would need to follow CTTB's guideline, especially when I am not physically there. It needs to be emphasized that my own sincerely held religious beliefs and practices are not controlled by the CTTB, or any other monastery across the world. Also, my relationship with the Buddha and my sincerely held religious beliefs in Buddhism are not meant to be judged by a third party. On the other hand, DRBU is a registered university in California, which is required by law to follow the public health guidance. It has to be clearly stated that I have no public or private relationship with the DRBU. As a result, the guidelines DRBU is following does not apply to me. It is recommended that the school shall conduct more research on this matter professionally before making any claims. The school's claim on DRBU, enforcing me to follow its guideline, is not grounded and lacks the support of the law.

I invite the university and the school to review its initial claims, to make legal and thorough claims, and to recognized and respect my sincerely held religious belief. It is not my intention to create conflict. As a sincere Buddhist for over decades, I hope the university will value and respect my religious belief, consider my case, and grant me an exemption for the COVID-19 vaccines so that I can continue being a medical student and become a great physician in the future. Thank you for reading this letter and your consideration.

Sincerely,

███████

M.D. Candidate, Class of 2025



**Undergraduate Medical Education**

Building 500, Room E1330
13001 East 17th Place, MS F523
Aurora, CO  80045

August 30, 2021

**VIA ELECTRONIC MAIL**

Re: ▮▮▮▮ – *Request to Reconsider Vaccine Exemption*

Dear ▮▮▮▮

This letter is in response to your letter dated August 26, 2021, in which you ask the University of Colorado Anschutz Medical Campus ("University") to reconsider its decision to deny your religious exemption request related to the University's mandatory COVID-19 vaccination requirement.

The University adopted its COVID-19 Vaccination Policy for the purpose of protecting the health and safety of the campus community including the patients that medical students treat in University, UC Health, and Children's Hospital clinics. The University determined that a mandatory vaccination requirement for its employees and students is the best way to accomplish this goal.

A recent study by the Centers for Disease Control and Prevention found that individuals who have not been vaccinated were nearly five times more likely to be infected with COVID-19 than vaccinated people. In addition, the study found that unvaccinated people are about 29 times more likely to be hospitalized with COVID-19 than those who are fully vaccinated. [1]

The University's mandatory vaccination policy offers exemptions to individual's whose religious beliefs are opposed to all vaccinations.  When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you had several objections including (1) your belief that the COVID-19 vaccines involve cell lines from human fetal cell cultures, (2) your belief that the vaccine may be harmful to your body, and (3) your belief that a mandatory vaccine requirement violates your right to free choice.

The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine, disbelieve the scientifically accepted view that it is harmless to most people, and express concern that a mandatory requirement infringes on your freedom. The basis for your objections are all of a personal nature and not part of a comprehensive system of religious beliefs.

Your materials include numerous legal citations that we have discussed with our legal counsel and we respectfully disagree with your interpretations.

Having reconsidered your exemption request, it is denied. You must submit documentation that you have received the first vaccine via the campus portal by September 1, 2021.  You will be allowed to continue attending school between the time you receive your first vaccination and the time you are fully vaccinated (two weeks after you receive the second dose of the vaccine). Failure to submit documentation that you have received the first vaccine by September 1, 2021

---

[1] *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention, August 27, 2021.

**Exhibit 15**

will result in a referral to the Promotions Committee for further action, up to and including dismissal.


Sincerely,

Shanta M. Zimmer, MD
Professor of Medicine,
Senior Associate Dean for Education,
Associate Dean for Diversity and Inclusion



School of Medicine

UNIVERSITY OF COLORADO
**ANSCHUTZ MEDICAL CAMPUS**

**Undergraduate Medical Education**

Building 500, Room E1330
13001 East 17th Place, MS F523
Aurora, CO  80045

September 2, 2021

**VIA ELECTRONIC MAIL**



@cuanschutz.edu

*Re: Request to Consider Vaccine Exemption based on Religious Grounds*

Dear Mr  :

On December 21, 2020, the Vatican's doctrinal office, the Congregation for the Doctrine of the Faith (CDF), issued a statement noting it is "morally acceptable" for Catholics to take vaccines against COVID-19.  Among other things, the CDF stated:

"All vaccinations recognized as clinically safe and effective can be used in good conscience with the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion from which the cells used in production of the vaccines derive" … "the morality of vaccination depends not only on the duty to protect one's own health, but also on the duty to pursue the common good."

"In the absence of other means to stop or even prevent the epidemic, the common good may recommend vaccination, especially to protect the weakest and most exposed."

In a statement released on December 14, 2020, the United States Conference of Catholic Bishops (USCCB) reiterated that, given the urgency of the crisis, "the lack of available alternative vaccines, and the fact that the connection between an abortion that occurred decades ago and receiving a vaccine produced today is remote, inoculation with the new COVID-19 vaccines in these circumstances can be morally justified."

The Colorado Catholic Conference of Bishops reaffirmed in its letter dated August 5, 2021, that use of some COVID-19 vaccines is morally acceptable. The CCC explains that a decision not to receive the COVID-19 Vaccine is a personal decision based on each person's conviction.

The University does not accept personal beliefs as a basis for not complying with its Covid 19 vaccination requirement.

The University adopted its COVID-19 Vaccination Policy for the purpose of protecting the health and safety of the campus community including the patients that pharmacy students treat in University, UC Health, and Children's Hospital clinics. The University determined that a mandatory vaccination requirement for its employees and students is the best way to accomplish this goal.

A recent study by the Centers for Disease Control and Prevention found that individuals who have not been vaccinated were nearly five times more likely to be infected with COVID-19 than

**Exhibit 16**

vaccinated people. In addition, the study found that unvaccinated people are about 29 times more likely to be hospitalized with COVID-19 than those who are fully vaccinated. [1]

The University's mandatory vaccination policy offers exemptions to individual's whose religious beliefs are opposed to all vaccinations.  When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you object based on your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion.

The rationale provided does not constitute a religious belief, but a personal objection to the development of the vaccine. The basis for your objection is of a personal nature and not part of a comprehensive system of religious beliefs.

Having considered your exemption request, it is denied.

You must submit verifiable documentation indicating you have received the first COVID-19 vaccine dose to the School's Office of Student Life and submit your verification via the campus portal by September 6, 2021.  You will be allowed to continue attending school between the time you receive your first vaccination and the time you are fully vaccinated (two weeks after you receive the second dose of the Pfizer or Moderna vaccine or the single dose of the J&J vaccine).  For any in-person activities, you will be required to follow campus safety protocols for unvaccinated individuals as set out in University policy, including, but not limited to, weekly testing, masking, and social distancing where possible.

Alternatively, if you do not intend to submit documentation that you have received the first COVID-19 vaccine dose by September 6, 2021, you may request a Leave of Absence from the School or withdraw from the School by September 6, 2021.

Failure to select any of these options will result in referral to the Promotions Committee for further action, up to and including dismissal.

Shanta M. Zimmer, MD
Professor of Medicine,
Senior Associate Dean for Education,
Associate Dean for Diversity and Inclusion

---

[1] *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention, August 27, 2021.



**Thomas More SOCIETY**

*A national public interest law firm defending life, family and religious liberty.*

September 3, 2021

Jeremy Hueth
Vice President and University Counsel
1800 Grant Street, Suite 800
Denver, CO 80203
Jeremy.hueth@cu.edu
*Sent via email*

Shanta M. Zimmer, MD
Professor of Medicine
Senior Associate Dean for Education
Associate Dean for Diversity and Inclusion
shanta.zimmer@cuanschutz.edu
*Sent via email*

Steve Zweck-Bronner
Anschutz Medical Campus Counsel
Building 500, Room W5150
13001 E. 17th Place
Aurora, CO 80045
Steve.Zweck-Bronner@ucdenver.edu
*Sent via email*

Dear Messrs. Hueth & Zweck-Bronner & Dr. Zimmer:

My name is Peter Breen, and I am Vice President and Senior Counsel for the Thomas More Society. We are a non-profit, public interest law firm that has defended the rights of individuals and organizations across the country for the past 25 years, including in Colorado. As relevant here, we represent ███████████, a fourth-year medical student at the University of Colorado's School of Medicine ("the University"), after Mr. ██████ was denied a religious exemption from the University's COVID-19 vaccine mandate ("the mandate"). That denial was based on the University's illegitimate reliance on Mr. ██████'s supposed misunderstanding of his own Catholic faith, and despite the fact that an ordained Catholic priest at Mr. ██████'s parish signed Mr. ██████'s exemption form. This is a direct violation of the First Amendment.

This letter is to request that the University immediately re-evaluate Mr. ██████'s request for a religious accommodation based on *his asserted religious beliefs*, not the University's (flawed) understanding of the teachings of the Catholic Church, before September 7, 2021, the day Mr. ██████ has been instructed to confirm receipt of the first dose of a COVID-19 vaccine.[1] Otherwise, on behalf of Mr. ██████, the Thomas More Society will timely move for a Temporary Restraining Order and Preliminary Injunction in federal court against the University's illegitimate denial of Mr. ██████'s request for religious exemption, and seek corresponding attorneys' fees, costs, and damages as appropriate. A government-run university has no business telling a believer what his personal religious belief should be. And here, the University has grossly misrepresented Catholic teaching on COVID-19 vaccines.

Mr. ██████ is an exemplary student at the University's medical school. ████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████
But when Mr. ██████ submitted a request for religious accommodation from the University's COVID-19 vaccine mandate on September 1, 2021, the University denied his request because Mr. ██████'s beliefs were allegedly "personal," not religious, given the University's flawed evaluation of Catholic Church teaching and its corresponding erroneous conclusion that a Catholic cannot object to COVID-19 vaccines

---

[1] Mr. ██████ has been informed that a "Promotions Committee" will meet on September 15, to decide the sanctions the school will impose on him, because he has exercised his right to a religious exemption.

**Exhibit 17**

on religious grounds.

Mr. ████'s request for religious exemption (*see* **Exhibit A**) relied on several distinct religious objections to the currently available COVID-19 vaccines. Primarily, Mr. ████ said he objected because the vaccines were "created using aborted human fetuses," in violation of "Catholic teaching maintain[ing] that human life is sacred because we are made in the image of God." (Id.) Indeed, it is inarguable that during the course of their development, the currently available COVID-19 vaccines either used or were tested on abortion-derived human fetal cell lines. *See* https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/. Mr. ████ "acknowledged that there is debate within different sects of the Catholic Church regarding this issue as it relates to medical research," but that for *his Catholic beliefs*, receiving a vaccine that relied on abortion-derived fetal cell lines in its development "corroborates the false narrative that no other way might be found by which these advances could occur, distorts our understanding of the sacridity of human life, and implicates those who reap the benefits of this research in that initial, deplorable act, which deprived a human being of his or her right to life." (Id.)

Mr. ████'s position is consistent with a recent unanimous statement of the Colorado Catholic bishops, who declared that "[t]here is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cell lines derived from abortion," while noting "it is permissible to use such vaccines *only* under case-specific conditions—if there *are no other alternatives* available and the intent is to preserve life." *A letter from the bishops of Colorado on COVID-19 vaccine mandates*, Colorado Catholic Conference, August 6, 2021, https://denvercatholic.org/a-letter-from-the-bishops-of-colorado-on-covid-19-vaccine-mandates/. The bishops further noted that "[v]accination is not morally obligatory and so must be voluntary." (Id.)

Additionally, Mr. ████ stated that the currently available COVID-19 vaccines' unique "mechanism of action" never before exercised at a large scale against a disease violates his "Catholic . . . responsibility to make conscientious decisions regarding the use and care of my body," given the lack of current understanding of the vaccines' long-term effects. (Id.) Thus, Mr. ████ said he believes "the marginal benefit that is offered is not worth the potential risk." (Id.)

Once again, Mr. ████'s position was consistent with the Colorado Catholic bishops' recent statement, which also declared that "[a] person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings." *Colorado Bishops' Letter, supra*. The bishops further stated that "[t]he Catholic Church teaches that a person may refuse a medical intervention, including vaccination, if his or her conscience leads them to that decision." (Id.)[2]

Finally, in response to the University's religious exemption questionnaire, Mr. ████ stated that although he has received vaccinations in the past (presumably some of which were connected to abortion), he previously "did not hold these firmly held beliefs," and the long-term effects of COVID-19 vaccines are uniquely unknown. (**Exhibit A**.)

In all, Mr. ████'s request for religious accommodation was consistent with the aforementioned statement of the Colorado bishops, who stated: "Taken as a whole, these points mean a Catholic may

---

[2] Mr. ████ additionally stated that he sought a religious exemption because of his conscientious objection "to the use of vaccinations as a form of social licensure" in order to participate fully in society, (**Exhibit A**), though this ground was manifestly separate and independent from his other bases of religious objection (id.).

judge it right or wrong to receive certain vaccines for a variety of reasons, and there is no Church law or rule that obligates a Catholic to receive a vaccine – including COVID-19 vaccines." *Colorado Bishops' Letter, supra*.

The University had a different idea. In particular, the University's letter denying Mr.     's request began by immediately quoting "the Vatican's doctrinal office, the Congregation for the Doctrine of the Faith," which "issued a statement noting it is 'morally acceptable' for Catholics to take vaccines against COVID-19." (Letter, **Exhibit B**.) The University's letter went on to quote statements by the Vatican, the United States Conference of Catholic Bishops, and the aforementioned letter of the Colorado Catholic bishops providing that it *may be* morally acceptable to receive some of the available COVID-19 vaccines. (Id.) The University's letter then manifestly misinterpreted the aforementioned Colorado bishops' statement by declaring that said bishops "reaffirmed in [their] letter dated August 5, 2021 [sic], that use of some COVID-19 vaccines is morally acceptable," (id.), notwithstanding the Colorado bishops' actual statement that individual Catholics may come to the conclusion that receiving abortion-connected COVID vaccines *is not* morally acceptable. *Colorado Bishops' Letter, supra*.

The University's letter then concluded that because Mr.     's religious objection is "based on [his] belief that the COVID-19 vaccines were developed from human cell lines derived from abortion," his "rationale . . . does not constitute a religious belief, but a personal objection to the development of the vaccine." (Letter, **Exhibit B**.) Although the University's letter stated that its "mandatory vaccination policy offers exemptions to individuals whose religious beliefs are opposed to all vaccinations," it told Mr.      that "[t]he basis of your objection is of a personal nature and not part of a comprehensive system of religious beliefs," and therefore his request was denied. (Id.)

The University's willingness to provide religious exemptions to the COVID-19 vaccine mandate on some asserted religious grounds, but not others, based on the University's flawed understanding of a religious objector's theology, is a flagrant violation of the First Amendment. The U.S. Supreme Court has plainly held that "we reject the notion that to claim the protection of the Free Exercise Clause, *one must be responding to the commands of a particular religious organization*." *Frazee v. Illinois Dep't of Emp. Sec.,* 489 U.S. 829, 834, 109 S. Ct. 1514, 1517–18, 103 L. Ed. 2d 914 (1989) (emphasis added); *see also Thomas v. Rev. Bd. Of Indiana Emp. Sec. div.*, 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). In other words, the University's denial of Mr.     's request for religious exemption based on *its understanding* of the institutional Catholic Church's teachings in this regard, and not on Mr.     's own asserted religious beliefs, was wholly illegitimate and unconstitutional. And unsurprisingly, it was also embarrassingly flawed—the very reason the First Amendment limits government institutions from attempting such inquiries in the first place.

Given the University's willingness to offer religious exemptions for *some* religious reasons, but not others, its vaccine mandate easily fails the test of neutrality required of government toward religion under *Employment Division v. Smith*, 494 U.S. 872 (1990). And in view of the University's willingness to offer exemptions for *various* reasons (including religious and medical), but not for Mr.     's religious reasons (including on the basis of the vaccines' connection to abortion), the mandate also easily fails the separate and independent test of general applicability under *Smith*. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (stating that a law lacks general applicability when it prohibits religious conduct while allowing other conduct "that undermines the government's asserted interests in a similar way").

Therefore, we request an immediate re-evaluation of Mr.     's request for religious

Mr. Jeremy Hueth, *et al.*                                      4                                      September 3, 2021

accommodation from the University COVID-19 vaccination mandate within the required parameters of the First Amendment. Given the University's admission that it is indeed offering religious exemptions from the mandate, we will continue to closely monitor its evaluation of Mr. ███████'s request. If the University does not engage in such re-revaluation, we will timely pursue Mr. ███████'s remedies in federal court pursuant to 42 U.S.C. § 1983 and seek corresponding attorneys' fees.

Please respond to this request by noon on September 7. In the alternative, if the University needs more time to evaluate our position, and is willing to extend its own deadlines for action against Mr. ███████, please contact me directly. In the meantime, it is our understanding that no adverse action will be taken against Mr. ███████ until at least September 15, 2021. If that is not the case, please let me know immediately. Thank you for your time and attention.

Very truly yours,

Peter Breen
THOMAS MORE SOCIETY
*One of the attorneys for Mr.* ███████

Enclosures

cc:   Theresa Lynn Sidebotham          Paul M. Jonna                   Michael McHale
      Telios Law PLLC                  LiMandri & Jonna LLP            Thomas More Society
      19925 Monument Hill Road         P.O. Box 9120                   10506 Burt Circle, Suite 110
      Monument, CO 80132 (physical)    Rancho Santa Fe, CA 92067       Omaha, Nebraska 68114
      P.O. Box 3488                    Tel: (858) 759-9930             402-501-8586 (direct)
      Monument, CO 80132 (mailing)     *Attorney for Mr.* ███████      *Attorney for Mr.* ███████
      (855) 748-4201
      *Attorney for Mr.* ███████

**EXHIBIT A**



# University of Colorado
## Denver | Anschutz Medical Campus

## Religious Exemption From COVID-19 Vaccination Requirement

All University of Colorado Anschutz Medical Campus students are required to be immunized against COVID-19 prior to their participation in courses in the Fall of 2021, which may be as early as June 1, 2021. However, the University recognizes religious exemptions based upon a religious belief whose teachings are opposed to immunizations. Under that circumstance, the University requires that students submit this religious exemption form.

1. Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a COVID-19 vaccination? Please include a detailed response.

The vaccine was created using aborted human fetuses. Catholic teaching maintains that human life is sacred because we are made in the image of God. It also teaches that life begins at conception, and that abortion is a mortal sin. A mortal sin is the gravest of transgressions within the Catholic faith. I acknowledge that there is debate within different sects of the Catholic Church regarding this issue as it relates to medical research. Some justify research purposes that utilize aborted fetal tissue, using a cost-benefit analysis. They state that the good that can be derived from a broadly applicable medical advancement using what would otherwise be disregarded human tissue is a net positive that justifies the use of these cells for that cause. In response to this, I would argue that use of this tissue corroborates the false narrative that no other way might be found by which these advances could occur, distorts our understanding of the sacridity of human life, and implicates those who reap the benefits of this research in that initial, deplorable act, which deprived a human being of his or her right to life. As a Catholic, it is also my responsibility to make conscientious decisions regarding the use and care of my body. The vaccines provided against COVID-19 function by a mechanism of action that has not previously been deployed at large scale against disease. It is impossible to understand or to know what the long-term effects of these novel therapeutics will be, and on these grounds, I do not feel that the marginal benefit that is offered is worth the potential risk.
Lastly, vaccination status is being used as leverage against individual liberty by gatekeeping participation in free society. I wish to file this religious exemption, in part, to conscientiously object to the use of vaccinations as a form of social licensure by which conformation to public policy--even public health policy--is unjustly used against the ability of an individual to function and to succeed in their society.

2. Have you had an influenza or other vaccine in the past? How does this differ?

I have. This differs in two substantial ways. The first is personal. I did not hold these firmly held beliefs prior and will be seeking an exemption for the flu shot this year as well. Secondly, the flu shot is not a new treatment modality. It is a vaccine that functions by the same mechanisms as all vaccines have functioned previously. It does not rely on new technology and recent breakthroughs in biochemistry to function. The shot itself, as well as the mechanism by which it works have been tried and tested for decades. This vaccine has not. The long-term effects of the flu vaccine are known. The long-term effects of this vaccine cannot be known without further time.

By signing below, I acknowledge that although a religious exemption from the required COVID-19 vaccination is recognized by CU Anschutz as the student's right, the clinical, lab, practica, and internship sites that partner with CU Anschutz, █████████████████████████ or rescind a student's clinical placement if that pa███████████████████████tion or does not allow unvaccinated individuals on their pre██████████

Student Name: _____ ██████████████████ _____

Statement of Exemption
I am hereby claiming a religious exemption from vaccination against COVID-19 as indicated above.

I attest that the information I have provided on this form is complete and accurate.

I understand that claiming this religious exemption may affect my progression at CU Anschutz as described above.

I also understand that because I am not being vaccinated against COVID-19 I will be required to follow CU Anschutz policies and procedures tha̶t̶ ̶O̶t̶h̶e̶r̶s̶ ̶w̶h̶o̶ ̶a̶r̶e̶ ̶v̶a̶c̶c̶i̶n̶a̶t̶e̶d̶ against COVID-19 during the entire time I am enrolled at CU̶

**REQUIRED** Student Signature:_____

Date: _____09/01/2021_____

FR. Daniel R. Nolan, FSSP
ASST. Pastor, OLMC
Littleton, Co



**Exhibit B**

# School of Medicine

UNIVERSITY OF COLORADO
**ANSCHUTZ MEDICAL CAMPUS**

**Undergraduate Medical Education**

Building 500, Room E1330
13001 East 17th Place, MS F523
Aurora, CO  80045

September 2, 2021

<u>**VIA ELECTRONIC MAIL**</u>

@cuanschutz.edu

*Re: Request to Consider Vaccine Exemption based on Religious Grounds*

Dear Mr. ▮▮▮:

On December 21, 2020, the Vatican's doctrinal office, the Congregation for the Doctrine of the Faith (CDF), issued a statement noting it is "morally acceptable" for Catholics to take vaccines against COVID-19.  Among other things, the CDF stated:

"All vaccinations recognized as clinically safe and effective can be used in good conscience with the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion from which the cells used in production of the vaccines derive" … "the morality of vaccination depends not only on the duty to protect one's own health, but also on the duty to pursue the common good."

"In the absence of other means to stop or even prevent the epidemic, the common good may recommend vaccination, especially to protect the weakest and most exposed."

In a statement released on December 14, 2020, the United States Conference of Catholic Bishops (USCCB) reiterated that, given the urgency of the crisis, "the lack of available alternative vaccines, and the fact that the connection between an abortion that occurred decades ago and receiving a vaccine produced today is remote, inoculation with the new COVID-19 vaccines in these circumstances can be morally justified."

The Colorado Catholic Conference of Bishops reaffirmed in its letter dated August 5, 2021, that use of some COVID-19 vaccines is morally acceptable. The CCC explains that a decision not to receive the COVID-19 Vaccine is a personal decision based on each person's conviction.

The University does not accept personal beliefs as a basis for not complying with its Covid 19 vaccination requirement.

The University adopted its COVID-19 Vaccination Policy for the purpose of protecting the health and safety of the campus community including the patients that pharmacy students treat in University, UC Health, and Children's Hospital clinics. The University determined that a mandatory vaccination requirement for its employees and students is the best way to accomplish this goal.

A recent study by the Centers for Disease Control and Prevention found that individuals who have not been vaccinated were nearly five times more likely to be infected with COVID-19 than

vaccinated people. In addition, the study found that unvaccinated people are about 29 times more likely to be hospitalized with COVID-19 than those who are fully vaccinated. [1]

The University's mandatory vaccination policy offers exemptions to individual's whose religious beliefs are opposed to all vaccinations.  When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you object based on your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion.

The rationale provided does not constitute a religious belief, but a personal objection to the development of the vaccine. The basis for your objection is of a personal nature and not part of a comprehensive system of religious beliefs.

Having considered your exemption request, it is denied.

You must submit verifiable documentation indicating you have received the first COVID-19 vaccine dose to the School's Office of Student Life and submit your verification via the campus portal by September 6, 2021.  You will be allowed to continue attending school between the time you receive your first vaccination and the time you are fully vaccinated (two weeks after you receive the second dose of the Pfizer or Moderna vaccine or the single dose of the J&J vaccine).  For any in-person activities, you will be required to follow campus safety protocols for unvaccinated individuals as set out in University policy, including, but not limited to, weekly testing, masking, and social distancing where possible.

Alternatively, if you do not intend to submit documentation that you have received the first COVID-19 vaccine dose by September 6, 2021, you may request a Leave of Absence from the School or withdraw from the School by September 6, 2021.

Failure to select any of these options will result in referral to the Promotions Committee for further action, up to and including dismissal.

Shanta M. Zimmer, MD
Professor of Medicine,
Senior Associate Dean for Education,
Associate Dean for Diversity and Inclusion

---

[1] *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention, August 27, 2021.



Peter Breen <pbreen@thomasmoresociety.org>

## Immediate Request for Reconsideration of Denial of Religious Exemption

**Spiering, Kimberly** <KIMBERLY.SPIERING@ucdenver.edu>                    Tue, Sep 7, 2021 at 12:06 PM
To: "Zimmer, Shanta" <SHANTA.ZIMMER@cuanschutz.edu>, Peter Breen <pbreen@thomasmoresociety.org>, "Hueth, Jeremy" <JEREMY.HUETH@cu.edu>, "Zweck-Bronner, Steve" <STEVE.ZWECK-BRONNER@ucdenver.edu>
Cc: Theresa Lynn Sidebotham <tls@telioslaw.com>, Paul Jonna <PJonna@limandri.com>, Michael McHale <mmchale@thomasmoresociety.org>

Dear Peter,

Please be advised that Mr. ███████ ███████'s medical exemption request has been approved and he will not be referred to the School of Medicine's Promotions Committee on September 15, 2021. He will be notified of this decision by the School of Medicine shortly.

Please let me know if you have any questions.

Best regards,

Kimberly C. Spiering (Pronouns: she/her/hers)

Senior Associate University Counsel

University of Colorado

Office of University Counsel - Denver │ Anschutz Medical Campus

t 303.724.9283

f 303.724.4738

kimberly.spiering@ucdenver.edu



CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

[Quoted text hidden]



**From:** A Message From Dr David Brumbaugh
<MessagefromDrDavidBrumbaugh@childrenscolorado.org>
**Sent:** Monday, September 20, 2021 1:59 PM
**Subject:** ACTION NEEDED: COVID-19 Vaccine Requirement

To: All Children's Colorado team members

Dear team,

On Sept. 1, we announced the process for team members to submit documentation for their approved COVID-19 vaccination series in order to comply with Children's Colorado's vaccination requirement deadline of **Oct. 1, 2021.** In that message we also shared that the Colorado State Board of Health issued an emergency rule on Aug. 30, 2021, requiring all licensed healthcare facilities to ensure their eligible employees, direct contractors and support staff "obtain full COVID-19 vaccination status by Oct. 31."

Currently, we are showing you as "**Non-Compliant**" with this requirement.

## Your action is required

**Children's Colorado employees**
If you received your complete COVID-19 vaccine series at a Childrens' mass vaccination clinic your compliance is complete and *no action is required*. You may disregard the rest of this email.

If you received your complete COVID-19 vaccine series outside of Children's Colorado, you <u>must</u> submit your proof of vaccination using the following link by Oct. 1, 2021.

**Children's Colorado partners (e.g. non-CU medical staff, contractors, vendors, etc.)**
If you received your complete COVID-19 vaccine series at any location (Children's Colorado or non-Children's Colorado clinic), you <u>must</u> complete your requirement using the following link by Oct. 1, 2021.

**All CU affiliated partners (e.g. faculty, residents, administrative staff, students, etc.)**
If you received your complete COVID-19 vaccine series at any location (Children's Colorado or non-Children's Colorado clinic), you <u>must</u> complete your requirement using the following link by Oct. 1, 2021.

Team members who previously submitted proof of vaccination through CU School of Medicine must complete their requirement through Children's Colorado using the above link. However, if you have already received an approved medical or religious exemption through the CU School of Medicine you do not need to take further action.

**Requesting an exemption (applies to all of the above categories except CU affiliated partners)**
Submit an exemption request (medical or religious) by **Oct. 1, 2021**. The process, which requires use of a mandatory form, is described below.

If you intend to request a medical or religious exemption, you <u>must</u> submit an exemption request by Oct. 1. Details regarding this process, including a mandatory form, are described below.

Exhibit 19

A table summarizing these requirements appears at the bottom of this email. If you have already completed the above steps, no further action is required. If you are a volunteer, you may disregard this communication and follow the previously communicated process for volunteers.

## How to request medical and religious exemptions

Over the past week and a half, we have worked closely with the State Board to understand how to properly adhere to their mandate as we develop processes and plans for team members seeking exemptions to receiving the COVID vaccine.

The State Board does not provide latitude for organizations to define medical or religious exemptions. The board is currently planning to issue their final rule **Oct. 21, 2021.** We will be monitoring any relevant and substantive changes over the next month. In the meantime, Children's Colorado will allow team members seeking medical or religious exemptions to defer receipt of their first dose of the COVID-19 vaccine until Oct. 21.  After that date, we will review all requests for medical and/or religious exemption and notify the team member as to the decision on if an exemption is or is not granted.

All team members who intend to seek a medical exemption or religious exemption must complete and submit their signed exemption form — linked below — and submit it via the instructions described on the form by **Oct. 1, 2021**, and will be required to follow PPE and-19 COVID PCR testing processes previously announced by Children's Colorado. Details of this testing process will follow at a later date.

Please note that the language regarding the vaccine mandate and medical and religious exemptions remains to be finalized by the State Board by **Oct. 21, 2021**. Team members who wish to request a medical or religious exemption should complete and submit the appropriate form as soon as possible and no later than **Oct. 1.** Please bear in mind that the submission of a request does not guarantee approval; however, your timely submission will enable Children's Colorado to review your request as quickly as possible. Children's Colorado will review all requests for exemptions, and will begin notifying team members of the decision to grant or not grant an exemption no earlier than **Oct. 21, 2021**.

*Those seeking a medical exemption will be required to submit their request via the following form:*

A medical exemption must be signed by a physician, physician assistant, advanced practice nurse, or certified nurse midwife **licensed in Colorado** that a team member is medically contraindicated as described in the product labeling approved OR authorized by the FDA.

Please have your medical provider sign this form, then follow the instructions on the form to complete your submission.

The due date for submitting a request for medical exemption is **Oct. 1, 2021.**

📄 **Download the official form for medical exemption requests >>**

*Those seeking a religious exemption will be required to submit their request via the following form:*

The State's ruling requires documentation of religious exemptions, as defined by an organization's facility policy. In accordance with this requirement, Children's Colorado's evaluation of religious exemptions will include Legal, Human Resources and Occupational Health review. Fill out the form, then follow the instructions on the form to complete your submission.

The due date for submitting a request for religious exemption is **Oct. 1, 2021.**

📄 **Download the official form for religious exemption requests >>**

Summary table (Published Sept. 16, 2021)

| Children's Employee | Children's Partners – Non-CU Medical Staff, Contractors and Vendors | Anschutz Campus Colorado University Partners and Affiliates |
|---|---|---|
| • If you received your complete COVID vaccine series at a Childrens' mass vaccination clinic your compliance is complete and no action is required.<br>• If you did not receive your COVID vaccine series at a Children's mass vaccination clinic, you must:<br>1. Submit proof of vaccination (if you have already completed this step no further action is required), OR<br>2. Become vaccinated by October 1st and submit proof of vaccination, OR<br>3. Submit an exemption request (medical or religious) by October 1st. | • If you received your complete COVID vaccine series at a Children's mass vaccination clinic your proof of vaccination can be completed in two ways:<br>1. Grant release of COVID record via REDCap form, OR<br>2. Submit proof of vaccination by October 1st.<br><br>• If you did not receive your COVID vaccine series at a Children's mass vaccination clinic, you must:<br>1. Submit proof of vaccination (if you have already completed this step no further action is required), OR<br>2. Become vaccinated by October 1st and submit proof of vaccination, OR<br>3. Submit an exemption request (medical or religious) by October 1st. | • If you received your complete COVID vaccine series at a Children's mass vaccination clinic your proof of vaccination can be submitted in two ways:<br>1. Grant release of COVID record via REDCap form, OR<br>2. Submit proof of vaccination by October 1st.<br><br>• If you did not receive your COVID vaccine series at a Children's mass vaccination clinic, you must:<br>1. Submit proof of vaccination (if you have already completed this step no further action is required), OR<br>2. Become vaccinated by October 1st and submit proof of vaccination.<br><br>• Medical and religious exemptions approved through the University of Colorado will be accepted at CHCO. If you received an exemption through CU no action is required. The Occupational Health records will be coordinated through the two institutions. |

| Applies to all Children's employees | Applies to all contractors, vendors and other partners who have an active CHCO badge for any campus.  Examples include:<br>• Non-CU Medical Staff<br>• Hospital Shared Services<br>• Crothall<br>• Clinical Vendors<br>• Medical Interpreters<br>• Maintenance and Construction Contractors<br>• Other Independent Contractors | Applies to all faculty, fellows, residents, students, administrative leaders affiliated with any CU Anschutz campus partner (Medical School, Dental School, School of Nursing, etc.) |
| Note:  Exemption requests will not be reviewed until after the final State Board of Health Ruling on October 21st. No vaccination is required until after this date for those requesting an exemption. | | |

Thank you for your ongoing patience, grace and attention as we continue to navigate this process. If you have questions about the vaccine requirement, the documentation process or others not answered in this message, please visit The Loop for FAQs. If you do not find the answer you're looking for, submit your question via The Loop.

Sincerely,

## EMPLOYEE WITNESS # 1

### DECLARATION OF ████████████

I, ████████████████, declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as Chief Chaplain of Service at the Veterans Affairs ("VA") Maine Healthcare System, in Augusta, Maine, which is part of the Veterans Health Administration ("VHA").

3) The VHA is the largest integrated health care system in the United States, employing more than 367,200 full time health care professionals and support staff, who deliver healthcare services to over 9 million veterans at 1,293 healthcare facilities throughout the United States. (*See* https://www.va.gov/health/aboutvha.asp).

4) In Maine, the VA Maine Healthcare System serves over 42,500 veterans at facilities in Bangor, Calais, Caribou, Lewiston, Lincoln, Portland, Rumford, Saco, and the facility in Augusta, where I am based. (*See* https://www.maine.va.gov/about/index.asp).

5) The VHA permits and freely grants exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations, including COVID-19 vaccination.

6) The VHA form for requesting and obtaining a religious exemption and accommodation from its mandatory COVID-19 vaccination policy is very simple, and requires employees only to check a box indicating that they have a deeply held religious belief that prevents them from receiving the COVID-19 vaccine, and that they have notified their immediate supervisor in writing of that belief. Here is a true and accurate copy of the VHA exemption form:

**Exhibit 20**

**July 27, 2021**

**VHA DIRECTIVE 1193(1)**
**Appendix B**

☒ I notified my immediate supervisor in writing that I have a deeply held religious belief that prevents me from receiving the COVID-19 vaccine. I understand that by declining to receive the vaccine within eight weeks of publication of this directive, or within eight weeks of beginning employment, I must wear a face mask according to requirements and guidelines within VHA Directive 1193, Coronavirus Disease 2019 Vaccination Program for Title 38 Health Care Personnel.

_____ 8-16-2021 _____
Supervisor Signature         Date         Supervisor Email

I have read and fully understand the information on this form and have been given the opportunity to have my questions answered. I understand that violation of the directive may result in disciplinary action up to and including removal from Federal service.

Name (print): _____        Last 4 SS# _____

Dept./Serv: Chaplain Service

Employee Signature: _____        Date: 13 AUG 2021

**VHA Title 38 HCP are to provide this form to the VHA facility Employee**
**Occupational Health Office. Secure electronic submission is permissible.**

7) Once a VHA employee checks the box and completes the exemption form, he or she is automatically exempted from the mandatory vaccination policy, and permitted to continue in the same job function, with the same duties and responsibilities. The only requirement (or accommodation) for exempt employees is that they must wear a face mask according to requirements and guidelines within VHA Directive 1193, as stated on the exemption form above.

8) On August 13, 2021, I submitted the above exemption form.

9) On August 16, 2021, my exemption was formally acknowledged.

10) With my religious exemption in place, and with the face mask accommodation, I am permitted to carry out my duties and responsibilities to the same extent as always. I interact

and counsel patients, both inpatients and outpatients, both with COVID and without COVID, in the entire hospital in Augusta, as well as other facilities. I interact and counsel with other healthcare workers routinely as well.

11)     As part of my counseling of other healthcare employees within the VA Maine Healthcare System, I became personally aware of more than 100 other employees with sincerely held religious convictions that prohibit them from accepting vaccinations. These employees requested and obtained religious exemptions from the mandatory COVID-19 vaccination requirement using the same form and procedure that I did. These employees are permitted to continue their duties and responsibilities, including direct patient care, to the same extent that they did previously, subject to the masking accommodation described above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 2**

## DECLARATION OF ▮▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮▮▮▮▮ declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse at the Veterans Affairs ("VA") Maine Healthcare System, in Augusta, Maine, which is part of the Veterans Health Administration ("VHA").

3)      The VHA is the largest integrated health care system in the United States, employing more than 367,200 full time health care professionals and support staff, who deliver healthcare services to over 9 million veterans at 1,293 healthcare facilities throughout the United States. (*See* https://www.va.gov/health/aboutvha.asp).

4)      In Maine, the VA Maine Healthcare System serves over 42,500 veterans at facilities in Bangor, Calais, Caribou, Lewiston, Lincoln, Portland, Rumford, Saco, and the facility in Augusta, where I am based. (*See* https://www.maine.va.gov/about/index.asp).

5)      The VHA permits and freely grants exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations, including COVID-19 vaccination.

6)      The VHA form for requesting and obtaining a religious exemption and accommodation from its mandatory COVID-19 vaccination policy is very simple, and requires employees only to check a box indicating that they have a deeply held religious belief that prevents them from receiving the COVID-19 vaccine, and that they have notified their immediate supervisor in writing of that belief. Employees are not required or expected to explain the nature

of their religious beliefs, and supervisors are not required to "approve" those beliefs. Here is a true

and accurate copy of the VHA exemption form:

---

**Department of Veterans Affairs**      **COVID-19 VACCINATION**

**DATE** *(MM/DD/YYYY)*: 08/04/2021

I am a VHA: [×] Employee    [ ] Other - please indicate: _____

CHECK ONE STATEMENT BELOW AND COMPLETE AND SIGN THE LAST SECTION OF THIS FORM PRIOR TO SUBMISSION TO EMPLOYEE OCCUPATIONAL HEALTH:

[ ] I received the full COVID-19 vaccine series (any required documentation is attached).

[ ] I have been granted a medical exemption from receiving the COVID-19 vaccine.
I have a contraindication for the COVID-19 vaccine as defined by Centers for Disease Control and Prevention (CDC). The reasons for contraindication must be recognized contraindications and precautions by the CDC, found here: https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fvaccines%2Fcovid-19%2Finfo-by-product%2Fclinical-considerations.html, located under Interim Clinical Considerations for Use or Vaccine Indications. This has been discussed and acknowledged by my personal physician. I understand that by declining to receive the vaccine within eight weeks of publication of this directive, or within eight weeks of beginning employment, I must wear a face mask according to requirements and guidelines within VHA Directive 1193, COVID-19 Vaccination Program for VHA Employees and Health Care Personnel.

Printed Physician Name and Address

Physician Signature      Date *(MM/DD/YYYY)*      National Provider Identification Number

Supervisor Signature      Date *(MM/DD/YYYY)*      Supervisor Email

[×] I notified my immediate supervisor in writing that I have a deeply held religious belief that prevents me from receiving the COVID-19 vaccine.

I understand that by declining to receive the vaccine within eight weeks of publication of this directive, or within eight weeks of beginning employment, I must wear a face mask according to requirements and guidelines within VHA Directive 1193, COVID-19 Vaccination Program for VHA Employees and Health Care Personnel.

Supervisor Signature      Date *(MM/DD/YYYY)*      Supervisor Email

I have read and fully understand the information on this form and have been given the opportunity to have my questions answered. I understand that violation of the directive may result in disciplinary action up to and including removal from Federal service.

Name (print): ▓▓▓▓▓▓      Last 4 SS#: ▓▓▓▓

Dept./Serv: ▓▓▓▓▓▓      Date *(MM/DD/YYYY)*: 08/04/2021

Employee Signature: ▓▓▓▓▓▓

**VHA Title 38HCP are to provide this form to the VHA facility Employee Occupational Health Office. Secure electronic submission is permissible.**

---

7)      Once a VHA employee checks the box and completes the exemption form, he or she is automatically exempted from the mandatory vaccination policy, and permitted to continue in the same job function, with the same duties and responsibilities. The only requirement (or accommodation) for exempt employees is that they must wear a face mask according to requirements and guidelines within VHA Directive 1193, as stated on the exemption form above.

8)      On August 13, 2021, I submitted the above exemption form.

9)      On the same date, my exemption was formally acknowledged.

10)     My exemption and accommodation permit me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use a mask, as stated in the exemption form. My individual facility is also requiring twice weekly testing for COVID-19 for those exempted healthcare workers such as myself who have to work in the long term care unit. I comply with all of these requirements.

11)     Until recently, I was also working as a per diem nurse at Eastport Memorial Nursing Home, in Eastport, Maine. I requested a religious exemption there as well. I was told that even though my employer wanted to provide me with an exemption, it could not do so because the State of Maine had abolished religious exemptions for healthcare workers. My employment there was terminated as a result.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 3**

<u>**DECLARATION OF**</u> ██████████

I, ████████████, declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a chemotherapy nurse at the Veterans Affairs ("VA") Medical Center in Portland, Oregon. My hospital is part of the Veterans Health Administration ("VHA").

3) The VHA is the largest integrated health care system in the United States, employing more than 367,200 full time health care professionals and support staff, who deliver healthcare services to over 9 million veterans at 1,293 healthcare facilities throughout the United States. (*See* https://www.va.gov/health/aboutvha.asp).

4) In Oregon, the VA Portland Healthcare System serves over 95,000 veterans at more than a dozen facilities throughout the state. (*See* https://www.portland.va.gov/about/index.asp).

5) The VHA permits and freely grants exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations, including COVID-19 vaccination.

6) The VHA form for requesting and obtaining a religious exemption and accommodation from its mandatory COVID-19 vaccination policy is very simple, and requires employees only to check a box indicating that they have a deeply held religious belief that prevents them from receiving the COVID-19 vaccine, and that they have notified their immediate supervisor in writing of that belief. Employees are not required or expected to explain the nature of their religious beliefs, and supervisors are not required to "approve" those beliefs. Here is a true and accurate copy of the VHA exemption form:

**July 27, 2021**

**VHA DIRECTIVE 1193**

**Appendix B**

☑ I notified my immediate supervisor in writing that I have a deeply held religious belief that prevents me from receiving the COVID-19 vaccine. I understand that by declining to receive the vaccine within eight weeks of publication of this directive, or within eight weeks of beginning employment, I must wear a face mask according to requirements and guidelines within VHA Directive 1193, Coronavirus Disease 2019 Vaccination Program for Title 38 Health Care Personnel.

| ███████████████ | 07/28/2021 | ████████████████ |
|---|---|---|
| Supervisor Signature | Date | Supervisor Email |

I have read and fully understand the information on this form and have been given the opportunity to have my questions answered. I understand that violation of the directive may result in disciplinary action up to and including removal from Federal service.

Name (print): ████████████████████    Last 4 SS# ██████

Dept./Serv:   Chemo Clinic

Employee Signature: ████████████████    Date: 07/28/2021

*VHA Title 38 HCP are to provide this form to the VHA facility Employee Occupational Health Office. Secure electronic submission is permissible.*

7)    Once a VHA employee checks the box and completes the exemption form, he or she is automatically exempted from the mandatory vaccination policy, and permitted to continue in the same job function, with the same duties and responsibilities. The only VHA requirement (or accommodation) for exempt employees is that they must wear a face mask according to requirements and guidelines within VHA Directive 1193, as stated on the exemption form above.

8)    On July 28, 2021, I submitted the above exemption form.

9)    On the same day, my exemption was formally acknowledged.

10)      My exemption and accommodation permit me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use a mask, as stated in the exemption form. My individual facility is also requiring weekly testing for COVID-19. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 4**

**DECLARATION OF** ▮▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮▮, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a Direct Support Professional at Shangri-La, in Salem, Oregon. Shangri-La is a non-profit human services organization dedicated to providing services, including healthcare services, to individuals with disabilities. My job responsibilities include providing direct support to individuals with intellectual disabilities.

3)      The State of Oregon does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 9, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> This message is to confirm that your religious exemption request has been accepted and approved with an accommodation.
>
> This means that you are exempt from receiving the COVID-19 per the state mandate that into effect on August 25, 2021.
>
> Shangri-La has determined that an accommodation for employees to continue to work when exempt from the vaccine is to test weekly for COVID-19.
>
> Details regarding weekly testing is currently being worked on. You will receive information such as when and where soon. This information will come from me, our CEO, or your Program Director.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to individuals with intellectual disabilities. I am required to undergo weekly testing as part of my accommodation. I comply with this requirement.

6)      I am personally aware that 2 other employees who work with me and who interact with both on-site clients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021



## EMPLOYEE WITNESS # 5

### DECLARATION OF ███████

I, ███████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse at Saint Agnes Hospital in Fresno, California. St. Agnes is owned by Trinity Health, which employs about 123,000 healthcare workers at facilities in 22 states.

3)      The State of California does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      In August 2021, Trinity Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:



**CASE N°** ███████
CREATION DATE: 07/██/2021 ███

**2021 Covid-19 Vaccination Document**



**Colleague ID:** ███████
**Organization:** F01 Saint Agnes Medical Center
**Legal Full Name:** ███████
**Preferred Name:** ███████

**Is the 2021 Covid-19 Vaccination <u>Exemption</u> Approved?**
Yes

5)     My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, monitor and report symptoms daily, submit to temperature checks upon entering my facility, and undergo COVID-19 testing twice per week. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

**EMPLOYEE WITNESS # 6**

<u>**DECLARATION OF**</u> ███████

I, ███████ declare as follows:

1)   I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)   I am employed as a registered nurse by Sutter Health in Roseville, California. Every day, I fulfill my life's calling and passion by caring for patients in private homes, assisted living facilities and skilled nursing facilities.

3)   Sutter Health employs approximately 55,000 employees at 24 hospitals in California.

4)   The State of California does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

5)   On August 20, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:



6)     My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, self-monitor and report symptoms, and undergo weekly testing for COVID-19. I comply with all of these requirements.

7)     I am personally aware that 3 other individuals who work for Sutter Health and who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

## EMPLOYEE WITNESS # 7

### DECLARATION OF █████████

I, █████████   declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a pharmacy technician by Kaiser Permanente in Lincoln, California. Kaiser Permanente employs approximately 220,000 employees, of which 149,000 are in California.

3)      The State of California does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On August 30, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to on-site pharmacy patients. As part of my accommodation, I am required to mask, self-monitor and report symptoms, and undergo weekly testing for COVID-19. I comply with all of these requirements.

6)      I am personally aware that 3 other individuals at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

█████████████

## EMPLOYEE WITNESS # 8

### DECLARATION OF ██████████

I, ████████████████, declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a medical social worker at PIH Health Downey Hospital, in Downey, California. My hospital is part of PIH Health, which employs over 7,500 employees at facilities throughout California.

3) I work with inpatients of the hospital in the Definitive Observation / COVID Unit.

4) The State of California does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

5) On August 19, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> We have reviewed your request for Religious Belief Accommodation to be exempt from the Covid-19 vaccine government-mandated requirement. Based on the information provided we are granting your exemption.
>
> This is also a reminder that you must comply with the California state mandatory requirements currently in place for healthcare workers including mandated testing. In addition, N95 masks are available upon request.
>
> Should you have any questions related to your granted exemption, please contact your Human Resources/Employee Relations representative based on your assigned location.

6) My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to COVID inpatients at the hospital. As part of my accommodation, I am required to use PPE and undergo twice-weekly testing for COVID-19. I comply with all of these requirements.

7)       I am personally aware that approximately 20 other employees who work at my hospital and who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

## EMPLOYEE WITNESS # 9

### DECLARATION OF ████████████

I, ████████████ declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a licensed practical nurse at Multicare Health System in Tacoma, Washington. Multicare employs more than 20,000 employees at facilities throughout the State of Washington.

3) The State of Washington does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4) On August 25, 2021, my hospital granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> The Immunization Exemption Committee has reviewed your request for exemption from the Covid 19 vaccine and has granted approval on the basis of a strongly held personal or religious belief.
>
> Employee Health have been copied with this information and will update your information to compliant.
>
> Please let me know if you have any questions.
>
> Thank you,

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients in the ICU. I am required to follow the same COVID-19 safety protocols that all other Multicare employees follow and have been following since the start of the pandemic..

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

# EMPLOYEE WITNESS # 10

### DECLARATION OF ██████████

I, ██████████, declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a registered nurse in the Intensive Care Unit at Valley Medical Center in Renton, Washington. My hospital is part of the University of Washington Healthcare System. My hospital employs approximately 4,000 employees.

3) The State of Washington does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4) On August 23, 2021, my hospital granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

Thank you for submitting your request for a religious exemption from the requirement to receive the COVID-19 vaccination. The request was reviewed by Human Resources, and the exemption is granted.

Please note the following:

- There will be education on preventing COVID-19 infection that you will be required to complete.
- You will need to submit a separate request if you'd like to be exempt from the flu vaccine.

You will be required to wear a mask at all times while on the VMC campus, even after the mask mandate has been lifted. The only exceptions will be when you're in an enclosed, private office space or when you're eating or drinking outdoors or in a break room.

Please let me know if you have any questions.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients in the ICU. As part of my accommodation, I am required to use PPE and to wear a mask outside of any enclosed, private office space. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

## EMPLOYEE WITNESS # 11

### DECLARATION OF █████████████

I, █████████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as an emergency medical technician for Albuquerque Ambulance in Albuquerque, New Mexico. Albuquerque Ambulance is owned by Presbyterian Healthcare Services, which is New Mexico's largest employer, employing 14,000 healthcare workers at facilities throughout the state.

3)      The State of New Mexico does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 2, 2021, my employer granted me a religious exemption and  accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> **Fw: exemption testing processes and requirements**
>
> good afternoon,
> You have been approved for an exemption from receiving the covid-19 vaccine. The exemption require you receive a negative covid-19 test weekly. Full details can be found at COVID-19 Vaccine Exemption. You will need to coordinate with your direct supervisor to understand what day of the week they want to receive the test results. Please follow the instructions for utilizing the at home testing. Please plan on time for shipping of materials to align with the day of the week your leader will need your results. More details about this free testing through Vault Health.
>
> Each week, you will provide a copy of your negative test results to your direct leader and also to Employee Health. If you test position, follow the already established process through ExemptWeeklyCOVIDTesting@phs.org.
>
> Failure to comply with the testing requirement will result in removal from work and can lead to possible disciplinary action up to and including termination.
>
> Please let us know if you have any questions.
>
> Thank you.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site and in ambulances, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE and test weekly for COVID-19. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

**EMPLOYEE WITNESS # 12**

<u>**DECLARATION OF**</u> ███████████

I, ███████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a clinical supervisor and bedside registered nurse at Mercy Hospital in Springfield, Missouri. My hospital employs approximately 5,000 employees.

3)      The State of Missouri does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 10, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> the appeals committee has overturned the denial and approved your religious exemption. Co-Worker Health will be advised to update your status. You will be required to follow the new protocol released by senior leadership regarding co-workers with an exemption to the Covid-19 vaccine.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my bedside patients. As part of my accommodation, I am required to use PPE as everyone else, follow masking guidelines, and, depending on community level, undergo COVID-19 testing weekly. I comply with all of these requirements.

6)      I am personally aware that 2 other employees who work at my hospital and who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 13**

## DECLARATION OF ▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮▮▮▮▮ declare as follows:

1)     I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)     I am employed as a registered nurse at Methodist Hospital in Dallas, Texas. Methodist Hospital is owned by Methodist Health System, which employs over 7,000 healthcare workers at facilities in Texas.

3)     The State of Texas does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)     On September 7, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy.

5)     My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, submit to temperature checks upon entering my facility, and self-monitor and report any symptoms. My employer has advised me that it may institute weekly testing for exempt employees as well. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

**EMPLOYEE WITNESS # 14**

<u>**DECLARATION OF**</u> ███████████

I, ███████████ declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a charge nurse and provide bedside patient care at Methodist Midlothian Medical Center, in Midlothian, Texas. My facility is owned by Methodist Health System, which employs over 7,000 healthcare workers at facilities in Texas.

3)      The State of Texas does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 8, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe bedside care to my patients. As part of my accommodation, I am required to use PPE, submit to temperature checks upon entering my facility, and self-monitor and report any symptoms. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

## EMPLOYEE WITNESS # 15

### DECLARATION OF ███████████.

I, ███████████, declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a registered nurse in the Intensive Care Unit at Advocate Aurora Health/Memorial Hospital in Burlington, Wisconsin. Advocate Healthcare employs over 70,000 healthcare workers in Wisconsin and Illinois.

3) The State of Wisconsin does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4) On September 1, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

Your request for COVID Vaccine Religious Exemption
has been reviewed by the Exemption Committee.

Your Exemption is:

x **Approved.**  This approval grants you an exemption
from receiving the COVID-19 vaccine this year and
for the duration of your employment with AAH

Approved: Request meets COVID vaccine exemption criteria

. With the approval, you need to complete the
following requirements:

1. Must comply with current Advocate Aurora
   guidance on PPE use
2. Must comply with current Advocate Aurora
   guidance on travel and testing requirements;
   and
3. Must complete the then-current SafeCheck or
   daily COVID-19 symptom screening process
   prior to entering an Advocate Aurora site.

5) My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, self-monitor and report symptoms daily using a company app, and follow company guidance on travel and testing requirements. I comply with all of these requirements.

6) I am personally aware that 12 other employees at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

**EMPLOYEE WITNESS # 16**

<u>DECLARATION OF</u> ████████

I, ████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered vascular ultrasound technician at Minneapolis Heart Institute in Minneapolis, Minnesota. Minneapolis Heart Institute is part of Allina Health, which employs 29,000 healthcare workers at 12 hospitals and 90 clinics in Minnesota and Wisconsin.

3)      The State of Minnesota does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 2, 2021, Allina Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a true and accurate copy of the approval notice that I received:

Communication from my Health System employer stating approval & accommodations.

We have received your request for an exemption to be excluded from receiving a COVID 19 and/or Influenza Vaccination.

• Your request for an exemption is granted as described below:

You are not required to receive the:
___X_____COVID 19 Vaccination
_____Influenza Vaccination

Approved exemptions are subject to immediate change at Allina Health's sole discretion if a determination is made that Allina Health can no longer uphold your request. Circumstances that may prompt Allina Health to reevaluate your request may include, but are not limited to, the following:
Recommendations from Infection Prevention Other business considerations that may affect patient care

Expectations of those with an approved accommodation:
• You must adhere to all PPE guidelines for your position.
• Regardless of current PPE guidelines, at a minimum, you must wear a surgical mask when in an Allina Health facility, property, or vehicle regardless of whether you are providing direct care for a patient.
• Health Care Workers with an approved exemption or deferral are required to comply with Allina Health's Personal Protective Equipment (PPE) policies, which, at a minimum, require them to wear a surgical mask at all times while working on any Allina Health Premises, while in an Allina Health vehicle with another employee or patient, while caring for patients in their home or other facilities, except for reasonable periods when eating or drinking.
• In certain areas, where patients are exceptionally vulnerable, Allina Health may have to evaluate work assignments.
• You may be required to take additional appropriate measures while at work to attempt to avoid the spread of disease to patients, employees, staff and visitors.  For example, employees who are granted an exemption or deferral, regardless of the reason, may be excluded from patient care areas and job duties or may be required to observe additional masking and PPE requirements.
Thank you,

Employee Relations

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, follow masking guidelines, and undergo regular testing for COVID-19. I comply with all of these requirements.

6)      I am personally aware that at least 100 other employees within Allina Health, and very likely more, who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

## EMPLOYEE WITNESS # 17

### DECLARATION OF ████████████

I, ████████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse in the pediatric emergency room at University of Chicago Medical Center, in Chicago, Illinois.

3)      The State of Illinois does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 1, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

This correspondence serves as official notification that Human Resources received your religious exemption for the Covid Vaccine. After review of the documentation you submitted, the following determination has been made:

[X]      **Approved**

- **You have met the requirement and will be marked as "compliant."**

[  ]      **Denied**

- **Based on the information you provided, you have *not* met the requirement and need to receive the Covid vaccine by the September 3, 2021 deadline. Otherwise, you will be marked as "non-compliant."**

Sincerely,

Employee and Labor Relations

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, which I and all of my colleagues do.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

## EMPLOYEE WITNESS # 18

### DECLARATION OF ████████

I, ████████ declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a respiratory therapist at Advocate Children's Hospital in Oak Lawn, Illinois. Advocate Healthcare employs over 70,000 healthcare workers in Wisconsin and Illinois.

3)      The State of Illinois does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 11, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

Dear Team Member

Your COVID Vaccine Religious Exemption appeal has been reviewed by the Exemption Committee.

Your Appeal was:

**Approved.** This approval grants you an exemption from receiving the COVID vaccine this year and for the duration of your employment with AAH. With this approval, you need to complete the following requirements:

1. Must comply with current Advocate Aurora guidance on PPE use
2. Must comply with current Advocate Aurora guidance on travel and testing requirements
3. Must complete current SafeCheck or daily COVID-19 symptom screening process prior to entering an Advocate Aurora site.

While your Religious exemption appeal is approved, we are not endeavoring to address each basis for your appeal, some of which may contain factual inaccuracies and/or basis for an exemption which, alone, would have warranted a denial.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, self-monitor and report symptoms daily using a company app, and follow company guidance on travel and testing requirements. I comply with all of these requirements.

6)     I am personally aware that 15 other individuals at various Advocate Health facilities who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

# EMPLOYEE WITNESS # 19

## DECLARATION OF ████████

I, ████████, declare as follows:

1)    I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)    I am employed as a registered nurse at Advocate Aurora Health, in Park Ridge, Illinois. Advocate Healthcare employs over 70,000 healthcare workers in Wisconsin and Illinois.

3)    The State of Illinois does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)    On September 6, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy.

5)    My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, self-monitor and report symptoms daily using a company app, and follow company guidance on travel and testing requirements. I comply with all of these requirements.

6)    I am personally aware that 4 other registered nurses and 1 physician at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

## EMPLOYEE WITNESS # 20

### DECLARATION OF █████████

I, █████████████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a nurse in the Intensive Care Unit at Advocate Sherman Hospital in Elgin, Illinois. Advocate Healthcare employs over 70,000 healthcare workers in Wisconsin and Illinois.

3)      The State of Illinois does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 6, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to ICU patients. As part of my accommodation, I am required to use PPE, self-monitor and report symptoms daily using a company app, and follow company guidance on travel and testing requirements. I comply with all of these requirements.

6)      I am personally aware that 1 other individual at my location who interacts with both on-site patients and on-site colleagues was also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021



**EMPLOYEE WITNESS # 21**

<u>DECLARATION OF ███████████</u>

I, ████████████, declare as follows:

1)   I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)   I am employed as an ultrasound technician at UCHealth in Fort Collins, Colorado. UCHealth is a 24,000-employee health organization under the umbrella of University of Colorado. It is consistently ranked as one of the best healthcare systems in the United States.

3)   The State of Colorado does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)   On August 23, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

Your request for a sincerely held religious belief, practice, or observance as defined under applicable law for a religious exemption from the COVID-19 vaccine is approved subject to the following conditions:
• You are required to follow the masking guidelines at all times. Click here for link
• You are required to get a PCR COVID-19 test at a UCHealth facility twice a week and at least 72 hours apart and agree to provide such test results to UCHealth employee health. This testing requirement will begin on October 1, 2021 and details will be provided to you prior to that requirement date, including the limited instances in which a PCR COVID-19 test at a non-UCHealth facility may be permitted.
• Your supervisor will be made aware of this requirement and failure to comply can result in disciplinary action up to and including termination.
• UCHealth reserves the right to reevaluate your requested accommodation at any time.

5)     My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients (inpatients, outpatients and ER patients). As part of my accommodation, I am required to use PPE as everyone else, follow masking guidelines, and undergo COVID-19 testing twice per week. I comply with all of these requirements.

6)     I am personally aware that 5 other employees who work at my hospital and who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021



## EMPLOYEE WITNESS # 22

### DECLARATION OF ██████████

I, ████████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a physician assistant (PA) at St. Joseph Mercy Hospital in Howell, Michigan. St. Joseph is owned by Trinity Health, which employs about 123,000 healthcare workers at facilities in 22 states.

3)      The State of Michigan does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On August 13, 2021, Trinity Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

**Request History**

| Date | Author | Response |
|------|--------|----------|
| 8/13/2021 ████ | | Your 2021 COVID-19 vaccination exemption request has been approved. You are required to follow masking, physical distancing, and any other accommodation requirements as determined by your Health Ministry. You may print this page by clicking on the "COVID-19 Vax Exemption " located under Print My Verification above and present it to your Health Ministry, if required. |
| 8/3/2021 ████ | ████████ | PDF form is attached below. |

**Last Response**

Your 2021 COVID-19 vaccination exemption request has been approved.  You are required to follow masking, physical distancing, and any other accommodation requirements as determined by your Health Ministry.  You may print this page by clicking on the "COVID-19 Vax Exemption " located under Print My Verification above and present it to your Health Ministry, if required.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, monitor and

report symptoms, and observe physical distancing when and as possible. I comply with all of these requirements.

6)      I am personally aware that at least 3 other employees at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 23**

<u>**DECLARATION OF**</u> ▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓▓ , declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse at St. Joseph Mercy Hospital in Ypsilanti, Michigan. St. Joseph is owned by Trinity Health, which employs about 123,000 healthcare workers at facilities in 22 states.

3)      The State of Michigan does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On August 3, 2021, Trinity Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:



5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, monitor and report symptoms, and observe physical distancing when and as possible. I comply with all of these requirements.

6)      I am personally aware that at least 5 other employees at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 24**

**DECLARATION OF** ███████████

I, ███████████, declare as follows:

1)     I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)     I am employed as a nurse practitioner at St. Joseph Mercy Oakland Hospital in Pontiac, Michigan. St. Joseph is owned by Trinity Health, which employs about 123,000 healthcare workers at facilities in 22 states.

3)     The State of Michigan does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)     On August 9, 2021, Trinity Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

| Request History | | |
| --- | --- | --- |
| **Date** | **Author** | **Response** |
| 8/9/2021 12:46 PM | ████████ | Your 2021 COVID-19 vaccination exemption request has been approved. You are required to follow masking, physical distancing, and any other accommodation requirements as determined by your Health Ministry. You may print this page by clicking on the "COVID-19 Vax Exemption " located under Print My Verification above and present it to your Health Ministry, if required. |
| 8/1/2021 7:44 AM | ████████ | NA |

**Last Response**

Your 2021 COVID-19 vaccination exemption request has been approved.  You are required to follow masking, physical distancing, and any other accommodation requirements as determined by your Health Ministry.  You may print this page by clicking on the "COVID-19 Vax Exemption " located under Print My Verification above and present it to your Health Ministry, if required.

5)     My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and

safe care to my patients. As part of my accommodation, I am required to use PPE, observe physical distancing and self-monitor and report symptoms. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

## EMPLOYEE WITNESS # 25

### DECLARATION OF ▇▇▇▇▇▇▇

I, ▇▇▇▇▇▇▇ declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a nurse assistant at Henry Ford Hospital in Clinton Township, Michigan. Henry Ford Health employs over 30,000 healthcare workers at over 40 hospitals.

3) The State of Michigan does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4) On August 17, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:



**Henry Ford HEALTH SYSTEM**

**Religious/Spiritual Exemption Determination**
**Employee Notification**

We have received and reviewed your request for religious exemption from the COVID-19 vaccines. Your request has been reviewed by a committee and the following determination was made:

☒ **Exemption Approved**        ☐ Exemption Denied

*All determinations are final

Thank you,

5) My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE and self-monitor and report symptoms. I comply with all of these requirements.

6)     I am personally aware that 4 other employees at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

**EMPLOYEE WITNESS # 26**

**DECLARATION OF** ███████████

I, ███████████, declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a bedside registered nurse in the Neuro Step Down Intensive Care Unit at Henry Ford Health System in Detroit, Michigan. Henry Ford Health employs over 30,000 healthcare workers at over 40 hospitals.

3) The State of Michigan does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4) On August 23, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:



**Religious/Spiritual Exemption Determination**
Employee Notification

We have received and reviewed your request for religious exemption from the COVID-19 vaccines. Your request has been reviewed by a committee and the following determination was made:

☒ Exemption Approved          ☐ Exemption Denied

*All determinations are final

If you would like to schedule an appointment to receive your COVID-19 vaccine, please call 313-651-1119.

Thank you,

HFHS Employee Health Services

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe bedside care to my patients. As part of my accommodation, I am required to use PPE and self-monitor and report symptoms. I comply with all of these requirements.

6)      I am personally aware that 2 other employees at my location who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

# EMPLOYEE WITNESS # 27

### DECLARATION OF ███████████

I, ███████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse at Atrium Medical Center – Premier Health Partners, in Middleton, Ohio. My hospital employs approximately 1,400 people.

3)      The State of Ohio does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 11, 2021, my employer granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

**COVID-19 Vaccination Exemption Request**

 Premier Employee Health          Sep 11
⋯

Thank you for the submission of your Vaccine Religious Accommodation Request Form. As you know, it is the policy of Premier Health and all affiliated entities, that it is in the best interest of patient and employee safety to prevent the transmission of the COVID-19 virus by requiring employees and those working in our facilities to be vaccinated.

Your request for a religious accommodation has been APPROVED for the COVID-19 vaccination through November 30, 2022.

*Please note: Unvaccinated employees must follow all masking guidelines. While we are not currently testing unvaccinated workers in our facilities on a routine basis, we reserve the right to do so as a reasonable accommodation.*

Thank you.

5)       My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to follow masking guidelines. I comply with all of these requirements.

6)       I am personally aware that 1 other employee who works at my hospital and who interacts with both on-site patients and on-site colleagues was also granted a religious exemption and accommodation from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 28**

<u>**DECLARATION OF**</u> ████████████

I, ████████████ , declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse at the Ambulatory Surgical Center of Temple University, in Philadelphia, Pennsylvania. Temple University has a premier educational and research health system.

3)      The State of Pennsylvania does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 10, 2021, Temple University granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> Thank you for submitting the request for a vaccine exemption. The information you provided us meets the criteria for an approved exemption. You will need to engage in weekly or twice weekly testing. You will receive an e-mail each week with the testing requirements for the upcoming week. You must continue COVID-19 testing unless and until you are directed otherwise by Student or Employee Health. Please proceed to schedule your regular testing appointments through the following website: Patient Health Portal
>
> Sincerely,
>
> **COVID-19 Waiver Review Team**
> Temple University

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE and to undergo weekly testing for COVID-19. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 29**

<u>**DECLARATION OF**</u> ███████████

I, ███████████ , declare as follows:

1) I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2) I am employed as a registered respiratory therapist at Holy Redeemer Hospital, in Meadowbrook, Pennsylvania. My hospital is part of the Redeemer Health System, which employs approximately 2,500 employees.

3) I also work on a per diem basis at St. Mary's Medical Center, in Langhorne, Pennsylvania. This facility is part of Trinity Health.

4) The State of Pennsylvania does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

5) On August 12, 2021, Holy Redeemer Hospital granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

> The COVID-19 Religious Exemption Review Committee has reviewed your request for a religious exemption to determine if an exemption should be approved.
>
> Based on this review, the COVID-19 Religious Exemption Review Committee has approved your request for a religious exemption.
>
> Please be advised that while you have received the approval of an exemption from the COVID-19 vaccine, you will remain subject to regular testing as per state/federal regulations and Redeemer Health guideline.

6) I have also received an exemption and accommodation from St. Mary's and Trinity Health.

7)      At both of my employers, my accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation at Holy Redeemer Hospital, I am required to use PPE and to undergo periodic testing for COVID-19. At St. Mary's/Trinity, I am required to use PPE, monitor and report symptoms, and observe physical distancing when and as possible. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

## EMPLOYEE WITNESS # 30

### DECLARATION OF ▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮ declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a homecare physical therapist at St. Francis at Home in Wilmington, Delaware. St. Francis is part of Trinity Health, which employs about 123,000 healthcare workers at facilities in 22 states.

3)      The State of Delaware does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On August 25, 2021, Trinity Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, including goggles, and undergo regular testing for COVID-19. I comply with all of these requirements.

6)      I am personally aware that at least 8 other employees at St. Francis (homecare or hospital) who interact with both on-site patients and on-site colleagues were also granted religious exemptions and accommodations from the COVID-19 vaccination requirement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

**EMPLOYEE WITNESS # 31**

<u>DECLARATION OF</u> ███████████

I, ███████████, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a registered nurse in the labor and delivery unit at Baltimore Washington Medical Center in Glen Burnie, Maryland. My hospital is part of the University of Maryland Medical System. My hospital employs approximately 3,300 employees.

3)      The State of Maryland does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      On September 3, 2021, my hospital granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:

## Religious Exemption – Approved

Dear ███████

Your request for a religious exemption from the UMMS COVID-19 Mandatory Vaccination Policy is GRANTED at this time.

This decision is based on your objection to the use of fetal cell lines in the development of the COVID-19 vaccines.

Thank you for your service to UM BWMC, UMMS and our communities during this challenging time. If you have any questions regarding your request for religious accommodation, please contact us.

Please note that since you are exempt from COVID-19 mandatory vaccine, you  must undergo serial testing starting in October.

5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE and undergo COVID-19 testing once per week (starting in October). I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2021

## EMPLOYEE WITNESS # 32

### DECLARATION OF <span style="background:black">      </span>

I, ▮▮▮▮▮▮▮▮▮▮, declare as follows:

1)      I am over the age of 18, and competent to testify as follows, based upon my personal knowledge.

2)      I am employed as a nurse at Holy Cross Hospital in Ft. Lauderdale, Florida. Holy Cross Hospital is owned by Trinity Health, which employs about 123,000 healthcare workers at facilities in 22 states.

3)      The State of Florida does not prohibit healthcare employers from providing religious exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations.

4)      In August 2021, Trinity Health granted me a religious exemption and accommodation from its mandatory COVID-19 vaccination policy. This is a copy of the approval notice that I received:



5)      My accommodation permits me to continue all of my previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to my patients. As part of my accommodation, I am required to use PPE, monitor and report symptoms, and observe physical distancing when and as possible. I comply with all of these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2021

**ADDENDUM I**
**UNIVERSITY OF COLORADO MEDICINE MEMBER PRACTICE AGREEMENT**
**MEMBER COVENANT NOT TO COMPETE**

**Liquidated Damages for Competition by Member**.  Member acknowledges and agrees that CU Medicine and the University have an investment in Member and Member's practice and that CU Medicine and the University will be economically injured in a material amount in the event Member competes with the business of the University.  The parties agree that the damages that may be suffered by CU Medicine and the University in the event Member engages in competition with the University or CU Medicine are difficult to assess and that the liquidated damages amounts provided for in this Agreement constitute a fair and reasonable good faith current estimate of the actual injury likely to be realized by CU Medicine and the University in the event Member competes with the University under the circumstances herein described and that measuring actual injury to CU Medicine and the University would be difficult in these circumstances.  Consequently, the parties agree that, if Member's employment with the University terminates for any reason except if terminated by the University for: 1) lack of resources or program discontinuance, or 2) by exercising any at-will termination rights the University may have, and the Member enters into competition with the University as defined below, Member shall pay to CU Medicine and the University liquidated damages in the amount of $310,950.

For the purposes of this agreement, the terms "competition with the University" or "competes with the business of the University" means for a period of 2 years after termination, establish, operate or provide professional medical services, either in his/her own practice or as an independent contractor, partner, shareholder, owner, or agent of a medical practice, clinic, or hospital within a 100 mile radius of the intersection of Colfax and Ursula, Aurora, Colorado or any other facility where the Member regularly provides medical services on behalf of the University.

Member acknowledges and agrees that these terms and conditions are reasonable as to geographic scope, duration and amount, and that the amount of liquidated damages specified above is reasonable, and reflects the actual damages that University and CU Medicine would suffer.  Any amounts owed by Member hereunder can be offset by University and CU Medicine against any amounts owed by University and CU Medicine to Member.

The University, with the agreement of CU Medicine, may, in their sole discretion, elect not to enforce this provision.  In considering whether to enforce this covenant the University will consider whether its enforcement will result in undue hardship to the Member.

If any provisions of this covenant not to compete relating to time period, scope of activity restricted, or geographic area described herein shall be declared by any court of competent jurisdiction to exceed the time period, scope of activity or geographic area which the court deems to be reasonable and enforceable, then the time period, scope of activity restricted and/or geographic area provided for in this covenant shall be modified and this covenant deemed amended to be that time period, scope of activity and/or geographic area which the court finds is reasonable and enforceable.

**Exhibit 21**

██████████ - Non-Compete Agreement
Page **2** of **2**

Agreed to:
Member:

_____ ████████████  2/12/19
Signature                     Date

████████████
Print Name

Department Chair:

_____ 1|18|19
Signature                     Date

Stephen R. Daniels, MD, PhD
Print Name

Dean, School of Medicine:

_____ 2/5/19
Signature                     Date

John. J. Reilly, Jr., MD
Print Name

PROFESSIONAL DEVELOPMENT (/TOPIC/PROFESSIONAL-DEVELOPMENT)

## Guidelines for the Consideration of Application for Transfer or Advanced Standing

Preamble: These guidelines are established:



1. to assist medical schools in the handling of applications
   a. from individuals currently enrolled in a medical school who are interested in transfer to another medical school,
   b. from individuals previously, but not currently, enrolled in a medical school who are interested in enrollment with advanced standing at a medical school, and/or
   c. from individuals with specialized education and training who are interested in enrollment with advanced standing at a medical school, and
2. to ensure communication and cooperation among medical schools and between medical schools and the AAMC.
   a. Once a student enters medical school, it is expected that the individual has chosen a school where he/she will remain for completion of the entire undergraduate medical curriculum. However, circumstances may arise that cause an individual to seek transfer to another medical school. A medical student has a right to apply for transfer from one medical school to another medical school. A medical school has a responsibility to provide a transcript of the individual's academic record and a letter of evaluation, if requested by the student, to another medical school.
   b. Medical schools should not recruit applicants for transfer from other institutions. The acceptance of transfers should be limited to students who demonstrate compelling circumstances as one of the reasons for their request for transfer.
   c. Each medical school determines whether or not it will accept transfer students.
   d. Schools that accept transfer students should develop and publish criteria for the acceptance of transfer applicants or applicants for advanced standing.
   e. Schools that accept transfer students should develop and publish the timetable for the availability of transfer application material; deadline dates for the receipt of applications and for the receipt of transcripts, the school letter of evaluation, and faculty recommendations; and the date for notification of acceptance. The application materials should include information about the approximate number of places available for transfer students for the next academic year and the criteria for selection.
   f. Applications for transfer or advanced standing should include an official transcript and an official letter of evaluation from the Dean/Associate Dean for Student Affairs or other appropriate official of the applicant's current school.
      i. The transcript should document the individual's entire academic history at the medical school, including notation of any leaves-of-absence, schedule modifications, and an explanation of the grading system. If any of these items are not included on the school's transcript, they should be included in the letter of evaluation.
      ii. The letter of evaluation should state the eligibility (or expected eligibility) of the individual for promotion to the next academic year at the student's current school. The letter should address the academic and non-academic qualifications of the individual for the eventual practice of medicine. Specific comment should be included on any infractions of the school's code of ethical and behavioral conduct.
      iii. The application for transfer or advanced standing should include a question asking the applicant to state whether he or she has ever been the recipient of any action by any postsecondary institution for unacceptable academic performance such as dismissal, disqualification or suspension, or for conduct violations.
   g. It is recommended that a school's transfer application deadline be no later than May 1 preceding the academic year of anticipated enrollment.
   h. It is recommended that the school accepting the student telephone or email the Associate Dean of Student Affairs or other appropriate official at the student's current school at the time an acceptance is offered. A copy of the letter of acceptance should be sent to the Associate Dean for Student Affairs at the institution where the applicant is currently enrolled at the time of acceptance.
   i. The letter of acceptance for a transfer should state clearly the starting date, the year of the curriculum that the student will enter, any conditions of acceptance (such as a passing score on the USMLE), and implications for the transfer student if all conditions of the transfer are not met.
   j. Ideally, an individual should not be permitted to enroll as a transfer student at the receiving school prior to receipt of an official letter of acceptance by the student and confirmation by the receiving school that the student has resigned from the student's current school. If another arrangement is used, it should be with the full understanding of both schools.
   k. Medical schools are expected to report acceptances of Advanced Standing/Transfer Students to the AAMC by adding and updating the acceptee's information in the Student Records System (SRS).
   l. Medical schools are expected to notify the AAMC when an accepted applicant withdraws as a candidate for admission so that the Advanced Standing/Transfer Student Master Acceptance List can be maintained accurately.

Developed by the Group on Student Affairs Steering Committee, March 20, 1995

Approved by the AAMC Executive Council, June 22, 1995

Updated July 18, 2016

---



655 K Street, NW, Suite 100 Washington, DC, 20001-2399

---

© 2021 AAMC

**Tuesday, October 19, 2021 at 6:35:15 PM Mountain Daylight Time**

**Subject:** Vaccine Verification Process Completed
**Date:** Monday, September 13, 2021 at 3:11:56 PM Mountain Daylight Time
**From:** vaccine@cuanschutz.edu
**To:** ▮▮▮▮▮▮▮
**Attachments:** Vaccine Verification Form - 9-13-2021.tif

Hello ▮▮▮▮

Thank you for completing the University of Colorado Anschutz Medical Campus vaccine verification process. You have attested that you are vaccine exempted. Please keep this email for your records.

If you **are fully vaccinated**, there is no further action needed.

If you **are not fully vaccinated**, have submitted an exemption or have registered partially vaccinated, CU Anschutz requires that you follow all established safety protocols while on campus (complete the daily health questionnaire; wear a mask; observe physical distancing; self-report if symptomatic, test positive or exposed).  A requirement for regular COVID-19 testing will follow.

Learn about current campus protocols: CU Anschutz Return to Campus Information

Find campus FAQ's: CU Anschutz COVID-19 FAQs

Thank you for helping keep #CUAnschutzTogether.

Exhibit 23

September 7, 2021

**<u>VIA ELECTRONIC MAIL</u>**

█████████,
████████████@cuanschutz.edu

*Re: Request to Consider Vaccine Exemption based on Religious Grounds*

Dear ████████r:

We received your submission for religious exemption from the campus COVID-19 vaccination requirement. Pursuant to guidance from the CU Anschutz Exemption Verification Team, we have the following information and decision regarding your request.

The University adopted its COVID-19 Vaccination Policy for the purpose of protecting the health and safety of the campus community including the patients that medical students treat in University, UC Health, and Children's Hospital clinics. The University determined that a mandatory vaccination requirement for its employees and students is the best way to accomplish this goal.

A recent study by the Centers for Disease Control and Prevention found that individuals who have not been vaccinated were nearly five times more likely to be infected with COVID-19 than vaccinated people. In addition, the study found that unvaccinated people are about 29 times more likely to be hospitalized with COVID-19 than those who are fully vaccinated. [1]

The University's mandatory vaccination policy offers exemptions based on a person's religious belief whose teachings are opposed to all immunizations, i.e., your religion teaches you and all other adherents that immunizations are forbidden under all circumstances.  When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you object based on your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion.

The basis for your objection to vaccination against COVID-19 is of a personal nature and not part of a comprehensive system of religious beliefs.

Having considered your exemption request and the campus COVID-19 vaccination policy, your request is not approved.

Please submit verifiable documentation indicating you have received the first COVID-19 vaccine dose to the School's Associate Dean for Student Affairs and Admissions, and submit your verification via the campus portal by September 15, 2021.  You will be allowed to continue attending school between the time you receive your first vaccination and the time you are fully vaccinated (two weeks after you receive the second dose of the Pfizer or Moderna vaccine or the single dose of the J&J vaccine).  For any in-person activities, you will be required to follow campus safety protocols for unvaccinated individuals as set out in University policy, including, but not limited to, weekly testing, masking, and social distancing where possible.

---

[1] *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention, August 27, 2021.

**Exhibit 24**

Alternatively, if you do not intend to submit documentation that you have received the first COVID-19 vaccine dose to the Associate Dean for Student Affairs and Admissions by September 15, 2021, you may request a Leave of Absence from the School or withdraw from the School by September 15, 2021.  Your fall 2021 tuition and fees will be returned if you withdraw or go on a leave of absence.  Please let the Associate Dean for Student Affairs and Admissions know if you would like more information about any of these options.

Failure to select any of these options will result in referral to the Student Performance Committee for further action, up to and including dismissal.

Sincerely,

Eric P. Mediavilla, DDS
Associate Dean for Student Affairs and Admissions



University of Colorado
Denver | Anschutz Medical Campus

University Police Department
**Office of the Chief of Police**
12454 E. 19th Place
MS F409 Building 407
Aurora, Colorado 80045

o   303 724 0230
m  303 724 2000
f   303 724 0718

www.ucdenver.edu/police

**Via E-mail**

Date:          September 29, 2021

████████████
Technician V
University Police Department

SUBJECT:     **Notification of Disciplinary Action**

Dear ████

In accordance with State Personnel Board Rule 6-15, you are hereby notified that the following disciplinary action has been taken against you.

**ACTION TAKEN:**  Having met with you in accordance with State Personnel Board Rule 6-10 September 20, 2021, to present the issues indicated below, and having given you an opportunity to admit or refute the information, or to present information regarding mitigating circumstances, I have determined the reasonable and just action to be **a temporary pay reduction of 10% for one month**.  If you remain unvaccinated after November 1,2021, additional disciplinary action may be initiated because of your continued violation of the campus vaccination policy. If that were to occur, a new notice and R-6-10 meeting would take place.

The disciplinary action outlined above has been issued because termination would cause an undue hardship to the operations of the police department at this time, given the business need of the unit and that your role as Technician V and serving as supervisor in Police Dispatch makes you essential to the operation of the University Police Department until a replacement can be identified.

Furthermore, remote work is not an option as your position as Technician V and your role in Police Dispatch requires you to be on campus.

**EFFECTIVE DATE OF ACTION:**          **October 1, 2021**

**Exhibit 25**

While on campus you are required to follow the below safety measures to protect the health and safety of your colleagues. Please note that while these present an undue hardship to the campus, since termination is not an option at this time these are the steps that we feel are necessary.

- You will be required to adhere to additional safety protocols, including, but not limited to wearing masks, social distancing, staying home when sick, quarantining in accordance with current Centers for Disease Control ("CDC") guidance, submitting daily attestations, and undergoing weekly testing.
- Only your presence in building 407 and Campus Services (in the event of an activation of the Emergency Operations Center) is permitted. You are not permitted to access other parts of the campus.
- You will work in isolation as much as possible and will limit in-person contact with anyone as much as possible.
- You will be given until November 1, 2021, to submit verification of vaccination (at least one dose of a two-dose series) via the campus verification system. Failure to submit verification of the vaccination by November 1, 2021 will result in additional disciplinary actions, up to and including termination.
- Once you submit verification of receiving at least one dose of the vaccine, you will still be required to comply with the campus COVID-19 safety protocols, including weekly testing, masking, social distancing, and completing the daily attestation form until you are fully vaccinated (two weeks after receiving your final dose).

Failure to improve your performance and to perform these duties competently as described may result in further corrective and/or disciplinary action.

You may protest this action by filing an appeal under the State Personnel Board Rules. Forms are available from the Human Resources Department at (303) 315-2700. The State Personnel Board's appeal/dispute form is available at http://www.ucdenver.edu/about/departments/hr/formstemplatesprocesses/pages/otherrelated forms.aspx. The appeal must be in writing, signed by you or your representative, and must be mailed or delivered not later than the tenth (10th) calendar day after your receipt of this letter, and addressed as follows: State Personnel Board, Attention: Appeals Processing, 1525 Sherman Street, 4th Floor, Denver, Colorado 80203.

The ten (10) day deadline and the appeal procedures also apply to all charges of discrimination.

Sincerely,

*Randy Repola*

Randy Repola
Appointing Authority
Chief of Police

Employee signature

While outlaying received only

Date

**Anesthesiologist Assistant Program**

SCHOOL OF MEDICINE

UNIVERSITY OF COLORADO **ANSCHUTZ MEDICAL CAMPUS**

Academ c Off ce 1
Ma  Stop 8202
12631 E. 17ᵗʰ Avenue
Aurora, Co orado 80045
p 303.724.1764   f 303.724.1761

Date:   August 30, 2021

To:   ▇▇▇▇
       Anesthesiologist Assistant Student
       Master of Science Program
       Department of Anesthesiology

**VIA ELECTRONIC MAIL**

▇▇▇▇▇ cuanschutz.edu

*Re: Request to Consider Vaccine Exemption based on Religious Grounds*

Dear Mr ▇▇▇:

This letter is in response to your religious exemption form dated August 24, 2021, in which you ask the Anesthesiologist Assistant Program ("Program") of the University of Colorado Anschutz Medical Campus' School of Medicine ("University") to consider your religious exemption request related to the University's mandatory COVID-19 vaccination requirement.

The University adopted its COVID-19 Vaccination Policy for the purpose of protecting the health and safety of the campus community including the patients that medical students treat in University, UC Health, and Children's Hospital clinics. The University determined that a mandatory vaccination requirement for its employees and students is the best way to accomplish this goal.

A recent study by the Centers for Disease Control and Prevention found that individuals who have not been vaccinated were nearly five times more likely to be infected with COVID-19 than vaccinated people. In addition, the study found that unvaccinated people are about 29 times more likely to be hospitalized with COVID-19 than those who are fully vaccinated. [1]

The University's mandatory vaccination policy offers exemptions to individual's whose religious beliefs are opposed to all vaccinations.  When asked to explain how your religious beliefs prevent you from receiving the COVID-19 vaccine, you responded that you object based on your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion.

The rationale provided does not constitute a religious belief, but a personal objection to receiving the vaccine. You express disagreement with the development of the vaccine. The basis for your objection is of a personal nature and not part of a comprehensive system of religious beliefs.

---

[1] *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention, August 27, 2021.

**Exhibit 26**



Academ c Off ce 1
Ma   Stop 8202
12631 E. 17th Avenue
Aurora, Co orado 80045
**p** 303.724.1764   **f** 303.724.1761

Having considered your exemption request, it is denied. You must submit documentation that you have received the first vaccine to the Anesthesiologist Assistant Program and via the campus portal by September 1, 2021.  Even if the University had approved your exemption, an accommodation would not be possible because of the undue burden it would cause to the Program's ability to provide safe patient care. You will be allowed to continue attending school between the time you receive your first vaccination and the time you are fully vaccinated (two weeks after you receive the second dose of the vaccine).

Alternatively, if you do not intend to submit documentation that you have received the first vaccine by September 1, 2021, you may withdraw from the Program or request a Leave of Absence from the Program by September 1, 2021.

Failure to select any of these options will result in further action by the Program, up to and including dismissal.

Sincerely,

Ann-Michael Holland, MMSc, CAA
Director, Master of Science Program
Department of Anesthesiology



Academic Office 1
Mail Stop 8202
12631 E. 17th Avenue
Aurora, Colorado 80045

Date:   September 3, 2021

To:   ███████████
Anesthesiologist Assistant Student
Master of Science Program
Department of Anesthesiology

Dear ██████,

In response to the significant risks associated with the ongoing COVID-19 pandemic to all healthcare professions, the University of Colrado's Anschutz Medical Campus adopted a campus-wide policy that requires all students, staff, and faculty to submit proof of vaccination against COVID-19 or receive an approved medical or religious exemption.

The campus policy states that religious exemptions will be approved if they indicate that the individual holds religious beliefs that are opposed to all vaccinations.

In your exemption request, you stated that you object to all of the COVID-19 vaccines based on your belief that those COVID-19 vaccines were developed from human cell lines derived from abortion.

On August 26, 2021, Dr. Shanta Zimmer sent you an email explaining that your religious exemption request did not meet the policy requirement and explaining the alternative options available to you, including leave of absence or withdrawal.

On August 30, 2021, you received a letter from Ms. Ann-Michael Holland, the Program Director of the Anesthesiologist Assistant Program ("Program") denying your religious exemption request because the rationale provided does not constitute a religious belief, but a personal objection to receiving the COVID-19 vaccines.

On August 31, 2021, you provided Ms. Holland with a letter expressing your view as to why you believe your religious exemption request should have been approved.

On August 31, 2021, you also had a conversation with Ms. Holland as well as Mr. David Dunipace from the program regarding the denial of your religious exemption request.  As you discussed and pursuant to the Program Handbook, your failure to comply with University Policy and the Program Handbook could be sent to the Progress and Promotions Committee ("PPC") for consideration to determine whether that policy violation constituted Nonclinical Misconduct.  You agreed that it should be sent to the PPC to make that determination.

On August 31, 2021, Ms. Holland sent you an email and letter confirming that this matter would be referred to the PPC and attaching the documents that the Progress & Promotions Committee would review as well as the letter from Ms. Holland confirming the referral to the PPC.  Ms. Holland also attached the Program Handbook for your reference regarding the PPC's involvement and the appeals process.

**Exhibit 27**



Academic Office 1
Mail Stop 8202
12631 E. 17th Avenue
Aurora, Colorado 80045

The PPC met on August 31, 2021 at 7:30 pm and determined that the policy violation at-issue would constitute Non-Clinical Misconduct.

On September 1, 2021, Ms. Amy Hebbert sent you an email attaching a letter that conveyed that decision by the PPC that the policy violation at-issue constitutes Non-Clinical Misconduct, specifically, "Neglecting mandatory requirements for Program and University compliance."

On September 1, 2021, you stated that you would like to appear before the PPC as soon as possible. Although the Program asked if you would like additional time to consider a withdrawal or a leave of absence before appearing before the PPC, you answered in the negative and reiterated that you wished to appear before the PPC.

On September 3, 2021 at 9 am, the PPC was convened on short notice to provide you an opportunity to address them regarding the policy violation.  On September 3, 2021, you appeared before the PPC along with your student advocate, Dr. John Repine.

You presented your case and participated in answering any questions from the PPC.

On September 3, 2021, after due deliberation and consideration of all documentation, evidence and information as described above, the Committee recommended to me that in accordance with University Policy and the Program Handbook Non-Clinical Misconduct (pages 25 through 26), you should be dismissed from the University of Colorado Master of Science in Anesthesiology Program.

I have received the Committee's recommendation and accept that decision.  Please be aware of the appeals process as described in detail in the Program Handbook on pages 30 through 31.

If you wish to appeal the Committee's decision, you must let me know in writing of the desire to appeal and the reason for doing so by the end of the day on Tuesday September 7, 2021. At that time, I will initiate the process with the Department of Anesthesiology's Acting Vice Chair of Education, Dr. Shanta Zimmer.

We understand this is an extremely difficult situation and we appreciate your participation in the process. Please do not hesitate to reach out if you have any questions.

Ann-Michael Holland, MMSc, CAA
Director
Master of Science Program
Department of Anesthesiology
School of Medicine

Copy to Dr. John Repine and Dr. Shanta Zimmer

University of Colorado **Anschutz Medical Campus**

**Campus Administrative Policy**

**Policy Title:**        **COVID-19 Vaccination Requirement and Compliance**

**Policy Number:**  3012             Functional Area:   General Administration

| | |
|---|---|
| Effective: | September 24, 2021 |
| Date Last Amended/Reviewed: | September 24, 2021 |
| Date Scheduled for Review: | September 24, 2028 |
| Supersedes: | COVID-19 Vaccination Requirement and Compliance September 1, 2021 |
| Approved by: | Donald M. Elliman, Jr Chancellor, University of Colorado Anschutz Medical Campus |
| Prepared by: | Office of University Counsel |
| Reviewing Office: Responsible Officer: | Office of the Chancellor of the CU Anschutz Medical Campus Executive Vice Chancellor for Administration and Finance \| CFO, University of Colorado Anschutz Medical Campus |
| Applies to: | CU Anschutz Medical Campus |

**A.    INTRODUCTION**

The purpose of this policy is to protect the health and safety of the University of Colorado Anschutz Medical Campus ("CU Anschutz") community, including all faculty, staff, students,  badged affiliates, persons of interest (POIs), visitors, and volunteers ("Individuals") who work or learn on the Anschutz  Medical Campus or off campus in connection with CU Anschutz programs. This policy requires all Individuals who currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz  program, or whose employment or academic activities may require in-person interaction with other CU Anschutz employees, students, patients, study subjects, or members of the public, regardless of location, to become fully vaccinated against COVID-19 with a vaccine that has been approved by the World Health Organization ("WHO") as of June 1, 2021, subject to limited exceptions and exemptions.[1] In addition, this policy requires Individuals to receive booster shots for those specific vaccines, as

---

[1] As of June 1, 2021, the WHO has approved the following COVID-19 vaccines: Pfizer-BioNTech, Moderna, Johnson & Johnson, Oxford–AstraZeneca, Sinovac, and Sinopharm.

1



required or recommended by the WHO or Centers for Disease Control.

All faculty, staff, badged affiliates, and POIs must submit proof of COVID-19 vaccination prior to the individual's start date or prior to accessing or participating in any CU Anschutz program.  Students must submit proof of COVID-19 vaccination in accordance with their program deadline,  which varies by program.  Students who will initially participate in University-related activities remotely will be  required to submit proof of COVID-19 vaccination before starting any in-person component of their  curriculum whether on campus, or at a clinical site or remote location. Individuals who do not provide proof of vaccination may be subject to additional safety protocols as described more fully below.

**B.**   **DEFINITIONS**

    **1.**   The term "employees" includes, but is not limited to, all full and part -time staff, faculty, post-doctoral  fellows, medical residents, predoc trainees, and fellows.

    **2.**   The term "badged affiliates" includes, but is not limited to, any individual who has a CU Anschutz badge to access campus facilities, whether leased or owned on or off campus, including badged contractors and  employees at affiliated institutions who have a CU Anschutz badge and access campus  facilities on a regular basis.

    **3.**   The term "students" includes, but is not limited to, all students, including part-time,  full-time, degree-seeking, non-degree seeking, hybrid (combination of online and in   person, either: (i) on campus and/or (ii) in clinical settings), visiting students,  undergraduate, or graduate students enrolled at CU Anschutz.

**C.**   **POLICY STATEMENT**

All Individuals, who are, or may access any University facility or participate in any University program, or whose employment or academic activities may require in-person interaction with other CU Anschutz employees, students, patients, study subjects or members of the public, including external conferences, regardless of location, must be fully vaccinated against COVID -19unless they have received an approved medical or religious accommodation as further described below.   Individuals are required to comply with this Policy, regardless of the Individual's frequency on campus or interaction with other employees, students, patients, or others. For example, even a one-time visit or interaction requires compliance.

Positions or programs that require on-campus presence or interaction with others will not be allowed to be performed remotely in order to avoid compliance with this Policy. However, Individuals who hold positions that have been previously approved by a supervisor as being 100% remote without any current or future presence at any CU Anschutz facility (owned or leased) or participation in any Anschutz program, or whose employment or academic activities do not require in-person interaction with other CU Anschutz employees, students, patients or study subjects of the Anschutz Medical campus, regardless of location, are not required to be comply with this policy. Schools, departments, and units may implement additional rules, and requirements, related to

2

university business that takes place off-campus.  It is recommended that university events that are held off-campus follow the university safety protocols, including, but not limited to wearing masks, social distancing, and not attending if feeling sick.

1. **Vaccine Verification**

All Individuals must submit verification of COVID-19 vaccination. Employees, badged  affiliates, POIs, and volunteers must submit verification of their COVID-19 vaccination via the  campus verification system. Submission of false or fabricated vaccine information may be grounds for discipline, including termination of employment or dismissal from a program. Visitors will not be required to submit verification via the campus verification system, but will be required to submit verification to the department or unit hosting their visit. It is the responsibility of the unit who is hosting the visitor to ensure the visitor's compliance with this Policy. Students must submit proof  of COVID-19 vaccination to their individual Schools/College/programs in the same manner that they would submit proof of other required vaccinations.

In the absence of an approved medical or religious accommodation under Section 2 of this Policy, an Individual's failure to provide valid proof of vaccination may lead to discipline, up to and including termination.  Schools, departments, or individual units may require addition documentation verifying vaccine status, beyond what is required by the campus verification system, including providing a vaccine card.

2. **Accommodations**

Individuals may receive a medical or religious accommodation if they are unable to receive the vaccine for medical reasons or sincerely held religious beliefs as further described below. Supervisors and unit heads will be made aware that an Individual has received an accommodation, but will not be aware of the reason for the accommodation.

A medical accommodation may be granted if vaccination is absolutely contraindicated due to other medical conditions.[2]  A Physician (MD, DO), Advanced Practice Nurse (APN), or Physician Assistant licensed in Colorado, must sign the medical exemption form and attest to the accuracy of the information contained therein. Employees, badged affiliates, visitors, and volunteers must submit their medical exemption forms via the approved campus database, which is a campus-wide platform. Students must submit their medical exemption forms to their individual Schools/College/programs in the same manner that they would submit exemptions for other required vaccinations. A medical accommodation will not be granted, if the accommodation poses an undue hardship or the accommodation poses a direct threat to the health or safety of the

---

[2] Currently, the only absolute contraindications to COVID-19 vaccination are i) severe immediate allergic reaction to a previous dose or to a component of the COVID-19 vaccine, ii) immediate reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine.

3

Individual or others.

A religious accommodation may be granted based on an employee's religious beliefs. Employees must submit their religious accommodation request form via the campus verification system.  A religious accommodation will not be granted if the accommodation would unduly burden the health and safety of other Individuals, patients, or the campus community.

Religious accommodations are not currently available to students or applicants.

Individuals who are granted medical or religious accommodations will be required to adhere to additional safety protocols, including, but not limited to wearing masks, social distancing, staying home when sick, quarantining in accordance with current Centers for Disease Control ("CDC") guidance, submitting daily attestations, and undergoing frequent asymptomatic testing.[3]

Unvaccinated Employees, Badged Affiliates, or POIs who fail to complete the COVID -19 verification form or comply with required safety protocols for accommodated individuals will be referred to their Supervisor for potential action and/or discipline, up to and including termination. Supervisors will be required to provide Campus Human Resources with information regarding such action and/or discipline with respect to unvaccinated employees.

Unvaccinated students who fail to submit verification of vaccination or comply with required safety protocols for accommodated individuals may be referred to their respective School/College/program for potential action and/or discipline, up to and including termination from the program. Schools/College/programs will be required to provide the Associate Vice Chancellor for Student Affairs at CU Anschutz with information regarding such action and/or discipline.

Individuals who are not vaccinated and do not have an approved medical or religious accommodation, will not be allowed to access University facilities or programs in person. Individuals who previously tested positive for COVID-19 will not be granted an accommodation unless they obtain a note from a physician or health care provider that indicates vaccination is absolutely contraindicated.

The COVID-19 pandemic and its impact on campus operations is rapidly evolving.

Individuals are encouraged to consult the COVID-19 website referenced in Section D(4) below on a regular basis for up-to-date information regarding CU

---

[3] Currently, Individuals who are required to submit to ongoing asymptomatic testing will be required to do so on a  weekly basis, but the frequency of testing is subject to change at CU Anschutz' discretion based on evolving medical and scientific recommendations.

Anschutz' COVID-19-related policies, procedures, and guidance.

**3.**  **Reasonable Accommodations under the ADA**

CU Anschutz recognizes that some medical conditions may be protected under the Americans with Disabilities Act and amendments ("ADA"), entitling students and employees to request reasonable accommodations.

If you are a student at the CU Anschutz Medical Campus and need to make an application for reasonable accommodations or need information regarding the ADA, contact the Office of Disability Access and Inclusion at (303) 724-5640 or disabilityresources@cuanschutz.edu.

If you are an employee and need to make an application for reasonable accommodations  or need information regarding the ADA, contact the ADA Coordinator at (303) 315-2700 or  HR.ADACoordinator@ucdenver.edu.

**D.**  **RELATED POLICIES, PROCEDURES, FORMS, GUIDELINES, AND OTHER RESOURCES**

1.  Related Administrative Policy Statements (APS) and Other Policies

- Campus Policy 7014: Student Immunization Requirements and Compliance

2.  Forms

- CU Anschutz Student Medical Exemption Form

3.  Other Resources (i.e., training, secondary contact information)

- CU Anschutz COVID-19 Resources
- EEOC What you Should Know About COVID-19 and the ADA, the Rehabilitation Act, and other EEOC laws

**Notes**

1.  Dates of official enactment and amendments:

June 3, 2021: Approved by the CU Anschutz Chancellor

2.  History:

June 3, 2021:  This is a new policy.  As part of CU Anschutz ongoing response to the COVID-19 pandemic, the University of Colorado system decided to require that all faculty and staff be vaccinated against COVID-19 by September 1, 2021, and that all students be vaccinated against COVID-19 before the start of each respective School's Fall Semester.  Chancellor Elliman further decided that this Policy will apply to volunteers, visitors, and badged affiliates who come to CU Anschutz Medical Campus.  Religious

5

and Medical Exemptions from the Policy are available.

September 1, 2021: Updated for clarifying language and forms section

September 24, 2021: Clarifying language for religious and medical accommodations.

3.      Initial Policy Effective Date: June 2, 2021

4.      Cross References/Appendix:

- Campus Policy 7014: Student Immunization Requirements and Compliance
- CU Denver Student Code of Conduct