IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-2637-RM-KMT

JANE DOES 1 through 11, and JOHN DOES 1 and 3 through 7,
    Plaintiffs,
v.

BOARD OF REGENTS of the UNIVERSITY of COLORADO; et al.,
    Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 27)

Defendants Board of Regents of the University of Colorado, University President Todd Saliman, Chancellor Donald Elliman, Senior Associate Dean Shanta Zimmer, Associate Dean Eric Mediavilla, Program Director Ann-Michael Holland, in their official capacities (collectively, "the University"), submit the following Response to Plaintiffs' Renewed Motion for Preliminary Injunction (ECF No. 27). This response is also submitted on behalf of the defendants who are sued in their individual capacities.[1]

## FACTUAL BACKGROUND

### I.    COVID-19

COVID-19 is an infectious disease caused by SARS-CoV-2, the novel coronavirus that primarily spreads through respiratory droplets and very small particles that contain the virus.[2]

---

[1] These include Defendants Elliman, Zimmer, Mediavilla, and Holland. Defendant Saliman is sued only in his official capacity.

[2] Ex. A, Decl. of Dean Samet, ¶¶20-22; https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, *last visited* Dec. 1, 2021. A court may take judicial notice of a fact not subject to reasonable dispute because it can be readily determined from sources whose accuracy cannot reasonably be questioned. *See* F.R.E. 201(b); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

People of all ages can contract and transmit COVID-19, and those who contract the disease may suffer severe illness or death, or incur long-term, ongoing health problems.[3] Ex. A, Decl. of Dean Samet, ¶¶23-25. Anyone who contracts COVID-19, including children and young people, may transmit the disease to others.[4] *Id*., ¶24. Persons with certain medical conditions, such as cancer, kidney, liver, and lung disease, heart conditions, diabetes, those who are pregnant, and the immunocompromised, among others, are at a heightened risk of severe illness or death from COVID-19.[5] *Id*., ¶25. This list includes many of the patients who seek medical care from the University's providers and students.

The University's pediatric critical care doctors have been treating children admitted to the pediatric intensive care unit ("PICU") due to COVID-19 infections. Ex. C, Decl. of Dr. Cripe, ¶3; Ex. D, Decl. of Dr. Dominguez, ¶6. Some of those children have developed complex and life-threatening Multisystem Inflammatory Syndrome in Children ("MIS-C") following such an infection.[6] *Id.*, ¶5 Due to widespread infections, the SARS-CoV-2 virus mutated into the so-called Delta variant, which is significantly more transmissible and deadlier than prior versions of the virus. The Delta variant remains the predominant strain in Colorado and throughout the United States. *Id.*, ¶8. New and potentially deadlier variants will continue to mutate until there is

---

[3] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html, *last visited* Oct. 12, 2021.

[4] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, *last visited* Oct. 12, 2021.

[5] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, *last visited* Dec. 1, 2021.

[6] *See* https://covid.cdc.gov/covid-data-tracker/#mis-national-surveillance, *last visited* Oct. 12, 2021.

"a level of population immunity at which the epidemic can no longer propagate." Ex. A, ¶49, 53 (Delta); 54-55 (Omicron); 51 ("Vaccination is needed to control the spread … and to assure that … replication of the virus … driven by the non-vaccinated does not lead to further mutations …").

There have been approximately 48.5 million cases of COVID-19 in the United States, *see* Ex. M, CDC Chart of Cumulative Cases, and nearly 780,000 people have died from COVID-19 nationwide, so far. *Id.*, ¶26; Ex. N, CDC Chart of Cumulative Deaths. Colorado has had over 829,437 confirmed cases and approximately 9,473 deaths due to COVID-19.[7] Ex. A, ¶27.

The situation in Colorado is critical. In September of 2021, the pandemic in Colorado began an upward turn and modeling projections showed increasing numbers of infections, hospitalizations, and deaths. *Id.*, ¶28. Experts predicted that "approximately 1 in every 99 Coloradoans were infectious, which was in the upper range of prevalence rates of infection in 2021." *Id.*, ¶17-18. On October 31, 2021, Governor Jared Polis signed Executive Order D 2021 135 authorizing the Colorado Department of Public Health and Environment to order hospitals to transfer or cease admission of patients to respond to the growing COVID-19 disaster.[8] *Id.*, ¶29. Hospitalizations continued to increase, and the number of available hospital beds correspondingly decreased, prompting Governor Polis to amend and extend Executive Order D 2021 135 on November 29.[9] *Id.*, ¶30-32; Executive Order D 2021 138. As of the week of

---

[7] *See* https://covid19.colorado.gov/data, *last visited* Dec. 9, 2021.
[8] *See* https://drive.google.com/file/d/1iUxoynYjvUdRu00suieFdmecHoBPLEOb/view, *last visited* Dec. 1, 2021.
[9] *See* https://drive.google.com/file/d/1iUxoynYjvUdRu00suieFdmecHoBPLEOb/view, *last visited* Dec. 1, 2021.

Thanksgiving, about 93% of acute care hospital beds, and 94% of ICU hospital beds in Colorado were in use.[10] Ex. A, ¶32. Colorado anticipated the tenth highest hospital demand nationwide. *Id.*, ¶31.

The University of Colorado Anschutz Medical Campus in Aurora, Colorado houses numerous health sciences schools and hospitals, including but not limited to the UC Health University of Colorado Hospital, Children's Hospital Colorado, and a Veterans Affairs hospital (together, "Anschutz Campus"). *See* Ex. E, Decl. of Chancellor Elliman, ¶2-5. Aurora is split amongst Adams, Arapahoe, and Douglas Counties. The CDC recognizes all three as "high" risk for community transmission.[11] Ex. A, ¶33. Arapahoe County has had more than 89,086 cases, and experienced 999 deaths due to COVID-19.[12] *Id.*, ¶34. The number of deaths in Arapahoe County exceeds that of Denver and 60 other counties and is surpassed only by El Paso and Adams. *Id.*, ¶34-36. In Adams County – where the campus is situated – there have been 86,572 cases and 1,137 deaths due to COVID-19.[13]

## II.     COVID-19 Vaccines

Vaccination is "the path to safeguard the University's employees, students, and patients to the fullest extent possible." *Id.*, ¶62; Ex. D ¶9. Three COVID-19 vaccinations are available to Coloradoans over the age of 12 at no cost: Pfizer BioNTech mRNA, Moderna mRNA, and

---

[10] *See* https://covid19.colorado.gov/data, *last visited* Dec. 1, 2021.
[11] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, *last visited* Dec. 1, 2021.
[12] *See* https://covid19.colorado.gov/data, *last visited* Dec. 1, 2021.
[13] *See* https://covid19.colorado.gov/data, last visited Dec. 10, 2021.

Johnson/Janssen ("J&J") viral vector vaccine ("COVID Vaccines").[14] Ex. A, ¶41-43. The U.S. Food and Drug Administration ("FDA") approved the COVID Vaccines under Emergency Use Authorization, an approval method used during public health emergencies.[15] *Id.*, ¶37. On August 23, 2021, the FDA gave full approval to the Pfizer BioNTech mRNA vaccine. *Id.*, ¶42. The Pfizer vaccine was also recently approved for children ages 5 to 11. *Id.*, ¶44. Children under 5 years old are ineligible for vaccination. *Id.*, ¶45; Ex. G, Decl. of Dr. Jackson, ¶15. The CDC recommends vaccination for everyone over age 5, with these vaccinations that have "brought about the possibility of bringing the … pandemic under control." Ex. A, ¶¶37, 46.

The COVID Vaccines have proven safe and effective, with over 475 million doses administered in the United States. *Id.* at ¶47; Ex. O, CDC Chart. People who are vaccinated are less likely to be infected or to transmit the virus to others (including the Delta variant) and the chances of hospitalization or death from contracting the virus substantially decrease.[16] Ex. A, ¶49. Vaccination is the only safe means of controlling the spread and further mutations of the SARS-CoV-2 virus to achieve herd immunity and to end the worldwide pandemic that has been ravaging Colorado for nearly 22 months. *Id.* at ¶37-38; Ex. D, ¶11; Ex. J, Decl. of Dr. Wynia, ¶12, 14; Ex. K, Decl. of Zimmer, ¶17. No other available intervention has a level of effectiveness approaching that of vaccination. Ex. A, ¶38-40; Ex. D ¶7-9. Vaccination is the most effective means of protecting the most vulnerable—children and the immunocompromised—whom the

---

[14] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html, *last visited* Oct. 12, 2021.
[15] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html, *last visited* Oct. 12, 2021.
[16] *See* https://covid19.colorado.gov/vaccine-breakthrough, *last visited* Oct. 12, 2021.

University's employees and students serve as medical professionals. Ex. D ¶9, 12; Ex. G ¶15-16; Ex. K, ¶11-15.

"[T]here is no alternative to vaccination" in pursuit of the goal of "safe classrooms, offices, laboratories, and clinics and hospitals." Ex. A, ¶62. The mere use of PPE will not end the pandemic. Ex. D, ¶10; Ex. J, ¶12. While there are nonpharmaceutical interventions that can be layered to reduce transmission, none – save vaccination – have any impact on reducing the severity of COVID-19. Ex. A, ¶49. On December 8, 2021, fully 84% of those who are hospitalized due to COVID-19 are unvaccinated. *Id.*, ¶50. This – coupled with the present inability to vaccinate children under age 5 – means that the threshold rate of vaccination in the hospital and medical care settings attained by staff is reduced by introduction of patient and visitor populations. And although people can develop immunity through prior infection, such "natural immunity" wanes, and its protections do not endure. *Id.*, ¶¶56-57. Hence, achieving the highest vaccination rate possible among healthcare workers and other on-campus individuals is critical to patient and community safety at the University, as well as Arapahoe and Adams County and Colorado. *Id.*, ¶62.

### III.     Campus Policy 3012

The Colorado Board of Health issued a rule requiring that all staff in healthcare facilities, including students and trainees, be vaccinated against COVID-19. *See* 6 C.C.R. 1011-1:2-12. Across multiple locations, CU Anschutz faculty, staff, and students provide care to approximately 2.1 million patients each year. Ex. E, ¶7. As one of Colorado's largest healthcare providers and the State's only medical school, CU Anschutz takes its responsibility to promote public health seriously. *Id.*, ¶12. Consistent with the Board of Health's direction, the University

adopted Policy 3012 to require vaccination of all of individuals who work or learn on the Anschutz Campus or off campus in connection with CU Anschutz programs. Ex. E, ¶9; Plaintiff's Ex. 1. The University initially adopted its policy on September 1, 2021 ("Initial Policy") but as infections and hospitalizations rose sharply throughout the month, the University amended it on September 24, 2021 ("Amended Policy"). Ex. E, ¶10; Ex. L, Amended Policy 3012; ECF No. 30, at 103-07, 235-40. The Amended Policy provides medical and religious exemptions where otherwise required by federal law. Specifically, as required by the ADA and Section 504 of the Rehabilitation Act, both students and employees may seek an accommodation for a medical condition. Ex. L, ¶10-11; ECF No. 30, at 237. Likewise, the Amended Policy requires the University to consider employees' requests for an accommodation based upon their sincerely held religious belief consistent with Title VII.[17] ECF No. 30, at 238. Finally, the Amended Policy removed certain language governing religious exemptions—specifically the requirement that the employee's religious belief must be based on a religion "whose teachings are opposed to all immunizations." Ex. E ¶10-11; ECF No. 30, at 105.

The goals of the Amended Policy are to safeguard patient and community health, limit transmission of the deadly COVID-19 virus, and reduce staffing shortages wrought by severe illness among providers and staff, which would jeopardize patient care and overburden current resources. Ex. E ¶13-16. The Amended Policy's goal to maximize vaccination on campus is consistent with the recommendations of government sources regarding higher education, as well

---

[17] The Initial Policy inadvertently authorized religious accommodations for students even though Title VII applies only to employees, not students. Ex. E, ¶10-11. The Amended Policy corrected this oversight. *Id.*

as the consensus amongst medical professional organizations, and experts. Ex. A, ¶58-62; Ex. G ¶16. In furtherance of that goal, exemptions are narrow. The University received 74 medical exemption requests, and granted only 29: 18 temporary, and 11 permanent, based upon known contraindications. Ex. I, Decl. of Dr. Montague, ¶8. In contrast, the University received more than 200 religious exemption requests. Ex. B, ¶10. The ongoing review process for each type of request is identical, Ex. F, Decl. of Flippin, ¶6, 9, and if the requestor cannot be accommodated remotely to prevent undue hardship, the request is denied. *Id.*, ¶8-9. Regardless of the type of exemption sought, unvaccinated providers and students are not allowed to work in facilities with immunocompromised patients. Ex. K, ¶14. Prior mistakes that permitted a pair of students with medical accommodations to see patients have been remedied. Ex. S, Decl. of Dir. Holland, ¶3-4; Ex. R, Decl. of Dr. Dwinnell, ¶3-4.

### IV.   Employees

As indicated, the University adopted its Amended Policy on September 24, 2021—five days before Plaintiffs filed this lawsuit. Since then, the University has undertaken a thorough review of its current employees' requests for religious accommodation.[18] Ex. B, Decl. of Assoc. Vice Chancellor and Chief Human Resources Officer Brownawell, ¶5. This review is independent of any consideration the University may have given to an employee's religious accommodation request under the Initial Policy. *Id.* In particular, the University appointed

---

[18] Two of the employee Plaintiffs separated from the University prior to the review process. Dr. Jane Doe 2 resigned in September of 2021, and Jane Doe 9 was terminated October 2, 2021, for failure to follow policy. Because neither individual remains employed with the University their respective requests seeking accommodation are moot. *See Caddo Nation of Oklahoma v. Wichita & Affiliated Tribes*, 877 F.3d 1171, 1176 (10th Cir. 2017).

independent reviewers who did not previously consider the employees' requests. Ex. B, ¶5.

The comprehensive two-tiered review process is ongoing. *Id*., ¶6. First, the Associate Vice Chancellor and Chief Human Resources Officer reviews the accommodation request to ensure it is made based on a sincerely held religious belief. *Id*., ¶7. Next, the Human Resources Principal Professional works with the appropriate supervisor(s) to evaluate whether an accommodation is possible, based upon the employee's position and job duties, without undue hardship to the University. *Id*.

COVID-19 is transmitted via airborne droplets and aerosols. Ex. A, ¶22, People produce large numbers of particles in the aerosol size range when they exhale and larger numbers when speaking. *Id*. Those aerosols, which can travel substantial distances and remain suspended in indoor air for hours, are not adequately blocked by surgical or other masks, either when infected people produce them or when people inhale contaminated air. *Id*. In indoor environments, air movement by HVAC can distribute aerosols and most systems do not sufficiently filter them, meaning that both PPE and social distancing may offer incomplete protection. *Id*. As a result, for the University's purposes, an undue hardship is occasioned when an unvaccinated employee's duties would require in-person work, since unvaccinated individuals threaten the health and safety of the University's patients, other employees, students, and community. Ex. B, ¶7. Hence, accommodations requests have been approved where the employee's duties can be modified to prevent in-person interaction with the campus community or where their duties can be performed 100% remotely. *Id*., ¶8.

The review has resulted in the grant of religious accommodations for six Plaintiffs: Jane Does 4 and 6, and John Does 3-5, and 7. *Id*. The decision regarding whether each

employee's request can be accommodated without undue hardship is set forth below.

| Alias | Department (Location), Position | Decision |
|---|---|---|
| Dr. Jane Doe 1 | Children's PICU (Aurora) | Accom. denied d/t undue hardship |
| Dr. Jane Doe 2 | SOM, Anesthesiology | Accom. denied d/t undue hardship; Resigned Sept. of 2021 |
| Dr. Jane Doe 3 | VA Hospital (Aurora), Rheumatologist | Accom. denied d/t undue hardship |
| Jane Doe 4 | Kempe Center (Aurora), Co-Director | Accommodation granted |
| Jane Doe 5 | Steadman Hawkins Clinic (Engl.), Inverness Program Coordinator | Long term accom. denied d/t undue hardship; temporary partial accommodation made |
| Jane Doe 6 | SOM Dean's Office (Aurora), Business Services Manager | Accommodation granted |
| Jane Doe 9 | SOM Data & Analytics, Research Asst. | Accom. denied d/t undue hardship; Terminated Oct. 2, 2021, d/t failure to follow University policies |
| Jane Doe 10 | Clinical Research Manager at the Colorado Cancer Center | Accom. denied d/t undue hardship; FMLA through Mar. 2022 |
| Jane Doe 11 | SOM Psych at CMHIP (Pueblo) | Accom. denied d/t undue hardship |
| John Doe 3 | Office of Information Technology (Aurora), Data Integrations Engineer | Accommodation granted |
| John Doe 4 | AMC Police (Aurora), Dispatch Police Communications Supervisor | Accommodation granted |
| John Doe 5 | Office of Information Technology (Aurora), Snr. Network Engineer | Accommodation granted |
| John Doe 7 | Office of Information Technology (Aurora), IdM Developer | Accommodation granted |

**Dr. Jane Doe 1** is a pediatric critical care doctor at the Children's Hospital in Colorado Springs. ECF No. 30, at 7. She requested a religious accommodation based on her Catholic faith. *Id.* The University denied her request for an accommodation, because while the University

recognizes and respects Dr. Jane Doe 1's sincerely held beliefs, her request for exemption could not be granted as her position requires in-person interaction with critically ill children, many of whom are unable to be vaccinated, which occasions an undue hardship. Ex. B, ¶9; Letter to Jane Doe 1; Ex. C, ¶3. Dr. Jane Doe 1 is one of seven physicians who staff the PICU. Ex. C, ¶2. She works very closely with patients, ranging from 3-4 days to 21 years old, who suffer from complex and life-threatening medical conditions, including patients with COVID-19. *Id.*, ¶3; Ex. D, ¶6. Many of the pediatric patients are not vaccinated due to their age or underlying medical condition. Ex. C, ¶6. In addition to critically ill children, Dr. Jane Doe 1 must meet with family members, nurses, consulting physicians, social work, case management, clinical pharmacists, physical and speech therapists, respiratory therapists, and dieticians, among others, and each such interaction carries a risk of provider-to-provider transmission. *Id*.; ¶5; Ex. D, ¶7. Each of these people then in turn interact with others, including other at-risk patients. Other pediatric providers concur that vaccination *plus* PPE is required to ensure pediatric patient protection. Ex. C, ¶7; Ex. D, ¶9. As Dr. Doe 1's position requires daily high-risk in-person interactions, the University cannot accommodate her request without the undue hardship of either divesting her unit of an adequate number of providers or risk exposing critically ill children to significant potential jeopardy.

**Dr. Jane Doe 2** was a pediatric anesthesiologist at the Children's Hospital in Aurora. ECF No. 30, at 8. She requested a religious accommodation based on her Christian faith. *Id.* Like Dr. Jane Doe 1, Dr. Jane Doe 2 worked with ill children, many of whom cannot be vaccinated. As an anesthesiologist, she worked in and around the mouths and noses of her young patients. The University denied her request for an accommodation because "the exemption would pose

significant health and safety risk to CU Anschutz community and … patients [and] removing or modifying [her] duties to preclude contact with others would pose an undue burden on the University, as it would require [her] colleagues to perform [her] duties in addition to their own." ECF No. 30, at 28. Prior to the implementation of the Amended Policy, she chose to resign in lieu of termination. *Id.*, at 8 and 79. Because she is no longer a University employee, her request was not reviewed under the Amended Policy. Ex. B, ¶4-5.

**Dr. Jane Doe 3** was a Rheumatologist at the Veterans' Hospital in Aurora. ECF No. 30, at 8. She requested a religious accommodation based on her objection to taking vaccines that were tested on cell lines that came from a fetus that may have been aborted. *Id.* Her patients included the immunocompromised and older persons, both groups of whom are at higher risk for poor outcome if infected with COVID-19.[19] Ex. A, ¶25. The University denied Dr. Jane Doe 3's request for an accommodation because her position required in-person work, which posed great risk to patients, thus, accommodating her would pose undue hardship. Ex. B, ¶9; Letter to Jane Doe 3. ECF No. 30, at 30-31. After her request was denied, Dr. Jane Doe 3, asserted that she had "natural immunity" due to prior infection. *Id.* Because such immunity wanes, it would not mitigate the risk posed to Dr. Jane Doe 3's high-risk patients and the University community. Ex. A, ¶56-57.

**Jane Doe 4** is the Co-Director in multisystem therapy with the Kempe Center at the Anschutz campus in Aurora. ECF No. 30, at 9. Her position is designated as 100% remote. Ex.

---

[19] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, *last visited* Dec. 1, 2021.

B, ¶8; Letter to Jane Doe 4. She sought a religious accommodation because she does not accept any vaccines. ECF No. 30, at 9, 33. Her request for accommodation was granted and she works fully remote. Ex. B, ¶8; Letter to Jane Doe 4.

**Jane Doe 5** is a Program Coordinator at the Steadman Hawkins Clinic in Englewood. ECF No. 30, at 9. She sought a religious accommodation based on her Orthodox Christian faith. *Id.* at 35. The University has temporarily allowed Ms. Doe 5 to work remotely – at an undue hardship. Ex. B, ¶9; Letter to Jane Doe 5. Since she cannot fulfill all of her duties working remotely, and others have had to take on some of her core duties, her compensation has been reduced congruently. *Id.* Ultimately, the University has denied her request since her job "cannot be performed 100% remotely without job modifications that would present and undue hardship … [since her work] as the only administrator supporting the Inverness Clinic's faculty includes provider support which requires in-person presence at the … facility, including in the clinic … [and] requires [her] to perform on-site administrative duties like distributing checks, distributing mail, and in-person meetings with faculty and staff." *Id.*

**Jane Doe 6** is a Business Services Manager in the Dean of the School of Medicine's Office at the Anschutz campus in Aurora. ECF No. 30, at 10. She sought a religious accommodation based on her Christian faith. ECF No. 30, at 36. Her request for accommodation was granted and she works fully remote. Ex. B, ¶8; Letter to Jane Doe 6.

**Jane Doe 9** is a former Data & Analytics Team research assistant at the School of Medicine who requested and was denied a religious accommodation because her "on-campus presence and job duties which involve direct contact with others poses a risk … [that is] and undue hardship on the University, which cannot be accommodated. Ex. P, Jane Doe 9

Termination Letter, dated Sept. 20; ECF No. 30, at 11; 41. She was later terminated due to her failure to comply with University policy, including because she came to campus unvaccinated and unmasked. Ex. P, p. 1; ECF No. 30, at 41. Because she is no longer a University employee, her request was not reviewed under the Amended Policy. Ex. B, ¶4-5.

**Jane Doe 10** is a Clinical Research Manager at the Colorado Cancer Center. ECF No. 30, at 11. She sought a religious accommodation based on her Christian faith. *Id.*, at 42. Cancer is one of the conditions that places people at greatest risk for severe illness or death from COVID-19. Ex. A, ¶25. As such, the University denied her request for an accommodation because her position required in-person interaction with staff and direct patient care, which poses significant risk to her patients, and her position cannot be modified without under hardship to the University. Ex. B, ¶9; Letter to Jane Doe 10. She is presently on FMLA after the birth of her child through March of 2022, after which time if she does not take the vaccine her position will terminate. Ex. A, ¶25.

**Jane Doe 11** is a Psychiatric Mental Health Nurse Practitioner at the Colorado Mental Health Institute at Pueblo, contracted through the University. ECF No. 30, at 12. She sought a religious accommodation. Ms. Doe 11's work requires interactions with persons with mental health problems that place them at higher risk of severe illness or death from COVID-19.[20] The University denied her request for an accommodation because her position requires "in-person

---

[20] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, *last visited* Dec. 10, 2021.

interaction, including direct patient care duties on a daily basis," which poses great risk to patients, thus, accommodating her would pose undue hardship. Ex. B, ¶9; Letter to Jane Doe 11.

**John Doe 3** is a Data Integrations Engineer with the Office of Information Technology at the Anschutz campus in Aurora. ECF No. 30, at 13. He sought a religious accommodation based on his Catholic faith. *Id.* at 9, 33. His request for accommodation was granted and he works fully remote. Ex. B, ¶8; Letter to John Doe 3.

**John Doe 4** is a Police Communications Supervisor at the Anschutz campus in Aurora. ECF No. 30, at 13. He sought a religious accommodation based on his Christian faith. *Id.* at 55-56. His request for accommodation was granted and he works fully remote. Ex. B, ¶8; Letter to John Doe 4.

**John Doe 5** is a Senior Network Engineer with the Office of Information Technology at the Anschutz campus in Aurora. ECF No. 30, at 13-14. He sought a religious accommodation based on his Christian faith. *Id.* at 57-58. His request for accommodation was granted and he works fully remote. Ex. B, ¶8; Letter to John Doe 5.

**John Doe 7** is an Identity Management ("IdM") Developer with the Office of Information Technology at the Anschutz campus in Aurora. ECF No. 30, at 14. He sought a religious accommodation based on his Christian faith. *Id.* at 60. His request for accommodation was granted and he works fully remote. Ex. B, ¶8; Letter to John Doe 7.

## V. Students

While the University respects students' religious beliefs, students are ineligible for religious exemption. Ex. L, Amended Policy 3012, p. 4; Ex. E, ¶11; Ex. Q, Dec. 7 Campus Email, p. 6. This change in the Amended Policy was made in response to rising numbers of

infection and furthers the University's goal of requiring as many students as legally possible to get vaccinated to stop the spread of COVID-19 and reduce the severity of its effects. Ex. E, ¶11, 13-15. Legally required medical accommodations remain available *only* when "vaccination is absolutely contraindicated due to other medical conditions" and would jeopardize the life or health of the recipient due to an allergic reaction. Ex. L, Amended Policy 3012, p. 3; Ex. E, ¶10; Ex. I, ¶4, 6; Ex. J, ¶13. Medical students, like providers, must see and examine patients. Ex. K, ¶11-12.

| Alias | Program | Status |
|-------|---------|--------|
| Jane Doe 7 | Dental (4th year) | Prior illness; must obtain vax by Dec. 15 |
| Jane Doe 8 | Public Health | Dropped one class |
| John Doe 1 | Medical (1st year) | On a leave of absence |
| John Doe 6 | Anesthesiology Asst. (1st year) | Withdrew; received tuition refund |

**Jane Doe 7** is a fourth-year dental student. ECF No. 30, at 10. Ms. Doe initially sought a religious exemption based on her Christian faith, then contracted COVID-19, which rendered her ineligible to take the vaccine until December 15. *Id.* at 10, 37-38. While she claims "natural immunity" due to her infection, research shows that immunity from contracting the virus wanes. Ex. A, ¶56-57. She is ineligible for exemption under the Amended Policy. Ex. L, p. 4; Ex. E, ¶11; Ex. Q, p. 6.

Even if she were eligible, accommodation would be highly unlikely given that dental care presents a unique risk to both provider and patients: One study concluded that the "risk of COVID-19 infection by dental staff and … the risk of nosocomial transmission in dental practices is considered high [due to] … the short distance to the patient, proximity to saliva,

blood, spatter and aerosol exposure."[21] The American Dental Association "strongly" recommends dentists receive the vaccine, and approximately 93.4% of dentists have received at least one dose.[22] Ms. Doe's education includes clinical rotations requiring her to place her hands into, and breath in proximity to, patients' mouths, and both patient and provider into contact with one another's aerosols, with only the imperfect protection of PPE. *Id.*, ¶22.

**Jane Doe 8** is an undergraduate student in public health on the University's Denver Campus, where she received a religious exemption to vaccination and continues to pursue her studies. ECF No. 30, at 11. She also enrolled in a master's level course on the Anschutz campus. *Id.* While the Denver campus was able to grant her religious accommodation request, the Anschutz campus necessarily denied the request due to the unique risks attendant to the medical campus environment, including the presence of ill patients. Ex. L, Amended Policy 3012, p. 4; Ex. E, ¶¶11, 13-15; ECF No. 30, at 39-40. She is ineligible for exemption under the Amended Policy. Ex. L, p. 4; Ex. E, ¶11; Ex. Q, p. 6.

**John Doe 1** is a first-year medical student who applied for religious exemption based on his Buddhist faith. Ex. K, p. 4; ECF No. 30, at 12, 47. The University denied Mr. Doe 1's request under the previous Initial Policy. *Id.* When the University gave Mr. Doe the option of

---

[21] Gurzawska-Comis, K., Becker, K., Brunello, G., Gurzawska, A., & Schwarz, F. (2020). Recommendations for Dental Care during COVID-19 Pandemic. *Journal of clinical medicine*, *9*(6), 1833. https://doi.org/10.3390/jcm9061833.

[22] https://www.ada.org/publications/ada-news/2021/july/ada-strongly-encouraging-dental-professionals-to-be-vaccinated, *last visited* Dec. 2, 2021 (Reporting that ADA President Daniel J. Klemmedson, D.D.S., M.D. wrote in in an email to members dated July 28, 2021, that dentists should "do our part to move public health forward. If you haven't already been vaccinated, please get vaccinated and encourage your team members and patients to do the same.")

withdrawing or taking a leave of absence, he opted for the latter. ECF No. 30, at 49, 68. He is ineligible for exemption under the Amended Policy. Ex. L, p. 4; Ex. E, ¶11; Ex. Q, p. 6.

**John Doe 6** is a first-year master's of anesthesiology student. ECF No. 30, at 14. He sought a religious accommodation. *Id.* His was notified that his requested accommodation "would not be possible because of the undue burden it would cause to the Program's ability to provide safe patient care." *Id.* at 231-32. He is ineligible for exemption under the Amended Policy. Ex. L, p. 4; Ex. E, ¶11; Ex. Q, p. 6.

## PROCEDURAL BACKGROUND

Two of the Plaintiffs, Jane Doe and John Doe, commenced this lawsuit on September 29, 2021, seeking a temporary restraining order and preliminary injunction against the University's vaccine policy. ECF No. 2. This Court denied their motion on October 25, 2021, finding their challenge to the Initial Policy moot because the University issued the Amended Policy on September 24. ECF No. 21, at 2-3. As to the Amended Policy, the Court noted that the Plaintiffs intended to amend their complaint "imminently" to raise additional arguments. *Id.* at 3. The Court explained it "is not in the business of considering arguments [regarding the Amended Policy] that have not yet been made." *Id.* The Court therefore denied Plaintiffs' request to enjoin the Amended Policy. *Id.*

Plaintiffs, now totaling 18 in number, renewed their preliminary injunction request on November 2, 2021, ECF No. 27, and filed their Amended Complaint on November 4, 2021, ECF No. 30. The Amended Complaint names as defendants the University's Board of Regents and multiple University leaders in both their official *and* individual capacities.

**ARGUMENT**

Plaintiffs focus on their Free Exercise claim as the basis for their renewed preliminary injunction request. ECF No. 27, at 3-18. A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff bears the burden of proof to demonstrate that each factor tips in his or her favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003). In addition, the preliminary injunction Plaintiffs seek here is a "disfavored" injunction in at least two ways—they request a "mandatory" injunction and it would upset the existing status quo under the Amended Policy. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). Plaintiffs therefore bear "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: [they] must make a strong showing these tilt in [their] favor." *Free the Nipple v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted).

I.      **Plaintiffs are not substantially likely to succeed on the merits.**

    A.      **Several of Plaintiffs' arguments are moot—the University has amended its vaccination policy and five Plaintiffs have left the University.**

Plaintiffs' renewed preliminary injunction motion repeatedly makes arguments challenging the constitutionality of the University's Initial Policy. *See, e.g.*, ECF No. 27, at 9. But the Initial Policy was superseded about three weeks after enactment when the University promulgated its Amended Policy on September 24—five days before this lawsuit was filed. Ex.

E, ¶10. The Amended Policy states that a religious accommodation "may be granted based on an employee's religious beliefs." ECF No. 30, at 238. It therefore removes the prior requirement under the Initial Policy that the accommodation seeker's religious belief must be based on a religion "whose teachings are opposed to all immunizations." *Id.* at 105.

Where a party to a lawsuit has withdrawn a challenged action, "a plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured by the defendant in the future." *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1147 (10th Cir. 2007) (internal quotations omitted); *see also McKeen v. Forest Serv.*, 615 F.3d 1244, 1255-56 (10th Cir. 2010) (request for declaratory relief related to permit that had since been superseded was moot). Indeed, "government self-correction provides a secure foundation for mootness so long as it seems genuine." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 881 (10th Cir. 2019) (cleaned up). Plaintiffs make no argument that the Amended Policy is not genuine. Nor could they. Six of the Plaintiffs' religious accommodation requests have been granted under the Amended Policy. Ex. B, ¶9.

In addition to the Amended Policy mooting several of Plaintiffs' arguments, five of the Plaintiffs have recently left the University. Thus, they no longer face the ongoing or imminent harm required to obtain the injunctive relief they request.[23] Plaintiffs' "burden to demonstrate standing for each form of relief sought . . . exists at all times throughout the litigation." *Collins v.*

---

[23] ECF No. 30 (John Doe 1 on leave of absence); *Id*. at 60 (John Doe 6 dismissed from the anesthesiology program); *Id*. at 38 (Jane Doe 7 requested religious exemption under the September 1 policy but is currently on a 90-day medical leave of absence); *Id*. at 40 (Jane Doe 8 no longer enrolled in masters courses); *Id*. at 28-29 (Jane Doe 2 resigned from the University).

*Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019). The injury required to receive a preliminary injunction must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021) (cleaned up). If the harm is not "likely to occur before the district court rules on the merits," there is no need for preliminary injunctive relief. *Id.* The Plaintiffs who left the University have not demonstrated that they will suffer ongoing and imminent harm from the University's vaccine policy.[24] Their departure from the University moots their claims for injunctive relief, even though other relief may still be available to them. *See Caddo Nation of Okla. v. Wichita & Affiliated Tribes*, 877 F.3d 1171, 1176 (10th Cir. 2017) ("But though a *case* may not be moot because partial relief is still possible, a specific request for an injunction may become moot.").

> **B.      The courts have long rejected Free Exercise challenges to vaccine requirements.**

Free exercise challenges to vaccine requirements are not new. Opponents have long challenged mandatory vaccination policies as violating their Free Exercise rights. Courts have consistently rejected such challenges. *See Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community of the child to communicable disease or the latter to ill health or death."); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("New York could constitutionally require that all children be

---

[24] To the extent Plaintiffs face economic harms, adverse employment consequences like the loss of income "are not the type of harm that usually warrants injunctive relief" because they are "typically compensable with money damages." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021).

vaccinated in order to attend public school."); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) (upholding state public health authority to fight smallpox epidemic, including vaccine requirement for children to attend public school).

Even the Supreme Court's seminal Free Exercise decision, *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), recognizes that mandatory vaccine requirements do not offend the Free Exercise Clause. In rejecting a religious exemption from Oregon's peyote ban, Justice Scalia highlighted the slippery slope that would result if the challengers' position were adopted:

> The rule respondents favor would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind—ranging from compulsory military service, to the payment of taxes, to health and safety regulation such as manslaughter and child neglect laws, ***compulsory vaccination laws***, drug laws, and traffic laws, to social welfare legislation such as minimum wage laws, child labor laws, animal cruelty laws, environmental protection laws, and laws providing for equality of opportunity for the races. ***The First Amendment's protection of religious liberty does not require this***.

494 U.S. at 889-90[25] (emphasis added; internal citations omitted). Following *Smith*'s binding guidance, numerous federal courts have recently considered and rejected Free Exercise challenges to mandatory COVID-19 vaccination policies.[26] At least one of these challenged

---

[25] Plaintiffs' renewed preliminary injunction motion mentions *Smith* only in passing in footnote. ECF No. 27, at 6 n.3. Any attempt to downplay *Smith*'s importance should be rejected. The Supreme Court recently declined to overrule *Smith*, making clear it continues to provide the governing standard. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

[26] *See, e.g., Doe v. San Diego Unified Sch. Dist.*, __ F.4th __, No. 21-56259, 2021 WL 5757397, at *1-3 (9th Cir. Dec. 4, 2021); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 280-90 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021); *Does 1-6 v. Mills*, 16 F.4th 20, 29-35 (1st Cir. 2021), *application for injunctive relief denied sub nom.*, __ U.S. __, No. 21A90 (Oct. 29, 2021); *Troogstad v. City of Chicago*, __ F. Supp. 3d __, No. 21 C 5600, 2021 WL 5505542,

policies goes even further than the University's policy here, offering no religious

accommodation of any kind. *See Mills*, 16 F.4th at 24. Based on the weight of this authority

alone, Plaintiffs are not substantially likely to succeed on the merits of their Free Exercise claim.

### C. The University's Amended Policy is neutral and generally applicable, easily satisfying rational basis review.

Under *Smith*, a "neutral law of general applicability" is subject to rational basis review

even if it incidentally burdens a particular religious practice. 494 U.S. at 878-79. The

University's Amended Policy is both neutral and generally applicable.

### 1. Neutrality

Neutrality hinges on whether a law's object "is to infringe upon or restrict practices

*because of* their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

508 U.S. 520, 533 (1993) (emphasis added). The court analyzes both whether the law is facially

neutral and whether the government acts in "'a manner intolerant of religious beliefs or restricts

practices because of their religious nature.'" *Does 1-6 v. Mills*, __ F. Supp. 3d __, No. 21-cv-

00242-JDL, 2021 WL 4783626, at *7 (D. Me. Oct. 13, 2021) (quoting *Lukumi*, 508 U.S. at 533,

and *Fulton*, 141 S. Ct. at 1877).

Here, the Amended Policy is neutral both facially and as applied. It does not single out

religious practices for disfavored treatment because of their religious nature. To the contrary, the

---

at *11 (N.D. Ill. Nov. 24, 2021); *Doe v. San Diego Unified Sch. Dist.*, No. 21-CV-1809-CAB-LL, 2021 WL 5396136, at *3-5 (S.D. Cal. Nov. 18, 2021); *Bacon v. Woodward*, No. 21-CV-0296-TOR, 2021 WL 5183059, at *4-5 (E.D. Wash. Nov. 8, 2021); *Wise v. Inslee*, No. 21-CV-0288-TOR, 2021 WL 4951571, at *2-4 (E.D. Wash. Oct. 25, 2021); *Klaassen v. Trustees of Indiana Univ.*, __ F. Supp. 3d __, No. 21-CV-238 DRL, 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th Cir. 2021), *application for injunctive relief denied sub nom.*, __ U.S. __, No. 21A15 (Aug. 12, 2021).

Amended Policy mentions the word "religion" only to reference the availability of religious accommodations required by federal employment law. ECF No. 30, at 237-38. The availability of a religious accommodation for University employees "expressly *favors*" religious practices. *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021). It does not "target[ ]" them for disfavored treatment. *Lukumi*, 508 U.S. at 533.

Despite this, Plaintiffs assert that the Amended Policy is not neutral because it "singles out student religious objectors" for disfavored treatment, while "allowing *employee* religious exemptions." ECF No. 27, at 13. This argument bears on the "generally applicable" requirement rather than neutrality. But regardless, the University is permitted to treat different categories of persons differently for non-religious reasons without violating the general-applicability requirement. *See San Diego Unified Sch. Dist.*, 2021 WL 5757397, at *4 (upholding vaccine policy permitting religious accommodations for employees but not students); *Kane v. De Blasio*, __ F.4th __, No. 21-2711, 2021 WL 5549403, *7 (2d Cir. Nov. 28, 2021) (generally applicable law "applies to an entire *class* of people" and need not "apply to all people, everywhere, at all times").

Moreover, the University's reason for distinguishing between employees and students has nothing to do with favoring secular conduct over religious conduct or favoring one religious denomination over another. *See Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 701 (10th Cir. 1998) (rejecting Free Exercise challenge where public school's policy against part-time attendance contained exceptions that were not "in any way based on religious categorization or discrimination."). Rather, the University's distinction is rooted in federal statute—specifically, Title VII of the Civil Rights Act of 1964. The Act protects employees, not students, and requires

that employers offer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business. 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j). The University's attempt to conform its policy to federal statute constitutes a lawful, secular basis for distinguishing between employees and students. *See San Diego Unified Sch. Dist.*, 2021 WL 5757397, at *4; *see also Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) ("[W]e have already refused to interpret *Smith* as standing for the proposition that a secular exemption automatically creates a claim for a religious exemption."); *Wise*, 2021 WL 4951571, at *1 (upholding vaccination policy that "acknowledges" the availability of certain exemptions for "disability-related accommodations" and "sincerely held religious belief accommodations" under federal statutes).

Plaintiffs also argue that the University's "switch in time" from allowing student religious accommodations under the Initial Policy, to disallowing them under the Amended Policy, shows a "lack of neutrality." ECF No. 27, at 13. Plaintiffs' sole authority for this argument is the district court's decision in *Dr. A. v. Hochul*, No. 21-CV-1009, 2021 WL 4734404 (E.D.N.Y. Oct. 12, 2021). But that decision has since been reversed by the Second Circuit, which held that the challengers there failed to demonstrate that New York's policy shift was "intended to 'target' individuals opposed to receiving the COVID-19 vaccines because of their religious beliefs." *Hochul*, 17 F.4th at 283.

So too here. Plaintiffs cite no evidence linking the change between the Initial Policy and the Amended Policy to any form of religious hostility by the University. That should come as no surprise. The University fully respects the religious beliefs of its entire campus community. Far

from targeting religion, the change between the two policies merely reflects the University's attempt to strengthen its policy so that it better achieves the University's goal of protecting the University community against COVID-19 while also complying with federal statutes and recent federal court holdings under the Free Exercise Clause. *See* Ex. E, ¶10. Were Plaintiffs' view adopted, it would discourage state universities and governments from improving or correcting policies lest they be accused of religious hostility. As such, the Amended Policy is neutral.

### 2. General Applicability

A law may not be "generally applicable" under *Smith* for either of two reasons: if it either (1) "'invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions,'" or (2) "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Hochul*, 17 F.4th at 284 (quoting *Fulton*, 141 S. Ct. at 1877). Plaintiffs argue under the second category that the Amended Policy is not generally applicable because it permits the University to grant students medical exemptions but not religious exemptions. ECF No. 27, at 14-15. In their view, unvaccinated individuals with medical exemptions could pose risks that are similar to unvaccinated individuals who harbor religious objections. *Id.*

Federal courts have roundly rejected this argument, reasoning that religious exemptions present risks to the government's safety interests that medical exemptions do not. *See, e.g., Hochul*, 2021 WL 5121983, at *11-13; *Mills*, 16 F.4th at 30-31; *San Diego Unified Sch. Dist.*, 2021 WL 5396136, at *4.

In *Hochul*, for example, New York's rule requiring vaccinations for health care employees permitted a medical exemption but no religious exemption. 17 F.4th at 272. The

Second Circuit upheld the rule on three grounds. First, the court explained that compelling vaccines for those workers who are subject to medical contraindications could harm their health and make it less likely they could continue working. *Id.* at *12. This could lead to "staffing shortages that can compromise the safety of patients and residents even beyond a COVID-19 infection." *Id.* By contrast, applying the vaccine mandate to employees who oppose the vaccine on religious grounds does not undermine the government's interest in "protecting the health of covered [healthcare] personnel." *Id.* Second, the court cited to evidence that medical exemptions are more likely to be "limited in duration," while one's religious beliefs are "unlikely to change to permit vaccination in the future." *Id.* Finally, the appellate court stated that medical exemption requests in New York were "more limited in number" than religious exemption requests. *Id.* "[I]t may be feasible for healthcare entities to manage the COVID-19 risks posed by a small set of objectively defined and largely time-limited medical exemptions," the Second Circuit explained, while a "much greater number of permanent religious exemptions" could "pose a significant barrier to effective disease prevention." *Id. Hochul* therefore stands for the rather obvious point that medical and religious exemptions are "not comparable in terms of the 'risk' that they pose." *Id.* (citing *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021)).

*Hochul*'s reasoning is on all fours here. The University promulgated its Amended Policy offering medical exemptions not only to protect its vulnerable patient population from COVID-19, but also to protect the health of its employees and students for whom a vaccine is contraindicated. Ex. I, ¶6. This in turn benefits the University's patients. The University is a teaching hospital, meaning that both its employees and students supply critical healthcare services to patients. Ex. E, ¶¶3-4. Requiring a University employee or student to receive a

27

vaccine even when it is contraindicated would put their health in jeopardy, making it less likely

that could continue providing care or services that support care providers. If that occurred, the

University would encounter greater difficulty "keep[ing] its healthcare facilities staffed in order

to treat patients, whether they suffer from COVID-19 or any other medical condition." *Mills*, 16

F.4th at 31. Further, the vaccine contraindications that the University is aware of are more likely

to be temporary. Ex. I, ¶8. By contrast, one's religious beliefs are unlikely to change in the future

to permit vaccination absent the approval of new vaccines that are developed in a different way.

*See Hochul*, 17 F.4th at 286. Last, the number of people who requested religious exemptions is

more than double those seeking medical exemptions. *Compare* Ex. B, ¶10 *to* Ex. I, ¶8. The

University's interests in "effective disease prevention" are therefore undermined to a far greater

degree if religious accommodations for students must be granted. *Hochul*, 17 F.4th at 286.

Accordingly, the University's policy permitting medical but not religious accommodations is

generally applicable.

Next, Plaintiffs argue that the University has created an impermissible system of

individualized exemptions by determining who qualifies for a medical exemption on

"individualized basis." ECF No. 27, at 11. This argument is without merit. A government-created

system of individualized exemptions runs afoul of the Free Exercise Clause only when it

"'invite[s]' the government to decide which reasons for not complying with the policy are

worthy of solicitude." *Fulton*, 141 S. Ct. at 1879 (quoting *Smith*, 494 U.S. at 884). So, in *Fulton,*

a city policy governing adoption service providers was found unconstitutional because it granted

an official "sole discretion" to grant or deny exemptions to an anti-discrimination provision in

the city's contracts. 141 S. Ct. at 1878. And in *Dahl v. Board of Trustees of Western Michigan*

*University*, 15 F.4th 728, 734 (6th Cir. 2021), a case heavily relied on by Plaintiffs, the court upheld a preliminary injunction against a university's vaccine mandate for student-athletes that allowed the university to consider exemption requests "on an individual basis."

In this case, however, the University has no such boundless discretion. Under the Amended Policy, a medical exemption is available only if vaccination is "absolutely contraindicated due to other medical conditions" and a licensed medical professional signs a medical exemption form attesting to its accuracy. ECF No. 30, at 237. This is an objective requirement that eliminates the University's discretion. That a medical professional "must use their medical judgment to determine whether a particular individual has a contraindication . . . does not render the exemption discretionary." *Hochul*, 17 F.4th at 289-90 & n.29 (distinguishing *Dahl* on this basis). Nor does the University's evaluation of undue hardship render the policy unconstitutional. When evaluating whether an undue hardship exists, the University considers requests for medical exemptions under the ADA and section 504 of the Rehabilitation Act. Ex. F, ¶9. These statutory schemes contain robust objective criteria that guide the University's decision-making. *See, e.g.*, 42 U.S.C. § 12111(10); 29 U.S.C. § 794(d); 29 C.F.R. § 1630.2(p). Plaintiffs cite no authority, and the University is aware of none, suggesting that evaluating accommodation requests under federal statute violates the Free Exercise Clause.

Finally, Plaintiffs contend that persons receiving medical accommodations are treated "less harshly" than students with religious objections as demonstrated by a student medical exemptee who is allegedly allowed to continue treating patients so long as precautions are taken. ECF No. 27, at 10-11. Plaintiffs are incorrect. The review processes for requests are alike, Ex. F, ¶6, 9, and if a remote accommodation that prevents undue hardship is unavailable based on

duties, a request is denied. *Id.*, ¶8-9. Unvaccinated employees and students are not permitted to work in facilities with immunocompromised patients. Ex. K, ¶14. Plaintiffs claim an unidentified non-party student was permitted to round with a medical exemption. ECF No. 3-1, 3. That error was corrected, Ex. R, ¶3-4; Ex. S, ¶3-4, as under the Amended Policy accommodations are similarly granted or denied based on undue burden irrespective of the category of exemption.

At bottom, Plaintiffs have failed to carry their burden of proving that the Amended Policy is not neutral and generally applicable. Rational basis review therefore applies. *Klaassen*, 2021 WL 3073926, at *26 (noting "the consistent use of rational basis review to assess mandatory vaccination measures."). The Amended Policy easily passes this deferential test. Plaintiffs do not contend otherwise. Indeed, requiring vaccinations for its on-campus as a method to combat a virus that has killed more than 9,473 Coloradans is "a reasonable exercise of the [University's] power to enact rules to protect the public health."[27] *Hochul*, 17 F.4th at 290.

**D.**  **The University's denial of religious exemptions under the Amended Policy was not pretextual; accommodation would cause undue hardship.**

Plaintiffs also argue that the University Hospital's denials of Plaintiffs' accommodation requests were pretextual. ECF No. 27, at 7-9. Plaintiffs are wrong. They point to the Initial Policy and the disparate treatment it afforded to Plaintiffs' requests for religious exemptions—

---

[27] The federal courts overwhelmingly agree that vaccine mandates pass rational basis review. *See, e.g., San Diego Unified School District*, 2021 WL 5757397, at *5; *Mills*, 16 F.4th at 32; *Klaassen v. Trustees of Indiana Univ.*, 7 F.4th 592, 594 (7th Cir. 2021); *Slidewaters LLC v. Washington State Dep't of Lab. & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021); *Dixon v. De Blasio*, __ F. Supp. 3d __, No. 21-cv-5090, 2021 WL 4750187, at *5 (E.D.N.Y. Oct. 12, 2021); *Harris v. Univ. of Massachusetts, Lowell*, __ F. Supp. 3d __, No. 21-cv-11244, 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021); *Valdez v. Grisham*, __ F. Supp. 3d at __, No. 21-cv-783, 2021 WL 4145746, at *9 (D.N.M. Sept. 13, 2021); *America's Frontline Doctors v. Wilcox*, No. EDCV 21-1243 JGB, 2021 WL 4546923, at *3-5 (C.D. Cal. July 30, 2021).

based on whether the religion opposed all vaccinations—as evidence of pretext under *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1293 (10th Cir. 2004), and contend that the University denied exemptions because of the nature of Plaintiffs' religious beliefs, not because accommodating them created an undue hardship. ECF No. 27, at 8. This argument fails because the Initial Policy has since been superseded by the Amended Policy, which eliminated the qualification language upon which Plaintiffs' pretext argument relies.

The University reconsidered each of the Plaintiffs' accommodation requests under the current Amended Policy. It provided accommodations to those who could perform their work remotely and denied accommodations to those who could not because of the undue hardship it puts on the University. Ex. B, ¶¶8-9. There is no evidence that, under the Amended Policy, the University failed to accommodate an exemption requests because of the nature of a particular religious belief. Nor is there evidence that the interactive review process required by federal law for accommodating religious exemptions "was a sham pretext for an impermissible ulterior motive." *Axson-Flynn*, 356 F.3d at 1293. Instead, the job responsibilities of each applicant and whether the applicant could perform them remotely determined the outcome of the University's accommodation decisions—not religious animosity directed at Plaintiffs. Ex. B, ¶8.

These facts distinguish this case from *Axson-Flynn*, where the court found a material issue of fact as to whether the defendants' requirement of script adherence was pretextual, since there was evidence in the record that the defendants were motivated by an anti-Mormon sentiment. *Axson-Flynn*, 356 F.3d at 1293. Here, though, the University articulated legitimate, nondiscriminatory reasons for both its vaccine policy and inability to accommodate Plaintiffs' religious exemptions: preventing undue hardship and protecting the health and safety of its

patients, employees, students, and community from the spread of COVID-19 that results from in-person contact. Ex. E, ¶14. Vaccinated individuals are less likely to be infected and to transmit the virus to others (including the Delta variant of the virus), and the chances of hospitalization or death from contracting the virus substantially decrease.[28] Vaccination is the safest, most effective means of controlling the spread and further mutations of the SARS-CoV-2 virus. Ex. A, ¶¶38-40, 48-49. And it is the most effective means of protecting the most vulnerable—children and the immunocompromised—whom Plaintiffs serve as medical professionals.

The law does not require the University to accommodate employees whose jobs require in-person contact. Doing so would subject the University to undue hardship—and risk of liability—by risking the health and safety of its patients, employees, and community, and by increasing the workload of Plaintiffs' colleagues at the University. *See Mills*, 16 F.4th at 35-36 (affirming denial of preliminary injunction and concluding that "hospitals need not provide [a COVID-19 vaccination] exemption . . . because doing so would cause them to suffer undue hardship."). Even a *de minimis* cost to the University can constitute an undue hardship. *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994). And as the Tenth Circuit has recognized, "[t]he cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Id.* Accordingly, the University has demonstrated a legitimate, nondiscriminatory, and non-pretextual reason for its inability to accommodate Plaintiffs' religious exemptions.

---

[28] https://covid19.colorado.gov/vaccine-breakthrough, *last visited* Oct. 12, 2021.

**E.      Even if strict scrutiny applied, the University satisfies it.**

Federal courts routinely apply rational basis review when evaluating Free Exercise challenges to vaccine mandates, though the University's Amended Policy would withstand even strict scrutiny. That is because the University has a compelling interest in protecting the health and safety of its patients, employees, students, and community, and has narrowly tailored its policy to address that interest.

In support of its Amended Policy, the University relied on reports from the CDC documenting that "COVID-19 vaccines are a key component in controlling the COVID-19 pandemic." Ex. A, ¶40. An August 26, 2021 CDC report, for example, found that "the greatest risk of transmission [of COVID-19] is among unvaccinated people who are much more likely to get infected, and therefore transmit the virus."[29] Consistent with this CDC advice, the University's Amended Policy limits in-person contact to vaccinated individuals because employees and students have a greater risk of contracting COVID-19 if they interact with unvaccinated patients, coworkers, and classmates.[30] This interest unquestionably qualifies as a

---

[29] *Id*. (referencing *Delta Variant: What We Know About the Science*, Centers for Disease Control and Prevention (Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.)

[30] The Supreme Court recognizes that courts should generally defer to "the reasonable medical judgments of public health officials." *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288, (1987). The CDC is the federal agency responsible for protecting the public health of the country by providing leadership and direction in the prevention and control of diseases. "It isn't the job of the judiciary to second-guess the 'wisdom, need, or appropriateness' of the measures taken by a state to protect the health of its people during a pandemic." *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 828 (D. Colo. 2020); *see also Jacobson*, 197 U.S. at 28, 30-35 ("It is no part of the function of a court . . . to determine [what is] likely to be the most effective for the protection of the public against disease.").

compelling one. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest[.]").

The University has also narrowly tailored its Amended Policy governing religious and medical exemptions to achieve its compelling interest in reducing the spread of COVID-19. The University applied its Amended Policy affording religious exemptions to its employees and provided accommodations to those employees who could perform their work remotely or in isolation. The University made similar accommodations for medical exemptions. Ex. I, ¶¶5-6, 8; Ex. F, ¶9; *see Fulton*, 141 S. Ct. at 1881.

These facts distinguish the University's Amended Policy from that at issue in *Dahl*, 15 F.4th 728. There, the court explained that Western Michigan University's vaccine requirement for student athletes was not a narrowly tailored public health measure since the school allowed similar conduct that "create[s] a more serious health risk" by permitting its non-athletes—the majority of its students—to remain unvaccinated. *Id.* at 734-735. By directing the policy solely at the student athletes, Western Michigan University failed to narrowly tailor its policy to achieve its interest in preventing the spread of COVID-19. *Id.* at 735. Here, however, the University's Amended Policy applies to all its employees and students who pose a risk of COVID-19 exposure and transmission from in-person contact at University facilities and programs.

The University has also narrowly tailored its Amended Policy to address the University's compelling interest. The University's Amended Policy is the least restrictive alternative available to achieve its goal of protecting the University community from the spread of COVID-19. Vaccines provide the safest and most effective means to reduce serious illness and death caused by COVID-19. Ex. A, ¶¶37-51, 57. Alternative forms of personal protection, like masks and

gloves, are less effective at reducing the rates of COVID-19 transmission and do nothing to reduce the severity of COVID-19 symptoms once a person contracts the virus. Ex. A, ¶¶37-38. The University's vaccine policy therefore survives strict scrutiny.

### F. The Eleventh Amendment forecloses relief against the Board of Regents.

Plaintiffs assert three federal claims under 42 U.S.C. § 1983 against the Board of Regents.[31] ECF No. 30, at 73-80. But sovereign immunity under the Eleventh Amendment protects states and arms of the states from suit in federal court. *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015). "This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The University, as an arm of the state of Colorado, is entitled to Eleventh Amendment immunity. *See Rozek v. Topolnicki*, 865 F.2d 1154, 1158 (10th Cir. 1989); *see also Sturdevant v. Paulsen*, 218 F.3d 1160, 1170–71 (10th Cir. 2000) (collecting cases). Likewise, the Board of Regents, as the University's governing body, is considered a state entity entitled to Eleventh Amendment immunity. *Murray v. Colorado*, 149 Fed. Appx. 772, 774 (10th Cir. 2005) (unpublished).[32]

Additionally, as for the Plaintiffs' § 1983 claims against the individual defendants in their personal capacities, the individual defendants are entitled to qualified immunity. *See, e.g.*, *Cary v. Tessier*, No. 12-cv-02072-RM-KJM, 2014 WL 5293558, at *4 (D. Colo. Oct. 16, 2014) (J.,

---

[31] Plaintiffs' fourth and fifth claims are brought under the ADA and the Colorado Constitution. Neither is cited as the basis for Plaintiffs' renewed preliminary injunction motion. ECF No. 27.
[32] Plaintiffs' § 1983 claims against the University fail for the additional reason that the University is not a "person" under § 1983. *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 64 (1989); *Howlett v. Rose*, 496 U.S. 356, 365 (1990) (holding that "arms of the State . . . are not subject to suit under § 1983").

Moore) ("[Q]ualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." (internal quotations omitted)). For the reasons above, there is no constitutional violations that could form the basis for a claim and, even if the Plaintiffs had alleged a constitutional violation, prohibitions against such conduct were not clearly established at the time.

## II.    The remaining preliminary injunction factors overwhelmingly favor the University.

### A.    Plaintiffs have not shown irreparable harm.

A plaintiff may suffer irreparable harm when injuries cannot be adequately remedied with money or when complete relief cannot be granted following a final determination on the merits. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal citation and quotations omitted). The threatened injury "must be both certain and great," and "not be merely serious or substantial." *Id.*

In this case, Plaintiffs claim the University's COVID vaccine policy harms them in various ways. Each of the employee Plaintiffs, for example, alleges they are irreparably harmed because they fear termination, the difficulty of possible relocation, or a hiatus in the practice of medicine. ECF No. 27, at 18-19. Similarly, the student Plaintiffs allege irreparable harm because they face a year's delay in the completion of their degrees or transfers other institutions. *Id*. at 19. But these harms, while potentially serious and substantial, are not irreparable: Plaintiffs may pursue remedies at law for any economic losses they suffer, and they have done so in this case.[33]

---

[33] Plaintiffs have requested actual and compensatory damages. ECF No. 30, at 84.

*Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) (absent unusual actions related to discharge, claims of loss of income or difficulties in obtaining other employment "will not support a finding of irreparable injury, however severely they may affect a particular individual."); *Hochul,* 17 F.4th at 295 (adverse employment consequences such as termination or the loss of income accompanying a suspension without pay generally do not warrant a preliminary injunction).

Plaintiffs further claim irreparable harm to their reputations from potential termination or expulsion. ECF No. 27, at 18. But "[s]peculative harm does not amount to irreparable injury." *Schrier*, 427 F.3d at 1267. Plaintiffs have failed to show how their objections to taking a COVID vaccine—the alleged cause of the potential separations from the University—would damage their reputations. This alleged harm is entirely speculative. But to the extent it exists, any reputational damage can be remedied with money damages.

Finally, Plaintiffs claim that violation of a constitutional right is alone sufficient to constitute irreparable injury. ECF No. 27, at 18. But while the alleged violation of a constitutional right must weigh heavily in the irreparable harm analysis, the Court "must nonetheless engage in [the] traditional equitable inquiry as to the presence of irreparable harm in such a context[.]" *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). For the reasons previously discussed, not only have Plaintiffs failed to show a substantial likelihood of success on the merits, they have failed to show any injury that cannot be compensated monetarily.

### B. The balance of equities and the public interest strongly favor upholding the University's vaccine policy.

The third and fourth preliminary injunction factors require the Court to balance the harm to Plaintiffs of not obtaining the injunctive relief they request against the University's harm if the

injunction is granted. *Fish*, 840 F.3d at 755-56. These two factors merge where the requested injunction is opposed by an arm of the State. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

It is hard to imagine a case where the public interest is more directly and adversely impacted by the granting of the injunction than the one before the Court. COVID-19 has had a catastrophic impact on all aspects of life for the past 21 months. In the United States, close to 780,000 lives have been lost, millions have become ill, and millions have lost their livelihoods, with tragic consequences on their ability to keep their homes, feed their families, and pay their bills. Several hundred thousand have been hospitalized, straining resources to their limits— including resources at the Anschutz campus. The most effective way to stop this devastation is clear: reduce the number of new infections through vaccinations so that the virus cannot continue mutating in new hosts. Thus, to remain effective, any exemptions from a vaccine mandate must be extremely limited. The University carefully structured its Amended Policy with this mind.

Moreover, vaccination is the leading public health strategy to end the COVID-19 pandemic and to minimize the virus's adverse effects. Ex. A, ¶¶38, 49, 51. The greatest risk of transmission is among the unvaccinated, who are much more likely to get and transmit the virus. *Id.* at ¶40. Mortality due to COVID-19 drops steeply and inversely with the vaccination rate. *Id.* at ¶39. And the evidence shows that vaccines provide more robust protection than antibodies from a previous COVID-19 infection. *Id.* at ¶57. Perhaps most important during the current Delta surge, vaccines reduce the potential for hospitalization, providing needed relief for fatigued hospital staff. The overwhelming majority of patients hospitalized both at the University and elsewhere are unvaccinated. *Id.* at ¶50.

Plaintiffs' refusal to receive the vaccine is not a self-contained choice that risks only their

38

own health. Granting exemptions to Plaintiffs—and to the many who, like Plaintiffs, have requested a similar exemption—would defeat the Amended Policy's purpose of safeguarding the community and working to end the pandemic. The strong interest in public safety and in maintaining a functioning healthcare system tip this factor substantially against preliminary relief. *See San Diego Unif. Sch. Dist.*, 2021 WL 5757397, at \*6 (public's interest in preventing the spread of COVID-19 weighs "strongly" in favor of denying preliminary injunction request on religious grounds); *see also Hochul,* 17 F.4th at 295-96 (public interest outweighs plaintiffs' requests for religious exemptions from vaccine mandate for healthcare workers); *Does 1-6,* 16 F.4th at 37 ("Maine's interest in safeguarding its residents is paramount.").

## CONCLUSION

Plaintiffs' renewed request for a preliminary injunction (ECF No. 27) should be denied.

Respectfully submitted this 10th day of December 2021.

PHILIP J. WEISER
Attorney General


/s/ *Jacquelynn Rich Fredericks*
JACQUELYNN RICH FREDERICKS*
First Assistant Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
GRANT T. SULLIVAN*
Assistant Solicitor General
MEGAN PARIS RUNDLET*
Senior Assistant Solicitor General

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Tel: (720) 508-6171

E-Mail: kit.spalding@coag.gov;
  jacquelynn.richfredericks@coag.gov;
  grant.sullivan@coag.gov; megan.rundlet@coag.gov

*Counsel of Record for Defendant Board of Regents,
  and for Defendants Todd Saliman, Donald Elliman,
  Shanta Zimmer, Eric Mediavilla, and Ann-Michael
  Holland in their official capacities

/s/ *Hermine Kallman*
_____
HERMINE KALLMAN**
University of Colorado
Office of University Counsel
Special Assistant Attorney General
1800 Grant St., Suite 700
Denver, CO  80203
Tel: 303 860-5691
hermine.kallman@cu.edu

**Counsel of Record for Defendants Board of
  Regents, Todd Saliman, Donald Elliman, Shanta
  Zimmer, Eric Mediavilla, and Ann-Michael
  Holland

HOLLAND & HART, LLP

/s/ *Gregory Goldberg*
_____
Matthew J. Smith***
Gregory Goldberg***
Jessica J. Smith***
Holland & Hart, LLP
555 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000
mjsmith@hollandhart.com
ggoldberg@hollandhart.com
jjsmith@hollandhart.com

***Attorneys for Defendants Elliman, Zimmer,
Mediavilla, and Holland in their personal capacities

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUCTION upon all parties herein by filing copies of same using the ECF System, this 10th day of December, 2021 addressed as follows:

Joseph Brown
Theresa Sidebotham
Telios Law PLLC
PO Box 3488
19925 Monument Hill Rd
Monument, CO 80132
jjb@telioslaw.com
tls@telioslaw.com

Michael McHale
Michael G. McHale, Attorney at Law
10506 Burt Cir, Ste 110
Omaha, NE 68114
mmchale@thomasmoresociety.org

Gregory Goldberg
Matthew Smith
Jessica Smith
Holland & Hart LLP
555 17th St, Ste 3200
Denver, CO 80202
ggoldberg@hollandhart.com
mjsmith@hollandhart.com
jjsmith@hollandhart.com

Martin Whittaker
Peter Breen
Thomas More Society
309 W Washington St, Ste 1250
Chicago, IL 60606
privatrecht@gmail.com
pbreen@thomasmoresociety.org

Hermine Kallman
University of Colorado, Office of
  University Counsel
1800 Grant St, Ste 700
Denver, CO 80203
hermine.kallman@cu.edu

*/s/ Carmen Van Pelt*