# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

JANE DOES 1-11 & JOHN DOES 1 & 3-7,

   Plaintiffs,

   v.

BOARD OF REGENTS of the UNIVERSITY OF COLORADO, *et al.*,

   Defendants.

**No. 21-cv-2637-RM-KMT**

**The Hon. Raymond P. Moore**
**U.S. District Judge**

**The Hon. Kathleen M. Tafoya**
**U.S. Magistrate Judge**

## PLAINTIFFS' REPLY IN SUPPORT OF PRELIMINARY INJUNCTION[1]

Defendants' Response Brief ("Resp.") is staggering both for what it reveals and what it seeks to conceal. After their prior briefing argued that the *same religious accommodation* process exists in both the September 1 and September 24 Policies (ECF No. 15, Br. at 15-16), now—under the direction of new counsel from the Attorney General's Office—Defendants attempt to distance themselves from the September 1 Policy's blatant violations of religious neutrality, *especially* since the Second Circuit Court of Appeals recently struck down a similar New York City policy that likewise evaluated religious exemption requests by looking to statements of official denominational leaders. *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (per curiam).

Also, after previously arguing that challenges to the September 1 Policy were moot, *simply because* it had been replaced by the September 24 Policy for *future* applicants (ECF No. 15, Br. at 11-14), Defendants now argue they have conducted last-minute *re-evaluations* of most Plaintiffs' religious exemption requests under the September 24 Policy, apparently attempting to

---

[1] To avoid repetition, Plaintiffs respectfully reassert here their prior arguments in their Renewed Motion and the facts in their previously submitted Declarations and Verified Amended & Supplemental Complaint.

paper over the explicit discrimination they engaged in under their September 1 Policy. Defendants claim to have granted religious accommodations to six of the 18 Plaintiffs who were already working remotely, while continuing to discriminate against the remaining 12. But even the six exempted individuals have not been guaranteed *equal treatment* with non-religious exemptees in accord with the *First Amendment*, regardless of the specifics of Title VII.

Defendants also claim they engaged in a near-midnight crusade on the eve of their filing deadline, terminating any previously granted *medical* exemptions for those in clinical settings— allegedly because Defendants now believe they pose an "undue hardship" (a legal term of art which Defendants misconstrue). Yet at the same time, Defendants insist that medical exemptions in clinical settings are *justified*, in part because of the alleged grave need to *retain* more healthcare staff to care for sick patients (an interest which applies just as much to those with religious contraindications to the vaccine). But as Plaintiffs argue below, Defendants' litigation-motivated attack on the medically fragile is a thinly veiled attempt to moot Plaintiffs' non-general applicability First Amendment claim—a maneuver that easily fails under the doctrine of voluntary cessation. It also reflects *additional* non-neutrality since it was taken openly *because* of Plaintiffs' religious beliefs (that is, as an attempted end-run around the fact Plaintiffs' religious objections were being treated more harshly than medical contraindications).

But Defendants' brief also conceals key facts. Specifically, it fails to acknowledge additional categorical and de facto exemptions within Defendants' discriminatory policies that further expose occasions of non-general applicability. In particular, Defendants don't acknowledge exemptions from their COVID-19 vaccine mandate for: (a) unvaccinated patients; (b) vaccinated staff and students who work alongside unvaccinated healthcare staff exempted at other facilities; and (c) vaccinated staff and students with immunodeficiencies who fail to

develop immunity from vaccination yet are allowed to work in-person within the Anschutz community. All these loopholes undermine Defendants' asserted interests and trigger strict scrutiny, which Defendants easily fail.

Further, although Plaintiffs' arguments don't require this Court to decide the science, as it were, Defendants fill their brief with contradictory assertions of unscientific nonsense. For instance, Defendants say vaccination "is the <u>only safe means</u> of controlling the spread" of COVID, and "there is <u>no alternative</u> to vaccination" (Resp. at 5, 6), but one of their own physician witnesses admits "<u>(PPE) has been quite effective</u> in preventing the spread of provider-to-patient and patient-to-provider infections if worn correctly," and has resulted in "provider-to-provider transmission" only when there has been "more lax behavior of physicians and staff when outside of patient treatment areas." (Defs.' Ex. D, ¶7.) Moreover, healthcare facilities across Colorado—and in nearby states—have granted medical and religious exemptions to hundreds of employees and/or students without doing any apparent damage to slowing the spread of COVID.[2] Indeed, Defendants point to no other healthcare facility in the country that has gone so far as to deny all medical exemptions in clinical settings. That's especially notable here, where Defendants have already apparently achieved a 99.5% vaccination rate among the 37,000 people who work on the Anschutz campus. (Jane Doe 3 Decl. at ¶14.)

Defendants also say that natural immunity—which they put in "scare quotes"—is ineffective because it "wanes" and thus "its <u>protections</u> do not endure." (Resp. 6.) Yet it's widely acknowledged that the protection from COVID-19 vaccination *also wanes*—and likely to a

---

[2] John Daley, "Colorado's vaccine mandate did drive a lot of health care and government workers to get the shot – some more than others, though," CPR News, Nov. 1, 2021, https://www.cpr.org/2021/11/01/colorado-covid-vaccine-mandate-health-care-government-workers/ (noting 1,100 exemptions granted by UC Health alone); ECF No. 27, Ex. 1 (McHale Declaration noting nearly 200 religious exemptions granted by comparable University of Nebraska Medical Center in Omaha, Nebraska).

*greater degree* than natural immunity. (French Decl. ¶¶15-26) Moreover, the emerging evidence shows that normal vaccination without boosters is statistically ineffective against the dominant Omicron variant. (French Decl. ¶¶18, 23.) In Ontario, Canada, for example, the most recent data shows higher COVID case rates in vaccinated residents than unvaccinated residents. (Id. ¶20.) These facts only further undermine Defendants' alleged compelling interest in refusing to grant a disproportionately small amount of religious exemptions to their vaccine mandate.

Defendants also note the State Board of Health mandated vaccination for all healthcare workers in Colorado. (Resp. at 6-7.) But they conceal the fact that the Board initially invited facilities to seek waivers to grant religious exemptions, and have now adopted a more religion-friendly approach, simply counting religious exemptees toward the 100% vaccination requirement for facilities, without need for any Board approval.[3] Defendants at Anschutz denigrate the same religious rights that the State Board of Health honors across Colorado.

Defendants further say they adopted the September 24 Policy as a result of an alleged sharp rise in COVID infections and hospitalizations in September. (Resp. 7.) But the actual timeline of events shows they adopted the updated policy as an attempt to whitewash the blatantly unconstitutional violations of the September 1 Policy.

On **August 26, 2021**, many Plaintiffs received a form email from the anonymous "Vaccine Verify" team asserting their religious exemption requests had been denied because "campus policy" "only recognizes religious exemptions based on a religious belief whose *teachings* are opposed to *all immunizations*," the same policy memorialized in the September 1 Policy (See, e.g., V. Am. Cmplt. ¶71, 90, 96, 100, 108, 114, 117, 154, 164, 175) (emphasis

---

[3] David Gartenberg and Laura Spector, "Colorado's Vaccine Mandate for Healthcare Providers Remains in Effect Despite Stays to CMS Vaccine Mandate," Littler, Dec. 15, 2021, https://www.littler.com/publication-press/publication/colorados-vaccine-mandate-healthcare-providers-remains-effect-despite.

added). On **September 2, 2021**, Defendant Zimmer emailed "Student A" a letter denying his religious exemption request because, despite his alleged Catholic beliefs against the vaccine, the University's own interpretation of Catholic teaching determined that Catholics have no legitimate objection to COVID vaccination. (ECF 1, Ex. 16.) After a demand letter to the University, on **September 7, 2021**, Defendants granted Student A a medical exemption while sidestepping his request for religious exemption. (ECF No. 1, Ex. 18.) On **September 15, 2021**, counsel for Jane Doe 1 emailed Defendants a demand letter explaining the blatant constitutional flaws of the September 1 Policy. (V. Am. Cmplt. ¶78.) The next day, **September 16, 2021**, the University changed position and added summary language denying pending or new exemption requests on "undue hardship" grounds, (id. ¶78, 83), despite responding to Jane Doe 1's demand letter on **September 20, 2021** that "[t]here has been no First Amendment violation" committed by September 1 Policy. (ECF 1, Ex. 5.) On **September 24, 2021**, Defendants amended the September 1 Policy purporting to eliminate the language requiring religious inquisitions and replace it with more neutral-appearing language for employees, along with explicitly forbidding all religious exemption requests for students. Plaintiffs were not notified of the issuance of the September 24 Policy, nor was it applied to any of their religious exemption requests, all of which were denied under the September 1 Policy. On **October 12, 2021**, Defendants submitted their opposition brief to Plaintiffs' original preliminary injunction motion, continuing to argue that the September 1 Policy was perfectly constitutional. (ECF No. 15, Br. at 16.) On **November 22**, Defendants sought an extension of time to file their response, due the next day, to Plaintiffs' renewed preliminary injunction motion, on the basis of "trial conflicts," and in order to allow new counsel from the Colorado Attorney General's Office to get up to speed on the case. On **December 7, 2021**, that phalanx of attorneys from the Colorado Attorney General's Office

appeared for Defendants. (See Dkts. Txt. Nos. 48-55.) On **December 9, 2021**, one day before their extended deadline to respond to Plaintiffs' renewed preliminary injunction motion, the eleven currently employed staff Plaintiffs received purported "reconsiderations" of their religious exemption requests, all of which were denied in late August and early September. Then, on **December 10, 2021**, Defendants announced in their Response they had revoked all medical exceptions for those in clinical settings, calling these exemptions a "mistake" that had now been "remedied." (Resp. at 8, 28-29.)

This timeline reveals Defendants' actions for what they are—a sustained, unapologetic effort to eliminate all religious objectors to COVID-vaccination from the Anschutz community, even at the cost of (allegedly) terminating all medical exemptees from the same premises, no matter how needed their services or how little risk they pose. This conclusion is not altered by Defendants' purported "reconsideration" of each staff Plaintiff request for religious exemptions under the new policy, and Defendants' explanation of this effort is riddled with unsupported and misleading assertions. For example, with respect to Jane Doe 1, Defendants say that "pediatric providers concur that vaccination *plus* PPE is <u>required</u>" to protect patients, whereas the cited declaration paragraphs merely say it's simply "the most effective" form of protection (Resp. at 11; Defs.' Ex. C, ¶7; Ex. D, ¶9)—but the Supreme Court is clear that government lacks a compelling interest in requiring the *most* effective means of achieving a goal at the expense of fundamental rights where sufficient alternatives are available, as discussed below. By way of additional example, Defendants say they have now accommodated John Doe 4—but fail to mention they docked his pay by 10% *solely* for seeking a religious accommodation, nor do they state whether his pay will be restored, further manifesting the base religious discrimination underlying even the September 24 Policy's attempt to cover up Defendants' earlier legal sins.

Of course, even if Defendants are not still violating religious neutrality, the September 24 Policy remains riddled with exceptions while failing to provide Plaintiffs equal treatment. That alone triggers strict scrutiny and violates the First Amendment on these facts. Thus, Defendants' attempts to avoid an injunction fail at each step. This Court should grant Plaintiffs' motion for preliminary injunction.

## ARGUMENT

## I. LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Mootness.

Defendants argue this case is moot for several reasons, including because (1) they claim to have replaced the initial September 1 Policy with the amended September 24 Policy, (2) six of the Plaintiffs have now been granted religious accommodations, and (3) five Plaintiffs are no longer with the University. (Resp. 19-20.) Defendants have also *effectively* attempted to moot Plaintiffs' Free Exercise claims by rescinding or denying—on the eve of their Opposition Brief's due date—even *medical* exemptions from those students and staff who work in clinical settings. (Id. at 28-29.) In reality, none of Plaintiffs' claims are moot, for at least the following reasons: (1) mere amendment of the Initial Policy did not moot the original harm inflicted by that policy; (2) the six currently accommodated Plaintiffs have not been guaranteed permanent equal treatment under the Free Exercise with comparable individuals who have been accommodated for non-religious reasons; (3) the five Plaintiffs are not "gone" but include several students on (forced) leave awaiting permission to return, with all five suffering *ongoing harm* as a result of Defendants' unconstitutional policies and *seeking full reinstatement*; and (4) the doctrine of voluntary cessation undermines Defendants' attempt to vitiate Plaintiffs' Free Exercise claim by exiling medical exemptees from clinical settings, since it is not absolutely clear they will not

reinstate those medical exemptions—whose legality they still vigorously defend—at some point in the future, especially given the dire need for increased healthcare staffing in Colorado.[4]

"A claim is moot when a plaintiff loses a personal stake in the outcome because of some intervening event." *Equal Emp. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173 (10th Cir. 2017). "In assessing mootness, we consider whether a favorable judicial decision would have some effect in the real world." *Id*. Only where "a plaintiff no longer suffers an actual injury redressable by a favorable judicial decision" is "the claim moot." *Id*. However, "[a] special rule applies when the defendant voluntarily stops the challenged conduct," in which case "the claim will be deemed moot only if . . . [1] It is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," and "[2] Interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id*. at 1173-74. Indeed, the rule of voluntary cessation "is designed to prevent gamesmanship," as "a party should not be able to evade judicial review, or defeat judgment, by temporarily altering questionable behavior." *Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016).

First, even if one accepts the claim that "the Initial [September 1] Policy was superseded" by the "Amended [September 24] Policy" (Resp. at 19), that would not moot Plaintiffs' challenge to the September 1 Policy, as they all remained entitled to a full and fair *re-evaluation* under a policy that complies with the First Amendment. *See Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (per curiam) (enjoining New York City accommodation standard that denied religious accommodation requests if "the leader of [one's] religious organization has spoken publicly in favor of the vaccine," even though the City had agreed the standard was "constitutionally suspect" and consented to similar relief ordered by a prior motions panel);

---

[4] *See John Daley*, "Colorado patients and providers alike are frustrated, angry and worried as COVID cases pack hospitals across the state," CPR News, Dec. 9, 2021, https://www.cpr.org/2021/12/09/colorado-covid-cases-hospitalizations-staffing-shortage/.

*accord Rezaq v. Nalley*, 677 F.3d 1001, 1008-10 (10th Cir. 2012) (due process challenge not moot because "[w]ere the Court to order BOP to provide plaintiffs additional process to determine whether their transfers to ADX were proper, this new process could result in a finding that plaintiffs were not properly placed in ADX in the first place").

Indeed, Defendants' own actions in this case have effectively conceded the non-mootness of Plaintiffs' challenge to the September 1 Policy, as Defendants now claim that, at the last minute, they've conducted a truly "independent" review of Plaintiffs' accommodation requests under the September 24 Policy. (Resp. 8-9.) However, as Plaintiffs stated in their opening brief, all of their claims against the September 1 Policy remain live to the extent that policy has continued to infect the evaluation of their requests for religious accommodations, under the September 24 Policy or otherwise. (Opening Br. at 3, 7-9.)

Additionally, the mere fact Defendants have granted religious accommodations (for now) to six Plaintiffs under Title VII does not moot these Plaintiffs' claims, since they have not been guaranteed *equal treatment* with similarly situated employees exempted for non-religious reasons, in accord with the First Amendment's requirement of *equal treatment* for religious believers. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (April 9, 2021); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993). Therefore, because these six Plaintiffs remain vulnerable to a different outcome under Title VII at a later time, independent of Defendants' treatment of non-religious exemptees, they still have a personal stake in the outcome of this case given that it hinges on the First Amendment's promise of equal treatment for religious believers, and is not based on Title VII.

Further, Defendants' position that the five Plaintiffs not currently with the University no longer have live claims is utter nonsense. These five Plaintiffs are all seeking *reinstatement* to

their previous positions with the University, since their exile is a direct result of the University's unconstitutional policies at issue in this case. (V. Am. Cmplt. at pp. 83-84.) Thus, their exile is quintessentially an *ongoing* constitutional harm, which a preliminary injunction would immediately remedy. If that's not a personal stake in the outcome of the case, it's difficult to know what would be.[5]

In arguing that Plaintiffs are not "suffer[ing] ongoing and imminent harm from the University's vaccine policy" and cannot "demonstrate standing," (Resp. 21) Defendants are not only wrong, they have "confused mootness with standing . . . and as a result placed the burden of proof on the wrong party," since it is a defendant's burden to show mootness. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221-222 (2000). Defendants easily fail that burden here, for the reasons already discussed, and (presumably for similar reasons) they have not lodged any straightforward attack on Plaintiffs' standing. Thus Plaintiffs claims against the Initial and Amended Policies are clearly not moot.

Finally, Defendants' claim that they have now (allegedly) revoked or denied even *medical* exemptions for students and patients who work in clinical settings is a transparent attempt to moot Plaintiffs' First Amendment claim, which partially relies on the fact the University granted *medical but not religious* exemptions to some students and staff in clinical settings. (Resp. 29-30; Defs.' Ex. B ¶7; Defs.' Ex. F ¶¶6, 9; see also ECF No. 15, Br. at 15, 20, 24 (acknowledging University had granted a small amount of medical exceptions without distinguishing between clinical and non-clinical exemptees).) As discussed in prior filings, Defendants had granted a medical exemption in early September to "Student A," allowing him to

---

[5] Notably, Defendants admit they have not even re-evaluated Plaintiffs Jane Doe 2 and Jane Doe 9 under the September 24 Policy. (Resp. 8 n.18.) But since both were denied under the blatantly discriminatory September 1 Policy, and because both their cases remain live, a preliminary injunction must issue for at least these two Plaintiffs requiring that they be given a full and fair re-evaluation under the September 24 Policy.

continue performing clinical rotations to complete his final year of medical school. V. Am. Cmptl. ¶183. But three months later, on the virtual eve of filing their Opposition Brief to this motion, now under the direction of the Attorney General's office rather than University counsel, Defendants flipped and revoked Student A's medical exception without any changed factual circumstances, much less evidence he had been causing any harm. Defendants' Opposition Brief labels Student A's prior exemption a "mistake"—taken with advice of counsel under threat of litigation—that has now been "corrected." (Resp. at 8, 29-30.) Defendants present no valid reason for their sudden attack on staff and students for whom COVID vaccination may cause significant threat to life and health—nor is there any reason, other than to deny religious objectors to COVID vaccination their rights. If anything, this midnight move concedes *sub silentio* Plaintiffs' argument that "persons receiving medical accommodations are treated 'less harshly' than students with religious objections." (Resp. at 8, 29, 30.) But this sort of "gamesmanship" is prohibited by the doctrine of voluntary cessation, *Brown*, 822 F.3d at 1166, and Defendants thus must fail in their last-ditch attempt to moot Plaintiffs' case.

Critically, Defendants' brief vigorously defends the supposed legal validity of granting medical, but not religious, exemptions *even in clinical settings*. (Resp. 26-28.) But Defendants then claim they have revoked all previously granted medical exceptions in clinical settings. (Resp. 29-30.) At the same time, they do not forswear to granting medical exceptions in clinical settings at any time in the future, including after the conclusion of this litigation—while healthcare facilities remain in dire need of more staff.[6] Nor do Defendants concede any wrongdoing, whether under their September 1 or September 24 policies, against Plaintiffs' fundamental constitutional rights. Thus, Defendants have not met their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be

---

[6] *Supra* n.4.

expected to recur." *Id*. at 1167 (quoting *Already, LLC v. Nike, Inc.*, 85 U.S. 85, 91 (2013)).

Accordingly, Defendants' conveniently timed decision to remove prior medical exemptees from clinical settings must fail as an attempt to moot Plaintiffs' case—and if anything, this attack on medically fragile individuals shows the depths to which Defendants will stoop, all to prejudice Plaintiffs' religious liberties. Defendants were right to grant medical exceptions in the months leading up to their Opposition Brief, and in the future, this remains a key exception that renders their policy non-generally applicable under the Free Exercise Clause.

### B.  Vaccine mandates are not impermeable to Free Exercise challenges.

Defendants argue that Free Exercise challenges to vaccine mandates must necessarily fail, and that Plaintiffs "attempt to downplay" the applicability of *Employment Division v. Smith*, 494 U.S. 872 (1990). (Resp. 21-23.) In reality, Defendants completely ignore the slate of recent federal court cases—including the express indications of five Justices of the Supreme Court— that COVID-19 mandates may, as here, sometimes run afoul of the Free Exercise Clause. And Plaintiffs' Free Exercise claim alleges the challenged policies are *neither neutral nor generally applicable*—the precise framework demanded by *Smith*.

Defendants note the usual cases cited by government defendants in COVID-19 mandate cases, including *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944), *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015), *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), and, of course, *Smith* itself. But none of these cases stand for the proposition that vaccine mandates *that are not neutral or generally applicable*, either facially or as-applied, somehow comply with the Free Exercise Clause. *See, e.g.*, *Zucht v. King*, 260 U.S. 174, 176-77 (1922) (finding a "substantial constitutional question" as to whether application of San Antonio school district vaccine mandate violated the Equal Protection Clause).

Instead, contrary to Defendants' citations, multiple federal courts have recently held that COVID-19 vaccine mandates can indeed fail constitutional muster. *See U.S. Navy Seals 1-26 et al., v. Biden et al.*, No. 4:21-cv-01236 (N.D. Tex. Jan. 3, 2022) (preliminarily enjoining Navy vaccine mandate's de facto categorical denials of religious exemptions to 35 Navy Special Warfare servicemembers); *Kane v. De Blasio*, 19 F.4th 152, (2d Cir. 2021) (New York City arbitration accommodation standard in COVID-19 vaccine mandate likely violated requirements of religious neutrality); *Thoms v. Maricopa Cty. Cmty. Coll. Dist.*, No. 2:21-CV-01781-SPL, 2021 WL 6172538 (D. Ariz. Nov. 5, 2021) (COVID-19 vaccine mandate denying religious exemptions for some students while allowing non-religious exemptions for similarly situated students was defectively underinclusive); *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728 (6th Cir. 2021) (holding that university's student-athlete COVID-19 vaccine mandate likely violated the Free Exercise Clause); *Magliulo v. Edward Via College of Osteopathic Medicine*, 3:31-cv-2304, 2021 WL 3679227 (W.D. La. Aug. 17, 2021) (holding that Louisiana college operating as state actor failed to satisfy strict scrutiny in denying complete religious exemptions to COVID-19 vaccine mandate sought by three medical school students).

Additionally, several Justices of the Supreme Court have recently stated or indicated that a COVID-19 vaccine mandate authorizing medical but not religious exemptions runs afoul of the First Amendment. This position was expressly approved by three Justices, who would have held that Maine's willingness to grant medical but not religious exemptions to its COVID-19 vaccine mandate for healthcare workers violated the Free Exercise Clause. *Does 1-3 v. Mills*, 142 S. Ct. 17, 19-22 (2021) (Gorsuch, J., dissenting). In denying an application for emergency relief in *Does 1-3 v. Mills*, Justices Barrett and Kavanaugh wrote a separate concurrence taking pains to note that their denial was *not* based on "an assessment of the underlying merits," but rather on a

"discretionary judgment about whether the Court should grant review in the case," given the lack of full briefing and oral argument, and the fact it was "the first case to address the questions presented." *Id.*, at 18 (Barrett, J., concurring). As Justice Gorsuch opined—without any rebuttal from Justices Barrett and Kavanaugh—the dissenters' merits position is essentially demanded by the Supreme Court's recent decision in *Tandon v. Newsom*, which ended any doubt that strict scrutiny applies under the Free Exercise Clause not just when government *targets* religion, but also whenever government treats "*any* comparable secular activity more favorably than religious exercise." 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

Accordingly, Defendants' idea that vaccine mandates are shielded from constitutional scrutiny is overly blunt and simply outdated. The Free Exercise Clause very much applies in considering the application of Defendants' mandate to these religiously conscientious Plaintiffs.

## C. Defendants' policies remain hopelessly non-neutral and non-generally applicable.

### 1. Neutrality

Laws that fail to operate "without regard to religion," or that otherwise "single out the religious" for disfavored treatment, "clear[ly] . . . impose[] a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2021, 2021-22 (2017); *see also Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020) (disqualifying otherwise eligible recipient from public benefit "solely because of their religious character" triggers strict scrutiny, as does a "law[] that impose[s] special disabilities on the basis of religious status"). Further, "[a] law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny in only rare cases." *Lukumi*, 508 U.S. at 2233 (1993).

Here, the September 24 Policy expressly targets students' religious beliefs for disfavored treatment in direct violation of the foregoing precedents. As mentioned, it specifically provides that "*[r]eligious* accommodations are not currently available to students or applicants," while at the same time allowing students to apply for "medical accommodation[s]." Defendants say this argument bears only on the general applicability analysis, (Resp. 24), but the September 24 Policy makes students subject to "special disabilities" solely "on the basis of religious status." *Trinity Lutheran*, 137 S. Ct. at 2021.

Defendants also completely ignore that "the historical background" and "specific series of events leading to" the September 24 Policy cements its non-neutrality, *Lukumi*, 508 U.S. at 533, in part given that the preceding September 1 Policy (requiring that one belong to a *religion* whose *teachings* oppose *all vaccines*) was a veritable clinic in how to violate the First Amendment. *See Kane*, 19 F.4th 152, 168 (2d Cir. 2021) ("Denying an individual a religious accommodation based on someone else's public expressed religious views—even the leader of her faith—runs afoul of the Supreme Court's teaching that '[i]t is not within the judicial ken to question . . . the validity of particular litigants' interpretations of those creeds.'"). The September 24 Policy's formal denial of religious exemptions to students is plainly a post hoc attempt to shroud—yet continue—the September 1 Policy's de facto ban on all student and employee religious exemptions. (*See* V. Am. Cmplt. ¶169 (noting Defendant Zimmer stated that only "Christian scientists" would likely qualify for religious exemption under the September 1 Policy, with no evidence that any Anschutz students are actually Christian scientists); *see also id*. ¶131 (University counsel admitting that effect of September 1 Policy was to deny *all* religious exemptions—i.e., "I am unaware of a religion that only prohibits COVID 19 vaccinations").)

Defendants say they are merely disfavoring students "for non-religious reasons," because federal employment law requires a religious accommodation process for employees but not students. (Resp. 24.) But nothing in federal law *prohibits* religious exemptions for students, either, and sometimes, as here, the First Amendment *requires them*. Thus, Defendants are not merely "following federal law" in the September 1 Policy, but are *gratuitously* prohibiting religious exemptions to students *no matter their circumstances*. Accordingly, *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, is completely distinguishable, because there a rule against part-time attendance merely offered several secular exceptions (including for fifth-year seniors and part-time students) *without expressly singling out religious needs for disfavored treatment*. 135 F.3d 694, 701 (10th Cir. 1998).

Defendants also argue this kind of disfavored treatment for students was upheld in *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021), *pet. rhrg. en banc pending, pet. for cert. pending* (Resp. 24). But there the analysis hinged on the fact Title VII does not *require* religious exemptions for employees if their requests are insincere or exemptions would pose an undue hardship. *Id*. But here the University has now granted religious accommodations to *six employee Plaintiffs* who are able to work remotely. (Resp. 9, Ex. B. ¶8.) Yet the University continues to categorically prohibit religious exemptions to students, *no matter their circumstances*, including to Jane Doe 8 in seeking to complete her master's of public health degree, after having been accommodated to complete her concomitant bachelor's degree at the University's Denver campus. (V. Am. Cmplt. ¶23.) Thus, the *San Diego* decision (which is not binding on this Court) is not even persuasive here.

Defendants' remaining citations are just as unavailing. Defendants point to *Grace United Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) for the rule that not every

secular exemption justifies a religious exemption—but Plaintiffs are not arguing otherwise, and here they merely note that Defendants are *expressly disfavoring students based on their religious status* in violation of bedrock Supreme Court precedents. Defendants also hold up *Wise v. Inslee*, No. 2:21-cv-0288, 2021 WL 4951571 (E.D. Wash. 2021), but that case involved a COVID vaccine mandate for certain *employees and contractors*, not students, and several plaintiffs had already received religious accommodations. Finally, Defendants' say the Second Circuit's recent decision in *Dr. A. v. Hochul*, 17 F.4th 266, 283 (2d Cir. 2021) upholding New York's healthcare vaccine mandate, despite an ostensibly similar "switch in time" from a prior policy, undermines Plaintiffs' argument here. (Resp. 25.) But the Second Circuit held that New York "did not amend" its prior order, but "independently promulgated a new Rule," *id*. at 282-83, whereas here Defendants have openly styled the September 24 Policy as the "Amended Policy," in acknowledgment of the obvious fact it amended, and must be interpreted in light of, the September 1 Policy's blatant exercise in religious discrimination.

Defendants say Plaintiffs "cite no evidence linking the change . . . to any form of religious hostility," (Resp. 25) but Plaintiffs have explicitly argued that the blatantly discriminatory September 1 Policy (and its discriminatory application) (see, e.g., V. Am. Cmplt. ¶136) shows that the cleaned up September 24 Policy is simply pretextual. (Op. Br. 3.). And regardless, "[t]he constitutional benchmark is 'government *neutrality*,' not 'government avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008)). And here the amended policy's revisions are hardly a mere "correcting [of] policies" (Resp.. 26), where no federal statute requires denying religious exemptions to students, and recent Supreme Court precedent

squarely forbids government bodies from "singl[ing] out the religious" for disfavored treatment. *Trinity Lutheran*, 137 S. Ct. at 2021-22.

Finally, Defendants have revealed additional non-neutrality by suddenly revoking or denying medical exceptions for Anschutz individuals who were originally allowed work in clinical settings under the September 24 Policy. (Resp. 29-30.) While Defendants' declarations assert these exemptions pose an "undue hardship," the convenient timing of Defendants' decision and their own legal argument reveal otherwise. Indeed, Defendants did not revoke medical exemptions in clinical settings until the virtual eve of their Response deadline, and this more than three months after granting a medical exemption to Student A, for example. (V. Am. Cmplt. ¶183, Ex. 18.) Then, in their Opposition Brief, Defendants rely on this last-minute revocation as the key point in rebutting Plaintiffs' argument that Anschutz individuals receiving medical exceptions are treated "less harshly" than religious objectors in violation of the First Amendment. (Resp. 29.) Thus, Defendants' last-minute revocation was plainly taken "because of" Plaintiffs' religion—that is, in order to avoid the reality that Plaintiffs were otherwise being treated more harshly than medical exemptees (including Student A) under the amended September 24 Policy, in direct violation of the First Amendment. In other words, suppressing Plaintiffs' religious objections was "the object" of Defendants' revocation of medical exemptions. *Lukumi*, 508 U.S. at 533.

Accordingly, the September 24 Policy is not neutral on its face and as applied.

**2. General Applicability.**

The September 24 Policy is also riddled with categorical and de facto exemptions and is thus blatantly non-generally applicable.

As to medical exemptions, Defendants assert that federal courts "have roundly rejected" the argument that medical exemptees pose similar risks to would-be religious exemptees in a COVID-19 vaccine mandate (Resp. 26), but they ignore the cases discussed above finding otherwise. *See Thoms*, 2021 WL 6172538; *Dahl*, 15 F.4th 728; *U.S. Navy Seals 1-26 et al.*, No. 4:21-cv-01236, Slip Op. at 20. They also ignore that at least five Justices of the Supreme Court have expressly found otherwise or are at least open to applying the Court's Free Exercise jurisprudence to COVID vaccine mandates, as also discussed earlier. *See Does 1-3*, 142 S. Ct. at 18 (2021) (Barrett, J., concurring); *see also id.*, S. Ct. at 20 (Gorsuch, J., dissenting) ("Maine does not suggest that a worker who is unvaccinated for medical reasons is less likely to spread or contract the virus than someone who is unvaccinated for religious reasons."); *see also Hochul*, 142 S. Ct. 552, 556 (2021) (Gorsuch, J., dissenting) ("[A]llowing a healthcare worker to remain unvaccinated undermines the State's asserted public health goals equally whether that worker happens to remain unvaccinated for religious reasons or medical ones.").

Defendants argue that medical exceptions are necessary to protect those who are medically contraindicated to the vaccine (Resp. 27)—but if unvaccination were truly a mortal threat, Defendants would have immediately fired or expelled the unvaccinated *12 months ago*, in January 2021, after vaccinations became widely available for those in the healthcare context. Defendants say they need these workers, in order to ensure their facilities are sufficiently staffed (Resp. 28)—but that *same* logic applies to Plaintiffs, who are just as capable of filling staffing needs and whose only distinguishing characteristic is their *religious* inability to get the vaccine. Defendants say medical contraindications "are more likely to be temporary" (*id.*), but the declaration they provided acknowledges many medical contraindications are *permanent*. (Defs. Ex. I, ¶8.) Finally, Defendants argue they received a far greater number of requests for religious

exemptions than medical (Defs. Resp. 28), but at most that would justify a *quota* of religious exemptions equal to medical exemptions, not a blanket prohibition on all religious exemptions. And regardless, "rights belong to individuals[,] [a]nd the relevant question here involves a one-to-one comparison between the individual seeking a religious exemption and one benefiting from a secular exemption." *Hochul*, 142 S. Ct. at 556 (2021) (Gorsuch, J., dissenting); *see also U.S. Navy Seals 1-26 et al.*, No. 4:21-cv-01236, Slip Op. at 22 ("No matter how small the number of secular exemptions by comparison, *any* favorable treatment" triggers strict scrutiny).

Of course, notwithstanding Defendants' all-out defense of medical exemptions in clinical settings, Defendants claim they have now taken the radical step of *revoking* medical exceptions in clinical settings (Resp. 29-30)—conceding by their drastic actions Plaintiffs' point that medical and religious exemptions are entirely comparable. Indeed, as discussed above, this last-minute revocation was simply a failed attempt to moot Plaintiffs' general applicability argument, based on Defendants' prior grant of such medical exemptions. Defendants' willingness to grant medical but not religious exemptions in clinical settings under the September 24 Policy continues to trigger strict scrutiny.

Additionally, Defendants have granted at least four additional categories of exemptions that also trigger strict scrutiny. First, Defendants have no rule prohibiting unvaccinated *patients* from being treated by members of the Anschutz community, and they acknowledge that "fully 84% of those who are hospitalized due to COVID-19 are unvaccinated." (Resp. 6.) These patients are just as capable as Plaintiffs of infecting *other* immunocompromised patients or staff—thus undermining the precise interest used to justify denying exemptions to Plaintiffs.[7]

---

[7] Colin Woodard, "Unvaccinated patients and employees driving COVID outbreaks in Maine hospitals," Portland Press Herald, Oct. 21, 2021, https://www.pressherald.com/2021/10/21/unvaccinated-patients-and-staff-still-driving-hospital-outbreaks/.

Second, Defendants are allowing vaccinated Anschutz staff and students to continue working at affiliated sites with their own exemption policies, and which sites are *actually granting* both religious and medical exemptions to their own staff.[8] These sites include, but are not limited to, UC Health University of Colorado Hospital, Children's Hospital Colorado, Rocky Mountain VA Medical Center, Denver Health Medical Center, and National Jewish Health. (Defs. Ex. E, ¶3.) UC Health alone has "granted 1,100 medical or religious exemptions."[9] As well, Colorado Mental Health Institute at Pueblo has granted an exemption to Jane Doe 11's own husband, but Defendants are denying Jane Doe 11 an exemption to work at the same Institute— though she could return in a heartbeat if she submitted to vaccination. (Jane Doe 11 Decl. ¶¶2-6.) Even more absurdly, the VA Medical Center has granted an exemption to Jane Doe 3 in her capacity as *a staff member there*, but Defendants are denying her an exemption to work at that same site in her capacity as *an Anschutz faculty member*. (Jane Doe 3 Decl. ¶¶6-9.) In other words, the Amended Policy's real-world application directly undermines Defendants' asserted interest in ensuring that *no members of the Anschutz community* work in the presence of unvaccinated healthcare staff—the interest used to justify Plaintiffs' terminations and expulsions. (*See, e.g.*, Resp. 9 ("[F]or the University's purposes, an undue hardship is occasioned when an unvaccinated employee's duties would require in-person work, <u>since unvaccinated individuals threaten the health and safety of the University's patients, and other employees, students, and community.</u>") Thus, allowing vaccinated employees and students to be around unvaccinated

---

[8] David Gartenberg and Laura Spector, "Colorado's Vaccine Mandate for Healthcare Providers Remains in Effect Despite Stays to CMS Vaccine Mandate," Littler, Dec. 15, 2021 (noting that State Board of Health initially allowed healthcare facilities to obtain a waiver from 100% vaccination requirement in order to grant religious exemptions, but that "religious exemptions now count toward the 100% vaccination requirement" and the previous rule has been stricken).
[9] John Daley, "Colorado's vaccine mandate did drive a lot of health care and government workers to get the shot – some more than others, though," CPR News, Nov. 1, 2021, https://www.cpr.org/2021/11/01/colorado-covid-vaccine-mandate-health-care-government-workers/.

healthcare staff exempted at affiliate sites is plainly a de facto exemption that triggers strict scrutiny.

Additionally, it is widely acknowledged that immunocompromised individuals may not respond well to COVID-19 vaccination, including some who respond not at all.[10] (Jane Doe 3 Decl. ¶19, bullet point five.) But the Amended Policy does not prohibit such individuals from continuing to work in clinical settings as part of the Anschutz community, even if they have not developed any immunity from the normal COVID-19 vaccination cocktail. Once again, these individuals pose no less risk of contracting or spreading COVID than Plaintiffs, and thus this exemption, too, triggers strict scrutiny.

All told, Defendants' categorical exemptions for medical contraindications, patients, employees and students working among unvaccinated staff at affiliated sites, and immunocompromised employees and students, all undermine Defendants' asserted interest used to fire or expel Plaintiffs. Thus, because Defendants' "treat *any* [of these] comparable secular activit[ies] more favorabl[y] than religious exercise," *Tandon*, 141 S. Ct. at 1296, the September 24 Policy is not generally applicable and must undergo strict scrutiny.[11]

### 3. The Denials Remain Blatantly Pretextual.

Defendants argue Plaintiffs' denials under the September 24 Policy were not pretextual, even in the light of *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1293 (10th Cir. 2004). (Resp. 30-

---

[10] CDC, "COVID-19 Vaccines for Moderately or Severely Immunocompromised People," Dec. 14, 2021 (noting this includes those who have been "receiving active cancer treatment for tumors or cancers of the blood"), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html; *see also* Simon D et al., "SARS-CoV-2 vaccination responses in untreated, conventionally treated and anticytokine-treated patients with immune-mediated inflammatory diseases," *Annals of the Rheumatic Diseases* 2021; 80:1312-1316, *https://ard.bmj.com/content/80/10/1312*.

[11] Defendants' bar to religious exemptions also must undergo strict scrutiny because, contrary to Defendants' protestations, their policies nonetheless "invite[] an individualized assessment of the reasons why a servicemember is not vaccinated," and thus authorize individualized exemptions that must give equal solicitude for religious objections to vaccination. *U.S. Navy Seals 1-26 et al., v. Biden et al.*, No. 4:21-cv-01236, Slip. Op. at 21 (N.D. Tex. Jan. 3, 2022).

31.) Defendants refuse to grapple squarely with the fact that the September 1 Policy was not neutral with respect to religion, instead arguing there is no religious-nature discrimination "*because* the Initial [September 1] Policy has since been superseded by the Amended [September 24] Policy, which eliminated the qualification language upon which Plaintiffs' pretext argument relies." (Resp. at 31 (emphasis added); *cf.* ECF No. 15, Defs.' Br. in Opp. to First TRO/PI Motion at 15-16 (arguing the September 1 "does not distinguish between various religious beliefs or denominations" and "employs" *the same* "two-step process" as the September 24 Policy).) But Defendants' prior sin, and their continued efforts to cover it up, evinces pretext here.

Defendants say *Axson-Flynn* is inapposite since there the "defendants were motivated by anti-Mormon sentiment," whereas here the University has "articulated legitimate, non-religious reasons" for its policy. (Resp. 31.) But looking underneath benign articulations of official policies is the *very point* of pretext analysis, and here Defendants fail to grasp that it was anti-Mormon *statements* by relevant officials in *Axson-Flynn* that revealed anti-Mormon sentiment, notwithstanding any benign *official* policies that did not expressly discriminate because of religion. *Axson-Flynn*, 356 F.3d at 1292-93. So too here, since the September 1 Policy expressly rejected religious exemption requests based on the nature of applicants' religious beliefs, and it was enforced accordingly. (See, e.g., V. Am. Cmplt. ¶¶131, 169.) *See Kane*, 19 F.4th at168. That explicitly discriminatory policy, and the discriminatory statements made by key officials in enforcing it, places this case on all fours with *Axson-Flynn*.

Defendants say the fact they have now exempted already *remote* workers is evidence of non-discrimination. (Resp. at 31.) But none of these exemptions have been extended to students, who remain just as categorically ineligible now as under the old policy *no matter their*

*circumstances.* (See *supra.*) And the fact Defendants have engaged in a last-minute search-and-destroy effort against *medical* exemptees in clinic settings, without any evidence these once-hailed "heroes of the front lines" have caused any harm—all in an effort to rebut Plaintiffs' legal position that medical exemptees were otherwise being treated "less harshly"—only further demonstrates Plaintiffs' discriminatory motives.

Moreover, Defendants argue that anyone who poses "[e]ven a *de minimis* cost to the University" can be deemed an "undue hardship" under Title VII. (Resp. 32.) That is simply wrong. The Supreme Court and 10th Circuit precedent is clear that a person must be *more* than a de minimis cost before they can be deemed an "undue hardship." *See Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994) ("To require an employer 'to bear *more than* a *de minimis* cost in order to [accommodate an employee's religious beliefs] is an undue hardship.'" (first emphasis added) (quoting *TWA v. Hardison*, 432 U.S. 63, 84 (1977))). The fact Defendants are firing individuals for being even a *de minimis* burden is a violation of clearly applicable law, and it precisely does *not* "demonstrate[] a legitimate, nondiscriminatory, and nonpretextual reason for their inability to accommodate Plaintiffs' religious exemptions." (Resp. 32.) This only further confirms that the fiasco which was the September 1 Policy continues to infect Defendants' decision making, rendering it quintessentially pretextual.

### D. Strict Scrutiny Still Eviscerates Defendants' Policies.

The strict scrutiny test courts must "apply once a law fails to meet the *Smith* requirements is not watered down, but really means what it says." *Lukumi*, 508 U.S. at 546 (cleaned up). Defendants do not come close to meeting that test.

Defendants say courts should generally defer to public health officials and shouldn't "second-guess" the wisdom of state public health measures during a pandemic, relying on

*Jacobson v. Massachusetts*, 197 U.S. 11, 28 (1905). (Resp. n. 30.) But the Supreme Court conspicuously avoided any mention of *Jacobson* in recently striking down various COVID-19 restrictions on religious exercise. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021). And it has explicitly condemned mere bureaucratic "assert[ions] that certain [COVID] risk factors are always present" in certain religious activities, "or always absent from the other secular activities the government may allow." *Tandon*, 141 S. Ct. at 1296 (internal quotations omitted). Thus, reflexive "*Jacobson* deference" and mere bureaucratic assertions about the dangers of religious exemptions to COVID-related mandates no longer suffice.

Defendants say their policy "limits in-person contact to vaccinated individuals because employees and students have a greater risk of contracting COVID-19 if they interact with unvaccinated patients, coworkers, and classmates." (Resp. 33.) This is false as a matter of fact, see *infra*, but even so, Defendants do not require patients to be vaccinated (and they do not segregate vaccinated and unvaccinated patients), and they allow employees and students to interact with unvaccinated healthcare staff at other facilities with their own exemption policies. Defendants also do not hire only those employees, or enroll only those students, who limit their off-campus interactions to only vaccinated family, friends, or members of the public. Yet "a law cannot be regarded as protecting an interest of the 'highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547; *see also Dahl*, 15 F.4th 728, 735 (6th Cir. 2021).

Defendants point to *Brooklyn Diocese*'s dicta that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," (Resp. 34) without acknowledging the Supreme Court's later clarification, in a case involving full merits review on the regular (as opposed to the so-

called "shadow") docket, that "[r]ather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). Here Defendants merely rely on general assertions about vaccine efficacy, without explaining how granting even *some* in-person religious exemptions would undermine their interest, particularly where they require the kind of PPE their own evidence admits "has been quite effective in preventing the spread" of COVID. (Defs.' Ex. D, ¶7.) This is particularly true where the campus vaccination rate already eclipsed 99%. (Jane Doe 3 Decl. ¶14.)

Moreover, Defendants' claim flies in the face of the best current science, which holds vaccines to be fleetingly effective against the now-dominant Omicron COVID variant—*a fact that Defendants' own expert concedes*. (*See* French Decl. ¶¶ 13-23.) In particular, it appears the vaccine effectiveness rate against transmission is as low as 0% to 20% against Omicron, (*id.* ¶19), and according to Defendants' own expert, its effectiveness against Omicron "*drops off* about 10 weeks after a *third* dose of the mRNA vaccine" (*id.* ¶23) (emphasis added). In fact, in some comparable locations, COVID case rates are now *higher among the vaccinated than the unvaccinated* (*id.* 20).

Defendants' claim that vaccines "provide the safest and most effective means" to reducing the spread, and masks and other alternatives "are less effective" (Resp. 35) is thus unsupported. But even if true, that argument tumbles squarely into the Supreme-Court declared pitfall that "government does not have a compelling interest in each marginal percentage point by which its goals are advanced," *Brown v. Ent. Merchants Ass'n*, 564 U.S .786, 803 n.9 (2011), particularly where, as here, Defendants have acknowledged that alternative means of reaching its goal are "quite effective."

Most glaringly, however, Defendants still make no attempt to "show[] that it considered different methods that *other* jurisdictions have found effective" and deemed them wanting. *McCullen v. Coakley*, 573 U.S. 465, 494 (2014) (emphasis added). Defendants completely fail to address Plaintiffs' McHale Declaration, explaining that the comparable University of Nebraska Medical Center in Omaha, Nebraska, granted nearly 200 religious exemptions to its students and staff and has shown no signs of COVID-related distress. (ECF No. 27, Br. at 17.)

What's more, Plaintiffs are aware of no other healthcare setting *in the entire country*— and Defendants point to none—that have gone so far as to eliminate *medical* exceptions in clinical settings, even in the oft-hard-hit State of New York. *See, e.g.*, *Hochul*, 17 F. 4th at 272. That makes Defendants' policy a one-of-a-kind "much tighter" regulation "than those adopted by many other jurisdictions hard-hit by the pandemic" and thus one that easily fails the narrow tailoring test. *Brooklyn Diocese*, 141 S. Ct. at 67.

Thus, when applying the proper compelling-interest and narrow-tailoring tests, Defendants do not come close to satisfying strict scrutiny.

## II. Remaining Factors.

Defendants do nothing to alter the conclusion that Plaintiffs easily satisfy the remaining factors entitling them to a preliminary injunction.

First, Defendants imply the Tenth Circuit has recently overruled the Supreme Court's holding that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374 (1976). (Resp. 36.) In reality, the Tenth Circuit expressly recognizes *Elrod*'s enduring authority and thus that "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). Here,

Plaintiffs' likelihood of success on the merits means they have also suffered, and continue to suffer, blatant irreparable harm.

Defendants also say Plaintiffs can simply obtain economic damages for any harm accruing from loss of employment, or from any "academic hiatus." (Resp. 36.) But although the employee Plaintiffs can seek lost wages, "it is not clear at all who would pay them," as "[a]bsent a waiver, . . . sovereign immunity would likely prevent Plaintiffs from obtaining money damages from the State." *Hochul*, 17 F.4th at 295. To be sure, Plaintiffs will continue pursuing damages against Defendants in their individual capacities, including for their now admitted blatant violations of religious neutrality under the September 1 Policy, but Defendants' official-capacity sovereign immunity render Plaintiffs' loss-of-employment and -academic status manifestly irreparable in this case.

Defendants argue that any alleged reputational harm is speculative (Resp. 37), despite Plaintiffs' direct evidence that those who oppose vaccination have been called "ignorant trash and don't deserve to live" and need to be "[g]un[ned] [] down while they're all in one place and let God sort it out." (ECF No. 28, Br. at 4.) Further, it is no speculation to say that outing themselves as unvaccinated places these Plaintiffs at an immediate disadvantage in obtaining a job in other healthcare settings that seek to avoid the trouble of considering a religious accommodation request.[12] This is akin to the kind "business reputation[al]" injury that indeed arises to a "cognizable irreparable harm," *See Dalkita, Inc. v. Distilling Craft, LLC*, 356 F.Supp.3d 1125 (D. Colo. 2018), and cannot be remedied by mere damages.

As to the public interest and balance harms, Defendants say it's "hard to imagine a case where" these factors tip more favorably to the government than here (Resp. 38), but in reality, the exact opposite is true. Defendants claim vaccines are the "most effective way" to stop the

---

[12] *See supra*, n. 3 and accompanying text.

"devastation," but their own evidence admits PPE is "quite effective." (Defs.' Ex. D, ¶7.) And over the course of the entire pandemic, there have been only three small COVID outbreaks within the Anschutz community, and none since *December 2020*, and none that involved *any* spread from providers to patients. (Jane Doe 3 Decl. ¶11.) Moreover, there have been *no reports of any spread at all from provider to patients*, whatsoever, at Anschutz throughout the pandemic. (*Id.*) Therefore, to imply that potential accommodations for less than one-half of one-percent of the entire Anschutz community, (*id.*) essentially poses the greatest imaginable threat to the public interest, is, to put it mildly, entirely overwrought.

Defendants say that "the evidence shows" vaccination provides more robust protection than natural immunity anti-bodies (Resp. 38), but they point only to a single assertion in a single declaration that cites no scientific evidence at all in support, (Defs.' Ex. A, ¶57), in direct violation of the Supreme Court's recent teaching against data-less bureaucratic assertions. *Tandon*, 141 S. Ct. at 1296.

Defendants also say vaccines "reduce the potential for hospitalization" and thus provide "needed relief for fatigued hospital staff" (Resp. 38)—but that argument contemplates a vaccine mandate for *patients*, not Anschutz employees and students. And Defendants themselves are only exacerbating any fatigue problem by *firing or expelling* any clinical employee or student who has a medical or religious inability to obtain the vaccine, even though Defendants acknowledge PPE is "quite effective" and these same employees and individuals worked heroically on the front lines throughout the pandemic without spreading COVID to any patient whatsoever. Thus Defendants cannot realistically cite a need to "safeguard patients" as justification for exiling Plaintiffs—particularly when that exile is the very thing likely to cause maximal patient harm by way of reduced healthcare staffing and increased fatigue among those who remain.

And finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). As such, this factor, as merged with the balance-of-harm factor where the defendant is the State, *Nken v. Holder*, 556 U.S. 418, 435 (2009), cuts decidedly in favor a preliminary injunction for Plaintiffs.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Renewed Motion for a Preliminary Injunction.

Respectfully submitted,

/s/ Peter Breen
Peter Breen
Martin Whittaker
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/ Michael G. McHale
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiff*