**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLORADO**

JANE DOES 1 through 11, and JOHN DOES 1,
and 3 through 7,

   Plaintiffs,

  v.

BOARD OF REGENTS of the UNIVERSITY
OF COLORADO, *et al.*,

  Defendants.

No. 21-CV-2637-RM-NYW

The Hon. Raymond P. Moore
U.S. District Judge

The Hon. Nina Y. Wang
U.S. Magistrate Judge

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

As Chief Justice Roberts stated this past December: "The most basic violation of the First

Amendment religion clauses is for the government to draw distinctions between religions based

on their doctrine."[1] The University of Colorado Anschutz School of Medicine and its responsible

agents ("Defendants") did exactly that in their September 1 COVID-19 vaccine mandate,

categorically forbidding religious exemptions for anyone who belongs to a religion whose

"*teachings*" are not "opposed to *all immunizations*" ("September 1 Policy") (emphasis added).

(V. Am. Cmplt., Ex. 1, p. 105 of 240.) Although the September 1 Policy was *eventually* replaced

by the "September 24 Policy," which Defendants *eventually* purported to apply to most (but not

all) of the employee Plaintiffs in this case, Defendants now move to dismiss *all* Plaintiffs' claims

entirely. (ECF No. 76.) Defendants' Motion should be rejected.

Most tellingly, Defendants completely ignore Plaintiffs' inherently non-moot First

Amendment claims *for damages* against the Defendants sued in their personal capacities for their

---

[1] Oral Argument Transcript, *Carson v. Makin*, No. 20-1088, Dec. 8, 2021, p. 58:13-17 (cleaned),
https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-1088_7kh7.pdf.

actions *specifically applying the September 1 Policy*, before the September 24 Policy existed. As discussed more below, those actions were quintessentially "clearly established" violations of the Religion Clauses.[2] Defendants rightly do not even attempt to argue otherwise.

None of Plaintiffs' remaining claims should be dismissed, either, whether for a supposed lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), or for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

Plaintiffs embrace a variety of faith traditions, and each of them has a sincere religious objection to the currently available COVID vaccines. (V. Amend. Cmplt. ¶¶3, 16-32, 68-177.)

Jane Does 1 through 11 are nine employees of the University (including three physicians), a fourth-year student in the Anschutz School of Dental Medicine, and a student in a dual degree bachelor's and master's program in public health. (Id. ¶13.) John Does 1 and 3 through 7 are four employees and three students at Anschutz (including one M.D. candidate in the medical school and one master's anesthesiology student). (Id. ¶14.) All have been required to submit to mandatory COVID-19 vaccination or else lose their jobs or enrollment at Anschutz. (*Id.*) All have suffered tangible damages and ongoing irreparable harm from Defendants' transparently botched denials of their requests for religious exemptions.

### A.    The "September 1 Policy."

On and around August 26, 2021, most of these Plaintiffs received a terse, mass-produced form email from an anonymous "Vaccine Verify team" stating that their religious exemption requests had been denied because "campus policy" "only recognizes religious exemptions based on religious beliefs whose *teachings* are opposed to *all* immunizations." (V. Am. Cmplt. ¶¶71,

---

[2] This fact makes Defendants' new assertion that they promulgated the September 1 Policy only "[a]fter significant research and consultation" (Mot. 3) difficult to take seriously.

90, 96, 100, 108, 114, 117, 154, 164, 175.) That policy was memorialized in an Anschutz "Campus Administrative Policy" requiring COVID-19 vaccination by September 1, 2021 ("September 1 Policy"). (Emphasis added.) The Policy, which was expressly "[a]pproved by" Chancellor Elliman, stated that a "religious exemption may be submitted based on a person's religious belief whose teachings are opposed to all immunizations." (V. Am. Cmplt. Ex. 1, pdf pp. 103, 105 of 240.)[3] In contrast, "medical exemptions" were possible "if vaccination is medically contraindicated due to other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health," as attested to by a physician, advanced practice nurse, or physician assistant. (Id., Ex. 1, pp. 105-106 of 240.)

Defendants shamelessly applied the September 1 Policy to all 17 Plaintiffs (and many others). (V. Am. Cmplt. 55.) For example, John Doe 1 was told via email that his exemption request must "cite to the official doctrine of an organized religion, in this case, Buddhism, as announced by the leaders of that religion." (Id., ¶136.) This email was signed by Defendant Shanta Zimmer, Senior Associate Dean of Medical Education at Anschutz. Later, Zimmer emailed "Student A" a letter denying his religious exemption request because, despite his asserted Catholic beliefs opposing COVID vaccination, Defendants' interpretation of Catholic teaching determined that Catholics cannot object to COVID vaccination. (Id., Ex. 16, pp. 144-45 of 240.) After a demand letter from Student A's counsel to the University, Defendants granted a medical exemption to Student A (which he was also seeking) while sidestepping his request for religious exemption. (Id., Exs. 17 and 18, pp. 146-54 of 240.)

---

[3] In ruling on a Rule 12(b)(6) motion, courts "will consider documents incorporated by reference in the complaint and documents referred to in and central to the complaint, when no party disputes their authenticity." *Goodwill Indus. of Cent. Oklahoma, Inc. v. Philadelphia Indem. Ins. Co.*, 21 F.4th 704, 709 (10th Cir. 2021) (cleaned up).

On September 14, 2021, counsel for Dr. Jane Doe 1 emailed Defendants a demand letter explaining the blatant constitutional flaws of the September 1 Policy. (Id., ¶78.) Two days later, September 16, 2021, the University began adding summary language to denials of then-pending or new exemption requests by citing alleged "undue hardship" grounds (including for some of the Plaintiffs here; *see* id. ¶¶78, 83, 114, 169), *despite* simultaneously responding to Dr. Jane Doe 1's demand letter on September 20, 2021 that "[t]here has been no First Amendment violation" committed by the September 1 Policy. (V. Am. Cmplt. Ex. 5, pp. 116-19 of 240.) Each Plaintiff's request for religious exemption was denied under the September 1 Policy. (Id. ¶55.)

**B.      The "September 24 Policy."**

On September 24, 2021, without notice to Plaintiffs or the public, Defendants amended the September 1 Policy to alter its exemption terms. (V. Am. Cmplt. ¶5, and Ex. 28, p. 240 of 240.) Defendants replaced the September 1 Policy's religious exemption provision with one purporting to track Title VII of the Civil Rights Act of 1964, stating: "Individuals may receive a medical or religious accommodation if they are unable to receive the vaccine for medical reasons or sincerely held religious beliefs," unless (for a medical accommodation) it would pose "an undue hardship" or "a direct threat to the health and safety of the Individual or others," or (for a religious accommodation) it "would unduly burden the health and safety of other Individuals, patients, or the campus community."(Id. pp. 237-38.) *See* 42 U.S.C. § 2000e(j). At the same time, the September 24 policy established a categorical bar against religious-objecting students, stating: "Religious accommodations are not currently available to students or applicants." (Id., pp. 238 of 240.) Tellingly, Defendants did not notify any Plaintiff (or Plaintiffs' counsel, for that matter) of this new Policy, or otherwise indicate any intent to reconsider their exemption requests thereunder. (Id. ¶5.)

On October 12, 2021, Defendants submitted their opposition brief to Plaintiffs' original preliminary injunction motion, *continuing to argue the September 1 Policy was constitutional*. (ECF No. 15, Br. at 16.)[4] After Plaintiffs filed a *renewed* Motion for Preliminary Injunction (discussed below) to account for the September 24 Policy, Defendants secured an extended response date of December 10. (ECF 42.) On December 9, Defendants sent the currently employed staff Plaintiffs purported "reconsiderations"—and continued denials—of their religious exemption requests under the September 24 Policy. (ECF 56 at 10-18.) Six employee Plaintiffs were also *removed* from the scope of the Policy and allowed to work remotely.[5] (Id. at 10.) Then, on December 10, Defendants claimed in their Response they had allegedly revoked all previously granted medical exceptions for those in clinical settings, calling these exemptions a "mistake" that had now been "remedied." (Id. at 8, 28-29.)

This timeline reveals Defendants' actions here as part of a sustained, unapologetic effort to eliminate all religious objectors to COVID vaccination from the Anschutz community, based on a presumptively unconstitutional distrust of their stated religious objections to COVID vaccination. And even if Defendants are not still violating religious neutrality (which they are), the September 24 Policy is riddled with exceptions while failing to provide Plaintiffs with equal

---

[4] In Rule 12(b)(6) dismissal actions, this Court can take judicial notice of matters outside the complaint without converting the motion to dismiss into a motion for summary judgment, including notice "of its own files and records, as well as facts which are a matter of public record," as long as they are considered only for their contents and not the truth of the matter asserted therein. *Lorusso v. Boulder Brands, Inc.*, No. 15-cv-01043, 2017 L 4334070, at *1 (D. Colo. Feb. 27, 2017). Plaintiffs respectfully request that this Court take judicial notice of such matters as cited herein. Indeed, the voluminous factual record in the preliminary injunction proceedings bears on the outcome of this proceeding, particularly given Defendants' post-Amended Complaint actions purporting to apply the September 24 Policy.

[5] Defendants say these six Plaintiffs were granted "accommodations" because they can work remotely, but the September 24 Policy applies only to those who "currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program, or whose . . . activities may require in-person interaction with other CU Anschutz" individuals. (V. Am. Cmplt. Ex. 28, pp. 235 of 240.)

treatment. These actions cannot satisfy *either* strict *or* rational-basis scrutiny, and thus Plaintiffs have stated valid religious discrimination claims under both the First Amendment and the Colorado Constitution. Plaintiffs have also stated valid claims under the Americans with Disabilities Act, for the reasons discussed below.

### C.     Procedural History.

On September 29, 2021, Plaintiffs Jane Doe 1 and John Doe 1 filed the original Verified Complaint, along with a Motion for a Temporary Restraining Order and Preliminary Injunction, challenging the September 1 Policy's discriminatory religious-exemption provision as an obvious violation of the Free Exercise and Establishment Clauses of the First Amendment. (ECF 1 and 2.) On October 25, 2021, this Court denied their request for preliminary injunction as moot based on a lack of evidence the September 1 Policy might be reinstated. (ECF 21.) Plaintiffs timely filed their Notice of Appeal. (ECF 43, No. 21-1414.)

On November 2, 2021, the original two Plaintiffs and sixteen new Plaintiffs filed a Renewed Motion for a Temporary Restraining Order and Preliminary Injunction, based on a Verified Amended Complaint filed on November 4, 2021, seeking an injunction also specifically against the September 24 Policy. (ECF 27 and 30.) This Court denied Plaintiffs' Motion on January 27, 2022, (ECF 65), from which Plaintiffs timely appealed (ECF 66, No. 22-1027). Defendants now seek to dismiss all of Plaintiffs' claims entirely.

### ARGUMENT

Plaintiffs agree with Defendants' recitation of the legal standard for Rule 12(b)(1) and 12(b)(6) motions (*see* Mot. 7-8), but add that dismissals under Rule 12(b)(6) are not appropriate where Plaintiffs have pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs have done so abundantly here.

I.      **None of Plaintiffs' claims are moot.**

"The burden of demonstrating mootness is a heavy one." *Rezaq v. Nalley*, 677 F.3d 1001,

1008 (10th Cir. 2012). And it is "[t]he party arguing in favor of mootness" who "bears the

burden to show the case is moot." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868,

878 (10th Cir. 2019).

Further, "[i]n assessing mootness, we consider whether a favorable judicial decision

would have some effect in the real world." *Equal Emp. Opportunity Comm'n v. CollegeAmerica*

*Denver, Inc.*, 869 F.3d 1171, 1173 (10th Cir. 2017). Critically, while "[p]ast exposure to illegal

conduct does not in itself [establish] a present case or controversy regarding injunctive relief," a

"case is not moot if the [government] made decisions under the old policies that have ongoing,

long-term consequences for the plaintiffs that could be mitigated by an award of prospective

relief." *Rezaq*, 677 F.3d at 1008. Here, none of Plaintiffs' claims are moot.

A.  **Jane Does 4 and 6; John Does 3, 4, 5, and 7**: Defendants say these six Plaintiffs'

claims are moot because they have all been "accommodated" under the September 24 Policy by

being allowed to work 100% remotely or in isolation. (Mot. 9.) But that argument is in the

analytical framework of Title VII of the 1964 Civil Rights Act, which guarantees a reasonable

"accommodation" that the employer feels does not impose an undue hardship (consistent with

the terms of the September 24 Policy). *See* 42 U.S.C. § 2000e(j). But these Plaintiffs have *not* yet

filed such claims in this case, and are now pursuing their *First Amendment* rights, including to

*equal* treatment with secular exemptees. (V. Am. Cmplt. ¶¶212-229.) Thus, all six are seeking

restoration to their *pre*-September 1 status quos, having specifically complained that "fully

remote" work "does not allow . . . vital skill-development . . . necessary to perform [their] work."

(*See, e.g.*, V. Am. Cmplt. ¶¶155-56, 165-66, 176-77.) The injunction they seek would therefore have "some effect in the real world," and thus their claims are not moot.[6]

B. **Jane Doe 2 and John Doe 6**: Defendants argue these two Plaintiffs' claims are moot because they are allegedly "no longer subject to" the Anshutz vaccination policies, since "they are not presently employed by or enrolled at the Anschutz Medical Campus." (Mot. 10.) But both of these Plaintiffs separated from the University *as a direct result* of Defendants' vaccination policies, and they now seek restoration to the status quo. (V. Am. Cmplt. ¶¶17, 24, 114, 170.) It beggars belief to think their *forced* separation from the University pursuant to the very Policies they challenge in this lawsuit somehow negates their claims against those Policies. Indeed, Defendants' logic here would extend to *any* other Plaintiff who has been forcibly separated from the University under the September 1 and September 24 Policies—including Jane Does 1 and 11 who were forcibly terminated on January 31, 2022, after this Court's order denying Plaintiffs' Renewed Motion for Preliminary Injunction. (*Does 1-11 v. Bd. of Regents*, Case Nos. 22-1027 & 21-1414, Docs. 010110644452 and 010110644453, Exs. 3 and 4 to Appellants' Mot. for Inj. Pending Appeal, filed Feb. 11, 2022.)[7] But tellingly, Defendants do not argue Jane Does 1 and 11's claims are also thereby moot, and no such argument can be made with respect to Jane Doe 2 and John Doe 6, either.

C. **Claims for Equitable Relief Against the September 1 Policy**: Defendants argue Plaintiffs' equitable-relief challenges to the September 1 Policy and its application are moot because it was replaced by the September 24 Policy. (Mot. 11.) But the Tenth Circuit recognizes

---

[6] Defendants also say Jane Doe 7's claims are moot because she received the vaccine, but Defendants have not met their burden of showing it "is absolutely clear the allegedly wrongful behavior," e.g., a booster requirement, "could not reasonably be expected to recur." *Brown v. Buhlman*, 822 F.3d 1151, 1166 (10th Cir. 2016).

[7] As Defendants note, this Court has "wide discretion" to consider additional materials outside the Complaint to determine its subject matter jurisdiction under Rule 12(b)(1). (Mot. 3.)

the obvious principle that simply replacing a prior unconstitutional policy does not necessarily moot a challenge to that policy. Specifically, "even though the new policy *may* provide adequate process, the case is not moot if the [University] made decisions under the old policy that have ongoing, long-term consequences for the plaintiffs that could be mitigated by an award of prospective relief." *Rezaq*, 677 F.3d at 1009 (cleaned up). Here, the September 24th amendment did not "completely and irrevocably eradicate the effects of the [earlier] violation because [Plaintiffs] have never been returned to their pre-[September 1 Policy] placements." *Id.* at 1009.

Additionally, "prospective relief remains available" because "the plaintiffs have a liberty interest in avoiding [termination] without [religious discrimination] *and* their [purported re-evaluations/disqualifications] were constitutionally deficient." *Id.* Here, Plaintiffs are entitled to additional "process," as it were, by showing that the University's "undue hardship" findings, ban on student religious exemptions, and supposed "accommodations" for six of these Plaintiffs under the September 24 Policy likewise do not pass constitutional muster—particularly given the secular exemptions allowed by Defendants described below. This ongoing claim for prospective relief, coupled with the lingering unconstitutional effects of the September 1 Policy, means that Plaintiffs' challenges to the September 1 Policy are not moot.[8]

Defendants' citations to *Denver Bible* and *Kaler* are inapt. In the former, the plaintiff church had been *restored* to its status quo ante after Colorado lifted its COVID-19 religious-gathering restrictions, and under the voluntary cessation doctrine there was no reasonable probability the challenged restrictions would be reinstated. *Denver Bible Church v. Polis*, No. 20-1391, 2022 WL 200661, at *4-6 (10th Cir. Jan. 24, 2022). Similarly, in the latter, the

---

[8] This is *especially* true for Jane Does 2 and 9, who were forced out of the University solely under the September 1 Policy, were not "re-evaluated" under the September 24 Policy, and are seeking an injunction restoring them to the status quo. (V. Am. Cmplt. ¶¶17, 114; ECF 56 at 8.)

University of Minnesota *abrogated and replaced* a challenged policy governing "major events" going forward, and Plaintiffs did not claim the old policy had any lingering present-day effects. *See Young Am.'s Found. v. Kaler*, 14 F.4th 879, 886-87 (8th Cir. 2021).

Here, Plaintiffs have *not* been returned to the status quo ante, and they claim the September 1 Policy is *still* causing present-day irreparable harm. Thus their claims are not moot.

## II.   Eleventh Amendment.

Defendants argue that Eleventh Amendment immunity applies to Plaintiffs' claims against the following Defendants: the Board of Regents; the Defendants allegedly sued in their official capacity for damages; and President Saliman under *Ex Parte Young*. Defendants are mostly wrong. Additionally, Defendants say nothing about the putatively anonymous members of the "Vaccine Verify" team, whom Plaintiffs have also sued (V. Am. Cmplt. ¶38), though these members are similarly situated to the four identified individual-capacity Defendants.

First, Plaintiffs concede the Board of Regents, as such, is generally immune under the Eleventh Amendment from Plaintiffs' First Amendment claims. However, the Supreme Court has held that Title II of the ADA (creating liability for *public entities*) validly abrogates state sovereign immunity from actions for damages against states. *U.S. v. Georgia*, 546 U.S. 151 (2006). To determine whether such abrogation applies here, this Court must consider "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Guttman v. Khalsa*, 669 F.3d 1101, 1113 (10th Cir. 2012) (quoting *Georgia*, 546 U.S. at 159). Defendants have not even argued that standard preserves sovereign immunity here, and thus none of Plaintiffs' ADA claims against Defendants should be dismissed under Rule 12(b)(1).

Second, while Plaintiffs agree that the Eleventh Amendment prevents them from seeking damages against Defendants sued in their official capacities (on their First Amendment claims), Plaintiffs have not done so here. The mere fact they have sought "damages" in their Prayer for Relief at Section (C) "without distinction," as Defendants argue (Mot. 14), does not mean they're somehow seeking damages from Defendants in their *official capacities* on their First Amendment claims, given that they sued the *same* Defendants in their *personal* capacities. (V. Am. Cmplt., ¶¶36-38.) Defendants' argument here is specious.

Third, Plaintiffs' claims for equitable relief against Defendant Saliman should not be dismissed under *Ex Parte Young*, which requires "the named state official" to "have some connection with the enforcement of the challenged action." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021). To say that President Saliman has *no* "connection with the enforcement" of the challenged rule is a bridge too far. As Plaintiffs alleged, President Saliman is the President of the University who oversees *all* of its various COVID-19 vaccination policies, including the much more forgiving religious-exemption policies on the Boulder, Colorado Springs, and Denver campuses, (V. Am. Cmplt. ¶49), as well as the botched September 1 and September 24 Policies on the Anschutz campus (V. Am. Cmplt. ¶35).

Defendants say to the contrary that: Plaintiffs failed to allege "Saliman was involved" in ongoing violations of their First Amendment rights; Plaintiffs merely alleged "[h]is *office* issued, maintains, and oversees" the challenged Polices; and Plaintiffs identified him by name only once. (Mot. 13 (emphasis added).) In reality, Plaintiffs expressly refrained from suing Saliman in his personal capacity (V. Am. Cmplt. ¶35, n.1), and their allegations that "his office" enforces the Policies follows the rule that "when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold *office* while the action is pending[,] [t]he officer's

successor is automatically substituted as a party." Fed. R. Civ. P. R. 25(d) (emphasis added).

Further, a "public officer who . . . is sued in an official capacity may be designated by official

title rather than by name," R. 17(d), so Defendants' name-counting game is baseless.

The key, rather, is the official-capacity defendant's *connection with enforcement* of the

Policy, including whether "the state official [has] the power to perform the act required in order

to overcome the bar of the Eleventh Amendment." *El-Ghori v. Grimes*, 23 F. Supp. 2d 1259,

1267 (D. Kan. 1998). Here, the University President clearly has the power to stop Defendants

from enforcing the September 1 and September 24 Policies in violation of Plaintiffs'

constitutional rights. To say that President Saliman is "not 'enforcing' [the challenged Policies],

minimizes his role as President of the University," since "the buck stops with" him at the

University. *Coal to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134-35 (9th Cir. 2012)

(rejecting university president's dismissal motion under *Ex Parte Young* in a lawsuit against the

University of California's enforcement of state constitutional amendment forbidding affirmative

action). Indeed, the University President directly *appoints* the Anschutz Chancellor,[9] who in turn

expressly "[a]pproved" both the September 1 and September 24 Policies (V. Am. Cmplt. pp.

104, 235 of 240)—confirming the fallacy in saying President Saliman has *no* enforcement

connection with the challenged Policies.

**III.    Qualified Immunity and Plaintiffs' "Clearly Established" Rights.**

Defendants argue that Plaintiffs' individual-capacity claims against Defendants Elliman,

Zimmer, Mediavilla, and Holland are barred because they all supposedly have qualified

immunity.[10] "Government officials are entitled to qualified immunity from liability for civil

---

[9] https://connections.cu.edu/stories/chancellor-don-elliman-loses-interim-title.

[10] Defendants fail to argue that the putatively anonymous members of the "Vaccine Verify team" are entitled to qualified immunity, and thus have waived that argument. Regardless, the Vaccine Verify team's brazen and naïve enforcement of the embarrassingly unconstitutional September 1

damages under § 1983" only "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1137 (10th Cir. 2006). Because qualified immunity is a "two-pronged" inquiry that considers both whether Defendants violated Plaintiffs' statutory or constitutional rights, and whether those rights were "clearly established" at the time of violation, Plaintiffs analyze only the "clearly established" prong here, and consider the general-violation prong in opposing dismissal under 12(b)(6) (*see infra*). In short, Defendants plainly violated Plaintiffs' *clearly established* constitutional rights here.

To show that a right is clearly established, generally Plaintiffs "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (internal quotations omitted). Typically the right must be clearly established "in light of the specific context of the case, not as a broad, general proposition." *Id.* (internal quotations omitted). Notably, while "the unlawfulness must be apparent" "in the light of pre-existing law," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), the Supreme Court "do[es] not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### A.     Defendants' violations under the September 1 Policy.

Astonishingly (but tellingly), Defendants do not argue they are entitled to qualified immunity for their actions pursuant to the September 1 Policy, even though all Plaintiffs have brought claims for damages arising out of these actions. (Mot. 15-17); (V. Am. Cmplt. ¶¶212-240.) Even if Defendants' qualified immunity arguments for their actions under the *September 24 Policy* were true (e.g., that the government can carte blanche deny religious exemptions to

---

Policy easily arose to clearly established First Amendment violations, for the reasons discussed herein. (V. Am. Cmplt. ¶¶71, 90, 96, 100, 108, 114, 117, 154, 164, 175.)

vaccine mandates in all circumstances), it cannot seriously be disputed that the Defendants' *explicitly discriminatory mechanism* for denying religious exemptions under the September 1 Policy violates Plaintiffs' "clearly established" constitutional rights.[11]

The "clearest command of the Establishment Clause" (and a corollary requirement of the Free Exercise Clause) is the prohibition on *denominational* discrimination. *Larson v. Valente*, 456 U.S. 228, 244 (1982). "From the beginning, this nation's conception of religious liberty included, at minimum, the equal treatment of all religious faiths without discrimination or preference." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008). Indeed, the government is not permitted "to make a value judgment . . . favoring some religions over others." *Id.* at 1260; *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) ("Government fails to act neutrally when it . . . restricts practices because of their *religious nature*.").

Further, the Religion Clauses also prohibit the government "from trolling through a person's or institution's religious beliefs." *Colo. Christian Univ.*, 534 F.3d at 1261. As the Supreme Court has stated, "[i]t is not only the conclusions reached by the [government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). Indeed, such "inquiry into [students' and employees'] religious views" is "not only unnecessary but also offensive." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality); *see also Colo. Christian Univ.*, 534 F.3d at 1261 (government may not conduct "intrusive judgments regarding contested questions of religious belief or practice"); *see also id.* at 1265 ("Under the First Amendment, government is not permitted to have an ecclesiology, or to second-guess the

---

[11] This is true even if Plaintiffs' claims for equitable relief with respect to the September 1 Policy are moot (which they're not), since a "claim 'for damages saves the case from the bar of mootness.'" *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 n.17 (10th Cir. 2019) (cleaned up) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 8 (1978)).

ecclesiology espoused by our citizens."); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (government "cannot act in a manner that presupposed the illegitimacy of religious beliefs or practices").

Finally, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). Indeed, the Supreme Court has plainly "reject[ed] the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religion." *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989). Thus, "the availability of a free exercise defense cannot depend on the objective truth or verity of a person's religious beliefs." *Int'l Soc. for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 438 (2d Cir. 1981) (citing *United States v. Ballard*, 322 U.S. 78, 86 (1944), *and Thomas*, 101 S. Ct. at 1429). While officials *can* make a "*threshold* inquiry into the 'religious' aspect [of one's] particular beliefs and practices," *id.* at 439 (emphasis added), they cannot require an applicant for a religious exemption from an "immunization requirement" to "obtain a letter from the Roman Catholic diocese or her parish" under the Constitution, since "*[p]ersonal* religious beliefs, as long as they are in fact religious, are sufficient." *Farina v. Bd. of Educ. of the City of New York*, 116 F. Supp. 2d 503, 507-08 (S.D.N.Y. 2000) (emphasis added).

As the Second Circuit recently put it in enjoining a similar COVID-19 vaccine religious exemption policy in New York City: "Denying an individual a religious accommodation based on someone else's publicly express religious views—even the leader of her faith—runs afoul of the Supreme Court's teaching that 'it is not within the judicial ken to question . . . the validity of particular litigants' interpretation of those creeds.'" *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021).

Yet here, Defendants managed to violate *each one* of the foregoing blackletter principles in applying the September 1 Policy to Plaintiffs. This feat of theocratic hubris and "naïve[ty]," *see Emp. Div. Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 894 (1990) (O'Connor, J., concurring), would be comical if it weren't so demeaning (and damaging) to Plaintiffs.

Chancellor Elliman expressly "approved" the September 1 Policy, (V. Am. Cmplt. p. 103 of 240), which Defendants admit was promulgated only after "significant research and consultation." (Mot. 3.) "[T]o establish *personal* liability in a § 1983 action, it is enough to show that the state official, acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (emphasis in original) (internal quotations omitted). Here, Chancellor Elliman's personal approval of the September 1 Policy flagrantly caused such deprivations on multiple levels.

By requiring that putative religious exemptees demonstrate affiliation with a religion whose "*teachings*" oppose all vaccines, Chancellor Elliman's Policy violated the "*clearest* command" of the Religion Clauses prohibiting denominational discrimination. *Larson*, 456 U.S. at 244. Further, the September 1 Policy's requirement that religious opposition to COVID-19 vaccines be part of a religious opposition to *all* immunizations effectively "restrict[ed] practices because of their religious *nature*." *Fulton*, 141 S. Ct. at 1877. It also set in motion a process of religious "*trolling* through a person's or institution's religious beliefs," *Colo. Christian Univ.*, 534 F.3d at 1261, as seen in the experience of students like John Doe 1 (requiring that he "cite to the official doctrine of . . . Buddhism") and Student A (instructing him on what "the Vatican's doctrinal office" supposedly *really* teaches about COVID-19 vaccines). (V. Am. Cmplt. ¶136 and Ex. 16, pp. 144-45 of 240.) Thus, because Defendants "denied each and every religious exemption request presented to them" by all 17 "Plaintiffs, under and in view of the September 1

Policy's religious tests and conditions," (V. Am. Cmplt. ¶55), Chancellor Elliman blatantly violated Plaintiffs' clearly established constitutional rights.

As to Defendant Zimmer, she was a "duly empowered agent . . . in . . . enforcing" the September 1 Policy (V. Am. Cmplt. ¶51) and likewise violated each Plaintiff's clearly established constitutional rights. For example, she signed off on the email to John Doe 1 demanding that he cite to official Buddhist teaching in support of his religious exemption request (which email also admitted "the University" had begun *trolling into his Buddhist faith*), as the email concluded: "Sincerely, Deans Dwinnell *and Zimmer*." (V. Am. Cmplt., Ex. 13, p. 135 of 240 (emphasis added).) On August 30, 2021, after John Doe 1 submitted additional information clarifying his religious beliefs, Zimmer issued him a final denial letter reiterating the September 1 Policy's discriminatory terms and concluding: "The basis for your objections are . . . *not part of a comprehensive system of religious beliefs*." (Id., ¶141 (emphasis added).) Several days earlier, on August 26, she told John Doe 6 via teleconference that the only religious exemption requests that could be approved were for those who would never get any vaccines, "like Christian Scientists." (Id., ¶141.) Thus, Zimmer engaged in systematic and pervasive denominational discrimination, religious-nature discrimination, and intrusive religious trolling, all plainly in violation of Plaintiffs' clearly established constitutional rights.

Defendant Ann-Michael Holland, the Director of the Department of Anesthesiology, issued John Doe 6 a letter on August 30, 2021, denying his request for religious exemption, concluding in part that his religious belief was "not part of a comprehensive system of beliefs," and that his objection "based on [his] belief that COVID-19 vaccines were developed from human cell lines derived from abortion" "*does not constitute a religious belief*." (Id. ¶169; and id., Ex. 26, p. 231 of 240 (emphasis added).) As a result, John Doe 6 was formally dismissed

from the University. (Id., ¶170.) Holland's denominational, religious-nature, and intrusive trolling discrimination plainly violated John Doe 6's clearly established constitutional rights.

Defendant Mediavilla, Associate Dean for Student Affairs at the Anshutz Dental School, denied student Jane Doe 7's religious exemption request on September 7, 2021, emailing her a letter stating: the University only recognizes religious exemption requests that show "your religion *teaches you and all other adherents that immunizations are forbidden under all circumstances*," and that "your belief that the COVID-19 vaccines were developed from human cell lines derived from abortion" was "*not part of a comprehensive system of religious beliefs*." (Id., ¶104 (emphasis added).) Thus, Defendant Mediavilla likewise violated Jane Doe 7's clearly established constitutional rights.

Accordingly, these Defendants are not entitled to qualified immunity for damages arising out of their actions pursuant to the September 1 Policy.

### B.      Defendants' Actions Under the September 24 Policy.

The individual-capacity Defendants assert they have qualified immunity for their actions pursuant to the September 24 Policy, arguing there is no Supreme Court or Tenth Circuit case establishing that students or employees have an "absolute right" to religious exemptions from vaccine mandates. (Mot. 16.) But Plaintiffs do not argue otherwise, while Defendants ignore on-point Supreme Court, Tenth Circuit, and clearly established weight of authority from other courts establishing that the *manner* in which they have denied religious exemptions violates Plaintiffs' First Amendment rights. *See Zucht v. King*, 260 U.S. 174 (1922) (finding no substantial question that San Antonio school district had the *power* to impose a vaccine mandate, but finding the challengers "present[ed] a substantial constitutional question" that its application violated the Equal Protection Clause).

Numerous federal courts have recently held that COVID-19 vaccine mandates likely violated the First Amendment as applied to religious objectors. *See Navy Seal 1 v. Austin*, No. 8:21-cv-2429, 2022 WL 534459 (M.D. Fla. Feb. 18, 2022); *Air Force Officer v. Austin*, No. 5:22-cv-0009, 2022 WL 468799, at *11 (M.D. Ga. Feb. 15, 2022); *U.S. Navy Seals 1-26 et al. v. Biden et al.*, 27 F.4th 336 (5th Cir. 2022); *Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021); *Thoms v. Maricopa Cty. Cmty. Coll. Dist.*, No. 2:21-cv-01781-SPL, 2021 WL 5162538 (D. Ariz. Nov. 5, 2021); *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728 (6th Cir. 2021); *Magliulo v. Edward Via College of Osteopathic Medicine*, 3:31-cv-2304, 2021 WL 3679227 (W.D. La. Aug. 17, 2021).

Although last week the Supreme Court granted a "partial stay" in *U.S. Navy Seals 1-26* "insofar as" the injunction prevents the Navy from considering the plaintiffs' vaccination status in making "deployment, assignment, and other operational decisions," *Austin v. U.S. Navy Seals 1-26*, No. 21A477, 2022 WL 882559 (March 25, 2022), three days later, the District Court in the same case granted the plaintiffs' motion for a class-wide preliminary injunction on grounds that the Navy mandate still violates the First Amendment (and the Religious Freedom Restoration Act), and partially stayed its order consistent with the Supreme Court's partial stay last week. *See U.S. Navy Seals 1-26*, No. 4:21-cv-01236 (ECF 140) (N.D. Tex. March 28, 2022).

Additionally, the Supreme Court has made clear that laws burdening religion must be *neutral*, and "the minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see also Trinity Lutheran Church v. Comer*, 137 S. Ct. 2021, 2022 (2017) (laws that "single out the religious" for disfavored treatment "trigger[] the most exacting scrutiny"). But Defendants' September 24 Policy expressly discriminates on its face by providing that students and applicants

19

are categorically ineligible from seeking "*[r]eligious* accommodations," even though they can still seek *medical* accommodations. (V. Am. Cmplt. Ex. 28, p. 238 of 240 (emphasis added).) And it's clear in this Circuit that government cannot intentionally interfere with religious exercise in order to achieve a secular end, *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1144 (10th Cir. 2006), as Defendants have (at best) done here by intentionally refusing to recognize students' *religious* objections in order to achieve maximum vaccination on campus. Thus, Defendants' actions[12] in promulgating and enforcing the September 24 Policy's bar on student religious exercise violate the student Plaintiffs' clearly established rights.

Additionally, laws that target religion in their *operation* are also clearly established violations of religious neutrality, *Lukumi*, 508 U.S. at 534-35, and that's exactly what Defendants have done under the September 24 Policy by continuing to deny (formally or effectively) all Plaintiffs' requests for religious accommodations, consistent with the effect of the more transparently pernicious September 1 Policy.

Further, it's also clear that laws which are not "generally applicable"—i.e., that "treat *any* comparable secular activity more favorably than religious exercise"—and yet that burden religious exercise are also presumptively unconstitutional. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original). The Supreme Court has been clear that an exempted activity is "comparable," for purposes of a COVID-19-related mandate, where that activity "could" have "presented similar risks" of spreading COVID as the forbidden religious activity. *Id*.; *see also Brooklyn Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (invalidating COVID gathering restriction on houses of worship where large stores, schools, and factories were "treated less harshly" even

---

[12] Indeed, the September 24 Policy is likewise "Approved by" Chancellor Elliman; and Zimmer, Holland, and Mediavilla remain his agents in enforcing it against these Plaintiffs. (V. Am. Cmplt. ¶37, and Ex. 28, p. 235 of 240.)

though they "have contributed to the spread of COVD-19"). Yet, for example, under the September 24 Policy Defendants granted exemptions for medical reasons, even though *any* unvaccinated student or employee allegedly poses a fatal threat to Defendants' interest in stopping COVID, while Defendants never granted such favorable treatment to Plaintiffs (and even categorically forbid it for religious-objecting students). (V. Am. Cmplt. ¶183.) Defendants thus have also violated Plaintiffs' clearly established constitutional rights in enforcing the September 24 Policy.[13] Accordingly, the individual-capacity Defendants do not have qualified immunity against Plaintiffs' claims under Counts I and II.

For the same reasons, Defendants necessarily lack qualified immunity from Plaintiffs' Equal Protection claims under Count III, since violating Plaintiffs' clearly established rights to equal treatment under the Free Exercise Clause thereby violates their clearly established rights to the same under the Equal Protection Clause. *See Locke v. Davey*, 540 U.S. 712, 721 n.3 (2004).

## IV. Plaintiffs' Claims Should Not Be Dismissed Pursuant to Rule 12(b)(6) For Failure To State a Claim.

Defendants argue that all of Plaintiffs' claims should now be dismissed under Fed. R. Civ. P. R. 12(b)(6), even though Plaintiffs' First Amendment challenges to the September 1 and September 24 Policies are currently pending before the Tenth Circuit. For the following reasons, Defendants are wrong.

---

[13] Defendants brazenly err in arguing the Supreme Court recently "denied injunctive relief" in *Dr. A v. Hochul*, 142 S. Ct. 552 (2021) and *Doe v. Mills*, 16 F.4th 20 (2021), both of which also involved Free Exercise challenges to state COVID-19 vaccine mandates in healthcare settings. (Mot. 16, 17.) On the contrary, the Supreme Court simply denied *motions for extraordinary emergency injunctions pending appeal* in those cases, which quintessentially says *nothing* about the Supreme Court's view of the merits—i.e., whether it would actually "den[y] injunctive relief." *See Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (Barrett, J., concurring); *see U.S. v. Carver*, 260 U.S. 482, 490 (1923) (even denials of *certiorari* "import[] no expression of opinion upon the merits . . . as the bar has been told many times").

### A. Free Exercise and Establishment Clause Claims.

#### 1. September 1 Policy

Once again, Defendants do not even attempt to defend the September 1 Policy because they say Plaintiffs' challenges to it are moot. (Mot. 25.) For the reasons already discussed, Defendants are wrong—most especially as to Jane Does 2 and 9, who were dismissed solely because of the September 1 Policy and were never re-evaluated under the September 24 Policy (*see supra*). And because the September 1 Policy is so obviously unconstitutional (*see supra*), Plaintiffs' challenges to it under both Count I (Free Exercise Clause) and Count II (Establishment Clause) state valid, non-dismissible claims.

#### 2. September 24 Policy

Plaintiffs have also stated valid claims against the September 24 Policy under both Counts I and II. Indeed, this Policy fails both the "neutrality" and "general applicability" prongs required to avoid strict scrutiny under *Employment Division v. Smith. See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1232-33 (10th Cir. 2009). And even if it satisfies both, it fails rational basis scrutiny, anyway.

As a preliminary matter, Defendants offensively imply that the September 24 Policy has not even had "the effect of *slightly* burdening Plaintiffs' free exercise rights." (Mot. 18 (emphasis).) Here, Defendants once again ignore bedrock Supreme Court caselaw, since it's elementary that a government rule that "force[s] [an employee] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion in order to accept work, on the other hand," is a quintessential substantial burden on religious exercise. *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

**Neutrality:** Defendants note that this Court already deemed the September 24 Policy neutral on its face and as applied. (Mot. 19; ECF 65 at 7.) But Plaintiffs maintain that the

Policy's express prohibition of religious exemptions for students plainly triggers strict scrutiny, because "[w]hen government calls out religion *by name*, that is a clarion sign that we are not dealing with a neutral and generally applicable law," and shows that the government is "target[ing] religion for differential treatment." *Doe v. San Diego Unified Sch. Dist.*, 22 F.4th 1099, 1103 (9th Cir. 2022) (Bumatay, J., dissenting from denial of rehearing en banc) (emphasis in original). Although a majority of the Ninth Circuit ruled otherwise, Judge Bumatay's opinion analyzed a similar school policy expressly forbidding student religious exemptions; was joined by six other Ninth Circuit judges; and is manifestly persuasive here. *See id.*; *accord S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.) (California's COVID restriction "obviously targets religion for differential treatment" by "openly impos[ing] more stringent regulations on religious institutions" and "assign[ing] places of worship their own [category].")

Defendants say the Policy is neutral including because it doesn't distinguish "on the basis of religion versus nonreligion," (Mot. 19)—but that's *exactly* what the bar on student "religious" exemptions does, especially since the Policy simultaneously allows students to seek *medical* exemptions. (V. Am. Cmplt. Ex. 28, p. 237 of 240.) Defendants imply that the purpose of this provision is to protect campus health, etc., and not "the infringement or restriction of religious practices." (Mot. 19.) But, as noted, Defendants may not *intentionally infringe on religious beliefs* for the purposes of a neutral, benign end. *Shrum*, 449 F.3d at 1144; *see also id.* at 1144-45 ("[T]he Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise . . . for secular reasons, such as saving money, promoting education, obtaining jurors, maintaining morale on the police force, or protecting job

opportunities.") (internal citations omitted). Thus, the September 24 Policy's express bar on student religious exemptions is not neutral and triggers strict scrutiny.

Additionally, the September 24 Policy is not neutral as applied to all Plaintiffs, since heightened scrutiny applies "upon even slight suspicion . . . [of] animosity to religion *or distrust of its practices*." *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731 (emphasis added). Courts must "survey meticulously" the direct and circumstantial evidence and determine if the supposedly neutral policy nonetheless targets religion. *Lukumi*, 508 U.S. at 534. "Relevant evidence includes . . . the historical background of the [rule] under challenge, the specific series of events leading to [its] enactment . . . , and [its] legislative or administrative history." *Id.* at 541. Further, "the effect of a law in its real operation is strong evidence of its object." *Id.* at 535.

As pled in Plaintiffs' Amended Complaint, the close nexus between the September 1 and September 24 Policies easily gives rise to the suspicion that the September 24 Policy is likewise predicated on the presumed *illegitimacy* of Plaintiffs' religious objections to COVID vaccination. Notably, the September 24 Policy has the same *effect* as the September 1 Policy—i.e., barring all religious exemptions in clinic and other in-person settings. (V. Am. Cmplt. ¶218.) And yet Defendants only reverted to it under threat of litigation (id., Exs. 4-5, pp. 112-19 of 240), and only actually applied it on December 9, 2021—*after* Plaintiffs filed their Amended Complaint, and on the eve of Defendants' response deadline to Plaintiffs' Renewed Motion for Preliminary Injunction. (ECF 56 at 18-19.) *See* Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1190, 1226 (March 2022) ("If the jeopardized policy is amended or 'replaced' with a policy that functions similarly, the intervening event of threatened litigation is a key piece of information binding the policies together."). Indeed, Defendants continued to demean the legitimacy of Jane Doe 1's religious beliefs under the September 24 Policy, arguing her beliefs were *still*

disqualified thereunder based on Defendants' patently erroneous assertion that drugs like Tylonel and Aspirin (which were developed in the *1800s*) are just as connected to modern aborted fetal cell lines as COVID-19 vaccines. (ECF 15 at 7-8.)

Finally, Defendants' transparently litigation-motivated extermination of previously allowed medical exemptions, in response to Plaintiffs' plea for equal treatment with such exemptees, also gives rise to a reasonable inference that Defendants' application of the September 24 Policy violates religious neutrality.

Thus, Plaintiffs have indeed alleged sufficient facts creating a reasonable inference of a *suspicion* that the September 24 Policy is a "covert suppression of particular religious beliefs," *Brown v. Roy*, 476 U.S. 693, 703 (1986), of the kind explicitly suppressed in the prior Policy.

**General Applicability:** Defendants note that this Court also previously deemed the September 24 Policy to be generally applicable. (Mot. 20; ECF 65 at 9.) But this Court hasn't yet opined on all of Plaintiffs' arguments to the contrary. (*Compare* ECF 61 at 20-22 *with* ECF 65 at 9-12.)

Plaintiffs again contend that Defendants' practice of allowing medical but not religious exemptions is non-generally applicable under *Smith*, *Tandon*, *Brooklyn Diocese*, etc. (*see supra*). Defendants argue that the *process* for *employees* in obtaining medical and religious exemptions is now neutral (i.e., evaluating whether someone has a medical or religious contraindication to vaccination, and then whether an exemption would be an undue hardship) (Mot. 21). But Defendants ignore the fact that *students* are categorically forbidden from any such neutral process for religious exemptions (*see supra*), even though they pose no greater threat of harm than employees. Additionally, Defendants *actually granted* medical accommodations for in-person activity last fall, without extending such treatment to Plaintiffs. (V. Am. Cmplt. ¶183.)

And "[s]lice it how you will, medical exemptions and religious exemptions are on comparable footing when it comes to the State's asserted interests." *Does 1-3*, 142 S. Ct. 17, 20 (2021) (Gorsuch, J., dissenting from non-merits denial of emergency injunctive relief). Thus, Defendants' practice of providing medical but not religious exemptions triggers strict scrutiny.

Moreover, Defendants allow vaccinated Anschutz staff and students to work at affiliated sites with their own exemption policies, and which sites have *granted* exemptions to their own staff. (V. Am. Cmplt. ¶¶11, 16, 74, 124, 186-87.) This despite Defendants' assertion that "*unvaccinated individuals threaten the health and safety of the University's patients, and other employees, students, and community*." (ECF 56 at 9 (emphasis added).) But allowing vaccinated staff and students to work with unvaccinated individuals at other sites plainly undermines "the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. This activity is plainly "comparable" to Plaintiffs' potential religiously exempted activity.

Additionally, patients need not be vaccinated under the September 24 Policy (*see* V. Am. Cmplt. Ex. 28, pp. 235-36 of 240), even though there is evidence that unvaccinated patients contribute to COVID spread as much as or more than providers.[14] Accordingly, this is likewise a comparable exception that triggers strict scrutiny.

Finally, Defendants have now lifted their booster-shot mandate,[15] despite Plaintiffs' evidence that merely a one- or two-shot regimen has a transmissibility effectiveness rate against the Omicron variant of *0% to 20%*. (ECF 61-3, French Decl. at ¶18.) As such, this practice also allows activity "comparable" to Plaintiffs' potential exemptions and triggers strict scrutiny.

---

[14] Colin Woodard, "Unvaccinated patients and employees driving COVID outbreaks in Maine hospitals," Portland Press Herald, Oct. 21, 2021, https://www.pressherald.com/2021/10/21/ unvaccinated-patients-and-staff-still-driving-hospital-outbreaks/.
[15] https://www.cuanschutz.edu/about/leadership/chancellor/communiques/updating-campus-protocols-with-covid-19-on-decline.

**Strict Scrutiny:** To satisfy strict scrutiny, Defendants must demonstrate a compelling interest "in denying an exception" to "*particular* religious claimants," *Fulton*, 141 S. Ct. at 1882 (emphasis added), but Defendants assert only a *general* interest in stopping COVID. (Mot. 24.) And Defendants must show the restriction "is the *least restrictive means*" of achieving that interest. *Thomas v. Rev. Bd. of Indiana Sec. Div.*, 450 U.S. 708, 718 (1981) (emphasis added).

Here, Defendants lack a compelling interest because they cannot show that Plaintiffs' "religious exercise is more dangerous than" comparable exceptions "even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297. That includes medical exceptions, in-person work alongside the unvaccinated at affiliate sites, unvaccinated patients, and un-boosted students and staff. Additionally, Defendants must show that burdening Plaintiffs' First Amendment rights is "actually necessary" for achieving their goals, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011), but here one of Defendants' own experts informed this Court that PPE "has been quite effective in preventing the spread" of COVID. (ECF 56-15 at ¶7.)

Additionally, Defendants cannot show vaccination is the *least* restrictive means, since their own affiliates allow exceptions for direct-care providers, as does the Colorado Board of Health.[16] Indeed, Plaintiffs submitted a "Group Exhibit" with declarations from 31 exemplary health care witnesses around the country who received religious exemptions and have continued to work. (V. Am. Cmplt. 191, and Ex. 20, pp. 159-220; *see also* ECF 27-1 (noting 200 exemptions granted from similar mandate at the University of Nebraska Medical Center in Omaha, Neb.).) *See Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 735 (6th Cir.

---

[16] David Gartenberg and Laura Spector, "Colorado's Vaccine Mandate for Healthcare Providers Remains in Effect Despite Stays to CMS Vaccine Mandate," Littler, Dec. 15, 2021, https://www.littler.com/publication-press/publication/colorados-vaccine-mandate-healthcare-providers-remains-effect-despite.

2021) (university's denial of religious exemptions to plaintiff students not narrowly tailored where "several other universities grant exemptions from their COVID-19 mandates").

Thus, the September 24 Policy cannot survive strict scrutiny.

**Rational Basis Scrutiny:** Nor can it survive even rational basis scrutiny. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1033 (10th Cir. 2007). Defendants say the September 24 Policy "seeks to maximize the number of individuals at the Anschutz Medical Campus who are vaccinated, [and thus is] rationally related to the University's asserted goal of protecting the health of *Anschutz Medical Campus* patients, employees, students, and other community members." (Mot. 24 (emphasis added).) Yet that goal is utterly and irrationally attenuated to the September 24 Policy's application to three Plaintiffs who worked *entirely away from the Anschutz Campus* (Jane Does 1, 5, and 11). This is especially true as to Jane Doe 1, who worked at Children's Hospital in Colorado Springs more than 60 miles away and whose supervisor acknowledged that her termination would likely only hurt sick children and other patients in need. (V. Am. Cmplt., ¶16; ECF 19 and 19-1.) And Jane Doe 11 worked entirely at the Colorado Mental Health Institute in Pueblo, more than 100 miles away, and *received a religious exemption* from the Colorado Department of Human Services to continue working there—yet Defendants still fired her, thus preventing her from staying at the Institute. (V. Am. Cmplt. ¶¶26, 124-29.)

Moreover, the fact Defendants still allow their students and employees to work among the unvaccinated at affiliate sites, and the fact they've lifted the booster mandate on campus, only further means they don't have a rational basis in barring these 17 Plaintiffs from the

Anschutz community. The September 24 Policy therefore fails rational basis review. Plaintiffs'

First Amendment claims against that Policy in Counts I and II thus cannot be dismissed.[17]

### B.     Americans with Disabilities Act.

While Plaintiffs must have a "disability" in order to state an ADA claim, the ADA

"broadly defines 'disability'" to include "being *regarded as* having such an impairment."

*E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1161 (10th Cir. 2006) (emphasis added) (quoting 42

U.S.C. §§ 12112(a) and 12102(2)). "The 'regarded as' standard is met" when Defendants

"*mistakenly believe*[]" that Plaintiffs have an impairment. *Id.* (emphasis added). Defendants say

being unvaccinated is not an "impairment" and "has no bearing on an individual's ability to

pursue major life activities." (Mot. 27.) But to establish "regarded-as" liability, Plaintiffs need

only allege they have "been subject to an action prohibited under this chapter because of . . . [a]

*perceived* physical . . . impairment *whether or not the impairment limits or is perceived to limit* a

*major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). This provision is part of the

2008 ADA Amendments Act (which Defendants entirely overlook) that expanded covered

entities' ADA liability. *Adair v. City of Muskogee*, 823 F.3d 1297, 1305-06 (10th Cir. 2016); *see*

*also id.* at 1306 (a "plaintiff no longer needs to plead and prove that the actual or perceived

impairment substantially limited one or more major life activities"). Further, the ADA also now

defines "major life activity" to include "the operation of a major bodily function, including . . .

functions of the immune system." 42 U.S.C. § 12102(B).

---

[17] For the same reasons, because the religious liberty protections of the Colorado Constitution parallel those of the First Amendment, *see Craig v. Masterpiece Cakeshop, Inc.*, 2015 COA 115 ¶¶98-99, 370 P.3d 272, 292-93, *rev'd on other grounds by Masterpiece Cakeshop, Ltd.*, 138 S. Ct. 1719, Plaintiffs have stated valid state constitutional claims in Count V, as well. (V. Am. Cmplt. ¶¶258-265.) Also for the same reasons, Plaintiffs have stated valid claims under the Equal Protection Clause, since it likewise protects them from arbitrary classifications (indeed, *Christian Heritage Academy* is an *Equal Protection* case, 483 F.3d at 1033).

Defendants say Plaintiffs have alleged discrimination only based on their religious status, not their vaccination status (Mot. 27), but Plaintiffs *also* specifically alleged "Defendants have (erroneously) treated the absence of COVID-vaccination generated antibodies in Plaintiffs as a physical impairment." (V. Am. Cmplt. ¶253.) Indeed, it is Defendants' position throughout this record that they have acted based only on Plaintiffs' vaccination status (including whether it would be an "undue hardship" to the University) and not their religious beliefs. (Mot. *passim*.) Further, Plaintiffs' perceived impairment is not "transitory or minor" (which is defined as having a duration of six months or less), and the employer was aware of the perceived impairment at the time of Plaintiffs' extermination. (Id; *see also, e.g.*, V. Am. Cmplt. Ex. 5, pp. 117-119 of 240 (purporting to disqualify Dr. Jane Doe 1 for being unvaccinated).) *See Adair*, 823 F.3d at 1306. Thus the only question is whether Plaintiffs were "qualified individuals." *Id.*

But Defendants have not sought dismissal on grounds that Plaintiffs are not "qualified individuals" and have thus forfeited that issue at this stage. (Mot. 26-28.) Nonetheless, "qualified individuals" are employees who "can perform the essential functions of the employment position" with or without reasonable accommodation. *Id.* at 1306-07. (*See* Mot. 26-28.) And here, by way of example, many of these Plaintiffs were *explicitly* deemed qualified at their off-campus physical places of work, with reasonable accommodations. (V. Am. Cmplt. ¶¶16, 26, 97, 124-29; ECF 19-1.) Indeed, all Plaintiffs have pled sufficient facts showing they are qualified (which is often a jury issue anyway, *see Heartway*, 466 F.3d at 1165), and thus Plaintiffs have stated viable ADA claims under Count IV, as well.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

_/s/ Peter Breen_
Peter Breen
Martin Whittaker
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
_Counsel for Plaintiffs_

_/s/ Michael G. McHale_
Michael G. McHale
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
_Counsel for Plaintiffs_

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
_Counsel for Plaintiffs_